1  Todd Ashker, C58191

2  Danny Troxell, B76578

3  P.O. Box 7500/DI-SHU

4  Crescent City, Ca. 95532

5  Plaintiffs, In pro-se #

6

7

8

9                THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     OAKLAND-DIVISION

                        CV 09    5796

12

13  TODD ASHKER and DANNY TROXELL,          CASE NO: _____ (PR)

14              Plaintiffs,

15      VS.                                  42 U.S.C. Section 1983

16                                           Civil Rights Complaint

17  ARNOLD SCHWARZENEGGER, MATHEW CATE,      And Demand For

18  RODERICK Q HICKMAN, JEANNE WOODFORD,     Jury Trial

19  JOE McGRATH, RICHARD KIRKLAND,

20  ROBERT HOREL, FRANCISCO JACQUEZ,         E-filing

21  WILLIAM BARLOW, R.L. JOHNSON, D.W.

22  BRADBURY, J. McKINNEY, ROBERT MARQUEZ,

23  R. RICE, JOHN HARRISON, B. THORNTON, G.H. WISE,

24  A. HERNANDEZ, ROBERT DOYLE, SUSAN

25  FISHER, ROBERT HARMON, HOLLIS

26  GILLINGHAM, D. SMITH, S. TUCKER, AND

27  DOES 1-20, inclusive,

28              Defendants.



# I.

## JURISDICTION & VENUE

1.) This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivations, under color of state law, of rights secured by the Constitution of the United States. Jurisdiction is based upon 28 USC Sections 1331 and 1343. Plaintiffs' seek damages, as well as declaratory relief [pursuant to 28 USC Sections 2201 and 2202].

2.) Venue is proper under 28 USC Section 1391(b)(2) because the unlawful acts and omissions alleged occurred primarily within the Northern District of California, in the County of Del Norte. Plaintiffs' respectfully request a jury trial on these allegations.

# II.

## PARTIES

3.) Plaintiffs Todd Ashker and Danny Troxell are both serving life terms, with the possibility of parole, who have been confined at Pelican Bay State Prison [PBSP] and housed within the Security Housing Unit [SHU] during the events described in this Complaint.

4.) The Defendants are state officials responsible for the policies, practices and procedures by which California operates the prison system, including inmate care and wellbeing, classification(s) and rehabilitative programming opportunities; as well as lifer parole policies, practices and proceedings. Defendant Arnold Schwarzenegger is Governor of the State of California and Chief Executive of The State Government. Mathew Cate is the Secretary of the California Dept.

1. of Corrections and Rehabilitation [CDCR]. Defendants Roderick Q. Hickman
2. and Jeanne Woodford are former Secretary(s)/Directors of CDCR. Defendants
3. Joe McGrath, Richard Kirkland, and Robert Horel are each former P.B.S.P.-
4. Wardens/SHU Administrators. Defendant Francisco Jacquez is current acting
5. PBSP-Warden. William Barlow is PBSP-Litigation Coordinator. Defendant R.L.
6. Johnson is PBSP-D-SHU Captain. Defendant D.W. Bradbury is PBSP-D-SHU Assoc.
7. Warden. Defendants' J. McKinney, Robert Marquez, R. Rice, John Harrison, and
8. B. Thornton, G.H. Wise are each current/former gang investigators for [CDCR-PBSP]. Def.
9. A. Hernandez is a corrections officer [C.O.], at PBSP-DI-SHU.
10. Defendant Robert Doyle is current chairman of the Board of Parole Hearings
11. [B.P.H.]. Defendants Susan Fisher, Robert Harmon, Hollis Gillingham, Dennis Smith,
12. and Steven Tucker, are current/former [BPH] Commissioners.
13. Defendants' Does 1-20, are each responsible in some manner for the U.S.
14. Constitutional violations and damages to plaintiffs alleged herein. Their true
15. names and identities and capacities are presently unknown, and plaintiffs'
16. will seek leave to amend this complaint to add their true names once they are
17. ascertained.
18.   5.> Defendants Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez,
19. Barlow, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, Wise and
20. Hernandez, and Does 1-20, are each sued individually and in his or her
21. official capacity [for damages and injunctive relief].
22.   6.> Defendants Schwarzenegger, Doyle, Fisher, Harmon, Gillingham, Smith, and
23. Tucker, are each sued in his or her official capacity [for declaratory and injunctive
24. relief].
25.   7.) Each and all of the Defendants have acted, and those still employed continue to
26. act, under the color of authority and state law at all times relevant to this complaint.

## III. PRELIMINARY STATEMENT & INTRODUCTION OF FACTS

8.> This is a 42 U.S.C. Section 1983 Civil Rights action filed by Todd Ashker and Danny Troxell, who are state prisoners serving "term to life" sentences in the California Department of Corrections and Rehab. [hereafter, the CDCR], at Pelican Bay State Prison's Security Housing Unit [hereafter, the PBSP-SHU]. Plaintiffs' are challenging conditions of their confinement [seeking damages, injunctive, and declaratory relief], and, policies and practices of the Board of Parole Hearings [hereafter, the BPH] [seeking injunctive and declaratory relief], alleging the Defendants have violated their rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

9.> These claims were originally dismissed without prejudice for failure to fully exhaust all available administrative remedies in Ashker, Troxell v. Schwarzenegger, et. al., U.S.D.C.-N.D.Cal, No. C04-1967 CW

10. Many of these claims were refiled on Aug. 11, 2005, based on the plaintiffs' belief that the claims had been fully exhausted per. the law in effect at that time [e.g., Ngo v. Woodford, 403 F.3d 620, 626 [9th Cir. 2005]; On June 14, 2007, the Court dismissed the claims without prejudice again, for failure to fully exhaust administrative remedies as to the Fifth, Eighth, and most of the Fourteenth Amendment claims [per. Woodford v. Ngo, 548 U.S. 81, 88 [2006]); and on March 25, 2009, the Court granted defendants summary judgement on remaining claims [re: Ashker's due process on his 2001, 2004 (SHU) retention, and 2003 parole hearing issues][See: Ashker, Troxell v. Schwarzenegger, #C05-3286 CW]

11.> Plaintiffs' have fully exhausted all of their available

<4>

administrative remedies, as to all claims presented herein, via use of
the CDCR - 602 Appeals process; and fact that there are no available
administrative remedies to challenge the (BPH) issues [per 2009-
repeal], thus permitting this action to now proceed on the merits.

12.) This action arises from the defendants policies, practices, acts
and omissions, which have caused plaintiffs to be wrongly retained
in (SHU) indefinitely, for more than (23) years now, based on alleged
prison gang activity and association; and the (BPH) related, unwritten
"No parole policy, and issuance of multi-year deferals", based on CDCR-
gang classification and related (SHU) status.

13.) This action includes claims arising from defendants policies,
practices, acts and omissions, regarding First amendment access to the
courts, and free speech issues [and denial of books], as follows:

(a) Legal Mail [ failure to process incoming and outgoing legal-
mail; opening incoming legal mail outside of plaintiffs'
presense; failure to mail and deliver plaintiffs' incoming and
outgoing legal-mail. All of which harmed plaintiffs' civil action(s),
and has inhibited, chilled, and interfered with their confidential
communications with their attorneys]

(b) Legal-Mail from approved inmate witnesses [ confiscating legal
mail responses from authorized inmate witnesses in order to
interfer with and harm plaintiffs' civil-actions # C05-3286 CW., and
[C05-3759cw]
which did cause harm, and has inhibited, chilled, and interfered
with their communications with inmate witnesses; and refusal
to permit more than one contact with inmate witnesses, or the
return of said witnesses legal document exhibits, copy of declaration,

<5>

or any other reason, while litigating the entire case [ an inmate litigating an active case, pro-se, and authorized to conduct discovery, can request approval to contact an inmate witness on a "one time only" basis. After this he is not permitted to send the witness a copy of his declaration, nor can he return any of the witnesses exhibits. No follow ups are allowed], causing harm to cases, and inhibiting, chilling, and interfering with their litigation (s) and communications with inmate witnesses]

(C) Denial of Books re: written adult erotica [containing no pictures]

## IV  FACTS

### Facts Pertaing to Plaintiffs' Placement and Indefinite Retention in the Security Housing Unit

### (a) General History & Applicable Rules and Regulations

14.) As detailed below, plaintiffs have been continuously confined in (SHU) For more than (23·24) years.

15.) Ashker, has been classified as an A.B. member since 1988, based on unsubstantiated allegations From confidential inmate informants claims to prison staff. He denies this gang affiliation.

16.) Ashker, has been subject to indefinite (SHU) confinement since January 1992, based on the CDCR·GANG LABEL; he has never been found guilty of committing an illegal gang-related act.

17.) Troxell, has been classified as an A.B. member since 1985, based on unsubstantiated allegations From confidential inmate informants claims to prison staff. He denies this gang affiliation.

〈6〉

18.) Troxell, has been subject to indefinite (SHU) confinement since October 1985, based on the CDCR-gang label; he has never been found guilty of committing an illegal gang-related act.

19.) Between October 1985 and June 1999, CDCR-did not have any legally promulgated rules and regulations pertaining to indefinite (SHU) confinement.

20.) Between Oct. 1985 and June 1999, inmates on indefinite (SHU) status, based on CDCR's gang-classification, only left (SHU) via parole, death, or debriefing.

