Todd Ashker, C58191

Danny Troxell, B76578

P.O. Box 7500/ D1-SHU

Crescent City, Cal. 95532

Plaintiffs, In pro-se ⊢

**FILED**

MAY 2 1 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

The United States District Court

For The Northern District Of California

Oakland-Division

TODD ASHKER and DANNY TROXELL,

Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, MATHEW CATE, RODERICK Q. HICKMAN, JEANNE WOODFORD, JOE McGRATH, RICHARD KIRKLAND, ROBERT HOREL, FRANCISCO JACQUEZ, DERRAL ADAMS, WILLIAM BARLOW, R.L. JOHNSON, D.W. BRADBURY, J. McKINNEY, ROBERT MARQUEZ, R. RICE, JOHN HARRISON, B. THORNTON, G.H. WISE, A. HERNANDEZ, ROBERT DOYLE, SUSAN FISHER, ROBERT HARMON, HOLLIS GILLINGHAM, D. SMITH, and S. TUCKER, inclusive, Defendants.

CASE No. C09-5796 C.W.

First Amended Complaint For Damages and Injunctive-Relief [42 USC § 1983] And Demand For Jury Trial

## I. JURISDICTION & VENUE

1) This action is brought pursuant to 42 USC §1983 to redress the deprivations under color of state law, of rights secured by the Constitution of the United States. Jurisdiction is pursuant to 28 USC §§ 1331 & 1343. Plaintiffs seek damages, as well as declaratory relief [per. 28 USC §§ 2201 & 2202]

2) Venue is proper pursuant to 28 USC § 1391(b)(2) because the alleged unlawful acts and ommisions occurred primarily within the Northern District Of California, in the County of Del Norte. Plaintiffs request a trial by jury on all claims.

## II. PARTIES

3) Plaintiffs Todd Ashker and, Danny Troxell, are both serving term-to-life sentences in the custody of the Calif. Dept. of Corrections & Rehabilitation [C.D.C.R.]. They have been, and were at all times mentioned herein, confined in Pelican Bay State Prison's S.H.U. unit.

4) Defendant Arnold Schwarzenegger, is Governor and Chief Executive of the state of California. At all times mentioned herein, he has been legally responsible for the policies, customs, and practices, adhered to by the C.D.C.R. [i.e., he is personally aware of, and condons, state sanctioned torture as a way of coercing P.B.S. P-SHU inmates into providing information & confessions]; as well as, The Board of Prison Hearings [BPH] re: term-to-life inmates parole criteria [i.e. he created, and/or allowed the continuance of, the policy, or custom under which unconstitutional practices occur; e.g., reviewing [BPH] parole grants, per article 5, sect. 8(b) of the Calif. Const., and rescinding the parole grants given to inmates with many years of inactive gang-status, until said inmates "debrief" [See below paras'*26-27, 40, re: debriefing"]

5) Defendant Matthew Cate, is the Secretary of [CDCR]; per. Cal. Penal Code §5054, Secretary Cate, is the head of [CDCR], responsible for the supervision, managent and control of the state prisons, and for the care, custody, treatment, ...of all persons confined therein. Sec. Cate, is responsible for promulgating and rescinding the rules and regulations for the administration of the prisons [per. Cal. Pen. Code §5058]

〈1〉

Defendant Cate, has personally created, and/or allowed the continuation of, the policies and customs under which the unconstitutional policies, customs & practices occurred.

6) Defendants Roderick Q. Hickman, and Jeanne Woodford, are former Secretarys [Directors] of [C.D.C.R.]. At all times mentioned herein, they both had the same duties and responsibilities as Defendant Cate; each of them were personally responsible for creating, and/or allowed the continuance of, the policies and customs under which the unconstitutional policies, customs, and practices occurred.

7) Defendants Joe McGrath, Richard Kirkland, Robert Horel, and Francisco Jacquez, are each former Wardens/acting Wardens and Administrators at P.B.S.P.; Def. Darral Adams, is current PBSP - acting Warden, At all times mentioned herein, each of them was legally responsible for implementing and adhering to the Secretary/Directors rules and regulations, and for the operation of P.B.S.P., and the welfare of all inmates therein. Each of them was personally responsible for creating, and/or, allowing the continuance of, the policies and customs under which the unconstitutional policies, customs, and practices occurred. [each were directly, and personally involved in the violations too]

8) Defendants William Barlow [PBSP- Litigation Coordinator], R.L. Johnson [PBSP-SHU, Captain], and D.W. Bradbury [PBSP-SHU, Associate Warden], at all times mentioned herein, were each legally responsible for carrying out their duties [per. assigned posts]; including, following applicable law, rules and regulations. Each of them was personally put on notice of the unconstitutional policies, customs, and practices described in the complaint, and each had the power, and duty, to take remedial action. Instead, each of them, via their acts and omissions, exacerbated the problems by condoning them, and thereby ensuring the continuance of the violations indefinitely.

9) Defendants J. McKinney, Robert Marquez, R. Rice, G.H. Wise, John Harnson, and B. Thornton, are each current and former [CDCR-PBSP] gang-investigators. At all times mentioned herein, each of them were legally responsible for carrying out their assigned duties, and adhering to all applicable laws, rules and regulations. Each of them claimed they personally investigated Plaintiffs gang-affiliation, and status, issues, and each

of these Defendants have personally violated Plaintiffs US. Constitutional rights via their failure to follow CDCR- policies; and/or, the policies, customs, and practices they did follow are unconstitutional, as specified in the complaint below.

10) Defendant A. Hernandez, is a former CDCR- correctional officer, who was assigned to P.B.S.P.- SHU, D1- Block. At all times mentioned herein, part of her duty(s) included the processing/reviewing of PBSP-SHU inmates, approved inmate to inmate legal correspondence. As detailed in the complaint, Def. Hernandez, personally violated Plaintiffs' U.S. Const. rights via her acts and omissions re: approved legal correspondence violations.

11) Defendant Robert Doyle, is current [BPH] chairman; Defendants Susan Fisher, Robert Harmon, Hollis Gillingham, Dennis Smith, and Steven Tucker, are each current and former [BPH] commissioners. At all times mentioned herein, each of them were legally responsible for conducting term-to-life inmates, parole suitability hearings pursuant to applicable laws, rules and regulations. Each of them personally created, and/or, allowed the continuance of, the unconstitutional policies, and customs under which the unconstitutional practices occurred. Defendants each personally applied the arbitrary, status-based, no parole and multi-year deferals practice, applied to lifers in [SHU] for administrative reasons; including the Plaintiffs, as specified below.

12) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Barlow, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, Wise, and Hernandez, are each sued individually and in their official capacity [for damages and injunctive relief].

13) Defendants Doyle, Fisher, Harmon, Gillingham, Smith, Tucker, and Adams, are each sued in their official capacity [for declaratory and injunctive relief].

14) Each of the Defendants have acted, and those still employed continue to act, under color of state law at all times relevant to this complaint. Plaintiffs are informed and believe that each of the kinds of conduct complained of herein, are the subject of numerous prisoner complaints, which are reviewed by the Governor, Secretary/Directors, Wardens, and [BPH] staff, Additionally, this conduct has been

<3>

the subject of numerous individual suits and writs by inmates [including the Plaintiffs many complaints, memos, and suits]. Defendants have been on notice of the constitutional violations and refuse to correct the problems, and in fact condone these continuing violations.

### III. INTRODUCTION

15) This is a claim for damages and injunctive relief brought under 42 USC §1983, against the Governor, CDCR, and BPH officials, for violations of Plaintiffs rights to: free speech and association; freedom from incriminating themselves and others; freedom from torture and other cruel and unusual punishment; right to due process [both procedural and substantive], equal protection, and ex post facto protection; as protected by the 1st, 5th, 8th, and 14th Amendments to the U.S. Constitution [and United Nations 1984 Convention Against Torture and other cruel, inhuman or degrading treatment]

16) This action arises from Defendants policies, customs, practices, and/or, acts and omissions re: Plaintiffs [23-24+] years of SHU-confinement and related harm therefrom, including multi-year parole deferals. Defendants have arbitrarily and wrongly retained them in SHU, and issued multi-year parole denials, on the basis of status [a CDCR-gang label]: (a) Without due process of law; (b) When they deny membership, and have never been found guilty of committing an illegal, gang-related act; (c) On the basis of innocent association; (d) On the basis of coerced, erroneous, false, and unreliable information; (e) As part of Defendants informant procurement custom, via the use of torture and cruel, unusual, and dehuman-izing treatment; (f) For more than (23-24) years, in conditions that seriously impact Plaintiffs physical and mental health; (g) And predicating their release from (SHU), and parole, upon their agreement to become known informants, and thereby subject themselves [and family] to serious risk of retaliatory danger.

17) This action also includes claims arising from Defendants acts, omissions, customs, policies, and practices, re: U.S. Constitutional First Amendment

Violations of Plaintiffs protected rights to: free speech, access to courts, and reading material.

