Supreme Court has repeatedly interpreted to mean that "sanctionable gang-activity" requires "a conviction for felonious, gang-related acts; not for innocuous-associational activity." [e.g., People v. Castaneda [2000] 23 Cal.4th 743, 749]

(b) Plaintiffs are informed, and thereby allege, Defendants Hickman, or Woodford, stipulated to the above referenced interpretation of Title 15 §§ 3000, and 3023, re: definition of "gang-activity", when they settled Castillo v. Almeida, USDC-ND #C94-2847 [in 2004]. However, Defendants have continued to use "innocuous activity", to keep Plaintiffs in SHU- indefinitely [see below paras # 42-137].

(c) Defendants also claim, reliable confidential 'inmate' informants have provided information of Plaintiffs' involvement in "felonious gang-activity", on numerous occasions, over the course of the past [20+] years; and used these allegations to keep them in SHU- indefinitely [thus, making them ineligible for parole. see paras # 141-161], without ever issuing a single CDCR-rule violation rpt. [R.V.R.], in violation of CCR-Title 15 §§ 3312(A)(3), and 3315(A)(2), which mandate that any serious misconduct constituting a violation of CDCR- rules, or law, that is supported by credible evidence, "... shall be reported on a CDC-115 [R.V.R.]." Which in turn, requires specific due process [e.g., notice of charge(s), right to investigative-employee, right to call witnesses, and a hearing that relies on the "preponderance of evidence" standard of proof]; Defendants intentional, repeat circumvention of these rules violates due process [alternatively, it means the informants were not credible; thus, relying on them also violates due process. As detailed and supported in paras # 42-137] [BPH-Defendants reliance on the info. is a violation too. [paras # 141-161]]

(d) Defendants claim a CDCR- classification, stating an inmate is a validated prison gang assoc., or member, mandates indefinite SHU-status, because this automatically means the inmate "is deemed to be a severe threat to the safety of others, or security of institutions" per CCR- Tit.15 § 3341.5(c)(2)(A)2. However, this mandate includes an exception, referring to Title 15 § 3378(d), which states, "a gang member/assoc. in "general population" may be considered for review for 'inactive status', with (2) years of 'no documented gang-activity.' These (2) Title 15 sects., were legally promulgated [per. A.P.A.], in August 1999, in response to a court ruling [see above, paras # 29-30]. Indefinite SHU- status, has always been applied arbitrarily, and presently there are

⟨10⟩

tens of thousands of gang members/assocs, in CDCR-general population prisons; while a few hundred have been in SHU-more than (20) years, without ever being found guilty of committing an illegal, gang-related act [including Plaintiffs. See para's #42-137]

(e) The above referenced policy(s) are also contradictory and vague; per. 3341.5(c)(2)(A)2, a CDCR-gang label mandates indefinite SHU [but] there's an exception to this mandate, per. 3378(d) [but] there is no reference re: exception criteria.

(f) The above referenced policy [§3378(d)], is also arbitrary because it allows gang affiliates in general population to be eligible for "inactive review," with (2) years of no documented gang-activity; compared to Plaintiffs, who are eligible for "inactive review," in (6) years [per. §3378(e)]

(g) CCR-Title 15 § 3341.5(c)(2)(i) specifies, "an inmate on indeterminate SHU-term shall be reviewed by a classification committee at least every [180] days for consideration of release to a general inmate population"; and, Title 15 § 3341.5(c)(3) specifies, "an inmate cannot be retained in SHU-beyond (11) months, unless a classification committee determines retention beyond this time period is required for one of the following reasons,"... (B) Release would severely endanger the lives of staff, inmates, or security." The problems with these policies are:

1) CCR-Tit 15 § 3341.5(c)(2)(A)2, mandates indefinite SHU-terms for validated gang-affiliates [but] includes reference to an exception [without] reference to exception criteria [thus, it is vague, arbitrary, and contradictory. See above para's #35 (d)(e)]

2) The Court mandated (180) day committee reviews are not meaningful, since they provide no substantive due process; and, the outcome is predetermined, because the committees have no authority to change Plaintiffs SHU-status, unless they have previously debriefed. Such (180) day reviews are shams [Id, Lira Order, p.#42]

(h) CCR-Tit 15 §§ 3341.5(c)(5)(6), and 3378(e)(f), were legally promulgated [per. A.P.A.] in August 1999; these allegedly provide inmates on indefinite SHU-terms, with an alternative to "debriefing" out of SHU, called "inactive" status. This requires (6) years of zero documented gang-activity, and an LEIU-recommendation to committee, to release the inmate from SHU. The problems with this are:

