81.) The appeal continues, ... On [4-22-08], I received my copy of the SSU-Review, finding me ineligible for "inactive" status; and notifying me my next 'review' will be [10-29-13] [see copy of CDC-128B-2 ...] This means, between now & [10-29-13] my only way out of [SHU] is to die, parole, or become an informant... Such policy(s) & practices violate clearly established Law, as briefly stated below [note: these issues will be pursued in Court]

1.) Punishment based on "status" [association - label], without ever being found guilty of a single gang related - illegal act, is a pretext for "indefinite [SHU] status," which violates the 1st and 14th Amend's of U.S. Const, & State Statutory Law [see: Hewitt v. Helms [1983] 459 US 460, 477 n.9; NAACP v. Claiborne Hardware Co. [1982] 485 U.S. 866, 925; Amer. Arab Anti-Discrimination v. Reno, 70 F3d 1045, 1063 [9th Cir 1995]; Cal. Penal Code § 186.21 & 186.22; People v. Castaneda, 23 Cal. 4th 743, 749 [00]]

2.) Providing "meaningful" review of indefinite (SHU) status, once every (6) yrs., violates the 14th Amend., US Const, Procedural & Substantive Due Process [see: Wilkinson v. Austin [2005] 125 S.Ct. 2384; Hewitt v. Helms; supra; McClary v. Coughlin, 87 F. Supp. 2d 205 [W.D.N.Y. 2000]]

3.) Failure to follow terms of Castillo v. Alameida [USDC-ND Cal #C94-2847] re: "Gang-Activity" definition in CCR-Tit 15 § 3023 [which includes the caveate that such acts be, "unlawful or acts of misconduct classified as serious per Tit 15 § 3315; which in turn, require a RVR, per § 3312]; the CDCR/PBSP Reviews are a SHAM, merely rubber stamping inmate informant lies [such as I point out in my 11-19-07 response, disputing 1030's of 3-29-06 & 9-18-06]; & use of artwork that's undated &/or given to me as a legal exhibit; and informant claims of my "status" all violate

⟨30⟩

31

Castillo; & additional state & federal law. If there was <u>real evidence</u> supporting illegal acts, a R.V.R. is <u>mandatory</u>!

4.) Keeping me in (SHU) per. § 3378(c), while allowing thousands of active gang members/associates to remain on CDCR- Gen Population [per. 3378(d)), constitutes unequal treatment compared to those similarly situated, thus violating 14th Amend., U.S. Const.

5.) Keeping me on indefinite (SHU) status for over (16) yrs. & counting, without charges & findings of guilt for personal involvement in any "illegal, gang-related" acts; and premising my opportunity for release from (SHU) upon my willingness to agree to become an informant, is a violation of the U.S. Consts. 1st, 5th, 8th & 14th Amendments, as briefly shown by:

    (A) I retain the right to remain silent, as well as right to be punishment free when choosing not to speak, per. 1st & 5th Amends. [<u>See</u>: U.S. v. Safirstein, 827 F.2d 1380, 1388 [9th Cir. 1987]; Hydrick v. Hunter, 2006 DJ DAR 13181, 13186 [9th Cir. 2006]].

    (B) Right not to be subject to "informant status," and thus subject myself and family to the danger associated with informants, per. 8th Amend. [<u>See</u>: Valandingham v. Bojorquez, 866 F.2d 1135, 1138 [9th Cir. 1989]

    (C) Right to be free from conditions of confinement known to present serious danger to physical and/or mental health and safety, per. 8th & 14th Amends. Prisoners don't have to wait & actually suffer harm to their physical-mental well being to obtain relief from unconstitutional conditions of confinement. It's well known that informants [and their families] face serious risk of danger to their physical welfare—

⟨31⟩

32

which CDCR is not capable of remedying — Thus, CDCR-Policy of premising (SHU) release upon one's agreement to become an informant is a violation [see: Valandingham, supra]; and, it's now recognized that the longer one is subject to (SHU) confinement conditions, the greater the risk of suffering serious mental-health damage — which is also a violation [see: Madrid v. Gomez; and U.S. v. Basciano, 369 F. Supp. 2d 344 [E.D.N.Y. 2005], for examples]

