152.) Troxell was programming on Folsom Prison Gen. Population, earning positive work evaluations from the kitchen supervisor, until being placed back in [SHU] Oct. 30, 1985, for undisclosed investigatory reasons. Subsequently, he was told he would remain in (SHU) indefinitely – until he agreed to debrief [based on confidential inmate informants, alleging he was an A.B. gang-member. All of Troxell's administrative appeals challenging this gang-label, and related SHU status - debriefing objections, have been denied. See above paras #94-137, for details]

153.) Troxell has been in (SHU) since Oct. 30, 1985, and he has been housed in [PBSP-SHU] since Dec. 27, 1989, where there were no opportunities for him to formally upgrade his education, vocation, or self-help, until 2001, when G.E.D. study [with ability to get the required proctored exams] was offered. Troxell obtained his GED in (2005) - delay caused by vision-problems requiring surgery - his repeat requests to participate in College have been ignored and denied [See above para's #138-140, for details]

154.) That the following facts are examples of parole board commissioner's applying their "unwritten", no parole for (SHU) lifer policy [with Catch 22 of: Become a CDCR informant, so you can get out of (SHU) to a lower level institution where programs are available; or, remain and die in (SHU),... it's your choice]:

    (A) Troxell's initial parole eligibility hearing was held on Sept. 19, 1995 before Comm's Guaderrama, et al., ; they denied parole, and issued a (5) year deferral to his next hearing based on their boiler-plate recital of immutable factors [i.e., life crime; prior criminality and related drug addiction; lack of sufficient programming, continued disciplinary and anti social behavior [his last rule violation, 1988 verbal threat to staff] validated gang-member and SHU-status] [NOTE: Troxell, has read other PBSP-SHU lifer's (BPH) Transcripts, wherein Guaderrama states - as long as they're in SHU - refusing to debrief - no parole]   <60>

B) Troxell's next parole hearing was not held until nearly (6) years later, on July 10, 2001, before Comm's. Welch; Granlund; and Stern. At the time, Troxell was working on his G.E.D., and believed he was still being considered for "inactive gang-status" [having been up for it since Dec. 1999; he did not know the decision to deny this had been made June 23, 2001, based on Def. Wise' fabricated info] [see above - para's #103-108,113]; the Comm's. commended him for his efforts to achieve the G.E.D., and "inactive status" [without careful review of his file, or they'd have seen this had been denied Id., para's 103-108, 113], and then denied parole for (4) years - based on their boiler-plate recital of immutable factors [i.e., life crime; prior crime history and related drug habit; unstable social history; programmed in a limited manner, and failed to upgrade vocationally and self-help, per prior panel's recommendations; failed to demonstrate positive change and continued to display negative behavior [based on SHU-status, and a 1997 fist-fight], as a result he is in (SHU) where his ability to demonstrate parole readiness <u>will remain hampered</u>; lack of parole plans] [NOTE: Troxell has read other PBSP-SHU inmates (BPH) transcripts, wherein Comm. <u>Welch</u> says they need to <u>debrief</u>.]

155.) Troxell's next parole hearing was held (4½) years later, on Jan. 10, 2006, before Defendant's [Comm's. Fisher and Harmon]; Troxell presented evidence at this hearing to challenge the validity of the repeat use of immutable factors to justify the prior panel's decision to deny parole. He also presented several certificates of completion in education and self-help [G.E.D.; Math Studies; Anger Mgt.; Victim Awareness; Life-skills, and others] and viable parole-plans. He also pointed out his only avenue out of (SHU) is via informant-status, and explained why he could not, would not do this.

