# EXHIBIT A

```
┌──────────────────────────────────────────────────────────┐
│               PELICAN BAY STATE PRISON                     │
│               SECOND LEVEL REVIEW                          │
└──────────────────────────────────────────────────────────┘
```

DATE: NOV 2 3 2004


Inmate ASHKER, C-58191
Pelican Bay State Prison
Facility C, Security Housing Unit
Building 8, Cell 102


RE:     WARDEN'S LEVEL DECISION                    APPEAL: PARTIALLY GRANTED
        APPEAL LOG NO. PBSP-C-04-02664            ISSUE: ADA


This matter was reviewed by RICHARD J. KIRKLAND, Warden, at Pelican Bay State Prison (PBSP).
M. Nimrod, Classification & Parole Representative, interviewed the inmate on October 19, 2004 in response
to a CDC-1824, Reasonable Modification or Accommodation Request.

                                    ISSUES

The inmate requests assistance with daily activities.

                                   FINDINGS

                                       I

The inmate claims he has limited range of motion, strength and nerve damage in his right arm and hand after
suffering a gun shot wound in 1990.  He claims he requires daily assistance due to his injury as he is unable
to use his arm for prolonged periods of time.  He claims his cellmate previously assisted him with these
needs prior to their separation on June 8, 2004 as a result of safety concerns.  Ashker opposed this action
and subsequently addressed this matter in Appeal Log # PBSP-C-04-01650.  However, he was retained on
single-cell status due to security concerns taking precedence.  He claims that since he can no longer be
assigned a cellmate he must be provided with daily assistance.

                                       II

A medical exam has been conducted and substantiates that Ashker's right arm has been injured and has a
limited range of motion most likely causing pain and discomfort.  As a result, he has been authorized to
spend time in the law library to complete projects that require extensive writing with the assistance of
another inmate.

                                      III

The California Code of Regulations Section 3270 requires security take precedence over all other
considerations in the operation of programs and activities within the institution.

Supplement Page 2
Ashker, C-58191
Appeal # PBSP-C-04-02664

## DETERMINATION OF ISSUE

However, the inmate is dissatisfied claiming he was not provided any details as to how he can obtain the authorized assistance. He further claims to be involved in five correspondence courses and numerous legal actions requiring daily assistance. The Second Level Reviewer conducted an interview with the inmate at his cell in an effort to determine how he has been managing without a cellmate for the past several months. He stated it was not a matter of whether he was able to manage on his own, but rather the increased level of pain and discomfort he must endure in doing so. He believes that performing these daily activities on his own has compounded his injury. However, a determination has been made that assistance with writing is sufficient as he has not demonstrated an inability to function on his own or that his impairment has suffered as a result. According to Facility Captain S. Wheeler the inmate may submit a request to the law library to obtain necessary assistance with writing, therefore the APPEAL IS PARTIALLY GRANTED. He may also wish to discuss with medical staff the availability of medical appliances that might provide further relief.

## MODIFICATION ORDER

No modification of this action or decision is required.

RICHARD J. KIRKLAND,
Warden
Pelican Bay State Prison

BDS #010 11-17-04



STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA  94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:  JAN 1 9 2005

In re:  Ashker, C-58191
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA  95531-7000

IAB Case No.: 0406313          Local Log No.: PBSP  04-02664

This matter was reviewed on behalf of the Director of the California Department of Corrections (CDC) by Appeals Examiner Ken Allen. All submitted documentation and supporting arguments of the parties have been considered.

I  **APPELLANT'S ARGUMENT:**  It is the appellant's position that he requires assistance with his daily activities due to his limited range of motion. He claims that he has strength and nerve complications in his right arm and hand resulting from a gunshot wound in 1990. He claims that since he lost his ability to have a cellmate, who assisted him on a daily basis, his pain and discomfort has gotten worse. He requests on appeal that he receive assistance with his daily activities.

II  **SECOND LEVEL'S DECISION:**  The reviewer found that the appellant's inability to have a cellmate is due to a safety and security issue. He was provided with the proper procedure to request legal assistance in the law library. The appellant has been sustaining life just fine for several months without a cellmate. The appellant has proven that he is capable of taking care of himself and his request for a cellmate cannot be granted at this time. The appeal was partially granted at the Second Level of Review.

III  **DIRECTOR'S LEVEL DECISION:**  Appeal is denied.

A.  **FINDINGS:**  The appellant was examined and it was determined that assistance with writing is sufficient as he has demonstrated an ability to function on his own. The appellant may submit a request to the law library to obtain necessary assistance with writing and legal work. Due to the security needs of the institution, staff, and other inmates the appellant is assigned to single-cell status. The CDC's rules require that institution security and the safety of persons shall take precedence over all other considerations. At the Director's Level of Review (DLR), the appellant contradicts his condition and needs, as he states that he regularly exercises and works up a significant sweat. It appears that he is capable of taking care of his daily activities by himself.

The appellant has failed to provide any evidence that staff failed to provide him with appropriate care or access to assistance in legal preparations; nor has he provided any compelling information that would warrant a modification to the decision reached by the institution. No relief is warranted at the DLR.

B.  **BASIS FOR THE DECISION:**
Armstrong v. Davis Court Ordered Remedial Plan: ARPI, ARPII.A, ARPII.D, ARPII.F
California Code of Regulations, Title 15, Section: 3085, 3350

C.  **ORDER:**  No changes or modifications are required by the institution.



ASHKER, C-58191
CASE NO. 0406313
PAGE 2


This decision exhausts the administrative remedy available to the appellant within CDC.


N. GRANNIS, Chief
Inmate Appeals Branch

cc:     Warden, PBSP
        Health Care Manager, PBSP
        Appeals Coordinator, PBSP
        Medical Appeals Analyst, PBSP

# EXHIBIT B

STATE OF CALIFORNIA

CDC 128 -B (Rev. 4/74)

NAME and NUMBER          ASHKER          C-58191          C08-102

On November 23, 2004, per Second Level Appeal # C-04-02664, inmate ASHKER was granted the use of a "writing assistant" to help him with his legal and other paperwork. Title 15, Section 3163, Assisting Other Inmates, and Section 3164, Administrative Segregation, describe what may be done. (See below) Per Title 15, inmate TROXELL, B-76578, C08-101; (who is in the cell next to ASHKER), has asked for and been granted permission to assist ASHKER.  Inmate's ASHKER and TROXELL will be allowed to exchange "paper" materials only between their respective cells.  All materials being exchanged will be subject to search for content and contraband.  Exchange of paper materials will only be completed during regular unlocks for both inmates.  There will be no exceptions.  Inmate housing assignment change or violation of any rule or security regulation will terminate this approval for exchange of materials.

D. Skerik

D. SKERIK
CORRECTIONAL SERGEANT /
SHU LAW LIBRARY

ORIG   :   C-File
cc         AWC
           Law Library
           INMATES
           Unit Staff

DATE   12/10/200                                    PBSP      GENERAL CHRONO

3163.  Assisting Other Inmates.

One inmate may assist another in the preparation of legal documents, but shall not receive any form of compensation from the inmate assisted. Legal papers, books, opinions and forms being used by one inmate to assist another may be in the possession of either inmate with the permission of the owner. All papers must be returned to the respective owners when either inmate is transferred to another institution or when other administrative action prevents direct communications between the inmates. An inmate may be barred from giving legal assistance to other inmates when violations of regulations and established procedures relate directly to such activities. An inmate will not be barred from giving or receiving legal assistance for violations of regulations and procedures which are unrelated to providing or receiving legal assistance. However, no otherwise prohibited contacts or access to prohibited areas will be permitted because of this regulation.

NOTE: Authority cited: section 5058, Penal Code. Reference: *Johnson v. Avery,* 89 S. Ct. 747 (1969).

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).

2. Amendment filed 10-7-82; effective thirtieth day thereafter (Register 82, No. 41).

3164.  Administrative Segregation.

(a) Inmates confined in administrative segregation for any reasons will not be limited in their access to the courts.

(b) During a period of disciplinary detention, as described in Section 3330, legal resources may be limited to pencil and paper which will be provided upon request for correspondence with an attorney or the preparation of legal documents for the courts. Other legal material in the inmate's personal property may be issued to an inmate in disciplinary detention if litigation was in progress before the inmate's placement in disciplinary detention and legal due dates are imminent.

(c) Inmates who are housed in any restricted unit and who are not serving a period of disciplinary detention may possess and have access to any legal resource material available to the general population and may assist each other in their legal work to the extent compatible with institution security. For the purpose of this subsection, restricted units include reception centers, institution reception or orientation units, controlled housing and security housing units.

(d) If an inmate's housing restricts him or her from going to the inmate law library, arrangements will be made to deliver requested and available law library material to the inmate's quarters.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

HISTORY:

1. Amendment filed 10-7-82; effective thirtieth day thereafter (Register 82, No. 41).



# EXHIBIT C

*My Copy*

Memorandum

To: P.B.S.P Administrative Staff Warden Kirkland; C.C.II Hawkes —
With copy to Deputy Atty General Jorgenson (Re: U.S.D.C # C00-1480 C.W.)

Subject: Ashker disability accommodation issues & apparent plan to separate
Ashker and Troxell when they are moved to D-Facility

1/25/06

To the above P.B.S.P - Administrative Staff.

I have recently been informed that prisoners labeled by (CDCR) as prison gang-
members are to be relocated — housed in D-Fac. (SHU) blocks #1-4
at any time, and that when this happens a decision has already been made
to house Danny Troxell, B #76578 and I in separate pods.

