IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD ASHKER, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>    Defendants.<br>_____/ | No. C 09-5796 CW<br><br>ORDER DENYING<br>MOTION TO DISMISS<br>(Docket No. 160) |

Plaintiffs, ten inmates at Pelican Bay State Prison, bring this putative class action against Defendants, the Governor of the State of California, the Secretary of the California Department of Corrections and Rehabilitation (CDCR), the Chief of CDCR's Office of Correctional Safety, and the Warden of Pelican Bay State Prison, for violations of the Eighth and Fourteenth Amendments. Defendants move to dismiss Plaintiffs' second amended complaint (2AC) for lack of subject matter jurisdiction and failure to state a claim. Plaintiffs oppose the motion. After considering the parties' submissions and oral argument, the Court denies Defendants' motion.

BACKGROUND

Plaintiffs Todd Ashker and Danny Troxell have lived in solitary confinement in Pelican Bay's Secure Housing Unit (SHU) for over two decades. Docket No. 1, Compl. ¶¶ 16-18. On December 9, 2009, they filed this lawsuit challenging the conditions of their confinement. Their pro se complaint charged various CDCR officials with violating their First, Fifth, Eighth, and Fourteenth Amendment rights. Id. ¶ 8.

On September 10, 2012, after securing counsel, Ashker and Troxell filed a second amended complaint (2AC) converting this suit into a putative class action and joining eight other long-term SHU inmates as plaintiffs. Docket No. 136, 2AC ¶ 1. In their 2AC, Plaintiffs assert that the conditions inside the Pelican Bay SHU violate the Eighth Amendment's ban on cruel and unusual punishment. Id. ¶¶ 177-92. Specifically, they allege that "the cumulative effect of extremely prolonged confinement, along with denial of the opportunity of parole, the deprivation of earned credits, the deprivation of good medical care, and other crushing conditions of confinement at the Pelican Bay SHU" have caused them significant harm, both physically and psychologically. Id. ¶¶ 180-81. They claim that SHU inmates are forced to "languish, typically alone, in a cramped, concrete, windowless cell, for 22 and one-half to 24 hours a day" without access to "telephone calls, contact visits, and vocational, recreational or educational programming." Id. ¶ 3.

In addition to their Eighth Amendment claim, Plaintiffs assert that CDCR's procedures for assigning inmates to the SHU violate the Fourteenth Amendment's guarantee of due process. Id. ¶¶ 193-202. According to Plaintiffs, CDCR assigns inmates to the SHU based solely on their membership in or association with prison gangs, without regard for the inmate's "actual behavior." Id. ¶¶ 91-92. CDCR relies instead on the word of confidential informants and various indicia such as "gang-related art, tattoos, or written material" to determine whether inmates are affiliated with a gang -- a process known as "gang validation." Id. ¶ 92.

2

Inmates who have been validated as gang members or associates are assigned to the SHU for an indefinite term. Id. ¶¶ 92-94.

Once inside the SHU, inmates receive periodic reviews every six months to determine whether they should be released into Pelican Bay's general population. Id. ¶¶ 96-97. Plaintiffs assert that these reviews are essentially "meaningless," however, because they require inmates to "debrief" -- that is, renounce their membership in the gang and divulge the gang's secrets to prison officials -- in order to secure release. Id. ¶¶ 96-97, 7. Plaintiffs contend that debriefing is not a viable option for most inmates, who believe that it "places [them] and their families in significant danger of retaliation" from other prisoners. Id. ¶ 7.

CDCR also conducts reviews of SHU inmates' gang affiliation status every six years to determine whether they are still "active" gang members or associates. Id. ¶¶ 102-04. As with the six-month reviews, however, Plaintiffs claim that this process typically only leads to the inmate's release from the SHU if the inmate is willing to debrief. Id. Plaintiffs allege, in short, that they have effectively been denied "information about an actual path out of the SHU, besides debriefing." Id. ¶ 117. They assert that they "are entitled to meaningful notice of how they may alter their behavior to rejoin general population, as well as meaningful and timely periodic reviews to determine whether they still warrant detention in the SHU." Id. ¶ 200.

