JULES LOBEL (*pro hac vice*)
Email: jll3@pitt.edu
ALEXIS AGATHOCLEOUS (*pro hac vice*)
Email: aagathocleous@ccrjustice.org
RACHEL MEEROPOL (*pro hac vice*)
Email: rachelm@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6478
Fax: (212) 614-6499

GREGORY D. HULL (Bar No. 57367)
Email: greg.hull@weil.com
BAMBO OBARO (Bar No. 267683)
Email: bambo.obaro@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Tel: (650) 802-3000
Fax: (650) 802-3100

Attorneys for Plaintiffs
(Additional counsel listed on attached page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, DANNY TROXELL, GEORGE RUIZ, JEFFREY FRANKLIN, GEORGE FRANCO, GABRIEL REYES, RICHARD JOHNSON, PAUL REDD, LUIS ESQUIVEL, and RONNIE DEWBERRY, on their own behalf, and on behalf of a class of similarly situated prisoners, <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., Governor of the State of California, MATTHEW CATE, Secretary, California Department of Corrections and Rehabilitation (CDCR); ANTHONY CHAUS, Chief, Office of Correctional Safety, CDCR; and G.D. LEWIS, Warden, Pelican Bay State Prison, <br><br> Defendants. | Case No. 4:09 CV 05796 CW <br><br> **DECLARATION OF TERRY KUPERS, M.D., M.S.P., IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Honorable Claudia Wilken |

I, Dr. Terry A. Kupers, declare under penalty of perjury that:

1.      I am a board-certified psychiatrist retained as an expert witness by the plaintiffs in this matter to interview named plaintiffs and others and to conduct an investigation for the purpose of testifying at trial regarding conditions of confinement at the Pelican Bay Security Housing Unit (SHU), plaintiffs' mental health, and related issues.

## I.      Expert Qualifications

2.      I am Institute Professor in the Graduate School of Psychology at The Wright Institute. I have been on the faculty of The Wright Institute since 1981.  I teach doctoral students the basics of forensic and correctional psychology and I teach them to practice psychotherapy.  I also teach in other venues, for example a continuing education webinar presentation: "Correctional Psychiatry Overview," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic (co-sponsored by the American Association of Community Psychiatrists), a national videoconference originating in Pittsburg, PA on February 2, 2012.

3.      I am a Distinguished Life Fellow of the American Psychiatric Association. I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association, and the William Rossiter Award at the 2009 Annual Meeting of the Forensic Mental Health Association of California. My C.V. and a list of forensic cases of the past four years are attached to this report.

4.      I am author of four books, including *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It* (Jossey-Bass/Wiley, 1998).  I am co-editor of *Prison Masculinities* (Temple University Press, 2001), Contributing Editor of *Correctional Mental Health Report*, and the author of many professional articles (see C.V., attached).

5.      I give many lectures (see C.V., attached), including the keynote address, "Solitary

2

Confinement and Mental Health," at the Conference of the Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9, 2012, and the invited lecture, "Suicide Behind Bars: The Forgotten Epidemic," at the Institute on Psychiatric Services, American Psychiatric Association, San Francisco, October 28, 2011.

6.     I serve as a consultant to community mental health programs as well as jails and departments of correction. For example, I have met with the staff at Contra Costa County, San Francisco City and County and Solano County Jails for staff development and training sessions. I also periodically conduct trainings with the mental health staff at Progress Foundation in San Francisco. I have also consulted with the Ohio Department of Corrections and I served as a consultant to the U.S. Department of Justice and Human Rights Watch. I am currently monitor of the *Presley v. Epps* consent decree (federal court) in Mississippi, involving prisoners with mental illness in isolated confinement at Mississippi State Penitentiary.

7.     I became interested in corrections as my training in psychiatry was ending in the early 1970s. I became aware that quite a few people who would qualify as consumers in community mental health settings were being "lost to follow-up," and it turned out they had been sent to jails and prisons. I researched their fate behind bars, and one of my books is largely a report on their situation.[1] Once I learned of the realities of life in jail and prison, I turned my attention to the problem of crowding and testified in several lawsuits about jail and prison conditions. Meanwhile, I was asked to investigate sexual abuse behind bars and testified in court about that issue. And by the late 1980s, long-term isolation was a widespread practice in the prisons and I was asked to investigate and testify about the possible psychiatric harm in long-term isolative confinement.

