1  KAMALA D. HARRIS
   Attorney General of California
2  WILLIAM C. KWONG
   Supervising Deputy Attorney General
3  JILLIAN R. O'BRIEN
   Deputy Attorney General
4  MARTINE N. D'AGOSTINO
   Deputy Attorney General
5  ADRIANO HRVATIN
   Deputy Attorney General
6  State Bar No. 220909
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA  94102-7004
    Telephone:  (415) 703-1672
8  Fax:  (415) 703-5843
    E-mail:  Adriano.Hrvatin@doj.ca.gov
9  *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14

15  **TODD ASHKER, et al.,**                 C 09-05796 CW

16                            Plaintiffs,    **DEFENDANTS' OPPOSITION
                                             TO PLAINTIFFS' MOTION FOR
17       v.                                  CLASS CERTIFICATION**

18  **GOVERNOR OF THE STATE OF**             Date:  August 22, 2013
19  **CALIFORNIA, et al.,**                  Time:  2:00 p.m.
                                             Dept.:  Courtroom 2, 4th Floor
20                            Defendants.    Judge:  The Honorable Claudia Wilken

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3 Introduction ................................................................................................................. 1

4 Statement ..................................................................................................................... 3

5      I.     Pelican Bay's SHU serves a legitimate penological purpose ................................ 3

     II.    Life in Pelican Bay's SHU is not torture. ....................................................... 6

6      III.   How an inmate gets to the SHU based on gang validation has changed. ............. 10

7          A.    Plaintiffs focus on the old rules, which have consistently been
              found constitutional ................................................................................ 10

8          B.    Different rules now apply to gang validation and review. ....................... 12

9 Argument ................................................................................................................... 14

10      I.     Plaintiffs' proposed Due Process class is imprecise and overbroad. .................. 15

     II.    Plaintiffs' proposed class and subclass should not be certified because they

11           cannot satisfy each element of Rule 23(a). ....................................................... 17

12          A.    Plaintiffs do not demonstrate sufficient commonality. ........................... 17

             1.    Commonality is lacking because Plaintiffs' claim is based

13                     on a policy that is no longer applicable to all members of the
                    proposed Due Process class. ............................................... 17

14              2.    Plaintiffs' Eighth Amendment claim presents a host of
                    individual questions not subject to classwide proof ............... 18

15          B.    Plaintiffs do not demonstrate sufficient typicality. ................................ 21

16          C.    Plaintiffs do not demonstrate that all proposed counsel are
              adequate ................................................................................................ 23

17               1.    Attorney Carbone's opinions as to the qualifications of
                    Attorneys McMahon, Strickman, and Weills do not make

18                     them adequate ..................................................................... 23

19               2.    Attorneys McMahon and Strickman are fact witnesses,
                    which compromises their ability to serve as class counsel. .......... 23

20      III.   The injunctive relief sought is not amenable to Rule 23(b)(2). .......................... 24

21 Conclusion ................................................................................................................. 25

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

5

*Alfaro v. Lewis*
    No. C 12-1555 CRB (PR), 2013 U.S. Dist. LEXIS 85603 (N.D. Cal. June 18, 2013)........... 12

6

*Campbell v. PricewaterhouseCoopers, LLP*
    253 F.R.D. 586 (E.D. Cal. 2008) ....................................................................... 15

7

8

*Castro v. Terhune*
    712 F.3d 1304 (9th Cir. 2013)............................................................................ 10

9

*Corral v. Gonzalez*
    No. 1:12-cv-01315-LJO-SKO, 2013 U.S. Dist. LEXIS 2013................................ 12

10

*Cortez v. Best Buy Stores, LP*
    No. CV 11-05053, 2012 U.S. Dist. LEXIS 15190 (C.D. Cal. Jan. 25, 2012).................. 15, 16

11

12

*Ellis v. Costco Wholesale Corp.*
    657 F.3d 970 (9th Cir. 2011)............................................................................ 15

13

14

*Florence v. Bd. of Chosen Freeholders*
    566 U.S. ___, 132 S. Ct. 1510 (2012) ............................................................ 5

15

16

*Gen. Tel. Co. of Sw. v. Falcon*
    457 U.S. 147 (1982)................................................................................. 3, 17

17

18

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992)........................................................................... 21

19

*Madrid v. Gomez*
    889 F. Supp. 1146 (N.D. Cal. 1995) ........................................................... passim

20

21

*Maryland v. King*
    ___ U.S. ___, 133 S. Ct. 1958 (2013)............................................................ 5

22

23

*Rhodes v. Chapman*
    452 U.S. 337 (1981)......................................................................................... 21

24

*Soto v. Lewis*
    No. 11-4704, 2012 U.S. Dist. LEXIS 158455 (N.D. Cal. Nov. 5, 2012) .............................. 12

25

26

*Swarthout v. Cooke*
    ___ U.S. ___, 131 S. Ct. 859 (2011).............................................................. 11

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Toussaint v. McCarthy*
    801 F.2d 1080 (9th Cir. 1986) ............................................................. 10

4

5

*Vandervort v. Balboa Capital Corp.*
    287 F.R.D. 554 (C.D. Cal. 2012) ........................................................ 15

6

*Wal-Mart Stores, Inc. v. Dukes*
    564 U.S. ___, 131 S. Ct. 2541 (2011) ........................................... passim

7

8

*Wilkinson v. Austin*
    545 U.S. 209 (2005) .......................................................................... 10

9

10

*Wilson v. Seiter*
    501 U.S. 294 (1991) .......................................................................... 19

11

*Wolff v. McDonnell*
    418 U.S. 539 (1974) .................................................................... 11, 16

12

13

*Zinser v. Accufix Research Inst., Inc.*
    253 F.3d 1180 (9th Cir. 2001) ........................................................... 14

14

15

**STATUTES**

16

California Code of Regulations, Title 15
    § 3341.5(c)(2)(A)(1) ......................................................................... 10
    § 3341.5(c)(2)(A)(2) ......................................................................... 10
    § 3341.5(c)(5) .................................................................................. 10
    § 3378(c)(7) ..................................................................................... 10
    § 3378(e) .......................................................................................... 10

17

18

19

California Penal Code
    § 2933.6(a) .............................................................................. 11, 12, 16

20

21

United States Code, Title 18
    § 3626(a) ..................................................................................... 24, 25

22

23

**CONSTITUTIONAL PROVISIONS**

24

United States Constitution
    Eighth Amendment ...................................................................... passim
    Fourteenth Amendment ...................................................................... 18

25

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

Page

COURT RULES

Federal Rule of Civil Procedure
Rule 23 ................................................................................................ 1, 2, 14
Rule 23(a) ........................................................................................ 3, 14, 17
Rule 23(b)(1) ................................................................................................ 24
Rule 23(b)(2) ............................................................................... 3, 15, 24, 25
Rule 23(g) .................................................................................................... 23
Rule 65 ................................................................................................... 3, 15
Rule 65(d) ............................................................................................. 24, 25
Rule 65(d)(1)(A)-(C) .................................................................................... 24

OTHER AUTHORITIES

Confinement and Conditions (June 2012), available at
http://www.prisonerswithchildren.org/resource-library/prison-conditions/. .......................... 22

**INTRODUCTION**

Plaintiffs' motion for class certification does not stand up to the "rigorous" analysis now mandated by Rule 23 of the Federal Rules. *Wal-Mart Stores*, *Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2551 (2011).  On the first read, Plaintiffs' motion suggests that this is an open-and-shut case.  Plaintiffs argue that all inmates validated and housed in the Security Housing Unit (SHU) at Pelican Bay State Prison have received the same level of due process pursuant to a single and uniform gang validation policy, and that all SHU inmates suffer some form of psychological harm due to the same "crushing" conditions of Pelican Bay's SHU.  (Pls.' Mot. Class Certification 2-8, May 2, 2013, ECF No. 195.)  On closer review, however, and with *Wal-Mart* as the guide, Plaintiffs' motion fails on the threshold elements of commonality and typicality because of the substantial "dissimilarities" among putative class and subclass members.  These dissimilarities are significant, and as described below, go beyond a matter of mere degree.  Because dissimilarities within the proposed classes "impede the generation of common answers," Plaintiffs have not met their burden under Rule 23.  *Wal-Mart*, 131 S. Ct. at 2551, 2565.

