KAMALA D. HARRIS
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
JILLIAN R. O'BRIEN
Deputy Attorney General
MARTINE N. D'AGOSTINO
Deputy Attorney General
ADRIANO HRVATIN
Deputy Attorney General
State Bar No. 220909
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-6207
  Fax: (415) 703-5843
  E-mail: Adriano.Hrvatin@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, et al. | C 09-05796 CW |
| Plaintiffs, | DECLARATION OF K. HARRINGTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| v. | |
| GOVERNOR OF THE STATE OF CALIFORNIA, et al., | |
| Defendants. | |

I, K. Harrington declare:

1. I am employed by the California Department of Corrections and Rehabilitation (CDCR) in the position of Associate Director, High Security Mission. Due to my employment, experience, and knowledge, I am familiar with CDCR's policies, procedures, and practices related to prison management, the management of high-risk, high-control inmate populations, gang management, and the specific safety and security concerns presented by that segment of the inmate population. I am competent to testify to the matters set forth in this declaration and, if

1

called on by the Court, would do so. I submit this declaration in support of Defendants' opposition to Plaintiffs' motion for class certification.

2. I was appointed to the position of Associate Director, High Security Mission in August 2010, but have been employed by CDCR for almost 26 years and have served in various capacities during my tenure. Prior to my appointment as Associate Director, I served as the Warden at Kern Valley State Prison, which is a Level IV maximum security prison. I have also held the positions of Chief Deputy Warden and Associate Warden at Wasco State Prison, as well as Captain, Correctional Counselor I and II, and Correctional Officer.

3. Pelican Bay State Prison is a Level IV institution, which is the highest custody level within CDCR. All Level IV institutions are maximum security prisons that house inmates assigned to the highest custody level available within CDCR. These facilities are located within a secured perimeter with armed surveillance coverage. The Security Housing Unit (SHU) is an inmate housing unit located at four men's institutions. Inmates are assigned to SHU housing if they have been determined to require segregation from the other inmates in general population for the safety and security of other inmates, staff, or the institution. In addition to the SHU at Pelican Bay, CDCR maintains and operates three other SHU units that house male inmates: at California Correctional Institution, California State Prison–Corcoran, and California State Prison–Sacramento. CDCR also maintains one SHU for female inmates.

4. Due to its unique physical characteristics, the SHU at Pelican Bay provides the greatest control and protection for inmates who require security housing. As a result, Pelican Bay's SHU houses those inmates who pose the greatest threat to the security of the institution and the safety of others, including gang members and associates.

5. An inmate who is validated as a gang member or associate "is deemed to be a severe threat to the safety of others or the security of the institution." Cal. Code Regs. tit. 15 § 3341.5(c)(2)(A)(2). Gangs pose a serious threat not only to individuals within all of CDCR's institutions, both staff and inmates, but they also pose a serious, credible threat to the safety of communities beyond the institutions' walls. The level of influence that prison gangs have on California's prisons is unique compared to other states. Most of the nation's prisons simply do

2

not have the gang problems that California has. CDCR must manage the most violent and sophisticated gang members and associates in the nation.

6. The most notorious prison gangs, such as the Mexican Mafia, the Northern Structure, the Nuestra Familia, the Black Guerilla Family, the Aryan Brotherhood, and Nazi Lowriders all started in California prisons. Prisons are especially vulnerable to internal disruption by gang affiliates and their influence over other inmates through covert operations, violence, and victimization. Typical gang behavior within the institutions includes homicide, inmate and staff assaults, smuggling of narcotics, and directing coordinated criminal activity that spans inmates at several of CDCR's institutions. Gang members and associates within CDCR's institutions are also routinely and consistently connected to major criminal activities in communities outside of prison, including coordination of homicides, drug trafficking, prostitution, human trafficking, and extortion. Gang members and associates look for every opportunity to exert their influence over other inmates and prison staff through fear and intimidation

7. During the 1980s, prior to the construction of CDCR's SHU units, there was an outbreak of violence between gangs in California's prisons. To protect the safety of all inmates within its custody, CDCR responded to the epidemic of gang violence and criminal activity by establishing a gang validation and management policy that included the segregation of gang members and associates in SHU units, including the SHU at Pelican Bay, away from the general inmate population. The ability to house gang members and associates in SHU units was paramount to prison officials' regaining control of prison institutions plagued by the disruptive influence of prison gangs.

