1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JULES LOBEL (*pro hac vice*)
ALEXIS AGATHOCLEOUS (*pro hac vice*)
RACHEL MEEROPOL (*pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: 212.614.6478
Fax: 212.614.6499
Email: jll4@pitt.edu

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, JEFFREY FRANKLIN, GEORGE FRANCO, GABRIEL REYES, RICHARD JOHNSON, DANNY TROXELL, PAUL REDD, GEORGE RUIZ, LUIS ESQUIVEL, and RONNIE DEWBERRY, on their own behalf, and on behalf of a class of similarly situated prisoners,<br><br>    Plaintiffs,<br>v.<br><br>EDMUND G. BROWN, Jr., Governor of the State of California; MATTHEW CATE, Secretary, California Department of Corrections and Rehabilitation (CDCR); ANTHONY CHAUS, Chief, Office of Correctional Safety, CDCR; and G.D. LEWIS, Warden, Pelican Bay State Prison,<br><br>    Defendants. | Case No.:  4:09-cv-05796-CW<br><br>**PLAINTIFFS' SUPPLEMENTAL COMPLAINT**<br><br>**CLASS ACTION** |

# I.   INTRODUCTION

1.      Plaintiffs George Ruiz, Jeffrey Franklin, Todd Ashker, George Franco, Gabriel Reyes, Richard Johnson, Danny Troxell, Paul Redd, Luis Esquivel, and Ronnie Dewberry sue on their own behalf and as representatives of a class of prisoners who have been incarcerated in California's Pelican Bay State Prison's Security Housing Unit ("SHU") for an unconscionably long period of time without meaningful review of their placement.  Plaintiffs have been isolated at the Pelican Bay SHU for between 11 and 22 years.  Many were sent to Pelican Bay directly from other SHUs, and thus have spent even longer – over 25 years – in solitary confinement.

2.      California has subjected an extraordinary number of prisoners to more than a decade of solitary confinement at the Pelican Bay SHU.  According to 2011 California Department of Corrections and Rehabilitation (CDCR) statistics, more than 500 prisoners (about half the population at the Pelican Bay SHU) have been there for more than 10 years.  Of those people, 78 prisoners have been there for more than 20 years.  As one federal judge in the Northern District of California noted, retention of prisoners in the Pelican Bay SHU for 20 years "is a shockingly long period of time."  *See Griffin v. Gomez*, No. C-98-21038, slip op. at 10 (N.D. Cal. June 28, 2006).

3.      California's uniquely harsh regime of prolonged solitary confinement at Pelican Bay is inhumane and debilitating.  Plaintiffs and class members languish, typically alone, in a cramped, concrete, windowless cell, for 22 and one-half to 24 hours a day.  They are denied telephone calls, contact visits, and vocational, recreational or educational programming.  Defendants persistently deny these men the normal human contact necessary for a person's mental and physical well-being.  These tormenting and prolonged conditions of confinement have produced harmful and predictable psychological deterioration among Plaintiffs and class members.

4.      The solitary confinement regime at Pelican Bay, which renders California an outlier in this country and in the civilized world, violates the United States Constitution's requirement of due process and prohibition of cruel and unusual punishment, as well as the most basic human rights prohibitions against cruel, inhuman or degrading treatment.  Indeed, the prolonged conditions of brutal confinement and isolation at Pelican Bay cross over from having any valid penological purpose into a system rightly condemned as torture by the international community.

5.      The conditions at Pelican Bay have become so harsh and notorious that prisoners at the Pelican Bay SHU, as well as thousands of others incarcerated in facilities across the country, have engaged in two recent sustained hunger strikes.

6.      California, alone among all 50 states and most other jurisdictions in the world, imposes this type of extremely prolonged solitary confinement based merely on a prisoner's alleged association with a prison gang.  While defendants purport to release "inactive" gang members after six years in the SHU, in reality their so-called gang validation and retention decisions (and resulting indefinite SHU placement) are made without considering whether plaintiffs and class members have ever undertaken an illegal act on behalf of a gang, or whether they are – or ever were – actually involved in gang activity.  As one example, defendants continue to detain plaintiff George Ruiz in the Pelican Bay SHU after 22 years, based on nothing more than his appearance on lists of alleged gang members discovered in some unnamed prisoners' cells and his possession of allegedly gang-related drawings.

7.      Plaintiffs' and class members' only way out of isolation is to "debrief" to prison administrators (i.e., report on the gang activity of other prisoners); as such, defendants unreasonably condition release from inhumane conditions on cooperation with prison officials in a manner that places prisoners and their families in significant danger of retaliation.  *See Griffin*,

No. C-98-21038 at 8.  Accordingly, for those many prisoners who refuse or are unable to debrief, defendants' policies result in "effectively permanent" solitary confinement.  *Id.*

8.  The conditions at the Pelican Bay SHU are extremely harsh when compared to the experience of a typical California state prisoner, particularly given the extraordinary length of SHU confinement at Pelican Bay.  Yet plaintiffs and the class they represent are incarcerated for years without any meaningful review of their SHU confinement or any notice of how they can earn their way back to the general population without becoming informants.

9.  A few years after Pelican Bay opened its doors in December 1989, a class of Pelican Bay prisoners brought a constitutional challenge to the conditions, practices, and abuse at the facility.  After an extensive trial, the court found that, for a subclass of prisoners at high risk for developing mental illness, the isolation and harsh conditions in the Pelican Bay SHU constituted cruel and unusual punishment.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995).  Although the court rejected Eighth Amendment claims brought by prisoners outside this high risk group, it emphasized that it had only considered isolation lasting up to three years. The court could "not even begin to speculate on the impact on inmates confined in the SHU for periods of 10 to 20 years or more[.]"  *Id.* at 1267.  This case presents the substantial question left unanswered by *Madrid*.

10.  Plaintiffs and the class seek a declaration that the ongoing practices of the defendants – the Governor of California, the Secretary and the Chief of the Office of Correctional Safety of the CDCR, and the Warden of Pelican Bay State prison – violate their constitutional rights, and injunctive relief compelling defendants to provide prisoners at Pelican Bay with meaningful review of their indeterminate SHU assignment and to cease holding prisoners in the inhumane conditions of solitary confinement for extremely prolonged periods.

1

## II.   JURISDICTION AND VENUE

2

11.     Plaintiffs and the class bring claims pursuant to 42 U.S.C. § 1983 and the Eighth

3

and Fourteenth Amendments to the United States Constitution.

4

12.     This Court has jurisdiction for claims seeking declaratory and injunctive relief

5

pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201,

6

2202.

7

13.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §

8

1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims brought by

9

10

plaintiffs and the class have occurred in this District.

11

## III.   PARTIES

12

**A.      Plaintiffs**

13

14

14.     Plaintiff GEORGE RUIZ (B82089) is a 69-year-old prisoner who has spent 22

15

years at the Pelican Bay SHU, and the last 28 years in solitary confinement, due to his validation

16

as a member of the Mexican Mafia (EME).  He has had no significant rule violations since his

17

incarceration began in 1980.  Indeed, he has only had one disciplinary violation of any kind since

18

1986.  He is serving a seven year to life sentence and has been eligible for parole since 1993, but

19

20

multiple parole boards have indicated that he will never be paroled while he is housed in the

21

SHU.

22

15.     Plaintiff JEFFREY FRANKLIN (C08545) is a 52-year-old prisoner who has spent

23

the last 22 years at the Pelican Bay SHU.  In 2006, he was denied inactive Black Guerilla Family

24

(BGF) status based solely on evidence that he associates with other gang members, shares a

25

common ideology, and attempts to educate the community and other prisoners to his philosophy.

26

16.     Plaintiff TODD ASHKER (C58191) is a 48-year-old prisoner who has spent over

27

25 years in solitary confinement, and 22 years at the Pelican Bay SHU.  He was validated as an

28

Aryan Brotherhood member in 1988, and has been denied inactive status based on confidential memoranda from informants and artwork found in his cell. Ashker has never been charged with or disciplined for a proven gang-related act. As the Warden stated in response to one of Ashker's administrative grievances, unless Ashker debriefs, by "formally renounc[ing] his membership" in the Aryan Brotherhood and "divulg[ing] all of their secrets to the authorities," he will remain incarcerated in the SHU for the rest of his life.

17.    Plaintiff GEORGE FRANCO (D46556) is a 46-year-old prisoner who has spent 20 years in solitary confinement at the Pelican Bay SHU. In 2008, Franco was denied inactive Nuestra Familia status based on confidential statements by informants regarding his role within the gang, and the fact that his name appeared on gang rosters found in other prisoners' cells. None of the source items relied on to retain Franco in the SHU for another six years alleged any gang activity or criminal conduct.

18.    Plaintiff GABRIEL REYES (C88996) is a 46-year-old prisoner who has spent almost 16 years continuously in isolation in California, and has been kept in the Pelican Bay SHU for 14 and one-half years. Reyes is serving a sentence of 25 years to life as a result of California's "three strikes" law. At his last inactive review in 2008, he was denied inactive EME associate status solely on possession of artwork allegedly containing gang symbols.

19.    Plaintiff RICHARD JOHNSON (K53293) is a 61-year-old prisoner who has spent almost 15 years in solitary confinement at the Pelican Bay SHU due to his validation as a BGF member. Under California's "three strikes" law, Johnson is currently serving 33 years to life for drug-related offenses. Johnson has never incurred a major disciplinary offense, yet continues to languish in the Pelican Bay SHU.

20.    Plaintiff DANNY TROXELL (B76578) is a 59-year-old prisoner who has spent over 26 years in solitary confinement, and 22 years at the Pelican Bay SHU due to his validation

as a member of the Aryan Brotherhood.  Troxell's only act of violence in the last 30 years involved a fist fight in 1997 in which nobody was significantly injured.  He has been eligible for parole since 1996, but pursuant to a practice of denying parole to all SHU prisoners, he has no hope of being released from prison.

21.     Plaintiff PAUL REDD (B72683) is a 55-year-old prisoner who has spent almost 33 of the past 35 years in solitary confinement in California and has spent the last 11 and one-half years in Pelican Bay's SHU.  Redd was first validated as a BGF gang member in 1980 based on six confidential memoranda stating that he had communicated with other BGF prisoners and that his name was on a coded roster found in a validated BGF member's possession.  Over 30 years later, he continues to be labeled a gang member based merely on association.

22.     Plaintiff LUIS ESQUIVEL (E35207) is a 43-year-old prisoner who has spent the last 13 years in solitary confinement in the Pelican Bay SHU.  He has never incurred a serious disciplinary violation.  In 2007, after more than six years in the SHU, Esquivel was determined to be an inactive gang associate, but was nonetheless retained in the SHU.  He was revalidated as an active EME associate a year later because he possessed allegedly gang-related Aztec artwork.

23.     Plaintiff RONNIE DEWBERRY (C35671) is a 53-year-old prisoner who has spent the last 27 years in solitary confinement.  He has been repeatedly validated as a BGF member based merely on his associations and his political, cultural, and historical writings. He has had no major disciplinary infractions since 1995.  Dewberry would be eligible for parole consideration but for his retention in the SHU.

24.      As detailed below, plaintiffs are suffering serious mental and physical harm due to their prolonged confinement in isolation at the Pelican Bay SHU.

**B.     Defendants**

25.     Defendant EDMUND G. BROWN, Jr., is the Governor of the State of California.

As such, he has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at Pelican Bay SHU, as described below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Brown is sued in his official capacity only.

