Daniel M. Lindsay SBN 142895
Phillip Murray SBN 213352
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS ASSOCIATION
LEGAL DEPARTMENT**
755 Riverpoint Drive, Suite 200
West Sacramento, California 95605
Telephone: (916) 372-6060
Facsimile: (916) 340-9372

Attorneys for CCPOA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| Todd Ashker, et al<br><br>Plaintiffs,<br><br>v.<br><br>Governor of the State of California, et al.<br><br>Defendants. | **Case No: 4:09-cv-05796-CW**<br><br>**BRIEF OF AMICI CURIAE IN OPPOSITION TO SETTLEMENT**<br><br>Date: January 26, 2016<br><br>Time: 2:30 PM<br><br>Courtroom: 2, 4th Floor<br><br>Judge: Chief Judge Claudia Wilken |

### I.  CORPORATE DISCLOSURES

Amici California Correctional Peace Officers Association ("CCPOA") is a California mutual benefit nonprofit corporation operating under Section 501(c)(5) of the Internal Revenue Code. Amici does not have a parent corporation and is not publicly held.

### II.  IDENTITY AND INTEREST OF AMICI CURIAE

Amici CCPOA is the exclusive bargaining representative for California's state correctional officers. Amici represents Bargaining Unit 6, which consists of approximately

31,0000 correctional peace officers and their supervisors employed by the California Department of Corrections and Rehabilitation ("CDCR") in contract negotiations with the state of California. *California Correctional Peace Officers Association v. State of California, et al.* (2006) 142 Cal.App.4th 198. In its representative capacity, amici advocates on matters affecting correctional officer safety. Accordingly, Amici has a direct interest in the terms of the settlement before this Court because any court-ordered changes in Pelican Bay State Prison SHU procedures or any possible settlements will impact the working conditions of not only Pelican Bay's correctional officers, but correctional officers statewide, most significantly in the area of staff safety.

### III.   INTRODUCTION

When this Court denied amici CCPOA's motion to intervene, the Court granted CCPOA leave to file an amicus brief in support of any dispositive motion filed by Defendants. This amicus brief is filed pursuant to that order.

This Court has construed a motion to approve a settlement agreement as a dispositive motion. *See Luo v. Zynga Inc.*, 2013 WL 5814763, (N.D. Cal. Oct. 29, 2013). In *Luo*, this Court considered whether a settlement agreement which was the subject of the motion should remain under seal. In determining whether the agreement should remain sealed, this Court was required to rule on whether the motion was a dispositive motion. Noting the lack of binding authority on the issue, this Court acknowledges that "most district courts considering a motion to seal in connection with a motion to approve settlement of FLSA claims have applied a presumption of public access." (citing *Joo v. Kitchen Table, Inc.*, 763 F.Supp.2d 643, 646–48 (S.D.N.Y.2011). Again, the effect of applying a presumption of public access necessarily means the court construed the motion to approve settlement as a dispositive motion.

This rationale for construing a motion to approve a settlement in a FLSA action as a dispositive motion applies equally well to the class action section 1983 claims alleged in the Second Amended Complaint and Supplemental Complaint. The public has an independent interest in assuring that inmates' constitutional rights are not violated. This is evident in that this case has been fought both in the legal and public relations spheres. As such, this Court should construe the Joint Motion as a dispositive motion.

In addition and as a practical matter, the settlement agreement will dispose of "all claims for relief asserted in the Second Amended Complaint and Supplemental Complaint." ECF No. 424-2. Amici CCPOA maintains that its interests have not been adequately protected. *See United States v. City of Los Angeles, Cal.*, 288 F.3d 391, 400 (*amicus curiae* status insufficient to protect interests). CCPOA has no other opportunity to submit its concerns on behalf of the nearly 31,000 correctional officers who, in addition to the plaintiffs, will be the persons directly affected by settlement of this case. As such, CCPOA should, at the very least, be provided the opportunity to comment pursuant to its *amicus curiae* status.

## IV. ARGUMENT

### A. Affiliation with a Prison Gang Should Still be a Consideration in Threat Potential

The Settlement provides that prison gang validation is no longer to be the sole basis for SHU assignment. Paragraph 18 provides that CDCR shall modify its Step Down Program ("SDP") program so that it is based on the individual accountability of an inmate's Security Threat Group ("STG") behavior and not upon the inmate's validation status or level of STG affiliation. Amici realizes that when CDCR first implemented its SDP, it sought to transition from total reliance upon gang validation towards a fairer behavior-based rationale for security threat group assessment. Amici is concerned, however, that the Settlement discounts prison gang validation, diminishing affiliation or validation as a factor in SHU placement to a point where involvement in a prison gang counts for nothing, ignoring the fact that mere involvement in a prison gang presents a danger in and of itself.