21.) "Debriefing" out of (SHU) requires an inmate to provide prison staff with "sufficient veritiable information about other gang affiliates, so they will no longer accept him back" [per Defendants' policy]; this amounts to the inmate being a "known informant" subject to serious danger [defendants use this as the reason for not formally disclosing the informants' identity, and actual allegations, as noted in Lira v. Cate, USDC-ND Cal #C00-0905 SI, Findings of Fact, p33, fn.27, Order of Sept.30,2009; yet "successful debriefing" requires the inmate to become a "known informant"

22.) On June 25, 1999, a Sacramento Superior Court, held that the CDCR-gang validation, and related placement, retention, and manner of obtaining release from (SHU) [re: alleged gang affiliates], were underground rules, not legally promulgated per. Admin. Proc. Act [A.P.A.], and thereby unenforceable [illegal].

23.) In response, the CDCR enacted several rules into CCR-Title15/per. A.P.A. requirements, effective Aug. 19-30, 1999]; they are vague, arbitrary, and contradictory [esp. taken in context to applicable statutes, and related rules] examples being:

(A) CCR-Title 15 §§ 3000 [defining "Gang"], and 3023 [defining "Gang Activity"], when taken together in context, define "gang activity" as, ... when one ..., knowingly commits acts of misconduct classified "serious" per. CCR-Title 15 § 3315 [unlawful acts], on behalf of a gang. This is supported by the fact-these (2) Tit. 15 sections, are per. to Cal. Penal Code Section 186.22

⟨7⟩

[re: sanctionable gang activity, and which the Cal. Supreme Court has interpreted as requiring conviction for felonious gang-related act(s); not for innocuous association activity. See, e.g., People v. Castaneda (2000) 23 Cal. 4th 743, 749) And, in settling Castillo v. Alameida, USDC-N.D. Cal #94-2847, in 2003-2004, defendants Hickman and Woodford stipulated to this interpretation [based on information and belief]

Ⓑ CCR-Title 15 §§ 3312 (A)(3) and 3315 (A)(2) mandate that any serious misconduct constituting a violation of CDCR rules, or law, which is supported by credible evidence, ..., shall be reported on a CDC-115 Rule Violation Report [RVR]". This includes "conspiracy(s)".

Ⓒ CCR-Title 15 § 3023 "Gang Activity" definition incorporated subsection (b) "Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons", via legal promulgation [Filed 8-12-99] This has been the pretext used to justify placement, and indefinite (SHU) retention, of a few hundred inmates classified as active prison gang members and associates [begining in October 1985, with Troxell and a few others. While allowing others out of (SHU) to the Gen. Prison Population]

Ⓓ Initially, the selective segregation of certain inmates classified as gang affiliates was per. CCR Title 15 § 3335 (a) [i.e., the inmates presense in general population presents an immediate threat to safety and security]. Begining the end of (1986) CDCR- claimed all inmates classified as prison gang affiliates constituted "a severe threat to

⟨8⟩

safety and security," mandating placement and retention in (SHU) until they paroled, debriefed, or died. However, this has always been applied selectively, and currently there are tens of thousands of active gang affiliates throughout the CDCR-system, in general prison population [based on info. and belief eg., statements in the Madrid case; statements by CDCR staff during legislative hearings and the media; and CCR TITLE 15 § 3378(c)]

(E) CCR Title 15 §§3341.9 (c)(2)(1)(2) were legally promulgated on [8.12.99] and specify, an inmate on indeterminate shu term shall be reviewed by a classification committee at least every 180 days for consideration of release to a general inmate population [3341.5 (c)(2)(1)]; and, "Except as provided at section 3335(a), section 3378(d) and subsection (c)(5) [re: active gang affiliates in gen. population, and dropouts], a validated prison gang affiliate is deemed a threat to safety and security and will be placed in (SHU) for an indeterminate term" [3341.5 (c)(2)(2)] Again, this is vague and contradictory as shown by:

   1. The 180 Committee reviews are a [SHAM] because they have NO AUTHORITY to release the inmate from (SHU) unless he has previously, successfully debriefed, or deemed inactive, after (6) years of zero documented gang-activity, and per. LEIU authorization [3341.5 (c)(4)-(5), 3378(c)] [as noted by Court in Lira, supra, findings of fact & conclusions of Law, p42, re: ICC reviews are not meaningful]

   2. On Aug. 30, 1999, CDCR legally promulgated another avenue for an inmate serving an indefinite (SHU) term to gain release to general prison population called "inactive status", and applied differently to inmates classified as active gang affliates in Gen. Prison Pop., and those in (SHU)... inmates in gen. population can meet "inactive status" going (2) years without any documented gang-activity;

⟨9⟩

whereas, (SHU) inmates are required to have (6) years of zero documented gang-activity [compare CCR Title 15 § 3378(d) and (e)] Thus, there are thousands of inmates classified as active gang-affiliates who are not in (SHU) per. 3341.5(c)(2)(a), who are treated differently re: "inactive status" too[per. 3378(d); and based on info and belief, see above page # 8-9] Also, def's use innocuos activity among SHU inmates own race to claim active [yet cross race activity is not]

(F) CCR-Title 15 § 3341.5 (c)(3) specifies an inmate cannot be retained in (SHU) beyond (11) months, unless a classification committee determines retention beyond this time period is required for one of the following reasons "... (B) Release would severely endanger the lives of staff, inmates, or the security of the institution, ..." This is the reason given at all of plaintiffs 180 day reviews - based on the "gang-label"- for the past (24) years. And it is applied arbitrarily, as summarized in (E) above; the criteria for being an active gang affiliate in general prison population is not stated in CCR Title 15, or anywhere else, that plaintiffs have heard of.

(G) As referenced above, on August 30, 1999, the CDCR legally promulgated an alternative avenue for inmates serving indefinite (SHU) terms for gang validation, called "inactive gang status." For a (SHU) inmate, this requires the inmate to have gone (6) years, without any documented gang-activity; and, the LEIU's recommendation to the committee for (SHU) release [per. CCR-Title 15 §§ 3378(e)(4); and 3341.5(c)(5)(6)] Defendants' definition of sanctionable "gang-activity" meriting denial of inactive status is ... unsubstantiated allegations re: illegal gang-related activity from confidential informants [supported by fact that such allegations result in zero CDC-115 RVRs [see above (B)]; and, innocuous activity [inspite of being violative of law, see above (A) for examples]

⟨10⟩

(H) The alternative to debriefing one's way out of (SHU), refered to as "inactive status", is also a SHAM; it is applied arbitrarily [as summarized in (E) above], and used and abused by the defendants in their efforts to coerce inmates to become informants [e.g., releasing a small (number of long term SHU inmates to Gen. Population for a brief time, then telling them, "...your name's come up again, you can debrief now, and thereby stay in G.P., or go back to SHU for at least (6) more years". Noteably, this "alternative" is not available to plaintiffs. See Below para's[*] 64 A-C]

[b] General Facts Re: CDCR-PBSP Use of Informants [Debriefing]

24.) Once an inmate is validated as a prison gang affiliate, it is virtually impossible to undo a wrongful validation. This is because subsequent institutional classification committee reviews [ICC], and the CDCR-602 Appeals process, are both perfunctory - procedural reviews [zero substantive review is done. e.g. Lira, supra, Order, at pp. 40-41, per. Def. McGrath's trial testimony]

25.) That Plaintiff's validations are based on statements from confidential inmate informant-debriefer's [and "innocuous activity", staff claim was gang activity] [innocent assoc. with their race is "gang-activity", cross-race is not]

26.) Defendants claim they have to keep the identities, and specific details of the statements of confidential informant-debriefer's secret, because regardless of how many years have passed, divulging this information will place the informant, and his family members at risk of retaliation [e.g. Lira, supra, Order, p.[*] 33 Fn.27]

27.) Not knowing one's accusser, or the specific allegations, make it virtually impossible to defend against.

⟨11⟩

28.) Defendants refuse to formally divulge "confidential inmate informants" identities [and statements] due to safety issues [Id. para #21, and #26]; however, they require the "debriefer" to provide information about the gang and affiliates, to the extent that it has an adverse impact on them, so they will not accept him back [per. policy. practice, admitted by Def. Marquez, and other CDCR-staff]

29.) Thus, Defendants require the "debriefer" to become a "known informant" against other gang affiliates [knowing this puts the inmate and his family in serious danger – potentially for life]; while at the same time, refusing to formally disclose the identity, and specific allegations made [per. professed concern about safety] thus prejudicing plaintiffs ability to defend themselves.