## IV FACTS

### FACTS PERTAINING TO PLAINTIFFS ARBITRARY, ILLEGAL, AND INDEFINITE RETENTION IN THE P.B.S.P.-S.H.U.

### (a) General Facts re: Violations of Applicable Law, Rules, and Regulations

18) As detailed below, Plaintiffs have been arbitrarily and illegally, confined in [SHU] for more than [23-24] years; such indefinite SHU-confinement is a continuing violation of their protected U.S. Constitutional rights, as follows.

19) The CDCR classified Ashker as an A.B. member in 1988, based on unreliable, unsubstantiated allegations made by confidential inmate informants - to prison staff. This initial classification came about without prior notice that (a) a gang classification was cause for sanctions; and (b) he was even being investigated. He received no notice re: allegations being made about him, nor any opportunity to respond. He has always maintained he is not a gang affiliate, nor is he party to any illegal, gang-activity.

20) Ashker's been in (SHU) since 1986, and been on indefinite (SHU) status at PBSP - since January 1992, based on CDCR's arbitrary application of policy(s) re: SHU due to gang-label. Defendants have repeatedly told him his only way out of (SHU) is to parole, die, or debrief; and Defendants Schwarzenegger, and (BPH) commissioners, expect him to debrief his way out of (SHU), prior to a chance to parole [see details, paras# 42-91, and 141-149]

21) The CDCR classified Troxell as an A.B. member in 1989, based on unreliable, unsubstantiated allegations made by confidential inmate informants - to prison staff. This initial classification came about without any prior notice that (a) a gang classification was cause for sanctions; and (b) that he was even being investigated. He received no notice about allegations being made about him, nor any opportunity to respond.

He has always maintained he is not gang affiliated, nor party to any illegal, gang-activity.

22) Troxell has been subject to (SHU) since 1985; and indefinite PBSP-SHU confinement since December 1989, based on CDCR's arbitrary application of policies re: SHU due to gang-label. Defendants have repeatedly told him his only way out of (SHU) is parole, die, or debrief; and, Defendants Schwarzenegger, and [BPH] commissioners, expect him to debrief his way out of (SHU), prior to a chance to parole [see details, Para's #92-137, 141-143, and 150-161]

23) Plaintiffs received subsequent reviews of their gang-status in 1995, 2001, 2002, 2003, and 2007. The 1995-2003, reviews were conducted without prior notice or opportunity to be heard. They were given prior notice, and opportunity to be heard, for their 2007 reviews, whereupon Defendants re-validated them again; However, Plaintiffs are informed and thereby allege, that none of their subsequent reviews [1995-2007], were inclusive of subjective investigation(s) [per Defendant McGrath's testimony, and Court findings of fact in Lira v. Cate, USDC-N.D.Cal# C00-0905 SI, Order of Sept. 30, 2009] [Order, at pp. #40-42]

24) Plaintiffs challenged the gang-validations via several CDCR-602 Appeals; all of which Defendants, or their agents, denied, based on their unconstitutional policies, and customs at issue. Plaintiffs are informed and thereby allege, that none of their 602's, received subjective investigatory reviews [Id, per McGrath's testimony ref'd in Lira Order, pp #40-42; as detailed in below para's #46-87, and #97-133]

25) Between 1985 and 2010, Defendants, and their agents, were mandated to provide meaningful reviews of Plaintiffs (SHU) status every 120/180 days [per Toussaint/Madrid rulings]. This is because Plaintiffs have a liberty interest in not being held in (SHU) beyond (11) months, absent specific exceptions. Plaintiffs are informed and thereby allege that their 120/180 day reviews were without subjective due process, and thus, meaningless [Id., Lira Order, at p. 42:8-25].

26) As stated above [see para's #20-22, and para's ref'd], and more fully detailed below, Plaintiffs only avenue for release from SHU [and to be found suitable for parole] is by

⟨6⟩

successfully "debriefing". Pursuant to Defendants policy and custom, successful debriefing requires the inmate to provide staff with "sufficient verifiable information about other gang-affiliates, that causes them harm, so they will never accept him back".

27) Defendants "debriefing" policy and custom, described above, is unconstitutional. It requires the inmate to become a known informant; known by other inmates to have harmed them. This puts the debriefer [and his family], at substantial risk of serious harm due to known informant status; and, Defendants are not able to protect inmate informants [or their families], and don't bother to tally the one's who have been hurt.

28) CDCR-Defendants have subjected Plaintiffs, and similarly situated inmates [i.e., arbitrary, indefinite SHU-confinement, for alleged administrative reasons], to progressively more punitive-restrictive conditions in PBSP-SHU [as detailed in below paras 138-140], in order to coerce them into providing staff with damaging information about themselves, and others [Defendants Schwarzenegger, and BPH, use their power over parole for the same coercive purpose]

29) Between October 1985 and June 1999, CDCR-did not have any legally promulgated rules or regulations re: indefinite SHU-confinement, or criteria for release therefrom. On June 25, 1999, A Sacramento Superior Court, ruled that CDCR's-gang-validation, and related SHU-placement, retention, and avenue for release, were not legally promulgated [per. Administrative Proc. Act [A.P.A.]], and were not enforceable.

30) In response, CDCR-Defendants have incorporated several rules into the Calif. Code of Regs, Title 15 [per. A.P.A. requirements], that became effective between Aug. 19, 1999 and the present. Such rules are vague, contradictory, and arbitrarily applied. Other rules, and related policies, customs and practices [summarized in above paras 18-29], promulgated, or allowed to continue, and applied, by Defendants [to Plaintiffs], are unconstitional violations of Plaintiffs rights, as presented below,

31) Defendants Schwarzenegger, Cate, Hickman, Woodford, McGrath, Kirkland, Horel, Jacquez, Adams, Johnson, Bradbury, McKinney, Marquez, Rice, Harrison, Thornton, and

<7>

Wise, at all times mentioned herein, created and/or approved, and allowed the continuance of [and personally applied], the policies, or customs under which the unconstitutional practices, policies, and customs have occurred and caused damage and harm to Plaintiffs [as summarized below, and supported in para's* 42-140]

32) At all times specified here, the above named Defendants knew at the time, or should have known in the proper performance of their official duties:

(a) Plaintiffs had a right to prior notice that a CDCR-gang label was cause for punitive sanctions [i.e., indefinite SHU-status, and denial of parole- until you become a successful informant, known for harming other inmates to get out] prior to being sanctioned

(b) Plaintiffs have a liberty interest in remaining in General Prison Population, and to a parole date; because, in part, the SHU is punitive and restrictive, with potential for causing serious mental illness and exacerbating phys. health problems, and no parole.

(c) Based on this liberty interest and harm caused by decades of indefinite SHU-status, the U.S. Constitution requires due process protection against arbitrary actions, including, procedural due process [i.e., prior notice and opportunity to respond to allegations re: gang issues, before being sanctioned]; and, substantive due process [i.e., legitimate, thorough investigations re: sources of information and Plaintiffs rebuttals; by the gang-investigators, the 180 day committee reviewers, and the 602 Appeals process]

(d) That Plaintiffs have been in [SHU] for [23-24+] years now, without being provided the required due process, since day one [per details in para's* 18-25, and para's referenced]

(e) That inmate informants are at serious risk of harm in CDCR-prisons; and this risk is greater when the informant is known by gang-affiliates to have told on and harmed them (this may also result in retaliatory harm to the informants family, whom Defendants are not able to adequately protect from such harm].

(f) That their policy, custom, and practice of requiring Plaintiffs to become notorious informants in order to successfully debrief their way out of SHU [and have

a chance to parole], and thereby be at serious risk of harm to themselves [and their family], violates the Eighth Amendment of the U.S. Constitution [and, U.N. Convention Against Torture] [as detailed and supported by para's # 26-27, and # 36-161].

(g) That their policy, custom, and practice of making PBSP-SHU, progressively more punitive-restrictive, for purpose of coercing Plaintiffs, and others, into providing staff with damaging information about themselves, and others [including this requirement to get a parole date], violates the 1st, 5th, and 8th Amend's, of the U.S. Constitution [and, U.N.C.A.T.] [as described in para's # 138-140].