⟨11⟩

1) Defendants continue to abuse the definition of "gang-activity," in order to deny Plaintiffs inactive status [per. (6) year reviews], by relying on innocuous association with members of their race, and use of common symbols in art, and inmates claiming they are gang-members [without ref. to activity]; and, unreliable, unsubstantiated, allegations of illegal activity, provided by confidential inmate informants [See para's #36-137]

2) "Inactive status" is vague, arbitrary, and contradictory [See above para's #35(F)]

3) "Inactive status" avenue for SHU-release is a sham, used by Defendants in their efforts to coerce inmates to become CDCR-informants [e.g., periodically releasing a few longterm SHU-inmates to general population for a brief time, then telling them, "Your name's come up again, re: gang-activity, you can debrief now and stay in g.p., or go back to SHU for at least (6) more years." See para. #64]. Noteably, Defendants Woodford, and McGrath, told Plaintiffs in 2004, that their only way out of SHU, is informant status [para. #64]

[b] General Facts Re: Defendants Violations Of Plaintiffs U.S. Constitutional Rights
   [via policies, customs and practices re: use of inmate informants]

36) Plaintiffs gang validations are based on statements about them from confidential inmate informant-debriefers.

37) Plaintiffs incorporate above [para's #31 & 33] here, and state the same Defendants, at all times specified herein, knew at the time, or should have known in the proper performance of their official duties, that the following are violations;

38) Defendants claim they have to keep the identities, and details of statements from inmate informant-debriefers, a secret because regardless of how many years have passed, divulging this information will place the informant, and his family members at risk of retaliation [See e.g., Lira, supra, Order, p. #33, fn. 27]

39) Defendants refuse to formally disclose the identities, and statements, of conf. inmate informant-debriefers, claiming safety issues [see above para.]; however,

⟨12⟩

they also require the debriefer to become a known informant against other gang-affiliates [they have to know the debriefer told staff harmful information about them, so that they will never accept the debriefer back].

40) Thus, Defendants are committing at least (2) constitutional violations via their policies, and custom referenced above [para's #38-39], as follows:

(a) To get out of SHU [and have a chance to parole], they require the debriefer to become a known informant against other gang-affiliates, knowing this puts the inmate, and his family, in serious danger - potentially for life [knowing they aren't able to protect informants, or their families; and Def. McGrath admitted that CDCR doesn't track the number of debriefers, and their families, retaliated against - due to the "burden" this would impose [McGrath's Admits, USDC #C05-3286CW]

(b) While at the same time, refusing to formally disclose the informants identity, and specific allegations made by him, due to professed safety concerns; thereby, causing serious prejudice to Plaintiffs ability to defend themselves [on top of which, Defendants conduct no subjective investigations. See para's #23-24]

41) At all times specified herein, the same Defendants knew at the time, or should have known in the proper performance of their official duties, about the additional constitutional violations re: use of inmate informants to justify Plaintiffs, and those similarly situated, to indefinite SHU-status, as shown by:

(a) Defendants policy, custom, and practice of making SHU-conditions progressively more harsh and restrictive for the purpose of coercing inmates to implicate themselves, and others, in gang-activity, violates the 1st, 5th, and 8th Amendment [and U.N.C.A.T.], as summarized in para's #138-140.

(b) Defendants are aware that the severity of the overall SHU-conditions, has been the cause for many inmates to: go insane; die or have worse health; and, to become so desperate, they will, and have, agreed to become known informants [via debriefing], willing to say anything, about anyone, so they can leave SHU, and have a chance to parole

⟨13⟩

inspite of the risks; and whose debriefings are "coached-along" by gang unit staff, and whose stories are largely based on: rumors, innuendo, and imaginative elaborations on information spread by staff, other inmates gossip, published legal cases, newspapers, magazine articles, and T.V. programs [e.g., Oct./Nov. 2002, news story, with Plaintiffs photos and alleged conspiracies [based on review of rpts., and SHU-isolation]

(c) Subjecting Plaintiffs to [23-24+] years of indefinite SHU, based on stories from confidential inmate informants - without reliable corroboration [supported by fact that not a single CDC-115 R.V.R. has been issued to them re: illegal gang-acts. See para's #35(a-c), and #42-137], inspite of the fact that such informants are notoriously unreliable, manipulators and opportunists [based on: common knowledge, e.g., published legal cases, numerous studies, and the 1988 [60]Minutes news program, demonstration by notorious L.A. Jail informant, Leslie White], worsened by fact Defendants failure to review said informants stories, substantively.