A federal Court has given CDCR notice that a combination of the above (2) factors [physical harm & mental health - risks] combine — to create an 8th Amend. Violation per, criteria and principles in Helling v. McKinney (1983) 509 US 25; and Ordered CDCR to release the prisoner from PBSP-SHU [see: Griffin v. Gomez, USDC-ND Cal #C98-2103BJW, Order Granting Writ, Filed: 6-28-06, citing Wilson v. Seiter [1991] 501 U.S. 294, 304-305 RE: combined conditions]]

You are on notice, Failure to cease the practices/policies briefly described will be cause for litigation, on above grounds [but not limited to such grounds]

82.) Ashker requested relief, as follows: "Release from [SHU] to a G.P. [alternatively, creation of a modified - less restrictive program with G.P. type programs & privileges]; and to be fully compensated for my (16) plus, years of illegal - pretextual - indefinite (SHU) confinement, and CDCR-PBSP's compliance with state & federal law & CCR-Tit. 15, Rules & Regulations re: Gang Activity & RVR (115's)."

83.) The appeal was denied by Defendant Horel, at the Warden's Level on June 2, 2008.

〈32〉

84.) Defendant's Horel and Wise, denied the appeal, claiming they "conducted a thorough investigation into Ashker's claim", and "Ashker did not raise any legitimate questions/evidence in his rebuttals to change outcome of active/inactive review".

85.) Ashker's position is that Defendants Horel and Wise did not conduct a substantive, independent investig. into the substance of the confidential inmate informants claims, in lieu of Ashker's rebuttal(s); and in fact merely rubber stamped the OCS' chrono, [Based on info. and belief. i.e., Def. Wise claims he conducted and completed this "thorough review/investigation" in one day [5-78-08]; and testimonies of Def. McGrath, and other I.G.I. staff, at the Lira, supra, trial, admitting no substantive investigations are done on appeals re: gang-status]

86.) Defendant's Horel and Wise, ignore all of Ashker's other points re: 1st, 5th, 8th Amendment violations, inspite of reference to supporting case law. This is deliberate indifference [based on info and belief, these defendants were personally made aware of these Constitutional violations via numerous inmate appeals; the Griffin ruling of 2006, referenced above; and numerous inmates becoming mentally ill in [SHU] at PBSP] [And doing nothing to fix the problems]

87.) On Oct. 7, 2008, Defendant Cate, denied the appeal at the Director level, by rubber stamping the Warden's response, and ensuring the continuation of such Constitutional violations, inspite of being repeatedly put on notice [per. same manner as Def. Horel, as stated above.]

## HARMFUL EFFECT FROM 23 YEARS OF SHU-CONFINEMENT

88.) Ashker has presently been subject to more than [23] years of continuous [SHU] confinement; the past [17+] years of which have been arbitrary and pretextual [based on defendants allegation that his gang-classification-automatically make him a serious threat to safety/security, requiring [SHU] housing for administrative reasons - indefinitely [until he dies, or agrees to become an informant], ..., while allowing tens of thousands of gang-affiliates to be in gen-population prisons], without being found guilty of ever committing an illegal, gang-related act.

89.) Defendants' have punished him for refusing to become their inform-ant, and exercising his first amendment right of choosing not to speak; and, prior to being classified as a gang-affiliate, he was never notified the label would be cause for indefinite (SHU), unless he agreed to become a known informant for the authorities [and thereby, face serious risk of reprisals, for informant status; such policy constituting an eighth amendment violation]

90.) Ashker has been isolated in (PBSP-SHU) since May 2, 1990, and has no information to provide; and, he's not willing to become an informant for Defendants, or anyone else, based on principle; and unwilling to place himself or family in the position of the serious danger informants face.