⟨61⟩

156.) Defendants' Fisher, and Harmon, commended Troxell for his positive achievements, on his own initiative in (SHU), and noted he had viable parole plans; then, they denied parole for (3) years [per application of the no parole for (SHU) policy] stating the following "reasons" without articulation of nexus re: how the factors cited, equate to evidence demonstrating a current danger to public safety:

    (A) Immutable Factors: Life crime; prior crime history, related to his drug-addiction, and institutional discipline history; until recently, had not been programming, in part, due to (SHU) placement; and... "Part of the reason for the multiple year denial, Mr. Troxell, is I'm sure you know, is the fact that you continue to be validated as a member of a prison gang" [NOTE: Troxell has read other PBSP-SHU Lifers (BPH) Transcripts wherein Comm. Harmon, repeatedly infers that they need to debrief out of SHU]

    (B) The above factors fail to constitute "evidence" of current danger to public-safety, as follows [as presented to Defs during the hearing]
        1) Life crime was the unintended death of store mgr. during robbery to obtain drug money; Troxell pled guilty, had served (27) years and no longer uses drugs.
        2) Prior crime history - drug addiction; This was over (30) years old - history [noteable for zero physical harm to anyone - which is a factor for suitability], and zero drug use for (20) years.
        3) Institutional Discipline History; Between 1988-2006, he'd received (1) Rule Violation classified serious, for a (1997) Fist-Fight.
        4) He had been studying, on his own initiative his entire (SHU) term.
        5) His gang-validation is based on allegations from Confidential-Inmate Informants, claiming he's a gang-member. That's why he's been in (SHU) for over (24) years. He has never been found guilty of illegal gang-activity.

&lt;62&gt;

63

©Defendant's Fisher, and Harmon, recommended Troxell; remain discipline free, reduce custody level [get out of SHU], and continue to upgrade education, vocation, and self-help areas;

157.) Troxell's next parole hearing was held more than [3] years later, on April 8, 2009, before Defendants Gillingham, and Tucker. Troxell's state appointed atty. present evidence - again, challenging the validity of repeat use of immutable factors to justify parole denials [as described in para #156]

158.) At the April 8, 2009 hearing, Troxell had over [30] years in on his sentence, and he presented evidence of his compliance with all of the (2006) panel's recommendations, except getting out of SHU [he produced several additional certificates of completion in self-help; demonstrated vocational skills per history [and had obtained all the information for attending Truck driving school, upon release], and he has viable parole plans. He detailed the basis of the CDCR-gang validation and related (SHU) status for (24) years; and pointed out, his only way out of (SHU) was via known informant status [and reason(s) he can't, and won't, do this - with case law re: illegality of using "status" and refusal to become an informant against him].

159.) The Defendant Comm's. commended Troxell, for his positive achievements since the (2006) hearing, and acknowledged his viable-parole plans. They stated that these factors are why they were denying him for only (7) years [rather than 10 or 15 years]; the basis of this (7) year denial was Troxell's CDCR-gang label, and related continued (SHU) status [and refusal to debrief] is shown by:

Ⓐ Defendants stated (7) year denial based on: life crime purpetrated to get money for drugs; prior crime history, related to drug-addiction;

⟨63⟩

64

unstable social history, and problematic relationships, consisting of A.B. membership...". You are in [SHU], and you're a validated member of the A.B., and that's what we have to base our decisions on;" Lack of insight into life crime; prior prison discipline history."

Ⓑ Defendants further stated, "... you're updated as a member of the A.B. ... you're on indeterminate status. Now you'll be here as long as it takes, and you have a choice either to debrief or make it through your lawsuit". ..." you're heading in the right direction. It's just a matter of disassociating yourself from this other A.B. stuff. That may take a long time."..." But, again, what's hampering you is your placement'" [per April 8, 2009 (BPH) hearing transcript]

160.) Defendants admitted that they did not review any of the conf. information in Troxell's file [yet they used CDCR-gang validation against him, which is based on conf. info], and they admitted there was nothing in his file showing he'd ever been guilty of committing an illegal, gang-related act [with Tucker, speculating on why that may be. Id., transcript]
161.) Defendants failed to articulate a "nexus" between the factors cited to deny parole for (7) years, and how they demonstrate evidence of current danger, denying due process. And, they denied Troxell individualized consideration, issuing the [7-year] denial based on "status", without bothering to delve into basis for such "status", nor considering evidence of what specific gang-activity has he actually been guilty of - to thereby find he personally poses a current danger [this is a "categorical" denial of parole, which is a denial of due process]; and they punished him with the (7) year denial for exercising his right not to speak [refusing to become an informant —