I am requesting your intervention help on this situation because,
Troxell has been my appointed writing assistant per partially granted
A.D.A. Reasonable Accommodation Request [#C04-02664 response by C.C.II
Nimrod dated Oct. 19, 2004 ... And 128-C.Crono by Law Lib. Sgt. Skerik of 12-10-04.

Troxell and I were originally allowed to share cell #C8-101 in July of 2003 -
specifically in response to a Memo I sent to Warden McGrath, Assoc. Warden
O'Neill, and H.C.M. Winslow (re: disability - need for assistance issues).

On June 8, 2004 Assoc. Warden Castellaw had us separated in response to a
review of all (SHU) double-cell's by (SSU) in Sacramento. But we were allowed
to be housed next door to each other for assistance with legal work purposes.
And the reason it worked well having Troxell appointed as my writing assistant -
was staff did not have to take us to the law library every week (which is not
workable anyhow because of the # of cases, volume of work/writing involved -
I currently have (6) active cases in the courts].

Now, staff plan to separate us, and I have a trial date on my A.D.A.
civil case # USDC-N.D. Cal. # C00-1480 C.W. (scheduled for April 24th 2006);
in which there are a lot of pre-trial/trial matters to deal with - and which
case Troxell is familiar with & been helping me with since July 2003.

Troxell and I have both been disciplinary clean for the past (9-12) yrs.

and we have not being a problem to unit staff at all since being together in C8-block.

I'm asking for your help in making it possible for us to be housed next door to each other when we're moved to D-facility.

Thank You for your time & consideration

T. Adler

w/ proof of service

# EXHIBIT D

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE (Settlement Agreement) is made and entered into this 31st day of January, 2006, by and between:

"Releasor":     Todd Lewis Ashker (Ashker)

"Releasees":     The California Department of Corrections and Rehabilitation (CDCR), Cal Terhune, Robert Ayers, Teresa Schwartz, Joe McGrath, Edward Alameida, Allen Scribner, J. Cox, Rose Conley, Robert Carl, Richard Kirkland, Jeanne Woodford, and Barry O'Neill

## RECITALS

A.     Releasor filed a Complaint in the United States District Court for the Northern District of California, Case No. C 00-1480 CW (the Complaint), which arose out of certain alleged acts or omissions by the Defendants in providing an assistant to Releasor under the Americans With Disabilities Act (ADA), the Rehabilitation Act, and the Eighth Amendment to accommodate his alleged disability by helping him with manual tasks like writing and cell cleaning. In the Complaint, Releasor sought to recover monetary damages and an injunction. The Releasor agrees to the dismissal of the Complaint with prejudice as part of this Settlement Agreement.

B.     Releasor asserted a claim for denial of internet generated mail in violation of the First Amendment. The parties have stipulated to the dismissal of that claim, but the Court has not entered a dismissal of the claim. The Releasor agrees to the dismissal of that claim with prejudice as part of this Settlement Agreement.

C.     Releasor filed a separate complaint in the United States District Court for the Northern District of California, Case No. C 05-3759 CW, alleging claims for relief under the First, Eighth and Fourteenth Amendments, the ADA, and under state law. The claims arose out of alleged acts or omissions in providing an assistant under the ADA, for failure to accommodate his alleged disability by helping him with manual tasks like writing, providing a cellmate, modified pen, and extra clothing. In the Complaint, Releasor sought to recover monetary damages and an injunction. As part of the

1

settlement for Case No. C 00-1480 CW, Releasor agrees to dismiss with prejudice the fourth cause of action for ADA and Rehabilitation Act violations in Case No. C 05-3759 CW.

    D. The parties desire to enter into this Settlement Agreement in order to provide for certain payments and terms in full settlement of all claims which are or might have been, the subject of the Complaint, upon the terms and conditions set forth below.

AGREEMENT

    The parties agree as follows:

1.0    RELEASE AND DISCHARGE

1.1    In consideration of the obligations set forth in Section 2.0, Releasor completely releases and forever discharges Releasees, the State of California, its departments, including but not limited to the CDCR, Pelican Bay State Prison in Crescent City, California, their agents, and employees, all in their individual and official capacities, from any and all obligations, actions, causes of action, rights, damages, costs, expenses and compensation of any nature whatsoever, whether based on a civil rights, constitutional or other theory of recovery, which Releasor now has, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of the Complaint and all related pleadings, including, without limitation, any and all known or unknown claims for injuries to Releasor, which have resulted or may result from the alleged acts or omissions of the Releasees or their employees or agents. This Release on the part of the Releasor shall be a fully binding and complete settlement between the Releasor, the Releasees, their assigns and successors. The Releasor agrees to defend, indemnify and hold the Releasees harmless from and against all such claims, demands, obligations, actions, causes of actions, damages, costs and expenses.

1.2    This release and discharge shall also apply to Releasees' past, present and future attorneys, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors and successors in interest, and assigns and all other persons, firms, or corporations with whom any of the former have been, are now or may hereafter be affiliated which arises from the subject of the Complaint filed by the Releasor.

2

1.3   This Release, on the part of the Releasor, shall be a fully binding and complete settlement between the Releasor, the Releasees, their heirs, assigns, and successors.

1.4   The Releasor acknowledges and agrees that the Release and Discharge set forth above is a general release.   The Releasor expressly waives and assumes the risk of any and all claims for damages which exist as of this date, *see below* but of which the Releasor does not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Releasor's decision to enter into this Settlement Agreement.

1.5   The Releasor further agrees that the Releasor has accepted payment of the sums and terms specified herein as a complete compromise of matters involving disputed issues of law and fact. The Releasor assumes the risk that the facts or law may be other than Releasor believes. It is understood and agreed to by the parties that this settlement is a compromise of a doubtful and disputed claim, and the payments and terms are not to be construed as an admission of liability on the part of the Releasees, by whom liability is expressly denied.   This settlement can not be used to prove or disproved liability or lack of liability for any present or future claims.

1.6   There will be no injunctive relief and the claims will be dismissed with prejudice.   The settlement is for all claims under the ADA and Rehabilitation act until now and all claims for damages for not providing a writing assistant between July 1998 and March 1999 and prospective injunctive relief based on the ADA but not claims under the Constitution or state common law. This settlement includes all claims, including Eighth Amendment claims, previously dismissed in case No. C 00-1480 CW.

2.0   PAYMENTS

In consideration of the Release set forth above, CDCR agrees to pay to the Releasee $7,000 payable to Todd Lewis Ashker.

3.0   FEES AND COSTS

Each party shall bear their own attorney's fees, expert fees, and costs incurred in connection with the

*This Release is only applicable to claims (events, issues, actions, inactions re: A.D.A. issues) occurring prior to January 31, 2006. As terms discussed & agreed upon during the 1-31-06 settlement conference. (T.A.)*

Complaint, this Settlement Agreement and Release, and the matters and documents referred to herein, the filing of a dismissal of the Complaint, and all related matters.

### 4.0 REPRESENTATION OF COMPREHENSION OF DOCUMENT

The Releasor represents that the terms of this Settlement Agreement are fully understood and voluntarily accepted by the Releasor.

### 5.0 WARRANTY OF CAPACITY TO EXECUTE AGREEMENT

The Releasor represents and warrants that no other person or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Settlement Agreement, except as otherwise set forth herein; that the Releasor has the sole right and exclusive authority to execute this Settlement Agreement and receive the sums specified in it; and that the Releasor has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Settlement Agreement.

### 6.0 GOVERNING LAW

This Settlement Agreement shall be construed and interpreted in accordance with the laws of the State of California.

### 7.0 ADDITIONAL DOCUMENTS

The Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional action which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement.

✱ 7.1 Releasor agrees to file a dismissal of Case No. C 00-1480 CW with prejudice and to file a dismissal of the fourth cause of action in Case No. C 05-3759 CW with prejudice and to serve copies of those dismissals on counsel for Releasees.

### 8.0 ENTIRE AGREEMENT AND SUCCESSORS IN INTEREST

This Settlement Agreement contains the entire agreement between the Releasor and Releasees with

✱ when the funds are paid I will do so. (T.A.)

4

regard to the matters set forth in it and shall be binding upon and enure to the benefit of the executors, administrators, personal representatives, heirs, successors and assigns of each.

### 9.0   COUNTERPARTS

This Settlement Agreement may be signed by the parties in counterparts, and each signed counterpart shall be come part of the final agreement and shall have the same force and effect thereof.  A copy of any signature on a signature page shall be as valid and binding as an original signature.

### 10.0   EFFECTIVENESS

This Settlement Agreement shall become effective immediately.  The Releasor understands that the funding may take as long as 120 days after all documents are executed.

Releasor:

By: _T.L. Ashker_          Date: _3-29-06_
    Todd Lewis Ashker
    Plaintiff

Defendants:

By: _R. Kirkland_          Date: _4/7/06_
    Richard Kirkland
    Warden, Pelican Bay State Prison
    Defendant

By: _Michael Jorgenson_          Date: _4/10/06_
    Michael Jorgenson
    Deputy Attorney General
    Attorney for Defendants the California Department of Corrections and Rehabilitation, Cal Terhune, Robert Ayers, Teresa Schwartz, Joe McGrath, Edward Alameida, Allen Scribner, J. Cox, Rose Conley, Robert Carl, Richard Kirkland, Jeanne Woodford, and Barry O'Neill

\* Per court's order dated Feb. 3, 2006 the money is to be paid by May 3, 2006. If it's not paid by then I reserve the right to nullify the agreement y move the court for a Trial date (T.A.)