Plaintiffs' 2AC seeks declaratory and injunctive relief. In particular, Plaintiffs request "alleviation of the conditions of confinement" in the SHU, meaningful review of the continued need for solitary confinement of all inmates who have been in the SHU

3

for over six months, and release from the SHU of every inmate who has spent over ten years there. Id. at ¶¶ 45-46. They have not asserted any claims for monetary damages.

## LEGAL STANDARDS

### I. Subject Matter Jurisdiction

Subject matter jurisdiction is a threshold issue which goes to the power of the court to hear the case. Federal subject matter jurisdiction must exist at the time the action is commenced. Morongo Band of Mission Indians v. Cal. State Bd. of Equalization, 858 F.2d 1376, 1380 (9th Cir. 1988). A federal court is presumed to lack subject matter jurisdiction until the contrary affirmatively appears. Stock W., Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989).

Dismissal is appropriate under Rule 12(b)(1) when the district court lacks subject matter jurisdiction over the claim. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion may either attack the sufficiency of the pleadings to establish federal jurisdiction, or allege an actual lack of jurisdiction which exists despite the formal sufficiency of the complaint. Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979); Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987).

### II. Failure to State a Claim

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable

4

claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

## DISCUSSION

I. Subject Matter Jurisdiction

Defendants contend that Plaintiffs' due process claim is moot because CDCR has recently implemented new procedures for assigning inmates to the SHU.[1] The new procedures -- which took effect in October 2012 -- are part of the agency's "Security Threat Group" (STG) pilot program, which aims to revamp CDCR's "gang management policies." Declaration of G. Giurbino ¶ 5. According to a CDCR administrator, George Giurbino, the pilot program involves (1) creating a "new STG-behavior-based disciplinary matrix, which provides for additional procedural due process safeguards"; (2) forming a "new STG Classification Committee, which provides an additional level of due process review and confirms initial STG validations"; and (3) introducing new procedures to incentivize good behavior among gang affiliated inmates. Id. The program will also include a case-by-case review of every SHU inmate across

---

[1] Mootness is properly raised on a motion to dismiss under Rule 12(b)(1). White v. Lee, 227 F.3d 1214, 1243 (9th Cir. 2000).

5

the State. Id. ¶ 6. During the first nine weeks of the pilot program, these reviews led to forty-three inmates at five different correctional facilities being "classified for release from the SHU to the general population." Id. Defendants have not specified how many of these releases occurred at Pelican Bay.

The changes implemented by the STG program do not moot Plaintiffs' due process claim. A claim is moot only if it has lost its character as a present, live controversy, and if no effective relief can be granted. Flast v. Cohen, 392 U.S. 83, 95 (1968). In general, a defendant cannot moot a claim merely by ceasing voluntarily to engage in illegal conduct; rather, it must show that "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Barnes v. Healy, 980 F.2d 572, 580 (9th Cir. 1992). The defendant bears a "heavy burden" in making this showing. Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States Dep't of Energy, 232 F.3d 1300, 1303 (9th Cir. 2000).

Defendants here have failed to satisfy this burden. In particular, they have not shown that the STG program will permanently cure the specific due process violations that Plaintiffs allege. The Ninth Circuit has rejected mootness arguments for this reason in the past. In Gluth v. Kangas, the court specifically rejected prison officials' argument that a group of Arizona inmates' claims of lack of access to the courts were rendered moot by the prison's "post-litigation promulgation of a new access policy." 951 F.2d 1504, 1507 (9th Cir. 1991). The Gluth court found the officials' mootness argument

6

1 "overreaching" because they had not explained in detail how the
2 new policy would permanently dispose of the plaintiffs' claims.
3 <u>Id.</u> ("Even assuming that the policy meets constitutional standards
4 on its face, given the Department's history of allegedly denying
5 access arbitrarily and the vagueness of the new policy, it cannot
6 be said 'with assurance' that there is no 'reasonable expectation'
7 that the alleged violations will recur.").