8.     I have testified more than two dozen times in state and federal courts about the

---

[1] Kupers, Terry. (1999). *Prison Madness: The Mental Health Crisis and What We Must Do About It.* Jossey-Bass/Wiley.

3

DECLARATION OF TERRY KUPPERS, M.D., M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Case No. 4:09 CV 05796 CW

psychiatric effects of jail and prison conditions, the consequences of sexual abuse behind bars and the quality of correctional management and mental health treatment.  Litigation where I have testified at trial on matters similar to the issues in the present case include *Rutherford v. Pitchess*, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977; *Wilson v. Deukmejian*, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983; *Toussaint/Wright/Thompson v. Enomoto*, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983; *Gates v Deukmejian*, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989; *Coleman v. Wilson*, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993; *Bazetta v. McGinnis*, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000; *Jones 'El v. Litscher*, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax isolation, 2002; *Russell v. Johnson* and *Presley v. Epps*, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment of prisoners with mental illness on Death Row inside supermaximum Unit 32 and regarding all prisoners in isolated confinement at Parchman, 2003 and 2006; *Austin v. Wilkinson*, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005; *DAI, Inc. v. NY OMH*, Federal Court in New York, April 3, 2006, regarding mental health care in NY Dept. of Correctional Services, with special attention to supermax confinement and its effects on vulnerable prisoners; *Hadix v. Caruso*, Federal Court in Grand Rapids, Michigan, regarding correctional mental health care, April 29, 2008.  I also serve as Monitor for the consent decree in *Presley v. Epps*, a class action regarding conditions in

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

1  Supermax Unit 32 at Parchman/Mississippi State Penitentiary and the treatment of prisoners with

2  serious mental illness.

3  **II.    Preparation**

4          9.      In preparation for this declaration, on April 17 and 18, 2012, I interviewed 10

5  individual prisoners for approximately 45 minutes each, using non-contact visits in the Security

6  Housing Unit (SHU) visiting area at Pelican Bay State Prison (PBSP).  I also reviewed medical and

7  custody charts when available in the Medical Facility.  I plan further interviews with the 10 prisoners

8
9  I have already met with, as well as more interviews, a tour of the facility, plus extensive document

10 review in this action.  I would like to talk in detail with staff at PBSP about issues relevant to this

11 action, and if Defendants are not willing to permit me to talk with staff, I will rely on deposition

12 testimony to learn the staff's perspective.

13 **III.    Common Themes in the Ten Prisoners.**

14         10.     There is a rich literature of robust research on the effects of long-term solitary

15 confinement in prison.[2]  Long-term confinement (greater than three months) in an isolated

16
17 confinement unit such as the supermaximum Security Housing Unit (SHU) at Pelican Bay State

18 Prison (PBSP) is well known to cause severe psychiatric morbidity, disability, suffering and

19 mortality.[3]  Hans Toch provided early narrative reports from prisoners at the highest levels of security

20

21

22 [2] For an overview of supermaximum security and isolated confinement, see Rhodes, Lorna (2004). *Total
   Confinement: Madness and Reason in the Maximum Security Prison*, Berkeley: University of California
23 Press; and Shalev, Sharon. (2009). *Supermax: Controlling Risk Through Solitary Confinement*, Portland,
   Oregon: Willan Publishing.
24
25 [3] For reviews of this research, see Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmate:
   A Brief History and Review of the Literature, 34 CRIME  & JUST . 441, 488–90 (2006); and Bruce Arrigo &
26 Jennifer Leslie Bullock, The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units:
   Reviewing What We Know and Recommending What We Should Change, Int J Offender Ther Comp
27 Criminol 2008 52:, 622-640.