Inmates validated as gang members and associates who are housed in Pelican Bay's SHU do not live in "solitary confinement," nor does their confinement amount to "torture."  This is significant because Plaintiffs seek to certify a class of all gang validated inmates who are now, or will be in the future, imprisoned in the SHU at Pelican Bay for longer than ten continuous years based on that contention.  (Pls.' Mot. Class Certification 2.)  The commonality and typicality required to maintain such a class is absent here.  The conditions of the SHU are necessarily strict to manage the influence and operations of prison gangs.  Yet, SHU inmates experience the conditions of the SHU differently.

The evidence reveals, in the first instance, that the conditions of the SHU are not "crushing," as Plaintiffs would have the Court and public believe.  Inmates Elrod and Zubiate, former high-ranking members of the Aryan Brotherhood and Nuestra Familia, have lived in the SHU for as long as some of the Plaintiffs and describe an environment of frequent communication and interaction, among inmates and staff, within the SHU.  This is in marked contrast to the claims of "social isolation" and "sensory deprivation" trumpeted by Plaintiffs and

1

their experts.[1]  Inmates Elrod and Zubiate further present evidence to dispute the psychological harm or risk of harm that Plaintiffs contend exist as to all SHU inmates.  And the testimony of Dr. Robert Morgan, Ph.D., Defendants' mental health expert, also disputes those claims.  The evidence indicates that the effects of segregated housing vary among different individual inmates.  Consequently, only an inmate-by-inmate analysis can determine whether SHU conditions amount to a constitutional violation for any particular inmate.  The requirement of such an inmate-by-inmate analysis counsels against certification of a class for Plaintiffs' claim that the SHU constitutes cruel and unusual punishment for all inmates housed in the SHU for ten or more years.

Nor do Plaintiffs meet the threshold commonality and typicality requirements of Rule 23 with respect to their purported class of all validated inmates serving indeterminate terms in the SHU at Pelican Bay, none of whom allegedly "have been or will be afforded meaningful review of their confinement."  (Pls.' Mot. Class Certification 2.)  That alleged class of inmates does not exist because the California Department of Corrections and Rehabilitation (CDCR) is formalizing and promulgating new gang validation and review procedures through its Security Threat Group (STG) program.  This is not an experiment.  CDCR is currently validating inmates, and determining whether to assign them to the SHU at Pelican Bay or another of CDCR's four SHUs, in accordance with the STG program's guidelines, not the validation guidelines in title 15 of California's Code of Regulations.

Separately, CDCR continues to conduct case-by-case reviews of currently validated inmates, including inmates housed in Pelican Bay's SHU, for assignment to a level of the STG program's step-down program.  Under the new step-down program, if an inmate's behavior indicates a genuine progression towards disassociation from gang activity, the inmate may be released from the SHU in as little as three years, which is far less than the "indeterminate" SHU terms Plaintiffs complain of here.  Critical to class certification, Plaintiffs' claim that CDCR's policies do not provide "meaningful review" focuses on CDCR's old validation and review

---

[1] Inmates Elrod and Zubiate voluntarily chose to debrief and are near the completion of the debriefing process.  Because these inmates have chosen to debrief, they are no longer classified as validated inmates in the SHU program and thus are not members of the class or subclass Plaintiffs seek to certify in this case.

1   policies, which have now changed.  (Pls.' Mot. Class Certification 6-8 (citing to various sections

2   of title 15 without mention of CDCR's STG program).)

3       As *Wal-Mart* reaffirmed, it is Plaintiffs' burden to demonstrate Rule 23(a) commonality by

4   bridging the gap between an individual's claimed injury, an alleged policy, and the "existence of

5   a class of persons who have suffered the same injury as that individual, such that the individual's

6   claim and the class claim will share common questions of law or fact and that the individual's

7   claim will be typical of the class claims."  131 S. Ct. at 2553 (quoting *Gen. Tel. Co. of Sw. v.*

8   *Falcon*, 457 U.S. 147, 157-58 (1982)).  Here, the STG program presents a new framework for

9   validation and review of inmates' SHU confinement.  Consequently, Plaintiffs cannot bridge the

10  gap between their due process claims, which are based on the old policy, and the claims of a

11  putative class of inmates who are only subject to the new STG program, which constitutes a

12  vastly different policy and approach to validation and confinement in the SHU.

13      Plaintiffs' motion fails in other ways as well.  *First*, it is Plaintiffs' burden to propose

14  adequate class definitions.  Plaintiffs have not done so here, as their purported "Due Process"

15  class definition is imprecise and overbroad.  *Second*, Plaintiffs have failed to show that each of

16  the attorneys they propose as class counsel has demonstrated their adequacy.  *Finally*, the scope

17  of relief sought by Plaintiffs in this matter, as pled in the operative complaint, goes far beyond

18  that permitted by Rule 23(b)(2), which requires a level of particularity contemplated by Rule 65

19  of the Federal Rules as well as the Prison Litigation Reform Act.  The burden is on Plaintiffs to

20  prove, with sufficient facts, that the superior method to adjudicate this matter is as a class action.

21  Having failed to do so, Plaintiffs' motion for class certification should be denied.

22                          **STATEMENT**

23  **I.    PELICAN BAY'S SHU SERVES A LEGITIMATE PENOLOGICAL PURPOSE.**

24      Plaintiffs maintain that they have been retained in the SHU based on their validation as "so-

25  called" gang associates or members (Pls.' Mot. Class Certification 1), as if prison gang members

26  and associates mingle in harmony among general population inmates and warrant no special

27  attention from prison officials.  But CDCR knows that prison gangs have historically wreaked

28  havoc in California's prisons and continue to do so today when left unchecked.  (Harrington Decl.

                                   3

¶¶ 6, 9.)  The SHU is designed to optimize CDCR's ability to manage and control gang activity, an inherently dangerous and disruptive element present in California prisons that has cost numerous lives.  (*Id*. ¶¶ 4, 7.)  This is fundamentally a legitimate penological purpose.

The SHU houses the leaders, members, and associates of the Mexican Mafia, Nuestra Familia, Aryan Brotherhood, Black Guerilla Family, and other recognized prison gangs that compete and seek to influence not only each other, but also uninvolved inmates in the general population, and members of the community, through fear, intimidation, and criminal activity.  (Swift Decl. ¶ 6.)  The influence and sophistication of prison gangs is well documented, not only by CDCR and Pelican Bay staff (*see, e.g.*, *id*. ¶¶ 6, 15; Harrington Decl. ¶¶ 6, 10), but by inmates who have voluntarily left their gangs to pursue an honest life, and who have provided insight into the complex and organized web of channels and methods used by prison gangs to further gang activity (*see* Elrod Decl. ¶ 10 (describing taking votes of Aryan Brotherhood members while in the SHU); Zubiate Decl. ¶¶ 11-13 (describing the hierarchy and structure of the Nuestra Familia prison gang)).  The management of gangs constitutes a significant and consuming challenge to California prison officials and staff.  (Swift Decl. ¶ 6; Harrington Decl. ¶ 5.)

The SHU's physical characteristics constrain the reach of prison gangs by reducing the numbers of inmates that gang members and associates come into contact with when compared to inmates housed in the general population.  (Swift Decl. ¶¶ 4, 7.)  In this regard, the SHU's design of clustering eight cells together in a "pod," with four on an upper tier and four on a bottom tier, provides increased surveillance for the security of the housing unit and better enables prison staff and investigators to monitor inmate communication and interaction.  (*Id*. ¶ 7.)  The SHU's design also allows inmates to move by themselves to the shower and exercise yard without having to be handcuffed or put in other restraints.  (*Id*.)  But, by administratively segregating gang members and associates in the SHU, CDCR and Pelican Bay have effectively reduced the level of violence and criminal activity on general population yards and narrowed the reach of prison gangs.  (Elrod Decl. ¶ 13 (housing Aryan Brotherhood leadership in the SHU's short corridor "effectively killed the Brand," because the lines of communication to inmates with determinate SHU terms who would soon be released to the general population were cut); Zubiate Decl. ¶ 22 (the "Nuestra

4

1   Familia really took a hit when we were moved to the short corridor" of Pelican Bay's SHU

2   because it was easier for IGIs to monitor mail and the gang's connections "were hurt").)