8. It is my experience that gangs in general population facilities wield a high degree of influence and control over virtually all inmates in general population facilities. Gangs exercise that control by threatening violence or retaliation against inmates who refuse to obey their rules and directives.

9. Before implementation of CDCR's gang management policy, inmates in segregation were permitted to exercise with other inmates in large concrete yards. There was rampant violence on these yards, particularly at Corcoran and California Correctional Institution

3

Harrington Decl. Supp. Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)

(CCI). Inmates attacked other inmates on a daily basis, often with inmate-manufactured knives (shanks), resulting in correctional officers having to use force to stop the attacks, escalating the risk to the inmates and officers involved. Due to this gang-related violence, CDCR developed the exercise units now used in the SHU and administrative segregation, where inmates may exercise separately or with their cellmate, rather than a larger group. Use of these individual exercise yards has drastically reduced the violence in CDCR's institutions.

10. The influence and sophistication of prison gangs is well documented. Because of the violence of prison gangs, CDCR has a zero tolerance policy for gang activity. CDCR's gang management strategy seeks to identify gang affiliates, investigate and suppress known behavior, and limit the spread of violence and criminal activity. CDCR is able to pursue and accomplish these goals in significant part by removing validated gang members and associates engaged in gang activity from the general population and housing them in the SHU, a more restrictive setting where their influence on others can be limited.

11. CDCR recently implemented significant changes to its gang validation and management policies through the "Security Threat Group Prevention, Identification, and Management" (STG) program. Given the breadth of the changes, CDCR initially implemented the STG program as a pilot program in October 2012. But CDCR will formally promulgate the STG program through the Administrative Procedure Act, as the program constitutes CDCR's studied and comprehensive effort to address evolving trends of gang activity in its prisons. The restrictive nature of SHU housing continues to be an integral part of CDCR's ability to curtail the influence of prison gangs, particularly with respect to inmates who, by their behavior, demonstrate a concerted unwillingness to disengage from gang activity and thus present a threat to inmate and institutional safety and security that warrants SHU retention.

12. Historically and presently, California's prison gang members and associates cannot be integrated without violence. The release of gang members and associates from SHU to the general population carries the threat of violence between rival gangs. For this reason, CDCR consulted with institution wardens to determine how many formerly-validated inmates each prison's general population could accommodate under the STG Program, without leading to

4

outbreaks of violence on general population yards. I was present during these discussions.

13. As part of my job duties, I was involved in discussions with prisoner advocates, including a "mediation team" purporting to represent four SHU inmates who designated themselves the "Pelican Bay Hunger Strike Representatives" during the 2011 Hunger Strike. These four inmate representatives included two of the named plaintiffs in this litigation, Todd Ashker and Ronnie Dewberry. Carol Strickman and Marilyn McMahon, attorneys for plaintiffs in this case, have served as mediators in discussions between the four representatives and CDCR since at least 2010. I participated in these discussions. From my participation, I know that Ms. Strickman and Ms. McMahon also participated in these discussions and have personal knowledge of events that occurred between 2010 and 2013 related to inmates in the SHU, particularly the two named plaintiffs, with respect to communication between inmates at multiple institutions and between inmates and officials at CDCR.

14. In her role as a mediator, Ms. Strickman authored a "Summary of October 12, 2011 Information Session," a true and correct copy of which is attached as Exhibit A. I was involved in this information session. Both Ms. Strickman and Ms. McMahon signed this summary. The summary indicates that Ms. Strickman transmitted CDCR's key points to plaintiffs Ashker and Dewberry and the two other Pelican Bay Hunger Strike Representatives. The summary indicates that Ms. Strickman and Ms. McMahon "spoke with the hunger strike representatives" and "can verify that they decided to end the hunger strike."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Sacramento, California, on July 16, 2013.

K. Harrington

SF2012204868
5

Harrington Decl. Supp. Defs.' Opp'n Pls.' Mot. Class Certification (C 09-05796 CW)