26.     Defendant MATTHEW CATE is the Secretary of the CDCR.  As such, he has caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Pelican Bay SHU, as described below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below. Defendant Cate is sued in his official capacity only.

27.     Defendant ANTHONY CHAUS is the Chief of the Office of Correctional Safety of the CDCR.  The Office of Correctional Safety houses and supervises the Special Services Unit (SSU), which is CDCR's primary departmental gang-management unit responsible for investigating prisoners suspected of gang affiliation.  As such, he has caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at the Pelican Bay SHU, including but not limited to issues of gang validation.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Chaus is sued in his official capacity only.

28.     Defendant G.D. LEWIS is the Warden of Pelican Bay State Prison.  As such, he has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs, and practices that prevail at the Pelican Bay SHU, as described below.  He has, therefore, directly and proximately

caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant Lewis is sued in his official capacity only.

## IV.  FACTUAL ALLEGATIONS

**A.  Conditions at the Pelican Bay SHU**

29.  California opened Pelican Bay State Prison on December 1, 1989.  It is the most restrictive prison in California and one of the harshest super-maximum security facilities in the country.

30.  The prison is split between general population units for maximum security prisoners and the Security Housing Unit (SHU).  The SHU contains 1,056 cells explicitly designed to keep the alleged "worst of the worst" in the state prison system under conditions of extreme isolation, sensory deprivation, and restricted movement.  Also characteristic of Pelican Bay's SHU are the extremely limited recreational and cultural opportunities afforded to prisoners, a near total lack of contact with family and loved ones, an absolute denial of work opportunities, limited access to personal property, and extraordinary levels of surveillance and control.

31.  Pelican Bay was specifically designed to foster maximum isolation.  Situated in rural Del Norte County, on California's northern border with Oregon, its lengthy distance from most prisoners' families was considered advantageous by the California correctional administrators who developed the facility.  The prison is a 355-mile drive from San Francisco and a 728-mile drive from Los Angeles, where many of the prisoners' families live.

32.  The original planners did not contemplate that prisoners would spend decades at Pelican Bay.  Rather, they designed the prison under the assumption that prisoners would generally spend up to 18 months in the SHU – a term consistent with practices in the rest of the country.

33.  According to CDCR, there were on average 1,106 people incarcerated in the

Pelican Bay SHU in 2011.  About half (513) had been in the SHU for more than 10 years.  Of those people, 222 had been incarcerated in the SHU for 15 or more years, and 78 had been there for more than 20 years.  Of the remaining people, 544 had been in the SHU for five to 10 years, and the rest, 54, were there for five years or less.

34.     Many plaintiffs and class members, including Ruiz, Ashker, Troxell, Franklin, and Dewberry, have been at Pelican Bay since the year it opened.

35.     Some plaintiffs and class members have spent even longer in continuous isolation, as they were transferred directly from other solitary units to the Pelican Bay SHU.  For example, Ruiz has been held in solitary confinement since 1984 – for approximately 28 years.  Dewberry has been in isolation for 27 years.  Troxell has spent over 26 years in isolation, and Ashker has spent over 25 years in isolation.

36.     All plaintiffs have been held in the Pelican Bay SHU for over 10 years.

37.     California's prolonged isolation of thousands of men is without equal in the United States.  There is no other state in the country that consistently retains so many prisoners in solitary confinement for such lengthy periods of time.

38.     The cost of housing a prisoner at the Pelican Bay SHU is considerably higher than the cost of incarcerating a prisoner in general population housing.  CDCR reports that it cost the State $70,641 in 2010-2011 to house a single prisoner at the Pelican Bay SHU – tens of thousands of dollars more per prisoner than in the general population.

39.     Plaintiffs and the hundreds of other long-term SHU residents at Pelican Bay are warehoused in cramped, windowless cells, are given almost no access to recreation or exercise, and have no access to programming or vocational activities.  Prisoners never leave the Pelican Bay SHU except under rare circumstances for medical purposes or a court appearance.

40.     Compounding the extremity of their situation, plaintiffs and class members must

face these conditions in a state of near total solitude.  Pelican Bay prisoners have absolutely no access to group recreation, group education, group prayer, or group meals.  Most are housed in a single-occupancy cell and cannot have a normal human conversation with another prisoner.  Their only avenue of communication is by speaking loudly enough for the prisoner in the next cell, or a cell down the line, to hear.  Guards, however, have discretion to issue warnings and punish any loud communication as a rule violation, and do so.  Moreover, any communication with another validated gang member or associate, even just a greeting, may and has been be used by CDCR as evidence of gang affiliation justifying the prisoners' retention in the SHU.

41.    For example, CDCR cited as evidence of Franklin's continued gang affiliation the fact that he was observed in 2006 "communicating by talking" between pods with another prisoner who is a validated member of a different gang.

42.    Similarly, in March 2011, Franco received a disciplinary violation simply for speaking to a prisoner in the next pod as he passed by his cell on the way back from the shower.  Redd, too, was disciplined in 2007 for talking to another prisoner in passing.

43.    While some plaintiffs and class members have had cellmates at Pelican Bay, being locked up with a cellmate all day in an 80-square-foot cell does not compensate for the severe isolation of the Pelican Bay SHU, as the *Madrid* Court found.  *See Madrid*, 889 F.Supp. at 1229-30.  Instead, double-celling requires two strangers to live around-the-clock in intolerably cramped conditions, in a cell barely large enough for a single human being to stand or sit.

44.    Plaintiffs' and class members' communication with loved ones outside the facility is also subject to severe restrictions.

45.    Prisoners at the Pelican Bay SHU are prohibited from any access to social telephone calls absent an emergency.  A single telephone call may be granted to a prisoner in the event of an emergency (such as a death in the family), but Pelican Bay staff retains complete

discretion to determine whether the circumstances allow for a call. Ashker, for example, was able to speak to his mother only twice in 22 years: once in 1998, and once in 2000. She has since died. Reyes was denied a telephone call home after his stepfather died, because he had been allowed a telephone call several months earlier when his biological father died.

46.     Neither plaintiffs nor the experts they have consulted are aware of any other federal, local or state correctional system in the United States that forbids all non-emergency telephone communication.

47.     The remote location of Pelican Bay means that most SHU prisoners receive no visits with family members or friends for years at a time. Many prisoners have thus been without face-to-face contact with people other than prison staff for decades.

48.     When they do occur, family visits are limited to two two-hour visits on weekends. No physical contact whatsoever is allowed; visits occur behind plexiglass, over a telephone, in a cramped cubicle. This means that prisoners may not even hug or hold hands with visiting family members, children, or other loved ones. Despite the non-contact nature of the visits, prisoners are strip-searched before and after.

49.     The visits are monitored and recorded, and the tapes are later reviewed by gang investigators seeking evidence of gang communication to use against the prisoner and his visitor.

50.     When Ashker's disabled mother visited him, no accommodation was made for her wheelchair, causing a shortened and difficult visit. She never visited again. Dewberry, whose family lives in Oakland, has had less than one visit per year since his 1990 transfer to Pelican Bay. He had no visits between 2008 and February 2012. Franklin's last social visit was in 2005.

51.     Troxell's family has given up trying to visit him because of the distance and cost of traveling to Pelican Bay and because non-contact visits are so upsetting. He has five grandchildren and one great-grandchild, but has never met them.

52.     Esquivel sought a hardship transfer from Pelican Bay, due to his mother's difficulty in visiting him from San Diego.  The transfer was denied, and he was told to debrief instead.  As a result, Esquivel was unable to see or speak to his parents between 2000 and 2009, when his mother died.  After her death, he was allowed one phone call with his father and sister – his only social call in nine years.  As soon as he hung up the phone, Pelican Bay gang investigators told him to think about taking advantage of the debriefing program.

53.     The lack of telephone calls and functional lack of visitation imposes considerable strain on family relationships; those relationships have frequently broken down entirely.  Reyes has not hugged his daughters in almost two decades, since they were in pre-school.  They are now adults.  Reyes was only recently allowed to send his children a photograph of him – his first in 17 years.  His aging mother is ill and cannot travel the considerable distance to Pelican Bay, and the rules forbid him to speak with her by phone.

54.     Esquivel has not shaken another person's hand in 13 years and fears that he has forgotten the feel of human contact.  He spends a lot of time wondering what it would feel like to shake the hand of another person.

55.     Prisoners at the Pelican Bay SHU may receive non-legal mail, but they may only keep 10 pieces of social mail at a time; any other mail is confiscated.  There are significant delays in the delivery of both social and legal mail to prisoners.

56.     These extreme restrictions on human contact are imposed on plaintiffs and class members as a matter of official CDCR policy and have been approved or implemented by defendants.

57.     In addition to the near total isolation that prisoners at Pelican Bay face, the physical conditions under which they live are stark.

58.     The cells in the Pelican Bay SHU are completely concrete, measure approximately

80 square feet, and are eight feet high. They contain a bed made of concrete, a sink, and a toilet. Concrete slabs projecting from the walls and floor serve as a desk and stool. The cells have no window, so prisoners have no view of the outside world, nor any exposure to natural light. Until the summer 2011 hunger strike described below, prisoners were not allowed to put up any decorations, drawings, or photographs on their walls; now they are permitted one wall calendar. The doors to the cells consist of solid steel, rather than bars, and are perforated with small holes that allow for a partial view into a concrete hallway. The door has a food slot that an officer may unlock to insert food or mail, and that is also used to handcuff the prisoner before the door is opened. The cells do not contain an emergency call button, so prisoners must yell for help in the event of an emergency, or rely on a staff member noticing that they are in distress.

59.     The unit is loud – guards' conversations echo down the tier all day. At night the guards stamp mail loudly, open and close doors, and walk the tier with rattling keys and chains for count. Prisoners who are not "showing skin" during these counts are awakened. As a result of these conditions, and the impact of their long-term isolation, many prisoners have developed sleep disorders, vision problems, and headaches.

60.     Bedding consists of a hard, lumpy mattress, sheets, and two thin blankets.

61.     The temperature in the cells can be excessively hot or cold. The ventilation consists of recycled air, which is cold in the winter and hot in the summer.

62.     Property is tightly restricted. Plaintiffs and the class are allowed a total of only 10 books or magazines, and up to six cubic feet of property. They may purchase a television set or radio if they have the means, though available stations are limited. Prisoners at the Pelican Bay SHU are given one quarter of the regular monthly canteen allowance and may receive one annual package, not exceeding 30 pounds in weight, including packaging.

63.     Plaintiffs and the class normally spend between 22 and one-half and 24 hours a

day in their cells.  They are typically allowed to leave their cells only for "exercise" and to shower.

64.    "Exercise" occurs in a barren, solid concrete exercise pen, known as a "dog run." It is supposed to last for one and one-half hours, seven times weekly.  However, prisoners often do not receive even this minimal amount of exercise due to staff shortages and training days, disruptions, inclement weather, or arbitrary staff decisions.

65.    The exercise pen is small and cramped, with high walls.  Half of the roof is partially covered with painted plexiglass and a metal mesh grate that obstructs direct sunlight; the other half allows the only exposure Pelican Bay SHU prisoners ever have to the sky.  Pelican Bay is situated in one of the wettest areas of California, with an average rainfall of 67 inches.  Rain falls directly into the exercise pens, causing water to pool on the floor.  The walls of the exercise pen have accumulated mildew or mold, aggravating respiratory problems among the prisoners.