California has long been plagued with the violence of prison gangs. (*Griffin v. Gomez* 741 F.3d 10 (9th Cir. 2014). Prison gangs engage in extortion of other inmates, drug trafficking, assault, and murder within California's prisons. (Ibid.) Prison gang criminal activity is not limited to just California's prisons. Drug trafficking and violence and the prison gangs' control of those activities extend beyond the prison walls and into the streets of the general population. One California court has described the problem thus:

> "Despite the sequestration of prison gang members in the SHU, gang
> violence within the prison's general population persists. The power
> and influence of prison gangs extend to the streets and prison gangs

> often form symbiotic relationships with street gangs. The incarceration of a street gang member in Pelican Bay's general population provides a conduit from the prison gang member housed in the SHU to the street gang living in the general population. Prison gang members in the SHU contact street gang members in the prison's general population through inmate notes, messages relayed through visitors, and mail routed through third parties. In this manner, prison gang members can direct criminal acts through affiliated street gang members in the general population."
> (*In re Morales* (2013) 212 Cal.App.4th 1410, 1416.)

Numerous other courts have remarked on the disruptive influence of prison gangs within and without the prisons. In *U.S. v. Shryock*, the 9th Circuit noted that prison gangs such as the Mexican Mafia project "their influence outside the prison system to control drug distribution." (*United States v. Shryock* 342 F.3d 948 (9th Cir. 2003).

Affiliation with a prison gang by itself is often enough to cause violence within the prison walls. Several studies have shown a positive association between gang affiliation and violent misconduct inside prisons, and inmates with gang affiliations are more likely than non-affiliated inmates to commit misconduct. (Griffin,Hepburn *Gang Affiliation and Inmate Violence*, <u>Criminal Justice and Behavior</u>, Vol.33 No.4, 2006.) Prison gangs are organizations that resist authority and violate rules and compete with other gangs, often violently, for control over contraband and its distribution. Membership or affiliation in a prison gang should not be discounted to the degree that the Agreement allows.

Prison gang members can carry out these criminal activities because they have well-established mechanisms for transmitting information. In its 2010 Annual Report to the Legislature on Organized Crime, the California Attorney General described such inmate communication: "prison gang members frequently communicate with coded messages, small notes known as 'kites' or 'wilas.' These codes or messages are passed through mail and telephone conversations, and during inmate transfers and visitation. Prison gang members will also hold meetings in the exercise yard, leave messages in books in the law library, and use hand signals to pass messages to other incarcerated members." (*Organized Crime in California,* Cal. Attorney General 2010 Annual Report to the Legislature, p. 17.) Often these communications direct and order criminal activity as for example an assault upon another inmate. (*Griffin v. Gomez* 741 F.3d 10 (9th Cir.

2014). Several declarations submitted to this Court by former prison gang members confirm these methods. Javiar Zubiate, a former member of Nuestra Familia, described how he manipulated CDCR's transfer procedures to be transferred to differing cells so that he could communicate with soon-to-parole Nuestra Familia members to transmit orders to gang members in the general population, "getting them ready to go out onto the streets and do things for me and the gang." (Decl. of J. Zubiate Supp. Defs. Opp'n Pls. Mot. Class Certification, p. 5, lns. 6-7.)

California houses prison gang members in the SHU to curtail prison gang members' ability to orchestrate criminal activity. As the *Madrid* Court noted, the unique architecture of the SHU was designed to limit social interaction and to monitor library, shower, and visitor interactions. (*Madrid v. Gomez* 889 F.Supp. 1146 (N.D. Cal. 1995). The declaration of SHU inmates submitted to this Court indicate that the strategy was effective and significantly crimped prison gang leaders from communicating with subordinates. Inmate J. Bryan Elrod described the effectiveness thus:

> "It is my opinion, and the opinion of other Aryan Brotherhood members I know, that the short corridor at Pelican Bay's SHU has effectively killed the Brand. Because most of the Aryan Brotherhood leadership is housed in the short corridor, away from inmates with determinate SHU terms who will soon be released to the general population, it is very difficult for them to influence the mainline inmates anymore, because the lines of communication out there have been cut." Decl. of J. Bryan Elrod Supp. Defs. Opp'n Pls. Mot. Class Certification, p., lns. 17-22.)