30.) Defendants are not able to protect inmate informants, or their families, after they have debriefed out of (SHU); and they don't bother to keep track of the number of "debriefers", and their families, who have been attacked and threatened in retaliation [and there have been many; based on info. and belief, e.g. incident reports, publicized accounts]

31.) In addition to the above problems with the "debriefing" requirement for (SHU) release [and use of debriefers' stories to continue to keep others in (SHU) indefinitely] has even more problems, examples being:

Ⓐ The Defendants are aware that the restrictive (SHU) conditions have been the cause for many inmates to become so desperate, that they will, and have, agreed to become informants [debriefers], willing to say anything, about anyone [and whose debriefings are "coached along" by gang staff; and whose stories are largely based on rumors, innuendo, imaginative elaborations – provided initially by CDCR-staff, other inmates, published legal cases, news and magazine

⟨12⟩

articles, and television programs [based on info., belief and common knowledge. e.g., Nov. 2002 News program, with plts. photos, & alleged conspiracies]

(B) Inmate informants are notoriously unreliable, manipulators and opportunists [based on info. and belief, and common-knowledge. e.g., published legal cases, numerous studies, and the demonstration by notorious Los Angeles Jail informant Leslie Vernon White, on television "60 Minutes" News program in 1988]

(C) CDCR-PBSP Defendants, and their agents, assist debriefer-informants [with personal-knowledge/credibility problems, due to isolative nature of PBSP-SHU), by strategical placement near inmate-targets [e.g. those up for inactive review] [i.e., in adjacent holding-cells at clinics, transport bus, visit room; or shifting them to different cell block cells], so the informant has the movement sheets, and housing records, to support a claim that... 'so and so told me this personally' [based on info., belief, and common knowledge, and witnessing such antics countless times over last (20) years]

(D) CDCR-PBSP Defendants, and their agents, routinely claim that confidential inmate informant/debriefs, meet the criteria for reliability [per. CCR-Title 15 § 3321], when in fact their reliability with respect to claims about [a specific inmates activity] was not even tested [and this has occurred many times, with "sources" used against Plaintiffs, over the course of the past (25+) years, to keep them in (SHU) indefinitely. Based on info., belief, and personal experience]

(E) CDCR-PBSP Defendants, and their agents, give no credence to plaintiffs' points; directly denying, and disputing, the scanty description of these informant allegations; nor do they substantively subject said informant claims to further, indepth investigation based on plaintiffs'

〈13〉

specific points to evidence disputing the general-scanty disclosures. [Based on info., belief, and personal experience; and Det. McGrath's testimony in the <u>Lira Trial</u>. <u>See</u>: <u>Lira, supra</u>, Order pp.# 40-41 <u>examples</u>]

[C.] <u>General Facts RE: Plaintiff Todd Ashker</u>

32.) Plaintiff Ashker has been incarcerated in the CDCR prison system since January 1985, per: six year term imposed after pleading guilty to burglary.

33.) He has been housed in various (SHU) units since August 1986; this (SHU) placement was originally for determinate terms, after being found guilty of violating rules.

34.) Between 1985 and 1987, Ashker was not provided with any notice, of any kind, that "association" with prison gang affiliates would result in permanent, indefinite (SHU) status, until the inmate agreed to become an informant [via debriefing]

35.) On or about May 22, 1987, Ashker attended a committee hearing to review his (SHU) status. The committee noted that he had <u>no</u> gang-affiliations; and a good candidate for release to General Prison Population when his (SHU) term was up in July 1987.

36.) On May 25, 1987, C.S.P.-S.C. [AKA: New Folsom] SHU- prison staff charged Ashker with the murder of inmate Murphy, occurring in (SHU) that day. In March 1988, he was arraigned on a first degree felony murder charge.

37.) In March 1990, trial commenced on the first degree felony murder with use of a knife. And (2) prior felony convictions [facing 36 yr. to life]

38.) The prosecutor presented the case as … " Ashker running into Murphy's cell and stabbing him to death, with a knife he'd gotten in there

⟨14⟩

somehow, ... with assistance from Murphy's cell-mate Tanner"[who was not charged because, ... the prosecutor's office did not believe he personally stabbed Murphy']; and this was done,"...for whatever reason".[informing the court during the trial, that...he, didn't know for sure what the motive may have been."]

39.) Ashker maintains that Murphy's death was not intentional, and occurred while he was defending himself from Murphy, ... who had ambushed Ashker with the knife.

40.) In April 1990, the jury acquitted him of First degree murder; and guilty of second degree murder, with use of a knife. The court Found (1) of the (2) prior Felonies true, and impossed a total term of 21yr. to-life.

41.) On May 2, 1990, C.S.P.-s.c., transfered him to P.B.S.P.-SHU, where he has remained ever since [except for a few temporary transfers to c.s.P-s.c., and San Quentin, for medical, and civil court proceedings.].


<u>Ashker's Initial Gang Validation</u>


42.) Ashker was originally validated as a member of the Aryan-Brotherhood prison gang on <u>May 23, 1988</u>. The basis for this validation was the submission of (12) confidential memos, from Gang Investigator Rosario at CSP-s.c., to Sacramento cocr-ssu.[on <u>March 22, 1988</u>]

43.) This original validation was done without giving Ashker any notice of the allegations against him; nor was he interviewed, or given any opportunity to dispute the allegations.

44.) Ashker was not even notified that he had been validated until months later [possibly not until late 1988 early 1989], when he was given a copy of a chrono, stating he was an A.B. member, without reference to

evidentiary basis [in 1989, he denied being an A.B. affiliate in 602 Appeal, and throughout court proceedings on the Murphy case; denies it to this day].

45.) As stated above [para #33], on [5·22·87] CSP-SC Administrators noted Ashker had no gang affiliations". His position is that the original validation was without procedural due process [and he has been denied substantive due process ever since], and came about as follows.

 Ⓐ On 5·25·87, Ashker was charged with the murder of inmate Murphy, by CSP-SC prison staff. Murphy was classified by CDCR as a long time A.B. member, and rumors immediately circulated that his death was an "A.B. hit."

 Ⓑ On August 6, 1987, CSP-SC, B-facility (SHU) opened the renovated B1-A section [called Bedrock]; wherein all metal had been removed from the (24) cells, the bunks replaced with cement slabs, Inmates were only allowed a small amount of legal material and (1) book – no other property or canteen was allowed. Ashker was placed there that day, behind the Murphy incident. There were (15) other white inmates placed there that day too, most behind A.B. classification.

 Ⓒ In March 1988, Ashker was arraigned in Sacramento Co. Muni. Ct. on the Murphy case. He proceeded pro-per up to the point of the March 1990 trial. It was during discovery that he learned [CDCR-theory] was that A.B. leader, Norris, had ordered Ashker to kill Murphy, based on his belief Murphy had turned informant. This theory was bolstered by confidential inmate informant Steve Larson's, June 1987 storey, and confidential inmate informant Robert Rowland's Nov. 1987 storey [both of whom were seeking a way out of CSP-SC-SHU; and in Rowland's

case, out of Bedrock and prison, via protective custody - which requires informant status]

Ⓓ The (2) informants *claimed Ashker and Tanner killed Murphy per. order from Norris [an A.B. hit]*. This was the only information given to Ashker [re: A.B. affiliation link, between 1987 - 1994 (??)].

Ⓔ The trial began in March 1990, the prosecuter declared that the <u>only</u> <u>evidence</u> to support [CDCR - A.B. hit theory/were *inmate informants* - who he was <u>not</u> using because he did not find them *credible*. And he never argued, or put on any affirmative evidence of an 'A.B. hit' [informing the court, and jury, he didn't know what the motive was]. Norris testified to begining the "debriefing" process in <u>Jan. 1990</u>, and passing a lie detector test - including questions re: Murphy case [i.e. he gave no order, and had no ill will against Murphy] and that he sent Murphy the knife, he requested to use on Ashker, over a personal dispute.

Ⓕ Ashker's (SHU) term for rule violations was set to expire in (1992), and in January 1992, PBSP - Committee, placed him on "indefinite (SHU) status", based on the A.B. label [the basis of which was not disclosed] Ashker did a 602 Appeal, denying gang-affiliation, and requested release to a G.P. to be able to program. This was denied at all levels of review.

Ⓖ In response to Madrid, the gang-validations of all (PBSP - SHU) inmates were reviewed in 1995. In 1994 -1995, *Ashker received* copies of the 1030 - confidential disclosure forms [re: 1988 validation], a few of which were specific enough to challenge via 602 Appeals, to no

avail [not surprising, considering such receive no "substantive" type of review, per Lira Order, supra] And the SSU's review resulted in rejection of (4) of the (12) 1988 documents [per Madrid Court directive i.e. cumulative] and "re-validated" Ashker, again, without opportunity to be heard.

46.) Ashker has rarely attended any of the 180 day committee reviews of his indefinite (SHU) status, because they have no authority to change his status to G.P., absent his successful debriefing [beforehand]; per what administrators told him when he arrived at PBSP-SHU in 1990 [the only way you'll leave is to "parole, die, or debrief"] and the Title 15 § 3341.5; and comm. chronos [pre-printed forms, that all state the same thing]

47.) The committees, C.S.R.'s reviews, and 602 Appeals process, do not provide any substantive due process re: gang-validation challenges, per Lira Court trial testimonies of Defendant McGrath, and others, supra, and exemplified by the following:

Ⓐ In 1999 Ashker received a chrono by CSR Morton, upholding the (ICC) recommendation for continued indefinite (SHU) status, based on 1995 re-validation [per (8) documents from 1988), on the basis of ... "continuing association and participation in criminal conspiracies that threaten safety-security."