33) At all times specified herein, Defendants Doyle, Fisher, Harmon, Gillingham, Smith, and Tucker, also personally applied the unconstitutional policy(s), customs, and practices described in above [para # 32(a-g)], when they denied parole, with multi-year deferrals, based on status, as detailed in [para's # 141 to 161]

34) At all times specified herein, the Defendants named above [in para 31], also created and/or approved, and allowed the continuance of [and personally applied] the below policies, customs under which the unconstitutional policies, customs, and practices occurred, and harmed Plaintiffs [as detailed in para's # 35 to 161; this applies to Defendants named in para # 33 too, as stated below]

35) At all times specified herein, the above referenced Defendants knew at the time, or should have known in the proper performance of their official duties, that the following policies, customs, and practices, are vague, arbitrary, and contradictory; and, violate the U.S. Const. as applied to Plaintiffs, and similarly situated inmates. All of which have been the subject of numerous complaints, and formal grievances, to Defendants - to no avail; as Defendants not only refuse to take corrective action, they have condoned and enabled the violations to continue [as detailed in para's # 35 - 161], as follows:

(a) CCR-Title 15 §§ 3000 [defining "Gang"], and 3023 [defining "Gang Activity"], when taken together in context, define "Gang-Activity" as, "... when one knowingly commits acts of misconduct classified serious's per Title 15 § 3315 [unlawful acts], or, behalf of a gang." This interpretation is supported by the fact that these (2) Title 15 sections, are pursuant to Cal. Pen. Code § 186.22 [which the California

〈9〉

Supreme Court has repeatedly interpreted to mean that "sanctionable gang-activity" requires "a conviction for felonious, gang-related acts; not for innocuous-associational activity," [e.g., People v. Castaneda [2000] 23 Cal. 4th 743, 749]

(b) Plaintiffs are informed and thereby allege, Defendants Hickman, or Woodford, stipulated to the above referenced interpretation of Title 15 §§ 3000, and 3023, re: definition of "gang-activity," when they settled Castillo v. Almeida, USDC-ND #C94-2847 [in 2004]. However, Defendants have continued to use innocuous activity, to keep Plaintiffs in SHU-indefinely [see below paras# 42-137].

(c) Defendants also claim, reliable confidential inmate informants have provided information of Plaintiffs' involvement in felonious gang-activity, on numerous occasions, over the course of the past [20+] years; and used these allegations to keep them in SHU-indefinitely [thus, making them ineligible for parole. see paras# 141-161], without ever issuing a single CDCR-rule violation rpt, [R.V.R.], in violation of CCR-Title 15 §§ 3312(A)(3), and 3315 (A)(2), which mandate that any serious misconduct constituting a violation of CDCR-rules, or Law, that is supported by credible evidence, "... shall be reported on a CDC-115 [R.V.R.]." Which in turn, requires specific due process [e.g., notice of charge(s), right to investigative employee, right to call witnesses, and a hearing that relies on the "preponderance of evidence" standard of proof]; Defendants intentional, repeat circumvention of these rules violates due process [alternatively, it means the informants were not credible; thus, relying on them also violates due process. As detailed and supported in paras# 42-137] [BPH-Defendants reliance on the info. is a violation too. [paras# 141-161]]

(d) Defendants claim a CDCR-classification, stating an inmate is a validated prison gang assoc., or member, mandates indefinite SHU-status, because this automatically means the inmate "is deemed to be a severe threat to the safety of others, or security of institutions." per CCR-Tit. 15 § 3341.5(c)(2)(A)2. However, this mandate includes an exception, refering to Title 15 § 3378(d), which states, a gang member/assoc, in "general population" may be considered for review for inactive status," with (2) years of no documented gang-activity." These (2) Title 15 sects., were legally promulgated [per. A.P.A.], in August 1999, in response to a court ruling [see above, paras# 29-30]. Indefinite SHU-status, has always been applied arbitrarily, and presently there are

〈10〉

tens of thousands of gang members/assocs, in CDCR-general population prisons; while a few hundred have been in SHU-more than (20) years, without ever being found guilty of committing an illegal, gang-related act [including Plaintiffs. See paras # 42-137]

(e) The above referenced policy(s) are also contradictory and vague; per. 3341.5(c)(2)(A)2, a CDCR-gang label mandates indefinite SHU [but] there's an exception to this mandate, per. 3378(d) [but] there is no reference re: exception criteria.

(f) The above referenced policy [§3378(d)], is also arbitrary because it allows gang affiliates in general population to be eligible for "inactive review", with (2) years of no documented gang-activity; compared to Plaintiffs, who are eligible for "inactive review", in (6) years [per. §3378(e)]

(g) CCR-Title 15 § 3341.5(c)(2)(1) specifies, "an inmate on indeterminate SHU-term shall be reviewed by a classification committee at least every [180] days for consideration of release to a general inmate population", and, Title 15 § 3341.5(c)(3) specifies, "an inmate cannot be retained in SHU-beyond (11) months, unless a classification committee determines retention beyond this time period is required for one of the following reasons,"... (B) Release would severely endanger the lives of staff, inmates, or security." The problems with these policies are:

1) CCR-Tit15 § 3341.5(c)(2)(A)2, mandates indefinite SHU-terms for validated gang-affiliates [but] includes reference to an exception [without] reference to exception criteria [thus, it is vague, arbitrary, and contradictory. See above para's # 35 (d)(e)]

2) The Court Mandated (180) day committee reviews are not meaningful, since they provide no substantive due process; and, the outcome is predetermined, because the committees have no authority to change Plaintiffs SHU-status, unless they have previously debriefed. Such (180) day reviews are shams [Id, Lira Order, p.# 42]

(h) CCR-Tit15 §§ 3341.5(c)(5)(6), and 3378(c)(f), were legally promulgated [per. A.P.A.] in August 1999; these allegedly provide inmates on indefinite SHU-terms, with an alternative to "debriefing" out of SHU, called "inactive" status. This requires (6) years of zero document-ed gang-activity, and an LEIU-recommendation to committee, to release the inmate from SHU. The problems with this are:

〈11〉

1) Defendants continue to abuse the definition of "gang-activity," in order to deny Plaintiffs inactive status [per. (6) year reviews], by relying on innocuous association with members of their race, and use of common symbols in art, and inmates claiming they are gang-members [without ref. to activity]; and, unreliable, unsubstantiated, allegations of illegal activity, provided by confidential inmate informants [see para's #36-137]

2) "Inactive status" is vague, arbitrary, and contradictory [see above para's # 35(f)]

3) "Inactive status" avenue for SHU-release is a sham, used by Defendants in their efforts to coerce inmates to become CDCR-informants [e.g., periodically releasing a few long term SHU-inmates to general population for a brief time, then telling them, "Your name's come up again, re: gang-activity, you can debrief now and stay in g.p., or go back to SHU for at least (6) more years." see para # 64]. Notably, Defendants Woodford, and McGrath, told Plaintiffs in 2004, that their only way out of SHU, is informant status [para.#64]

[b] General Facts Re: Defendants Violations Of Plaintiffs U.S. Constitutional Rights [via policies, customs and practices re: use of inmate informants]

36) Plaintiffs gang validations are based on statements about them from confidential inmate informant-debriefers.

37) Plaintiffs incorporate above [para's # 31 & 33] here, and state the same Defendants, at all times specified herein, knew at the time, or should have known in the proper performance of their official duties, that the following are violations.

38) Defendants claim they have to keep the identities, and details of statements from inmate informant-debriefers, a secret because regardless of how many years have passed, divulging this information will place the informant, and his family members at risk of retaliation [see e.g., Lira, supra, Order, p.33, fn. # 27]

39) Defendants refuse to formally disclose the identities, and statements, of conf. inmate informant-debriefers, claiming safety issues [see above para.]; however,

they also require the debriefer to become a known informant against other gang-affiliates [they have to know the debriefer told staff harmful information about them, so that they will never accept the debriefer back].

40) Thus, Defendants are committing at least (2) constitutional violations via their policies, and custom referenced above [para's # 38-39], as follows:

(a) To get out of SHU [and have a chance to parole], they require the debriefer to become a known informant against other gang-affiliates, knowing this puts the inmate, and his family, in serious danger - potentially for life [knowing they aren't able to protect informants, or their families; and Def. McGrath admitted that CDCR doesn't track the number of debriefer's, and their families, retaliated against - due to the "burden" this would impose [McGrath's Admits, USDC # C05-3286CW]

(b) While at the same time, refusing to formally disclose the informants identity, and specific allegations made by him, due to professed safety concerns; thereby, causing serious prejudice to Plaintiffs ability to defend themselves [on top of which, Defendants conduct no subjective investigations. See para's # 23-24]

41) At all times specified herein, the same Defendants knew at the time, or should have known in the proper performance of their official duties, about the additional constitutional violations re: use of inmate informants to justify Plaintiffs, and those similarly situated, to indefinite SHU-status, as shown by:

(a) Defendants policy, custom, and practice of making SHU-conditions progressively more harsh and restrictive for the purpose of coercing inmates to implicate themselves, and others, in gang-activity, violates the 1st, 5th, and 8th Amendment [and U.N.C.A.T.], as summarized in para's # 138-140.