(d) Defendants, and their agents, assist inmate informant [debriefers], who have personal knowledge-credibility problems [due to isolation of PBSP-SHU], by way of, strategical placement near inmate targets [e.g., those up for their (6) year, inactive review]. Such placement(s) may be: in adjacent holding cells at med. clinics; on clinic bus; law library; visit area; or, shifting them to different cell-blocks [this provides the informant with corroboration for his claim that, 'so and so, personally told him about conspiracies', via review of movement and housing records [based on, personally witnessing such antics many times in last (20) years.]]

(e) Defendants, and their agents, routinely claim that confidential informant-debriefers, meet "reliability" criteria [per CCR-Tit 15 §3321], when in fact they did not, as illustrated by:
  1) Their reliability re: specific claims, about a [specific inmates activity] is not even tested [based on Plaintiffs own experience in last (20) years; and noted in Lira Order, pp 46-48]
  2) Claim they're "reliable" because, "the debriefing inmate incriminated himself" when the reality is, debriefing involves no risk of self-incrimination [Id., Lira, p 46:18-22]

(f) Defendants, and their agents, give no credence to Plaintiffs points, denying and

⟨14⟩

disputes, of the informant allegations [limited, since no specifics are provided]; nor do they substantively investigate the informant's claims, in response to Plaintiff's points, disputing the generalized-scanty allegations provided [Based on personal experience, see below para's #42-137; and Def. McGrath's testimony, ref'd in Lira Order, pp. #40-41]

## US Constitutional Violations Re: Ashker's Initial Gang Validation

42) Plaintiff Ashker was originally validated as a member of the Aryan Brotherhood (A.B) prison gang on May 23, 1988. This was based on the submission of (12) confidential memos from C.S.P.-S.C. [New Folsom] gang investigator Rosario, to the CDCR-SSU [on March 22, 1988, the same month he was arraigned on the Murphy case, summarized below].

43) This initial validation was done without giving Ashker any notice of allegations made against him; nor was he interviewed, or given the opportunity to respond/dispute-allegations.

44) Ashker was not even notified that he had been validated, until months later [Late 1988 or early 1989], which is when he received a chrono, stating he was an A.B. member, without reference to evidentiary basis. Beginning in 1989, he challenged/denied being an A.B. affiliate - via 602 appeal [in several more 602's since then], all were denied [not a surprize, as per Def. McGrath's trial testimony, and findings of fact, in Lira, supra, Order, pp #40-42..." Once an inmate is validated as a prison gang affiliate, it is virtually impossible to undo a wrongful validation. This is because subsequent institutional classification committee [I.C.C.] reviews, and the CDCR-602 Appeals process, are both perfunctory-procedural reviews; no type of substantive review is done."

45) Ashker denies A.B. affiliation to this day, and his position is that the initial validation was totally lacking in procedural and substantive due process, and was wrong. On May 22, 1987, Ashker attended the classification committee, at C.S.P.-S.C. [New Folsom Prison], which was documented, and noted that he had no gang-affiliation at all.

⟨15⟩

Ashker's possition is that the original validation was created by C.S.P.-S.C., gang-investigators, with the assistance of fabricated stories from unreliable inmate informants; and the purpose was so CSP-S.C. staff would be able to support their theory that the Murphy case was an A.B. gang-hit, and thus, the original validation came about as follows:

(A) On May 25, 1987, CSP-S.C. prison staff charged Ashker with the murder of inmate Murphy. CDCR-had inmate Murphy classified as a member of the A.B. prison gang; and rumors began spreading that Murphy's death was the result of an A.B. gang-hit.

(B) On August 6, 1987, C.S.P.-S.C., B-Facility (SHU) opened the remodeled B1-A-Section [called Bedrock]; wherein, all metal had been removed from the (24) cells — the bunks, replaced with cement slabs. Inmates there were only allowed a small amount of legal material, and (1) book - no other property, or canteen was allowed. Ashker was housed there that day, because of the Murphy incident. There were (15) other white inmates housed there that day too, most of those were based on A.B. classification.

(C) In March 1988, Ashker was arraigned in Sacramento Co. Municipal Court, on the Murphy case [the same mo. Rosario submits gang pkg. See para.#42]. He proceeded pro-per, to the point of the March 1990 trial. It was during discovery that he learned [CDCR's theory] was that A.B. leader Norris, had ordered Ashker to kill Murphy, based on his belief Murphy had turned informant. This theory was based on story's from confidential inmate informants stating this [Steve Larson, in June of 1987, and Robert Rowland, in November of 1987, ... both of whom were seeking a way out of C.S.P.-S.C. [New Folsom] SHU; and in Rowland's

⟨16⟩

case, out of Bedrock and prison, via protective custody - which requires informant status]

(D) The (2) informants claimed Ashker and Tanner killed Murphy per. order from Norris [an A.B. hit]. This was the only information given to Ashker [re: A.B. affiliation link, between 1987 - 1994 [95]].