91.) This [23+] years of punitive (SHU) confinement has caused the ongoing harm, exemplified below:

(A) PBSP-SHU conditions are intentionally punitive [more so, than the other [3] SHU-facilities across the state - based on info, and belief]; with the purpose of coercing inmates to become informants. Examples are: more restrictions on allowable types of magazines and books, appliances, packages, clothing; lengthy mail delays, non-contact visits, no phonecalls, no education opportunities [that require proctored exams]

⟨34⟩

(B) Ashker has had no physical contact with Family, no phone-calls, and no photographs of himself to send to Family for 23 years; many of his neices, nephews and other relatives have never seen him - in person or photo. This, together with years of lengthy mail delays, has caused estrangement from many Family members. And, as of the past year Defendant Jacques and Cate have cut off (SHU) educational opportunities [while permitting (SHU) informants such education ops., and, contact visits, phone calls, photo's, canteen in packaged wrappers, etc]

(C) He has been eligible for parole since (2004); however, the [BPH] has an unwritten policy of issuing all (SHU) Lifer's, multi-year denials. And they have applied this to Ashker in [2003] with a [5] year denial, and in [2008], with a [4] year denial [see details in below paras # 141 to 149]

(D) Ashker's mental health has been damaged as a direct result of his [23] plus years of [SHU] [based on info. and belief; e.g., experiences with insomnia, hypersensitivity, anxiety, aggression, rage, lethargy; difficulty with concentration, focus, and communication. And, sensory overload with related discomfort when leaving his cell/pod area]; and, there's a serious risk that he may suffer severe mental illness - the longer he's subject to SHU [per many studies conducted between 1975 to present.] And (his physical-health has suffered, as he has a chronic pain condition from a permanently disabled right arm [caused by an exploding bullet fired by a PBSP-SHU Guard Ashker v. CDC, 112 F3d 392 [9th Cir. 1997] and his care and treatment has been harmed by his (SHU) placement - and has resulted in numerous civil-suits before this court.

357

36

[D.] General Facts Re: Plaintiff Danny Troxell

92.) Plaintiff Troxell has been incarcerated in the CDCR prison system since July 1979, per. 26 year-to-life sentence – imposed after his plea of guilty to First degree Felony murder [ while robbing a market the manager ran up and grabbed the end of Troxell's shotgun, causing it to discharge – killing him instantly]

93.) Soon after his arrival in CDCR, he was accused of being involved in a melee, and ended up in San Quentin (SHU); wherein he received additional rule violations that extended his stay there until being transferred to Folsom Gen. Population in January 1984.

94.) Upon his arrival at Folsom, he attended committee For clearance to G.P., and it was at this committee hearing that he was told for the first time that cdcr had classified him as an A.B. associate [ this had been done at San Quentin, in 1982, based on allegations by confidential inmate informant – perjuror, Mike Thompson] This happened without notice, or opportunity to be heard – and Troxell immediately denied this.

95.) The Folsom committee cleared him for the G.P., inspite of the gang-assoc. label; where he remained [programming via working in the kitchen and receiving positive work evaluations. And maintaining a good relationship with his fiancée and daughter via regular contact visits] until being placed back in (SHU) on Oct. 30, 1985, for unspecified reasons.

96.) Soon after this, he was transferred to an isolation strip cell in Chino – for unspecified "investigation" reasons. At Chino, he was lucky to get a visit once a month – behind glass; he was not charged with anything and believed he'd be back on G.P. within a year, because he hadn't done anything; and he married his Fiancée in June 1986.

⟨36⟩

37

97.) In late [1986] he was transferred to newly built (SHU) at Tehachapi [CCI-IV]; wherein he was informed for the first time that he was on indeterminate (SHU) status because of his gang classification, and in order to get out he'd have to debrief [become an informant]. At the time, no one had ever heard of this before; and between 1979 to 1986, no one ever notified Troxell that a gang label was cause for indefinite (SHU), until becoming an informant.

98.) On January 4, 1988, his cell-mate assisted him with a 602 Appeal, challenging his indefinite (SHU) status [and release requiring informant status], on the basis that he had never been charged and found guilty of committing an illegal, gang-related act.