⟨64⟩

violating U.S. Const. 1st, 5th, 8th, and 14th Amendments [procedural and substantive due-process; and EX POST FACTO principles]

### FACTS PERTAINING TO PLAINTIFF'S CLAIMS
### RE: Access To Court and FREE SPEECH

(a) LEGAL MAIL

162.) Between 2005, and the present date, CDCR-Defendants have violated the Plaintiff's U.S. Const. 1st Amendment rights via policies and practices in their handling confidential legal mail, which has interfered with and harmed plaintiffs' access to the Courts; and, inhibited, chilled, and interfered with - and harmed their confidential communications with attorneys, implicating free-speech violations, as follows:

(a) Between 2004 and October 2006, plaintiffs were represented by Attorney Franck [in related cases, USDC-N.D.Cal. #C04-1967 C.W., and #C05-3286 C.W. See above paras #9-10]. During this time period, several items of confidential-legal mail [sent to, and coming from Attorney Franck, were never received. This caused alot of conflict, and in Oct. 2006, Attorney Franck withdrew as counsel, and plaintiffs went pro-se, where upon their ability to obtain evidence supporting their claims - via discovery and contact with inmate witnesses was severely-harmed, as was their entire case via lack of attorney to argue for them in court; resulting in the dismissal of most of their meritorious claims [Based on Court rulings, stating the claims had merit, and record on file in #C05-3286 CW]

(b) Between 2006 to the present CDCR-Defendants continued to

⟨65⟩

excessively delay confidential-legal mail [sent to, and coming from attorney Franck, and other attorney's], and confidential mail from the U.S.D.C.-N.D.Cal., was never received. Defendants opened legal mail outside of plaintiff's presense; and in May-June of 2008, they made (3) seperate phone-call's to assoc. Law Professor Rovner, asking if she was really an attorney, sending legal-mail to Ashker. All of which has chilled plaintiff's relationships with attorneys, making it difficult to communicate freely about confidential-legal issues, and next to impossible to obtain attorney assistance.

163.) On Feb. 4, 2008, Ashker submitted a 602 Appeal #D08-00399, to complain, and challenge the above legal-mail violations [including, attaching examples of his out-going confidential legal mail to attorneys being held by defendants for [7 to 11] days; and incoming confidential mail opened outside his presense. He pointed out such violated the First amendment [per, Thornburgh v. Abbott, 490 U.S. 401, at 413-414 [1989]; and Procunier v. Martinez, at 413-414], and requested a halt to such practices, and monetary compensation.

164.) Between Feb. 7, 2008, and Aug. 29, 2008 Defendants' Horel; Cate, and Does 1-5, denied the appeal at each level of review. They were put on notice of the constitutional violation(s), and failed to correct the problem(s), thereby ensuring they continue unabated-indefinitely.

165.) On Sept. 3, 2006, Troxell, submitted a 602 Appeal #D06-02328, to complain about defendant's opening legal-mail outside his presense, and not giving it to him for (2) weeks thereafter. On Nov. 17, 2006, Defendant Horel cancelled the appeal [while also addressing the issues raised, and claiming Troxell did not submit support evidence, when he did attach the envelopes) claiming he did not cooperate in interview - which is false, Def. Cate refused appeal on March 23, 2007.

<66>

67

(b) <u>LEGAL MAIL FROM INMATE WITNESSES</u>

166.) Calif. Code of Regulations [CCR] Title 15 § 3163, authorizes CDCR-inmates to assist each other with the preparation of legal-documents. This specifically includes the possession of other inmates... "Legal papers, books, opinions and forms being used by one inmate to assist another with permission of owner." and "All papers must be returned to the respective owners when either inmate is transferred, or when other administrative action prevents direct communication."