5

# EXHIBIT E

State of California

# Memorandum

Date : June 11, 1996

To : All Security Housing Unit Staff

From : Department of Corrections
Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA  95531-7000

Subject : INMATE PLACEMENT IN LEXAN COVERED CELLS

In an endeavor to provide a safer work site from inmate assaultive behavior, the following procedure is placed in effect immediately:

In the event that an inmate assaults, attempts to assault or threatens to assault staff or another inmate(s), he will be housed in a cell with a Lexan covered cell front.

This housing status will be authorized by the Facility Captain/ Associate Warden, Security Housing Unit (SHU). Lexan housing status will be reviewed by the respective Facility Captain within 30 days of placement. The Facility Captain will review the inmate's propensity for assaultive behavior based on his current disciplinary record and unit staff recommendations. An inmate may be removed from Lexan housing status when it is determined by the Unit Classification Committee that he no longer poses a threat to safety/security as evidenced by the modification of his behavior.

This information will be reflected on the CDC 128G/CDC-114A. The housing of inmates behind Lexan is not for disciplinary reasons, rather it is for safety. The housing of inmates requiring Lexan cell fronts will be the responsibility of the Facility Sergeants.

Any questions should be directed to A. Lopez, Associate Warden, SHU, extension 6687.

STEVEN CAMBRA, JR.
Warden

cc: A. Lopez

# EXHIBIT F

STATE OF CALIFORNIA                                           DEPARTMENT OF CORRECTIONS
CDC 1030 (12/86)

## CONFIDENTIAL INFORMATION DISCLOSURE FORM

INMATE NUMBER   C-58191                    INMATE NAME:   ASHKER

1) Use of Confidential Information.

   Information received from a confidential source(s) has been considered in the:

   a)  CDC-115, Disciplinary Report dated   N/A                                    submitted by

   _____
                                    STAFF NAME, TITLE

   b)  CDC-114-D, Order and Hearing for Placement in Segregated Housing dated   N/A

2) Reliability of Source.

   The identity of the source(s) cannot be disclosed without endangering the source(s) or the security of the institution.

   This information is considered reliable because:

   a) ☐  This source has previously provided confidential information which has proven to be true.

   b) ☐  This source participated in and successfully completed a Polygraph examination.

   c) ☐  More than one source independently provided the same information.

   d) ☐  This source incriminated him/ herself in a criminal activity at the time of providing the information.

   e) ☐  Part of the information provided by the source(s) has already proven to be true.

   f) ☒  Other (Explain) The discovered information was intercepted within an incoming mailing and was not
   solicited by staff from a confidential informant.  Reliability is not an issue.

3) Disclosure of information received.

   Confidential CDCR 128-B, dated July 24, 2012, authored by Correctional Sergeant J. Frisk.  On July 19,
   2012, Sergeant Frisk reviewed an incoming letter from an author identified as Kendra Castaneda to an
   inmate housed within Pelican Bay State Prison. The author appears to be soliciting help from this inmate to
   support her with the veiled threats associated with the disallowed mailing dated July 16, 2012, to inmate
   Todd ASHKER, C-58191.

   (If additional space needed, attach another sheet.)

4)  Type and current location of documentation, (for example: CDC-128-B of 5-15-86 in the confidential material
   folder). Confidential CDCR 128-B dated July 24, 2012, authored by Sergeant J. Frisk located in the confidential
   section of inmate ASHKER's Central File.

   _____            9/10/12
              STAFF SIGNATURE, TITLE                       DATE DISCLOSED
   DISTRIBUTION: WHITE ▭ Central File; GREEN ▭ Inmate; YELLOW ▭ Institution Use



STATE OF CALIFORNIA                                                DEPARTMENT OF CORRECTIONS
CDC 1030 (12/86)

### CONFIDENTIAL INFORMATION DISCLOSURE FORM

INMATE NUMBER   C-58191                    INMATE NAME:   ASHKER

1) Use of Confidential Information.

   Information received from a confidential source(s) has been considered in the:

   a) CDC-115, Disciplinary Report dated   N/A _____ submitted by

   _____
                                    STAFF NAME, TITLE

   b) CDC-114-D, Order and Hearing for Placement in Segregated Housing dated   N/A _____

2) Reliability of Source.

   The identity of the source(s) cannot be disclosed without endangering the source(s) or the security of the institution.

   This information is considered reliable because:

   a) ☐ This source has previously provided confidential information which has proven to be true.

   b) ☐ This source participated in and successfully completed a Polygraph examination.

   c) ☐ More than one source independently provided the same information.

   d) ☐ This source incriminated him/ herself in a criminal activity at the time of providing the information.

   e) ☐ Part of the information provided by the source(s) has already proven to be true.

   f) ☒ Other (Explain) The discovered information was intercepted within an incoming mailing and was not
   solicited by staff from a confidential informant.  Reliability is not an issue. _____

3) Disclosure of information received.

   Confidential CDCR 128-B, dated July 16, 2012, authored by Correctional Sergeant J. Frisk.  On July 16,
   2012, Sergeant Frisk reviewed an incoming letter from an author identified as Kendra Castaneda to inmate
   Todd ASHKER, C-58191.  Within this letter, the author appears angry with inmate ASHKER and makes
   statements which appeared to be veiled threats.

   (If additional space needed, attach another sheet.)

4) Type and current location of documentation, (for example: CDC-128-B of 5-15-86 in the confidential material
   folder). Confidential CDCR 128-B dated July 16, 2012, authored by Sergeant J. Frisk located in the confidential
   section of inmate ASHKER's Central File. _____

   _____ SGT                    ___ 9/10/12 ___
   STAFF SIGNATURE, TITLE                                    DATE DISCLOSED

   DISTRIBUTION:  WHITE ⊡ Central File;  GREEN ⊡ Inmate;  YELLOW ⊡ Institution Use

④

STATE OF CALIFORNIA
INMATE/PAROLEE REQUEST FOR INTERVIEW, ITEM OR SERVICE
CDCR 22 (10/09)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## SECTION A: INMATE/PAROLEE REQUEST

| NAME (PRINT)   (LAST NAME) | (FIRST NAME) | CDC NUMBER | SIGNATURE |
|---|---|---|---|
| Ashker, Todd | | C58191 | T. Ashker |

| HOUSING/BED NUMBER | ASSIGNMENT | HOURS FROM / TO / | TOPIC (I.E. MAIL, CONDITION OF CONFINEMENT/PAROLE, ETC.): |
|---|---|---|---|
| D4-121 | SHU | | conditions |

CLEARLY STATE THE SERVICE OR ITEM REQUESTED OR REASON FOR INTERVIEW:

I have a problem with IGI as follows: #1 on 9/6, they ordered staff to move me from cell D1-119 to D4-121; & #2 They have a disproportionate # of whites isolated from their social arena (other whites in the short corridor !! These are unwarranted acts harmful to me & many others (incl. CDCR Administration) & need to be rectified asap, as supported below! Re: Point #1 - the sudden move to D4-121 - This seperates me from my friend & ADA - writing asst [Troxell] - we've been collies/next door to each other for more than (9) yrs [Jul'03] I've a permanent disability - recognized by the

| METHOD OF DELIVERY (CHECK APPROPRIATE BOX) **NO RECEIPT WILL BE PROVIDED IF REQUEST IS MAILED **see added pg |
|---|
| ☒ SENT THROUGH MAIL: ADDRESSED TO ASSOC. WARDEN, P.T. SMITH.   DATE MAILED: 9/9/12 |
| ☐ DELIVERED TO STAFF (STAFF TO COMPLETE BOX BELOW AND GIVE GOLDENROD COPY TO INMATE/PAROLEE): |

| RECEIVED BY: PRINT STAFF NAME: | DATE: | SIGNATURE: | FORWARDED TO ANOTHER STAFF? |
|---|---|---|---|
| C/o N. Banta | 9/9/12 | [signature] | (CIRCLE ONE) YES  NO |

| IF FORWARDED - TO WHOM: | DATE DELIVERED/MAILED: | METHOD OF DELIVERY: |
|---|---|---|
| SHU - ASSOC. WARDEN, P.T. SMITH | 9/9/12 | (CIRCLE ONE) IN PERSON  BY US MAIL |

## SECTION B: STAFF RESPONSE

| RESPONDING STAFF NAME: | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| R. Moore | 09/14/12 | R. Moore | 09/14/12 |

You were issued a CDCR 1030 informing you of the reason you were rehoused. It has been determined that you have been housed appropriately. Furthermore you have produced no information supporting your claim of an agreement. If you can produce information or documentation supporting your claim, your housing will be revisited.

## SECTION C: REQUEST FOR SUPERVISOR REVIEW   Rec'd 9/17/12 - sent out same day

PROVIDE REASON WHY YOU DISAGREE WITH STAFF RESPONSE AND FORWARD TO RESPONDENT'S SUPERVISOR IN PERSON OR BY US MAIL. KEEP FINAL CANARY COPY.