8 Defendants' mootness argument is similarly lacking here.
9 Although they have submitted a hundred-page CDCR memorandum
10 describing the new program, they have not shown that any of the
11 program's new procedures are permanent.  To the contrary, CDCR has
12 stated that the "pilot program has a lifespan of two years."
13 Giurbino Decl. ¶ 10.  As such, Defendants cannot establish that
14 the program will "<u>irrevocably</u> eradicate[] the effects of the
15 alleged violation[s]."  <u>Barnes</u>, 980 F.2d at 580 (emphasis added);
16 <u>cf.</u> <u>Celano v. Marriott Int'l, Inc.</u>, 2008 WL 239306, at *5 (N.D.
17 Cal.) (finding that the defendant's pilot program to improve
18 access to its facilities did not moot the plaintiff's Americans
19 with Disabilities Act claim because the defendant conceded that
20 "the pilot program . . . may be temporary").

21 Defendants request, as an alternative to dismissal, that the
22 Court stay Plaintiffs' due process claims until the STG program
23 has been fully implemented.  This request is denied.  A stay would
24 prejudice Plaintiffs, delay the case unduly, and save few
25 resources because the parties would still have to litigate
26 Plaintiffs' Eighth Amendment claims during the pendency of the
27 stay.
28

7

II.  Failure to State a Claim

    A.   Cruel and Unusual Punishment (First Cause of Action)

Plaintiffs allege that, while living inside the SHU, they have been deprived of basic human needs, including "normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity."  2AC ¶ 180.  They assert that their "extremely prolonged exposure to these deprivations" has caused them serious physical and psychological harm in violation of the Eighth Amendment.  Id. ¶¶ 179-82.

The Eighth Amendment requires prison officials to take reasonable measures to guarantee inmate safety.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Although the provision "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), it does require that prisons provide inmates with "basic human needs."  Helling v. McKinney, 509 U.S. 25, 33 (1993).

Eighth Amendment claims have two basic elements.  The first is objective: the deprivation alleged must be sufficiently serious.  Farmer, 511 U.S. at 832 (citing Wilson v. Seiter, 501 U.S. 294, 297-98 (1991)).  The second is subjective: the prison official must possess a sufficiently culpable state of mind.  Id. (citing Wilson, 501 U.S. at 298).  To determine whether an alleged deprivation is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation.  Id. at 834 (citing Wilson, 501 U.S. at 298).  With respect to the subjective component, the requisite state of mind depends on the nature of the claim.  In prison-conditions cases, the necessary

8

state of mind is one of "deliberate indifference." See, e.g., Wilson, 501 U.S. at 302-03; Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994).

Here, Plaintiffs have adequately plead both elements of an Eighth Amendment claim. They have alleged that their prolonged social isolation and lack of environmental stimuli -- each Plaintiff has lived in the SHU for at least eleven years -- causes "serious psychological pain and suffering and permanent psychological and physical injury." 2AC ¶¶ 181. These allegations are plausible in light of another court's fact findings that even shorter stays in the SHU are capable of causing psychological harm. See Madrid v. Gomez, 889 F. Supp. 1146, 1261-65 (1995) ("[T]he conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."). Plaintiffs' asserted injuries -- the symptoms of which include "chronic insomnia," "severe concentration and memory problems," "anxiety," and other ailments -- are sufficient to satisfy the objective component of their Eighth Amendment claim, considering the length of Plaintiffs' exposure to these conditions. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) (same).

9

Plaintiffs have also adequately plead facts to satisfy the subjective component of their claim. Not only are the physical symptoms they allege sufficiently obvious to apprise prison officials of their injuries but, in addition, Plaintiffs claim that CDCR officials were given explicit notice of their injuries by way of administrative grievances, written complaints, and inmate hunger strikes. 2AC ¶¶ 189-92. This assertion -- that CDCR officials knew of the risks of long-term solitary confinement but ignored them for several years -- is sufficient to satisfy the deliberate indifference requirement at the pleading stage. See Helling, 509 U.S. at 33 ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.").

The decision in Madrid, 889 F. Supp. at 1261-65, does not preclude Plaintiffs' claim here. Although the Madrid court only found that the conditions in the SHU violated the Eighth Amendment rights of inmates who were "already mentally ill" or predisposed to mental illness, it also stated:

> We emphasize, of course, that this determination is based on the current record and data before us. We can not begin to speculate on the impact that Pelican Bay SHU conditions may have on inmates confined in the SHU for periods of 10 or 20 years or more; the inmates studied in connection with this action had generally been confined to the SHU for three years or less.