                                              5
28 DECLARATION OF TERRY KUPPERS, M.D.,                          Case No. 4:09 CV 05796 CW
   M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
   CERTIFICATION

and Isolation.[4]  Craig Haney has researched the detrimental effects of long-term isolation.[5]  Stuart

Grassian has conducted similar research.[6] Two-thirds of the prisoners Dr. Grassian initially studied

had become hypersensitive to external stimuli (noises, smells, etc.) and about the same number

experienced "massive free floating anxiety." About half of the prisoners suffered from perceptual

disturbances that for some included hallucinations and perceptual illusions, and another half

complained of cognitive difficulties such as confusional states, difficulty concentrating, and memory

lapses. About a third also described thought disturbances such as paranoia, aggressive fantasies, and

impulse control problems. Three out of the fifteen had cut themselves in suicide attempts while in

isolation. In almost all instances the prisoners had not experienced any of these psychiatric reactions

prior to their time in isolation. For all prisoners, long-term solitary confinement has the effect, on

average, of making post-release adjustment very problematic and worsening recidivism rates.[7] An

alarmingly large proportion of prisoners consigned to supermaximum security isolation in recent

decades suffer from serious mental illness.  Sheilagh Hudgins and Gilles Cote performed a research

evaluation of penitentiary inmates in a Supermaximim Security Housing Unit and discovered that

29% suffered from severe mental disorders, notably schizophrenia.[8] David Lovell has described

---

[4] Toch, H.  (1975, 1992).  *Mosaic of Despair: Human Breakdown in Prison*, Washington, D.C.: American Psychological Association.

[5] Haney, C. (2003). *Mental health issues in long-term solitary and "supermax" confinement*. Crime & Delinquency, 49(2), 124-156.

[6] Grassian, S., & Friedman, N. (1986). *Effects of sensory deprivation in psychiatric seclusion and solitary confinement*. International Journal of Law and Psychiatry, 8(1), 49-65.

[7] Lovell, D., Johnson, L.C., & Cain, K.C.  (2007). *Recidivism of supermax prisoners in Washington*, Crime & Delinquency, 52,4, 633-56.

[8] Hudgins, S. & Cote, G.  (1991).  *The Mental health of penitentiary inmates in isolation*, Canadian Journal of Criminology, 177-182.

6

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

typical disturbed behavior.[9] I have reported my own findings from litigation-related investigations.[10] In other words, the conditions of confinement in place at the Pelican Bay SHU are well known to cause a very significant risk of serious psychiatric problems.

11.     All of the ten prisoners I interviewed at PBSP have been in the SHU for over ten years, some since the opening of PBSP in 1989, and many were already in segregation at another facility for some time prior to their transfer to the SHU at PBSP. They all report a significant number of symptoms known to result from isolated confinement lasting longer than three months, including irritability, paranoia, mounting anger, problems concentrating, problems with memory, depression, and despair. They report quite a lot of anxiety and hyper-alertness with startle responses (e.g., jumping when they hear a door open because they are afraid someone will "come in on them"). Most complain of severe chronic insomnia  They are convinced they will never get out of the SHU and therefore they will spend the remainder of their lives in isolation. They also universally complain that they have little or no contact with family and loved ones is possible because of restrictive visiting and phone policies.

12.     These prisoners all report anger plus dread of losing control of their anger- feelings that are almost universally reported by prisoners in long-term isolated confinement. By now, after a long period of isolated confinement, they have learned to keep their anger to themselves. They have all learned to keep quiet about their feelings and to not talk very much to others, neither staff nor other prisoners. They have progressively isolated themselves more and more even within the context of SHU confinement. They give various reasons for not talking about much with their neighbors or

[9] Lovell, D. (2008). *Patterns of disturbed behaviour in a supermax population*, Criminal Justice and Behaviour, 35,8, 2008, 985-1004.

[10] Kupers, Terry. (1999). *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It*. New York: Jossey-Bass/Wiley.