3       Despite the SHU's strict security controls, SHU inmates, like Plaintiffs, who have lived in

4   the SHU for extended periods have demonstrated through their behavior a continuing

5   involvement in gang activity.  (Swift Decl. ¶ 11.)  For example, inmate Zubiate describes

6   managing a cadre of drug dealers scattered throughout Northern California, from Santa Rosa to

7   Crescent City, all from within the confines of the SHU.  (Zubiate Decl. ¶ 12.)  Involvement in

8   prison gang activity is a choice, and it is a choice made for life.  (Elrod Decl. ¶ 31.)  What may

9   appear to be an innocuous connection to a prison gang such as tattoos, art work, symbols

10  (contained, for example, in birthday or holiday cards), and gang-related literature, directly

11  indicate an inmate's loyalty to the gang.  (Zubiate Decl. ¶ 8 (gang members expect inmates to

12  "earn" gang tattoos by working for the gang).)  An inmate not affiliated with a prison gang or

13  committed to a gang's mission and ongoing activities, simply would not be in possession of such

14  gang-related materials.  (*Id.* ¶ 9 ("innocent symbols, such as a huelga bird in a drawing on a

15  birthday card, have significance within the Nuestra Familia").)  In the prison-gang context,

16  symbols have substantive meaning beyond mere "affiliation," contrary to Plaintiffs' suggestion.[2]

17      That SHU inmates have not been disciplined for gang activity or serious rules violations

18  does not equate to an absence of gang activity on the part of those inmates.  Plaintiffs make much

19  of this — indeed, each alleges to have a clean or innocuous record of prison discipline.  (Pls.'

20  Mot. Class Certification 6 (stating that "many prisoners who have not engaged in any gang-

21  related activity or rule violation before validation are placed (or retained) in the SHU based

22  merely on allegations that they are associated with a gang").)  But a clean prison record does not

23  ---
    [2] Even the United States Supreme Court, in the context of identifying and booking
24  criminal suspects, recently stated:  "[r]ecognizing that a name alone cannot address this interest in
    identity, the Court has approved, for example, 'a visual inspection for certain tattoos and other
25  signs of gang affiliation as part of the intake process,' because '[t]he identification and isolation
    of gang members before they are admitted protects everyone.'"  *Maryland v. King*, ___ U.S. ___,
26  133 S. Ct. 1958, 1972 (2013) (citing *Florence v. Bd. of Chosen Freeholders*, 566 U.S. ___, 132 S.
    Ct. 1510, 1519 (2012)).  The Court acknowledged that:  "the use of DNA for identification is no
27  different than matching an arrestee's face to a wanted poster of a previously unidentified suspect;
    *or matching tattoos to known gang symbols to reveal a criminal affiliation*; or matching the
28  arrestee's fingerprints to those recovered from a crime scene."  *Id.* (emphasis added).

5

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1    necessarily demonstrate a lack of involvement in gang activity.  (Elrod Decl. ¶ 29 (describing

2    how he never received a gang related prison rule infraction in eighteen years, despite being

3    heavily involved in Aryan Brotherhood gang activity).)

4          Prison gangs continue to survive and succeed because they work at all times to stay one

5    step ahead of the authorities, like the IGIs (Zubiate Decl. ¶¶ 16-17); thus, they strive to operate at

6    a level of secrecy to avoid detection from law enforcement (*id*. (describing how his gang

7    coordinated law library visitation schedules with gang members in different pods, and used

8    general library books to transmit messages between gang leaders)).  Active gang members and

9    associates participate in their gang's activities, including criminal conspiracies, assaults, gang

10   votes, communications, and murders, while evading detection by law enforcement and any

11   discipline for their crimes and gang activities.  (Elrod Decl. ¶¶ 3-5, 9-10.)  The alleged lack of

12   discipline does not mean that Plaintiffs and other SHU inmates are free of gang behavior.

13   Instead, it speaks to the gangs' sophistication and how vigilant prison officials must be to prevent

14   the violence that results from the gangs' unwavering commitment to criminal activity.

15   **II.     LIFE IN PELICAN BAY'S SHU IS NOT TORTURE.**

16          The conditions of confinement in the SHU are strict, because they have to be.  (Harrington

17   Decl. ¶¶ 7, 9-10; Swift Decl. ¶¶ 7, 14.)  Inmates who have since left the gang provide rare and

18   valuable insight into the levels of sophistication, organization, and secrecy utilized to facilitate

19   gang activity.  For example, a high ranking Nuestra Familia leader ordered that all members and

20   associates of that gang learn a dialect of the indigenous Mexican language Nahuatl, for use in

21   their oral and written communications, to avoid detection by prison officials.  (Zubiate Decl. ¶

22   17.)  Nuestra Familia members and associates also write in general library books, with an empty

23   pen or staple, to create an impression that is barely visible, and then notify a fellow gang member

24   to take out that book so that he can read the "ghost written" message.  (*Id*. ¶ 18.)  These efforts,

25   on their own, indicate that although SHU inmates are "segregated," they are not "isolated," terms

26   Plaintiffs loosely and intentionally conflate.

27          SHU conditions, although strict, are not "crushing," as Plaintiffs characterize them.  The

28   housing units in the Pelican Bay SHU are exposed to natural light through skylights.  (Swift Decl.

6

¶ 8.)  The temperature in the SHU is electronically controlled.  (*Id.*)  A temperature gauge hangs on the wall across from inmates' cells in each SHU pod.  (Zubiate Decl. ¶ 24.)  The actual indoor SHU temperature is monitored and recorded every three hours to ensure that it remains at a comfortable level.  (Swift Decl. ¶ 8.)  The temperature in the SHU is not excessively hot or cold.  (Zubiate Decl. ¶ 24.)

SHU inmates can exercise within the exercise yard in their SHU pod for ninety minutes seven days per week, which provides fresh air through the yard's open roof.  (Swift Decl. ¶ 8.)  The inmates can work out, jog, do pull-ups, or play handball.  (Elrod Decl. ¶ 20.)  When inmates are released from their cells to the exercise yard, they walk unshackled and unescorted through the tier to the yard (Swift Decl. ¶ 7), regularly stopping by the cell fronts of other inmates in the pod to talk (Elrod Decl. ¶ 17).

SHU inmates receive the same food as the inmates in Pelican Bay's general population, based on their dietary needs or preferences.  (Swift Decl. ¶ 8.)  Most of the hot food for Pelican Bay inmates is cooked in Pelican Bay's main kitchen, then flash frozen and delivered to the respective satellite kitchens for SHU and general population, where the food is then heated to finish cooking.  (*Id.*)  The temperature is then tested and recorded.  (*Id.*)  Foods such as eggs, toast, and salads are made fresh in the SHU kitchen, not the main kitchen.  (*Id.*)  The main kitchen provides baked goods for the entire prison, including the SHU, which are not frozen.  (*Id.*)  The portions of the food in the SHU are not smaller.  (Elrod Decl. ¶ 19; Zubiate Decl. ¶ 23.)  The food is nutritious, includes fresh fruits and vegetables, and provides variety with a different meal every night.  (Zubiate Decl. ¶ 23.)

Non-contact family visitation is available weekly to SHU inmates, and many SHU inmates routinely meet with their lawyers in confidential settings during weekly attorney-visiting hours.  (Swift Decl. ¶ 8.)  Many SHU inmates are involved in active litigation, through which they communicate with the courts in writing and make court appearances by telephone or even in person.  (*Id.*)  These inmates also visit the law library to conduct legal research.  (*Id.*)

Mail (including legal mail), publications, and packages are delivered regularly to SHU inmates.  (*Id.*)  When a SHU inmate gets an annual package, it is customary to give other inmates

7

in the pod a small gift from the package.  (Elrod Decl. ¶ 18.)  SHU inmates regularly share their

canteen purchases with other inmates to ensure that inmates in the pod who may not have

sufficient funds still have canteen items, which demonstrates the tight bonds that SHU inmates

form with one another.  (*Id*.)  These facts demonstrate that SHU restrictions are not so severe that

they isolate inmates so as to deprive them of meaningful social interaction.

The vast majority of SHU inmates have personal radios and/or televisions in their cells.

(Swift Decl. ¶ 8.)  They currently have twenty-three television channels from which to choose.

(*Id*.)  Plus, all inmates have access to the books in the SHU library.  (*Id*.)  All SHU inmates have

access to the full array of educational programs offered through the Voluntary Educational

Program (VEP).  (*Id*.)  The VEP program includes adult basic education, general education

development (GED), and college/correspondence courses.  (*Id*.)  Basic literacy classes and

degrees as high as an Associate of Arts or Bachelor of Arts are available through cell-front

delivery by a credentialed teacher.  (*Id*.)  Assessments, mid-terms, and finals are administered in

the visiting areas and are proctored by credentialed teachers.  (*Id*.)  These are also opportunities

for interaction and socializing with others, and demonstrates that SHU inmates are not isolated.

SHU inmates:  (i) can earn their GED, and an AA degree from Coastline Community College at

no cost to them other than the price of books; (ii) can order books for personal study in foreign

languages, for example; and (iii) have access to free self-help correspondence courses, including

parenting courses, Alcoholics/Narcotics Anonymous, Anger Management, Gangs Anonymous,

and religious correspondence courses.  (Elrod Decl. ¶¶ 21-22.)  Many courses provide certificates

of achievement that are placed in inmates' central files and recognized by the Parole Board.  (*Id*.)