66.    Until the 2011 hunger strike, there was no equipment whatsoever in the exercise pen.  Since then, prisoners have been provided one handball. Prisoners exercise alone, unless they share their cell, in which case they are permitted to exercise with their cellmate.  If a prisoner with a cellmate wants to exercise alone to get a brief period of privacy, then his cellmate must forfeit his opportunity to exercise.

67.    Plaintiffs and other Pelican Bay SHU prisoners have absolutely no access to recreational or vocational programming.  While those prisoners who can afford them are allowed to take correspondence classes, there has been no consistent access to proctors for exams that would allow prisoners to get credit for their coursework.  Until the 2011 hunger strike, prisoners at the facility were banned from purchasing art supplies or hobby or crafting materials.  Prisoners who are discipline free for one year are now permitted to purchase and retain a limited amount of art supplies.

68.     Prisoners at the Pelican Bay SHU are allowed one 15-minute shower in a single shower cell three times weekly.

69.     Prisoners are allowed access to the law library for two hours, once a month, unless they have a court deadline within 30 days.

70.     Whenever a prisoner is moved outside of the "pod" in which he is housed and in which the shower and exercise pen is located, he is handcuffed, his hands are shackled to his waist or behind his back, and he is escorted by two guards.  The prisoner is also strip searched in public, near the door to the pod.

71.     While prisoners in the SHU are supposed to be served the same meals as other prisoners in California, in practice it is common that the meals prisoners receive in the SHU are substandard in that they contain smaller portions, fewer calories, and often are served cold, rotten, or barely edible.

72.     Conditions at Pelican Bay are so harsh, even compared to other California SHUs, that in 2011 Franklin requested to be transferred out of the Pelican Bay SHU to any of the other three SHUs in California so that he could have "minimal human contact" and not suffer the "extreme sensory deprivation" at Pelican Bay.  In his request, he explained that other SHUs have windows in the cells, allow some time for prisoners to "see and talk with each other," and permit prisoners to "see grass, dirt, birds, people and other things."

73.     Defendants are directly responsible for these stark conditions at Pelican Bay, and for the degree to which the conditions are compounded by other punitive measures, including a pattern and practice of coercive denial of standard medical care.

74.     Plaintiffs have serious medical conditions, some of which, upon information and belief, have been caused or exacerbated by their confinement at the Pelican Bay SHU.  Franklin, for example, has chronic back and eye problems, and Dewberry suffers from melanin deficiency

PLAINTIFF'S SUPPLEMENTAL COMPLAINT
Case No.: 4-09-cv-05796-CW

15

leading to severe pigmentation loss, vitamin D deficiency, chronic lower back problems and pain, stomach problems, and swollen thyroid glands.  Redd suffers from hypertension, diabetes, vision problems, and a thyroid disorder for which he receives no medication.

75.     Johnson has osteoporosis, arthritis, and cysts in both kidneys, and he has suffered renal failure.  He also had a heart attack in 2009 while in the SHU, and takes heart medication. He was scheduled to be transferred to Folsom Prison because of his heart condition, but was later refused transfer after his participation in the Pelican Bay hunger strike.

76.     Reyes suffers from several chronic medical ailments, including Sjogren's Disease, for which he was prescribed effective medications; those medications have been discontinued at the Pelican Bay SHU, and other medical treatment has also been withdrawn without explanation.

77.     Ruiz has glaucoma and had a corneal transplant on his left eye.  He may need one for his right.  He has diabetes, which became aggravated after a change in his medication.  He recently developed pneumonia, kidney failure, and difficulty breathing, and experienced a delay in being seen by a medical practitioner.

78.     Despite these serious conditions, prisoners with medical concerns are routinely told by prison officials that if they want better medical care for their conditions or illnesses, or improved pain management, the way to obtain adequate care is to debrief.

79.     Ashker, for example, who suffers from almost constant pain due in part to an old gunshot wound, was told by Pelican Bay medical staff in 2006 that he "holds the keys" to getting better medical care, presumably by debriefing and moving to the general population.

80.     Ruiz and Johnson have also been told that the only path to better health care is debriefing.

81.     The denial of adequate medical care at Pelican Bay is not isolated to a few doctors or correctional officials, but is rather a longstanding pattern and practice which, on information

and belief, has been officially sanctioned by defendants for the purpose of coercing plaintiffs and class members to debrief.

82.     The serious mental-health impact of even a few years in solitary confinement is well documented, yet mental health care at the Pelican Bay SHU is grossly inadequate.  Every two weeks, a psychologist walks past the prisoners' cells, calling out "good morning," or "you okay?"  The psychologist walks past eight cells in approximately 30 seconds during these "rounds."  It is incumbent on a prisoner to get the psychologist's attention to indicate that he wants to talk.  As a result, prisoners in neighboring cells are aware when someone calls out to the psychologist for help.  There is no opportunity during this brief encounter for a private consultation with a mental-health practitioner.

83.     Indeed, beyond a brief intake screening upon their arrival to the SHU, the only mental health assessment that many SHU prisoners receive occurs at Institutional Classification Committee meetings, at which a mental health staff member is present.  Each prisoner is asked two standard questions: (1) whether he has a history of mental illness; and (2) whether he wants to hurt himself or others.  These questions are asked in front of the Warden, Correctional Captain, and numerous other correctional staff.  No further mental health evaluation occurs.

84.     For these reasons, plaintiffs and class members have received inadequate mental health care or none at all.  Though prisoners may request mental-health services by filling out a form, some plaintiffs have declined to seek any mental health care while incarcerated because of concerns over lack of confidentiality.  Others do not talk to mental health staff because those staff members seem uncaring, and because officers can overhear sessions or are told of prisoners' personal problems.

85.     When one plaintiff actually requested mental health care, he was referred to a "self-help" library book.

86.     SHU assignment also prolongs plaintiffs' and class members' time in prison. Since legislative changes in 2010, prisoners cannot earn "good time" or "conduct" credit while in the SHU for gang affiliation.  Therefore, a prisoner with a determinate (fixed) sentence such as Esquivel, who was convicted in 1997 of robbery and burglary and is serving a flat 34-year sentence, will be released between four and five years later than he otherwise would have simply because he is incarcerated in the SHU.

87.     In addition, an unwritten policy prevents any prisoner held in the SHU from being granted parole.  Ruiz, Ashker, Troxell, Franklin, and Dewberry are all eligible for parole, but have been informed by parole boards that they will never attain parole so long as they are housed in the SHU.

88.     Ruiz, for example, has been incarcerated in California since 1981, after he was convicted of robbery and kidnapping and sentenced to seven years to life in prison.  He was told by the judge that he would likely serve 13 and one-half years, and has been eligible for parole since 1993.  However, multiple parole boards have indicated that he will never get parole as long as he is housed in the SHU.

89.     Franklin has been eligible for parole since 2000, and although the parole board has characterized his disciplinary history at Pelican Bay as "minimal," it has repeatedly denied him parole, citing, among other things, his refusal to disassociate with the gang through debriefing.  In 2001, he was explicitly told that he needed to get out of the SHU to gain parole.

90.     So too, Dewberry and Ashker have been eligible for parole since 1996 and 2004 respectively, but have been informed that they will not receive parole unless they first get out of the SHU.

**B.**     **Assignment to and Retention in the Pelican Bay SHU**

   **i.**     **Initial Assignment to the SHU**

91.     CDCR places prisoners who have been validated as gang affiliates into the above conditions in SHU for an indefinite term, served in repeatedly renewed six-year increments. *See* CAL. CODE REGS. tit. 15, § 3341.5(c)(2)(A)(2) (2012).

92.     Ignoring prisoners' actual behavior, CDCR identifies prison gang affiliates through a process called prison gang validation. *See* CDCR, OPERATIONS MANUAL § 52070.21 (2009).  Validation does not require CDCR to show that the prisoner has violated a prison rule, broken the law, or even acted on behalf of the gang.  Indeed, many prisoners who have not engaged in any gang-related misconduct or rule violations before validation are placed in the SHU based merely on allegations that they have associated with a gang.

93.     For example, Ruiz, Johnson, Redd, Esquivel and Dewberry were all validated as gang members or associates without allegations of actual gang activity or gang-related rule violations.  Rather, the prison relied on confidential informants who claimed these plaintiffs were gang members or associates, on possession of allegedly gang-related art, tattoos, or written material, and/or on inclusion of their names on alleged lists of gang members and associates.

94.     When validated, prisoners are classified as either gang members or gang associates.  A "member" is a prisoner who has been accepted into membership by a gang. CAL. CODE REGS. tit. 15, § 3378(c)(3).  An "associate" is a prisoner or any person who is involved periodically or regularly with members or associates of a gang.  *Id.* at § 3378(c)(4).  Both members and associates (referred to globally as "gang affiliates") are subject to indefinite SHU confinement.

95.     California's practice of placing people in long-term SHU confinement simply because of gang association is unusual and does not comport with the general practice of other

states that maintain super-maximum security prisons.

### ii.    Periodic Review

96.    Once a prisoner is validated as a gang affiliate and sent to the SHU for an indefinite term, he is entitled to periodic "reviews" of his validation.  Pursuant to California regulations, a classification committee must review the prisoner's status every 180 days, allegedly so they can consider releasing the prisoner to the general population.  *Id*. at § 3341.5(c)(2)(A)(1).  In reality, classification reviews do not substantively review the prisoner's SHU assignment, but rather involve three steps.  First, the prisoner is urged to debrief from the gang.  Second, a mental health staff member asks two questions: (1) do you have a history of mental illness; and (2) do you want to hurt yourself or others?  This mental health evaluation occurs in front of all members of the classification committee, including the Warden, Facility Captain, Correctional Captain, the Assignment Lieutenant, and other correctional staff.  *See id*. at § 3376(c)(2).  Third, the classification committee "reviews" the paperwork in the prisoners' file, to make sure that all required paperwork is accounted for.

97.    Unless a prisoner is willing to debrief, the 180-day review allows absolutely no possibility of release from the SHU.

98.    No examination of continued gang activity or association occurs at the 180-day review, nor is there any assessment of whether the prisoner's behavior requires continued SHU placement.  For this reason, such reviews are meaningless, and few Pelican Bay SHU prisoners attend them.

99.    The only review at which the classification committee team even purports to determine whether the prisoner should be released from the SHU occurs once every six years. *See id*. at § 3378(e).  Therefore, all gang validated prisoners in the SHU must remain in solitary confinement for six years without even the possibility of any review to obtain their release.  This

six-year interval is far longer than any equivalent classification review at other supermax or high-security systems in other states, the federal system, or other nations, and is far longer than the 120-day period that the Ninth Circuit deemed constitutionally permissible for prisoners housed in solitary confinement in *Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir. 1990).

100.    Yet even this six-year inactive review is meaningless for most prisoners housed in the SHU.

101.    In some cases, like that of plaintiffs Ashker and Troxell, defendants have made a predetermined decision to deny inactive status and thus retain the prisoner in the SHU until he either debriefs or dies.  For example, in 2004, Pelican Bay Warden Joe McGrath wrote in response to one of Ashker's grievances that Ashker had been identified as an active member of the Aryan Brotherhood and that "such an inmate must formally renounce his membership in this group and divulge all of their secrets to the authorities.  The alternative is remaining where extremely dangerous inmates belong: the SHU."

102.    For many, the six-year review results in SHU retention even though the prison can produce no evidence (or even allegations) of gang activity.  The review is supposed to determine whether the prisoner is "active" with the prison gang or has assumed "inactive" status.  Under California regulations, "when the inmate has not been identified as being involved in gang activity for a minimum of six (6) years," he can achieve "inactive status" and may be released from the SHU.  CAL. CODE REGS. tit. 15, § 3378(e).