Amici is deeply concerned that the proposed settlement opens up the lines of communication between prison gang leaders and their subordinates in the prison general population and in the streets, undoing the control prison officials have finally been able to achieve. For example, the Settlement creates a Restrictive Custody General Population ("RCGP") Housing Unit. This unit is for inmates who have refused to complete the SDP or who have committed repeated STG violations or who demonstrate a security threat that makes release into the general population a security risk. These inmates refuse to give up gang allegiance and continue to behave as gang members. These are the inmates who will have demonstrated by their refusal to participate in the SDP or by their willingness to continue gang activity a commitment to continuing criminal activity. Yet, even with demonstrated commitment to prison gang activity, these RCGP inmates

will be given, at a minimum, greater access to education programs, yard time in small groups, programs and leisure time activity. In short, greater access to social interaction. Currently, the Settlement does not describe with specificity how this RCGP Housing Unit will operate and what security measures will be in place to assure that increased access to other inmates and programs do not provide opportunities for criminal activity. Paragraph 26 of the Settlement indicates that the RCGP will be created as a pilot program, but Paragraph 26 indicates that inmates shall move around the unit without restraints, be given more out of cell time, and receive increased contact visits.

    Amici is also concerned about the reduced time inmates must participate in the SDP. Paragraphs 15 and 16 provide that STG-I and STG-II inmates will be placed into the general population after completing only two years of the STG, provided the inmate does not commit a SHU eligible offense during that period. Even if, however, he does so commit an offense or refuses to participate in the SDP, per paragraph 22, the inmate is retained in the SDP for an additional six months, and then eventually placed in the RCGP. There appears to be very little incentive for resistant inmates to complete the SDP as refusal will eventually get the inmate placed in the RCGP where he will enjoy increased privileges, albeit not as many as he would in a general population. Amici is also concerned that the decreased time spent in the SDP creates incentives for gang leaders to send Trojan horses into the general population. That is, inmates enter into the SDP not with the intent of disavowing criminal activity, but with the intent of keeping their noses clean for two years in order to get into the general population where they will then carry out leaders' orders, orders that will include trafficking drugs and contraband and carrying out assaults, so-call hits on other inmates.

    Amici is also concerned that the Agreement requires sensitive information to be disclosed to Plaintiffs on a semi-annual basis. Paragraph 37 requires that CDCR will be required to provide, among other things, the total number of Rules Violations Reports ("RVR") issued to inmates in the RCGP, STG, and Administrative SHU as well as the total number of RVRs issued for assaults and batteries on staff and other inmates, riots, weapon possession, attempted murder and actual murder. Most alarmingly, CDCR will be required to divulge a random sample of documents

relied upon to validate gang membership and the RVRs supporting those determinations. Amici is concerned that these disclosures have the potential to serve as reports on gang activities to gang leaders. As David Skarbek writes in his study of California prison gangs:

> "[An] organizational challenge facing prison gangs is the need to monitor members' actions. If gang leaders order someone to do a drug deal or assault someone, they need to have a way to find out if the member did it and did it well…this requires methods of generating information about what members do and providing that information to the people who have an incentive to use it productively. For instance, if a member fails to assault someone as ordered, then this information needs to be communicated to someone who can punish the disobedient member and who has an incentive to do so. Prison gangs that operate across different housing units within a facility or in prisons across the state will find this especially difficult." (David Skarbek, *The Social Underworld: How Prison Gangs Govern the American Penal System*, p.110.)

Amici is concerned that much of the information that will be contained in the documentation required by paragraph 37 will be used by gang leaders to determine whether orders and instructions are carried out.

### V.   CONCLUSION

Amici respectfully urges this Court to take into consideration that willingness to affiliate with or join a prison gang indicates a propensity to carry out crimes within the prison and to thwart the rules established by prison officials. Accordingly, gang membership or affiliation should be considered a factor in SHU placement and retention. Amici urges this Court to consider the vague and undefined procedures regarding how the RCGP units will operate and the opportunities that the RCGP units will create for gang leaders to communicate with subordinates. Respectfully submitted,

**CALIFORNIA CORRECTIONAL
PEACE OFFICERS ASSOCIATION
LEGAL DEPARTMENT**

Dated: 1-25-2016

By: _____
Phillip Murray, Staff Counsel