Ⓑ Ashker filed a detailed 602 Appeal, challenging this determination, and asking that evidence of his personal involvement in any criminal conspiracies be produced [pointing out he'd received no 115 RVR's for any conspiracies], and disputing the items used in 1988, wherein conf. inmate informants claimed he had committed an illegal act, of

〈18〉

which there were the following [with 602 Appeal (response to each]

1. Claimed Ashker stabbed inmate in early 1986, on Folsom G.P. ["to make bones for A.B"]; informant made claim around April 1986 - Yet, Ashker was on G.P. until August 1986, and has never been charged [this was not even disclosed to him until 1994 or '95] [Ashker's points ignored]

2. [Claims] Ashker killed Murphy for A.B.; Ashker submitted some of the trial transcripts, wherein the prosecutor stated he was *not* using them due to credibility problems [response: CDCR criteria is different than prosecutor's]

3. Claimed Ashker assigned to hit inmate Estem; however, he never touched Estem [Ashker's points ignored]

4. Ashker requested each source to be investigated re: credibility issue(s) [this was denied]

each level denied this appeal, without any *substantive review* [per. Lira, supra; and responses denying Ashker's request for such review]

## Ashker's Re-Validations & Denial of "Inactive Status"

48.) On August 30, 1999 the CDCR legally promulgated the alternate avenue for validated gang affiliates to gain their release from (SHU), refered to as "inactive status" [see above para's #23 E-H describing this change in policy, how it works, and allegations that it is applied arbitrarily, and is a SHAM]

49.) As of 1999, Ashker had well over the required (6) years in, without documented allegations of gang-activity (the last ones being the 1988-submissions referenced above); however, he was not reviewed until 2001.

<19.>

50.) Ashker first became aware of the "inactive status" policy in (2001), and when his counselor informed him he was scheduled for (ICC) committee review in July 2001, he submitted a written request to be put up for "inactive status" [while clarifying he was never "active" because he was never affiliated in the First place]

51.) An "investigation" into Ashker's alleged gang-status was conducted by Defendant G.H. Wise on Aug. 1, 2001.

52.) On Aug. 2, 2001, Wise issued a CDC-128B chrono, stating Ashker *did* not meet inactive criteria based on (4) confidential memorandum indicating "gang activity" in February and June 2001; and Ashker could request another review in June 2007.

53.) Ashker received Wise's [8-2-01] chrono on Aug. 24, 2001, at the same time, his counselor gave him copies of the CDC-1030 confidential-Disclosure Forms, referenced in Wise's chrono. This was the First time Ashker was aware of the (4) 2001 allegations.

54.) Ashker was not notified, nor given opportunity to respond to the (4) [2001] allegations prior to Wise's decision; nor did Wise conduct any sort of substantive investigation into the allegations [how could he, without giving Ashker a chance to respond]

55.) The confidential memos dated Feb. 22, 2001, and June 29, 2001, alleged that "an inmate proven reliable" had claimed "Ashker sent several coded messages to the mainline ... for non-validated associates of the A.B., to continue to kill blacks; and Ashker and other AB members in (SHU) were regularly referred to as leaders in the war with the Blacks" (2.22.01). And, "Ashker and other AB affiliates were conspiring to set up a white inmate to be killed in Feb. 2000" [6.29.01]

56.) Based on information and belief, the above referenced inmate

informants' "murder conspiracy" claims, are merely unsupported-
allegations by inmates seeking transfers out of (PBSP); if there was
any reliable evidence to support these allegations, CCR Title 15 §§
3312 & 3315, mandate issuance of CDC-115 Rule Violations, and referal to
the District Attorney, neither of which occurred [notably, if there was
reliable evidence supporting such allegations - the failure to issue
the mandated (115 RVR's) is a due process violation too]

57.) On Sept. 3, 2001, Ashker submitted 602 Appeal (#C01-02335, wherein
he specifically addressed, and pointed out easy-to-verify facts to
support his denial(s). He also pointed out the fact that he was never
issued any CDC-115 R.V.R's, charging him with anything — which is manda-
tory, if there was any reliable evidence to support such serious allegations.

58.) On Sept. 26, 2001, Def. McGrath, denied the Appeal at Wardens
Level, merely rubber stamping Wise's (8-2-01) decision, without any
sort of substantive investigation being conducted, based on Ashker's
response, and points disputing the allegations [based on info. and
belief, i.e., McGrath's testimony admitting that none of the 602 Appeals of
validation issues receive substantive review - investigation(s), during
Lira trial. per. Lira, supra, Order p. #40-42]

59.) Ashker received the Wardens denial on or about Oct. 2, 2001, and sent
it to Director Level on Oct. 14, 2001. Director Level denied the appeal on
Feb. 21, 2002, without any substantive type review - investigation [Id.
Lira, supra, Order]

60.) During litigation of Ashker, Troxell v. Schwarzenegger, et al (#C05-3286 CW.,
Defendants submitted another CDC-128 B Chrono, Authored by Wise,
dated Dec. 31, 2001, claiming Wise conducted an investigation into
Ashkers gang-status on Dec. 28, 2001, and located (6) conf. memos

dated June – August 2001, indicating continued gang-activity.

61.) Defendant Wise' (12-31-01) chrono does not state what prompted the alleged (12-28-01) "investigation" after conducting the [8-1-01] review – investigation [wherein Wise states, 'Ashker's next review would not be until 2007']; Wise also claims 'Ashker refused to participate in an interview' on 12-28-01.

62.) Ashker has no recollecting, and therefore _denies_, ever being asked if he would go for a gang status interview on 12-28-01; he _denies_ ever receiving the (12-31-01) CDC-128B chrono [until reciept of def's 2008 MSJ] And Ashker did not receive the 1030-Conf. Disclosures ref'd in Wise' 12-31-01 Chrono until [3-21-02], At which point he challenged them via 602 Appeal(s), which were denied without substantive review [based on _Lira, supra, order_]

63.) On July 8, 2003, the CDCR-LEIU Defendants' revalidated Ashker, as an active AB member, based on the 1988, 1995, and 2001, reviews. This was done without notice, or opportunity to be heard; and was not based on any substantive investigative process [_Id.,_ based on Lira, supra; and lack of opportunity to respond – no notice]

64.) Ashker believes the "inactive status" avenue for release from (SHU) is a SHAM [as alleged in above para #23 H, and based on examples of what has happened to PBSP-SHU inmates Paul Redd, Robert Tanner, and Brad Hart]; and that his only avenue For (SHU) release [and eventual parole] is via informant status, as supported by:

    Ⓐ On Feb. 23, 2004, he submitted a Group Appeal, #C04-00566, on behalf of himself and Troxell [per. CCR Tit 15 § 3084.2[F]], requesting program-rehabilitation opportunities in (SHU), in order to comply with (BPH) parole board recommendations.

Ⓑ On April 27, 2004, Def. McGrath denied the appeal at Warden's level, stating, "... you are considered a member of a terrorist organization, and until you fully cooperate with the authorities to help bring down the gang - you will remain in (SHU) without opportunities to program; and, should never be paroled either." [There was no mention of "inactive status" alternative]

Ⓒ On July 22, 2004, Def. Woodford denied the appeal at Director's level, stating, "... the Warden's response, represents the CDCR-position." All of Ashker, Troxell's points of dispute were ignored.

65.) On Sept. 15, 2004, Ashker submitted 602 Appeal (# C04-02600, wherein he challenged CDCR-Defendants "inactive gang" status criteria; pointing out that the defendants were denying "inactive status" based on hearsay allegations from questionable sources and innocuous activity. And he had not been found guilty of ever committing an illegal gang-related act - and the CDCR ccr title 15 §§ 3000 [Gang] and 3023 [Gang Activity] meant illegal activity - that mandates issuance of CDC-115 RVR [this 602 challenge was in response to ICC-committee SHAM review, and continued indefinite SHU-status, held 8-4-04, the chrono wasn't received by Ashker until 9-7-04)

66.) On Dec. 17, 2004, Def. Kirkland, denied the appeal at Warden's level, without addressing the issues, and without any substantive review; he just upheld Ashker's indefinite (SHU) status, based on CDC-128B of 7-8-03.

67.) On March 4, 2005, Def. Woodford rejected the appeal as untimely based on view the appeal challenged the (7-8-03) action. This was clear error, as the appeal challenged policies and practices - as applied by the ICC-Comm. on Aug 4, 2004.

68.) On June 6, 2005, Ashker submitted another 602 Appeal, #C05-01551, specifying that he was "challenging CDCR policy's of subjecting him to indefinite (SHU) status, for over (13) years [at the time], based on their gang label." He pointed out that he had never received a CDC-115 rule violation for committing an illegal act on behalf of a gang, the gang label was based on hearsay from undisclosed inmate informants; and, the continued (SHU) status was used by the (BPH) to justify (5) year parole deferral in (2003), and his only avenue for (SHU) release is via debriefing, or inactive status".

69.) The above referenced appeal pointed out that the policies and practices at issue violated U.S. Constitutional 1st, 5th, 8th and 14th Amendments as Follows:

Ⓐ Sanctions for mere association, without guilt for illegal activity, is a 1st Amendment violation [per. NAACP v. Claiborne Hardware Co. (1982) 485 US 866, 925; American Arab Anti-Discrimination v. Reno, 70 F3d 1045, 1063 [9th cir 1995]; Cal. Penal Code §§ 186.21-186.22 [e.g., People v. Castaneda, [2000] 23 Cal. 4th 743, 749]

Ⓑ Requiring inmates to become informants to gain release from (SHU) - thereby putting the inmate, and family, in danger of retributive harm, is a 8th Amendment violation.