(b) Defendants are aware that the severity of the overall SHU-conditions, has been the cause for many inmates to: go insane; die or have worse health; and, to become so desperate, they will, and have, agreed to become known informants [via debriefing], willing to say anything, about anyone, so they can leave SHU, and have a chance to parole

<13>

inspite of the risks; and whose debriefings are "coached-along" by gang unit staff, and whose stories are largely based on: rumors, innuendo, and imaginative elaborations on information spread by staff, other inmates gossip, published legal cases, newspapers magazine articles, and T.V. programs [e.g., Oct./Nov. 2002, news story, with Plaintiffs photos and alleged conspiracies [based on review of rpts.; and SHU-isolation]

(c) Subjecting Plaintiffs to [23-24+] years of indefinite SHU, based on stories from confidential inmate informants — without reliable corroboration [supported by fact that not a single CDC-115 R.V.R. has been issued to them re: illegal gang-acts. See paras #35(a-c), and #42-137], inspite of the fact that such informants are notoriously unreliable, manipulators and opportunists [based on: common knowledge, e.g., published legal cases, numerous studies, and the 1988 [60] Minutes news program, demonstration by notorious L.A. Jail informant, Leslie White], worsened by fact Defendants fail ~~use~~ to review said informants stories, substantively.

(d) Defendants, and their agents, assist inmate informant [debriefers], who have personal knowledge-credibility problems [due to isolation of PBSP-SHU], by way of: strategical placement near inmate targets [e.g. those up for their (6) year, inactive review]. Such placement(s) may be: in adjacent holding cells at med. clinics; on clinic bus; law library; visit area; or, shifting them to different cell-blocks [this provides the informant with corroboration for his claim that, so and so, personally told him about conspiracies', via review of movement and housing records [based on, personally witnessing such antics many times in last (20) years]]

(e) Defendants, and their agents, routinely claim that confidential informant-debriefers, meet "reliability" criteria [per: CCR-Tit 15 §332], when in fact they did not, as illustrated by:

1) Their reliability re: specific claims, about a [specific inmates activity] is not even tested [based on Plaintiffs own experience in last (20) years; and noted in Lira Order, pp 46-48]

2) Claim they're "reliable" because, "the debriefing inmate incriminated himself" when the reality is, debriefing involves no risk of self-incrimination [Id., Lira, p 46:18-22]

(f) Defendants, and their agents, give no credence to Plaintiffs points, denying and

disputes, of the informant allegations [limited; since no specifics are provided]; nor do they substantively investigate the informant's claims, in response to Plaintiff's points, disputing the generalized-scanty allegations provided [Based on personal experience, see below para's # 42-137; and Def. McGrath's testimony, ref'd in Lira Order, pp. # 40-41]

## US Constitutional Violations Re: Ashker's Initial Gang Validation

42) Plaintiff Ashker was originally validated as a member of the Aryan Brotherhood (A.B) prison gang on May 23, 1988. This was based on the submission of (12) confidential memos from C.S.P.-S.C. [New Folsom] gang investigator Rosario, to the CDCR-SSU on March 22, 1988, the same month he was arraigned on the Murphy case, summarized below.].

43) This initial validation was done without giving Ashker any notice of allegations made against him; nor was he interviewed, or given the opportunity to respond/dispute-allegations

44) Ashker was not even notified that he had been validated, until months later [late 1988 or early 1989], which is when he received a chrono, stating he was an A.B. member, without reference to evidentiary basis. Begining in 1989, he challenged/denied being an A.B. affiliate-via 602 appeal [in several more 602's since then], all were denied [not a surprize, as per. Def. McGrath's trial testimony, and findings of fact, in Lira, supra, Order, pp 40-42..." Once an inmate is validated as a prison gang affiliate, it is virtually impossible to undo a wrongful validation. This is because subsequent institutional classification committee [I.C.C.] reviews, and the CDCR-602 Appeals process, are both perfunctory-procedural reviews; no type of substantive review is done"

45.) Ashker denies A.B. affiliation to this day, and his position is that the initial validation was totally lacking in procedural and substantive due process, and was wrong. On May 22, 1987, Ashker attended the classification committee, at C.S.P.-S.C. [New Folsom Prison], which was documented, and noted that he had no gang-affiliation at all.

⟨15⟩

Ashker's possition is that the original validation was created by C.S.P.-S.C., gang-investigators, with the assistance of fabricated stories from unreliable inmate informants; and the purpose was so CSP-S.C. staff would be able to support their theory that the Murphy case was an A.B. gang-hit, and thus, the original validation came about as follows:

Ⓐ On May 28,1987, CSP-S.C. prison staff charged Ashker with the murder of inmate Murphy. CDCR-had inmate Murphy classified as a member of the A.B. prison gang; and rumors began spreading that Murphy's death was the result of an A.B. gang-hit.

Ⓑ On August 6,1987, C.S.P.-S.C., B-Facility (SHU) opened the remodeled B1-A-Section [called Bedrock]; wherein, all metal had been removed from the (24) cells - the bunks, replaced with cement slabs. Inmates there were only allowed a small amount of legal material, and (1) book- no other property, or canteen was allowed. Ashker was housed there that day, because of the Murphy incident. There were (15) other white inmates housed there that day too, most of those were based on A.B. classification.

Ⓒ In March 1988, Ashker was arraigned in Sacramento Co. Municipal Court, on the Murphy case [the same mo. Rosario submits gang pkg. See para #42]. He proceeded pro-per, to the point of the March 1990 trial. It was during discovery that he learned [CDCR's theory] was that A.B. leader Norris, had ordered Ashker to kill Murphy, based on his belief Murphy had turned informant. This theory was based on story's from confidential inmate informants stating this [Steve Larson, in June of 1987, and Robert Rowland, in November of 1987, ... both of whom were seeking a way out of C.S.P.-S.C. [New Folsom] SHU; and in Rowland's

⟨16⟩

case, out of Bedrock and prison, via protective custody - which requires informant status]

(D) The (2) informants claimed Ashker and Tanner killed Murphy per. order from Norris [an A.B. hit]. This was the only information given to Ashker [re: A.B. affiliation link, between 1987 - 1994 [95]].

(E) The trial began in March 1990; the prosecutor declared that the <u>only</u> <u>evidence</u> to support [CDCR - A.B. hit theory] were inmate informants - who he was <u>not</u> using because he did not find them credible. And he never argued, or put on any affirmative evidence, of an "A.B. hit" [informing the court, and jury, he didn't know what the motive was]. Norris testified to begining the "debriefing" process in <u>Jan. 1990</u>, and passing a lie detector test - including questions re: Murphy case [i.e. he gave no order, and had no ill will against Murphy] and that he sent Murphy the knife, he requested to use on Ashker, over a personal dispute.

(F) Ashker's (SHU) term for rule violations was set to expire in (1992), and in January 1992, PBSP - Committee, placed him on "indefinite (SHU) status", based on the A.B. label [the basis of which was not disclosed] Ashker did a 602 Appeal, denying gang-affiliation, and requested release to a G.P. to be able to program. This was denied at all levels of review.

(G) In response to Madrid, the gang-validations of all (PBSP - SHU) inmates were reviewed in 1995. In 1994 - 1995, Ashker received copies of the 1030 - confidential disclosure forms [re: 1988 validation], a few of which were specific enough to challenge via 602 Appeals, to no

<17>

avail [not surprising, considering such receive no "substantive" type of review, per Lira Order, supra] And the SSU's review resulted in rejection of (4) of the (12) 1988 documents [per. Madrid Court directive i.e. cumulative] and "re-validated" Ashker, again, without opportunity to be heard.

46.) Ashker has rarely attended any of the 180 day committee reviews of his indefinite (SHU) status, because they have no authority to change his status to G.P., absent his successful debriefing [beforehand]; per. what administrators told him when he arrived at PBSP-SHU in 1990 [the only way you'll leave is to "parole, die, or debrief"] and the Title 15§ 3341.5; and comm. chronos [pre-printed forms, that all state the same thing]

47.) The committees, C.S.R.'s reviews, and 602 Appeals process, do not provide any substantive due process re: gang-validation challenges, per. Lira Court trial testimonies of Defendant McGrath, and others, supra, and exemplified by the following:

Ⓐ In 1999 Ashker received a chrono by CSR Morton, upholding the (ICC) recommendation for continued indefinite (SHU) status, based on 1995 re-validation [per. (8) documents from 1988], on the basis of ... continuing association and participation in criminal conspiracies that threaten safety-security.'