(E) The trial began in March 1990, the prosecutor declared that the only evidence to support [CDCR - A.B. hit theory] were inmate informants - who he was not using because he did not find them credible. And he never argued, or put on any affirmative evidence of an "A.B. hit" [informing the court, and jury, he didn't know what the motive was]. Norris testified to begining the "debriefing" process in Jan. 1990, and passing a lie detector test - including questions re: Murphy case [i.e. he gave no order, and had no ill will against Murphy] and that he sent Murphy the knife, he requested to use on Ashker, over a personal dispute.

(F) Ashker's (SHU) term for rule violations was set to expire in (1992), and in January 1992, PBSP - Committee, placed him on "indefinite (SHU) status", based on the A.B. label [the basis of which was not disclosed] Ashker did a 602 Appeal, denying gang-affiliation, and requested release to a G.P. to be able to program. This was denied at all levels of review.

(G) In response to Madrid, the gang-validations of all (PBSP-SHU) inmates were reviewed in 1995. In 1994-1995, Ashker received copies of the 1030 - confidential disclosure forms [re: 1988 validation], a few of which were specific enough to challenge via 602 Appeals, to no

⟨17⟩

18

avail [not surprizing, considering such receive no "substantive" type of review, per Lira Order, supra] And the SSU's review resulted in rejection of (4) of the (12) 1988 documents [per. Madrid Court directive i.e. cumulative] and "re-validated" Ashker, again, without opportunity to be heard.

46.) Ashker has rarely attended any of the 180 day committee reviews of his indefinite (SHU) status, because they have no authority to change his status to G.P., absent his successful debriefing [beforehand]; per. what administrators told him when he arrived at PBSP-SHU in 1990 ["the only way you'll leave is to "parole, die, or debrief"] and the Title 15§ 3341.5; and comm. chronos [pre-printed forms, that all state the same thing]

47.) The committees, C.S.R.'s reviews, and 602 Appeals process, do not provide any substantive due process re: gang-validation challenges, per. Lira Court trial testimonies of Defendant McGrath, and others, supra, and exemplified by the following:

Ⓐ In 1999 Ashker received a chrono by CSR Morton, upholding the (ICC) recommendation for continued indefinite (SHU) status, based on 1995 re-validation [per. (8) documents from 1988], on the basis of "... continuing association and participation in criminal conspiracies that threaten safety-security."

Ⓑ Ashker filed a detailed 602 Appeal, challenging this determination, and asking that evidence of his personal involvement in any criminal conspiracies be produced [pointing out he'd received no 115 RVR's for any conspiracies], and disputing the items used in 1988, wherein conf. inmate informants claimed he had committed an illegal act, of

⟨18⟩

which there were the following [with 602 Appeal response to each]

1. Claimed Ashker stabbed inmate in early 1986, on Folsom G.P. ["to make bones for A.B"]; informant made claim around April 1986 - Yet, Ashker was on G.P. until August 1986, and has never been charged [this was not even disclosed to him until 1994 or '95] [Ashker's points ignored]

2. [Claims] Ashker killed Murphy for A.B.; Ashker submitted some of the trial transcripts, wherein the prosecutor stated he was not using them due to <u>credibility problems</u> [response: CDCR criteria is different than prosecutor's]

3. Claimed Ashker assigned to hit inmate Estem; however, he never touched Estem [Ashker's points ignored]

4. Ashker requested each source to be investigated re: credibility issue(s) [this was denied]

each level denied this appeal, without any substantive review [per. Lira, supra; and responses denying Ashker's request for such review]

<u>Ashker's Re-Validations & Denial of "Inactive Status"</u>

48.) On August 30, 1999 the CDCR legally promulgated the alternate avenue for validated gang affiliates to gain their release from (SHU), referred to as "inactive status" [see above paras #23[E-H] describing this change in policy, how it works, and allegations that it is applied arbitrarily, and is a SHAM]

49.) As of 1999, Ashker had well over the required (6) years in, without documented allegations of gang-activity [the last ones being the 1988-submissions referenced above]; however, he was not reviewed until 2001.

<19.>

20