99.) This appeal was denied at the Director's level of review on April 11, 1988 [Director log #8801657], based on, "...your A.B. involvement and its threat to institutional security" [while at the same time, tens of thousands of gang-affiliates were in general population prisons, all over the state. Based on info. and belief]

TROXELL'S Initial Gang Validation

100.) On May 25, 1989, the SSU-at CDCR Headquarters, received a gang-validation package from CCI-Gang Investigator C. Ford; this package contained [5] Confidential Memorandums dated: 5-2-88; 7-26-88; 8-5-88; 8-10-88; and 1-9-89. [NOTEABLY these memos were created soon after his [602] was denied Id]

101.) The [5] confidential memos referenced above were composed from conf. inmate informants [4 of whom claimed Troxell was an A.B. member, and (1) of whom claimed Troxell was running Folsom's 2 Bldg. for the A.B. in 1985]; the [1989] SSU-Review determined this was sufficient to validate Troxell as an A.B. member, all without notice or opportunity to be heard.

⟨37⟩

38

102.) On Dec. 27, 1989, Troxell was transfered to PBSP-SHU, where he has been housed ever since. Soon after arriving at PBSP-SHU, an administrator told him he would remain in PBSP-SHU until he died, paroled, or debriefed.

## Troxell's Re-Validations & Denial of Inactive Status

103.) On Dec. 14, 1999, ICC referred Troxell's case to the Law Enforcement Laison Unit [LEIU] at CDCR-Headquarters [via PBSP-I.G.I.] for clarification of his current gang-status [to determine if he met inactive status]

104.) On April 12, 2000, another ICC-Committee noted, "..Committee reviewed subject for inactive gang status and the date of the most recent gang-activity, as noted in the c-file, could not be established. On Dec. 14, 1999, ICC referred this case to the (LEIU) for gang status clarification. The [LEIU] review is pending."

105.) On March 21, 2001, another ICC-Committee noted that "s was referred to [IGI] by ICC of Dec. 14, 1999, for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to resubmit the referral to [IGI] for inactive gang status review."

106.) In June 2001, the LEIU/SSU determined Troxell was an active A.B. member based on Defendant Wise' presentation of (2) Confidential Memos dated: 9-20-99; and 8-3-00 [noteably, these conf. memos were absent from Troxell's File when ICC looked for this type of information in 1999, 2000, and March 2001]

107.) These (2) confidential memos were based on conf. inmate informants' claimed (1) Troxell was an A.B. member keeping a low profile; and (2) Troxell was a member of the A.B. council.

<38>

39

108.) On June 23, 2001, the [LEIU] issued a CDC-128B-2 Chrono, validating Troxell as active, based on the (2) Conf. Memos referenced above, and stated he could request a new inactive review after Aug 3, 2006.

109.) Prior to this June 2001, (LEIU) review, Troxell was not provided with any notice of the information used against him [i.e., the (2) conf. memos] nor was he given opportunity to respond. The first time he was aware of this was when his counselor gave him the (2) CDC-1030 Confidential disclosure forms ... AFTER the June 23, 2001 (LEIU) decision. Troxell maintains he is not affiliated with any gang.

110.) On July 8, 2003, the LEIU/SSU reviewed Troxell's status, and again deemed him to be an active gang-member based on the same conf. memos from [1989, and 2001]; again, this was done without notice or opportunity to be heard.

111.) On July 25, 2003, Troxell celled up with Ashker; prior to this Troxell did not file additional 602 Appeals to challenge (SHU) issues, because he saw it as a futile effort to challenge the false claims against him, with the CDCR-PBSP staff just rubber-stamping each others decisions.

112.) On Feb. 23, 2004 Troxell was party to the Group Appeal submitted by Ashker, requesting program opportunities - recommended by the [BPH] to enhance parole suitability.

113.) Defendant McGrath and Woodford denied the appeal at all levels by July 22, 2004, on the basis of, "... you're a member of a terrorist group, and until you fully cooperate with the authorities to bring down the A.B., you will remain in (SHU), and should never be paroled" [see above paras #64 (A to C, re: group appeal and Ashker's allegation's that the "inactive-reviews" are a SHAM. Troxell agrees, and re-alleges the same. An example being his own review, started in [1999] and ending June 2001, after Def. Wise fabricate

<39>