167.) CCR-Title 15 § 3164(c) applies to plaintiffs and states, "...Inmates who are in restricted housing units ... may possess and have access to any legal resourse material available to the general population and may assist each other in their legal work to the extent compatible with institutional security."

168.) P.B.S.P. Operational Procedure [O.P.] 205, as relevant here, states: "When an inmate needs to correspond with another inmate for reasons, which may include litigation, legal issues, and family emergencies, a one-time correspondence approval may be approved by the respective Facility Captains."

169.) Ashker utilized the above provisions many times between 1990 to late (2007), in the following manner, exemplified below:

    Ⓐ He would utilize Form CDC-1074 "Request For Correspondence Approval"; filling out information [e.g. case number, and need to exchange correspondence with inmate so and so, as he is a potential witness I need a declaration and documents from]

    Ⓑ This would be approved "One Time Only" [will be reviewed by I.G.I. [gang unit] and must only pertain to case listed].

    Ⓒ Ashker would send the letter, sample declaration, relevant

⟨67⟩

documents, for the inmate witness' review and reply.

(D) The inmate witness usually responds with a letter, declaration, with document exhibits, and possibly other material he thinks may be helpful.

(E) Ashker would make a copy, and return a copy of the witness' declaration, with his original documents [without a letter].

(F) When he needed to followup, and recontact the witness, he'd complete a new form [CDC-1074]. And go through the process again.

170. Begining around November 1, 2007, Defendants Barlow, Johnson, Bradbury [and a Doe defendant identified as "CDC-Attorney"] informed Ashker, that the correspondence approvals were "one time only" for the entire case [meaning no followups at all, for any reason]; shortly after this Ashker was informed by Defendant Hernandez [per. Barlow], that he was not allowed to return anything to the inmate witnesses [who sent him declarations and documents].

171) Defendants did the same things, described above to Troxell, and other (SHU) inmates.

172.) Defendants actions described in para.# 170 [in context with para's # 166 to 169], has damaged plaintiffs litigation efforts, and chilled their ability to obtain supporting documentary evidence from inmates [this is because most inmates do not want to lose their originals, and getting copies made is expensive]

173.) Ashker has been challenging CDCR-prison conditions, via state and federal court processes, since [1988]; and often the main way to obtain

⟨68⟩

69

information and supporting evidence is via contact with similarly-situated inmates, many of whom are not knowledgable re: drafting a declaration. Thus, prior to Nov. 2007, Ashker would often contact potential inmate witnesses with a letter asking a series of questions and whether, or not the inmate had relevant documents, and was he willing to sign a declaration. Depending on the response, Ashker would draft a declaration - incorporating any documents relevant - obtain a new approval to correspond, and send it all to the inmate for review, revision, and return.

174.) Since Nov. 1, 2007, this has not been possible, and has damaged the plaintiffs' litigation efforts, as summarized [above para's # 170-172]

175.) Ashker has also found it necessary to make followup contact with certain inmate witnesses, as the case(s) proceed, due to new information and developments. This is no longer possible, and has caused damage to litigation efforts [see above para's # 170-172, and below]

176.) An example of the harm caused to plaintiffs' litigation efforts, due to defendants' interference described above, is as follows:

  Ⓐ On (8-21-06) Ashker completed a onetime correspondence with PBSP-SHU inmate Bretches [re: USDC-N.D.Cal # C05-3286 CW] wherein, Bretches signed a declaration supporting Ashker's "NO PAROLE POLICY" claims. And, he attached (3) color copies of his art as exhibits - re: examples of his SHU- programming efforts - on his own initiative.

  Ⓑ Bretches (2006) declaration and exhibits were reviewed by PBSP-I.G.I. [gang-unit] prior to delivery to Ashker [per, policy]

  Ⓒ On Oct. 29, 2007, Def. Thornton [I.G.I] searched Ashker's cell re: (6) year inactive review; and he confiscated one of Bretches art copy-exhibits from (2006) [see above Ⓐ], and on 11-19-07, Thornton notified Ashker

⟨69⟩