DISSATISFIED! #1. I was never issued a 1030 stating why I was abruptly moved to a cell behind glass - seperated from my ADA asst #2. The settlement was informal but PBSP & Att. Gen recds support @ Phone call settlement w/ AG Jorgenson on 1-30-06 & Troxell & me - moving from C to D on 2-6-06 ! You people had no legit reason to move me & your breaching my settlement! #3. Moore ignores issue #2 I raise in sect. A.

| SIGNATURE: | DATE SUBMITTED: |
|---|---|
| T. Ashker | 9/17/12 |

## SECTION D: SUPERVISOR'S REVIEW

| RECEIVED BY SUPERVISOR (NAME): | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| | | | |

my copy

⑤

Attached Page [CDCR 22, Req For Interview]        Sept 2, 2012

Ashker, C58191 / D4-121

Court!, And, on Jan 30, 2006 I settled USDC-NDCal #C01-0392, CW, & part
of the settlement was an informal agreement between myself, DAG Jorgenson [atty
gen. office] & PBSP warden — that Troxell & I be housed next door to each other so
he can asst me w/all writing. (In the short-corridor, & that's why we were
moved from C8-101/102 to D1-119/120, on Feb 6, 2006!) An "informal" settlement
clause is still a binding contract!! Also, on Oct 13, 2011 CDCR undersecretary
Kernan, ordered I be housed back in my cell (D1-119) after agreeing to end the
statewide hunger strike — [after IGI sought to rehouse me in D3-124, behind
glass, w/no other whites in pod!] This cell (D4-121) is behind glass, w/no whites
in pod!!

I'm also one of (4) main PBSP Reps, who has been instrumental in working
with CDCR/PBSP Administration to suspend (2) massive hunger strikes last
year — prior to any prisoner H/S deaths — to give CDCR/PBSP time to keep their
word re=specific reforms   as well as, cont'd peaceful activity to keep masses
of prisoners patient — across the state — including monthly meetings w/admin's!
Troxell & I have worked together on the above, & he is my back-up for meetings!!
The cell move to D4-121, is very harmful to this entire process!!

Re: Point #2 - For many yrs (IGI) kept whites isolated from their social group —
other whites — by keeping them solo in pods! When we came to short-corridor, it was
supposed to be balanced so at least (2) prisoners from each group were in pods
together! Lately, IGI has been isolating whites again [eg, me, Troxell, Fortman,
Bolter, Yandell, & (2) more in D4 & (2) in D3], — — this is also not helpful
to our peaceful effort to work w/CDCR-PBSP Admin. re=positive reforms!!

over

(6)

The above (2) points are related as they are examples of IGI (& PBSP Admin's) cont'd reliance on subjecting long term (SHU) prisoners to as much isolation, sensory deprivation & related psychological torture as possible — in spite of our peaceful protest activity aimed at reforms! As well as related indifference to the court process re: ADA settlement issues !!

# EXHIBIT G

SEPT. 30, 2012

ANNE BUTTERFIELD WELLS
ATTORNEY AT LAW
 CITY CENTER
499 14TH STREET, SUITE 800
 OAKLAND, CA 94612


RE: TODD ASHKER

I AM RAYMOND PEREZ THE ONE WHO RECEIVED THE 2 STOPPED MAIL NOTIFI-
CATIONS. ASHKER IS A GOOD FRIEND OF MINE WHO HAS BEEN IN THIS "POD "E" IN D1
BLOCK SINCE JAN. 06 AND I HAVE BEEN IN THIS BLOCK IN "E"POD, SINCE 2000 AND
HE HAS NEVER HAD PROBLEMS WITH ME OR ANYONE ELSE. KENDRA CASTAÑEDA
IS THE ONE WHO WROTE ME WHO'S MAIL WAS STOPPED BY IGI (INSTITUTIONAL GANG
INVESTIGATIONS). WHAT EVER KENDRA WROTE AS I NEVER READ IT I'M SURE THE
IGI AS ALWAYS TENDS TO INTERPET THEIR OWN MEANING & EXAGGERATE WHAT
EVER THE LETTER SAID. I BELIEVE IT WAS JUST AN EXCUSE TO MOVE HIM AWAY
FROM THE REST OF THE COLLECTIVE MAIN BODY REPRESENTATIVES OF THE HS AND
THIS IS CDCR RETALIATION ON HIM. IF THIS WAS SO SERIOUS ABOUT HIM THEN
WHY AM I STILL ALLOWED TO CORRESPOND TO KENDRA AND NOT ONLY THAT
THEN WHY MOVE ASHKER INTO ANOTHER BLOCK & POD WITH PEOPLE THAT
I KNOW WHY NOT WORRY ABOUT THAT IF TRUE. THERE IS NO THREAT WHAT
SO EVER WITH ASHKER. HE CAN BE MOVED BACK INTO HIS OLD CELL HERE AN
I CAN GUARANTEE IGI IS EXAGGERATING FOR I KNOW NOTHING IS GONNA
HAPPEN TO HIM FOR HE IS MY FRIEND. I'VE HAD DOZENS OF STOPPED MAIL
NOTIFICATIONS FOR ONE REASON OR ANOTHER THAT IGI USES SO THIS ONE DOE
NOT SURPRISE ME. SO WHAT EVER KENDRA WROTE SHE ALSO AT TIMES TEND
TO EXPRESS HERSELF WILDLY BUT THAT IS ALL. THE IGI IS THE ONE WHO WA
TO MAKE SOMETHING OUTTA NOTHING!

RESPECTFULLY
Raymond Perez #K-12922
PBSP SHU  D1/219
PO BOX 7500
CRESCENT CITY, CA 95532

NAME: **Perez** _____ CDC#: **K12922** HOUSING **D1-219** ___ CDC 128-B

On __7/26/2012__ Correspondence was stopped for the above-named inmate. The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE/ ADDRESSED TO: ☒ INCOMING CORRESPONDENCE / FROM:

Kendra Castaneda
P.O. Box 18554
Long Beach, CA 90807

The correspondence was disapproved in accordance with Title 15, Section 3136 as it pertains to Sections 3006 and or 3135:

☒ **Title 15, Section 3006 CONTRABAND:**
  ☐ (c)(1) It incites murder; arson; riot; or any form of violence.
  ☐ (c)(4) Plans to escape or assist in an escape.
  ☐ (c)(5) *Plans to disrupt the order, or breach the security, of any facility (such as riot, escape, strike, etc.)*
  ☒ (c)(6) *Plans for activities which violate the law, these regulations, or local procedures.*
  ☐ (c)(7) *Coded messages.*
  ☐ (c)(8) A description of the making of any weapon, explosive, poison or destructive device.
  ☐ (c)(15)(17) Obscene material / Sexually explicit images.
  ☐ (c)(16) It is deemed to be a threat to legitimate penological interests.
  ☐ (d) It contains material or literature which would pose a threat to institutional security.
  ☐ Other (describe):

☐ **It violates regulations or local procedures:**
  ☐ Promotes gang activities [CCR, Title 15, section 3023 (a)]
  ☐ Unauthorized business dealings [CCR, Title 15, section 3024 (a)]
  ☐ Unauthorized inmate to inmate correspondence and or inmate to parolee / probationer correspondence [CCR, Title 15, section 3139]
  ☐ Possession and Exchange [CCR, Title 15, section 3192]
  ☐ Tattoos and Symbols [CCR, Title 15, section 3378 (c) (8) (B)]
  ☐ Any correspondence deemed circumventing [PBSP Department Operations Manual (DOM) Addendum, section 54010, Attachment 10, #32]
  ☐ Third party correspondence [PBSP DOM Addendum, section 54010, Attachment 10, #33]
  ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, PBSP DOM Addendum, Section 54010.6]
  ☐ Return address not provided [PBSP DOM Addendum, Section 54010.6]
  ☐ Other (describe):

☐ **Additional Information:**

**The disposition of the letter / mailing is as follows:**
  ☐ Retained by SHU Investigative Services Unit for investigation / potential disciplinary or court proceedings.
  ☐ Returned to sender.
  ☒ Confiscated by SHU ISU. The mailing is disallowed as per Title 15, Sections 3006, 3135 and 3136.
  ☐ Other (describe):

Title 15, Section 3132 (a) states in part, *"Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility, any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved."* Inmates may appeal the stopped mail utilizing the departmental appeal process.

Reporting Employee: _____

Correspondence Disapproval Authorized By (Captain level or above): _____

D. Gongora
Correctional Officer
Institutional Gang Investigations

B. W. FREELAND
Correctional Captain
Investigative Services Unit

cc:    C-File
       Investigative Services Unit
       Inmate
       Sender (incoming correspondence only)

7 /31 / 12
Date forwarded to inmate:

DATE: 7/26/2012    STOPPED MAIL NOTIFICATION    GENERAL CHRONO

17

CDC 128-B

NAME: PEREZ _____  CDC#: K-12992 ____ HOUSING D1-219L _____

On 7/20/2012 _____ , correspondence was stopped for the above-named inmate.  The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE / ADDRESSED TO:   ☒ INCOMING CORRESPONDENCE / FROM:

KENDRA CASTANEDA
P.O. BOX 18554
LONG BEACH, CA 90807

The correspondence was disapproved in accordance with the California Code of Regulations (CCR) Title 15, Section 3136, as it pertains to Sections 3006 and/or 3135:

☒ **CCR, Title 15, Section 3006, CONTRABAND, state in part:**
    ☒ (c)(1), *It incites murder; arson; riot; or any form of violence.*
    ☐ (c)(4), Plans to escape or assist in an escape.
    ☐ (c)(5), *Plans to disrupt the order, or breach the security, of any facility (such as riot, escape, strike, etc.)*
    ☒ (c)(6), *Plans for activities which violate the law, these regulations, or local procedures.*
    ☐ (c)(7), *Coded messages.*
    ☐ (c)(8), *A description of the making of any weapon, explosive, poison or destructive device.*
    ☐ (c)(15) & (c)(17), *Obscene material (sexually explicit images).*
    ☒ (c)(16), *Material that is reasonably deemed to be a threat to legitimate penalogical interests.*
    ☒ (d), *It contains material or literature which would pose a threat to institutional security.*
    ☐ Other (describe):

☐ **It violates regulations or local procedures:**
    ☐ Promotes gang activities [CCR, Title 15, Section 3023 (a)]
    ☐ Unauthorized business dealings [CCR, Title 15, Section 3024 (a)]
    ☐ Unauthorized inmate-to-inmate correspondence and/or inmate-to-parolee/probationer correspondence [CCR, Title 15, Section 3139]
    ☐ Possession and Exchange [CCR, Title 15, Section 3192]
    ☐ Tattoos and Symbols (Gang symbols) [CCR, Title 15, Section 3378 (c) (8) (B)]
    ☐ Any correspondence deemed circumventing [PBSP Department Operations Manual (DOM) Addendum, Section 54010, Attachment 10, #31]
    ☐ Third-party correspondence [PBSP DOM Addendum, Section 54010, Attachment 10, #32]
    ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, PBSP DOM Addendum, Section 54010.6]
    ☐ Return address not provided [PBSP DOM Addendum, Section 54010.6]
    ☐ Other (describe):

☒ **Additional Information:** AUTHOR IS INCITING VIOLENCE AGAINST ANOTHER INDIVIDUAL.