Id. The decision, thus, expressly left open the possibility that longer periods of confinement in the SHU -- such as those alleged here -- could implicate Eighth Amendment concerns, even for those inmates who are not predisposed to mental illness.

10

The other two cases that Defendants cite, Coleman v. Wilson, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995), and Plata v. Schwarzenegger, No. 01-1351 TEH, Docket No. 1237, Stipulation & Order, at 1 (N.D. Cal. June 6, 2008) are also not preclusive here. Coleman and Plata are class actions that address the adequacy of health care services provided by CDCR to inmates across California. The Coleman class includes all CDCR inmates "with serious mental disorders," 912 F. Supp. at 1293, while the Plata class includes all CDCR inmates with "serious medical conditions," No. 01-1351 TEH, Docket No. 20, Compl., at 52.[2] In contrast, Plaintiffs here seek to represent a much narrower class (inmates housed in the Pelican Bay SHU) and assert a much broader claim (prolonged deprivation of human contact and environmental stimuli). Because neither the Coleman nor Plata class sought to challenge long-term confinement in the Pelican Bay SHU, these cases do not require dismissal of Plaintiffs' Eighth Amendment claim.

B.  Due Process (Second Cause of Action)

Plaintiffs allege that CDCR's procedures for assigning inmates to the SHU and periodically reviewing those assignments violate the Due Process Clause of the Fourteenth Amendment. 2AC ¶¶ 193-202.

Courts use a two-step inquiry to determine whether a plaintiff has stated a valid procedural due process claim. See Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989). First, the court asks whether the plaintiff has alleged a

---

[2] The Plata class originally excluded Pelican Bay inmates but was later amended by stipulation.

11

deprivation of a legally cognizable interest -- that is, "whether there exists a liberty or property interest which has been interfered with by the State." Id. If the court finds that the plaintiff has alleged such a deprivation, it will then proceed to the second stage of the inquiry, asking "whether the procedures attendant upon that deprivation were constitutionally sufficient." Id.

Defendants here do not dispute that reassigning inmates to the SHU qualifies as a deprivation of a legally cognizable liberty interest. See Wilkinson v. Austin, 545 U.S. 209, 223-24 (2005) (recognizing inmates have a liberty interest in avoiding assignment to a supermax unit that disqualifies them for parole and imposes "severe limitations on all human contact" for an "indefinite" period of time). Their motion therefore turns on the second part of the due process inquiry: namely, whether the procedures CDCR allegedly uses to assign inmates to the SHU are constitutionally adequate. To answer this question, the Court must apply the three-part balancing test laid out in Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Under this test, the Court must weigh: (1) the "private interest that will be affected" by the challenged government action; (2) "the risk of erroneous deprivation of such interest" under current procedures and the "probable value, if any, of additional or substitute procedural safeguards"; and (3) the "[g]overnment's interest" in the official action, including the cost of providing additional procedures. Id. Because Plaintiffs here allege that they receive only minimal procedural safeguards while being subjected to a significant

12

deprivation of liberty, they have stated a valid due process claim under Mathews.

The Supreme Court's decision in Wilkinson provides useful guidance here. In Wilkinson, the Court held that Ohio's procedures for assigning inmates to the State's only supermax prison -- a facility similar to Pelican Bay's SHU -- satisfied the due process requirements of Mathews. 545 U.S. at 224-29. The Court's decision was based on the fact that Ohio's reassignment process includes numerous measures to help ensure that inmates are not erroneously assigned to the supermax facility. In particular, Court noted,

> Ohio provides multiple levels of review for any decision recommending [supermax] placement, with power to overturn the recommendation at each level. In addition to these safeguards, Ohio further reduces the risk of erroneous placement by providing for a placement review within 30 days of an inmate's initial assignment to [the supermax facility].