7

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

1  even a cellmate. Some say it is the fear that someone will get mad at them and then inform on them in

2  the process of de-briefing, some say it is because they have nobody of their own race on the Pod,

3  some say it is because living so close together makes tempers flare and they would rather not have

4  enemies. But they have nobody else to talk to. So first they are silent about their feelings, then they

5  begin to suppress those feelings to the point where they do not even know what they are feeling, and

6  as a result they feel numb or dead.   This loss of feelings and emotions are exacerbated by the

7  constant pressure they are under by staff to "de-brief." This makes it difficult to really trust their

8  neighbors, because they believe that what they say could be distorted and reported to staff during the

9  de-briefing procedure by someone who decides to inform.  They are afraid that if they say the wrong

10  thing to someone they will be re-validated or they will suffer some kind of retaliation.  Thus, for

11  various reasons, their experience over many years is progressively more emotionally numbing and

12  isolating, even from immediate neighbors and certainly from staff.

13

14       13.     These ten prisoners suffer from a number of severe symptoms, including

15  disorientation and numbness that derive from the lack of memorable feelings and social interactions.

16  Most report that they feel each day is the same, and they lose all sense of time. Or they simply feel

17  "numb," "dead," or they lack motivation to do anything, even to exercise.  As one prisoner, Richard

18  Johnson, put it, "I am so busy suppressing feelings and isolating myself all day, and so much anger

19  builds up in me from the conditions, that I can't sleep at night because the sound of a door opening or

20  closing wakes me and I get anxious about someone coming in on me and I can't fall back to

21  sleep." The lack of sleep exacerbates the irritability and anger, so they feel a need to suppress their

22  feelings all the more and to isolate themselves further.

23

24       14.     Thus, all of the ten men exhibit quite a few of the symptoms long associated with

25  long-term isolated confinement, including anxiety, hyper-awareness (sometimes becoming paranoia)

26

27

28  8

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

and startle reactions, mounting rage along with fear the rage will be expressed and there will be more trouble, difficulty with memory and concentration, depression and despair, perceptual distortions, and disordered thinking.

15.     Beyond that list, there is a clear and consistent pattern in the stories articulated by these 10 men about the psychological consequences of spending a decade or longer in the SHU. That pattern includes: 1) Angry feelings about being in segregation for so long, having little or nothing meaningful to do, being deprived of fair due process and being provided no way to win their release from SHU;  2) suppression of this rage, along with the harsh isolative conditions, lead to a numbing of all feelings, so over the ensuing years and decades the prisoner becomes less in touch with his feelings and less expressive;  3) Meanwhile, concerns about evoking hostility in others, or boredom with the monotonous conversations that occur in the SHU, or concerns that others will use information they receive to lie about one when they de-brief, or cultural alienation, cause the prisoners to progressively isolate themselves, even from cellmates and neighbors, but certainly from staff.  Thus they are isolated from family and the outside world because visits, phone calls and mail are so problematic, and then they isolate themselves from the people physically nearby.  They become increasingly isolated on all levels. 4)  There is a growing feeling that there is no use doing anything, nothing will change, so the prisoners shut down to a great extent, become unmotivated to do anything (the memory loss and problems concentrating contribute to this phenomenon), become listless and lacking in initiative.  Some of the prisoners describe this state as depression, some as deadness.  5) The prisoners withdraw into themselves, spending endless hours silent and alone, entirely out of touch with how they feel.  These are symptoms of depression, albeit exacerbated by isolation.  They get out of practice of expressing themselves.  They experience despair.  They begin to feel numb, unreal, non-human, or dead.  I have conducted upwards of a thousand interviews with

9

1   prisoners in a variety of correctional settings, and I have never before found a pattern at this level of

2   specificity described universally by a group of similarly situated individuals.