Even if generally confined to their cells for 22 ½ hours per day, there are several daily

opportunities for interaction with others, inmates and prison staff included.  SHU inmates

communicate frequently and in a host of contexts.  The inmates engage one another from cell to

cell, as they move through the tier and pod to the exercise yard or shower, for example, or to an

area outside the pod like the law library.  (Swift Decl. ¶ 9; Elrod Decl. ¶¶ 15, 17; Zubiate Decl. ¶

28.)  The cells in the SHU are not sealed isolation chambers.  They have an open-front, with

perforated holes, so the inmates can talk to as many as seven other inmates in the pod at any time

8

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1    every day.  (Elrod Decl. ¶ 15; Zubiate Decl. ¶ 28.)  SHU inmates often play chess from their cells

2    by calling the moves out loud to one another.  (Elrod Decl. ¶ 15; Ruggles Decl. ¶ 12.)

3         Some SHU inmates are assigned to be tier porters for the pod in which they live.  SHU

4    inmates regularly converse with their pod's tier porter, who performs tasks like cleaning the pod

5    and shower areas.  (Swift Decl. ¶ 9; Ruggles Decl. ¶ 12.).  The tier porters leave their cells twice a

6    week, and they socialize with the inmates in their pods as they perform their duties.  (Elrod Decl.

7    ¶ 16.)  Plaintiff Redd was a tier porter in the SHU's D-2 E-pod for years.  (*Id*.)

8         SHU inmates also converse with correctional staff, as well as mental health and medical

9    staff when they perform their regular tier tours.  (Ruggles Decl. ¶ 9.)  In addition to intake

10   evaluations and routine clinical rounds, an inmate may request an appointment with a mental

11   health provider to discuss his needs.  (*Id*. ¶¶ 9-10.)  These appointments occur in the SHU clinic

12   with a mental health professional in a private setting.  (*Id*. ¶ 10.)  SHU inmates have access to the

13   spectrum of Pelican Bay's medical and mental health services, which are provided and monitored

14   consistent with court-ordered remedial plans.  (*Id*. ¶ 4.)  Contrary to Plaintiffs' contention here,

15   validated inmates living in the SHU receive medical care just like other inmates at Pelican Bay,

16   even if care requires referral to a medical-care provider off prison grounds.  (Zubiate Decl. ¶ 26

17   (describing the care he received for a rare eye condition that he developed because of burning ink

18   for tattoos, not because of SHU conditions).)

19        *Madrid* held that mentally-ill inmates or inmates susceptible to mental illness could not be

20   housed in the SHU.  889 F. Supp. 1146, 1265-67 (N.D. Cal. 1995).  Exclusionary criteria exist to

21   meet *Madrid*'s mandate.  (Ruggles Decl. ¶ 6.)  That gang members and associates view mental

22   distress as a sign of weakness is a matter of gang culture, not inadequate care provided by Pelican

23   Bay staff.  (*Id*. ¶ 14; Elrod Decl. ¶ 24.)  To be sure, the SHU is austere and may not be

24   appropriate for some inmates.  (Elrod Decl. ¶ 14.)  But the conditions of the SHU are not

25   inhumane; nor do the conditions constitute torture.[3]  An inmate who has served all but eighteen

26   ───────────────
         [3] Some SHU inmates recognized that they could generate sufficient attention and support
27   from the public and prison advocates by characterizing the SHU in a manner as dreadful as
     possible, including as "torture."  (Elrod Decl. ¶¶ 39-40, 43; Zubiate Decl. ¶¶ 29, 33.)  The
28   motivation of those inmates was to put sufficient public pressure on CDCR to loosen its gang
                                                                                    (continued…)

                                                    9

1  months of his eighteen-year sentence in the SHU reflected on his stay in the SHU:  "I am in no

2  way mentally debilitated" and "[a]t 40, I will leave the SHU far saner than the out-of-control 22-

3  year-old kid who arrived here."  (Elrod Decl. ¶ 14.)  As discussed further below, and relevant for

4  class certification purposes, the alleged psychological effects of segregated housing like SHU

5  units are not as "grave," "obvious," or uniform as Plaintiffs and their experts allege.

6  **III.   HOW AN INMATE GETS TO THE SHU BASED ON GANG VALIDATION HAS CHANGED.**

7          **A.   Plaintiffs Focus on the Old Rules, Which Have Consistently Been Found**
               **Constitutional.**
8

9          Under title 15, an inmate validated as a gang member or associate was deemed a risk to

10  safety and security and assigned an indeterminate SHU term.  Cal. Code Regs., tit. 15, §

11  3341.5(c)(2)(A)(2).  Validated SHU inmates, under title 15, received periodic reviews of their

12  validations and housing every 180 days, *id.* § 3341.5(c)(2)(A)(1), yearly, *id.* § 3378(c)(7), as well

13  as at their six-year active/inactive review, *id.* §§ 3341.5(c)(5), 3378(e).  The decisions to validate

14  an inmate, assign the inmate to the SHU, and thereafter retain the inmate in the SHU are

15  administrative decisions for which the due process requirements are minimal.  Due process only

16  requires that prison officials provide the inmate with some notice of the charges against him, an

17  opportunity to be heard, and that the validation decision be supported by some evidence.  This

18  standard is well-established and uncontroverted, *see, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 229

19  (2005); *Castro v. Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013) (applying the "low 'some

20  evidence' standard" to gang validation); *Toussaint v. McCarthy*, 801 F.2d 1080, 1099 (9th Cir.

21  1986), and has been repeatedly upheld in the validation context in California federal courts.

22          In this case, Plaintiffs challenge the validation and review procedures of title 15.  (Pls.' Mot.

23  Class Certification 6-7 (citing to provisions in title 15 for "Defendants' Policy of Indefinite SHU

24  Confinement").)  They contend that a higher standard of due process applies.  Plaintiffs argue that

25  _____
    (…continued)

26  management policies, and use of SHU confinement, so that they could regain access to the
    general population, where they could promote and conduct gang business.  (Elrod Decl. ¶ 39;
    Zubiate Decl. ¶ 33.)  For example, inmate Zubiate signed a petition submitted to the United

27  Nations protesting SHU conditions as "torture."  (Zubiate Decl. ¶ 29.)  He recently asked that his
    name be removed from that petition.  (*Id.*)

28

the decision to assign and retain an inmate in the SHU based on gang validation is punitive, and thus warrants the due process protections contemplated for disciplinary proceedings in *Wolff v. McDonnell*, 418 U.S. 539 (1974).  Plaintiffs contend that this higher standard is necessary to ensure that they receive the "meaningful" review to which they are entitled.

For example, Plaintiffs argue that "[n]o examination of continued gang activity or association occurs at this 180-day review, nor is there any assessment of whether the prisoner's behavior requires continued SHU placement."  (Pls.' Mot. Class Certification 7.)  However, the "lack of continuing evidence of gang membership or activity is irrelevant since the justification for administrative segregation is the fact of gang membership itself, not any particular behavior or activity."  *Madrid*, 889 F. Supp. at 1278.  Plaintiffs claim that "[t]he review at which CDCR purports to determine whether the prisoner should be released from the SHU occurs once every six years," but that "even when Plaintiffs have engaged in no gang activity, they are nonetheless routinely denied inactive status."  (Pls.' Mot. Class Certification 7.)  That claim is false.  Inmates who have been in the SHU beyond the six-year inactive-review period have demonstrated, through their behavior, a continuing involvement in gang activity despite the strict security controls present within the SHU.  (Swift Decl. ¶ 11.)  Regardless, Plaintiffs' disagreement with the nature or significance of the evidence used to substantiate their status as validated gang members or associates does not mean the review provided as to that evidence was not meaningful or otherwise constitutionally deficient.  *See Swarthout v. Cooke*, ___ U.S. ___, 131 S. Ct. 859, 862-63 (2011) (procedural due process concerns "whether the constitutionally requisite procedures [were] provided," not whether they "produced the result that the evidence required").