103.    Logically, one who achieves "inactive" status is still a gang member or associate, but not an "active" one, in that he does not engage in any gang activities.  Yet CDCR routinely and regularly denies inactive status to prisoners even where there is no evidence whatsoever of any gang activity.  This longstanding pattern and practice is not the result of failings by individual gang investigators, but is instead CDCR policy which, upon information and belief, has been

approved and implemented by defendants.  Plaintiffs' experiences demonstrate this pattern.

104.    Ruiz, for example, was denied inactive gang status in 2007 based on: (a) two 2006 searches of unnamed prisoners' cells that uncovered Ruiz's name on a laundry list of purported EME members and associates in "good standing"; and (b) possession of photocopied drawings in his cell.  Ruiz openly possessed this artwork, drawn by other prisoners, for at least eight years without any complaint or objection from prison officials.  Three days before his 2007 inactive review, CDCR asserted that the drawings contained symbols associated with the EME.  Neither of these source items provides any evidence of active gang involvement.

105.    Reyes too has been repeatedly denied inactive status based on association, without evidence of any gang activity.  At his first inactive review, for example, Reyes was denied inactive status based on one source item: exercising with other validated prisoners in a group yard while in administrative segregation.  At his last inactive review, in 2008, Reyes was denied inactive status based only on drawings found in his cell, including a drawing for a tattoo of his name with alleged Mactlactlomei symbols and a drawing of a woman, man and Aztec warrior, with a geometric pattern known as the G-shield.  The G-shield also appears in a tattoo on Reyes' left pectoral and was rejected as a gang-related source item in 1996, 2003 and 2005.

106.    Franklin has had similar experiences.  In 2006, he was denied inactive status because he was listed as a board member of George Jackson University, claimed by CDCR to be a gang front, and because his name appeared on gang rosters confiscated from other prisoners. Shortly thereafter he was seen "communicat[ing] by talking" with a validated member of a different gang.  CDCR officials instructed that this should be considered during Franklin's next inactive review.

107.    Johnson's inactive reviews have also largely focused on association and shared ideology.  In 1997, for example, he was denied inactive status based on a Black Power tattoo,

possession of a book about George Jackson (Paul Liberatore's *The Road to Hell: the True Story of George Jackson, Stephen Bingham, and the San Quentin Massacre*), and a photograph collage of him and George Jackson.  Staff confidential informants also alleged, without any supporting facts attached, that Johnson was a high-ranking member of the BGF and that he communicated with BGF members through third parties.  Johnson was denied inactive status in 2006 based on old source items and possession of a copy of "N-GOMA Pelican Bay Support Project, Black August 2005," a newsletter which includes dedications to alleged BGF members who have died.  None of these source items provide any evidence of Johnson's active involvement in a prison gang in the prior six years.

108.    Redd was denied inactive status in 2011 based purely on association and not on any gang-related actions.  His SHU retention was based on possession of drawings, collages, and booklets related to George Jackson and the Black Panthers, as well as a card from a former Black Panther Party member and his appearance on a roster of purported gang affiliates found amid the property of another prisoner.  In addition, according to confidential informants, Redd is a "captain" of BGF who has communicated with other BGF members.  None of these source items provide any evidence of Redd's actions on behalf of a prison gang in the prior six years.

109.    Dewberry was recently denied inactive status in November 2011 based on his name appearing on a coded roster in another prisoner's possession, as well as such materials as his political and historical writings, his possession of a pamphlet in Swahili, which defendants' inactive review materials state is "a banned language at PBSP," confidential memoranda stating that he is an "enforcer," and his participation in George Jackson University, which according to defendants' inactive review materials "is not a university at all," but rather a "concept," "to teach the philosophies and ideologies of all 'Political Prisoners'" and "to enlist individuals who are not in prison to help spread the ideologies of the BGF (Black Guerilla Family)."  None of the

materials used to deny Dewberry inactive status and consign him to the SHU for at least six more years contained any evidence whatsoever that Dewberry was involved in any violent or gang-related activity.

110.    The most recent review of Franco's validation was in 2008, when he was found inactive in the Northern Structure but was revalidated as an active Nuestra Familia member.  His SHU retention was based on several confidential memoranda from informants regarding his status within the Nuestra Familia along with inclusion of his name on several gang rosters found in the cells of other validated gang members.  None of the source items relied on to consign Franco to another six years in the SHU alleged any actual gang activity or criminal conduct.

111.    At the same time that they were repeatedly denied inactive status, many plaintiffs have demonstrated their ability to follow prison rules by avoiding any significant prison misconduct.  Ruiz, for example, has been disciplined only once for violating a prison rule in over 25 years.  Indeed, his only rule violations in the past 30 years have been for missing count in 1981, possession of wine in 1983, possession of unlabeled stimulants and sedatives in 1986, and a 2007 rule violation entitled "Mail Violation With No Security Threat."  Despite this innocuous prison record, he has spent over 25 years in harsh isolation, without access to normal human contact.

112.    Similarly, Reyes' only disciplinary offenses in the last 12 years involved the recent hunger strike and unauthorized donation of artwork to a non-profit organization.  Johnson has had only one rule violation in close to 15 years in the Pelican Bay SHU: in 2000, he was disciplined for a mail violation.

113.    With the exception of violations in 2011 related to his involvement in the hunger strikes and his possession of a Black History scrapbook including information on the BGF's history, Dewberry has not been charged with violating any prison rule since 1995.

PLAINTIFF'S SUPPLEMENTAL COMPLAINT                    24
Case No.: 4-09-cv-05796-CW

114.    Redd's disciplinary offenses since 2000 consist mainly of simply speaking with other prisoners in passing, along with one mail violation.

115.    When, in the rarest of cases, a long-term prisoner does achieve inactive status, even this is no guarantee of escape from solitary confinement.  In 2007, after more than six years in the SHU with only minor disciplinary write-ups, including, for example, refusing handcuffs, refusing to leave the yard, and yelling, Esquivel was determined to be an inactive EME associate. Nevertheless, he was retained in the SHU for a 12-month observation period.  In 2008, after one year of SHU observation, Esquivel was revalidated as an active gang associate based on one source item: a report that officers found three items of artwork with Aztec symbols in his cell.

116.    CDCR informs prisoners that they can gain release from the SHU as an "inactive" gang member if CDCR has no evidence that they have been involved in "gang activity" for at least six years, but in practice it denies prisoners inactive status even where there is no evidence of any "gang activity" as that word is understood by the ordinary person.  This denies meaningful review.

117.    At the same time, plaintiffs and class members are not given information about an actual path out of the SHU, besides debriefing.

118.    The disconnect between CDCR's stated policy and actual practice has been compounded by the settlement in the case of *Castillo v. Almeida*, C-94-2847 (N.D. Cal. 1994), agreed to on September 23, 2004.  In that settlement, CDCR officials agreed that "laundry lists" – that is, lists by confidential sources, including debriefers, of alleged associates or members without reference to gang-related acts performed by the prisoner – would not be used as a source item to either validate a prisoner as a gang affiliate or deny him inactive status.  CDCR officials also agreed that "the confidential source must identify specific gang activity or conduct performed by the alleged associate or member before such information can be considered as a

source item." *Id*. at ¶ 21.

119.    The *Castillo* settlement was memorialized in a public document filed with the court and widely publicized to the prisoners at Pelican Bay prison.  Despite the *Castillo* settlement, defendants continue to rely on "laundry lists" and on informants who identify no specific gang activity or conduct by the prisoner to retain plaintiffs and class members at the Pelican Bay SHU at the six-year inactive review.  Such review violates due process a) by denying Plaintiffs and class members' fair notice of the evidence that can be used against them to deny inactive status, and b) by providing confusing and misleading notification of what they need to do to get out of the SHU.

120.    Thus, CDCR's practice of denying prisoners release despite their record of inactivity operates as a cruel hoax.  This bait-and-switch furthers the hopelessness and despair that plaintiffs and other prisoners experience in the SHU and leads them to reasonably believe that there is no way out of the SHU except to debrief or die.

121.    Defendants' policy of retaining prisoners in the SHU who are not active gang affiliates, or against whom no reliable evidence exists that they present any threat of gang-related violence or misconduct, is unmoored from any legitimate penological purpose or security need.

122.    These are not isolated aberrations limited to plaintiffs.  Rather, defendants engage in an unwritten but consistent pattern and practice of equating gang association or shared ideology with "current gang activity."  All prisoners in the Pelican Bay SHU are subject to this practice.

## C.    Psychological Harms

123.    In addition to being deprived of the minimal civilized measure of life's necessities as described above, plaintiffs and class members are also experiencing unrelenting and crushing mental anguish, pain, and suffering as a result of the many years they have spent without normal

human interaction, in stark and restrictive conditions, without any hope of release or relief. Prisoners describe this confinement as "a living nightmare that does not end and will not end."

124.   The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating future psychological harm.

125.   Researchers have demonstrated that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns.  Other documented effects include obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent fantasies, emotional flatness, mood swings, chronic depression, feelings of overall deterioration, as well as suicidal ideation.  Individuals in prolonged solitary confinement frequently fear that they will lose control of their anger, and thereby be punished further.

126.   Plaintiffs suffer from and exhibit these symptoms.

127.   While these symptoms are reported by people who have suffered from being placed in solitary confinement for days, months or a few years, they become more pronounced and cause greater pain and suffering when, as with plaintiffs and the class, one is incarcerated in these conditions for many years without any meaningful hope of release.  As plaintiff Gabriel Reyes wrote in 2011:

> You don't really know what makes [the SHU psychological torture] unless you live it and have lived it for 10, 15, 20 plus years 24/7. Only the long term SHU prisoner knows the effect of being alone between four cold walls with no one to confide in and only a pillow for comfort.  How much more can any of us take? Only tomorrow knows. Today I hold it all in hoping I don't explode.

128.    As a result of their prolonged SHU placement, most plaintiffs suffer from extreme and chronic insomnia.  For Johnson, "I am so busy suppressing feelings and isolating myself all day, and so much anger builds up in me from the conditions, that I can't sleep at night because the sound of a door opening or closing wakes me and I get anxious about someone coming in on me and I can't fall back to sleep."

129.    Similarly, Ashker only gets approximately one to three hours of sleep a night both because his mattress is too short for him, causing him to sleep on bare concrete from his knees down, and because noise from the doors constantly slamming open and shut in the SHU at night wakes him and causes anger and anxiety.  The startling loud noises cause flashbacks of the incident in which he was set up and shot unlawfully by a guard which began with the opening and slamming of his cell door.

130.    Many of the plaintiffs also suffer from severe concentration and memory problems.  For example, reading newspapers and books used to be a large part of Ruiz's daily routine, but the severe concentration and memory problems that he developed in the SHU now prohibit him from reading more than a few sentences at a time, and he forgets the paragraph he just read.  Therefore he has essentially given up reading.  Similarly, Franklin and Franco have trouble concentrating, and their attention span and memory are deteriorating because of the effects of long-term isolation in the SHU.

131.    Plaintiffs experience life in the SHU as a struggle to avoid becoming mentally ill.  They have done so thus far by developing responses that deaden feelings and emotions, suppress anger, and develop a psychological and physical state which removes much of what makes normal human beings human – namely, feelings, emotions, daily physical contact, regular social communication, and being able to see another person or living thing.