Ⓒ Premising release from (SHU) upon the inmate becoming an informant via debriefing [implicating ones self and others in gang related acts], which can be used to prosecute the debriefer, and others (and to keep others in SHU), is a violation of 5th and 14th Amendments.

Ⓓ The (SHU) status has seriously had an adverse impact on his chance For parole, the status has been illegal and completely lacking in adequate due process, in violation of 14th Amendment.

Ⓔ The policy(s) re: "inactive status" is a SHAM, and the (6) year review violate requirement that (SHU) confinement cannot be arbitrary, or a pretext for indefinite segregation and thus periodic - meaningful reviews are mandatory [per. Toussaint v. McCarthy, 801 F2d 1080, 1101; Madrid v. Gomez, at 1277-78, citing Hewitt v. Helms, 459 US 460, 477 n.9] and the ICC - Committee reviews deny meaningful review because they have no authority to release the (SHU) inmate unless he has debriefed, or deemed inactive during one of the (6) year reviews by LEIU, "

70.> Defendant Kirkland, denied the appeal at Wardens level (of review, on Aug. 22, 2005. He acknowledged Ashker's 8th Amendment issue re: debriefing places inmate in danger, then ignores it [demonstrating deliberate indifference]; and he acknowledges and admits Ashker has received no disciplinaries for participating in illegal gang activities. He ignores the other points.

71.> On Dec. 13, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at the Director level, merely rubber stamping the Wardens level denial.

72.> On Aug. 7, 2005, Ashker sent Defendant Hickman a (5) page memo signed by Ashker and Troxell, pointing out that the CDCR use of innocuous - activity, and allegations from confidential inmate informants, to keep them in (SHU) indefinitely unless they debrief, violated clearly established law. The response was, ... the issues presented could not be addressed because they were being litigated in court.

⟨25?

73.) On October 25, 2007, *PBSP - Institutional Gang Investigations [IGI]* Unit [Defendants Thornton and Rice] allegedly initiated an investigation regarding Ashker's current gang activity [per CCR-Tit.15 § 3378(e), six year review re: inactive status]

74.) This alleged "investigation" into Ashker's current gang activity, was a SHAM - it was not meaningful, because it lacked any semblance of substantive due process [no actual *investigation took place*] as shown by the following:

(A) On Nov. 26, 2007, *Defendants Thornton and Rice signed a CDC-128B chrono*, recommending that Ashker's *gang status remain* "active" based on their alleged "investigation" *consisting of:*

    1) Review of Ashker's Central file [revealing current gang activity, via (5) confidential memos]

    2) Property Search [revealing (3) photocopies of artwork]

    3) Nov. 26, 2007 "*interview*" of Ashker [*consisting of Ashker giving Def. Thornton (2) pages, denying each item used against him*]

(B) The (5) confidential memos, and Ashker's responsive denials, were as follows:

    1) March 14, 2007, chrono documenting 'a greeting card with numerous shamrocks. The shamrock is used by members of AB to show alliance/membership *in gang*'. [*Response: this is clearly a "St. Patrick's Day" card, dated '98. I kept it to use as a pattern for my own St. Pat's Day card creations & no "sources" ever claimed I've shown them "gang symbols"*].

    2) Memo dated Sept. 18, 2006, documenting an informants claim that 'kites were passed between validated *Nazi Lowrider [NLR]* members,

<26>

containing the housing assignment of Ashker as well as other AB members [the AB were recruiting the NLR for membership in AB at this time] ... Also identified was the fact Ashker had ordered the murder of attorney Franck, who owed Ashker money [Response:

#1. I have no control over who passes my ¢ cell on lists or kites; nor do I have any knowledge about "recruitment," ¢ it doesn't specify that I was recruiting anybody. #2. The claim re: putting "hit" on atty Franck is a lie! This atty. has helped me on legal issues for 17 yrs. - the money he owed has been paid for most part, ¢ it source was reliable, a 115 RVR is mandatory ¢ I've rec'd Ø! Last of all re: alleged "hit" there's zero demonstrating this is a "gang" issue. My relationship with atty is strictly professional ¢ personal ¢ you have no "evidence" proving otherwise]

3) Memo dated July 7, 2006, staff claimed 'Ashker attempted to relay messages thru (NLR) member to AB associate Brown, to have his girlfriend sponsor Ashker's girlfriend for U.S. citizenship. Ashker's request shows good standing in gang' [Resp. Brown is a personal friend since [1985]. My wife ¢ his are friends ¢ the subject has nothing to do with "gang" activity period]

4) Memo dated April 4, 2006, informant claimed Ashker is one of the top ranking AB members in PBSP' [Resp. I deny membership/assoc. or involvement in any type of illegal gang activity]

5) Memo dated March 29, 2006, Debriefer claimed, 'Ashker one of the A.B. members who ordered murder of AB member Michael Hicks in 2003'. [Resp. Your alleged reliable debriefer is a liar! I do not know anyone by

⟨27⟩

this name – have never met or been around this person at all-period!
And it there was evidence of my involvement – CDC rules mandate a
115 RVR be issued – I've rec'd none for this – I don't know anything about
this subject, or this person.]

ⓒ The property search [re: three drawings] resulted in (2) Chronos, and
Ashker's responses – denials were as follows:

   1) Oct. 30, 2007, chrono documenting photocopied drawing with a
   shamrock in axe blade [Resp. The art is from (1995) and I knew I'd
   inked over the shamrock 7-8 yrs ago when I heard staff were making
   issue out of art work! The symbol means "Irish Pride" to me ...]

   2) Oct. 29, 2007, Chrono documenting photocopied drawings by A.B.
   assoc. Evans and AB member Bretches: And by possession, shows Ashker's
   continued allegiance to gang and its members [Resp. As for Evan's
   art copies – so what, there's ∅ demonstrating anything illegal! And gang unit
   claims re: "indications" sounds juvenile & cartoonish.
   As for Bretches' art – I want that back! That was sent to me as part of an
   exhibit to declaration he did for me last year – per approved legal corresp.
   & was reviewed by I.G.I. – as part of my civil case]

75.) Defendants Thornton and Rice, received my above referrenced
responses, disputing all of the information alleging gang-activity, on
Nov. 26, 2007. The fact that they did not investigate the possible validity of
any of Ashker's points is supported by the fact that Nov. 26, 2007, is
the same day they received Ashker's responses, and authored their 128B –
Chrono, referring case to Office of Correctional Safety [OCS] with recommendation

<28>

Ashker's gang status remain unchanged; and he can request review again in October 2013.

76.) On April 22, 2008, Ashker received Defendant Harrison's CDC-128 B-Z chrono dated Jan. 16, 2008 – revalidating him as an active AB gang member based on the (4) confidential memos, submitted by Thornton and Rice.

77.) Defendant Harrison did not independently investigate any of the confidential memos at issue [and in lieu of Ashker's responsive denials.] He just rubber stamped Thornton and Rice's recommendations. [Based on info. and belief, i.e., CDCR – testimony(s) in Lira trial, supra, Order, admitting no substantive review, or independent investigations, are done.]

78.) On April 24, 2008, Ashker submitted 602 Appeal [# DO8-01173, wherein he challenges "[CDCR] Rules & Regs [CCR Tit. 15 §§ 3341.5 & 3378(e)], and the policies – practices related thereto, on the basis that my [14+] years of indefinite [SHU] confinement [based on "status," i.e., a label], violates clearly established state & federal law, as more fully – specifically detailed below."

79.) The appeal continues, "... I've been on continuous 'indefinite [SHU]' status since [1992], based on [CDCR] classifying me an assoc/member of the A.B. The basis for this classification is confidential inmate informant claims. Yet, I've never been issued a R.V.R [CDC-115] claiming evidence established my personal involvement in any illegal, gang-related activity."

80.) The appeal continues, "... In (2001) I was denied 'inactive status' based on alleged inmate informant & staff claims - yet, I was never charged, nor issued any RVR [CDC-115]. Recently, on [11-19-07] I was given [3] 128-B's and (4) 1030's, containing claims that such represents evidence that I remain "active." On [11-26-07] I gave I.G.I. my written response to these 128 B's/ 1030's, wherein I dispute each of them [see attached copies...]."