Ⓑ Ashker filed a detailed 602 Appeal, challenging this determination, and asking that evidence of his personal involvement in any criminal conspiracies be produced [pointing out he'd received no 115 RVR's for any conspiracies], and disputing the items used in 1988, wherein conf. inmate informants claimed he had committed an illegal act, of

⟨18⟩

which there were the following [with 602 Appeal response to each]

1. Claimed Ashker stabbed inmate in early 1986, on Folsom G.P. ["to make bones for A.B"]; informant made claim around April 1986 - Yet, Ashker was on G.P. until August 1986, and has never been charged [this was not even disclosed to him until 1994 or '95] [Ashker's points ignored]

2. [Claims] Ashker killed Murphy for A.B.; Ashker submitted some of the trial transcripts, wherein the prosecutor stated he was not using them due to credibility problems [response: CDCR criteria is different than prosecutor's]

3. Claimed Ashker assigned to hit inmate Estem; however, he never touched Estem [Ashker's points ignored]

4. Ashker requested each source to be investigated re: credibility issue(s) [this was denied]

each level denied this appeal, without any substantive review [per. Lira, supra; and responses denying Ashker's request for such review]

U.S. Constitutional Violations RE:
<u>Ashker's Re-Validations ½ Denial of "Inactive Status"</u>

48.) On August 30, 1999 the CDCR legally promulgated the alternate avenue for validated gang affiliates to gain their release from (SHU), refered to as "inactive status" [see above para's 35 [d-h] describing this change in policy, how it works, and allegations that it is applied arbitrarily, and is a SHAM]

49.) As of 1999, Ashker had well over the required (6) years in, without documented allegations of gang-activity [the last ones being the 1988 — submissions referenced above]; however, he was not reviewed until <u>2001</u>.

<19.>

50.) Ashker first became aware of the "inactive status" policy in (2001), and when his counselor informed him he was scheduled for (ICC) committee review in July 2001, he submitted a written request to be put up for "inactive status" [while clarifying he was never "active" because he was never affiliated in the first place]

51.) An "investigation" into Ashker's alleged gang-status was conducted by Defendant G.H. Wise on Aug. 1, 2001.

52.) On Aug. 2, 2001, Wise issued a CDC-128 B chrono, stating Ashker did not meet inactive criteria based on (4) confidential memorandum indicating "gang activity" in February and June 2001; and Ashker could request another review in June 2007.

53.) Ashker received Wise's [8-2-01] chrono on Aug. 24, 2001, at the same time, his counselor gave him copies of the CDC-1030 confidential-Disclosure Forms, referenced in Wise's chrono. This was the first time Ashker was aware of the (4) 2001 allegations.

54.) Ashker was not notified, nor given opportunity to respond to the (4) [2001] allegations prior to Wise's decision; nor did Wise conduct any sort of substantive investigation into the allegations [how could he, without giving Ashker a chance to respond]

55.) The confidential memo's dated Feb. 22, 2001, and June 29, 2001, alleged that "an inmate proven reliable" had claimed "Ashker sent several coded messages to the mainline ... for non-validated associates of the A.B., to continue to kill blacks; and Ashker and other AB members in (SHU) were regularly referred to as leaders in the war with the Blacks" [2.22.01]. And, "Ashker and other AB affiliates were conspiring to setup a white inmate to be killed in Feb. 2000" [6.29.01]

56.) Based on information and belief, the above referenced inmate

⟨20⟩

informants' "murder conspiracy" claims, are merely unsupported allegations by inmates seeking transfers out of (PBSP); if there was any reliable evidence to support these allegations, <u>CCR Title 15 §§ 3312 & 3315</u>, mandate issuance of CDC-115 *Rule Violations*, and referral to the District Attorney, neither of which occurred [notably, if there was reliable evidence supporting such allegations – the failure to issue the mandated (115 RVRs) is a <u>due process violation too</u>]

57.) On Sept. 3, 2001, Ashker submitted 602 Appeal (#C01-02335, wherein he specifically addressed, and pointed out easy-to-verify facts to support his denial(s). He also pointed out the fact that he was never issued any CDC-115 R.V.R's, charging him with anything – which is mandatory, if there was any reliable evidence to support such *serious allegations*.

58.) On Sept. 26, 2001, Def. McGrath, denied the Appeal at Warden's Level, merely rubber stamping Wise's (8-2-01) decision, without any sort of substantive investigation being conducted, based on Ashker's response, and points disputing the allegations [based on info. and belief, <u>i.e.</u>, McGrath's testimony admitting that none of the 602 *Appeals* of validation issues receive substantive review – *investigation(s), during Lira trial. per. Lira, supra, <u>Order</u> p #40-42* ]

59.) Ashker received the Warden's denial on or about Oct. 2, 2001, and sent it to Director Level on Oct. 14, 2001. Director Level *denied the appeal on* Feb. 21, 2002, *without any substantive type review – investigation [<u>Id</u>. Lira, supra, Order]

60.) During litigation of Ashker, Troxell v. Schwarzenegger, et al (#C05-3286 CW., Defendants submitted another CDC-128 B Chrono, Authored by Wise, dated Dec. 31, 2001, claiming Wise conducted an investigation into Ashker's gang-status on Dec. 28, 2001, and located (6) conf. memos

⟨21⟩

dated June - August 2001, *indicating continued gang-activity.*

61.) *Defendant Wise' (12-31-01) chrono does not state what prompted the alleged (12-28-01) "investigation" after conducting the [8-1-01] review — investigation [wherein Wise states, 'Ashker's next review would not be until 2007']; Wise also claims 'Ashker refused to participate in an interview' on 12-28-01.*

62.) Ashker has no recollection, *and therefore* <u>*denies*</u>, ever being asked if he would go for a gang status interview on 12-28-01; he <u>*denies*</u> ever receiving the (2-31-01) CDC-128B chrono [until reciept of def's 2008 msj] And Ashker did not receive the 1030-Conf. Disclosures ref'd in Wise' 12-31-01 chrono until [3-21-02], At which point he challenged them via 602 Appeal(s), which were denied without substantive review [based on <u>Lira, supra, order</u>]

63.) On July 8, 2003, *the CDCR-LEIU Defendants' revalidated Ashker,* as an active AB member, based on the 1988, 1995, and 2001, reviews. This was done <u>without notice</u>, or <u>opportunity to be heard</u>; and was not based on any substantive investigative process [<u>Id</u>., based on Lira, supra; and lack of opportunity to respond — no notice]

64.) Ashker believes the "inactive status" avenue for release from (SHU) is a SHAM [as alleged in above para 35(H) and based on examples of what has happened to PBSP-SHU inmates Paul Redd, Robert Tanner, and Brad Hart]; and that his only avenue for (SHU) release [and eventual parole] is via informant status, as supported by:

   Ⓐ On Feb. 23, 2004, *he submitted a Group Appeal, #CO4-00566, on behalf of himself, and Troxell, [per. CCR Tit 15 § 3084.2[F]], requesting program-rehabilitation opportunities in (SHU), in order to comply with (BPH) parole board recommendations.*

Ⓑ On April 27, 2004, Def. McGrath denied the appeal at Warden's Level, stating, "... you are considered a member of a terrorist organization, and until you fully cooperate with the authorities to help bring down the gang - you will remain in SHU without opportunities to program; and, should never be paroled either." [There was No mention of "inactive status" alternative]

Ⓒ On July 22, 2004, Def. Woodford denied the appeal at Director's level, stating, "... the Warden's response, represents the CDCR-position." All of Ashker, Troxell's points of dispute were ignored.

65.) On Sept. 15, 2004, Ashker submitted 602 Appeal [# C04-02600, wherein he challenged CDCR-Defendants "inactive gang" status criteria; pointing out that the defendants were denying "inactive status" based on hearsay allegations from questionable sources and innocuous activity. And he had not been found guilty of ever committing an illegal gang- related act- and the CDCR CCR Title 15 §§ 3000 [Gang] and 3023 [Gang Activity] meant illegal activity - that mandates issuance of CDC-115 RVR" [This 602 challenge was in response to ICC-committee SHAM review, and continued indefinite SHU-status, held 8-4-04, the chrono wasn't received by Ashker until 9-7-04)

66.) On Dec. 17, 2004, Def. Kirkland, denied the appeal at Warden's level, without addressing the issues, and without any substantive review; he just upheld Ashker's indefinite SHU status, based on CDC-128B of 7-8-03.

67.) On March 4, 2005, Def. Woodford rejected the appeal as untimely based on view the appeal challenged the (7-8-03) action. This was clear error, as the appeal challenged policies and practices - as applied by the ICC-Comm. on Aug 4, 2004.

〈23〉

68.) On June 6, 2005, Ashker submitted another 602 Appeal (# C05-01551, specifying that he was "challenging CDCR policy's of subjecting him to indefinite (SHU) status, for over (13) years [at the time], based on their gang label." He pointed out that "he had never received a CDC-115 rule violation for committing an illegal act on behalf of a gang, the gang label was based on hearsay from undisclosed inmate informants; and, the continued (SHU) status was used by the (BPH) to justify (5) year parole deferal in (2003), and his only avenue for (SHU) release is via debriefing, or inactive status".

69.) The above referenced appeal pointed out that the policies and practices at issue violated U.S. Constitutional 1st, 5th, 8th and 14th Amendments as follows:

Ⓐ Sanctions for mere association, without guilt for illegal activity, is a 1st Amendment violation [per. NAACP v. Claiborne Hardware Co. (1982) 485 US 866, 925; American Arab Anti-Discrimination v. Reno, 70F3d 1045, 1063 [9th Cir 1995]; Cal. Penal Code §§ 186.21-186.22 [e.g., People v. Castaneda, [2000] 23 Cal. 4th 743, 749]

Ⓑ Requiring inmates to become informants to gain release from (SHU) — thereby putting the inmate, and family, in danger of retributive harm, is a 8th Amendment violation.