**The disposition of the letter / mailing is as follows:**
☐ Retained by the Security Housing Unit (SHU) Investigative Services Unit (ISU) for investigation / potential disciplinary or court proceedings.
☐ Returned to sender at inmate's expense.
☒ Confiscated by SHU ISU.  The mailing is disallowed as per the CCR, Title 15, Sections 3006, 3135 and 3136.
☐ Other (describe):

The CCR, Title 15, Section 3132 (a) states in part, "*Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility; any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved.*"  Inmates may appeal the stopped mail utilizing the departmental appeal process.

Reporting Employee:

J. FRISK
Correctional Sergeant
Institutional Gang Investigations Unit
cc:    C-File
       Investigative Services Unit
       Inmate
       Sender (incoming correspondence only)

DATE:  7/20/2012

Correspondence Disapproval Authorized By (Captain level or above):

B. W. FREELAND
Correctional Captain
Investigative Services Unit

_____/____/_____
Date forwarded to inmate:

STOPPED MAIL NOTIFICATION

GENERAL CHRONO

NAME: **Perez**          CDC#: **K12922**     HOUSING **D1-219**          CDC 128-B

On __7/26/2012__          Correspondence was stopped for the above-named inmate.  The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE/ ADDRESSED TO:     ☒ INCOMING CORRESPONDENCE / FROM:

Kendra Castaneda
P.O. Box 18554
Long Beach, CA 90807

The correspondence was disapproved in accordance with Title 15, Section 3136 as it pertains to Sections 3006 and or 3135:

☒ **Title 15, Section 3006 CONTRABAND:**
- ☐ (c)(1) It incites murder; arson; riot; or any form of violence.
- ☐ (c)(4) Plans to escape or assist in an escape.
- ☐ (c)(5) *Plans to disrupt the order, or breach the security, of any facility (such as riot, escape, strike, etc.)*
- ☒ (c)(6) *Plans for activities which violate the law, these regulations, or local procedures.*
- ☐ (c)(7) *Coded messages.*
- ☐ (c)(8) A description of the making of any weapon, explosive, poison or destructive device.
- ☐ (c)(15)(17) Obscene material / Sexually explicit images.
- ☐ (c)(16) It is deemed to be a threat to legitimate penological interests.
- ☐ (d) It contains material or literature which would pose a threat to institutional security.
- ☐ Other (describe):

☐ **It violates regulations or local procedures:**
- ☐ Promotes gang activities [CCR, Title 15, section 3023 (a)]
- ☐ Unauthorized business dealings [CCR, Title 15, section 3024 (a)]
- ☐ Unauthorized inmate to inmate correspondence and or inmate to parolee / probationer correspondence [CCR, Title 15, section 3139]
- ☐ Possession and Exchange [CCR, Title 15, section 3192]
- ☐ Tattoos and Symbols [CCR, Title 15, section 3378 (c) (8) (B)]
- ☐ Any correspondence deemed circumventing [PBSP Department Operations Manual (DOM) Addendum, section 54010, Attachment 10, #32]
- ☐ Third party correspondence [PBSP DOM Addendum, section 54010, Attachment 10, #33]
- ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, PBSP DOM Addendum, Section 54010.6]
- ☐ Return address not provided [PBSP DOM Addendum, Section 54010.6]
- ☐ Other (describe):

☐ **Additional Information:**

**The disposition of the letter / mailing is as follows:**
- ☐ Retained by SHU Investigative Services Unit for investigation / potential disciplinary or court proceedings.
- ☐ Returned to sender.
- ☒ Confiscated by SHU ISU.  The mailing is disallowed as per Title 15, Sections 3006, 3135 and 3136.
- ☐ Other (describe):

Title 15, Section 3132 (a) states in part, *"Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility, any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved."* **Inmates may appeal the stopped mail utilizing the departmental appeal process.**

Reporting Employee: _____          Correspondence Disapproval Authorized By (Captain level or above):

_____          _____
D. Gongora          B. W. FREELAND
Correctional Officer          Correctional Captain
Institutional Gang Investigations          Investigative Services Unit

cc:     C-File
        Investigative Services Unit
        Inmate
        Sender (incoming correspondence only)                    7  /31 / 12
                                                        Date forwarded to inmate:

DATE:     7/26/2012          **STOPPED MAIL NOTIFICATION**          GENERAL CHRONO

CDC 128-B

NAME: __PEREZ__          CDC#: __K-12992__   HOUSING __D1-219L__

On __7/20/2012_____ , correspondence was stopped for the above-named inmate. The mailing is described as follows:

☐ OUTGOING CORRESPONDENCE / ADDRESSED TO:      ☒ INCOMING CORRESPONDENCE / FROM:

KENDRA CASTANEDA
P.O. BOX 18554
LONG BEACH, CA 90807

The correspondence was disapproved in accordance with the California Code of Regulations (CCR) Title 15, Section 3136, as it pertains to Sections 3006 and/or 3135:

☒ **CCR, Title 15, Section 3006, CONTRABAND, state in part:**
- ☒ (c)(1), *It incites murder; arson; riot; or any form of violence.*
- ☐ (c)(4), Plans to escape or assist in an escape.
- ☐ (c)(5), *Plans to disrupt the order, or breach the security, of any facility (such as riot, escape, strike, etc.)*
- ☒ (c)(6), *Plans for activities which violate the law, these regulations, or local procedures.*
- ☐ (c)(7), *Coded messages.*
- ☐ (c)(8), *A description of the making of any weapon, explosive, poison or destructive device.*
- ☐ (c)(15) & (c)(17), *Obscene material (sexually explicit images).*
- ☒ (c)(16), *Material that is reasonably deemed to be a threat to legitimate penological interests.*
- ☒ (d), *It contains material or literature which would pose a threat to institutional security.*
- ☐ Other (describe):

☐ **It violates regulations or local procedures:**
- ☐ Promotes gang activities [CCR, Title 15, Section 3023 (a)]
- ☐ Unauthorized business dealings [CCR, Title 15, Section 3024 (a)]
- ☐ Unauthorized inmate-to-inmate correspondence and/or inmate-to-parolee/probationer correspondence [CCR, Title 15, Section 3139]
- ☐ Possession and Exchange [CCR, Title 15, Section 3192]
- ☐ Tattoos and Symbols (Gang symbols) [CCR, Title 15, Section 3378 (c) (8) (B)]
- ☐ Any correspondence deemed circumventing [PBSP Department Operations Manual (DOM) Addendum, Section 54010, Attachment 10, #31]
- ☐ Third-party correspondence [PBSP DOM Addendum, Section 54010, Attachment 10, #32]
- ☐ Use of fictitious name or address [U.S.C.S. Title 18, Section 1342, PBSP DOM Addendum, Section 54010.6]
- ☐ Return address not provided [PBSP DOM Addendum, Section 54010.6]
- ☐ Other (describe):

☒ **Additional Information:** AUTHOR IS INCITING VIOLENCE AGAINST ANOTHER INDIVIDUAL.