Id. at 227.[3] The Court also emphasized that "Ohio requires that the decisionmaker provide a short statement of reasons. This

---

[3] Ohio's decision-making process involves several steps. First, to initiate the reassignment, a prison official must prepare a form detailing "matters such as the inmate's recent violence, escape attempts, gang affiliation, underlying offense, and other pertinent details." 545 U.S. at 216. Next, a three-member committee of corrections officials is convened to review the form and to hold a hearing on the matter. Although the inmate may not call witnesses at the hearing, he may appear to object to the proposed reassignment and offer any information or explanations that he finds relevant to the committee's decision. Id. The committee is required to give the inmate written notice, including a copy of the form that initiated the process, at least forty-eight hours before the hearing. Id.

13

requirement guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review." Id. at 226. Finally, the Court noted that inmates housed in the supermax facility are entitled to this same multi-tiered review process every year that they remain there. Id. at 217. Based on these robust safeguards, the Court concluded that Ohio's reassignment policy "strikes a constitutionally permissible balance between the factors of the Mathews framework." Id. at 230.

CDCR's reassignment procedures include significantly fewer protections than Ohio's. According to Plaintiffs' complaint, CDCR inmates do not receive a multi-tiered review before being reassigned to the SHU. Nor do they receive an immediate review of the reassignment decision within thirty days of their placement there. Inmates also receive fewer opportunities to object to CDCR's initial reassignment decision and to the subsequent six-month and six-year reviews of their gang affiliation status. In fact, according to Plaintiffs' complaint, the only way inmates can realistically secure release from the SHU is to debrief, an option which many inmates are reluctant to exercise. See Wilkinson, 545 U.S. at 227 ("Testifying against, or otherwise informing on, gang activities can invite one's own death sentence."). Finally,

---

If the committee recommends reassignment, it must issue a written report explaining its reasoning and summarizing the evidence presented at the hearing. Id. at 216-17. The warden at the facility where the inmate is housed must then sign off on the committee report and forward it to a state agency staffed with corrections officials, who must do the same. Id. Both the warden and the agency must annotate the committee report with the reasons for their respective decisions and provide a copy of the annotated report to the inmate. Id. If the inmate is ultimately reassigned, his file will be reviewed again by an official at the supermax facility within thirty days of his arrival there. Id.

14

unlike in Ohio, CDCR's initial reassignment decision is based solely on the inmate's gang affiliations, without regard to his criminal history or propensity for violence. Taken together, CDCR's procedures as alleged appear create a much greater "risk of erroneous deprivation" -- the second Mathews factor -- than was present in Wilkinson.

The third Mathews factor also weighs slightly in Plaintiffs' favor here because the costs of providing additional safeguards would be relatively small. Plaintiffs allege that Pelican Bay's SHU houses roughly a thousand inmates, which constitutes only a small fraction of California's total inmate population. Amending the procedural protections afforded to this subset of geographically isolated inmates would be considerably easier -- and cheaper -- than affording new protections to the inmate population as a whole.[4]

While the Court recognizes that the first Mathews factor -- the private interest at stake -- is ordinarily given less weight "within the context of the prison system and its attendant curtailment of liberties," Wilkinson, 545 U.S. at 225, this case presents unique circumstances, given the length and severity of the deprivations alleged. Plaintiffs here have spent much more time in the SHU than any of the Wilkinson plaintiffs spent in Ohio's supermax facility, which was only four years old when the case was filed. Five of the Plaintiffs here allege that they have

---

[4] As noted above, Defendants have represented that they intend to conduct a case-by-case review of all current SHU assignments as part of the new STG pilot program. Such an endeavor is likely possible only because of the relatively small number of inmates housed in SHUs across the State. Pelican Bay's SHU inmates represent an even smaller share of this subgroup.

15

lived in the SHU, with minimal human contact, for more than twenty consecutive years: even within the "context of the prison system," this represents a significant deprivation of liberty. See Keenan, 83 F.3d at 1089 ("We do know that relevant factors [when evaluating an inmate's liberty interest in avoiding a transfer] include whether there is a likelihood that the transfer will affect the duration of [the inmate]'s sentence and the duration of the transfer.").