3        16.    In the medical and psychiatric literature on the consequences of torture, a comparison

4   is often drawn between the consequences of torture and the consequences of severe trauma (including

5   but not limited to Posttraumatic Stress Disorder).[11]  What I am describing here is a third entity, the

6   consequences of very long-term solitary confinement as obtained in the SHU at PBSP when prisoners

7   remain there for over a decade.  What we find are men who are a shell of their former selves,

8   passionless and isolated.  They are very disabled, but their disability is not readily apparent because,

9   after all, they live in a cell and meals are delivered to them by staff.  All of the men I interviewed at

10  the SHU at PBSP on April 17 and 18, 2012, exhibit almost all of the characteristics that are described

11  in the literature about survivors of torture, as described in settings other than prison isolation

12  units.  For example, Rona Field's list of psychological consequences of torture include, besides

13  suicide and psychiatric breakdown requiring hospitalization (which are not the case for these men),

14  anxiety, fear, depression, irritability, introversion, difficulties in concentration, chronic fatigue,

15  lethargy, restlessness, communication difficulties, especially expressing emotion, memory and

16  concentration loss, loss of sense of identity, insomnia, nightmares, hallucinations, visual disturbances,

17  and headaches.[12]  But this is precisely the list of symptoms and experiences the ten men I interviewed

18  at the PBSP SHU report.

19       17.    In other words, it is very clear that the conditions of confinement in the SHU at PBSP

20  constitute severe stress, especially if an individual is confined therein for longer than a decade.  Stress

21  is known to cause very serious medical problems, including but not limited to hypertension,

---

[11] Eisenman, David, Allen Keller and Glen Kim.  (2000).  West/Med, 172 May, 301-304.

[12] Rona Fields, "The Neurobiological Consequences of Psychological Torture," in The Trauma of Psychological Torture, Ed. Almerindo E. Ojeda, London: Praeger, 2008, p. 1555

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

1   cardiovascular disorders, skin disease, gastric ulcer and other gastrointestinal disorders, and so forth.

2   **IV.   Synopsis of Interviews with Plaintiffs**

3        18.     Todd Ashker is a 48 year old Caucasian man who has been in a SHU since 1986, or 26

4   years.  He was transferred to the SHU at PBSP when it opened.  He has pain from an old gunshot

5   wound, and complains of inattention from medical staff, and he reports that the physician told him if

6   he wants better care he needs to "de-brief" and go to general population.  He suffers from severe

7   insomnia.  A part of the sleep problem is the noise that occurs throughout the night.  The slamming of

8   doors wakes him, and causes anxiety ███████████████████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14                                    99% of one's verbal contact with other prisoners

15  involves disembodied voices (i.e. they each can only see the far wall out of their window-less cell,

16  they cannot see each other from their cells), and then when they do meet face-to-face, for example

17  when one of them is in transit to the "yard" and passes in front of another's cell, ████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████d

22  ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████

25

26  DECLARATION OF TERRY KUPPERS, M.D.,
    M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION

11

19.     Ronald Dewberry is a 53 year old African American man who was sentenced at 22 to 25-years-to-life.  He was validated as a member of the Black Guerilla Family (BGF) in 1985. He has a severe back ailment, for which he feels he receives terrible medical care. ███████████

█████████████████████████████████████████████████████████████████ ongoing nausea and stomach pain, ██████████████████████████████████████████████

█████████████████████████████████████████████████████

20.     George Franco is a 46 year old Mexican American man who has been in the SHU at PBSP for 20 years. Several members of his family have passed away since he has been in SHU. ██ ███████████████   ██████████████████, including deteriorating memory and progressively more trouble concentrating on anything. █████████████████

21.     Danny Troxell is a 59 year old Caucasian man who has been in SHU for 27 years and

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION                                        Case No. 4:09 CV 05796 CW

1   was transferred to PBSP SHU close to the time it opened. ███████████████

2   ████████████████████████████████████████ The scarcity of visits

3   and the prohibition against phone calls have made contact with family very difficult, ██████d

4   █████████████████████████████████████████████████

5   █████████████████████████████████████████████████

6   █████████████████████████████████████████████████

7

8   ████████████████████████████████████████████

9   █████████████████████████████████████████████████

10  █████████████████████████████████████████████████

11  ████████████████████████ He does not initiate conversations, is not motivated to do

12  anything, and feels like he is in a stupor much of the time. █████████████████