Plaintiffs rely on a recent amendment to California's Penal Code, effective January 10, 2010, that no longer permits SHU inmates to earn good-time credits.  Cal. Pen. Code § 2933.6(a).  But the change in the law did not retroactively take away a SHU inmate's previously-earned good-time credits.  It impacted the inmate's ability to earn good-time credits in the future, which is significant from a due process perspective.  *See, e.g., Corral v. Gonzalez*, No. 1:12-cv-01315-LJO-SKO, 2013 U.S. Dist. LEXIS 95008, at *5-8 (E.D. Cal. July 8, 2013) (expressly rejecting that SHU-validated inmate is entitled to *Wolff*-type procedures after amendment to § 2933.6(a));

11

1   *Alfaro v. Lewis*, No. C 12-1555 CRB (PR), 2013 U.S. Dist. LEXIS 85603, at *11 (N.D. Cal. June

2   18, 2013) (rejecting inmate's due process challenge because inmates do not have federal right to

3   earn prison credits and the inmate could "restore his credit eligibility by completing the prison's

4   debriefing process").  This defeats Plaintiffs' contention that SHU retention is punitive and thus

5   worthy of a level of process applied to disciplinary prison decisions.  Moreover, even subsequent

6   to the amendment's application, courts faced with due process challenges to gang validation have

7   applied the due process test applicable to administrative functions.  And the impact, if any, of §

8   2933.6(a) has been raised, not in the context of a civil rights challenge under § 1983, but instead

9   via habeas corpus.  *See, e.g.*, *Soto v. Lewis*, No. 11-4704, 2012 U.S. Dist. LEXIS 158455, at *18

10   (N.D. Cal. Nov. 5, 2012).  Validation decisions and review procedures are administrative, not

11   disciplinary in nature.

12          **B.     Different Rules Now Apply to Gang Validation and Review.**

13          The gang management and review guidelines challenged by Plaintiffs in this case have been

14   revamped and supplanted by the STG program.  The STG program represents a massive shift in

15   the management of prison gangs in California prison institutions.  (Harrington Decl. ¶ 11;

16   Hubbard Decl. ¶ 5.)  The changes in policy were based on recommendations made by subject-

17   matter experts within CDCR and in consideration of strategies and best practices used by CDCR

18   and other correctional agencies.  (Hubbard Decl. ¶ 5.)  The STG program changes the

19   considerations contemplated at the initial stage of validation and the review provided for

20   validated inmates during the step-down program through release from the SHU in step five of the

21   program.  (*Id*. ¶ 4.)

22          Since the implementation of the STG program in October 2012, SHU inmates have another

23   alternative to earn their way out of the SHU through a step-down program.  (*Id*. ¶ 3.)  The step-

24   down program emphasizes individual inmate behavior, regardless of gang status, and provides

25   enhanced programs, increased interpersonal interactions, as well as increased privilege and

26   personal property allowances as the inmate progresses through each successive step.  (*Id*. ¶ 6.)

27   Under the step-down program, SHU inmates can eventually earn release to general population in

28   step five of the program.  (*Id*. ¶¶ 4, 13.)  The focus of the step-down program is on the inmate's

12

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1   behavior — that is, whether his behavior demonstrates, without having to debrief, his willingness

2   to disassociate from the gang.  (*Id.* ¶ 13.)  If the inmate acts in a manner that indicates gang

3   activity, the inmate may not progress to the next step of the program, and could be returned to a

4   previous step until he demonstrates behavior appropriate for movement to the next step and

5   towards ultimate release from the SHU.  (*Id.*; Swift Decl. ¶ 13.)  Plaintiffs challenge the

6   "indefinite" or "prolonged" nature of their confinement in the SHU.  But under the STG program,

7   validated inmates may be released from the SHU in four years, or potentially as few as three

8   years, if they refrain from disciplinary violations related to gang activity and participate in each

9   step of the program.  (Hubbard Decl. ¶ 7(h).)  That choice is presented to each inmate.

10       The step-down program is just one segment of CDCR's shift in gang management.  The

11   STG program also makes significant changes to CDCR's validation methodology and SHU

12   placement policy.  Among other policy changes, an inmate validated as an associate of a "security

13   threat group" is no longer automatically assigned to a SHU term unless he is found guilty of one

14   serious rule violation or two separate administrative rule violations within a one-year period for

15   behavior demonstrating a nexus to gang activity.  (*Id.* ¶ 7(d); Swift Decl. ¶ 5.)  Validation source

16   items have been assigned point values, which will be utilized in the new validation process.

17   (Hubbard Decl. ¶ 7(c).)  The incorporation of a weight-based, point-value system is designed to

18   correspond with the tested validation process under title 15, which required three individual

19   source items of gang-related evidence, including a direct link to a gang member or associate.

20   (*Id.*)  The total value of the source items must now equal ten or more points to attain validation.

21   (*Id.* ¶ 7(c) & Ex. A.)  In addition, a new administrative level of review has been developed, via

22   the STG Unit Classification Committee, to provide for additional procedural safeguards within

23   the new validation procedure.  (*Id.* ¶ 7(e).)

24       Just as significant, CDCR continues to conduct case-by-case reviews of inmates currently

25   validated as gang members or associates and serving indeterminate SHU terms, including inmates

26   in the SHU at Pelican Bay.  (*Id.* ¶¶ 4, 11.)  The purpose of these reviews is to apply the new STG

27   gang management criteria to inmates who are serving indeterminate SHU terms to determine the

28   appropriate placement of validated inmates by reviewing the inmates' conduct during the

13

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1   preceding four years to verify the existence of any ongoing STG behavior. (*Id.* ¶ 4.) Depending

2   on that assessment, a validated inmate may be:  (i) retained within the SHU; (ii) placed within one

3   of the four steps of the step-down program component of the STG program so that the inmate

4   may by his behavior earn ultimate release from the SHU; or (iii) classified for release to the

5   general population in step five. (*Id.*) To date, the results of the case-by-case reviews have been

6   significant and positive. (*Id.* ¶ 11.) As expected, the application of the STG program's new

7   criteria has reduced the number of inmates being placed in CDCR's SHUs, as well as reduced the

8   current SHU population (*id.*), including at Pelican Bay's SHU.[4]

9          The STG program, although rolled out in October 2012 as a pilot, has the effect of law, and

10   CDCR will formally promulgate the STG program through the Administrative Procedure Act.

11   (*Id.* ¶¶ 3, 14.) The program constitutes CDCR's studied and comprehensive effort to address

12   evolving trends of gang activity in its prisons. (*Id.* ¶ 5; Harrington Decl. ¶ 11.) This is not an

13   experiment. The STG program is currently being applied to SHU inmates at Pelican Bay, as well

14   as CDCR's four other institutions with SHU units. (Hubbard Decl. ¶ 4.)

15                                        **ARGUMENT**

16          Plaintiffs bear the burden of proving the elements of Rule 23. *Zinser v. Accufix Research*

17   *Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). "Rule 23 does not set forth a mere pleading

18   standard." *Wal-Mart*, 131 S. Ct. at 2551. Plaintiffs instead must "prove that there are *in fact*

19   sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original).

20   As a result, "[w]hen considering class certification under Rule 23, district courts are not only at

21   liberty to, but must perform a 'rigorous analysis [to ensure] that the prerequisites of Rule 23(a)

22   have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011)

23   (citation omitted). This, in turn, necessarily may "entail some overlap with the merits of the

24

25          [4] As of June 21, 2013, CDCR has conducted reviews of 249 inmates serving indeterminate
     SHU terms with the following results:  29 inmates have been placed in step one of the step-down
26   program; 27 inmates have been placed in step two; 16 inmates have been placed in step three; 11
     inmates have been placed in step four; 166 inmates have been approved for step five of the
27   program (i.e., for release to the general population). (Hubbard Decl. ¶ 11.) Of those 166 inmates,
     130 have been approved for transfer to a specific general population institution, and 101 inmates
28   have already been processed and released to the general population. (*Id.*)

1  plaintiff's underlying claim." *Id.* Applied here, the "rigorous" analysis reveals that:

2  (i) Plaintiffs' proposed Due Process class definition is flawed; (ii) the policies Plaintiffs contend

3  cut across their claims under the Eighth and Fourteenth Amendments are rife with individual

4  issues that undermine the commonality and typicality required to sustain certification; (iii) not all

5  of Plaintiffs' proposed counsel are adequate; and (iv) Plaintiffs seek far-reaching injunctive relief

6  incompatible with the Prison Litigation Reform Act (PLRA) and Rules 23(b)(2) and 65 of the

7  Federal Rules of Civil Procedure.  For each of these reasons, Plaintiffs' motion for class

8  certification should be denied.

9  **I.     PLAINTIFFS' PROPOSED DUE PROCESS CLASS IS IMPRECISE AND OVERBROAD.**

10      "Before a class can be certified, it is axiomatic that such a class must be ascertainable."

11  *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557 (C.D. Cal. 2012) (citation omitted).