132.    Plaintiffs experience growing and persistent rage at the conditions under which

they are incarcerated in the SHU. They attempt to suppress that rage in order to avoid self-destruction, irresponsible acts of violence, or a mental breakdown. Plaintiffs' attempts at suppression, in combination with their isolation, have led them to increasingly withdraw into themselves and become emotionally numb to the point of feeling "non-human."

133. Troxell, for example, does not initiate conversations, is not motivated to do anything, and feels as if in a stupor much of the time. He often becomes "blank" or out of touch with his feelings.

134. Ashker experiences great feelings of anger, which he tries to control and suppress, but this just deadens his feelings. He feels that he is "silently screaming" 24 hours a day.

135. Reyes copes with his years of SHU confinement by suppressing his anger, but to do so he has had to suppress all feelings to the point where he no longer knows what he is feeling.

136. Esquivel experiences a near-total loss of the capacity to feel. He states that he does not feel anything and this makes him "feel dead." He reports that days go by without him feeling anything, "as if I am walking dead." He watches some television but has no emotional reaction to the dramas he watches.

137. So too, when Redd suppresses his anger, he starts to not feel anything at all and becomes numb. He often "feels like a caged animal."

138. This mounting anger, and attempts to suppress it, is a recurring and predicable human reaction to the extreme situation that is isolated confinement. It is not a propensity unique to plaintiffs.

139. Plaintiffs also experience a range of other psychological symptoms stemming from their confinement in the SHU, including hallucinations, anxiety disorder, hypersensitivity, severe mood swings, violent nightmares and fantasies, and panic attacks. At least one plaintiff hears voices when no one is talking to him. Redd experiences frequent nightmares about

violence, something that he never experienced before being in the SHU.

140.    The harm to plaintiffs is compounded by their prolonged and indefinite lack of contact with their families and others. For example, Ashker speaks of never having any face-to-face communication with others; he just hears disembodied voices.  Other plaintiffs describe the pain of not being able to hug, share photos with, have phone calls with, or in some cases even see, family members for what they expect will be the rest of their lives.

141.    Plaintiffs are convinced that they will be kept in the SHU for the rest of their sentences, or the rest of their lives.  This causes them acute despair.

142.    These psychological symptoms are precisely those reported in the literature about individuals placed in prolonged solitary confinement.  But the extreme duration of plaintiffs' and class members' confinement has meant that the isolative and emotionally numbing effects of solitary confinement have become even more pronounced.  Plaintiffs' symptoms are almost identical to those described in psychological literature about the long-term effects of severe trauma and torture.

143.    Upon information and belief, numerous prisoners confined in the SHU for long periods of time have developed mental illness, and some have committed or attempted suicide while in the SHU.  All prisoners confined in the SHU for prolonged periods have a significant risk of descending into mental illness due to prolonged exposure to the conditions in the SHU.

144.    Most plaintiffs recently participated in two hunger strikes (described below), which provide additional evidence of the severe psychological distress, desperation, and hopelessness that they experience from languishing in the SHU for decades.  Almost every plaintiff participant reported viewing the possibility of death by starvation as a worthwhile risk in light of their current situation.

145.    Numerous plaintiffs also have serious physical ailments and illnesses caused or

exacerbated by their prolonged incarceration under the harsh conditions in the SHU, including eye and vision problems, headaches, diabetes, hypertension, and chronic back problems. These health concerns add to their psychological distress, as they fear that as they age and their health problems worsen, they will be left to die in the SHU without adequate medical care because they have refused to debrief.

**D.      International Standards Regarding Torture and Cruel, Inhuman or Degrading Treatment**

146.    In light of the well-documented harms described above, there is an international consensus that the type of prolonged solitary confinement practiced in California at Pelican Bay violates international human rights norms and civilized standards of humanity and human dignity. International human rights organizations and bodies, including the United Nations, have condemned indefinite or prolonged solitary confinement as a human rights abuse that can amount to torture.

147.    As just one example, in August 2011, the United Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded that the use of solitary confinement is acceptable in only exceptional circumstances, and that its duration must be as short as possible and for a definite term that is properly announced and communicated.

148.    Plaintiffs' and class members' prolonged detention meets none of these criteria.

149.    The Special Rapporteur concluded that prolonged solitary confinement is prohibited by the International Covenant on Civil and Political Rights (ICCPR) and the Convention Against Torture (CAT), and that prolonged solitary confinement constitutes torture or cruel, inhuman or degrading treatment or punishment. The Special Rapporteur has concluded that even 15 days in solitary confinement constitutes a human rights violation.

150.    Plaintiffs and class members have been held in solitary confinement for at least

250 times this duration.

151.    The Special Rapporteur's view comports with standards laid out by the Istanbul

Statement on the Use and Effects of Solitary Confinement, the ICCPR Human Rights Committee,

and the United Nations Office of the High Commissioner for Human Rights.

152.    The Convention Against Torture (CAT), ratified by the United States in 1994,

provides the following definition of torture:

> For the purposes of this Convention, torture means any act by which severe pain or
> suffering, whether physical or mental, is intentionally inflicted on a person for such
> purposes as obtaining from him or a third person information or a confession, punishing
> him for an act he or a third person has committed or is suspected of having committed, or
> intimidating or coercing him or a third person, or for any reason based on discrimination
> of any kind, when such pain or suffering is inflicted by or at the instigation of or with the
> consent or acquiescence of a public official or other person acting in an official capacity.

CAT, art. 1, para. 1.  By being forced to either debrief or endure the crushing and inhumane

policies and conditions at the Pelican Bay SHU described above, plaintiffs and class members are

being subjected to treatment consistent with CAT's definition of torture.

**E.      Pelican Bay Hunger Strikes**

153.    Coinciding with this international consensus against solitary confinement,

prisoners at Pelican Bay have repeatedly organized hunger strikes to draw public attention to the

conditions described above.

154.    A hunger strike occurred at Pelican Bay in 2002 and lasted approximately one

week.  The prisoners called off the strike after a California State Senator promised to look into the

strikers' complaints, primarily centered on the debriefing policy.  No reforms, however, were

implemented.

155.    In light of ongoing concerns, a 2007 report commissioned by CDCR examined

national standards about the handling of security threat group members and recommended a step-

down program through which prisoners in the SHU could be released to the general population

without having to debrief. *See* CDCR, SECURITY THREAT GROUP IDENTIFICATION AND MANAGEMENT (2007). Instead, they would spend a minimum of four years in a program in which their "acceptable custodial adjustment" resulted in stages of increased social contact and privileges. *Id*. at 6. CDCR also failed to implement these recommendations.

156.    On February 5, 2010, plaintiffs Ashker and Troxell sent a formal Human Rights Complaint to then-Governor Arnold Schwarzenegger and Defendant Cate, titled "Complaint on Human Rights Violations and Request for Action to End 20+ Years of State Sanctioned Torture to Extract Information From (or Cause Mental Illness to) California Pelican Bay State Prison Security Housing Unit (SHU) Inmates." The complaint outlined the history of Pelican Bay State Prison and set forth the prisoners' factual and legal claims for relief.

157.    In May 2011, the complaint was again sent to the Governor and Secretary. This time, it was accompanied by a "Final Notice" that an indefinite hunger strike would begin on July 1, 2011, and it provided five broad demands that CDCR: (1) end group punishment; (2) abandon the debriefing program and modify the active/inactive gang status criteria; (3) end long-term solitary confinement and alleviate conditions in segregation, including providing regular and meaningful social contact, adequate healthcare and access to sunlight; (4) provide adequate food; and (5) expand programming and privileges.

158.    In June 2011, the complaint and final notice were sent again to the Governor, the Secretary, and the Warden.

159.    On July 1, 2011, the hunger strike began. At its peak, over 6,600 prisoners at 13 California prisons participated. Ashker, Dewberry, Franco, Redd and Troxell were among the 11 principal representatives and negotiators for the prisoners at Pelican Bay State Prison. Most of the other plaintiffs also participated, as did prisoners from every major ethnic, racial, and geographic group. The hunger strike garnered national and international media attention and

support.

160.    CDCR staff met with prisoner representatives, and on July 20, 2011, the hunger strike was temporarily suspended after CDCR officials agreed to provide a few basic amenities and to revise the regulations by which a prisoner is assigned to and kept in the SHU.

161.    On August 23, 2011, an informational hearing on California's SHUs was held by the California State Assembly Public Safety Committee.  Hundreds of family members and supporters attended, and many testified about the conditions their loved ones endure in the SHU and in Administrative Segregation Units.  *See* http://solitarywatch.com/2011/08/24/historic-california-assembly-hearing-on-solitary-confinement.

162.    On September 26, 2011, the hunger strike resumed because prisoners lost faith that CDCR would implement a revision of the regulations as it had promised.  This time nearly 12,000 prisoners participated.  The hunger strike ended on October 12, 2011, after CDCR assured the prisoner representatives that it was working on the new regulations and would continue conversations about other improvements sought by the prisoners.

163.    On March 9, 2012, CDCR publicly issued a "concept paper" describing its proposed changes to gang validation regulations.  That document has been condemned by prisoners and prisoner-rights advocates as making virtually no meaningful changes and, instead, expanding the net of who may be incarcerated in the SHU.  No new regulations have been implemented to date.

164.    Since the hunger strike, CDCR has issued disciplinary rule violations against participants in that peaceful protest, and particularly serious rule violations against those it alleged were its leaders.  Ashker, Dewberry, Franco, Redd, and Troxell received disciplinary write-ups on this ground.

**F.    Class Allegations**

1
2
3
4
5
6

165.    Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all prisoners serving indeterminate SHU sentences at the Pelican Bay SHU on the basis of gang validation, none of whom have been or will be afforded meaningful review of their confinement, in violation of the Due Process Clause of the Fourteenth Amendment.

7
8
9
10
11
12

166.    Plaintiffs also bring this action on behalf of a subclass of Pelican Bay prisoners who are now, or will be in the future, imprisoned by defendants at the Pelican Bay SHU under the conditions and pursuant to the policies described herein for longer than 10 continuous years. Such imprisonment constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.

13
14
15
16
17
18
19
20

167.    The class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  As of April 1, 2012, there were more than 1,000 prisoners imprisoned at the Pelican Bay SHU.  Upon information and belief, all of these prisoners have been denied meaningful notice and review, and thus fit the class definition.  Of those prisoners, over 500, or approximately half, have been imprisoned for over 10 years in the Pelican Bay SHU, where they have been subjected to cruel and unusual punishment.  These 500 comprise the Eighth Amendment subclass.

21
22

168.    The class members are identifiable using records maintained in the ordinary course of business by CDCR.

23
24
25
26
27
28

169.    All members of the Eighth Amendment subclass are suffering the deprivation of at least one basic human need due to their prolonged confinement in the SHU, including mental and physical health, physical exercise, sleep, nutrition, normal human contact, meaningful activity, and environmental stimulation.  In addition, all class members are suffering significant mental and physical harm.  While the exact nature of those harms may differ in some respects for each

prisoner, the source of the harm complained of here is the same – namely, defendants' policies and practices in placing the class of prisoners for a lengthy period of time in conditions of confinement shown to cause serious mental and physical harm.

170.    In addition, all prisoners placed in the conditions at the Pelican Bay SHU face a common risk of suffering even more serious mental harm caused by their retention in the SHU for such a lengthy period of time.