⟨29⟩

B1.) The appeal continues, ...". On [4·22·08], I received my copy of the SSU-Review, Finding me ineligible for "inactive" status; and notifying me my next "review" will be [10·29·13] [see copy of CDC-128B-2 ...] This means, between now & [10·29·13] my only way out of [SHU] is to die, parole, or become an informant.... Such policy(s) & practices violate clearly established Law, as briefly stated below [note: these issues will be pursued in Court]

1.) Punishment based on "status"/association-Label), without ever being found guilty of a single gang related-illegal act, is a *pretext* for "indefinite [SHU] status," which violates the 1st and 14th Amends, of U.S. Const, & State Statutory Law [see: Hewitt v. Helms [1983) 459 US 460, 477 n.9; NAACP v. Claiborne Hardware Co. [1982) 485 U.S. 866, 925; Amer. Arab. Anti-Discrimination v. Reno, 70 F3d 1045, 1063 [9th Cir 1995); Cal. Penal Code §186.21 §186.22; People v. Castaneda, 23 Cal.4th 743, 749 [00]]

2.) Providing "meaningful" review of indefinite (SHU) status, once every (6) yrs., violates the 14th Amend., US Const. Procedural & Substantive Due Process [See: Wilkinson v. Austin [2005) 125 S.Ct. 2384; Hewitt v. Helms; supra; McClary v. Coughlin, 87 F. Supp. 2d 205 [W.D.N.Y. 2000]]

3.) Failure to follow terms of Castillo v. Alameida [USDC-ND Cal #C94-2847) re "Gang-Activity" definition in CCR-Tit 15 § 3023 [which includes the caveate that such acts be, "unlawful or acts or misconduct classified as serious per. Tit 15 § 3315," which in turn, require a RVR, per. § 3312]; the CDCR/PBSP Reviews are a SHAM, merely rubber stamping inmate informant lies [such as I point out in my 11·19·07 response, disputing 1030's of 3·29·06 & 9·18·06]; & use of artwork that's undated &/or given to me as a legal exhibit; and informant claims of my "status" all violate

〈30〉

Castillo; & additional state & federal law. If there was <u>real evidence</u> supporting illegal acts, a R.V.R. is <u>mandatory!</u>

4.) Keeping me in (SHU) per. § 3378(c), while allowing thousands of active gang members/associates to remain on CDCR-Gen Population [per. 3378(d)], constitutes unequal treatment compared to those similarly situated, thus violating 14th Amend., U.S. Const.

5.) Keeping me on indefinite (SHU) status for over (16) yrs. & counting, without charges & findings of guilt for personal involvement in any "illegal, gang-related" acts; and premising my opportunity for release from (SHU) upon my willingness to agree to become an informant, is a violation of the U.S. Const's. 1st, 5th, 8th & 14th Amendments, as briefly shown by:

Ⓐ I retain the right to remain silent, as well as right to be punishment free when choosing not to speak, per. 1st & 5th Amend's [See: U.S. v. Safirstein, 827 F.2d 1380, 1388 [9th Cir. 1988]; Hydrick v. Hunter, 2006 DJ DAR 13181, 13186 [9th Cir 2006]].

Ⓑ Right not to be subject to "informant status," and thus subject myself and family to the danger associated with informants, per. 8th Amend. [SEE: Valendingham v. Bojorquez, 866 F.2d 1135, 1138 [9th Cir. 1989]

Ⓒ Right to be free from conditions of confinement known to present serious danger to physical and/or mental health and safety, per. 8th & 14th Amend's. Prisoner's don't have to wait & actually suffer harm to their physical-mental well being to obtain relief from unconstitutional conditions of confinement. It's well known that informants [and their families] face serious risk of danger to their physical welfare—

which CDCR is not capable of remedying – Thus, CDCR-Policy of premising (SHU) release upon one's agreement to become an informant is a violation [see: Valandingham, supra]; and, it's now recognized that the longer one is subject to (SHU) confinement conditions, the greater the risk of suffering serious mental-health damage – which is also a violation [see: Madrid v. Gomez; and U.S. v. Basciano, 369 F. Supp. 2d 344 [E.D.N.Y. 2005], for examples]

A federal Court has given CDCR notice that a combination of the above (2) Factors [physical harm & mental health – risks] combine – to create an 8th Amend. Violation per, criteria and principles in Helling v. McKinney [1983] 509 US 25; and Ordered CDCR to release the prisoner from PBSP-SHU [see: Griffin v. Gomez, USDC-ND Cal #C98-21038 J.W., Order Granting Writ, filed: 6·28·06, citing Wilson v. Seiter [1991] 501 U.S. 294, 304-305 RE: combined conditions]]

You are on notice, Failure to cease the practices/policies briefly described will be cause for litigation, on above grounds [but not limited to such grounds)

82.) Ashker requested relief, as follows: "Release from [SHU] to a G.P. [alternatively, creation of a modified – less restrictive program with G.P. type programs & privileges]; and to be fully compensated for my (16) plus, years of illegal-pretextual-indefinite (SHU) confinement, and CDCR-PBSP's compliance with state & federal law & CCR-Tit.15, Rules & Regulations re: Gang Activity & RVR [115's][4]

83.) The appeal was denied by Defendant Horel, at the Warden's Level on June 2, 2008.

⟨32⟩

84.) Defendant's Horel and Wise, denied the appeal, claiming they "conducted a thorough investigation into Ashker's claim," and "Ashker did not raise any legitimate questions/evidence in his rebuttals to change outcome of active/inactive review".

85.) Ashker's position is that Defendants Horel and Wise did not conduct a substantive, independent investig. into the substance of the confidential inmate informants claims, in lieu of Ashker's rebuttal(s), and in fact merely rubber stamped the OCS' chrono, [Based on info. and belief. i.e., Def. Wise claims he conducted and completed this "thorough review/investigation" in one day [5.78.08]; and testimonies of Def. McGrath, and other I.G.I. staff, at the Lira, supra, trial, admitting no substantive investigations are done on appeals re: gang-status]

86.) Defendant's Horel and Wise, ignore all of Ashker's other points re: 1st, 5th, 8th Amendment violations, inspite of reference to supporting case law. This is deliberate indifference [based on info and belief, these defendants were personally made aware of these Constitutional violations via numerous inmate appeals; the Griffin ruling of 2006, referenced above; and numerous inmates becoming mentally ill in [SHU] at PBSP][And doing nothing to fix the problems]

87.) On Oct. 7, 2008, Defendant Cate, denied the appeal at the Director level, by rubber stamping the Warden's response, and ensuring the continuation of such Constitutional violations, inspite of being repeatedly put on notice [per. same manner as Def. Horel, as stated above.]

## HARMFUL EFFECT FROM 23 YEARS OF SHU-CONFINEMENT

88.) Ashker has presently been subject to more than [23] years of continuous [SHU] confinement; the past [17+] years of which have been arbitrary and pretextual [based on defendants allegation that his gang-classification-automatically make him a serious threat to safety/security, requiring [SHU] housing for administrative reasons - indefinitely [until he dies, or agrees to become an informant], ..., while allowing tens of thousands of gang-affiliates to be in gen-population prisons], without being found guilty of ever committing an illegal, gang-related act.

89.) Defendants have punished him for refusing to become their inform-ant, and exercising his first amendment right of choosing not to speak; and, prior to being classified as a gang-affiliate, he was never notified the label would be cause for indefinite (SHU), unless he agreed to become a known informant for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy constituting an eighth amendment violation]

90.) Ashker has been isolated in (PBSP-SHU) since May 2, 1990, and has no information to provide; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and unwilling to place himself or family in the position of the serious danger informants face.

91.) This [23+] years of punitive (SHU) confinement has caused the ongoing harm, exemplified below:

Ⓐ PBSP-SHU conditions are intentionally punitive [more so, than the other [3] SHU-facilities across the state-based on info, and belief]; with the purpose of coercing inmates to become informants. Examples are: more restrictions on allowable types of magazines and books, appliances, packages, clothing; lengthy mail delays, non-contact visits, no phonecalls, no education opportunities [that require proctored exam's]

⟨34⟩

(B) Ashker has had no physical contact with family, no phone-calls, and no photographs of himself to send to family for 23 years; many of his neices, nephews and other relatives have never seen him - in person or photo. This, together with years of lengthy mail delays, has caused estrangement from many family members. And, as of the past year Defendant Jacques and Cate have cut off (SHU) educational opportunities [while permitting (SHU) informants such education ops., and, contact visits, phone calls, photo's, canteen in packaged wrappers, etc.]

(C) He has been eligible for parole since (2004); however, the [BPH] has an unwritten policy of issuing all (SHU) lifer's, multi-year denials. And they have applied this to Ashker in [2003] with a [5] year denial, and in [2008], with a [4] year denial [see details in below para's # 141 to 149.]

(D) Ashker's mental health has been damaged as a direct result of his [23] plus years of [SHU] [based on info. and belief; e.g., experiences with insomnia, hypersensitivity, anxiety, aggression, rage, lethargy; difficulty with concentration, focus, and communication. And, sensory overload with related discomfort when leaving his cell/pod area]; and, there's a serious risk that he may suffer severe mental illness - the longer he's subject to SHU [per many studies conducted between 1975 to present.] And his physical-health has suffered, as he has a chronic pain condition from a permanently disabled right arm [caused by an exploding bullet fired by a PBSP-SHU Guard Ashker v. CDC, 112 F3d 392 (9th Cir 1997)] and his care and treatment has been harmed by his (SHU) placement - and has resulted in numerous civil-suits before this court -

‹357

[D.] General Facts Re: Plaintiff Danny Troxell

92.) Plaintiff Troxell has been incarcerated in the CDCR prison system since July 1979, per. 26 year-to-life sentence – imposed after his plea of guilty to First degree Felony murder [while robbing a market the manager ran up and grabbed the end of Troxell's shotgun, causing it to discharge – killing him instantly]

93.) Soon after his arrival in CDCR, he was accused of being involved in a melee, and ended up in San Quentin (SHU); wherein he received additional rule violations that extended his stay there until being transfered to Folsom Gen. Population in January 1984.

94.) Upon his arrival at Folsom, he attended committee for clearance to G.P., and it was at this committee hearing that he was told for the first time that CDCR– had classified him as an A.B. associate [this had been done at San Quentin, in 1982, based on allegations by confidential inmate informant – perjuror, Mike Thompson] This happened without notice, or opportunity to be heard – and Troxell immediately denied this.