Ⓒ Premising release from (SHU) upon the inmate becoming an informant via debriefing [implicating ones self and others in gang related acts], which can be used to prosecute the debriefer, and others [and to keep others in SHU), is a violation of 5th and 14th Amendments.

(D) The (SHU) status has seriously had an adverse impact on his chance for parole, the status has been illegal and completely lacking in adequate due process, in violation of 14th Amendment.

(E) The policy(s) re: "inactive status" is a SHAM, and the (6) year review violate requirement that (SHU) confinement cannot be arbitrary, or a pretext for indefinite segregation and thus periodic-meaningful reviews are mandatory [per. Toussaint v. McCarthy, 801 F2d 1080, 1101; Madrid v. Gomez, at 1277-78, citing Hewitt v. Helms, 459 US 460, 477 n.9] and the ICC-Committee reviews deny meaningful review because they have no authority to release the (SHU) inmate unless he has debriefed, or deemed inactive during one of the (6) year reviews by LEIU, "

70> Defendant Kirkland, denied the appeal at Warden's level (of review, on Aug. 22, 2005. He acknowledged Ashker's 8th Amendment issue re: "debriefing places inmate in danger," then ignores it [demonstrating deliberate indifference]; and he acknowledges and admits Ashker has received no disciplinaries for participating in illegal gang activities. He ignores the other points.

71.) On Dec. 13, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at the Director level, merely rubber stamping the Wardens level denial.

72.) On Aug. 7, 2005, Ashker sent Defendant Hickman a (5) page memo signed by Ashker and Troxell, pointing out that the CDCR use of innocuous-activity, and allegations from confidential inmate informants, to keep them in (SHU) indefinitely unless they debrief, violated clearly established law. The response was, ... the issues presented could not be addressed because they were being litigated in court.

⟨257⟩

73.) On October 25, 2007, PBSP - Institutional Gang Investigations [IGI] Unit [Defendants Thornton, and Rice] allegedly initiated an investigation regarding Ashker's current gang activity [per CCR-Tit15 §.3378(c), six year review re: inactive status]

74.) This alleged "investigation" into Ashker's current gang activity, was a SHAM - it was not meaningful, because it lacked any semblance of substantive due process [no actual investigation took place] as shown by the following:

&#9312; On Nov. 26, 2007, Defendants Thornton, and Rice signed a CDC-128B chrono, recommending that Ashker's gang status remain "active" based on their alleged "investigation" consisting of:

    1) Review of Ashker's Central file ['revealing current gang activity,' via (5) confidential memos]

    2) Property Search [revealing (3) photocopies of artwork]

    3) Nov. 26, 2007 "interview" of Ashker [consisting of Ashker giving Def. Thornton (2) pages, denying each item used against him]

&#9313; The (5) confidential memos, and Ashker's responsive denials, were as follows:

    1) March 14, 2007, chrono documenting 'a greeting card with numerous shamrocks. The shamrock is used by members of AB to show alliance/membership in gang.' [Response: this is clearly a "St. Patrick's Day" card, dated '98. I kept it to use as a pattern for my own St. Pat's Day card creations & no "sources" ever claimed I've shown them "gang symbols"].

    2) Memo dated Sept. 18, 2006, documenting an informant's claim that 'kites were passed between validated Nazi Lowrider [NLR] members,

<27>

containing the housing assignment of Ashker as well as other AB members [the AB were recruiting the NLR for membership in AB at this time] ... Also identified was the fact Ashker had ordered the murder on attorney Franck, who owed Ashker money [Response:

#1. I have no control over who passes my # cell on lists or kites· nor do I have any knowledge about "recruitment," # it doesn't specify that I was recruiting anybody. #2. The claim re: putting "hit" on atty Franck is a lie! This atty. has helped me on legal issues for 17 yrs. - the money he owed has been paid for most part, # it source was reliable, a 115 RVR is mandatory # I've rec'd Ø! Last of all re: alleged "hit" there's zero demonstrating this is a "gang" issue. My relationship with atty is is strictly professional # personal # you have no "evidence" proving otherwise]

3) Memo dated July 7, 2006, staff claimed 'Ashker attempted to relay messages thru (NLR) member to AB associate Brown, to have his girlfriend sponsor Ashker's girlfriend for U.S. citizenship. Ashker's request shows good standing in gang [Resp. Brown is a personal friend since [1985]. My wife # his are friends # the subject has nothing to do with "gang" activity period]

4) Memo dated April 4, 2006, informant claimed Ashker is one of the top ranking AB members in PBSP ' [Resp. I deny membership/assoc. or involvement in any type of illegal gang activity]

5) Memo dated March 29, 2006, Debriefer claimed, 'Ashker one of the A.B. members who ordered murder of AB member Michael Hicks in 2003. [Resp. Your alleged reliable debriefer is a liar! I do not know anyone by

<27>

this name — have never met or been around this person at all-period!
And if there was evidence of my involvement — CDC rules mandate a
115 RVR be issued — I've rec'd none for this — I don't know anything about
this subject, or this person.]

(C) The property search [re: three drawings] resulted in (2) Chronos, and
Ashker's responses — denials were as follows:

1) Oct. 30, 2007, Chrono documenting photocopied drawing with a
shamrock in axe blade [Resp. The art is from (1995) and I knew I'd
inked over the shamrock 7-8 yrs ago when I heard staff were making
issue out of art work! The symbol (means "Irish Pride" to me . . . ]

2) Oct. 29, 2007, Chrono documenting photocopied drawings by A.B.
assoc. Evans and AB member Bretches: And by possession, shows Ashker's
continued allegiance to gang and its members '[Resp. As for Evan's
art copies - so what, there's ø demonstrating anything illegal! And gang unit
claims re: "indications" sounds juvenile & cartoonish.
As for Bretche's art — I want that back! That was sent to me as part of an
exhibit to declaration he did for me last year — per approved legal corresp.
& was reviewed by I.G.I. — as part of my civil case]

75.) Defendants Thornton, and Rice, received my above referrenced
responses, disputing all of the information alleging gang-activity, on
Nov. 26, 2007. The Fact that they did not investigate the possible validity of
any of Ashker's points, is supported by the Fact that Nov. 26, 2007, is
the same day they received Ashker's responses, and authored their 128B-
Chrono, referring case to Office of Correctional Safety [OCS] with recommendation

⟨28⟩

Ashker's gang status remain unchanged; and he can request review again in October 2013".

76.) On April 22, 2008, Ashker received Defendant Harrison's, CDC-128B-2 Chrono dated Jan. 16, 2008 — revalidating him as an active AB gang member based on the (7) Confidential Memos, submitted by Thornton, and Rice.

77.) Defendant Harrison did not independently investigate any of the confidential memos at issue [and in lieu of Ashker's responsive denials] He just rubber stamped Thornton and Rice's recommendations. [Based on info. and belief, i.e., CDCR-testimony(s) in Lira trial, supra, Order, admitting no substantive review, or independent investigations, are done]

78.) On April 24, 2008, Ashker submitted 602 Appeal (#D08-01173, wherein he challenges "[CDCR] Rules & Regs [CCR Tit. 15 §§ 3341.5 & 3378(e)], and the policies-practices related thereto, on the basis that my [22+] years of indefinite [SHU] confinement [based on "status", i.e., a label], violates clearly established state & federal law, as more fully-specifically detailed below."

79.) The appeal continues, "... I've been on continuous 'indefinite [SHU]' status since [1992], based on [CDCR] classifying me an assoc/member of the A.B. The basis for this classification is confidential inmate informant claims. Yet, I've never been issued a R.V.R [CDC-115] claiming evidence established my personal involvement in any illegal, gang-related activity."

80.) The appeal continues, "... In (2001) I was denied 'inactive status' based on alleged inmate informant & staff claims - yet, I was never charged, nor issued any RVR [CDC-115]. Recently, on [11.19.07] I was given [3] 128-B's and (4) 1030's, containing claims that such represents evidence that I remain "active". On [11-26-07] I gave I.G.I. my written response to these 128B's/1030's wherein I dispute each of them [see attached copies...]."