**The disposition of the letter / mailing is as follows:**
- ☐ Retained by the Security Housing Unit (SHU) Investigative Services Unit (ISU) for investigation / potential disciplinary or court proceedings.
- ☐ Returned to sender at inmate's expense.
- ☒ Confiscated by SHU ISU.  The mailing is disallowed as per the CCR, Title 15, Sections 3006, 3135 and 3136.
- ☐ Other (describe):

The CCR, Title 15, Section 3132 (a) states in part, "*Correspondents are personally responsible for the content of each item of mail they send into or out of a correctional facility; any violation of laws governing mail will be referred to postal authorities and to appropriate criminal authorities. Violations of law, the policies and regulations or of approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved.*" **Inmates may appeal the stopped mail utilizing the departmental appeal process.**

Reporting Employee:                              Correspondence Disapproval Authorized By (Captain level or above):

_____          _____
J. FRISK                                         B. W. FREELAND
Correctional Sergeant                            Correctional Captain
Institutional Gang Investigations Unit           Investigative Services Unit
cc:      C-File
         Investigative Services Unit
         Inmate
         Sender (incoming correspondence only)          _____/_____/_____
                                                        Date forwarded to inmate:

DATE:   7/20/2012        **STOPPED MAIL NOTIFICATION**        GENERAL CHRONO

EXHIBIT H



JUL 0 8 2010

# UCSF Medical Center

512-21-09-5     07/05/1963
Ashker, Todd
Visit: 000017675218

C58191

## PAIN MANAGEMENT CENTER

2255 Post Street
Box 1654
San Francisco, California 94143-1654

Tel: (415) 885-7246   Fax: (415) 885-7575

### INITIAL EVALUATION

June 18, 2010

Michael Clifton Sayre, M.D.
5905 Lake Earl Drive
Crescent City, CA  95532
Phone: (707) 465-9197
Fax: (707) 465-9161

RE: Ashker, Todd
U#: 51221095
PMC#:
DATE OF SERVICE: 06/18/10

Dear Dr. Sayre:

Thank you for recommending this patient to the Pain Management Center for consultation regarding his chronic right upper extremity pain. We had the pleasure of seeing him in our center today. As you know, this patient is a 46-year-old male who has been incarcerated since 1984. In 1990, the patient was shot by a prison guard to the right upper extremity. The patient received extensive damage to his right upper extremity and according to him, the bullet had exploded in his right upper extremity, causing multiple fragments. The patient has subsequently undergone multiple surgeries to the right upper extremity, both for reconstruction and for removal of bullet fragments. He reports that there are still some bullet fragments that are left in that arm. The patient subsequently developed pain from his elbow down to his hand of that right upper extremity in the proximal distribution of the ulnar nerve. He then had nerve conduction studies, which showed ulnar nerve damage and palsy. In 1999, the patient underwent an ulnar release surgery which gave him a few years of pain relief, despite significant postoperative swelling and color change. He states that occasionally he will still see some purplish discoloration of his hand; however, swelling is not much of an issue anymore. The pain slowly returned since 2001. He reports that the pain is burning and stabbing, again mostly in the ulnar distribution in his forearm and his hand. Occasionally, he will feel radiation of pain from his elbow up the inner aspect of his right upper extremity towards his axilla. The patient will also feel numbness along the median and radial distribution of his forearm.

COPY FOR:  Michael Clifton Sayre, MD

758-022 (Rev. 10/04) WorkflowOne

EXHIBIT 



**UCSF Medical Center**

JUL 0 8 2010

512-21-09-5        07/05/1963
Ashker, Todd
Visit: 000017675218

C58191

He states that the pain is made worse with cold. The pain is made slightly better with physical therapy and warm pool therapy. The patient has seen a pain specialist while incarcerated. He was trialed on multiple medications in the past, which included Elavil, Neurontin, Trileptal, clonidine, and Lidoderm patches. He has also tried Ultram, Tylenol and NSAIDs. He reports that his best response was to Ultram, which he took twice a day. The patient also was concurrently taking Tylenol with Ultram; however, because of a history of hepatitis C and the fact that the patient was taking high-dose Tylenol at the time, the Tylenol was since discontinued. The patient had also been using NSAIDs, which gave him some level of relief; however, because of a history of gastritis and reflux, which was confirmed on EGD, the patient has since been off of all NSAIDs. Currently, the patient is taking Effexor and morphine sulfate twice per day, as well as 1 pill of Ultram at night. He reports excellent pain relief from morphine and Ultram at night; however, he states that the morphine in the day does not give him much in the way of pain relief, and also makes him somewhat sedated. The patient reports no other vasomotor changes in the right upper extremity except for a sense of increased hair growth in that arm.

INTERVENTIONAL PROCEDURES AND THERAPIES: He denies trying any injections for his pain. He also denies trying TENS unit, pain psychology, acupuncture, or biofeedback.

MEDICATIONS TRIED:
1. Ultram twice per day with significant benefit.
2. Tylenol with some level of relief; however, stopped because of high dose of Tylenol use with a history of hepatitis C.
3. NSAIDs stopped because of history of GI upset.
4. Elavil from 1998 to 2002. The patient is unsure of the exact dosage, and he does not have a medication list with him today. He stopped this because of side effects and also he reports lethargy and change in vision while on Elavil.
5. Trileptal with no benefit. Also gave the patient palpitations.
6. Neurontin, no benefit. Also gave the patient headaches.
7. Lidoderm patch, mild benefit.

MEDICATIONS:
1. Effexor.
2. Morphine sulfate 50 mg twice per day.
3. Ultram in the evening.
4. Sucralfate occasionally.

It must be noted that the patient does not come with a current medication and all the medications listed above are per the patient.

IMAGING STUDIES: None available.

MEDICAL HISTORY:
1. GERD/gastritis.
2. Right knee and left hip pain as well as mid-back pain.

COPY FOR: Michael Clifton Sayre, MD

758-022 (Rev. 10/04) WorkflowOne



**UCSF Medical Center**

512-21-09-5        07/05/1963
Ashker, Todd
Visit: 000017675218

C58191

3. Arthritis.

SURGICAL HISTORY:   Multiple surgeries to the right upper extremity.  Otherwise, no other surgeries.

ALLERGIES:   No known drug allergies.

FAMILY HISTORY:   The patient's family history is not pertinent to his chief complaint.

SOCIAL HISTORY:   The patient denies current alcohol use, tobacco use, or illicit drug use.  He does have a history of illicit substance abuse in the past, which includes methamphetamines.  The patient reports that he has an open lawsuit involving his chronic pain complaint which is related to receiving a gunshot to the right upper extremity while incarcerated.

REVIEW OF SYSTEMS:  GI: Denies nausea, vomiting.  He has occasional constipation which he attributes to opioid use.  Neurologic:  Denies headache, bowel or bladder incontinence.  Cardiovascular:  Denies chest pain, dyspnea on exertion, or orthopnea.  Respiratory:  Denies shortness of breath, cough, or sputum production.  GU:  Denies dysuria, hematuria, difficulty with urination.  Constitutional:  Denies fevers, chills or malaise.

PHYSICAL EXAMINATION:   Constitutional: Pulse 114, $O_2$ saturation 100% on room air.  Blood pressure 126/76.  General appearance:  This is a Caucasian male appearing his stated age.  He seems to be in no acute distress.  He is in prison garb.  He has a normal body habitus.  HEENT:  Mouth opening is average.  No mucosal lesions could be appreciated.  Respiratory:  Clear to auscultation bilaterally.  Cardiovascular:  Regular rate and rhythm, no murmurs, rubs, or gallops.  Skin:  Skin is intact.  No signs of infection, rashes or edema in all four extremities.  There are no obvious color or temperature changes.  Right upper extremity and left upper extremity:  The skin of the right upper extremity seems no different than the left upper extremity; although the patient does report increased hair growth on the right upper extremity, this is not visually apparent.  There is no allodynia of the right upper extremity.  The patient's sensation to light touch is intact in both upper extremities.  Palpation did not elicit any neuropathic response in the upper extremities.  There is some level of atrophy at the forearm of the right upper extremity.  This could also be secondary to previous surgery and trauma from gunshot wound.  Both hands seem to be equal in temperature to touch.  Musculoskeletal:  The patient has 4/5 strength with hand grip on the right compared to 5/5 on the left.  The patient has also 4/5 strength with elbow extension and flexion when compared to the left.  There are no obvious masses or asymmetry except for the right upper forearm which was noted previously to show signs of some atrophy.  There is normal tone of the musculature of both upper extremities.  Cervical spine shows normal range of motion.  Deep tendon reflexes are +2 at bilateral biceps and +1 at bilateral triceps.  I could not elicit any brachial radialis reflex.  Back:  Full range of motion.  Neurologic:  Cranial nerves II through XII are grossly intact.  Gait appears normal.  Deep tendon reflexes are mentioned above.  Psychiatric:  A&O x 3.  He is a good historian.  He is dressed in a prison uniform.

COPY FOR:  Michael Clifton Sayre, MD

758-022  (Rev. 10/04) WorkflowOne



JUL 0 8 2010

**UCSF Medical Center**

512-21-09-5          07/05/1963
Ashker, Todd
Visit: 000017675218

CS8191

The above history and physical was reviewed with Dr. Zhonghui Guan, and he is in agreement with the following assessment and plan.

ASSESSMENT:  This is a 46-year-old male with a history of gunshot wound to the right upper extremity, now with chronic right arm pain, which is likely secondary to ulnar neuropathy from nerve damage/entrapment.

PLAN:
1.  As the patient has received excellent pain relief from concurrent use of Ultram and Tylenol in the past, we will recommend that the patient be weaned off of morphine and started on Ultram 50 mg three times daily.  The patient can also use Tylenol 650 mg along with Ultram in three times daily dosing, as long as he is clear from a medical standpoint.  Although the patient does have a history of hepatitis C, he reports that there are no current issues with his liver.
2.  The patient is to return to clinic on a p.r.n. basis.

Thank you very much for your kind recommendation of this patient to our center for consultation.  We appreciate you allowing us to participate in this patient's care.  Please call us with questions or concerns; our phone number is (415) 885-7246, and our fax number is (415) 885-7575.

Sincerely,

ZHONGHUI GUAN, M.D.

I have seen and examined the patient.  I have reviewed and discussed the case with Dr. Yu-Fan Zhang and agree with the findings and treatment plan as documented above.