Toussaint v. McCarthy, 801 F.2d 1080, 1098-1101 (9th Cir. 1986), which Defendants cite for support, does not counsel otherwise. In Toussaint, the Ninth Circuit examined California's procedure for reassigning inmates to administrative segregation units and concluded that inmates lacked a substantial liberty interest in avoiding reassignment to those units. Id. at 1291-92. This holding has little application to the present case because Plaintiffs' asserted liberty interest here is considerably greater than merely avoiding administrative segregation. The SHU not only exposes inmates to harsher conditions than administrative segregation but, as noted above, does so for longer periods of time. Indeed, the conditions inside the SHU appear more similar to the conditions inside the Ohio supermax facility described in Wilkinson -- where the Supreme Court recognized a cognizable liberty interest -- than to those described in Toussaint. Toussaint is therefore inapposite.

So, too, is Bruce v. Ylst, 351 F.3d 1283, 1287-88 (9th Cir. 2003), another case on which Defendants rely. In Bruce, the Ninth Circuit rejected an individual SHU inmate's due process claim alleging that "prison officials did not have sufficient evidence

16

to validate him as a member of the BGF prison gang." Id. at 1287. The court held that the prison officials were entitled to summary judgment because their initial gang validation decision was supported by "some evidence." Id. at 1288. While the Bruce court upheld CDCR's gang validation decision in that case, however, it did not resolve the broader question presented here: namely, whether CDCR's practice of assigning inmates to the SHU indefinitely and then allegedly denying them realistic opportunities for release violates due process. Unlike in Bruce, Plaintiffs here allege a wide range of procedural deficiencies, which include the infrequency of CDCR reviews, the lack of meaningful opportunities to contest reassignment, conditioning release from the SHU on debriefing, and denying SHU inmates a chance to earn good-time credits.[5] These deficiencies must be considered as a whole. The Supreme Court's decision in Wilkinson illustrates that courts deciding due process challenges to inmate reassignment procedures must examine the entire reassignment process -- including both the initial reassignment decision and subsequent reviews of that decision -- rather than focusing on a single element of the process in isolation. Bruce, which was decided two years before Wilkinson, dealt only with a single gang validation decision and did not examine CDCR's broader decision-making process.

This Court's decision in Ashker v. Schwarzenegger, No. 05-3286 CW, Docket No. 336 (N.D. Cal. 2009), is inapplicable here for

---

[5] Notably, SHU inmates were not denied the opportunity to earn good-time credits until 2010, seven years after Bruce was decided, when the California Legislature amended the Penal Code to make them ineligible for such credits. Cal. Penal Code § 2933.6.

17

the same reason.  In that case, Plaintiff Ashker challenged CDCR's repeated decisions to validate him as a member of the Aryan Brotherhood prison gang in 2001, 2002, and 2003.  Relying on Bruce, this Court granted summary judgment to CDCR officials because their gang validation decisions were supported by "some evidence," id. at 27-35; the Court did not, however, hold that CDCR's entire reassignment process comports with due process.  Furthermore, Ashker's claims in the present lawsuit are not based on the 2001, 2002, and 2003 gang validation decisions he challenged in his prior lawsuit.  Docket No. 11, Order Granting Plaintiffs' Requests for Reconsideration & Extension of Time, at 3.  As this Court has previously stated, Plaintiff Ashker's prior due process claims do not preclude his claims in this case.  Id. ("[T]o the extent that Plaintiffs' claims regarding gang status reviews and revalidations have not been litigated in C 05-3286 CW, they are cognizable in this case.").

In sum, Plaintiffs have adequately plead a violation of their due process rights.  The Court need not decide at this stage whether they are entitled to the specific hearing procedures described in Wolff v. McDonnell, 418 U.S. 539, 563-72 (1974) or merely the "minimal process" required in cases like Sandin v. Conner, 515 U.S. 472, 479 (1995), and Hewitt v. Helms, 459 U.S. 460 (1983).  As explained above, Plaintiffs have alleged a sufficiently serious deprivation of liberty and corresponding lack of procedural safeguards to state a due process claim under Mathews.  Determination of the process due would be premature at the pleading stage, where Plaintiffs have yet to produce evidence to support their allegations.

18

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (Docket No. 160) is DENIED. Defendants must file their answer within twenty-one days of the date of this order.

IT IS SO ORDERED.

Dated: 4/9/2013

CLAUDIA WILKEN
United States District Judge