13  ████████████████████████████████████████

14

15  █████████████████████████████████████████████████

16  ████████████████████████████████ He has lost all hope of

17  being released from SHU ███████████████████████████

18  ████████████████████████████████████████

19  █████████████████████████████████████████████████

20  ████████████████████

21  22.    Jeffrey Franklin is a 52 year old African American man. █████████████

22  ███████████ He complains of severe eye problems. █████████████

23

24  ████████████████████ even to see the wall across the hallway he has to look through

25  a metal cell door with small pinholes in it█████████████████████████

26  █████████████████████████████████████████████████

27

28  DECLARATION OF TERRY KUPPERS, M.D.,                    Case No. 4:09 CV 05796 CW
    M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION

1  ████████████████████████████████████████████████████

2  ████████████████████████████████  He never sees a tree, or a bird.  ████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████  He tries to read but has a great deal of trouble concentrating, and he finds he cannot remember

11  what he read a page earlier.  His attention span and memory are definitely deteriorating,  ████████

12  ██████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ██████████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ██████████████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ████████████████████████

22
23. George Ruiz is a 69 year old Mexican American man.  He reports many symptoms

23  that began only since he has been in SHU.  He has severe problems with concentration, for example

24  when he tries to read he forgets what he read a paragraph earlier, loses interest in the text and puts the

25
26  book or newspaper down after reading only a few lines.  ████████████████████

27
14

28



He feels that the C.O.s taunt the prisoners, but he has learned to ignore them.

24.   Gabriel Reyes has been in SHU for 17 years.

He suffers from several chronic medical ailments.  He has learned over the years to

15

suppress his anger, but to do so he has had to suppress all feelings to the point where he does not any longer know what he is feeling. ████████████████████████████

████████████████████████████████████████

25.    Richard Johnson, a 60 year old African-American man, has been in the SHU for 14 years. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

DECLARATION OF TERRY KUPPERS, M.D., M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Case No. 4:09 CV 05796 CW

26.     Paul Redd is a 55 year old African American man who has been in SHU for 36 years, arriving at PBSP around when it opened. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

████ He suffers frequent nightmares about violence, something that he never experienced prior to being in SHU. He does not want to deal with his feelings, so he becomes numb. ██████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ The parole process is very frustrating for him. He has a 7 to life sentence, so his first appearance at the Board was in 1982. He has a fairly clean disciplinary record, and believes the gang validation is entirely erroneous. ████████████████████

████████████████████████████████████████

17

1  ███████████████████████████████████████████████████

2  ███████████████████████████████████████

3       27.    Luis Esquivel is a 43 year old Mexican National.   He has been in the **PBSP SHU** for

4  13 years. ██████████████████████████████████

5  ███████████████████████████████████████████████

6  █████████████████████████████████████████████████

7  

8  █████████████ has lost the ability to feel things, ██████████████████

9  █████████████████████████████████████████████

10 █████████████████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████ total loss of the capacity to feel.  He says he does not feel anything, and this

13 makes him "feel dead."  Days go by without him feeling anything, "as if I am walking dead." ████

14 ██████████████  During the nights there are repeated noises of doors being opened and

15 closed, ██████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████

19 ██████████████████████████████████████████

20 ███████████████████████████████████████████████

21 ██████████████████████████████████████████ He

22 spends his days working out and reading as much as he can ████████████████████

23 ███████████████████████████████████████████

24 ████████████ he has not shaken the hand of a human being in 13 years, he worries that he has

25 forgotten the feel of human contact.  Once, on his way to a doctor's appointment, where he was led in

26 

27

28 DECLARATION OF TERRY KUPPERS, M.D.,
   M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
   CERTIFICATION                                Case No. 4:09 CV 05796 CW

1   shackles by officers, he caught a glimpse of a tree. ███████████████

2   ████████████████████████████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████████████

5   ████████████████████████

6   **V.   How Representative Are These Ten Prisoners?**

7           28.     I have been asked to comment about how representative these ten prisoners are of the

8   entire population in the SHU at PBSP.  Do the other prisoners in the SHU at PBSP have the same or

9   similar experiences and is the psychiatric harm widespread throughout the facility?  A sufficient

10  number of representative cases is one consideration.  I supervise doctoral research in the Graduate

11  School of Psychology at The Wright Institute, and in our dissertation manual it is recommended that

12  for qualitative research, i.e. research that relies on interviews and narrative reports, a minimum of ten

13  subjects be included to make the study valid and reliable.  I have interviewed ten prisoners, so that

14  requirement is satisfied.