12  "An adequate class definition" requires that the "members be identified with particularity.'"

13  *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 593 (E.D. Cal. 2008) (citation

14  omitted).  Namely, courts must consider "whether the class can be readily identified in some

15  manner other than an individualized hearing."  *Cortez v. Best Buy Stores, LP*, No. CV 11-05053,

16  2012 U.S. Dist. LEXIS 15190, at *11-12 (C.D. Cal. Jan. 25, 2012).

17      In this case, Plaintiffs purport to bring this action on their own behalf and "on behalf of all

18  prisoners serving indeterminate SHU sentences at the Pelican Bay SHU on the basis of gang

19  validation, none of whom have been or will be afforded meaningful review of their confinement."

20  (Second Am. Compl. ¶ 165, Sept. 10, 2012, ECF No. 136.)  Cast as their "Due Process class,"

21  Plaintiffs in their moving papers tweak the definition slightly to include "all prisoners serving

22  indeterminate SHU sentences at the Pelican Bay SHU on the basis of gang validation, none of

23  whom have been or will be afforded meaningful review *or procedurally adequate review of their*

24  *confinement*."  (Pls.' Mot. Class Certification 1-2 (emphasis added).)  Both definitions of

25  Plaintiffs' Due Process class are impermissibly imprecise and overbroad.

26      The threshold defect is with Plaintiffs' vague use of the term or phrase "meaningful

27  review," and now "procedurally adequate review of their confinement."  For example, Plaintiffs

28  contend that the Due Process class includes validated SHU inmates "who have been deprived of

15

1    hearings to which they are entitled under *Wolff v. McDonnell*, 418 U.S. 539 (1974)." (*Id*. at 12.)

2    The contention, in turn, relies on a recent amendment to § 2933.6(a) of California's Penal Code,

3    effective January 10, 2010, which no longer permits SHU inmates to earn good-time credits.

4    (Pls.' Opp'n Defs.' Mot. Dismiss 1-2, Jan. 17, 2013, ECF No. 178 (arguing that "since 2010,

5    placement in the PB-SHU deprives Plaintiffs of good time credit, a punitive measure which the

6    Supreme Court has determined entitles them to greater procedural protections").)  Plaintiffs'

7    proposed Due Process class, however, encompasses SHU inmates validated and reviewed *before*

8    the effective date of the amended Penal Code statute, to which *Wolff*-review standards

9    presumably would not apply, and thus renders the class definition imprecise.

10        Plaintiffs separately contend that the purported Due Process class consists of validated SHU

11   inmates who have been "denied timely periodic review of their confinement" and "provided with

12   misleading notice as to how to earn their way out of the SHU." (Pls.' Mot. Class Certification 12.)

13   The law, however, is clear:  the decisions to validate an inmate, assign the inmate to the SHU, and

14   thereafter retain the inmate in the SHU are administrative decisions for which the due process

15   requirements are minimal.  Plaintiffs' Due Process class thus captures validated SHU inmates

16   whose due process rights were not violated.  Put another way, the minimal due process safeguards

17   that have been repeatedly upheld as adequate means that not all validated inmates living in the

18   SHU have a due process claim.

19        Similarly, the Due Process class definition ignores the import of the STG program, which

20   overhauls the manner in which inmates are validated and assigned to and retained in the SHU.

21   (Hubbard Decl. ¶ 7.)  CDCR is conducting case-by-case reviews of all validated members and

22   associates currently serving SHU terms.  (*Id*. ¶ 4.)  Inmates are placed into a level of the step-

23   down program and advised that they can "earn their way out of the SHU" through behavior

24   demonstrating a genuine disassociation from gang activity.  (*Id*. ¶ 7(g).)  As they progress through

25   levels one through four of the step-down program toward release to the general population in step

26   five, those inmates receive the "periodic review of their confinement" that Plaintiffs demand.  (*Id*.

27   ¶ 7(h).)  It is Plaintiffs' burden to define a class that can be readily ascertained in a manner other

28   than through an individualized hearing.  As defined, Plaintiffs' Due Process class is unworkable

16

1   because it requires individual determinations of the level of review any particular inmate received

2   at different points in time.

3   **II.   PLAINTIFFS' PROPOSED CLASS AND SUBCLASS SHOULD NOT BE CERTIFIED BECAUSE THEY CANNOT SATISFY EACH ELEMENT OF RULE 23(A).**

4

5   **A.   Plaintiffs Do Not Demonstrate Sufficient Commonality.**

6   The purpose of requiring commonality is to "save[] the resources of both the courts and the

7   parties by permitting an issue potentially affecting every class member to be litigated in an

8   economical fashion." *Falcon*, 457 U.S. at 155.  "Commonality requires the plaintiff to

9   demonstrate that the class members 'have suffered the same injury;'" it is no longer sufficient to

10  allege that the class members have all suffered a violation of the same provision of law. *Wal-*

11  *Mart*, 131 S. Ct. at 2551.  Nor does commonality turn on the mere existence of common

12  questions, "even in droves." *Id*.  Rather, what matters is "the capacity of a classwide proceeding

13  to generate common answers apt to drive the resolution of the litigation." *Id*.  Thus, the common

14  question must be capable of producing a common answer "in one stroke." *Id*.  In determining

15  whether a common question will generate a common answer, a court must consider any

16  dissimilarities between class members.  *Id*. at 2551, 2556.  This is because dissimilarities within

17  the proposed class can "impede the generation of common answers." *Id*. at 2551.

18  **1.   Commonality is lacking because Plaintiffs' claim is based on a policy that is no longer applicable to all members of the proposed Due Process class.**

19

20  The operative complaint and Plaintiffs' pending motion for class certification make clear

21  that Plaintiffs' due process challenge concerns the validation and review procedures set forth in

22  title 15 of the California Code of Regulations.  Plaintiffs argue, for instance, that §§

23  3341.5(c)(2)(A)(1) and 3378(e) fail to "provide SHU prisoners with advance written notice of the

24  claimed violation, a written statement as to the evidence relied upon and the reasons for the action

25  taken, and an opportunity to call witnesses and present documentary evidence in their defense."

26  (Pls.' Mot. Class Certification 12.)  Plaintiffs contend that validated inmates are "denied timely

27  periodic review of their confinement," because under § 3378(e) of title 15, "inactive reviews that

28  might result in a SHU prisoners' [sic] release occur only every six years."  (*Id*.)  For purposes of

17

1   commonality, Plaintiffs pitch the proposed threshold question as "whether CDCR's procedures

2   for assigning inmates to the SHU and periodically reviewing those assignments violate the Due

3   Process Clause of the Fourteenth Amendment." (*Id.* at 14.)

4         But Plaintiffs ignore the implementation and application of the STG program, and thus cast

5   too broad a net to satisfy commonality. Given Plaintiffs' focus (which, again, is on title 15) and

6   the fact that CDCR has modified its gang validation and review procedures, which CDCR has

7   given the effect of law in their application, Plaintiffs' purported common question does not lend

8   itself to a common answer subject to classwide proof, let alone "in one stroke." (Hubbard Decl.

9   ¶¶ 3, 14.) Put another way, whether Plaintiffs received due process under title 15 is a different

10  question, with a different answer, than whether putative class members validated and reviewed in

11  accordance with the STG program received due process. (*Id.* ¶¶ 4, 11.) This fundamental

12  dissimilarity of experience among proposed members of the Due Process class demonstrates a

13  lack of commonality. Plaintiffs cannot rely on a policy to establish commonality that is not, in

14  fact, applicable to all putative class members.

15         **2.**     **Plaintiffs' Eighth Amendment claim presents a host of individual**
                       **questions not subject to classwide proof.**

16

17        Plaintiffs seek to certify a subclass of validated inmates housed in Pelican Bay's SHU for

18  ten or more continuous years. To establish the requisite commonality, Plaintiffs argue that

19  "[p]rolonged confinement at the SHU affects plaintiffs and all members of the subclass

20  identically in that all are: 1) denied at least one basic human need such as normal human contact

21  or sensory stimulation, 2) currently suffering serious mental and/or physical harm as a result of

22  being exposed to this form of confinement for such a lengthy period of time, and/or 3) exposed to

23  a significant risk of future debilitating and permanent psychological harm." (Pls.' Mot. Class

24  Certification 13.) The questions that underlie each of these issues are not amenable to classwide

25  resolution because they generate dissimilar answers among the putative class.