171.    There are questions of law and fact common to the members of the class. Those questions include, but are not limited to:

a)   Whether prolonged confinement in the SHU for over 10 years under the conditions and policies maintained by the defendants objectively constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

b)   Whether defendants have been deliberately indifferent to the mental and physical suffering incurred by the plaintiff class.

c)   Whether incarceration under the conditions and policies imposed by defendants results in constitutionally cognizable harm, or presents a constitutionally unacceptable risk of harm.

d)   Whether a legitimate penological reason exists for defendants to incarcerate prisoners for decades in the conditions described herein simply because they are members or associates of a gang, without demonstrating that they are currently engaged or have been recently engaged in some illegal or wrongful gang-related misconduct.

e)   Whether the conditions at the Pelican Bay SHU and the policies imposed by defendants on all prisoners housed in the SHU constitute an atypical and significant hardship compared to the ordinary incidents of prison life.

f) Whether SHU confinement extends the duration of incarceration because of a de facto policy of denying parole to SHU prisoners.

g) Whether defendants deny prisoners incarcerated in the SHU meaningful, periodic review of their confinement as required by the Due Process Clause of the Fourteenth Amendment by: (1) failing to provide them with notice of what they can do to get released from the SHU apart from risking their lives and safety and that of their families by debriefing; (2)  providing misleading notice that they can become eligible to be released from the SHU by becoming an "inactive" gang member or associate and refraining from any gang activity, when in fact prisoners who are not involved in any current gang activity are still routinely retained in the SHU; and 3) making a predetermination that many prisoners will stay in the SHU until they either die or debrief, thus rendering the periodic reviews meaningless.

h) Whether defendants fail to provide timely meaningful review of prisoners' imprisonment in the SHU by engaging in 180-day reviews that do not substantively review whether the prisoners should be retained in the SHU and therefore are meaningless, and only affording the so-called "inactive" review every six years.

172.    Defendants are expected to raise common defenses to these claims, including denying that their policies and practices violate the Constitution.

173.    The claims of the plaintiffs are typical of those of the plaintiff class, as their claims arise from the same policies, practices, courses of conduct, and conditions of confinement, and their claims are based on the same legal theories as the class' claims.  The cause of the named plaintiffs' injuries is the same as the cause of the injuries suffered by the rest of the class, namely

1  defendants' policies and practices.

2       174.    Plaintiffs are capable of fairly and adequately protecting the interests of the

3  plaintiff class because plaintiffs do not have any interests antagonistic to the class.  Plaintiffs, as

4  well as class members, seek to enjoin the unlawful acts, policies, and practices of the defendants.

5  Indeed, some of the named plaintiffs have already served as de facto representatives of the class

6  by presenting the demands of thousands of Pelican Bay and other California hunger strikers to

7  defendants during the two hunger strikes in the summer and fall of 2011.  Finally, plaintiffs are

8  represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and

9  complex class litigation.

10

11      175.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1)

12 because the number of class members is numerous and prosecution of separate actions by

13 individuals create a risk of inconsistent and varying adjudications, which in turn would establish

14 incompatible standards of conduct for defendants.  Moreover, the prosecution of separate actions

15 by individual members is costly, inefficient, and could result in decisions with respect to

16 individual members of the class that, as a practical matter, would substantially impair the ability

17 of other members to protect their interests.

18

19      176.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P.

20 23(b)(2) because defendants' policies and practices that form the basis of this Complaint are

21 generally applicable to all the class members, thereby making class-wide declaratory and

22 injunctive relief appropriate.  Common questions of law and fact clearly predominate within the

23 meaning of Rule 23(b)(2) as set forth above.  Class treatment provides a fair and efficient method

24 for the adjudication of the controversy herein described, affecting a large number of persons,

25 joinder of whom is impractical.

26

27      **G.  Supplemental Allegations**

28

PLAINTIFF'S SUPPLEMENTAL COMPLAINT          38
Case No.: 4-09-cv-05796-CW

177.    In October 2012, Defendants established a pilot "Step Down Program" to replace the inactive reviews described in paragraphs 99-110 herein. Two sets of proposed amendments to the program were published in 2014.  After more alterations, a revised version of the program was made permanent on October 17, 2014, when Defendants published final regulations amending Title 15.

178.    The new regulations are available at http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/NCDR/2014NCR/14-02/Final_Text_of_Adopted_Regulations_STG.pdf, and are incorporated by reference herein.

179.    The new regulations alter the process and criteria for validating California prisoners as "Security Threat Group" affiliates, and placing such individuals in the Pelican Bay SHU.  *Id.* They also codify a five step program through which a validated prisoner may eventually earn release from solitary confinement. *See* CAL. CODE REGS. tit. 15, § 3000  (2014) (defining "Step Down Program").

180.    The Step Down Program continues California's attachment to prolonged solitary confinement. Indeed, Steps One through Four all require SHU confinement. *Id.* (defining "Step Down Program, Step 1 and 2" and "Step Down Program, Step 3 and 4."

181.    Each step is designed to be completed in 12 months, although it may be possible to complete Steps One and Two in six months each. *Id* at § 3378.3(b)(1) – (b)(3).

182.    Upon successfully completing each step, the prisoner proceeds to Step Five, which involves a minimum of 12-months observation in a general population unit.  *Id.* at § 3378.3(b)(5). The "general population" units used for Step Five prisoners are also highly restrictive.

183.    Class members placed in Steps One and Two receive few privileges differentiating their situation from that which existed prior to implementation of the new program. They remain at Pelican Bay SHU, under all the punishing conditions described above, with no normal social

interaction, no access to contact visitation, and no regular telephone communication. *Id.* at § 3044(i)(2)(A)-(D).

184.   However, prisoners do become eligible for *one* telephone call after six months in Step One if they have met "program expectations" and stayed discipline free. Prisoners receive one additional telephone call if they progress to Step Two.  *Id.*

185.   As has been the case for Pelican Bay SHU prisoners since the 2011 hunger strike, Prisoners in Step One and Two receive one photograph of themselves to send to their families after one year free of serious disciplinary behavior.  *Id.*

186.   Step Three involves only incremental differences in conditions. Rather than one telephone call a year (as is allowed in Steps One and Two), a prisoner in Step Three may receive two telephone calls over the year, six months apart. *Id*. Rather than one inmate package (as is available at Steps One and Two), a prisoner in Step Three may receive two inmate packages. *Id*. Rather than one photograph (as is available at Steps One and Two), a prisoner at Step Three may receive two photographs, six months apart. *Id*.

187.   Like prisoners in Pelican Bay SHU, prisoners in Step Three SHUs are isolated in their cells an average of 22 to 23 hours a day, without any access to recreation or programming outside a cage, or congregate meals.

188.   Step Four, as well, involves only incremental differences in conditions.  Rather than two telephone calls a year, dependent on program progress, prisoners at Step Four may receive four fifteen minute calls a year – one every 90 days.  *Id.*

189.   Like prisoners in the Pelican Bay SHU, prisoners in Step Four SHUs are isolated in their cells for an average of 22 to 23 hours a day.  *Id.* For the first six months at Step Four, they have no access to congregate recreation or meals. *Id.* After six months of programming, Step Four prisoners may be allowed yard access that "include[s] interaction with inmates of diverse

affiliations." *Id.*  Neither the regulations nor CDCR practices guarantees prisoners in Step Four

any minimum amount of time out of their cell, or in group activities.

190.   According to CDCR regulations, progression from step to step requires

"participation in program activities" including "completion of all required components /

curriculum." *Id.* at § 3378.3(a)(1)-(5), 3378.3 (b)(1)-(3).

191.   The various programs, components and curriculums required for successful

completion of the Step Down Program are not enumerated in the regulations nor listed in any

public CDCR policy statements, and many do not yet exist.

192.   Prisoners who are found guilty of an STG related Rules Violation Report,

(including such disciplinary offenses as possessing photographs or contact information of other

STG affiliates), fail to successfully participate in and complete the as-of-yet un-enumerated Step

Down Program requirements, or who "fail to maintain acceptable behavior" may be returned to a

previous step. *Id.*

193.   Starting in 2012, defendants began convening Departmental Review Board

(DRB) hearings to individually review every gang-validated prisoner housed in the Pelican Bay

SHU and determine where to place them in the Step Down Program.

194.   Thus far, approximately one third of gang-validated Pelican Bay SHU prisoners

have received a DRB hearing.  Around 850 to 900 Pelican Bay SHU prisoners have yet to receive

a hearing.  Of the 281 DRB hearings convened for Pelican Bay prisoners between 2012 and

October 2014, (a) 219 prisoners were placed in Step Five of CDCR's Step Down Program; (b) 13

prisoners were placed in Step Four; (c) 11 prisoners were placed in Step Three; (d) 19 prisoners

were placed in Step Two; and (e) 18 prisoners were placed in Step One.

195.   Every plaintiff, with the exception of Luis Esquivel, received DRBs between

March 2014 and October 2014.

196.     As a result of their DRBs, plaintiffs Franco and Ashker have been retained in the Pelican Bay SHU in Steps One and Two, respectively. There they continue to languish in extreme isolation, with no hope of earning release into a general population unit in fewer than three or four years, respectively.

197.     Three plaintiffs – Dewberry, Ruiz, and Troxell – have been placed in Step Three and transferred to the SHU at the California Correctional Institute at Tehachapi ("Tehachapi").

198.     One plaintiff, Franklin, was placed in Step Four and also transferred to the Tehachapi SHU.

199.     Three plaintiffs – Johnson, Redd, and Reyes – were placed in Step Five.  Johnson and Reyes have been moved to CSP Sacramento, and Redd has been transferred to SATF-CSP Corcoran.

200.     Among other methods of prioritization, defendants are currently prioritizing DRBs for prisoners held in Pelican Bay SHU continuously for over ten years.

201.     Given this prioritization, and the DRB results set forth in paragraph 194, upon information and belief, it is likely that there are 20 to 25 former Pelican Bay SHU prisoners who had been incarcerated for ten or more years at the Pelican Bay SHU who have, like Dewberry, Ruiz, Troxell and Franklin, been transferred to Step Three or Four at a CDCR SHU. Many more will be so transferred in the coming months.

202.     At Step Three and Step Four, plaintiffs and the supplemental class of prisoners they seek to represent ("Supplemental Class") face isolation that is substantially similar to what they endured at the Pelican Bay SHU for a decade or more.

203.     There are a few differences between Pelican Bay SHU and Tehachapi SHU. For example, Tehachapi SHU cells have windows and a solid steel door, as compared to no windows but a perforated metal mesh door at the Pelican Bay SHU. But there is no change in the crushing

continuation of prolonged isolation. Indeed, prisoners at Tehachapi SHU have considerably less access to family visits than at Pelican Bay. Prisoners in Step Three and Four continue to languish alone in their cell, with virtually no normal human contact, and extremely limited opportunity for social interaction.

204. The limited out-of-cell programming and social interaction these plaintiffs and class members receive on Steps Three and Four is wholly inadequate to repair the extreme injuries caused by their prolonged solitary confinement at the Pelican Bay SHU.

205. As at Pelican Bay SHU, Troxell, Dewberry and Ruiz and other similarly situated Step Three prisoners are confined to their cells for an average of 22 to 23 hours a day, without any normal human interaction. Unlike at Pelican Bay, most days of the week Step Three prisoners are confined to their cell for the entire 24 hours.

206. As at Pelican Bay SHU, Troxell, Dewberry and Ruiz and other Step Three prisoners are prohibited from any physical contact with their families or friends and regular telephone access.