95.) The Folsom committee cleared him for the G.P., inspite of the gang - assoc. Label; where he remained [programming via working in the kitchen and receiv-ing positive work evaluations. And maintaining a good relationship with his Fiancée and daughter via regular contact visits] until being placed back in (SHU) on Oct. 30, 1985, for unspecified reasons.

96.) Soon after this, he was transfered to an isolation strip cell in Chino – for unspecified "investigation" reasons. At Chino, he was lucky to get a visit once a month – behind glass; he was not charged with anything and believed he'd be back on G.P. within a year, because he hadn't done anything; and he married his Fiancée in June 1986.

<36>

97.) In late (1986) he was transferred to newly built (SHU) at Tehachapi [CCI-IV]; wherein he was informed for the first time that he was on indeterminate (SHU) status because of his gang classification, and in order to get out he'd have to debrief [become an informant]. At the time, no one had ever heard of this before; and between 1979 to 1986, no one ever notified Troxell that a gang label was cause for indefinite (SHU), until becoming an informant.

98.) On January 4, 1988, his cell-mate assisted him with a 602 Appeal, challenging his indefinite (SHU) status [and release requiring informant status], on the basis that he had never been charged and found guilty of committing an illegal, gang-related act.

99.) This appeal was denied at the Director's level of review on April 11, 1988 [Direct or log# 8801657], based on, "...your A.B. involvement and its threat to institutional security" [while at the same time, tens of thousands of gang-affiliates were in general population prisons, all over the state. Based on info. and belief]

<u>TROXELL's Initial Gang Validation</u>

100.) On May 25, 1989, the SSU at CDCR Headquarters, received a gang-validation package from CCI - Gang Investigator C. Ford; this package contained [5] Confidential Memorandums dated: 5-2-88; 7-26-88; 8-5-88; 8-10-88; and 1-9-89. [NOTEABLY these memos were created soon after his [602] was denied Id]

101.) The [5] confidential memos referenced above were composed from conf. inmate informants [4 of whom claimed Troxell was an A.B. member, and (1) of whom claimed Troxell was running Folsom's 2 Bldg., for the A.B. in 1985]; the [1989] SSU-Review determined this was sufficient to validate Troxell as an A.B. member, all without notice or opportunity to be heard.

<37>

102.) On Dec. 27, 1989, Troxell was transfered to PBSP-SHU, where he has been housed ever since. Soon after arriving at PBSP-SHU, an administrator told him he would remain in PBSP-SHU until he died, paroled, or debriefed.

## Troxell's Re-Validations & Denial of Inactive Status

103.) On Dec. 14, 1999, ICC referred Troxell's case to the Law Enforcement Liaison Unit [LEIU] at CDCR-Headquarters [via PBSP-I.G.I.] for clarification of his current gang-status [to determine if he met inactive status]

104.) On April 12, 2000, another ICC-Committee noted, "..Committee reviewed subject for inactive gang status and the date of the most recent gang-activity, as noted in the C-file, could not be established. On Dec. 14, 1999, ICC referred this case to the (LEIU) for gang status clarification. The (LEIU) review is pending."

105.) On March 21, 2001, another ICC-Committee noted that "S was referred to [IGI] by ICC of Dec. 14, 1999, for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to resubmit the referral to [IGI] for inactive gang status review."

106.) In June 2001, the LEIU/SSU determined Troxell was an active A.B. member based on Defendant Wise' presentation of (2) Confidential Memos dated: 9-20-99; and 8-3-00 [notably, these conf. memo's were absent from Troxell's file when ICC looked for this type of information in 1999, 2000, and March 2001]

107.) These (2) confidential memos were based on conf. inmate informants' claimed (1) Troxell was an A.B. member keeping a low profile; and (2) Troxell was a member of the A.B. council.

<38>

108.) On June 23, 2001, the [LEIU] issued a CDC-128B-2 *Chrono*, validating Troxell as active, based on the (2) Conf. Memos referrenced above, and stated he could request a new inactive review after Aug 3, 2006.

109.) Prior to this June 2001, (LEIU) review, Troxell was not provided with any notice of the information used against him [i.e., the (2) conf. memos] nor was he given opportunity to respond. The first time he was aware of this was when his counselor gave him the (2) CDC-1030 Confidential disclosure Forms ... *AFTER* the June 23, 2001 (LEIU) *decision*. Troxell maintains he is not affiliated with any gang.

110.) On July 8, 2003, the LEIU/SSU reviewed Troxell's status, and again deemed him to be an active gang-member based on the same conf. memos from [1989, and 2001]; again, this was done without notice or opportunity to be heard.

111.) On July 25, 2003, Troxell celled up with Ashker; prior to this Troxell did not File additional 602 Appeals to challenge (SHU) issues, because he saw it as a futile effort to challenge the False claims against him, with the CDCR-PBSP staff just rubber stamping each others decisions.

112.) On Feb. 23, 2004 Troxell was party to the Group Appeal submitted by Ashker, requesting program opportunities - recommended by the (BPH) to enhance parole suitability.

113.) Defendant McGrath and Woodford *denied the appeal at all levels by* July 22, 2004, on the basis of; '... you're a member of a terrorist group, and until you Fully cooperate with the authorities to bring down the A.B., you will remain in (SHU), and should never be paroled' [See above para's #64 [A to C, re: group appeal and Ashker's allegation's that the "inactive-reviews" are a SHAM. Troxell agrees, and re-alleges the same. *An example being his* own review, started in [1999] and ending June 2001, *after* Def. Wise fabricate

<39>

the Sept. 20, 1999, and Aug. 3, 2000, Conf. Memo's. See details in above paras #103-108]

114.) Between Nov. 8, 2004 and April 11, 2005, Troxell attempted to file (4) 602-Appeals, challenging Defendant's policies re: indefinite (SHU) status, the "informant status" requirement for release, and "inactive" criteria. Defendant Bradbury, refused to process all of these appeals on the pretext that they were "untimely" [CCR-Title 15 states inmates have the right to challenge any policy(s) which have an adverse impact]

115.) Def. Bradbury, rejected the above appeals, at the same time the appeal exhaustion issue was pending in USDC-N.D. Cal.#C04-1967CW [Dismissed without prejudice for failure to exhaust in early June 2005]

116.) On June 7, 2005, Troxell submitted another 602 Appeal, #C05-01550 [this appeal was the same as Ashker's appeal #C05-01551. See above para's #68-71).

117.) In this appeal he specified that, ...he was "challenging CDCR policy(s) of subjecting him to indefinite [SHU] status, for over [20] years [at that time], based on their gang-label. He pointed out that he had never received a CDC-115 rule violation for committing an illegal act on behalf of a gang, the gang label was based on hearsay from undisclosed inmate informants; and, the continued [SHU] status was used by the [BPH] to justify (4) year parole deferral in [2001], and his only avenue for [SHU] release is via debriefing, or inactive status.

118.) The above referrenced appeal pointed out that the policies and practices at issue violated U.S. Constitutional 1st, 5th, 8th, and 14th Amendments, as follows: [wherein, he listed the same points, and case law as Ashker's appeal. See above para. #69 [A-E] For details]

119.) Defendant Kirkland, denied the appeal at Warden's level of review, on Aug. 22, 2005 [the same day, for the same reasons as Ashker's, See above para. #70]

120.) On Dec. 12, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at

the Director level, merely rubber stamping the Warden's Level denial.

121.) On August 7, 2005, Troxell was party to the memo he and Ashker created, and sent to Defendant Hickman, *pointing out that the CDCR-use of innocuous activity, and allegations from confidential inmate informants, to keep them in [SHU] indefinitely, unless they debrief, violated clearly established law [with case cites incorporated], and requested Hickman remedy the problem. His response was ∴ the issues could not be addressed due to court litigation.*

122.) On March 9, 2007, *PBSP-I.G.I.-unit [Defendants Thornton and McKinney] allegedly initiated an investigation regarding Troxell's current gang-activity [per. CCR-Tit.15 § 3378(c), six year review re: inactive status]*

123.) This alleged "investigation" into Troxell's current gang activity, was a <u>SHAM</u> - it was not meaningful because it lacked any semblance of substantive due process [no actual "investigation" took place] *as shown by the following:*

   Ⓐ On March 19, 2007, Defendants Thornton and McKinney, *signed a CDC-128B Chrono, recommending that Troxell's gang status remain "active"* based on their alleged "investigation" consisting of:

      1) Review of Troxell's Central File [revealing current gang-activity, via [8] confidential memo's]

      2) Property Search [with negative results]

      3) March 19, 2007 "interview" of Troxell [consisting of Troxell giving Def. Thornton (3) pages, denying each item used against him]

   Ⓑ The [8] confidential memo's, and Troxell's responsive denials, were as follows:

      1) Conf. Memo of Sept. 18, 2006, Informant, claims Troxell's name was on a "kite"

informing other gang members of his location [Response: I have no control over what someone else does. Also, the mention of my name and where I'm housed doesn't meet criteria of "Gang Activity" per. Tit. 15 §§ 3000, 3023]

2) Memo of July 12, 2005, Written Material, during an investigation, info was discovered by staff indicating Troxell, and other AB members, were attempting to establish a line of communication with other AB's' [Resp. This claim is a fabrication by c/o Sprouse and certain I.G.I. staff in order to prevent white PBSP-SHU prisoners from establishing positive support and programming opportunities...]