〈29〉

81.) The appeal continues, ... On [4·22·08], I received my copy of the SSU-Review, finding me ineligible for "inactive" status; and notifying me my next "review" will be [10·29·13] [see copy of CDC-128B-2 ...] This means, between now & [10·29·13] my only way out of [SHU] is to die, parole, or become an informant. ... Such policy(s) & practices violate clearly established law, as briefly stated below [note: these issues will be pursued in Court]

1.) Punishment based on "status" [association-label], without ever being found guilty of a single gang related-illegal act, is a *pretext* for "indefinite [SHU] status," which violates the 1st and 14th Amends, of U.S. Const, & State Statutory Law [see: Hewitt v. Helms [1983] 459 US 460, 477 n.9; NAACP v. Claiborne Hardware Co. [1982] 485 U.S. 866, 925; Amer. Arab Anti-Discrimination v. Reno, 70 F3d 1045, 1063 [9th Cir 1995]; Cal. Penal Code § 186.21 & 186.22; People v. Castaneda, 23 Cal. 4th 743, 749 [00]]

2.) Providing "meaningful" review of indefinite [SHU] status, once every (6) yrs., violates the 14th Amend., US Const, Procedural & Substantive Due Process [see: Wilkinson v. Austin [2005] 125 S.Ct. 2384; Hewitt v. Helms, supra; McClary v. Coughlin, 87 F. Supp. 2d 205 [W.D.N.Y. 2000]]

3.) Failure to follow terms of Castillo v. Alameida [USDC-ND Cal #C94·2847] re: "Gang-Activity" definition in CCR-Tit.15 § 3023 [which includes the caveat that such acts be, "unlawful or acts of misconduct classified as serious per. Tit.15 § 3315," which in turn, require a RVR, per. § 3312]; the CDCR/PBSP Reviews are a SHAM, merely rubber stamping inmate informant lies [such as I point out in my 11·19·07 response, disputing 1030's of 3·29·06 & 9·18·06]; & use of artwork that's undated &/or given to me as a legal exhibit; and informant claims of my "status" all violate

〈30〉

Castillo; & additional state & federal law. If there was real evidence supporting illegal acts, a R.V.R. is mandatory!

4.) Keeping me in (SHU) per. § 3378(c), while allowing thousands of active gang members/associates to remain on CDCR-Gen Population [per. 3378(d)], constitutes unequal treatment compared to those similarly situated, thus violating 14th Amend., U.S. Const.

5.) Keeping me on indefinite (SHU) status for over (16) yrs. & counting, without charges & findings of guilt for personal involvement in any "illegal, gang-related" acts; and premising my opportunity for release from (SHU) upon my willingness to agree to become an informant, is a violation of the U.S. Consts. 1st, 5th, 8th & 14th Amendments, as briefly shown by:

Ⓐ I retain the right to remain silent, as well as right to be punishment free when choosing not to speak, per. 1st & 5th Amends. [See: U.S. v. Safirstein, 827 F.2d 1380, 1388 [9th Cir. 1987]; Hydrick v. Hunter, 2006 DJDAR 13181, 13186 [9th Cir 2006]].

Ⓑ Right not to be subject to "informant status," and thus subject myself and family to the danger associated with informants, per. 8th Amend. [See: Valendingham v. Bojorquez, 866 F.2d 1135, 1138 [9th Cir. 1989]

Ⓒ Right to be free from conditions of confinement known to present serious danger to physical and/or mental health and safety, per. 8th & 14th Amends. Prisoners don't have to wait & actually suffer harm to their physical-mental well being to obtain relief from unconstitutional conditions of confinement. It's well known that informants [and their families] face serious risk of danger to their physical welfare—

⟨31⟩

which CDCR is not capable of remedying - Thus, CDCR-Policy of
premising (SHU) release upon one's agreement to become an
informant is a violation [see: Valandingham, supra]; and, it's now
recognized that the longer one is subject to (SHU) confinement
conditions, the greater the risk of suffering serious mental-health
damage - which is also a violation [see: Madrid v. Gomez; and U.S.
v. Basciano, 369 F. Supp. 2d 344 [E.D.N.Y. 2005], for examples]
A federal court has given CDCR notice that a combination of the
above (2) factors [physical harm & mental health - risks]
combine - to create an 8th Amend. violation per. criteria and
principles in Helling v. McKinney (1983) 509 US 25; and Ordered
CDCR to release the prisoner from PBSP-SHU [see: Griffin v.
Gomez, USDC-ND Cal #C98-21038 J.W., Order Granting Writ, Filed:
6·28·06, citing Wilson v. Seiter (1991) 501 U.S. 294, 304-305 RE:
combined conditions]]

You are on notice, failure to cease the practices/policies
briefly described will be cause for litigation, on above grounds
[but not limited to such grounds)

82.) Ashker requested relief, as follows:" Release from [SHU] to a G.P.
[alternatively, creation of a modified-less restrictive program with
G.P. type programs & privileges]; and to be fully compensated for my
(16) plus, years of illegal-pretextual-indefinite (SHU) confinement,
and CDCR-PBSP's compliance with state & federal law & CCR-
Tit. 15, Rules & Regulations re: Gang Activity & RVR [U55]," [4]
83.) The appeal was denied by Defendant Horel, at the Warden's
level on June 2, 2008.

<32>

84.) Defendant's Horel and Wise, denied the appeal, claiming they "conducted a thorough investigation into Ashker's claim" and, "Ashker did not raise any legitimate questions/evidence in his rebuttals to change outcome of active/inactive review".

85.) Ashker's position is that Defendant's Horel and Wise, did not conduct a substantive, independent investigation into the substantiation of the confidential inmate informants claims, in lieu of Ashker's rebuttal(s); and in fact merely rubber stamped the OCS' chrono. [Based on info. and belief. i.e., Def. Wise claims he conducted and completed this "thorough review/investigation" in one day [5-28-08]; and testimonies of Def. McGrath, and other I.G.I. staff, at the Lira, supra, trial, admitting no substantive investigations are done on appeals re: gang-status]

86.) Defendant's Horel, and Wise, ignore all of Ashker's other points re: 1st, 5th, 8th Amendment violations, inspite of reference to supporting case law. This is deliberate indifference [based on info and belief, these defendants were personally made aware of these Constitutional violations via numerous inmate appeals; the Griffin ruling of 2006, referenced above; and numerous inmates becoming mentally ill in [SHU] at PBSP] [And doing nothing to fix the problems]

87.) On Oct. 7, 2008, Defendant Cate, denied the appeal at the Director Level, by rubber stamping the Warden's response, and ensuring the continuation of such Constitutional violations, inspite of being repeatedly put on notice [per. same manner as Def. Horel, as stated above.] [see above paras #5, 14, 19-41 re: Mr. Cate's duty(s), and failures thereof demonstrating and supporting liability; Also, on Feb. 5, 2010, Plaintiff's sent Governor Schwarzenegger, and Sec. Cate, an (11) pg complaint re: PBSP-SHU conditions violating US CONST. & U.N.C. AiT. [Mr. Cate replied on 3/18/10 "File a 602, if you haven't already"]

⟨33⟩

HARMFUL EFFECT FROM 23 YEARS OF SHU-CONFINEMENT

88.) Ashker has presently been subject to more than [23] years of continuous [SHU] confinement; the past [17+] years of which have been arbitrary and pretextual [based on defendants allegation that his gang-classification-automatically make him a serious threat to safety/security, requiring [SHU] housing for administrative reasons - indefinitely [until he dies, or agrees to become an informant], ..., while allowing tens of thousands of gang-affiliates to be in gen-population prisons], without being found guilty of ever committing an illegal, gang-related act.

89.) Defendants have punished him for refusing to become their inform-ant, and exercising his first amendment right of choosing not to speak; and, prior to being classified as a gang-affiliate, he was never notified the label would be cause for indefinite (SHU), unless he agreed to become a known informant for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy constituting an eighth amendment violation]

90.) Ashker has been isolated in (PBSP-SHU) since May 2, 1990, and has no information to provide; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and unwilling to place himself or family in the position of the serious danger informants face.

91.) This [23+] years of punitive (SHU) confinement has caused the ongoing harm, exemplified below:

Ⓐ PBSP-SHU conditions are intentionally punitive [more so, than the other [3] SHU-facilities across the state-based on info. and belief]; with the purpose of coercing inmates to become informants. Examples are: more restrictions on allowable types of magazines and books, appliances, packages, clothing; lengthy mail delays, non-contact visits, no phonecalls, no education opportunities [that require proctored exam's]

‹34›

For (24)yrs Ashker has been denied normal human contact & subject to sensory depriv

(B) Ashker has had no physical contact with family, no phone-calls, and no photographs of himself to send to family for 24 years; many of his neices, nephewss and other relatives have never seen him - in person or photo. This, together with years of lengthy mail delays, has caused estrangement from many family members. And, as of the past year Defendant Jacques and Cate have cut off (SHU) educational opportunities [while permitting (SHU) informants such education ops., and, contact visits, phone calls, photo's, canteen in packaged wrappers,etc.]

(C) He has been eligible for parole since (2004); however, the [BPH] has an unwritten policy of issuing all (SHU) lifer's, multi-year denials. And they have applied this to Ashker in [2003] with a [5] year denial, and in [2008], with a [4] year denial [see details in below para's # 141 to 149]

(D) Ashker's mental health has been damaged as a direct result of his [23] plus years of [SHU] [based on info. and belief; e.g., experiences with insomnia, hypersensitivity, anxiety, aggression, rage, lethargy; difficulty with concentration, focus, and communication. And, sensory overload with related discomfort when leaving his cell/pod area]; and, there's a serious risk that he may suffer severe mental illness - the longer he's subject to SHU [per many studies conducted between 1975 to present] And his physical health has suffered, as he has a chronic pain condition from a permanently disabled right arm [caused by an exploding bullet fired by a PBSP-SHU Guard Ashker v. CDC, 112 F3d 392 (9th Cir 1997)] and his care and treatment has been harmed by his (SHU) placement — and has resulted in numerous civil-suits before this court].