EXTRA COPIES:


CARBON COPIES:          Michael Clifton Sayre, MD
                        P O Box 7000
                        Crescent City CA 95532



DICTATED BY:            Yu-Fan Zhang, MD 76130


                        Electronically Signed by
                        Zhonghui Guan, MD 06/25/2010 11:57 A


ATTENDING PHYSICIAN:    _____
                        Zhonghui Guan, MD 73145

COPY FOR:  Michael Clifton Sayre, MD

758-822 (Rev. 10/04) WorkflowOne



**UCSF Medical Center**

512-21-09-5    07/05/1963
Ashker, Todd
Visit: 000017675218

C58191

D:     06/18/2010 12:04 P
T:     06/19/2010 04:15 P waw  CS#: 2408309

COPY FOR:  Michael Clifton Sayre, MD

758-022  (Rev. 1004) WorkflowOne

# EXHIBIT I

199608

# HEALTH CARE SERVICES REQUEST FORM (PBSP 7362)

| PART I: TO BE COMPLETED BY THE PATIENT |
|---|

If you believe this to be an urgent/emergent health care need, contact the correctional officer on duty.

REQUEST FOR: MEDICAL ☐ PSYCHIATRY ☐ MENTAL HEALTH ☐ DENTAL ☐ PHARMACY ☒

NAME: _Todd Ashker_ CDC #: _C.58191_ HOUSING: _D4-121_

PHARMACY REFILL # _____ *Pharmacy, place labels on back of form*

THE REASON YOU WANT HEALTH CARE. (DESCRIBE YOUR HEALTH PROBLEM AND HOW LONG YOU HAVE HAD THE PROBLEM)

_Refill-Tylenol ⟩ This was discontinued 11-15-12_
_Thx_

PATIENT'S SIGNATURE: _T Ashker_   DATE: _11/25/12_

| PART II: TO BE COMPLETED BY THE TRIAGE RN/RDA/MTA |
|---|

Date & Time Received: _OW 11/26/12_   Received by: _M_

Reviewed by RN/RDA, Date: _____ Time: _____ Signature: _____ Triage Designation: _____

S:

O:   T:   P:   R:   BP:   WEIGHT:

A:

P:

Signature/Date/Time:

APPOINTMENT SCHEDULED AS:   EMERGENCY ☐ (immediately)   URGENT ☐ (within 24 hours)   ROUTINE ☐ (within 14 calendar days)

REFERRED TO PCP:   DATE OF APPOINTMENT:

_____ _____ _11-26-12 1130_
Print/Stamp Name   Signature/Title   Date & Time Completed

## COPAYMENT INFORMATION – TO BE FILLED OUT BY DEPARTMENTAL STAFF

1. ☐ Visit was for an emergency
2. ☐ Visit was for diagnosis or treatment of a communicable disease condition (See Title 17, Chapter 4, Subchapter 1, Section 2500 CCR)
3. ☐ Visit was for mental health services
4. ☐ Visit was a follow-up requested by the clinician.
5. ☐ Visit was for State mandated evaluation or treatment (e.g., Annual TB tests)
6. ☐ Visit was for reception screening and evaluation only
7. ☐ Visit is NOT exempt from co-payment. Send PINK copy to Inmate Trust Office.

DISTRIBUTION:
ORIGINAL-Unit Health Record   YELLOW - Pharmacy   PINK - Inmate Trust   GOLDENROD – Inmate/Patient
PBSP 7362 (Rev. 7/03)

| Name: | CDC#: | Housing: | Institution: |
|---|---|---|---|

EXHIBIT J

# USA

# THE EDGE OF ENDURANCE

### PRISON CONDITIONS IN CALIFORNIA'S SECURITY HOUSING UNITS

## AMNESTY
### INTERNATIONAL



USA: THE EDGE OF ENDURANCE
PRISON CONDITIONS IN CALIFORNIA'S SECURITY HOUSING UNITS

# 4. US LAW AND STANDARDS

The US Supreme Court has not ruled that solitary confinement, even when imposed indefinitely, is *per se* a violation of the US Constitution.  However, there is a growing consensus among the US courts that housing mentally ill prisoners in "super-maximum security" isolation units is incompatible with the Eighth Amendment prohibition of "cruel and unusual punishment" under the US Constitution.  One of the landmark rulings was *Madrid v Gomez (*1995*),* which ordered the removal of seriously mentally ill prisoners from the Pelican Bay SHU on the ground that conditions put them at high risk of suffering "very severe injury to their mental health".[28]  However, the court stopped short of ruling that conditions for all prisoners at Pelican Bay SHU were unconstitutional (although, as discussed below, there is some evidence that neither the *Madrid* court nor the designers of the unit had envisaged such long term confinement there).

Judge Henderson, in delivering the *Madrid* ruling, noted that, "the record demonstrates that the conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods".  However, he held that, "while the conditions in the SHU may press the outer bounds of what most humans can psychologically tolerate, the record does not satisfactorily demonstrate that there is a sufficiently high risk to all inmates of incurring a serious mental illness from exposure to conditions in the SHU to find that the conditions constitute *per se* deprivation of a basic necessity of life".[29]

The court noted in its ruling that the California authorities had a legitimate penological interest in restricting the social activity of certain inmates. While Judge Henderson observed that some aspects of the SHU – such as windowless cells, lack of any view or equipment in the exercise yards – appeared to have tenuous links with what was necessary on security grounds, the court deferred to the considerable discretion afforded states by the federal courts to determine the specific conditions of confinement. Thus, the ruling left unchanged the physical conditions in the SHU.

While the impact of many years of indefinite SHU confinement in the conditions at Pelican Bay might persuade a court today to reach a different decision, the ruling reflects the very high threshold set by the US courts in deciding claims of cruel prison conditions.  The US Supreme Court has held that for conditions to amount to "cruel and unusual punishment" they must be so severe as to deprive the inmate of a "basic necessity of life".[30] This has been interpreted to include the physical requirements of food, clothing, shelter, medical care and personal safety.[31] However, the courts have been less willing to consider psychological pain or deterioration in a prisoner's mental state as sufficient to judge conditions unconstitutional, except in very severe cases.[32]

Since *Madrid*, other US courts have held that housing seriously mentally ill prisoners in "supermax" conditions is unconstitutional. However, Amnesty International believes that insufficient attention has been paid by the US courts – or by legislators and prison administrators – to the mental pain and suffering endured by all prisoners, whether or not they are assessed as suffering from serious mental illness, who are subjected to prolonged isolation and environmental and other deprivations.

The USA has sought to limit the application of international human rights law in its conduct by entering reservations to article 7 of the ICCPR and article 16 of the Convention against Torture as a condition of ratifying the treaties. The reservations state that the US considers itself bound by the articles only to the extent that "cruel, inhuman or degrading treatment or punishment" means the "cruel and unusual treatment or punishment" prohibited under the US Constitution.  In its initial report to the Human Rights Committee on its obligations under the ICCPR, the US administration, then under President Bill Clinton, explained its reservations by stating that certain US practices had withstood judicial review in the US courts under constitutional provisions which were arguably narrower than the scope of Article 7. The report cited, as an example, prolonged judicial proceedings in cases involving capital punishment, which the Committee had suggested could

constitute cruel, inhuman or degrading treatment or punishment in contravention of Article 7, and it noted that "the Committee has also indicated that the prohibition may extend to other practices as corporal punishment and solitary confinement." [33]

Amnesty International has repeatedly called on the USA to withdraw its reservations as defeating the object and purpose of the treaties in question and therefore incompatible with international law.[34] The Human Rights Committee has also noted with concern the restrictive interpretation made by the US of its obligations under the Covenant, as has the Committee against Torture.[35] In any event, the USA has made no similar reservation to Article 10 of the ICCPR which requires that all prisoners must be treated humanely, without exception. Given the clear consensus among international human rights bodies and experts that prolonged or indefinite solitary confinement is inhumane treatment, Amnesty International is concerned that US courts and governments continue to accept such practice.

While the US courts have taken a relatively narrow view of what are unconstitutional prison conditions – largely deferring to prison administrations on measures deemed necessary on security grounds – other US bodies have been more robust in expressing concern about the use of solitary confinement.

In its 2006 report *Confronting Confinement*, the Commission on Safety and Abuse in America's Prisons (a broad based panel co-chaired by a former US Attorney General and a former Chief Judge) called for an end to conditions of isolation in US prisons.[36] The report acknowledged that "Separating dangerous or vulnerable individuals from the general prison population is part of running a safe correctional facility". However, it found that in some systems, the "drive for safety, coupled with public demand for tough punishment has had perverse effects", with prisoners who were justifiably separated from the general population locked in cells with little opportunity to be productive or to prepare for release and others who were not a serious threat confined under the same conditions.  The report noted that in some places "the environment in segregation is so severe that people end up completely isolated, living in what can only be described as torturous conditions".[37]

The Commission recommended making segregation a last resort, for as brief a period as possible, with tighter admissions criteria and segregated prisoners given an opportunity to engage in productive activities.  Noting higher recidivism rates among prisoners released directly from segregation, the Commission also recommended that inmates should spend time in a normal prison setting before being released to the community.  The Commission called on US jurisdictions to "End conditions of isolation" and "Ensure that segregated prisoners have regular and meaningful human contact and are free from extreme physical conditions that cause lasting harm", citing as examples systems where prisoners are held in cells with few possessions and no natural light or view outside the cell and no contact with other prisoners or meaningful contact with staff.[38]

In 2010, the American Bar Association (ABA) promulgated standards on the treatment of prisoners which included standards on segregation.[39] These state that segregated housing "should be for the briefest term and under the least restrictive conditions practicable and consistent with the rationale for placement and with the progress achieved by the prisoner" (Standard 23-2.6).  The standards state that segregation for more than one year should be imposed only if the prisoner poses a "continuing serious threat" (23-2.7);  that "Conditions of extreme isolation should not be allowed regardless of the reasons for a prisoner's separation from the general population" (23-3.8 (b));  and that all prisoners in segregated housing should be provided with "meaningful forms of mental, physical and social stimulation", including, where possible, more out-of-cell time and opportunities to exercise in the presence of other prisoners (23-3.8 (c)). The standards also recommend a number of procedural protections for prisoners placed in segregated housing, including a hearing at which the prisoner has a reasonable opportunity to present witnesses and information and to participate in the proceedings, with regular, meaningful review (23-2.9).