15          29.     Random sampling is one of many techniques for assuring a representative study

16  sample, but it is not always a relevant consideration.  Thus far in this case the prisoners I interviewed

17  were not selected randomly, they are named plaintiffs in the present litigation (however, in my further

18  investigation in this matter I may rely on some random sampling).  But there are other ways to assess

19  the degree of commonality and typicality in a larger group.  Do all members of the selected sample

20  exhibit common symptomatology and functional impairment, or how universal are the symptoms in

21  the sampled group?  In the present case, it is stunning how consistently the 10 individuals I

22  interviewed report the same experience and resulting symptoms.  In their reports of anxiety,

23  hopelessness, mounting anger, insomnia, problems with cognition and memory, exaggerated startle

19

reaction, distorted thought processes and so forth – in other words, the list of symptoms uncovered by

Drs. Toch, Haney, Grassian, myself and others in long-term isolated confinement – each prisoner

reports somewhat different symptoms, none experience all of them, but so many of the prisoners

report such a long list of these well-known symptoms that it is clear they suffer emotional harm on

account of their long-term SHU confinement, and the consistency in this finding makes it very likely

that all other similarly situated individuals will evidence the same symptoms.

30.     Then there is another list of complaints and symptoms that are reported by every

single one of the ten men I interviewed.  These include a growing sense of being out of touch with

their feelings to the point of numbness or deadness; a continually worsening sense of isolation

accompanied by a tendency to isolate themselves even further, and an overwhelming sense of despair.

This group of complaints and symptoms, shared by all the ten prisoners, is distinct from the symptom

constellation generally reported in prisoners who are in long-term (more than three months) isolated

confinement, and seems clearly to result from very long-term isolated confinement, i.e. confinement

in excess of a decade.  Where symptoms traditionally reported in prisoners consigned to isolated

confinement, including memory loss, anxiety and paranoia, are reported by a certain proportion of the

prisoners in isolated confinement; this last group of experiences and symptoms are reported

universally by all ten prisoners I interviewed.  This is very strong presumptive evidence that this

symptom complex is present in very many of the other prisoners who have been in isolated

confinement for a very long time, i.e. longer than ten years.  In other words, if we find a clear set of

symptoms in every single one of ten prisoners, it is very likely that such symptoms and disabilities

are widespread throughout all of the prisoners similarly situated (confined in the SHU longer than ten

years).

31.     In arriving at the opinion that the reports of these ten men are quite representative of

20

DECLARATION OF TERRY KUPPERS, M.D.,
M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

1   the group of prisoners confined in the SHU at PBSP, I also call on all my previous experience

2   investigating conditions in isolation units and interviewing over a thousand prisoners in many states.

3   I have encountered prisoners in several states who were in isolated confinement for longer than ten

4   years, and found in many cases that they exhibited massively constricted affect, extreme isolative

5   tendencies and significant despair. As a general tendency, I have discovered that the longer an

6   individual remains in isolated confinement, the more severe the resultant symptoms and disability,

7
    especially symptoms related to constriction of affect, severe isolation and despair.[13] I cannot
8
9   guarantee that every single prisoner similarly situated in the SHU at PBSP suffers precisely the same

10  emotional pain and psychiatric symptomatology and disability as these ten men, but I can say with a

11  reasonable degree of medical certainty that, given the severity and consistency of these ten men's

12  reported suffering and symptomatology, most if not all of the prisoners in the SHU at PBSP suffer

13  from a significant degree of emotional numbing, social isolation and despair, resulting in severe pain,

14
    suffering and disability. In other words, I have discovered a consistent pattern of psychological harm
15
16  in the ten individuals I interviewed, a pattern which is entirely consistent with the research literature

17  about the effects of solitary confinement, and therefore I can predict with a reasonable degree of

18  medical certainty that I will find equivalent harm in the other inhabitants of the SHU at PBSP.