26        In their complaint, Plaintiffs alleged a host of deprivations, including "excessively hot or

27  cold" temperatures and inadequate ventilation, the deprivation of "normal human contact,

28  environmental and sensory stimulation, mental and physical health, physical exercise, sleep,

18

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1    nutrition, and meaningful activity." (Second Am. Compl. ¶¶ 61, 180.)  Plaintiffs' evidence on

2    class certification on the serious-deprivation issue is not so extensive.  Not one Plaintiff submits

3    evidence to support any alleged deprivation other than purported psychological harm each

4    attributes to his SHU confinement.  And yet, even with this narrowing, the required commonality

5    between Plaintiffs and members of the subclass they purport to represent is strained.  "Nothing so

6    amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no

7    specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

8    Conditions may only be actionable in combination "when they have a mutually enforcing effect

9    that produces the deprivation of a single, identifiable human need such as food, warmth, or

10   exercise-for example, a low cell temperature at night combined with a failure to issue blankets."

11   *Id*. at 304.  This combination is not present here.

12        According to Dr. Kupers, one of Plaintiffs' mental health experts, Plaintiffs "all report a

13   significant number of symptoms known to result from isolated confinement lasting longer than

14   three months, including irritability, paranoia, mounting anger, problems concentrating, problems

15   with memory, depression, and despair." (Kupers Decl. Supp. Pls.' Mot. Class Certification ¶ 11,

16   May 2, 2013, ECF No. 221.)  Plaintiffs "report quite a lot of anxiety and hyper-alertness with

17   startle responses," "complain of severe chronic insomnia," and "are convinced that they will

18   never get out of the SHU."  (*Id*.)  These alleged harms are insufficient to state a claim.  Indeed,

19   *Madrid* recognized that the loneliness, frustration, depression, or extreme boredom that inmates

20   may experience by virtue of their SHU confinement do not give rise to a violation of the Eighth

21   Amendment.  889 F. Supp. at 1261-64.

22        But pertinent to commonality, dissimilarities among inmates as to the effect of segregated

23   housing in the SHU are sufficient to defeat class certification.  Inmate Elrod, a former Aryan

24   Brotherhood member, has lived in the SHU for almost the entirety of his eighteen years in prison.

25   He is "in no way mentally debilitated."  (Elrod Decl. ¶ 14.)  To the contrary, he feels that he will

26   leave the SHU saner than when he arrived almost two decades ago.  (*Id*.)  Throughout his time in

27   the SHU, inmate Elrod did not experience or witness the "unrelenting and crushing mental

28   anguish, pain, and suffering" alleged by Plaintiffs in this case.  (*Id*. ¶ 25.)  Similarly, inmate

19

1    Zubiate, as a former member of the Nuestra Familia, has lived in Pelican Bay's SHU for over

2    sixteen years.  He has not developed mental problems that prevent him from functioning day-to-

3    day.  (Zubiate Decl. ¶ 27.)  As a member of the Nuestra Familia, inmate Zubiate stayed mentally

4    active.  For example, he could not memorize the gang's constitution if he had memory problems.

5    (*Id.*)  He was required, among other things, to study Nuestra Familia writings diligently every day.

6    (*Id.*)  And, contrary to Plaintiffs' allegations, inmate Zubiate did not observe SHU inmates who

7    were afraid or cautious to talk with one another.  (*Id.*)  Inmates in his SHU pod communicated

8    every day with each other as well as with Pelican Bay staff.  (*Id.* ¶ 28.)  The experiences of

9    inmates Elrod and Zubiate are not speculative or unique but rather exemplary of the dissimilarity

10   inherent across members of Plaintiffs' purported Eighth Amendment class.[5]

11       As *Madrid* recognized, "although the SHU conditions are relatively extreme, they do not

12   have a uniform effect on all inmates" such that, "[f]or an occasional inmate, the SHU

13   environment may actually prove beneficial."  889 F. Supp. at 1235.  There is increasing data to

14   suggest that administrative segregation is not harmful to all inmates and may not even be

15   damaging from a long-term mental health perspective to most inmates.  (Morgan Decl. ¶ 18.)

16   Many inmates, to be sure, are relieved to arrive to the SHU because "their whole thought process

17   on the mainline is consumed with physical safety because of the regular threat of violence on the

18   mainline."  (Elrod Decl. ¶ 27.)

19       As *Madrid* further recognized, for other inmates, "adverse psychological impact of the SHU

20   will be relatively moderate" and "[t]hey may experience some symptoms but not others, and/or

21   experience those symptoms to a minor or moderate degree."  889 F. Supp. at 1235.  Studies show

22   that imprisonment is not necessarily "bad" for inmates' general well-being (including inmates

23   with mental illness) and that some inmates actually do well, while other inmates may not.

24   (Morgan Decl. ¶ 17.)  In this way, the "question of the harmfulness of imprisonment on one's

25   well-being is an individual question and the answer appears to be 'yes' for some, but 'no' for the

26   _____

     [5] From a mental health perspective, Plaintiffs' activity in prison gangs provides a sense of
27   belonging and commitment to social structure.  (Morgan Decl. ¶ 28.)  It provides a sense of
     meaning and connectedness that might otherwise be absent during confinement in segregation,
28   thereby detracting from or combating the "social isolation" that Plaintiffs contest.  (*Id.*)

1   majority." (*Id.*)  This informs the individual nature of the answer to the question regarding the

2   alleged psychological impact of segregated housing.

3       Dr. Haney, another of Plaintiffs' mental health experts, opines that long-term segregated

4   housing like the SHU "places prisoners at grave risk of psychological harm."  (Haney Decl. Supp.

5   Pls.' Mot. Class Certification ¶ 12, May 2, 2013, ECF No. 195-4.)  But, even Dr. Haney noted,

6   when referring to his re-evaluation of certain inmates in this matter that he had initially evaluated

7   twenty years ago, that "[t]he problems they described are very similar to the ones that they and

8   others described in [his] earlier study." (*Id.* ¶ 43.)  In other words, the length of segregated

9   confinement did not appear to negatively impact the inmates' functioning or reported

10  symptomatology.  (Morgan Decl. ¶ 18.)  Although "supermaximum" correctional housing

11  presents some risk to inmates' mental health, not all inmates are impacted negatively, nor does

12  the length of confinement in segregation increase that risk.  (*Id.*)  The effects of segregated

13  housing appear to be inmate specific, such that the effect of segregated housing can only be

14  determined by evaluating each inmate exposed to those conditions.  (*Id.*)  Because Plaintiffs are

15  unable to present proof of classwide harm in support of their Eighth Amendment claim, Plaintiffs'

16  motion to certify the related subclass should be denied.  *See*, *e.g.*, *Rhodes v. Chapman*, 452 U.S.

17  337, 346 (1981) (stating that "[n]o static 'test' can exist by which courts determine whether

18  conditions of confinement are cruel and unusual").

19      **B.      Plaintiffs Do Not Demonstrate Sufficient Typicality.**

20      Rule 23(a)'s commonality and typicality requirements tend to merge.  *Wal-Mart*, 131 S. Ct.

21  at 2551 n.5.  "Both serve as guideposts for determining whether, under the particular

22  circumstances," the named Plaintiffs' claims and the claims of the class and subclass they seek to

23  represent "are so interrelated that the interests of the class members will be fairly and adequately

24  protected in their absence." *Id.*  To establish typicality, Plaintiffs must prove that the putative

25  class shares the same injury and that they were all injured by the same course of conduct.  *Hanon*

26  *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

27      Here, for many of the reasons set forth above, Plaintiffs cannot satisfy Rule 23(a)'s

28  typicality requirement.  Plaintiffs claim that "each member of the Due Process class raises the

21

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

same constitutional question:  whether the procedures used by Defendants to review placement

satisfy due process requirements."  (Pls.' Mot. Class Certification 18.)  According to Plaintiffs,

"[a]ll SHU prisoners are subject to exactly the same policies and practices."  (*Id*.)  But Plaintiffs

go too far.  Their challenge is to the gang validation and procedures of title 15.  (*Id*. at 6-8

(purporting to describe "Defendants' Policy of Indefinite SHU Confinement" with citations to

title 15).)  CDCR has supplanted those procedures with its STG program, which applies at the

initial validation stage, the review provided at various levels of the step-down program, and the

review provided during the ongoing case-by-case reviews for assignment to a level of the step-

down program.  (Hubbard Decl. ¶¶ 4, 7.)  The very criteria applied to determine, for example,

whether a validated associate should be assigned to the SHU under the STG program is different

than that previously applied under title 15.  (*Id*. ¶ 7(d) (STG validated associates are not

automatically assigned to a SHU term unless formally disciplined for behavior demonstrating a

nexus to gang activity).)  Just as Plaintiffs' due process challenge falls short on commonality,

neither can it be typical of all SHU inmates at Pelican Bay.

Plaintiffs contend that their Eighth Amendment claim "turns on the question of whether a

prisoner subjected to the crushing conditions at the Pelican Bay SHU for over a decade suffers

unacceptable harm, or an unreasonable risk of harm."  (Pls.' Mot. Class Certification 18.)  But, as

described above, what Plaintiffs claim to be "typical" as to the alleged conditions of the SHU

raises a host of individual issues that go beyond mere differences in experiences.  A substantial

question exists as to whether Plaintiffs and the members of their putative subclass suffer the same

injury, if any injury at all.[6]  Indeed, the record demonstrates that the conditions are not "crushing"

in the first instance.  (*See*, *e.g*., Elrod Decl. ¶¶ 14-27; Zubiate Decl. ¶¶ 23-28.)  Nor does the

record show with the requisite typicality that those conditions have the same psychological effect,

if any at all, on the subclass members Plaintiffs seek to represent.  (*Compare* Elrod Decl. ¶¶ 14,

---

[6] According to a report by Plaintiffs' counsel Legal Services for Prisoners with Children, Plaintiffs are in possession of forty-seven survey responses from Pelican Bay SHU inmates that are material to the injury alleged here.  *See* A Cage Within a Cage:  A Report on Indeterminate Security Housing Unit (SHU) Confinement and Conditions (June 2012), available at http://www.prisonerswithchildren.org/resource-library/prison-conditions/.  Defendants requested these survey responses in February 2013, but Plaintiffs have yet to produce them.

1   25, Zubiate Decl. ¶ 27, and Morgan Decl. ¶¶ 17-19 *with* Kupers Decl. ¶¶ 18-27.)  Under these

2   facts, it simply cannot be that the entire putative subclass shares the same alleged injury, or was

3   allegedly injured by the same course of conduct.  Plaintiffs have failed to demonstrate typicality.

### C.   Plaintiffs Do Not Demonstrate That All Proposed Counsel Are Adequate.

#### 1.   Attorney Carbone's opinions as to the qualifications of attorneys McMahon, Strickman, and Weills do not make them adequate.

Under Rule 23(g), each attorney must demonstrate why he or she is adequate to serve as

counsel for the class.  As a matter of general practice, counsel seeks to satisfy this requirement by

filing a declaration or curriculum vitae with the Court, documents that set forth in detail counsel's

experience in handling class actions and other complex litigation, his or her substantive law

experience, and the work done to investigate the facts and claims in the case at issue.  Plaintiffs

did that here with respect to Attorneys Lobel, Hull, and Carbone.  Each submitted declarations

purporting to demonstrate their adequacy, including that of their associates.  However, with

respect to Attorneys McMahon, Strickman, and Weills, each of whom is affiliated with a separate

law office, Plaintiffs did not make that showing.  Instead, they rely on Attorney Carbone's

hearsay description of their qualifications.  Attorneys McMahon, Strickman, and Weills must

independently demonstrate that they are adequate to serve as class counsel under Rule 23(g).

#### 2.   Attorneys McMahon and Strickman are fact witnesses, which compromises their ability to serve as class counsel.

Attorneys McMahon and Strickman are fact witnesses in this case.  As the Court may know,

in 2011, SHU inmates at Pelican Bay organized two mass disturbances in the form of hunger

strikes.  Those disturbances received the media and public attention that they did with the

assistance of attorneys and prisoner advocacy groups like California Prison Focus.  (Elrod Decl.

¶¶ 38-43.)  Attorneys McMahon and Strickman, in addition to being attorneys of record in this

litigation, are part of a "mediation team" comprised of community advocates that meets with

CDCR officials and Pelican Bay staff to discuss the inmates' complaints regarding the SHU.

(Harrington Decl. ¶ 13.)  In this capacity, they act as advocates, not as Plaintiffs' attorneys.

At least one SHU inmate, inmate Elrod, has since informed Attorney McMahon that the

real purpose of the hunger strikes was far from an idealistic call for the preservation of human

23

1   rights.  (Elrod Decl. ¶ 43.)  There was, instead, an ulterior motive.  (*Id.* ¶ 39 (the goal "was to get

2   out of the SHU" to the "general population, where we could "sell drugs, make money, and

3   develop an influence on the streets"); Zubiate Decl. ¶ 33 (the "only objective with the hunger

4   strikes was to get out of the SHU" and "into the general population, or mainline, and start running

5   our street regiments again").)  The discussions that Attorneys McMahon and Strickman have had

6   to date with SHU inmates and CDCR officials make them fact witnesses, particularly with respect

7   to Plaintiffs' allegations, as publicized during the hunger strikes, that SHU conditions constitute

8   "isolation," "solitary confinement," and "torture."  (Harrington Decl. ¶¶ 13-14.)  As fact

9   witnesses, Attorneys McMahon and Strickman have conflicts as between their duty of candor to

10  the Court and their duties as non-legal advocates on behalf of the inmates they otherwise now

11  seek to represent here.

12  ### III.   THE INJUNCTIVE RELIEF SOUGHT IS NOT AMENABLE TO RULE 23(b)(2).

13          Plaintiffs' second amended complaint alleged that this case could be maintained as a class

14  action under either Rule 23(b)(1) or Rule 23(b)(2).  (Second Am. Compl. ¶¶ 175-176.)  Plaintiffs

15  now rely solely on Rule 23(b)(2).  (Pls.' Mot. Class Certification 21-22.)  A class can only be

16  certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on

17  grounds that apply generally to the class so that final injunctive relief or corresponding

18  declaratory relief is appropriate respecting the class as a whole."  The requirement that a proposed

19  class be amenable to group remedies implies a requisite cohesion within the class such that a

20  class-wide injunction would satisfy Rule 65(d) of the Federal Rules.  Rule 65(d), in turn, provides

21  that every injunction must state the reasons why it is issued, state its terms specifically, and

22  describe in reasonable detail — and not by referring to the complaint or other document — the act

23  or acts restrained or required.  Fed. R. Civ. P. 65(d)(1)(A)-(C).  The PLRA, for its part, requires

24  that prospective relief be narrowly drawn, extend no further than necessary to correct a violation

25  of federal rights, and be the least intrusive means of doing so.  18 U.S.C. § 3626(a).

26          Plaintiffs broadly state that they seek an injunction "that would uniformly address all

27  injuries of the class and subclass."  (Pls.' Mot. Class Certification 22.)  Specifically, they seek a

28  variety of injunctive relief, including "the release from the SHU of those prisoners who have

24

Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

1    spent more than 10 years in the SHU," and "alleviation of the conditions of confinement of

2    prisoners in the SHU so that prisoners no longer are incarcerated under conditions of isolation,

3    sensory deprivation, lack of social and physical human contact, and environmental deprivation."

4    (Second Am. Compl. Prayer for Relief ¶¶ c.i.-ii.)  The relief sought is far-reaching.

5          The request that the Court release all inmates who have been in the SHU for more than ten

6    years contravenes the PLRA, which contemplates that "substantial weight" be given to "any

7    adverse impact on public safety."  18 U.S.C. § 3626(a)(1)(A).  The outright release of long-term

8    validated gang members and associates to the general population would jeopardize the safety and

9    security of inmates and staff.  (Harrington Decl. ¶ 12; Elrod Decl. ¶¶ 31, 39; Zubiate Decl. ¶ 33.)

10   The same is true with respect to the conditions of confinement, which CDCR has shown are

11   necessary to curtail the activity and disruptive influence of prison gangs.  (Harrington Decl. ¶¶ 7,

12   9; Swift Decl. ¶ 14; Elrod Decl. ¶ 13; Zubiate Decl. ¶ 22.)  Plaintiffs cannot request that the Court

13   fashion injunctive relief that exceeds the boundaries of Rule 65(d), the PLRA, and Rule 23(b)(2).

14                                        **CONCLUSION**

15         For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

16   motion for class certification.

17   Dated:  July 18, 2013                          Respectfully Submitted,

18                                                   KAMALA D. HARRIS
                                                     Attorney General of California
19                                                   WILLIAM C. KWONG
                                                     Supervising Deputy Attorney General
20                                                   JILLIAN R. O'BRIEN
                                                     Deputy Attorney General
21                                                   MARTINE N. D'AGOSTINO
                                                     Deputy Attorney General
22
                                                     /s/ Adriano Hrvatin
23
                                                     ADRIANO HRVATIN
24                                                   Deputy Attorney General
                                                     *Attorneys for Defendants*
25
     SF2012204868
26   20712333.doc

27

28

                                              25