207. As at Pelican Bay, they are denied all congregate recreation and meals. While Troxell, Dewberry, and Ruiz are currently receiving one to two hours a week of a 13 week group therapy program in adjoining cages, this limited interaction in not enough to dispel the injuries they have suffered and continue to suffer from their prolonged solitary confinement.

208. Plaintiffs and other Step Three prisoners have not received programming adequate to aid in their eventual transition to general population.

209. The same harsh solitary confinement they endured at Pelican Bay SHU continues in a different prison.

210. Plaintiff Franklin is at Step Four at Tehachapi SHU, where he continues to be held in solitary confinement for an average of 22 to 23 hours a day.

211.    In the second half of Step Four Franklin and some other Step Four prisoners have some, albeit limited, access to congregate programming and recreation. According to CDCR regulations, Step Four prisoners may have some access to congregate meals in the future. However, this interaction is so minimal as to fail to overcome the crushing isolation Franklin and other Step Four prisoners experienced at Pelican Bay SHU for over a decade, and continue to experience in a Step Four SHU.

212.    Franklin and other Step Four prisoners have received only very limited transitional programming or assistance.  This programming has not eased their transition after so many years in near total isolation.

213.    Plaintiffs and the Supplemental Class, who languished ten or more years in solitary confinement in the Pelican Bay SHU, and were then transferred to solitary confinement at a Step Three or Step Four SHU, continue to experience the psychological harm alleged in paragraphs 123 – 145, and continue to be deprived of one or more fundamental human needs. The Eighth Amendment violations they alleged in the Second Amended Complaint have not been remedied; they continue unabated in a new location.

214.    Plaintiffs Dewberry, Ruiz, Troxell and Franklin therefore continue this action on their own behalf, and pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a supplemental class of all prisoners who have now, or will have in the future, been imprisoned by defendants at the Pelican Bay SHU for longer than ten continuous years and subsequently transferred from Pelican Bay SHU to another SHU in California to be held in solitary confinement pursuant to Step Three or Step Four of the Step Down Program.

215.    Plaintiffs Johnson and Reyes are in Step Five at CSP Sacramento.  Redd is in Step Five at SATF-CSP Corcoran. All three plaintiffs are in a "general population" unit, yet Johnson and Reyes are locked down in their cells 22 to 24 hours per day. Some days they have up to two

hours of congregate recreation, other days they have none. They have no congregate meals. Redd has more out of cell time.  None of the three has received adequate transitional programming.

216.    Despite increased privileges in Step Five, Johnson, Reyes, and Redd continue to suffer the effects of their prolonged solitary confinement in the PB SHU, and face the very real possibility of return to Pelican Bay SHU under the Step Down Program regulations, if they are found to have engaged in any STG behavior (like having a photograph of a friend who is an STG affiliate), or if they fail to complete any of the un-written and ill-defined Step Down requirements.

217.    Plaintiffs' prolonged isolation has not yet been remedied.  The effects of their prolonged solitary confinement have not been fully eradicated and they face a realistic threat of return to the PB SHU.  Thus, plaintiffs Johnson, Reyes, and Redd continue this action on their own behalf, as individual plaintiffs.

**H. Supplemental Class Allegations**

218.    Plaintiffs Dewberry, Ruiz, Troxell and Franklin seek to represent a supplemental Eighth Amendment class of all prisoners who have now, or will have in the future, been imprisoned by defendants at the Pelican Bay SHU for longer than 10 continuous years and then transferred from Pelican Bay SHU to another SHU in California to be held in solitary confinement pursuant to Step Three or Step Four of the Step Down Program.

219.    The Supplemental Class is so numerous that joinder of all members is impracticable.

220.    All members of the Supplemental Class are suffering the deprivation of at least one basic human need due to their prolonged confinement in the Pelican Bay SHU and another SHU and face a common risk of suffering even more serious mental harm caused by their retention in a CDCR SHU for such a lengthy period of time.

221.    There are questions of law and fact common to the members of the Supplemental Class. Those questions include, but are not limited to

a)   Whether the prolonged confinement at the Pelican Bay SHU for over ten years and continued isolation at another SHU constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

b)   Whether defendants have been deliberately indifferent to the mental and physical suffering of the supplemental class members due to their confinement at the Pelican Bay SHU and the continuation of that confinement at another CDCR SHU.

c)   Whether the conditions and restrictions imposed upon supplemental class members at Step Three and Step Four of the Step Down Program reflect legitimate penological concerns.

222.    Defendants are expected to raise common defenses to these claims, including denying that their policies and practices violate the Constitution

223.    The claims of plaintiffs Dewberry, Ruiz, Troxell and Franklin are typical of those of the Supplemental Class, as their claims arise from the same policies, practices, courses of conduct, and conditions of confinement, and their claims are based on the same legal theories as the class' claims.  The cause of the named plaintiffs' injuries is the same as the cause of the injuries suffered by the rest of the class, namely defendants' policies and practices.

224.    Plaintiffs Dewberry, Ruiz, Troxell and Franklin are capable of fairly and adequately protecting the interests of the Supplemental Class because plaintiffs do not have any interests antagonistic to the class.  Plaintiffs, as well as class members, seek to enjoin the unlawful acts, policies, and practices of the defendants.  Finally, plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class litigation.

225.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the class is numerous and prosecution of separate actions by individuals create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for defendants.  Moreover, the prosecution of separate actions by individual members is costly, inefficient, and could result in decisions with respect to individual members of the class that, as a practical matter, would substantially impair the ability of other members to protect their interests.

226.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because defendants' policies and practices that form the basis of this Complaint are generally applicable to all the class members, thereby making class-wide declaratory and injunctive relief appropriate.  Common questions of law and fact clearly predominate within the meaning of Rule 23(b)(2) as set forth above.  Class treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impractical.

### V.    CLAIMS FOR RELIEF

**First Cause of Action: Eighth & Fourteenth Amendments**
**(Cruel and Unusual Punishment)**

227.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

228.    Plaintiffs advance this claim on their own behalf, and on behalf of the Eighth Amendment subclass, against all defendants.

229.    By their policies and practices described herein, defendants have deprived and continue to deprive plaintiffs and the class of the minimal civilized measure of life's necessities, and have violated their basic human dignity and their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution for

1    each of the reasons set forth below.

2    **A.    Deprivation of Basic Human Need**

3          230.    First, the cumulative effect of extremely prolonged confinement, along with denial

4    of the opportunity of parole, the deprivation of earned credits, the deprivation of good medical

5    care, and other crushing conditions of confinement at the Pelican Bay SHU, constitute a serious

6    deprivation of at least one basic human need, including but not limited to normal human contact,

7    environmental and sensory stimulation, mental and physical health, physical exercise, sleep,

8
     nutrition, and meaningful activity.
9

10   **B.    Imposition of Serious Psychological and Physical Injury, Pain and Suffering**

11         231.    Second, extremely prolonged exposure to these deprivations of basic human needs

12   is currently imposing serious psychological pain and suffering and permanent psychological and

13   physical injury on Plaintiffs and the class they represent.

14
           232.    In addition to plaintiffs' current psychological and physical pain, the likelihood
15

16   that plaintiffs and the class will remain in SHU for the foreseeable future subjects plaintiffs and

17   the class they represent to a significant risk of future debilitating and permanent mental illness

18   and physical harm.

19
     **C.    SHU Confinement Designed to Coerce Plaintiffs to Provide Information**
20

21         233.    Third, Defendants' harsh policies are not legitimately related to security or other

22   penological needs of isolating alleged dangerous prisoners from others, but rather are designed to

23   coerce plaintiffs to debrief and become informants for the State.  This policy of holding plaintiffs

24   and class members in prolonged solitary confinement for many years at the Pelican Bay SHU

25   until they debrief or die is, as one Court put it, "tantamount to indefinite administrative

26   segregation for silence – an intolerable practice in modern society." *Griffin*, No. C-98-21038 at

27
     11.  It is cruel and unusual punishment for defendants to coerce prisoners to provide information
28

on other prisoners – if indeed they have any such information – by maintaining them in stifling and punitive conditions that constitute an atypical and significant hardship, unless they so inform.

234.    Prisoners who debrief incur a substantial risk of serious harm and retaliation to themselves and to their families.  The combination of the crushing conditions in the SHU, the policies designed to coerce prisoners to debrief, the lack of any effective means of obtaining release from the SHU without debriefing, and the substantial risk of serious harm if one does debrief, puts prisoners in an untenable position and constitutes an unconstitutional threat to the safety of prisoners confined in the SHU in violation of the Eighth and Fourteenth Amendments to the Constitution.

**D.     Disproportionate Punishment**

235.    Fourth, defendants' policy of indefinite and prolonged SHU placement imposes disproportionate punishment on plaintiffs and class members.  Defendants have no legitimate penological interest in retaining prisoners indefinitely in the debilitating conditions of the SHU simply because they are gang members or associates, without recent, serious disciplinary or gang-related infractions.  Nor is this policy and practice rationally related to legitimate security needs. Defendants' decades-long infliction of  significant psychological and physical harm and the risk of future debilitating harm on these prisoners simply for allegedly being gang members or associates offends civilized society's sense of decency, constitutes an intolerable practice in modern society, and is a disproportionate punishment which violates the Eighth and Fourteenth Amendments to the Constitution.

**E.     Deprivation of Human Dignity in Violation of Contemporary Standards of Human Decency**

236.    Finally, Defendants' continuation of Plaintiffs' solitary confinement for many years under the debilitating and extreme conditions existing at the Pelican Bay SHU strips human beings of their basic dignity and humanity in violation of contemporary standards of human

decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution.

237.    That California's policies and practices violate contemporary standards of human dignity and decency is evidenced by the fact that those practices are unusual in comparison to other states' practices with respect to segregated prisoner housing.  Virtually no other state uses mere gang association or membership to confine prisoners in the SHU.  Other states do not warehouse hundreds of prisoners in the SHU for decades at a time.  Plaintiffs and class members are subject to unusually harsh conditions of confinement even in comparison with other supermax prisons, such as windowless cells and a lack of telephone calls to family members and friends. And finally, California's SHU policies and practices are atypical in effectively prolonging incarceration, in that prisoners in the SHU are deprived of good time credit and are rendered functionally ineligible for parole.

238.    That California's practices with respect to the plaintiff class violates contemporary standards of human decency and dignity is also evidenced by the international community's condemnation of the practice of prolonged and indefinite solitary confinement under very harsh and stifling conditions such as exist at the Pelican Bay SHU.  Such condemnation is reflected in international treaties such as the Convention Against Torture, the International Covenant on Civil and Political Rights, decisions and declarations of international bodies, customary international law, and decisions of regional and national courts such as the European Court of Human Rights and Canadian courts.

**F.    Defendants' Deliberate Indifference to the Deprivations Suffered by Plaintiffs**

239.    The policies and practices complained of herein have been and continue to be implemented by defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

240.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

241.    It should be obvious to defendants and to any reasonable person that the conditions imposed on plaintiffs and class members for many years cause tremendous mental anguish, suffering, and pain to such prisoners.  Moreover defendants have repeatedly been made aware, through administrative grievances, hunger strikes, and written complaints that plaintiffs and class members are currently experiencing significant and lasting injury.  Defendants have been deliberately indifferent to the plaintiffs' pain and suffering.

242.    Indeed, defendants have deliberately and knowingly caused such pain in an effort to force plaintiffs and the class to debrief.

## Second Cause of Action: Fourteenth Amendment
### (Due Process)

243.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

244.    Plaintiffs advance this claim on their own behalf, and on behalf of the class, against all defendants.

245.    Defendants have deprived plaintiffs and class members of a liberty interest without due process of law by denying them meaningful and timely periodic review of their continued long-term and indefinite detention at the Pelican Bay SHU and meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

246.    The conditions and the duration of defendants' confinement of plaintiffs and class members at the Pelican Bay SHU constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three basic reasons: (a) the exceedingly harsh and

isolated conditions in the SHU; (b) the lengthy duration of confinement in the SHU; and (c) the effect on the possibility of parole being granted and the overall length of imprisonment that results from such confinement.

**A.    Conditions at the Pelican Bay SHU**

247.    The conditions in the SHU are unduly harsh, and do not generally mirror those conditions imposed upon prisoners in administrative segregation and protective custody in California.  These harsh conditions include but are not limited to:  isolation in cells that are sealed off from contact with other prisoners, the lack of windows in cells, a prohibition on all social phone calls except in emergencies, no contact visits and very limited visiting hours, no or minimal educational or general programming, exercise facilities that provide very little natural sunlight and have virtually no recreational equipment, food which is inferior to that served to other California prisoners, and denial of standard medical care to prisoners unless they debrief.

**B.    Duration of Confinement at the Pelican Bay SHU**

248.    Plaintiffs have been held in the crushing conditions described above for 11 to 22 years.  Indeed, about half of the prisoners detained at the Pelican Bay SHU have been there for over 10 years, more than 20 percent have been held there for more than 15 years, and almost 10 percent have been held there for over 20 years.  Upon information and belief, this shockingly lengthy confinement is atypical in comparison to the ordinary disciplinary and administrative segregation imposed in California.

**C.    Effect of SHU Confinement on Overall Length of Imprisonment**

249.    An unwritten, but uniformly enforced policy imposed by CDCR precludes plaintiffs and class members from being released on parole while they are at the Pelican Bay SHU.  In addition, under California law, prisoners housed in the SHU cannot earn good-time credits no matter how impeccable their behavior.  The effect of these policies and practices has

1   been that many prisoners, including some of the named plaintiffs, spend a longer time

2   incarcerated in prison than had they not been housed in the SHU.

3   **D.     Lack of Meaningful Process**

4          250.    Because indefinite placement in the Pelican Bay SHU constitutes a significant and

5   atypical hardship, plaintiffs and class members are entitled to meaningful notice of how they may

6   alter their behavior to rejoin general population, as well as meaningful and timely periodic

7   reviews to determine whether they still warrant detention in the SHU.

8          251.    Defendants have denied and continue to deny any such notice or meaningful

9   review by: (1) failing to provide prisoners with notice of what they can do to get released from

10  the SHU apart from providing information that they do not have or risking their life and safety

11  and that of their families by debriefing; (2)  providing misleading notice that they can become

12  eligible to be released from the SHU by becoming an "inactive" gang member or associate and

13  refraining from engaging in any gang activities, when in fact prisoners who are not involved in

14  any current gang activity are still routinely retained in the SHU; (3) making a predetermination

15  that many prisoners will stay in the SHU until they either die or debrief, thus rendering the

16  periodic reviews substantively and procedurally meaningless; and (4) making the length of time

17  between reviews far too long to comport with the constitutional due-process standard.

18         252.    Defendants are also violating plaintiffs' due process rights by retaining plaintiffs

19  and the class in conditions that amount to an atypical and significant hardship without legitimate

20  penological interest, as this detention occurs without reliable evidence that plaintiffs and the class

21  are committing any acts on behalf of a prison gang and are thus active gang members.

**Third (Supplemental) Cause of Action: Eighth & Fourteenth Amendments**
**(Cruel and Unusual Punishment)**

253.     Plaintiffs Dewberry, Ruiz, Troxell, and Franklin incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

254.     Plaintiffs Dewberry, Ruiz, Troxell, and Franklin advance this claim on their own behalf, and on behalf of the Supplemental Class, against all defendants.

255.     By their policies and practices described herein, defendants have deprived and continue to deprive plaintiffs and the Supplemental Class of the minimal civilized measure of life's necessities, and have violated their basic human dignity and their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution for each of the reasons set forth below.

**G.     Deprivation of Basic Human Need**

256.     First, the cumulative effect of extremely prolonged confinement, along with denial of the opportunity of parole, the deprivation of earned credits, the deprivation of good medical care, and other crushing conditions of confinement at the Pelican Bay SHU, continued at another CDCR SHU, constitute a serious deprivation of at least one basic human need, including but not limited to normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

**H.     Imposition of Serious Psychological and Physical Injury, Pain and Suffering**

257.     Second, extremely prolonged exposure to these deprivations of basic human needs is currently imposing serious psychological pain and suffering and permanent psychological and physical injury on plaintiffs and the class they represent.

258.     In addition to plaintiffs' current psychological and physical pain, the likelihood that plaintiffs and the class will remain in SHU for the foreseeable future subjects plaintiffs and the class they represent to a significant risk of future debilitating and permanent mental illness

and physical harm.

**I.      Disproportionate Punishment**

259.    Third, defendants' policy of indefinite and prolonged SHU placement imposes disproportionate punishment on plaintiffs and class members.  Defendants have no legitimate penological interest in retaining prisoners indefinitely in the debilitating conditions of the SHU without serious disciplinary infractions.  Nor is this policy and practice rationally related to legitimate security needs.  Defendants' decades-long infliction of significant psychological and physical harm and the risk of future debilitating harm on these prisoners simply for allegedly being gang members or associates and/or for minor, non-violent disciplinary infractions, offends civilized society's sense of decency, constitutes an intolerable practice in modern society, and is a disproportionate punishment which violates the Eighth and Fourteenth Amendments to the Constitution.

**J.      Deprivation of Human Dignity in Violation of Contemporary Standards of Human Decency**

260.    Finally, defendants' continuation of plaintiffs' solitary confinement for many years under the debilitating and extreme conditions existing at the Pelican Bay SHU and other CDCR SHUs strips human beings of their basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution.

261.    That California's policies and practices violate contemporary standards of human dignity and decency is evidenced by the fact that those practices are unusual in comparison to other states' practices with respect to segregated prisoner housing.  Virtually no other state uses mere gang association or membership or minor disciplinary infractions to confine prisoners in the SHU.  Other states do not warehouse hundreds of prisoners in the SHU for decades at a time. And finally, California's SHU policies and practices are atypical in effectively prolonging

incarceration, in that prisoners in the SHU are deprived of good time credit and are rendered functionally ineligible for parole.

262.    That California's practices with respect to the plaintiff class violates contemporary standards of human decency and dignity is also evidenced by the international community's condemnation of the practice of prolonged and indefinite solitary confinement under very harsh and stifling conditions such as exist at the Pelican Bay SHU and other CDCR SHUs.  Such condemnation is reflected in international treaties such as the Convention Against Torture, the International Covenant on Civil and Political Rights, decisions and declarations of international bodies, customary international law, and decisions of regional and national courts such as the European Court of Human Rights and Canadian courts.

## K.    Defendants' Deliberate Indifference to the Deprivations Suffered by Plaintiffs

263.    The policies and practices complained of herein have been and continue to be implemented by defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

264.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

265.    It should be obvious to defendants and to any reasonable person that the conditions imposed on plaintiffs and class members for many years cause tremendous mental anguish, suffering, and pain to such prisoners.  Moreover defendants have repeatedly been made aware, through administrative grievances, hunger strikes, and written complaints that plaintiffs and class members are currently experiencing significant and lasting injury.  Defendants have been deliberately indifferent to the plaintiffs' pain and suffering.

266.    Indeed, defendants have deliberately and knowingly caused such pain in an effort to force plaintiffs and the class to debrief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRAYER FOR RELIEF

Plaintiffs and the classes they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of defendants, as alleged herein, unless plaintiffs and the classes they represent are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the United States Constitution.

WHEREFORE, the named plaintiffs and the classes they represent request that this Court grant them the following relief:

a.  Declare that this suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2);

b.  Declare that defendants' policies and practices of confining prisoners in the Pelican Bay SHU violate the Eighth and Fourteenth Amendments to the United States Constitution;

c.  Issue injunctive relief ordering defendants to present a plan to the Court within 30 days of the issuance of the Court's order providing for:

   i.  the release from the SHU of those prisoners who have spent more than 10 years in the SHU, and placement of these prisoners in either a) a general population unit, or b) in a modified general population unit, in which the prisoners are segregated from the general prison population in a high security setting but have similar privileges as do prisoners in general population such as access to small group congregate recreation, contact visits, phone calls, programming, and significant out of cell time, until such time as prisoners can safely transition into a non-segregated general population unit.

PLAINTIFF'S SUPPLEMENTAL COMPLAINT                          57
Case No.: 4:09-cv-05796-CW

ii.   alleviation of the conditions of confinement of prisoners in the SHU so that

prisoners no longer are incarcerated under conditions of isolation, sensory

deprivation, lack of social and physical human contact, and environmental

deprivation;

iii.   meaningful review of the continued need for confinement in a SHU of all

prisoners currently housed in the SHU within six months of the date of the

Court's order; and

iv.   meaningful review of SHU confinement for prisoners housed in the SHU in the

future;

d.   Award plaintiffs the costs of this suit and reasonable attorneys' fees and litigation expenses

pursuant to 42 U.S.C. § 1988, and other applicable law;

e.   Retain jurisdiction of this case until defendants have fully complied with the orders of this

Court; and

f.   Award such other and further relief as the Court deems just and proper.


Dated: March 11, 2015

Respectfully submitted,


/s/ Jules Lobel


JULES LOBEL (*pro hac vice*)
Email: jll4@pitt.edu
ALEXIS AGATHOCLEOUS (*pro hac vice*)
Email: aagathocleous@ccrjustice.org
RACHEL MEEROPOL (*pro hac vice*)
Email: rachelm@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6478
Fax: (212) 614-6499

ANNE CAPPELLA (Bar No. 181402)
Email: anne.cappella@weil.com

PLAINTIFF'S SUPPLEMENTAL COMPLAINT
Case No.: 4-09-cv-05796-CW

58

AARON HUANG (Bar No. 261903)
Email: aaron.huang@weil.com
BAMBO OBARO (Bar No. 267683)
Email: bambo.obaro@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Tel: (650) 802-3000
Fax: (650) 802-3100

CAROL STRICKMAN (SBN 78341)
Email: carol@prisonerswithchilodren.org
LEGAL SERVICES FOR PRISONERS WITH
CHILDREN
1540 Market Street, Suite 490
San Francisco, CA 94102
Tel: (415) 255-7036
Fax: (415) 552-3150

CHARLES F.A. CARBONE (Bar No. 206536)
Email: Charles@charlescarbone.com
LAW OFFICES OF CHARLES CARBONE
P. O. Box 2809
San Francisco, CA 94126
Tel: (415) 981-9773
Fax: (415) 981-9774

MARILYN S. MCMAHON (SBN 270059)
Email: Marilyn@prisons.org
CALIFORNIA PRISON FOCUS
1904 Franklin Street, Suite 507
Oakland, CA 94612
Tel: (510) 734-3600
Fax: (510) 836-7222

ANNE BUTERFIELD WEILLS (SBN 139845)
Email: abweills@gmail.com
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, CA 94612
Tel: (510) 839-1200
Fax: (510) 444-6698

*Attorneys for Plaintiffs*