3) Memo of July 11, 2005 [same as above memo of 7-12-05, with addition of, "Troxell was also receiving funds from an AB members' family"] [Resp. Same response as #2]

4) Memo of April 25, 2005, Staff Info., '...AB members were discussing locations of other members. Troxell was discussed as to current housing' [Resp. My response is same as #1 above...."]

5) Memo of April 2, 2005, Debriefer claimed, '...Troxell communicated housing info. to another member. Troxell was identified as an AB member, who also sponsored an inmate for membership' [Resp, your debriefer is a liar, and his statements - fabrications based on Ⓐ his imagination Ⓑ stuff he's made up based on things he's seen about me on T.V. [Like the Nov. 2002, KTVU Ch. 2 news story with my picture, name, and A.K.A. on it] Ⓒ stuff he's read about in newspaper]

6) Conf. CDC-128B dated Aug. 26, 2004, Written Material, staff confiscated an "AB roster" with Troxell's name and number on it' [Resp. Same as #1 & 4 above]

7) Memo of May 4, 2004, Debriefer claimed, '...Troxell is an active A.B member, who sponsored an inmate for membership, and gave orders to

⟨42⟩

assault certain inmates throughout the state' [Resp. Your informants claims are false, and not based on first hand information that I personally ordered him to do anything. I've not been issued a CDCR~ 115 Rule Violation. And it's been well publicized for past (20) years how prisoners fabricate info. and how easy it is for them to make it appear reliable. Also, many staff – including gang unit staff as far back as 2003 have gone around spreading rumors of conflict between whites and south mexicans]

8) Memo of March 3, 2004, Informant claimed, '.. Troxell one of the AB members that gave orders to assault Southern Hispanics throughout the state'. [Resp. Same as #7 above. You have no real/reliable evidence I ever personally ever gave "orders" to anyone. If you did, Title 15,§ 3312-3315 mandate issuance of a CDCR~ Rule Violation Report period! Failing to follow Tit 15-3023 re: what constitutes "gang-activity,"

Ⓒ Defendants' Thornton and McKinney, received my points, which dispute each of the (8) items used [to the best of Troxell's ability, based on lack of specific details given], on March 19, 2007; they did not bother to conduct any substantive investigation into any of the (8) items used [either prior to, or after, Troxell's responses were received; based on info. and belief, i.e., Defs 128-B-Chrono recommending [OCS] keep his gang status at "active" is dated the same day that he gave them his response [3-19-07] thus making it impossible to believe any "investigation" occurred; and Testimony in Lira case, supra – no substantive investigating is done'.)

124) On Dec.4, 2007, Troxell received Defendant Marquez' CDC-128 B-2 Chrono dated Oct.18, 2007 – revalidating him as an active AB gang-member

<43>

based on the [8] Confidential Memos, *submitted by Thornton and McKinney. And stating his next Active/Inactive Review, eligibility date would be Sept.1, 2012.*

125.) Defendant Marquez, *did not independently investigate any of the confidential memos at issue [and, in lieu of Troxell's responsive denials].* He just rubber stamped Thornton and McKinney's recommendations [Based on info. and belief, *i.e.*, CDCR-Testimony(s) in Lira trial, supra, Order of 9-30-09, admitting no substantive review, or independent investigations, are done] [And, on 9-26-07, PBSP-SHU-ICC, had already rubber stamped Thornton, and McKinney's, March 19, 2007, decision to deny inactive status]

126.) On Dec.12, 2007, Troxell submitted 602 Appeal #D07-02824, wherein he challenges [CDCR] Rules-Regs [CCR-Title 15 §§ 3341.5 & 3378(e)], and policies-practices related thereto, on the basis that my [22 plus] years of indefinite (SHU) confinement on the basis of "status" violates state & federal law, as detailed below."

127.) The appeal continues, "... I've been classified by CDC as an associate/member of the A.B. since Jan.1984, when I was released from S.Q., MaxB, to Folsom G.P. The basis for this label was confidential inmate informants. In Oct.1985, I was placed in (SHU) based on this label & have been in (SHU) ever since. I've never been issued a CDC-115 RVR for involvement in any illegal gang-activity.

128.) The appeal continues, "... In 2000/2001, I was denied inactive status on basis of conf. inmate informants claiming I was a gang member. I was told I can ask for another "inactive" review in 6 years; in the interim my sole means for release to G.P. is via informant status. In 2004, the Warden & Director stated on my group 602 Appeal #C04-00566, that I will never get out of SHU unless I, "fully cooperate with the authorities to bring down the A.B." On 3-15-07, I was issued [8] 1030's being used to deny me "inactive" status again. On 3-19-07, I gave IGI my

written response to these (8) 1030's, wherein I dispute each one [see attach-ed copies]"

129.) The appeal continues, ,"..On 12-4-07, I received my copy of the SSU-Review, deeming me ineligible for inactive status, and notifying me my next review will begin Sept. 1, 2012 [see copy of CDC-128 B-2...) Thus, between now and 9-1-12, my only way out of SHU is to become an informant. Such policies - practices violate clearly established law as supported below [Troxell then makes the same points, with ref. to the same case cites as Ashker's appeal. See above para # 81 [1-5 A-C), and requested the same relief. See above para # 82]

130.) Defendant Horel, denied the appeal at Warden's Level, on January 30, 2008, based on ..".a thorough investigation"... and determination that "there were no due process violations in relation to this validation". and, "This Reviewer has no authority to overturn a decision by OCS or SSU."

131.) Troxell's position is that Defendant Horel's review, did not include a substantive, independent investigation into the substance of the confident-ial inmate informants claims /staff info., in lieu of Troxell's rebuttals, and merely rubber stamped the OCS' Chrono. [Based on info. & belief. i.e., Def. Horel's agent claimed he conducted and completed this "thorough invest" in one day [1-28-08 - 1-29-08]; and trial testimonies of Def. McGrath, Marquez, and other I.G.I/SSU staff during Feb. 2009 Lira, case, supra, admitting no substantive reviews - investigations are done on appeals re; gang-status, See above para # 31 (E)]

132.) Defendant Horel, ignores all of Troxell's other points re: 1st, 5th, 8th Amendment violation claims, inspite of the reference to supporting case law. This is deliberate indifference [Based on info. and belief, each of

the CDCR-Defendants have repeatedly been made personally aware of these Constitutional violations via *numerous inmate appeals; the* Griffin ruling, referenced in above para# 81[5-C], *and numerous inmates* becoming mentally ill in (SHU) at P.B.S.P.;  *yet doing nothing to fix the problems].*

133.> On May 15, 2008, Def. Cate, *denied the appeal at the Director Level,* by rubber stamping the Warden's response, *and thereby ensuring the* continuation of such Constitutional violations, *in spite of being repeatedly* put on notice [*per.* same manner as Def. Horel, et al., *as stated above].*

## HARMFUL EFFECT FROM 24 YEARS OF SHU-CONFINEMENT

134.> Troxell has presently been subject to more than [24] years of continued [SHU] confinement, on the basis of arbitrarily applied policy(s) and pretextual justification [based on defendants allegation that his CDCR-gang classification automatically make him a serious threat to safety/security, requiring (SHU) housing indefinitely — For administrative reasons [until he dies, or agrees to become an informant],... *while allowing tens of thousands of* gang-affiliates to be in general population prisons], *without ever being* found guilty of committing an illegal, gang-related act.

135.> Defendants have punished him for refusing to become their informant, and exercising his first amendment right of choosing not *to speak; and,* prior to being classified as a gang-affiliate, he was never notified the label would be cause for indefinite [SHU], *unless he agreed to become a known informant* for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy being an Eighth Amendment violation].

136.> Troxell has been isolated in [PBSP-SHU] *since Dec. 27, 1989, and has no*

information to provide; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and, unwillingness to place himself, or family, in the position of the serious danger informants face.

137.) This [24+] years of punitive (SHU) confinement has caused the ongoing harm, as exemplified below:

Ⓐ PBSP-SHU conditions are intentionally punitive [more so than the other [3] SHU-Facilities across the state. Based on info. and belief]; with the purpose of coercing inmates to become informants. Examples are: more restrictions on allowable types of magazines and books, appliances, packages, clothing; lengthy mail-delays, *non-contact* visits, no phone-calls, no photograph's to send home, no education opportunities [none that require proctored exams - per. Def. Jacquez and Cate] While allowing informants, T.H.U., and G.P. inmates all of the above.

Ⓑ Troxell has had no physical contact with family, no photographs of himself to send to family, no phone-calls, ... For over [24] years; many of his nieces, nephew, grand kids, and other relatives have never seen him in person - or photograph. This, together with years of lengthy mail delays, has caused estrangement from many family members.

Ⓒ He has been eligible for parole since [1996]; however, the [BPH] has an unwritten policy of issuing all (SHU) lifers, multi-year *denials*. And they have applied this to Troxell in [1995] with a (5) year denial; in [2001] *with a [4] year denial*; in [2006] with a [3] year denial; and [2009] with a [7] year denial. [See details in below para's# 141-143, 150-161]