⟨357

[D.] General Facts Re: Plaintiff Danny Troxell

92.) Plaintiff Troxell has been incarcerated in the CDCR prison system since July 1979, per, 26 year-to-life sentence – imposed after his plea of guilty to First degree felony murder [while robbing a market the manager ran up and grabbed the end of Troxell's shotgun, causing it to discharge – killing him instantly]

93.) Soon after his arrival in CDCR, he was accused of being involved in a melee, and ended up in San Quentin (SHU); wherein he received additional rule violations that extended his stay there until being transferred to Folsom Gen. Population in January 1984.

94.) Upon his arrival at Folsom, he attended committee for clearance to G.P., and it was at this committee hearing that he was told for the first time that CDCR had classified him as an A.B. associate [This had been done at San Quentin, in 1982, based on allegations by confidential inmate informant – perjuror, Mike Thompson] This happened without notice, or opportunity to be heard – and Troxell immediately denied this.

95.) The Folsom committee cleared him for the G.P., inspite of the gang-assoc. Label; where he remained [programming via working in the kitchen and receiving positive work evaluations. And maintaining a good relationship with his fiancée and daughter via regular contact visits] until being placed back in (SHU) on Oct. 30, 1985, for unspecified reasons.

96.) Soon after this, he was transferred to an isolation strip cell in Chino – for unspecified "investigation" reasons. At Chino, he was lucky to get a visit once a month – behind glass; he was not charged with anything and believed he'd be back on G.P. within a year, because he hadn't done anything; and he married his fiancée in June 1986.

<36>

97.) In late [1986] he was transferred to newly built (SHU) at Tehachapi [CCI-IV]; wherein he was informed for the first time that he was on indeter minate (SHU) status because of his gang classification, and in order to get out he'd have to debrief [become an informant]. At the time, no one had ever heard of this before; and between 1979 to 1986, no one ever notified Troxell that a gang label was cause for indefinite (SHU), until becoming an informant.

98.) On January 4, 1988, his cell-mate assisted him with a 602 Appeal, challenging his indefinite (SHU) status [and release requiring informant status], on the basis that he had never been charged and found guilty of committing an illegal, gang-related act.

99.) This appeal was denied at the Director's level of review on April 11, 1988 [Direct or log #8801657], based on, "... your A.B. involvement and its threat to institutional security" [while at the same time, tens of thousands of gang-affiliates were in general population prisons, all over the state. Based on info. and belief]

U.S. Constitutional Violations RE:

<u>Troxell's Initial Gang Validation</u>

100.) On May 25, 1989, the SSU - at CDCR Headquarters, received a gang-valid- ation package from CCI - Gang Investigator C. Ford; this package contained [5] Confidential Memorandums dated: 5-2-88; 7-26-88; 8-5-86; 8-10-86; and 1-9-89. [NOTEABLY these memos were created soon <u>after</u> his [602] was denied <u>Id</u>]

101.) The [5] confidential memos referenced above were composed from conf. inmate informants [4 of whom claimed Troxell was an A.B. member, and (1) of whom claimed Troxell was running Folsom's 2 Bldg, for the A.B, in 1985]; the [1989] SSU-Review determined this was sufficient to validate Troxell as an A.B. member, all without notice or opportunity to be heard.

<37>

102.) On Dec. 27, 1989, Troxell was transfered to PBSP-SHU, where he has been housed ever since. Soon after arriving at PBSP-SHU, an administrator told him he would remain in PBSP-SHU until he died, paroled, or debriefed.

## US Constitutional Violations RE:
## Troxell's Re-Validations & Denial of Inactive Status

103.) On Dec. 14, 1999, ICC referred Troxell's case to the Law Enforcement Laison Unit [LEIU] at CDCR-Headquarters [via PBSP-I.G.I.] for clarification of his current gang-status [to determine if he met inactive status]

104.) On April 12, 2000, another ICC-Committee noted, "...Committee reviewed subject for inactive gang status and the date of the most recent gang-activity, as noted in the c-file, could not be established. On Dec. 14, 1999, ICC referred this case to the (LEIU) for gang status clarification. The (LEIU) review is pending."

105.) On March 21, 2001, another ICC-Committee noted that "S was referred to [IGI] by ICC of Dec. 14, 1999, for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to resubmit the referral to [IGI] for inactive gang status review."

106.) In June 2001, the LEIU/SSU determined Troxell was an active A.B. member based on Defendant Wise' presentation of (2) Confidential Memos dated: 9-20-99; and 8-3-00 [noteably, these conf. memo's were absent from Troxell's File when ICC looked for this type of information in 1999, 2000, and March 2001]

107.) These (2) confidential memos were based on conf. inmate informants' claimed (1) Troxell was an A.B. member keeping a low profile; and (2) Troxell was a member of the A.B. council.

⟨38⟩

108.) On June 23, 2001, the [LEIU] issued a CDC-128B-2 Chrono, validating Troxell as active, based on the (2) Conf. Memos referenced above, and stated he could request a new inactive review after Aug 3, 2006.

109.) Prior to this June 2001, (LEIU) review, Troxell was not provided with any notice of the information used against him [i.e., the (2) conf. memos] nor was he given opportunity to respond. The first time he was aware of this was when his counselor gave him the (2) CDC-1030 Confidential disclosure forms ... AFTER the June 23, 2001 (LEIU) decision. Troxell maintains he is not affiliated with any gang.

110.) On July 8, 2003, the LEIU/SSU reviewed Troxell's status, and again deemed him to be an active gang-member based on the same conf. memos from [1989, and 2001]; again, this was done without notice or opportunity to be heard.

111.) On July 25, 2003, Troxell celled up with Ashker; prior to this Troxell did not file additional 602 Appeals to challenge (SHU) issues, because he saw it as a futile effort to challenge the false claims against him, with the CDCR-PBSP staff just rubber-stamping each others decisions.

112.) On Feb. 23, 2004 Troxell was party to the Group Appeal submitted by Ashker, requesting program opportunities - recommended by the [BPH] to enhance parole suitability.

113.) Defendant McGrath and Woodford denied the appeal at all levels by July 22, 2004, on the basis of, "... you're a member of a terrorist group, and until you fully cooperate with the authorities to bring down the A.B., you will remain in (SHU), and should never be paroled" [see above para's #64 [A-to C, re: group appeal and Ashker's allegation's that the "inactive-reviews" are a SHAM. Troxell agrees, and re-alleges the same. An example being his own review, started in [1999] and ending June 2001, after Def. Wise fabricate

<39>

the Sept. 20, 1999, and Aug. 3, 2000, Conf. Memo's. See details in above
para's #103-108]

114.) Between Nov. 8, 2004 and April 11, 2005, Troxell attempted to file (4) 602-
Appeals, challenging Defendant's policies re: indefinite (SHU) status, the
"informant status" requirement for release, and "inactive" criteria. Defendant
Bradbury, refused to process all of these appeals on the pretext that they were
"untimely" [CCR-Title 15 states inmates have the right to challenge any policy(s)
which have an adverse impact]

115.) Def. Bradbury, rejected the above appeals, at the same time the appeal
exhaustion issue was pending in USDC-N.D. Cal.#C04-1467CW [Dismissed
without prejudice for failure to exhaust in early June 2005]

116.) On June 7, 2005, Troxell submitted another 602 Appeal, #C05-01550 [this
appeal was the same as Ashker's appeal #C05-01551. See above para's #68-71].

117.) In this appeal he specified that, ...he was "challenging CDCR policy(s) of
subjecting him to indefinite [SHU] status, for over [20] years [at that time], based
on their gang-label. He pointed out that he had never received a CDC-115 rule
violation for committing an illegal act on behalf of a gang, the gang label was
based on hearsay from undisclosed inmate informants; and, the continued
[SHU] status was used by the [BPH] to justify (4) year parole deferral in [2001],
and his only avenue for [SHU] release is via debriefing, or inactive status.

118.) The above referrenced appeal pointed out that the policies and
practices at issue violated U.S. Constitutional 1st, 5th, 8th, and 14th Amend-
ments, as follows: [wherein, he listed the same points, and case law as
Ashker's appeal. See above para # 69 [A-E] for details]

119.) Defendant Kirkland, denied the appeal at Warden's level of review, on Aug. 22,
2005 [the same day, for the same reasons as Ashker's. See above para # 70]

120.) On Dec. 12, 2005, Defendant(s) [Hickman or Woodford] denied the appeal at

<40>