USA: THE EDGE OF ENDURANCE
PRISON CONDITIONS IN CALIFORNIA'S SECURITY HOUSING UNITS

# 5.  CONDITIONS IN PELICAN BAY SHU

**"You lay there in your concrete tomb trying to block out the cold especially in the winter when this place is like a morgue. The wall I lay next to is an exterior wall... it's like sleeping next to a block of ice... sometimes the floor is warmer and there I will sleep".**

Letter written by an inmate who has been held in the Pelican Bay SHU for 16 years as a gang associate

The Pelican Bay SHU is a separate facility within Pelican Bay State Prison maximum security complex in Crescent City, situated in the far north of California close to the border with Oregon. At the time of Amnesty International's visit to the prison in November 2011, around 1,100 prisoners were held in the SHU, slightly above the official capacity of 1056. According to CDCR, 98% of prisoners in PBSP SHU are validated gang members serving indeterminate SHU terms.  Figures released by CDCR in 2011 revealed that more than 500 prisoners had spent over ten years in Pelican Bay SHU; of this number, 78 had spent 20 or more years in the SHU.  Many prisoners have been there since the prison opened in 1989, held in conditions of severe isolation. Amnesty International considers that the design and operating procedures in the SHU fall short of international standards for humane treatment.

Modelled on the Special Management Unit in Arizona, Pelican Bay SHU is designed to minimize human contact and reduce visual stimulation.[40] It consists of a low level concrete structure divided into cell blocks. The cell blocks themselves are divided into "pods", each containing eight cells arranged on two tiers.  The cells have no windows and face a blank wall so that prisoners have no view and cannot see each other. Each pod is self-contained with an exercise pen at one end and a shower at the other so that, apart from visits or occasional trips to the law library or for medical treatment, prisoners need never leave the confines of the pod.

A central control area overlooks each cell-block, with TV screens giving a view into the pods. In general, correctional staff enter the pods only when delivering food to prisoners through slots in the cell doors, or when conducting cell searches. All doors are operated electronically and individually, so that a prisoner can be let out of his cell to go the exercise pen or shower cell without having contact with a guard or another prisoner. Prisoners are shackled with handcuffs and ankle chains whenever they are escorted outside the pod. Apart from visits by a chaplain, people outside the prison system rarely have access to the housing pods. Amnesty International's delegates entered a pod in an area of D wing known as the "short corridor" where alleged gang leaders are held. One prisoner, who had been in the SHU for 22 years, told a delegate that they were the first outsiders he had seen in the cell block for years.

## CONDITIONS INSIDE THE CELLS

Prisoners are confined to their cells for at least 22 and a half hours a day. The concrete cells measure approximately 80 square feet and are equipped with two built-in cement bunks against the back wall, a combined toilet and sink unit, a concrete slab which serves as a desk, a fixed stool and small shelf for a TV. Although the bunks allow for double occupancy, albeit in a very confined space, 90% of prisoners currently in Pelican Bay SHU are single-celled and have no physical contact with any other inmate. Prisoners have no work, vocational training, or recreational or group activities of any kind. All meals are taken in the cells, delivered through a slot in the door. The table, toilet and sink unit are positioned close to each other on one side of the cell. As Amnesty International has observed elsewhere, there is a concern about the possible health risks from spending so much time in a confined space, and eating all meals in close proximity to the open toilet.[41]

The 80 square feet cell size just meets the standard set by the American Correctional Association (ACA) for prisoners who spend more than 10 hours a day confined to a single cell. While the standard is not binding, it provides a nationally recognized benchmark for best practice.[42] However, a cell sized 80 square feet falls short of this standard if it accommodates two prisoners. While most prisoners in Pelican Bay SHU are not currently double-celled, Amnesty is concerned that a purpose built, relatively modern facility has been designed to accommodate two prisoners in a space recommended for single occupancy. Although having a suitable cell-mate alleviates some of the effects of isolation, confining prisoners together in a small space for such prolonged periods may cause additional stresses.[43]

The cell doors are constructed of heavy gauge perforated metal which, in the words of the federal judge in the *Madrid* ruling, "significantly blocks vision and light".[44] The only natural light source in each pod comes from a skylight in the ceiling of the central corridor, above and beyond the cell tiers. The cells are primarily lit with a fluorescent light which can be operated by the inmate, with lights in the corridor which stay on at all times but are reportedly dimmed at night. Amnesty International's delegates stood inside a vacant cell and noted that, when the cell light was turned off and the door closed, little natural light entered the cell which was very gloomy, despite it being a bright day. (While it was just possible to read without artificial light, it would be difficult to do this for any length of time or on a dull day.)

The lack of natural light in the housing cells contravenes the UN Standard Minimum Rules for the Treatment of Prisoners (SMR) which state that "In all places where prisoners are required to live or work, a) windows shall be large enough to enable the prisoners to read or work by natural light, and shall be so constructed that they can allow the entrance of fresh air whether or not there is artificial ventilation" (Rule 11).[45] The UN Special Rapporteur on Torture has said that the provisions in the SMR relating to light and air are "of critical importance to the adequate treatment of detainees in solitary confinement."[46]

The ACA standards also require that "all inmates' rooms/cells provide access to natural light" and that "segregation housing units provide living standards that approximate those of the general population" in prison.[47]

The honeycombed-shaped perforations in the cell doors are designed to be small enough to prevent objects from being thrown through them, while allowing surveillance of the cell interior (CCTV cameras are positioned along the corridor for this purpose). However, it is difficult to focus when looking through the doors at close range. Amnesty International's delegates spoke to several prisoners at the cell door and found their vision became strained after just a few minutes of peering through the perforations in the thick steel. The doors thus have the dual effect of both hampering vision at close range (thereby hindering communication with anyone at the cell door), while allowing a full view into the cell from a distance. The latter means that prisoners are potentially on view at all times even when using the toilet which is situated at the front of the cell, and thus they have no privacy. The structure of the cell doors is just one example in the design of the SHU where, in Amnesty International's view, security considerations have taken precedence over the obligation

to provide a humane environment.

While the perforated doors allow entrance of some fresh air, prisoners have complained of cells becoming very cold in winter, particularly at night, and of not being provided with adequate clothing. The cold temperature is reportedly exacerbated by failure to insulate outside walls at the back of some cells, where the concrete bunks are situated. There are also reports that the ventilation system is inadequate, consisting of recycled air, releasing dust and particles, leading to respiratory problems.[48] While Amnesty International was unable to assess this through its visit, it believes that these complaints should be addressed.  CDCR should ensure that cells are sufficiently insulated from cold, are maintained at adequate temperatures and with sufficient ventilation. All prisoners without exception should be provided with adequate clothing, blankets and headwear.


## LEXAN CELLS

*"He tells me the hardest thing to bear is the lack of human contact. In the SHU, you can't touch people; you lack sunlight, even noise. It is total sensory deprivation".*
Wife of a gang validated prisoner who was one of the lead hunger strikers

In the cell block Amnesty International visited, the doors of the eight cells in one pod (F pod) were covered with sheets of unbreakable transparent plastic (Lexan).  The plastic sheets are reportedly installed to prevent prisoners thrusting sharp objects or spitting or throwing faeces through the perforations in the cell doors.  All of the cells were occupied at the time of the visit (one prisoner per cell) and the organization was told they would usually remain in the Lexan cells "for the duration" of their time in the SHU.  Amnesty International is concerned that the Lexan covered cells further isolate prisoners and may worsen the air quality inside the cells by blocking air circulation through the perforated doors.  According to testimony about the effect of Lexan cells elsewhere, they allow heat and humidity to build up within the cell during warm weather and muffle sound so that it is more difficult to communicate with someone behind Lexan doors.[49]

Following its visit Amnesty International sought information from CDCR on the number of prisoners held in Lexan-covered cells at Pelican Bay SHU and the reasons why prisoners were held in such cells. This information had not been provided at the time of writing. However, each cell block in the SHU is reported to have one pod of Lexan covered cells. According to a prison mental health expert, most throwing of bodily wastes in prison (also known informally as "gassing") occurs in solitary confinement/isolation units, and, along with non-suicidal self-harm and smearing excrement on cell walls, is usually a symptom of mental health or behavioural problems stemming from, or exacerbated by, the harsh, isolative conditions of confinement.[50]  One high ranking official is reported as saying that he had never heard of "gassing" before the advent of the SHU, but once Pelican Bay SHU opened, gassing became a frequent occurrence.[51] Amnesty International appreciates that gassing is a particularly unpleasant experience for officers and may also, in some instance, carry a risk of harm. However, the organization is concerned that prisoners who engaged in disturbed behaviour such as spitting or throwing excrement should be held in Lexan cells instead of receiving treatment for their behaviour in a more therapeutic environment.


## EXERCISE

*"The roof is a wire mesh with a plexi –glass covering; if you look up your view is distorted by the mesh. You do not get any direct sunlight and you are under surveillance by the video camera the whole time"*
Description of a SHU exercise yard in a letter written by an inmate who has been held in the SHU at Pelican Bay for 16 years

SHU Prisoners are allowed to exercise for an hour and a half a day, alone (or with a cell-mate in the few cases where they have one) in a bare, concrete yard at the end of each pod. The narrow yard