19      32.     Finally, I saw no evidence of malingering in the ten prisoners I interviewed.

20  Malingering is the invention or exaggeration of symptoms for secondary gain. The ten men I

21  interviewed are strongly inclined not to report, or to under-report, emotional symptoms. They tended

22  to underplay rather than exaggerate their emotional pain and disability. This is because they share a

23
24  "prison code" that discourages exhibiting weakness and emotional problems. They are very unlikely

25  to utilize mental health services. Many of them tell me that they do not trust that mental health staff

26
27  [13] See Kupers, Terry. (2008). *What To Do with the Survivors?: Coping With the Long-Term Effects of Isolated Confinement*, Criminal Justice and Behavior, Vol. 35 No. 8, August 2008 1005-1016.

21

28  DECLARATION OF TERRY KUPPERS, M.D.,                              Case No. 4:09 CV 05796 CW
    M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION

will maintain confidentiality, and their reports of symptoms could get them in trouble.  And the symptoms and disabilities I am memorializing in this report are not typical of any particular mental disorder.  If a prisoner were interested in creating a false impression that they suffer from a mental disorder in order to gain something, he would not tell me about the kinds of symptoms these men report. Rather, he would tell me about symptoms out of a psychiatric textbook, such as auditory hallucinations or suicidal inclinations, and he would be seeking some kind of psychiatric services or benefits.  Further, my conclusion is that these men share a common syndrome characterized by numbing, isolation and despair.  There is no way they would be able to concoct a false story with the consistency and integrity I discover in their oral reports.

33.     My interviews thus far are preliminary in the sense that I plan to conduct further interviews with the ten men I have discussed in this declaration and I expect to interview other like-situated prisoners by the time of trial in this matter.  I have conducted sufficient investigation and spent enough time with the prisoners I interviewed to be quite confident of the opinions I offer here, to a reasonable degree of medical certainty.  But I also plan to spend more time conducting interviews, taking a tour and reviewing documents, including depositions of staff and administrators. I reserve the right to alter my opinions accordingly.

I declare under penalty of perjury that the foregoing is true and correct based on my knowledge and belief and that this declaration was executed on April 10, 2013, in Oakland, California.

TERRY KUPERS, M.D., M.S.P.

DECLARATION OF TERRY KUPERS, M.D., M.S.P.,
ISO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

Case No. 4:09 CV 05796 CW

**ADDITIONAL PLAINTIFFS' COUNSEL**

1

2   CHARLES F.A. CARBONE (SBN 206536)
    Email: charles@charlescarbone.com
3   EVAN CHARLES GREENBERG (SBN 271356)
    Email: evan@charlescarbone.com
    LAW OFFICES OF CHARLES CARBONE
4   P.O. Box 2809
    San Francisco, CA  94126
5   Tel: (415) 981-9773
    Fax: (415) 981-9774
6

7   MARILYN S. MCMAHON (SBN 270059)
    Email: marilyn@prisons.org
8   CALIFORNIA PRISON FOCUS
    1904 Franklin Street, Suite 507
    Oakland, CA  94612
9   Tel: (510) 734-3600
    Fax: (510) 836-7222
10

11  ANNE BUTTERFIELD WEILLS (SBN 139845)
    Email: aweills@aol.com
    SIEGEL & YEE
12  499 14TH STREET, SUITE 300
    Oakland, CA  94612
13  Tel: (510) 839-1200
    Fax: (510) 444-6698
14

15  CAROL STRICKMAN (SBN 78341)
    Email: carol@prisonerswithchildren.org
16  LEGAL SERVICES FO PRISONERS WITH CHILDREN
    1540 Market Street, Suite 490
    San Francisco, CA  94102
17  Tel: (415) 255-7036
    Fax: (415) 552-3150
18

19

20

21

22

23

24

25

26

27
                                    23
28  DECLARATION OF TERRY KUPPERS, M.D.,          Case No. 4:09 CV 05796 CW
    M.S.P., ISO PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION