1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Nandor J. Vadas, Magistrate Judge

4

5  ASHKER, et al.,                    )
                                      )
6          Plaintiffs,                )
                                      )
7  vs.                                )   No. C 09-05796-CW
                                      )
8  BROWN, et al.,                     )
                                      )
9          Defendants.                )
   _____)
10

                                San Francisco, California
11                              Thursday, June 2, 2016

12

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13           RECORDING 2:17 - 4:10 = 113 MINUTES

14 APPEARANCES:

15 For Plaintiffs:

                                Siegel & Yee
16                              499 14th Street, Suite 360
                                Oakland, California 94612
17                   BY:  ANNE BUTTERFIELD WEILLS, ESQ.

18                              Legal Services for Prisoners
                                  with Children
19                              1540 Market Street, Suite 490
                                San Francisco, California
20                                94102
                     BY:  CAROL STRICKMAN, ESQ.
21
                                Barco Law Building
22                              3900 Forbes Avenue
                                Pittsburgh, Pennsylvania 15260
23                   BY:  JULES LOBEL, ESQ.

24

25

2

1   <u>APPEARANCES</u>:   (Cont'd.)

2   For Plaintiffs:
                              Bremer Law Group
3                             1700 Seventh Avenue
                              Suite 2100
4                             Seattle, Washington 98101
                        BY:   CARMEN E. BREMER, ESQ.
5
                              Center for Constitutional
6                                Rights
                              666 Broadway, Seventh Floor
7                             New York, New York 10012
                        BY:   ALEXANDRA AZURE WHEELER, ESQ.
8
                        BY:   CAROLE JOAN TRAVIS, ESQ.
9
    For Defendants:
10                            Department of Corrections and
                                 Rehabilitation
11                            Office of Legal Affairs
                              1515 South Street, 314 South
12                            Sacramento, California 95814
                        BY:   PATRICIA J. LEE, ESQ.
13                            JAY C. RUSSELL, ESQ.

14                            Office of the Attorney General
                              455 Golden Gate Avenue
15                            Suite 11000
                              San Francisco, California
16                               94102
                        BY:   ADRIANO HRVATIN, ESQ.
17
    Transcribed by:           Echo Reporting, Inc.
18                            Contracted Court Reporter/
                              Transcriber
19                            echoreporting@yahoo.com

20

21

22

23

24

25

3

1  <u>Thursday, June 2, 2016</u>                           <u>2:17 p.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4        THE CLERK:  Calling civil action C09-5796, Ashker,

5  et al versus Brown, et al.,

6     Counsel, please state your appearances for the record

7  and use the mics.  Thank you.

8        MR. LOBEL:  Jules Lobel for the Plaintiffs.

9        MS. BREMER:  Carmen Bremer for Plaintiffs.

10       MS. STRICKMAN:  Carol Strickman for Plaintiffs.

11       MS. WHEELER:  Azure Wheeler for Plaintiffs.

12       MS. WEILLS:  Anne Weills for Plaintiffs.

13       MS. LEE:  Patricia Lee, CDCR.

14       MR. HRVATIN:  Good afternoon.  Adriano Hrvatin for

15  Defendants.

16       MR. RUSSELL:  Jay Russell for Defendants.

17       THE COURT:  All right.  Good afternoon, everyone.

18  Mr. Russell and Ms. Bremer and I had an opportunity to

19  discuss some scheduling issues in chambers, and I thought it

20  would be appropriate is first I think, Ms. Bremer, you have

21  a motion regarding the Government's response?

22       MS. BREMER:  Yes, your Honor.  We would ask that

23  the Court order the Government's response to Plaintiffs'

24  motion to retain -- to enjoin CDCR from retaining five

25  prisoners in SHU, to order that it be filed under seal.

4

1            THE COURT:  Any objection, Mr. Russell?

2            MR. RUSSELL:  No, your Honor.

3            THE COURT:  Do we know what -- what is the number

4    on that?

5            MR. RUSSELL:  Well, the ECF --

6            THE COURT:  Do you have the ECF number?

7            MR. RUSSELL:  Your Honor, it is 536.

8            THE COURT:  All right.  Pursuant to the previously

9    -- what about the motion, Ms. Bremer, should both be filed

10   under seal?

11           MS. BREMER:  The motion's already under seal, your

12   Honor.

13           THE COURT:  All right.  So 536 will now be filed

14   under seal.

15           MR. HRVATIN:  And, your Honor, if I may, there was

16   a supporting declaration in connection with that filing at

17   537.  To the extent that that declaration -- statements from

18   that declaration are in the motion, both should likely then

19   be filed under seal.

20           THE COURT:  All right.  Any objection, Ms. Bremer?

21           MS. BREMER:  Not at all.  Thank you, Mr. Hrvatin.

22   And also, Mr. Lobel --

23           THE COURT:  Hold on.  Hold on.

24           MS. BREMER:  I'm sorry.

25           THE COURT:  So 536 and 537 will be filed under

5

1  seal pursuant to the protective order.

2      Ms. Bremer?

3          MS. BREMER:  With Plaintiffs' motion, I'm assuming

4  that the motion was filed under seal.  There was a proposed

5  order that we filed that was not under seal, and we would

6  like to also have that sealed if there's no objection.

7          THE COURT:  Rashondra (phonetic), can you seal

8  535?

9          MR. RUSSELL:  Your Honor, the proposed order --

10          THE COURT:  535.

11          MR. RUSSELL:  -- was filed as ECF Number 525.

12          THE COURT:  Correct.  So then we will seal

13  pursuant to the protective order 524, 525, 536 and the

14  declaration 537 -- I mean the declaration at 537.

15      All right.  Thank you.

16      Now, then the next matter the Court will take up is,

17  again, we had some discussions about whether or not the

18  Court should hear these motions or not.  That was done in

19  chambers, and I believe that the final decision was is that

20  I should hear the -- the motions that have been filed and

21  the responses.

22          MR. RUSSELL:  That's correct, your Honor.  The

23  Court had suggested June the 9th as a date.  Unfortunately,

24  I found out that we don't have that available.  The Court

25  also indicated the 8th and the 10th.  Would the Court be

6

1  available on June the 10th at 10:00 a.m.?

2        THE COURT:  Well, how long will this take?

3        MR. LOBEL:  Your Honor, we strongly object.

4        THE COURT:  I understand.  First let me find

5  out --

6        MR. LOBEL:  How long will it take?  I would say it

7  could take an hour at least.

8        THE COURT:  All right.  I have something at 11:45

9  to about 1:00 o'clock on Friday that I can't change.  So

10 would you prefer to do it Friday at, let's say, 1:15?

11       MR. RUSSELL:  That's fine, your Honor.

12       THE COURT:  All right.  Mr. Lobel, your objection?

13       MR. LOBEL:  We could do it if -- if we're going to

14 do it, we could it at that -- at least I could do it at that

15 time.

16       UNIDENTIFIED SPEAKER:  Would that be 4:15?

17       MR. LOBEL:  4:15 East Coast time.

18       UNIDENTIFIED SPEAKER:  That's going to be in

19 court?  You're going to be in the courthouse?

20       MR. LOBEL:  I don't know how we're going to do it,

21 but let me suggest -- let me say for the record -- I don't

22 know if we have a record here -- that we strongly object to

23 this.  We filed a motion.  They filed -- they briefed a

24 response.  We filed two motions.  They briefed the response.

25 The argument was due today.  Ms. Bremer and I flew -- I flew

7

1 a great distance to be here to argue this, and I see
2 absolutely no reason why this can't be argued today.  Nobody
3 has explained to me why it can't be argued today.  The
4 parties have fully briefed it.  They have -- the Defendants
5 had a full opportunity to brief it.  We filed a reply.  We
6 shortened our time for reply.  So I had to stay up all night
7 writing the reply, and I see no reason why we have to delay
8 argument then.  What -- is there any reason?
9          THE COURT:  Well, given what I know, the Court's
10 -- the Court will move the hearing on these motions until
11 1:15, Friday, June 10th to be done by video -- by video
12 conference.
13          MR. LOBEL:  But I would like a reason why we're
14 not hearing it today.
15          THE COURT:  Because I say so.
16          MR. LOBEL:  I think that will suffice.
17          THE COURT:  Thank you.
18     Now, then, is there anything else that we need
19 preliminary discussion?
20          MR. LOBEL:  Well, the question is then how are we
21 going to have that hearing at 1:15 --
22          THE COURT:  I would suggest you contact my
23 courtroom deputy, Ms. Knudson, and she'll assist you in
24 making those arrangements.
25          MR. LOBEL:  She -- she has said that in the past

8

1  that we would -- the only way they can do that is by

2  telephonic hearing.

3          THE COURT:  We can also do it by video.

4          MR. LOBEL:  She has suggested to me that we can't

5  -- that I cannot go down to the Federal District Court in

6  the Western District of Pennsylvania and do it by video,

7  number one, and, number two, 4:15 in the afternoon, the

8  Federal District Court's employees will leave the court.

9          THE COURT:  All right.  Then let's pick another

10  date and time.

11          MR. RUSSELL:  Your Honor, I don't know what the

12  Court's calendar is on the 8th, but we were -- that was also

13  a date that was suggested by the Court.

14          MR. LOBEL:  I'm not available on the 8th.

15          THE COURT:  All right.

16          MR. LOBEL:  I can -- but I --

17          THE COURT:  But we could do it then -- why don't

18  we do this --

19          MR. LOBEL:  We'd have to do it telephonically.

20          THE COURT:  We could do it at 9:00 a.m. on the

21  10th, which would give the parties approximately two hours

22  for the hearing.  Is that sufficient?

23          MR. LOBEL:  I would think it would be.

24          MR. RUSSELL:  That's fine, your Honor.

25          THE COURT:  So then we'll move it to 9:00 a.m.

9

1  Friday, June 10th.  Parties can appear by video.  I know

2  that we have done it in the past.  We have had -- we've had

3  a jury trial where we had a witness in the Federal District

4  Court in was it Greensboro, South Carolina?

5           UNIDENTIFIED SPEAKER:  Yes.

6           THE COURT:  Greensboro, South Carolina appear.  So

7  I'm sure that we can make those arrangements with the

8  Western District of Pennsylvania for you to appear, and that

9  would be in Pittsburgh, Mr. Lobel?

10           MR. LOBEL:  Correct.

11           THE COURT:  All right.  Ms. Bremer, where would

12  you be appearing from?

13           MS. BREMER:  Your Honor, I'd expect I'd be

14  appearing from the Western District of Washington.

15           THE COURT:  All right.  I know that Mr. Hilman

16  (phonetic) and Ms. Van Meter (phonetic) are quite successful

17  in setting up those types of conference calls through the

18  different courts and will make every effort to have the

19  parties appear by -- by video.

20           UNIDENTIFIED SPEAKER:  Your Honor, if we want to,

21  you know, listen as to other counsel, can we -- without

22  being videotaped, can we have access to the conversation?

23           THE COURT:  I'm not sure.  We could do this then

24  in July while I'm here for the week of July 19th.

25           MR. LOBEL:  We'll be prepared to move forward on

10

1  the 10th because we have a number of people in the SHU who

2  we believe ought to be out and should have been out many

3  months ago.

4           THE COURT:  All right.  That will stand over then,

5  as I said before, until 9:00 a.m. on June 10th for hearing

6  on the two motions, one of which is now under seal.

7      All right.  Any other preliminary matters that we need

8  to discuss?

9           MR. RUSSELL:  Not from the Defendants, your Honor.

10          THE COURT:  Ms. Bremer, Mr. Lobel?

11          MS. BREMER:  Not from our clients, your Honor.

12          THE COURT:  All right.  Let's start off with the

13  updates on the general statistics.  How many -- and I know

14  the number is a moving target.  We've done this before, but

15  how many do we -- what's the total universe of inmates in

16  the Corcoran and Pelican Bay SHU, and I believe there are

17  one or two other --

18          UNIDENTIFIED SPEAKER:  Tehachapi.

19          THE COURT:  -- in Tehachapi Institution?

20          MS. LEE:  The number as of yesterday was 1548

21  total as to DICCs to be done.

22          THE COURT:  All right.  Of those, how many have we

23  done the hearings on?

24          MS. LEE:  Fourteen twelve, which is about 91

25  percent.

11

1          THE COURT:  All right.  Let me ask Ms. Bremer and

2  Mr. Lobel, do you disagree with those numbers?

3          MS. BREMER:  Your Honor, you know, honestly we

4  just haven't had an opportunity to crunch the latest set of

5  numbers in view of the other issues on the table, but I have

6  no reason to doubt Ms. Lee's arithmetic.

7          THE COURT:  So about we have about 1400 that have

8  been reviewed, is that correct?

9          MS. LEE:  Correct.

10         THE COURT:  And then the balance need to be

11 reviewed.  Do we have a time table for those?  And, again,

12 I'm not asking within the, you know, quoted hour but at

13 least a general idea about how much longer for the rest of

14 the reviews of the -- of the inmates in question?

15         MS. LEE:  I think the number is 136 left to be

16 done, and we anticipate completion by August.

17         THE COURT:  Okay.  So another two months give or

18 -- two, two and a half?

19         MS. LEE:  I believe so, yeah.

20         THE COURT:  All right.  All right.  Of those 1400

21 that have been reviewed, how many currently have -- actually

22 have, as I said at the last hearing, boots on the ground,

23 numbers of people who are actually in the main line, general

24 population?

25         MS. LEE:  I have that we have 79 left to be

12

1  transferred.  So 79 from 1412, 1330.

2          THE COURT:  So we have approximately 1330 of the

3  class members transferred into --

4          MS. LEE:  The -- where they've been endorsed,

5  correct.

6          THE COURT:  That's actually boots on the ground in

7  whatever yard they're going to be in?

8          MS. LEE:  Yes.

9          THE COURT:  Now, one of the things that -- and

10  we'll touch about this a little bit more in detail, what

11  about the -- the number of inmates who are in the different

12  institutions but remain in one form or another on restricted

13  housing while the warden determines exactly when and how

14  that inmate will be moved into a general population yard?

15  There was issues at the last hearing or at the one before

16  that either Mr. Lobel or Ms. Bremer brought up that they

17  were being held for longer periods of time than they should

18  be.

19          MS. LEE:  We've gone through the -- the list, and

20  where we find for transfer delays, whatever it may be, for

21  instance, on this last month's list that we went through,

22  various issues that we encountered were an inmate had a

23  medical hold which prevented immediate transfer.  Two

24  inmates received RVRs pending adjudication after they were

25  endorsed to different housing, and for the five inmates

13

1  remaining in this last month's issues, their transfers

2  average less than 20 days.

3          THE COURT:  Do we still have -- and I think Ms.

4  Bremer and probably Mr. Lobel will bring this up -- do we

5  still have any inmates who are in sort of that limbo, that

6  have been moved from Pelican Bay, Tehachapi or Corcoran to

7  their institution but they remain in administrative

8  segregation for some issues?

9          MS. LEE:  I don't believe we're having a problem.

10 That could be once off, but I don't believe that we've got

11 any institution that is having an issue with holding them in

12 AdSeg for a period of time.

13         THE COURT:  Well, I mean, I have to say after

14 listening to this, I have no reason to doubt that these

15 numbers aren't accurate, and I think the Department should

16 be congratulated for moving these people out as quickly as

17 possible.  I've said this before, and I'll say it again.

18 The end of this progress looking towards September, we're

19 going to have a group of inmates who are problematic.  We

20 talked about it before, and those are the ones we may have

21 to start talking about on an individual basis.  Maybe as

22 many as 200, 300 of the inmates will simply not be, for one

23 reason or another, ready to move to a fully non-restricted

24 housing situation or at least that would be the Department's

25 contention, and we'll have to look at those inmates

14

1 individually and determine what best works within the

2 framework of the settlement agreement.

3          All right.  So let's see, the reviews -- what

4 about chronos?

5          UNIDENTIFIED SPEAKER:  If I could, your Honor,

6 could I just seek clarification on just one number that Ms.

7 Lee just reported?  I just noticed that in Mr. Russell's E-

8 mail from yesterday on page two, first paragraph below the

9 asterisk, he says that as of today 1412 such inmates have

10 been reviewed, which is the number Ms. Lee just reported,

11 and another 199 inmates remain, and I thought I just heard

12 136.

13          MS. LEE:  You did, and -- and that was -- it was

14 numbers that I did give Mr. Russell, but after I gave him

15 the numbers and he reported them, we backed out some non-

16 STGs out of that 199.  So when I give the number 136 as of

17 yesterday, those are STG ICCs to be completed.

18          UNIDENTIFIED SPEAKER:  Thank you.

19          MS. LEE:  Sure.

20          THE COURT:  All right.  Why don't we -- do both

21 sides have the agenda that Plaintiffs' counsel prepared?

22          MR. RUSSELL:  Yes, your Honor.

23          THE COURT:  All right.  So why don't we go (b) to

24 the ICC reviews.

25          MS. BREMER:  So did your Honor want to address DRB

1   reviews?  That was --

2          THE COURT:  All right.  Why don't we go ahead.  I

3   thought we did, but let's go ahead.

4          MS. BREMER:  Sure.  So I'll stand up, your Honor.

5   So, you know, the issue with respect to DRB reviews just

6   remains, you know, what your Honor's heard from us for

7   several months now, which is that notwithstanding the

8   requirement in the agreement, that the reviews be conducted

9   expeditiously, the rate's actually slowing down of reviews,

10  and the backlog is getting bigger, and so --

11         THE COURT:  How many people are we talking about?

12         MS. BREMER:  Right now the backlog is at -- and

13  this is as of my letter, which is a week old now.

14         THE COURT:  I know.  I'm -- I see the letter here.

15         MS. BREMER:  Yeah.  So, I mean, you know, we're at

16  a backlog of over 100.  We've got 127 prisoners waiting, of

17  which a number have been waiting more than 100 days.

18  Actually, 72 have been waiting for 100 or more days, and

19  that's probably gone up since I wrote the letter, whereas

20  last month I think only seven reviews, six reviews were

21  conducted, and I think the number we have heard initially

22  back in December was that they were going to try to do 25

23  reviews a month.  You know, that obviously hasn't happened

24  at least with respect to STG associated under our agreement.

25  So, you know, we continue to believe that this is not

16

1 meeting the requirement that they be conducted

2 expeditiously.

3          THE COURT:  Ms. Lee, since you -- you're the

4 number cruncher today, how are we doing on the DRBs and

5 what's the backlog?

6          MR. HRVATIN:  Your Honor, if I may, we find -- I

7 think CDCR finds itself, unfortunately, in a -- a limbo

8 here.  The Plaintiffs have already given notice that they

9 intend to file another motion on this particular issue.  We

10 have articulated to the Plaintiffs on several occasions some

11 of the challenges that have -- that the Department has

12 experienced in trying to conduct the DRB reviews as

13 expeditiously as possible.  They continue in those efforts,

14 and it does appear that this is one issue that whatever

15 response the Department provides, the Plaintiffs are

16 dissatisfied with, and so given the -- what appears to be

17 the pending litigation of the matter, we'd be happy to talk

18 with Plaintiffs offline further about where the Department

19 is and what it can do, but I think there is a fundamental

20 concern that no proposed solution, your Honor, will be met

21 with any openness.

22          THE COURT:  Well, there's also a -- a third party

23 that might need to be satisfied as to how the DRB reviews

24 are going, and that's the Court.  So I would like to know

25 the status of the DRBs and where -- where we are with them.

1 Ms. Bremer has brought up some issues that they seem to be

2 slowing down, and I think it's appropriate that the Court

3 hear from CDCR what the pace of the -- of the DRB reviews

4 are and if there are issues that need to be addressed today.

5          MS. LEE:  Were you looking for the -- the numbers?

6          THE COURT:  Yeah, let's give me -- give me the

7 numbers, Ms. Lee.

8          MS. LEE:  They are -- I believe we gave them in

9 the letter to the Court, but I'm happy to go through them.

10 As of this week, there were 184 STG DRB referrals.  Fifty-

11 nine have been completed.  Thirty-one have been endorsed to

12 GP, one to SNY, three retained in admin SHU, two of which

13 from admin SHU have already been transferred to THU, and one

14 is pending.  Two have been endorsed to ASU.  Nineteen have

15 been endorsed to RCGP.  One has been endorsed to THU.  And

16 two were retained pending imminent parole.

17          THE COURT:  So how many do we have left?  What's

18 the backlog?

19          MS. LEE:  About 123 if my math is right.

20          THE COURT:  Okay.

21          MS. LEE:  Hundred and twenty-five.

22          THE COURT:  A hundred and twenty-five.  Let me ask

23 a couple of questions.  How many more from the class do you

24 anticipate being added to that list before we're done?  Can

25 you -- is there any way of sort of having a ballpark number?

1    I don't hold you to the penny.  I hold you to the ballpark.

2            MS. LEE:  I don't think that we can estimate what

3    the number will be.  We anticipate --

4            THE COURT:  Do you anticipate another 100?

5            MR. RUSSELL:  Your Honor, so -- and here's the --

6            THE COURT:  Well, we're down to almost a handful

7    of people left to review overall.

8            MR. RUSSELL:  That's correct.  It appears that the

9    ICCs have reviewed -- have completed 1,140 reviews, and so

10   of those, as Ms. Lee reports, there's been 184 who have been

11   subjected to a further Departmental Review Board.  So it's a

12   little over 10 percent.  So it appears that there are 136

13   remaining class members who are to undergo ICC reviews.  So

14   we can probably expect 15 more, 20 more.

15           THE COURT:  Let's call it 20, 20.

16           MR. RUSSELL:  Twenty.

17           THE COURT:  We're talking about a ballpark of 200

18   people, 200 men that need to go through the Departmental

19   Review Board, right?

20           MR. RUSSELL:  I think that's correct.

21           THE COURT:  And -- seems about right.  What's the

22   hold up in general?

23           MR. HRVATIN:  Your Honor, so our understanding is

24   that there has been -- one of the practical challenges has

25   been the work that goes into preparing the underlying work

1  product for the DRB to review to determine appropriate

2  housing from one inmate to the next.  By way of these

3  inmates, the -- what their issue is is related to safety,

4  the amount of investigation that can be conducted at

5  headquarters or with instructions out to the field to

6  determine the current standing of certain kinds of security

7  concerns, threats to inmate safety, et cetera, that the --

8  that --

9          THE COURT:  Threats to inmate and to -- and/or to

10 others?

11         MR. HRVATIN:  Well, no.  With respect to these DRB

12 -- with respect to these particular referrals to the

13 Departmental Review Board, we're talking about inmates that

14 have -- that have -- that have security concerns themselves,

15 to themselves.

16         THE COURT:  That's what I just said, yeah.  But

17 also can be --

18         MR. HRVATIN:  Well, yeah.  I mean, it's not

19 mutually exclusive.  I mean, someone might have the -- it

20 could go both -- both -- go both ways.

21         THE COURT:  That's what I'm -- that's what I'm

22 getting at.

23         MR. HRVATIN:  So with respect to the

24 investigations that have to be done, your Honor, my

25 understanding is that depending on the length of an inmate's

1 file, the confidential nature of some of the documentation

2 that needs to be further verified, investigated to determine

3 what kind of present risk that inmate presents, that there

4 is just that inherent -- the process takes time, your Honor,

5 and some of these inmates have -- to the extent that some of

6 their concerns are significant, the -- the risk to

7 expediting the process is making a terrible mistake in which

8 an inmate is released to the general population and

9 assaulted or murdered.

10          THE COURT:  I'm not suggesting that -- that

11 anybody take these DRB reviews lightly, but many of these

12 people have been long-term guests of the Department of

13 Corrections, and I would think that much of the information

14 needed for these DRB reviews is already located in their

15 sentences.  So it strikes me that much of the leg work for

16 these types of cases is really a review of the central file

17 to determine where the -- the inmate is and then fashioning

18 that information to make it current.

19          MR. HRVATIN:  I -- I would think that that's

20 accurate, your Honor, but given the length or the size of

21 some of these inmates' files, to the extent that some may

22 have a confidential --

23          THE COURT:  I've seen --

24          MR. HRVATIN:  -- confidential enemies that need to

25 be identified, located, to determine whether and to what

1  extent that inmate still presents a risk, et cetera, that

2  there is a threatened investigatory process here that

3  notwithstanding that sentence can't be -- can't be

4  streamlined in a way given the potential risk or consequence

5  of making a -- a rush decision.

6        THE COURT:  And I'm not asking you to make a rash

7  decision or rush the decision because I understand the

8  consequences, but as Ms. Bremer pointed out in her letter of

9  May 26, the process seems to have been slowed down to some

10  extent, and we do want to keep this on a tight leash that,

11  you know, we have a time line that would allow us to have

12  this more or less resolved by October of this year, and

13  given the slow down in the DRB reviews, my question is is

14  one -- well, two questions, why and how can we pick up the

15  pace a little bit.

16        MR. HRVATIN:  Well, the DRB reviews are being --

17  are conducted at headquarters.  So to the extent that there

18  is any -- to the extent that there is now a smaller number

19  of reviews being done at the four SHU institutions, that

20  doesn't impact -- that doesn't have an impact on the

21  resources available at headquarters by the Departmental

22  Review Board to review these -- to review these cases.  That

23  work is being done at headquarters and then out to the field

24  certainly to gather information, but there isn't -- the

25  deeper -- the smaller number of ICC reviews that are being

1   done and that have a time line of October 2016 to complete

2   doesn't then have a -- the benefit of expediting the reviews

3   at headquarters that from one case to the next present the

4   logistical and administrative challenges in being able to

5   present the information to the decision maker so as to make

6   an informed and reasoned decision from one inmate to the

7   next.

8            THE COURT:  Well, I guess what I'm asking, without

9   compromising the safety and security of the inmates or the

10  institution, how can we move these DRB reviews along a

11  little bit more -- more quickly than they have been in the

12  past?  And I think that's perhaps the issue that Ms. Bremer

13  and Mr. Lobel have raised regarding these DRB reviews.

14           MR. HRVATIN:  And I think, your Honor, we have

15  informed -- I'm sorry, Professor.

16           MR. LOBEL:  Yeah, let me just put this in some

17  statistical overview.  For the last three months, February,

18  March and April, they've done an average of seven per month.

19  They now have about 140 or so eventually left to go in the

20  end, and new people are coming in.  At seven a month, that

21  will take 20 months.  That will extend not just past this

22  October, but it will extend past the lives of the agreement.

23  There has to be some way of speeding this up.

24           THE COURT:  That's what I'm exploring.  Thank you.

25           MR. HRVATIN:  And, your Honor, I think that the

23

1   Department -- there has been -- we've conveyed this to

2   Plaintiffs' counsel, and we may have conveyed it to the

3   Court as well, but over the last -- over the course of the

4   last several months, there has been a change in

5   administration at the Department of Adult Institutions which

6   plays a central role in the performance of these

7   Departmental Review Board hearings.

8       And so to the extent there has been a transition in the

9   staff up at the executive level, my understanding is that

10  the folks who have now come on board and who have gotten up

11  to speed as to where this case is if you ask for a case in

12  particular and its various obligations, are considering

13  alternatives given the Court's guidance that there would be

14  a benefit to finding a way to expedite these reviews and is

15  contemplating different ways -- ways of doing that.  This is

16  clearly on the executive folks' radar, and they have every

17  intention of, as they committed to or as the Department

18  committed to in the settlement agreement, as administrative

19  constraints permit, reviewing these cases, getting the

20  safety issues in play as expeditiously as possible, and I

21  can't tell you right now that I have any authority, your

22  Honor, to tell you exactly what those alternatives may be,

23  but I know that CDCR legal is working very very closely with

24  executive staff to determine how best to meet -- to meet

25  this obligation.

24

1          THE COURT:  I appreciate the efforts of the

2   Department.  I understand that when there's a change in

3   administration, sometimes priorities can be shifted, but the

4   Court expects and no doubt CDCR will abide by its

5   commitments within the terms of the settlement agreement.

6          Having said that, I do agree with Ms. Bremer and Mr.

7   Lobel that the pace has to quicken, and so what I'll request

8   from you, Mr. Hrvatin and from CDCR is at the next review in

9   July, one, actual concrete progress.  I want to see more

10  DRBs done.  And, two, I'd like then to be told, and it

11  should be shared with Plaintiffs' counsel exactly what the

12  process would be to speed up these reviews.

13         So why don't we move on to the next issue.

14         MS. BREMER:  So, relatedly, your Honor, still on

15  the issue of -- of DRBs, the Court may recall that at the

16  March meeting we raised a concern about the language in the

17  DRB chronos and the extent to which it's misleading about

18  the special right to appeal that's carved out basically

19  specifically through our settlement agreement.

20         An outcome of that was that your Honor asked CDCR to

21  reformulate the language of the DRB chrono and to do it in

22  -- your Honor didn't specify any particular language, but

23  you asked that it be done in a way that eliminates anything

24  that's misleading.

25         The language that -- that we -- I guess it's already

1 been adopted.  It's not entirely clear to me, but I think

2 that CDCR has already adopted new language for the DRB

3 chronos, and that language appears in my letter brief on

4 page two.

5          THE COURT:  Right, which was -- it starts "The

6 inmate was."

7          MS. BREMER:  That's right, your Honor.  And your

8 Honor can read it certainly.  I -- you know, our view is

9 that just -- that doesn't eliminate the -- the -- that

10 doesn't eliminate the language that was misleading.  I mean,

11 I don't think that's any less misleading.  We've -- you

12 know, we've got some language there in the second paragraph

13 that we propose that would, we think, make it much more

14 clear that there is this unique right of appeal that

15 prisoners have under the settlement agreement.

16     And I think your Honor can see, I mean, I think really

17 one of the critical distinctions between the two is I think

18 there needs to be a reference specifically to the Ashker

19 agreement --

20          MR. HRVATIN:  Your Honor, every inmate in the

21 population knows about the Ashker settlement agreement.

22          THE COURT:  I understand that.  That was a good

23 detail, sir, but go ahead.

24          MR. HRVATIN:  The Court requested that CDCR try to

25 meet Plaintiffs' request or complaint that the language was

1 misleading.  CDCR did not believe it to be misleading,

2 honored the Court's instruction and provided language that

3 it believes is sufficient to meet the Court's instruction.

4 This is an example from our view -- and there are many on

5 the agenda -- of, notwithstanding what CDCR tries to do,

6 it's -- it's not satisfactory, and so we took the Court's

7 instruction.  CDCR modified the language, and still it's not

8 good enough.

9        THE COURT:  Well, let's take a look at it.  Well,

10 how about splitting the baby a little bit here, which is

11 what I do best.  What about looking at the language in

12 paragraph two of (b), chronos at page two, and simply

13 advising the inmate?  The inmate was advised that during the

14 period of the Ashker monitorship, he has the right to seek

15 advice from class counsel if he disagrees with today's DRB

16 decision which is a decision issued from the highest level

17 of the Classification Review Board within CDCR.  What --

18 take me out of the loop here.  I don't need any extra work.

19        MR. HRVATIN:  Well, but, your Honor, that's

20 exactly what they want to do.  You are that person.  That's

21 what the settlement agreement provides.

22        THE COURT:  I understand, but what I understand is

23 that would focus them to speak with Ashker class counsel

24 regarding the -- the issue.  That would be -- I'm not quite

25 sure what would be wrong with that.

1        MS. BREMER:  Your Honor, that's acceptable to us.

2        MR. HRVATIN:  I would have to, your Honor, confer

3   with the folks at CDCR.  I can tell you that just even

4   revising the language that we proposed was challenging

5   enough.

6        THE COURT:  My suggestion would be -- my

7   suggestion would be that you insert the language "The inmate

8   was advised that during the period of the Ashker monitorship

9   he has the right to seek advice from class counsel if he

10  disagrees with today's DRB decision, which is a decision

11  issued from the highest level of classification review

12  within CDCR.

13     All right.  Why don't you discuss that change, which

14  apparently is acceptable to Plaintiffs' counsel, with your

15  clients, and then get back to Ms. Bremer or Professor Lobel

16  two weeks from today?

17        MR. HRVATIN:  Your Honor, we'd be happy to.  I

18  think we can at least on the initial consultation here

19  provide a little context as to what we'd anticipate to be a

20  challenge.  The -- the chrono or the memorandum that's

21  prepared to document the Departmental Review Board's hearing

22  and its decision is the same document applied statewide.  So

23  this is -- there's no specific or unique chrono or

24  memorandum related to these Ashker related reviews.

25     So to include language that specifically references the

28

1  Ashker monitorship would be misleading to everyone in the

2  State of California who's not an Ashker class member

3  receiving a DRB review.

4          THE COURT:  Then why don't you say the inmate

5  who's an Ashker class member?

6          MR. HRVATIN:  Again, I think we would have to,

7  your Honor, as you suggested, that we'd go back and talk to

8  our clients about it.  I would have to seek to what extent

9  that would be acceptable, and to the extent that your Honor

10 would like us to first confer with Plaintiffs' counsel, we

11 would be happy to do that.

12         THE COURT:  Why don't you go ahead and do that and

13 see if you can resolve it informally.  If not, then maybe

14 the -- Mr. Hrvatin and Ms. Bremer and myself and Professor

15 Lobel, I'm not cutting you out.  It's just if I have fewer

16 people to talk to, it seems to generally work better.  We

17 can have a -- we can have a phone conference to see if we

18 can resolve the issue.  If we can't resolve the issue, then

19 the parties can proceed as they think is appropriate.

20         MR. LOBEL:  Your Honor, I'm -- I'm willing and

21 happy to be cut out of this situation.  So it can Ms. Bremer

22 and Mr. Hrvatin.  I have one suggestion, though.  I don't

23 see why this language can't be inserted on a specific form

24 that would only be given to these DRB reviews that -- that

25 are for CGP safety review concerns.

29

1          MS. BREMER:  In addition to the statewide --

2          THE COURT:  I agree.  I mean, I don't see why they

3   can't be just given to those inmates that are a part of this

4   class.

5          MR. LOBEL:  And we see no reason that they have to

6   change the whole form.  Just give people who are -- the 150

7   people who are left to review, give them a notice that says

8   what your Honor suggested it say, and just give it to them.

9          THE COURT:  Let's talk about it and -- talk to

10  each other no later than two weeks from today.  If it

11  continues to be a problem, we can do it informally by phone,

12  or I'll leave it up to the parties to determine how they

13  want to proceed.

14      All right.  Anything further under subsection (a), Ms.

15  Bremer?

16          MS. BREMER:  No, your Honor.  That's everything

17  under subsection (a).  Thank you.

18          THE COURT:  Mr. Hrvatin?

19          MR. HRVATIN:  No, your Honor.  Thank you.

20          THE COURT:  Subsection (b), ICC reviews?

21          MS. BREMER:  So, once again, here, your Honor, I

22  think the picture overall is very good.  Your Honor did ask

23  to be updated on, you know, how reviews are going at

24  Corcoran because that's the one institution that we flagged

25  a few times.  And that institution does continue to lag a

1  bit behind.  I've got some statistics here in the letter,

2  but without repeating them all, basically if they were to

3  continue on pace, you know, per the statistics that I've

4  cited, they wouldn't complete all of the reviews by the

5  deadline.  So we're simply providing an update to the Court

6  in that regard.

7          MR. HRVATIN:  Your Honor, based on the statistics

8  that we have, there are 54 additional Ashker related STG

9  reviews to complete by October at Corcoran SHU.

10          THE COURT:  Let me ask you this.  As always, these

11  are floating numbers.  It's a moving target.  Do we

12  anticipate more being added to that pile?

13          MR. HRVATIN:  No, I think it would be the -- the

14  floating target is generally to decrease the total amount

15  because of issues with inmates, let's say paroling, before

16  they come up for their Ashker review.  So the numbers, to

17  the extent there was an anticipated or estimate as to the

18  number of reviews, that number has consistently gone down.

19          THE COURT:  Let me ask Ms. Lee, how much do you

20  anticipate being able to get these done -- Department

21  anticipate getting these done before October?

22          MS. LEE:  Well, your Honor, Corcoran so far has

23  done 313 STGs in the approximate seven months that we've

24  been in this.  So with 54 remaining, we're on target for

25  August.

1          THE COURT:  Ms. Bremer?

2          MS. BREMER:  Your Honor, I'm not -- I'm kind of at

3  a loss what to say.  I mean, we continue to be in a position

4  where, you know, our numbers come from the productions, and

5  our review of the most recent productions show that there

6  are 313 reviews remaining to be conducted.  I'm not sure

7  what else to say on it.  And this will come up again in the

8  data and documentation with regard to transfer delays, for

9  instance, and we repeatedly would raise the issue and then

10  the response comes back, "Oh, well, you're wrong.  This guy

11  was transferred.  This guy was transferred.  This guy was

12  transferred," but they're not in the production.  So we have

13  no way to know that unless we're told.

14          THE COURT:  The problem is, as we've talked about

15  before, this is an ongoing process.  The numbers, the -- the

16  statistics lag behind the actual physical activity --

17          MS. BREMER:  Oh, they do.

18          THE COURT:  -- to some extent.

19          MS. BREMER:  Yeah, absolutely.  But I'm talking

20  about, you know, if you go back to a date when something

21  should have -- you know, they'll say, "Oh, well, this guy

22  was transferred three months ago," but it still -- the

23  transfer just was never reported.  It just fell through the

24  cracks, and of course that happens, but, you know, in the

25  aggregate, it results in our numbers being different from

32

1  theirs, and, you know, that is what it is, but, you know,

2  when the response comes back that we shouldn't be monitoring

3  that or we shouldn't be spending time on that or, you know,

4  our numbers are wrong, well, I mean, we can only go based on

5  what we're given.

6          THE COURT:  I'm just trying to figure out what the

7  numbers are, where we are.  But you indicate that Corcoran

8  -- you've indicated, Ms. Lee, that Corcoran has done 313 of

9  these so far?

10         MS. LEE:  Correct, which is approximately 84

11  percent.

12         THE COURT:  And you have a remainder of?

13         MS. LEE:  Fifty-four.

14         THE COURT:  And you don't anticipate that number

15  increasing like the DRB reviews?

16         MS. LEE:  Correct.

17         THE COURT:  Okay.  I'm not going to hold you to it

18  if some other people decide, you know, that you have to put

19  some extra water in the bean pot because more people are

20  coming to dinner, but I -- I anticipate that this number

21  will stay pretty much steady until the end of the Ashker

22  settlement agreement.

23         MS. LEE:  I anticipate this number will go down.

24         THE COURT:  But as an overall number of people

25  that still have to be reviewed at Corcoran 54, it probably

33

1  won't increase?

2          MS. LEE:  That would be my guess.

3          THE COURT:  All right.  So you anticipate that,

4  and I saw your colleague over there nodding that maybe about

5  54, you'll be able to get those done by end of August?

6          MS. LEE:  That's what Corcoran anticipates the

7  completion date.

8          THE COURT:  Do you have any heartburn with that?

9          MS. BREMER:  Certainly, your Honor, if there are

10  truly only 54 left, that's terrific news.  You know, it

11  sounds like it could easily be done by October, and that's

12  great.  I would ask if we could, simply because I'm

13  consternated at the inability to figure out the numbers, if

14  we could ask Ms. Lee to identify to us who those 54 are so

15  we can figure out why we have 313, it would give us comfort.

16          THE COURT:  You have 313.  You believe 313 remain

17  to be done?

18          MS. BREMER:  Yeah.  We -- based on Corcoran -- you

19  know, at the beginning of this whole process, CDCR provided

20  a priority review list for each institution that identified

21  every prisoner who's entitled to an Ashker review and the

22  order in which they're going to largely be seen.

23          THE COURT:  Right.  And we talked about that.

24          MS. BREMER:  So we're basing it -- we are cross-

25  referencing the productions that show who has been reviewed

34

against that priority list, and in doing so, I believe --

and maybe Mr. Hrvatin is about to correct me, and please do

if I'm wrong, but our numbers show that there are 313

remaining to be reviewed.

          MS. LEE:  Your Honor, I think it's a couple of

things.  At the beginning of this process, when we started

the priority list, we had some non-STG guys inadvertently

placed in the priority list, which inflated the numbers,

number one.  Number two, even though we initially placed

them on a priority list at Corcoran, they may have been

moved to another institution who would then be responsible

for their ICC review.  So, for instance, Pelican Bay may be

picking up some ICC reviews.  Sac (phonetic), who has zero

right now, may be picking up some ICC reviews from Corcoran

or Tehachapi.  So that's how the numbers can change.  As you

stated, the minute I state them, they're updated them, but

as I sit here, I've got 373 total ICC's to be done at

Corcoran, and we're 313 done, leaving 54.

          MS. BREMER:  I guess that sounds great.  I hope --

you know, that -- that's terrific, but it would be helpful

if we could understand who those 54 are.

          MS. LEE:  Ms. Strickman is correct, some people

have also -- have also paroled.

          THE COURT:  Don't help the other side.

          MR. RUSSELL:  It doesn't happen very often, your

35

1 Honor.

2          THE COURT:  All right.  Look, I'm not going to

3 order you to do that.  If it becomes a problem I will ask

4 for those numbers, but right now it sounds to me that you've

5 got 60 days -- you think about 60 days to resolve -- maybe

6 90 days to resolve the rest of these in Corcoran.  And you

7 are supplying Ms. Bremer and Professor Lobel with the

8 numbers as they get reviewed, right?

9          MS. LEE:  We are supplying the Plaintiffs as well

10 as this Court with monthly numbers.

11          THE COURT:  Right.  Okay.

12          MS. LEE:  Yes.

13          THE COURT:  So --

14          MS. LEE:  And we anticipate -- like I said,

15 Corcoran anticipates having them completed by the end of

16 August, although they do have until October to complete

17 those.

18          THE COURT:  All right.  Why don't we leave it at

19 that for right now.

20          MR. LOBEL:  I have one more ICC review issue,

21 which is an individual issue, but I want to raise it so as

22 to avoid future debate about it.  And this is -- this

23 presents security concerns.  So I would prefer this part of

24 the record be sealed.

25          THE COURT:  All right.  Why don't we -- can we

36

1 hold off until the end and take all of the issues that may

2 require a sealed courtroom so we don't go in and out because

3 we do have some people in the --

4          MR. LOBEL:  That's fine.

5          THE COURT:  -- in the audience.  If you'll remind

6 me, Professor Lobel, that have some issues that need to be

7 taken at the end.

8          MR. LOBEL:  Okay.

9          THE COURT:  All right.  Then I guess transfer

10 delays?

11          MS. BREMER:  Yes, your Honor.  Slow down, another

12 issue that we've tried to touch on each month, and I believe

13 your Honor had asked for an update on.  Our numbers -- well,

14 I mean, our review of CDCR numbers tells us that as of, you

15 know, a week ago, there were 13 prisoners waiting more than

16 60 days for transfer, seven who've been waiting 90 days, and

17 two who've been waiting more than 150.

18          THE COURT:  Let me -- before -- let me interrupt

19 you for a moment.  When you say waiting for transfer, are

20 you -- are these inmates that are remaining in the SHU

21 facilities either at Pelican Bay, Tehachapi and Corcoran?

22          MS. BREMER:  That's right.

23          THE COURT:  All right.

24          MS. BREMER:  So they've been endorsed by the ICC

25 to go to a general population, and they're waiting for their

37

1  bus ticket.

2         THE COURT:  Okay.  And, you know, I fully suspect

3  these numbers are probably out of date now, and I'm glad to

4  hear updates that I know Patricia is about to provide, and

5  so that will be great.  But, you know, to the extent any of

6  these folks are, in fact -- you know, if it's not an issue

7  of inaccurate numbers but, in fact, some of these bodies are

8  remaining in the SHU, then, you know, our request would be

9  that anybody who's been waiting 60 days or more be

10 transferred within 15.

11        THE COURT:  Let me ask either Mr. Hrvatin or -- or

12 Mr. Russell or Ms. Lee, whoever wants to answer this

13 question, what's the delay?  Are there security issues that

14 are causing this?  Is it just an issue of not getting the

15 numbers out fast enough?  Is it a mixture of these issues?

16        MR. HRVATIN:  Your Honor, if I may, I don't --

17 based on the information that I have here, this is not --

18 this is going to -- periodically, Plaintiffs' counsel comes

19 to CDCR with a list of folks that they believe have not been

20 transferred out of SHU, notwithstanding a --

21        THE COURT:  Endorsement.

22        MR. HRVATIN:  The endorsement, correct.  Thank

23 you.  CDCR investigates those inmates' circumstances, and

24 the majority present no issues at all or to the extent there

25 is an issue, CDCR provides Plaintiffs' counsel with an

38

1  explanation as to why an inmate might still be housed in SHU

2  pending a transfer to general population.  I'm looking at

3  one specific instance here where the inmate had a medical

4  hold.  So there are certain issues with respect to that

5  inmate's case factors that either he can't be transferred to

6  a certain institution or he has to -- he has to be

7  transferred to a particular institution because of his

8  particular medical needs, and so that needs to be --

9          THE COURT:  So he needs to be transferred to CMC

10  or --

11          MR. HRVATIN:  He needs to be -- the appropriate

12  housing placement needs to be made, and so that it adds an

13  additional administrative layer than just transferring the

14  inmate to an institution as close to home as possible.

15          THE COURT:  Well, but, Mr. Hrvatin, you're talking

16  in terms of maybe one or two inmates.  It looks to me like

17  the -- the Plaintiffs are talking about maybe 22, 23 inmates

18  that apparently are somewhat in limbo, and I understand that

19  sometimes you can't just move somebody, but is there a

20  reason that these 20 inmates are being held back?  Is that

21  number incorrect perhaps?  I mean, I --

22          MR. HRVATIN:  My understanding, your Honor, is

23  that that's -- that there is a disconnect.  There's a --

24  they may be identifying these inmates at a certain point in

25  time as not having been transferred out of SHU, and by the

1 time they provide us with that information and we look into

2 the particular issues, it turns out to be a non-issue, just

3 that the inmates have been out on the general population for

4 months in certain circumstances.  So --

5          THE COURT:  Well, let me ask you this.  Then do

6 you or Ms. Lee, do you know how many remaining inmates there

7 are who have been endorsed to transfer and remain sitting in

8 the SHU for more than 30 days?

9          MS. LEE:  Your Honor, I don't have that number in

10 front of me.  I don't think it is a big number.  Like Mr.

11 Hrvatin said, every time we get Plaintiffs' list, we look

12 into it, and it can be a variety of reasons.  It could be

13 that the inmate has actually been transferred, and sometimes

14 the -- the inmates that they reflect in their letter

15 expressing their inquiry to us are actually in the

16 production and they didn't catch them, and sometimes they're

17 not in the production because there's a disconnect on our

18 side.  Sometimes the inmates have paroled.  So we're not

19 reflecting -- although we reflected an ICC endorsed to GP,

20 they actually never transferred to GP because they paroled

21 before they would get transferred.

22          THE COURT:  How many do we have that are in that

23 situation, parolee?

24          MS. LEE:  As I sit here I don't know.

25          THE COURT:  You're a number cruncher there was

40

1  mouthing something to you.

2           MS. LEE:  We believe that most of these particular

3  ones are paroled.

4           THE COURT:  There's an echo in here.

5           UNIDENTIFIED SPEAKER:  Oh, and just to be clear --

6  and I'm trying to do it -- these numbers are cumulative.  So

7  we're talking about 13 people.  Thirteen have been waiting

8  60 days or more.  Seven have been waiting I think -- yeah,

9  so we're talking about 13 total.

10          THE COURT:  Oh, 13, I'm sorry.

11          UNIDENTIFIED SPEAKER:  Yeah.

12          THE COURT:  Well, that makes it a little bit

13  different.  It sounds to me like they're moving along with

14  the people and -- and the representative from CDCR indicates

15  that many of these appear to be paroled inmates.

16          MS. LEE:  And another category, your Honor, is

17  where the inmate receives their RBR after he's been endorsed

18  but before he gets transferred.  That's also a hold on that

19  process.

20          THE COURT:  I understand that.  All right.  It

21  strikes me that this is an issue of lagging numbers, but

22  what I'm concerned about, Ms. Bremer, I'm not concerned but

23  I want to make sure is do you have also in the numbers that

24  are given to you the inmates who paroled and are no longer

25  part of the system -- or no longer part of the Ashker class

41

1  because they're outside of the CDCR?

2       Or let me ask Ms. Lee, is that part of the submission?

3  Do you say, "Well, this guy's no longer an issue because

4  he's out?"

5            MS. LEE:  I don't believe that that reflects in

6  the production.

7            MS. BREMER:  Yeah, they're just reporting, you

8  know, this person was transferred.  And so if the transfer

9  never happens because they were paroled, then they just

10 never get reported.

11      You know, maybe one way to do this, I mean, I think if

12 we were to look at, you know, the worst cases, if you will,

13 and see if we can make some progress there, I mean, there

14 are two guys I'm looking at here who are now over 150 days,

15 and, you know, maybe we could just take those two up right

16 now and see if anybody knows what's going on with them.  But

17 like, you know, I've got on my list George Dugraw (phonetic)

18 and Francisco Catano (phonetic).  They were both seen by the

19 ICC in December and endorsed to GP.

20            MS. LEE:  May I have a minute?

21            THE COURT:  Sure.

22            MS. LEE:  Catano transferred to Folsom GP on May

23 12.

24            MS. BREMER:  Thank you.

25            MS. LEE:  Dugraw had a second ICC review because a

42

1 safety issue arose.

2          THE COURT:  Why don't we take that up in closed

3 session.  Perhaps it would be more appropriate.

4          MS. LEE:  Thank you.

5          THE COURT:  Let me ask you this.  Over the years,

6 some of the inmates in the SHU have had -- and we shouldn't

7 -- because of HIPAA issues, we probably shouldn't talk about

8 specific ones, but, for instance, tuberculosis.  The other

9 one was, of course, hepatitis C, and then a few of them

10 perhaps were also HIV positive, which would -- I would

11 expect probably slows the transfer to the medical facilities

12 because the medical facilities tend to be filled.  Am I

13 bringing up an issue that doesn't need to be brought up or

14 is that one that is part of the problem here?

15          MS. LEE:  That's reflected as in the medical hold.

16          THE COURT:  All right.  And you're not worried

17 about the medical holds?

18          MS. BREMER:  No, that's certainly not the issue

19 that we're raising.

20          THE COURT:  All right.  I just want to make sure

21 that that was -- anything else on transfer delays?

22          MS. BREMER:  No, your Honor.

23          THE COURT:  All right.  Prisoners in AdSeg for

24 gang validation only.

25          MS. BREMER:  So, your Honor, this -- you may

43

1  recall this is an issue that came up last month --

2          THE COURT:  Right.

3          MS. BREMER:  -- on April 25th, and our concern

4  was, you know, there are these folks who are being held

5  essentially I guess by the San Quentin Reception Center.

6  They paroled directly from the SHU previously, and they're

7  reoffenders, and on the basis of their having been paroled

8  from the SHU, which was based not solely on gang validation,

9  the Reception Center is now holding them in AdSeg until they

10 get seen by the ICC.  And Ms. Lee had reported -- kind of

11 clear up who we're talking about here, that these are

12 reoffenders, and in response to that, you know, the Court's

13 observation was, "Okay, I think that, you know, CDCR has met

14 its obligations here."

15     We'd like to reurge the issue, and specifically, you

16 know, we would point the Court to paragraph 13 of the

17 settlement agreement which I think quite clearly does

18 contemplate this situation.  And, your Honor, I can read it

19 to you if you don't have it handy.

20         THE COURT:  I'm sorry.  I didn't bring my copy.

21 Oh, wait.  Yes, I did.  Hold on.  Hold on.  I did bring it.

22 Here it is.

23         MS. BREMER:  This one's a short one.  It's one

24 sentence long.

25         THE COURT:  Let me get there.  Let me read it.  So

44

1 these are former SHU inmates that were paroled to the

2 outside and either picked up a parole violation or they pick

3 up a new charge for which they are given a state prison

4 sentence.  They're sent to either one of the two reception

5 centers, San Quentin and where is the other one?

6          MR. HRVATIN:  Yeah, it depends where you reoffend.

7 They're --

8          THE COURT:  Isn't there one down south?

9          MR. HRVATIN:  Yes, they're located in different

10 parts of the state, your Honor.

11          THE COURT:  Yeah, all right.  And when they come

12 there, their old CDC file -- their old C file is reviewed.

13 It's found that they were previously SHU inmates, and then

14 they are placed in a hold until determination is made as to

15 what the appropriate housing is for them, is that right?

16          MR. HRVATIN:  I think you're there, your Honor.

17 By way of this not being -- paragraph 13, our understanding

18 is that the Department is not in violation of paragraph 13.

19 These inmates who reoffend and come back into the system are

20 not being put into administrative segregation solely because

21 of validation status.  These -- it's the manner in which

22 these inmates have previously been discharged from CDCR

23 custody.  They're maximum custody inmates, and per policy,

24 once -- if they reoffend and come back into the system, gang

25 validated or not, they're assigned to administrative

45

1  segregation primarily because these inmates -- because of

2  their -- of their maximum custody classification, are given

3  an ICC review specifically for a safety type issues that

4  these inmates -- that are uniquely present with those

5  inmates before the appropriate housing determination is

6  made.  So they're not being -- they're not being assigned to

7  administrative segregation upon reoffense solely because of

8  gang validation status.

9          THE COURT:  It may be -- it may be part of the

10 matrix, but from what you've indicated, it's not the sole

11 reason that these inmates are being segregated until housing

12 status can be determined?

13         MR. HRVATIN:  There's no distinction between an

14 inmate -- the policy isn't -- doesn't change based on the

15 inmate's validation status.  So an inmate might be.  He

16 might have a case factor that is validation, but it's not

17 the exclusive or the sole reason that he's assigned to

18 administrative segregation pending that further housing

19 determination.  So all the inmates, based on our

20 understanding of the policy, are treated equally, your

21 Honor.

22         THE COURT:  Do you have any reason to believe that

23 that's not an accurate reflection of what CDCR is doing

24 currently?

25         MS. BREMER:  Well, I think -- I don't, but I think

46

1    the point, your Honor, is that between two similarly

2    situated -- you know, for all other purposes, if a

3    reoffender comes in, everything between reoffender A and B

4    is exactly the same except that A paroled from SHU where he

5    was being held on an indeterminate sentence for gang

6    validation and B paroled from the general population, and my

7    understanding -- correct me if I'm wrong -- is that A and B

8    are treated differently with regard -- when they come into

9    the Reception Center, and the reason is because A was being

10   held in the SHU on an indeterminate sentence for gang

11   validation.  And so, respectfully, I mean, I think --

12              THE COURT:  Well, a lot of times --

13              MS. BREMER:  -- the position the Department is

14   taking is splitting hairs.

15              THE COURT:  But there -- there are a lot of gang

16   members in -- in CDCR.  Not all of them end up in the SHU.

17   Generally, my understanding is that most of the SHU inmates

18   are also held because of violence and other issues, and so

19   what strikes me is that -- that defense counsel is saying,

20   "Yes, they come back into the system.  There was a previous

21   SHU hold.  It's a red flag for us, but we're not holding

22   them for -- for the purpose of gang -- solely because

23   they're gang -- we believe they're gang members but because

24   of security and danger concerns," which I think is a subtle

25   but important difference to understand.

47

1      Am I --

2           MR. HRVATIN:  Thank you, your Honor.  Exactly.

3           MS. BREMER:  Well, so, but --

4           MR. HRVATIN:  That's our understanding of the

5  policy.

6           THE COURT:  Okay.

7           MS. BREMER:  Perhaps a better comparison -- and

8  please correct me if I'm wrong, and maybe I can understand

9  why this isn't the case, but maybe a better comparison is

10 that prisoner A paroled from the SHU where he was serving an

11 indeterminate term for gang validation.  Prisoner B paroled

12 from the SHU also, but he was serving a determinate term

13 because he assaulted another person.  My understanding --

14 and, again, correct me if Im' wrong -- is that the San

15 Quentin Reception Center says "Prisoner A, you're going to

16 AdSeg because you paroled from the SHU for gang validation.

17 Prisoner B, you're not because you paroled from the SHU on a

18 determinate term."

19           THE COURT:  Is that an accurate -- is that

20 accurate?

21           MR. HRVATIN:  My understanding is it's not, your

22 Honor.  If the inmate is released from SHU with a maximum

23 custody classification, he will be assigned to the

24 administrative segregation unit upon reoffense until

25 security issues can be investigated and clarified and some

1 determination made as to where that reoffender can be safely

2 housed.  That's our understanding of the policy.

3          THE COURT:  If that's correct, Ms. Bremer, then I

4 see no reason to involve the Court in any way.  It does not

5 appear to be a breach of paragraph 13 of the -- of the

6 agreement.  If for some reason you find facts that

7 contradict that, then you can bring it either to the -- to

8 the Department directly or you can proceed as appropriate.

9          MS. BREMER:  Thank you, your Honor.

10          THE COURT:  (e) concerns affecting debriefers, why

11 don't we take that in closed session.

12          MS. BREMER:  Sure.  I think that makes sense, your

13 Honor.

14          THE COURT:  All right.  So RCGP privileges, what

15 are we -- where are we with that?

16          MR. HRVATIN:  Your Honor, if I may, from the

17 defense team, our apologies.  CDCR counsel very capably and

18 timely provided a letter to your Honor and Plaintiffs'

19 counsel addressing some of the RCGP privileges or

20 programming issues that the parties have discussed

21 previously with respect to telephone calls and group

22 programming or incentives for more social interaction.  If I

23 may, I do have a -- I brought copies of the letter to

24 provide your Honor and to Plaintiffs' counsel which I think

25 outline where the Department is.  We'd be happy to talk

1 through it.

2          THE COURT:  Yeah, why don't we --

3          MR. HRVATIN:  My apologies in advance for not

4 having gotten this out before the conference.

5          THE COURT:  Well, and what I've said before is I

6 find this very important if this program is going to be

7 successful that -- that as Ms. Bremer and Professor Lobel

8 have indicated, that these programming issues are important

9 to acclimate especially long-term SHU inmates back into sort

10 of, you know, general -- general population.

11     I had the opportunity -- and I think I shared this with

12 the parties last time -- that I spoke to one of the class

13 members who had been in the SHU for almost 30 years, and he

14 said the first thing he did was he took off his shoes and

15 put his feet on the grass.  So, I mean, the -- there are

16 serious psychological impacts that derive from long-term

17 isolation, and I think socializing an inmate before he's --

18 before he's released is of value to everybody.

19          MR. LOBEL:  Your Honor, I just read this very very

20 briefly.  As to the phone calls, it seems, as I E-mailed the

21 Defendants, I think they're doing exactly what the Court

22 suggested they do or ordered them to do.

23     With respect to the programming, this is the first I'm

24 seeing this.  I did have a phone conference with one of the

25 people in -- well, we had phone calls with a number of the

1 people in the RCGP, and from what I could tell, their out of

2 cell programming is two to three hours a week at the most,

3 which seemed pretty limited to me, but maybe the way we

4 should deal with this is -- well, I don't know if we can

5 really discuss this now.  So maybe what we should do is

6 discuss this among the parties and come back to you, unless

7 you're prepared to discuss it now.

8          THE COURT:  Well, I mean, I think the better

9 course would be why don't the parties sit down together in a

10 phone conference, see if they can resolve any continuing

11 education -- any continuing issues.

12      And I will say, Ms. Lee, thank you for the letter.

13 This is something I think it's an enormously important --

14 and I've said it before.  In order for this program to be

15 successful, these guys simply can't be just sort of shoved

16 out the door after being kept in the SHU for 15, 20 years or

17 whatever it is or even five or six years.  I think it's

18 awfully important that we -- that we make sure that this is

19 successful, and I think helping them -- helping them with

20 their transition through these types of programs is

21 extremely valuable.

22      The one thing I wanted to ask, you brought it up before

23 and I wanted to make sure that in part of this there's also

24 some kind of psychological or group counseling.  Do we know

25 if there's -- if there's in all of this -- again, I'm not

51

1 managing the department, Mr. Russell, but I would like to
2 make sure that this is successful, that there is some
3 component here where there is some -- some psychological
4 assistance.

5      And I'll give you an example.  The one inmate -- and,
6 again, this is anecdotal, who I had a chance in another
7 settlement conference who mentioned that the first thing he
8 did was take his shoes off and put his feet on the grass, I
9 said, "So how is it going?"  And he says, "You know, loud
10 noises startle me."  He said, "I'm not used to it."  He
11 says, "I'm not complaining, but I'm not used to the noises.
12 I'm not used to the sound of general clanging of what goes
13 on in prison.  I'm also not used to having a roommate
14 again."

15      So all these kinds of things for many people it
16 probably doesn't -- doesn't affect at all, but, you know, I
17 want to make sure that we don't get somebody flipping out
18 and doing something stupid.

19           MR. RUSSELL:  And what you're describing, your
20 Honor, is kind of a cross-over between this case and the
21 Coleman case.

22           THE COURT:  Right.

23           MR. RUSSELL:  And -- and, as I believe the Court
24 is aware, you know, inmates are examined and reviewed on a
25 regular basis as part of Coleman.  If they've -- if they've

52

1  shown serious psychological problems while in the SHU,

2  they're not supposed to be in there.  They're supposed to be

3  in a psychiatric services unit, a PSU in another prison.

4      I think that that process -- I mean, we can confirm

5  that, but I think that that process continues -- or it will

6  continue into the RCGP where inmates, again, are reviewed

7  and will be placed according not only to their case factors

8  but also according to their medical and mental health case

9  factors under the <u>Coleman</u> -- under the provisions of

10 <u>Coleman</u>.

11         THE COURT:  Mr. Lobel, I think that you and Ms.

12 Bremer and counsel will discuss this off line.

13         MR. LOBEL:  Sure.

14         THE COURT:  All right.  Training of CDCR staff

15 under paragraphs 34 and 35.  How are we doing, Ms. Bremer?

16         MS. BREMER:  I know the Court really wanted to

17 hear from me again today about training.  And so I know I'm

18 sounding like a broken record, but I've got to raise it

19 again.  You know, we have concerns.  As more time passes,

20 we're more concerned.  I just don't see how the obligation

21 under paragraph 34 and 35, and 35 in particular, can be met.

22 To be -- you know, to just refresh everyone's recollection,

23 35 requires that training materials on the implementation of

24 the agreement be provided to Plaintiffs' counsel, that we be

25 able to have input on them, and then that we attend no more

53

1 than six trainings per year during the two-year monitorship,

2 and, I mean, it's pretty clear I think at this point, and I

3 believe Ms. Lee even made this representation last time,

4 that they just have no intention of putting on any trainings

5 under 35 within the one-year time frame and that they

6 thought it would take 12 months or longer.

7      I'm not trying to mischaracterize.  Perhaps I -- I see

8 that Ms. Lee has concerns about how I said that.  In any

9 event, we've been provided no materials under 35.  We have

10 gotten some under 34.  We very much appreciate that.  That

11 goes to confidential information.  We're working through

12 that with -- with counsel, but, you know, it's -- it's June.

13 The first year of monitoring is up in October, and we

14 haven't even been provided materials under 35, much less can

15 I imagine that a training would actually get scheduled such

16 that we could attend six this year.

17        THE COURT:  So how are we doing on the issues

18 raised under paragraph 35?

19        MR. HRVATIN:  Your Honor, in the first instance,

20 similar to a concern that we expressed with an earlier

21 agenda item, we understand that this is a motion that the

22 Court is likely to find on its -- on its calendar, which

23 complicates -- complicates CDCR's --

24        THE COURT:  Maybe if we can resolve it, it doesn't

25 end up as a motion on my calendar.

54

1          MR. HRVATIN:  Well, we would hope, your Honor.
2     But to the extent that we tried to provide -- CDCR's tried
3     to provide some insight and its intent -- its intentions
4     with respect to training, that that, again, has not been met
5     with much reception so far from the Plaintiffs' side.
6          THE COURT:  Do you have training materials
7     prepared?
8          MR. HRVATIN:  Well, it depends, your Honor, on --
9     there -- there have been certain training materials with
10    respect to -- Ms. Bremer's correct, with respect to
11    confidential information that Plaintiffs' counsel --
12         THE COURT:  Let's focus on paragraph 35 for right
13    now.
14         MR. HRVATIN:  Paragraph 35 concerns implementation
15    and management of the policies and procedures --
16         THE COURT:  Shall adequately training all staff
17    responsible for implementing and managing policies and
18    procedures set forth in this agreement.
19         MR. HRVATIN:  So my understanding, your Honor, is
20    that training is being developed currently with respect to
21    paragraph 35 that meets the formality that we believe the
22    Plaintiffs are -- are expecting.  Notwithstanding that,
23    various instructional -- I can advise the Court that CDCR
24    has issued various instructional memoranda.  Mr. Lobel, I
25    remember very early on in the case back in November that the

55

1  -- the matter had settled.  We had several revisions and
2  discussions with respect to an instructional memorandum that
3  went out to the field discussing the Ashker settlement that
4  provides folks on the ground floor with some of the context
5  for where the Department is heading with respect to the
6  settlement agreement.
7          THE COURT:  Have you -- have you supplied that --
8  those -- that documentation to Plaintiffs' counsel?
9          MR. HRVATIN:  At least I know, your Honor, because
10 I was involved in the negotiation of it with Mr. Lobel, I
11 know that at least one has gone out.  And I -- I do not know
12 the status with respect to some of these others.
13         MS. BREMER:  They did provide the document he's
14 talking about, but not on the training, your Honor.  It was
15 an informational memorandum, and certainly we appreciate
16 that.
17         THE COURT:  Well, informational memorandum isn't
18 -- if it goes out to staff, does morph its way into being
19 some form of training I suppose.
20     The question is is -- and I think Mr. Lobel --
21 Professor Lobel and Ms. Bremer have a point.  We've been
22 talking about this now kind of a regular basis, and we
23 haven't seen a training program put together or we
24 anticipate the time to satisfy the -- the requirements under
25 paragraph 35 and -- and, you know, at least get an initial

1  training.  It doesn't have to cover everything but at least

2  be a beginning and one that one of Plaintiffs' counsel can

3  attend as contemplated under the settlement agreement, and

4  I'm focusing here on the language that's in the settlement

5  agreement.

6          MR. HRVATIN:  Your Honor, my understanding -- and

7  we'd have to confirm with -- with the folks at headquarters,

8  but my understanding is that there is a further training

9  being developed under paragraph 35 that we anticipate being

10 rolled out within the next three months.

11         MS. BREMER:  And, presumably, we'll be provided a

12 copy of the materials in advance, and you've built in our

13 opportunity to comment on that in your time line?

14         MR. HRVATIN:  As required under paragraph 35.

15 We'll meet our commitments under --

16         THE COURT:  When do you anticipate actually

17 getting some documentation to counsel?

18         MR. HRVATIN:  I can only -- I can only go so far

19 as information that's provided to me right now, your Honor,

20 and there does not seem to be a time line in place at this

21 time.

22         THE COURT:  Well, Ms. Lee?

23         MS. LEE:  Your Honor, can I address paragraph 34?

24 We have received Plaintiffs' comments on that confidential

25 1030, and in the second part of it or the training is with

57

1  Plaintiff for comment.  So at this point in time, we're

2  waiting for them to complete the confidential 1030.  So

3  that's --

4          THE COURT:  That's -- but that's paragraph 34.

5          MS. LEE:  That is paragraph 34.  I just want to --

6          THE COURT:  Thank you.  I appreciate that, and I

7  don't think that Ms. Bremer was at this juncture raising any

8  issues regarding paragraph 34, but -- and I think we've been

9  talking about paragraph 35.

10          MS. BREMER:  If I could, your Honor, I mean, just

11  to refresh the Court's memory, at the last meeting the Court

12  asked for an update by May 9th, that the Court and

13  Plaintiffs' counsel be updated with a solid time line for

14  providing training materials and scheduling trainings under

15  paragraphs 34 and 35 and that that time line be faster than

16  12 months because last month the representation was made

17  that in the Mitchell case it took 12 months to develop

18  training.  And, you know, I mean, we did get a report, but

19  it only addressed confidential information, and there was

20  nothing whatsoever stated or any time line provided on 35.

21          THE COURT:  That's why I'm talking about it now.

22  So why don't we say this.  Is there a possibility that you

23  could at least get a draft for review of what -- what you

24  anticipate is the training under 35 will look like to

25  Professor Lobel and Ms. Bremer and the other counsel in the

1 matter in let's say 60 days?  Not just your -- the number

2 person is going 90.

3            MS. LEE:  Ninety would be a more realistic --

4            MS. BREMER:  And by then we're already out of the

5 settlement -- the first-year monitoring which, you know, I'm

6 glad to hear that.  Obviously we will be very happy to

7 receive the materials when we can.  I just wanted to make

8 clear we're not suggesting that not getting to go to six

9 this year is somehow not a breach of the settlement

10 agreement.

11            MR. RUSSELL:  Well, your Honor, the agreement does

12 provide that they can go up to six sessions each year, and

13 if there were zero sessions, that would be the number that

14 they could attend.  I mean, I'm sorry if it's not another

15 billing event that can be attended, but, you know, we'll --

16            MS. BREMER:  That's not the idea.

17            THE COURT:  Well, the idea is is that there's a --

18 there's a training implemented and moved forward so that we

19 could implement the settlement agreement.

20            MS. WEILLS:  Your Honor, there's a lot of history

21 in terms of the dispute over that and that the Department

22 did extensive training to guards all throughout the State of

23 California -- we learned this in discovery -- in terms of

24 explaining and implementing how it works, the six-year

25 inactive review.  So there is a very strong precedent for

1  this kind of thing.

2          THE COURT:  And I just -- I just want to move them

3  along, but I want it done right the first time.  Ms. Weills,

4  I don't disagree with you that it's been done in other

5  cases, but I would like to make sure that if it's done, it's

6  done right the first time and we don't have to fight over

7  the -- where the commas are.

8          MS. BREMER:  That's better, your Honor.  Just to

9  be clear, so the -- I guess the suggestion is that they

10 provide us materials within 90 days?

11         THE COURT:  Can you do that?

12         MS. BREMER:  Which, again, would be outside the

13 one-year --

14         THE COURT:  I understand.  Can you do that, 90

15 days provide materials as to what the training is going to

16 look like?

17         MS. LEE:  I can advise DAI that that's the Court's

18 request.  I certainly can't commit DAI to having training in

19 a draft form to Plaintiffs' counsel by that time frame and

20 ensure that we have a good product to give to them.

21         THE COURT:  The agreement was signed a while ago.

22 So it's not as though it's 90 days from today's date.  It's

23 90 days from the date that the agreement -- it's from the

24 time that the agreement was signed, and, you know, I think

25 the Department on this one needs to move a little bit more

60

1 aggressively.  So let's get to Plaintiffs' counsel within 90

2 days a draft proposal as to the training specifically for

3 the Ashker settlement -- implementation of the Ashker

4 settlement.

5         MS. BREMER:  And when you say draft proposal, your

6 Honor, you mean actual training materials or do you mean a

7 time line?

8         THE COURT:  Well, no.  I mean what is it that

9 you're going to do.  I mean, I don't know exactly how they

10 want to put together the training, but, I mean, it should be

11 at least in letter form saying we anticipate doing X, Y, and

12 Z, and hopefully at least the time line when the first of

13 these trainings can be accomplished because we do have to

14 move forward on this.

15         MS. LEE:  I understand that.

16         THE COURT:  I mean, I -- I understand that, you

17 know, you want to make sure you dot all your I's and cross

18 all your T's, and I'm glad the Department is very thorough.

19 But paragraph 45 requires that this training be implemented,

20 and it's been a while now since the settlement agreement has

21 been signed, and was given at least -- it was filed

22 September 1st, 2015.  It's almost a year.  We're pushing on

23 a year to get this done, and I know there are other things

24 the Department has on its mind other than the Ashker

25 settlement, but I have less on my mind, and so I will focus

61

1  on paragraph 35 and expect that it gets done.

2          MS. LEE:  Well, the terms of the Ashker settlement

3  is -- is enough to keep DAI busy.

4          THE COURT:  I understand.

5          MR. LOBEL:  As well as the other things.

6          THE COURT:  All right.  So let's see where we are.

7  What's next?

8          MR. LOBEL:  The individual prisoner issues.  I

9  suggest that we take the review of Frank Aluno (phonetic)

10 for RCPG eligibility and put that at the end.

11         THE COURT:  All right.  Why don't we just take all

12 of that.  But (b) --

13         MR. LOBEL:  No, that's (a), (h)(a).

14         THE COURT:  (h)(1).

15         MS. BREMER:  Your Honor, the numbers are brief are

16 different from the agenda.  My fault.

17         THE COURT:  Oh, all right.

18         MR. LOBEL:  I'm sorry.  I was just reading the

19 brief.

20         THE COURT:  Oh, I'm sorry.

21         MR. LOBEL:  So (h)(2), I don't think this is

22 confidential.  The -- we had agreed -- or you had ordered a

23 month -- I think it was a month and a half ago or two months

24 ago that with respect to the Castellanos (phonetic)

25 confidential file that they submit it in camera to you as

1 was done with the Franco file.  Number one, we want to know

2 if that's been done.  But, secondly, we want to reiterate

3 our objection to this process.

4     The settlement agreement contemplates that confidential

5 information would generally be provided to us, attorneys'

6 eyes only, either in a redacted form or a non-redacted form,

7 and with respect to the Castellanos matter, as we've argued

8 before, I think it raises the same concerns, due process

9 concerns as the Franco matter, and I would like to see it,

10 and I -- I don't see why we shouldn't be able to just get it

11 directly.

12        THE COURT:  Okay.  Well, I'll reiterate what I

13 said before.  Having seen some of these files, much of it is

14 not focused on the issue that's before the Court in terms of

15 Ashker.  A lot of it is collateral information.  They tend

16 to be somewhat a wide net spread, and I don't think it's

17 appropriate for the Court, even with a protective order, to

18 release some of the more sensitive information.

19     And, Professor Lobel, if this is in the form of a

20 motion, it will be denied.  We'll continue with the process

21 we did before if necessary to review the file, and I don't

22 believe -- in camera, and I don't believe I've had an

23 opportunity to see the Castellano file.  Have I?

24        MR. HRVATIN:  Your Honor, you're correct.  And

25 that's -- I take responsibility for that.  I have the

1 documents in my office.  In putting together my papers to

2 come here today -- you asked that the papers be given to you

3 the next time you were in San Francisco, and I had full

4 intentions of doing so, but I left the office this afternoon

5 for today's conference without them.  I'll bring them in --

6          THE COURT:  I leave tomorrow at noon.  So if you

7 could have it over here by noon.

8          MR. HRVATIN:  Absolutely.

9          THE COURT:  I'll review it.  We can review --

10 rather than having to come up, we can either do a video

11 review or a phone review within the next two weeks.  I'll

12 take a look at it.  I will determine what I think is

13 appropriate and then make sure that the Department then

14 delivers to you and Ms. Bremer the redacted versions.

15          MR. LOBEL:  Your Honor, I have no objection to

16 that, as long as I'm going to get it in a redacted form.

17 That's fine.

18          THE COURT:  All right.

19          MR. HRVATIN:  And, your Honor, just as a -- for

20 purposes of context here, I think we have stated this

21 before, but with respect to this particular inmate, Mr.

22 Castellanos has been out on the general population in Solano

23 since March of 2016.  So to the extent that these issues are

24 being raised with your Honor as reasons why inmates have not

25 been transferred from SHU and they're not getting the

1 benefits of the Ashker settlement, the RVR here issue was

2 issued in January of 2015.  We made that presentation to the

3 Court, and we appreciate the Court still would like to see

4 the confidential documents on this particular occasion, but

5 this inmate has been on the general population and not

6 housed in any SHU.  The inmate has received the benefits of

7 the Ashker settlement, but otherwise I'll -- I will -- and

8 my apologies again.  I'll submit those documents to your

9 Honor by noon tomorrow.

10        THE COURT:  Well, let me ask, given the

11 presentation by Mr. Hrvatin and the fact that Mr. Castellano

12 himself is on the main line, in general population, what

13 precisely would be the relevance of the documentation that

14 you're requesting, Professor, specifically as to the

15 implementation of the Ashker settlement agreement?

16        MR. LOBEL:  Thank you, your Honor.  As we've gone

17 over in the past, the appeal decision written by the highest

18 person -- appeal person in CDCR was rendered after the

19 Ashker settlement was already approved by the Court and

20 after it continued.  That appeal decision shows, in our

21 view, a total lack of understanding of how confidential

22 information should be provided to prisoners, and if the --

23 the paragraph 34, which suggests they have to train people,

24 requires them to train people in the use of confidential

25 information in the correct way.  This illustrates the level

1  of training that needs to be undertaken.  That's number one.

2      Number two, in the settlement agreement, they've agreed

3  to follow the rules set forth in 3321 with respect to the

4  use of confidential information.  The Castellanos case, in

5  our view, illustrates that they're not following those

6  rules, and they're not following those rules at a high level

7  subsequent to the Ashker agreement.  And so it doesn't

8  really matter whether Castellanos is in general population

9  or in the SHU.  This shows that there's a problem here which

10  needs to be rectified.

11      THE COURT:  I'll take a look at the documents.

12      All right.  Wellness checks, the big bugaboo and whose

13  -- whose class action manages the wellness checks.

14      MR. LOBEL:  We have a very short report on that,

15  your Honor.  We, as you suggested, wrote a letter to Judge

16  Muehler (phonetic) and Judge Wilkin.  We've received no

17  response.

18      I also met with the special master in <u>Coleman</u>.

19      THE COURT:  Just to let you know, my suggestions

20  generally also end up with the same -- same response.

21      MR. LOBEL:  We -- we were appreciative of your

22  suggestion.  We don't particularly like the result so far,

23  but -- and we didn't mention that it was your suggestion.

24      I met with the special master in Providence and his

25  whole team, and we laid out the problems, and he -- I met

1 with them.  It was an hour and a half, two-hour meeting.

2          THE COURT:  Who was the -- what was the up shot?

3          MR. LOBEL:  The up shot was that they did a review

4 -- they've done a review of the Pelican Bay --

5          THE COURT:  After the one we did?

6          MR. LOBEL:  After the one you did.  They did it

7 just two weeks ago, and I've written to the special -- I

8 wrote to Mr. Loebs (phonetic), the special master, to get a

9 report on that.  Depending on what they found, they may take

10 certain action or they may -- you know, we may take certain

11 action, but we are waiting for that report.

12          THE COURT:  And, again, I'll reiterate, I won't

13 belabor the issue because it's -- it's 10 to 4:00.  It's --

14 I'm loathe to -- to involve -- I understand the problem with

15 the Ashker people saying that it's disruptive, but the --

16 the reason that the wellness checks were implemented was

17 because of the problems of suicides and suicidal ideation in

18 the SHU, and I'm loathe to impose, even if I could, the

19 Ashker settlement on the Coleman people.

20          MS. BOYCE:  Well, let's see what they come up

21 with.

22          THE COURT:  Okay.  Let's see what they have to

23 say.

24     (Pause to confer with the clerk.)

25          MR. LOBEL:  Your Honor, there's one matter that we

67

1  skipped, at least in the brief.

2          MS. BREMER:  It's on the agenda too.

3          MR. LOBEL:  Oh, okay.

4          MS. BREMER:  It's the challenge with respect to

5  the --

6          THE COURT:  Which one, what --

7          MS. BREMER:  -- FERTA, but, you know, that's

8  probably something that should go in the sealed portion at

9  the end, your Honor.

10          THE COURT:  I thought that that was something that

11  we wanted to talk about.  I have it as H(3).  You probably

12  have it as H(c).

13          MS. BREMER:  That's what I have.

14          THE COURT:  Why don't we take that.

15      All right.  Issue concerning data and documentation,

16  documents missing from CDCR's first quarterly production.

17  What are we missing?

18          MS. BREMER:  So, your Honor -- and there was an

19  update that came in on this yesterday that I just haven't,

20  because I've been traveling, had the opportunity to fully

21  absorb.  So my apologies if any of this is no longer the

22  case, but I believe it still is.

23      Under 37(h), this is one of the provisions under which

24  CDCR is to make -- to provide a representative sample of

25  underlying documents, and so some documents were produced,

1  and there was some back and forth as to, you know, whether

2  those were the correct documents.

3      The representation has been made to us that -- by CDCR

4  that, "Yeah, we did, in fact -- this is a representative

5  sample," which is great.  We would just -- we think we're

6  entitled to know, okay, well, how was the representative

7  sample, you know, determined, what was your methodology, did

8  we get -- it's not so much that we're concerned about how

9  did you identify which of the individual people, but we

10 can't even tell necessarily were all documents produced.

11 Like if you chose prisoner A, did you produce everything for

12 A or did you do a -- you know, something for A and something

13 else for B, and we'd just like a little transparency into

14 that.

15     And then there's a related issue, but if you want to

16 take it one at a time, I'll stop here.

17         THE COURT:  Well, let's take it -- so what are you

18 producing, Ms. Lee, in regards to 37(h)?

19         MR. HRVATIN:  Well, your Honor, if I may based on

20 my understanding of it, and Ms. Lee might be able to provide

21 a little further context, I think that there is a -- that

22 there might be a couple of -- sounds like a couple of issues

23 here, the first being Plaintiffs' disagreement as to -- or

24 the parties' disagreement as to what a random sample of the

25 material that should be produced is, that being one issue

1 versus the second issue being substantively what is being

2 provided.

3      I think in the first instance, with respect to what

4 constitutes a random sample, the Plaintiffs have come to us

5 with a proposal that to the extent that any types of

6 documents are to be produced under this particular

7 subsection, if it includes up to 20 cases, that all the

8 underlying information be produced.  That, from our view, is

9 not a random sample.  That's the entirety of the sample.

10 So --

11           THE COURT:  I don't think that that's appropriate

12 to produce everything.

13           MR. HRVATIN:  So, as an example, what the

14 documents that I'm looking at show is that in the first

15 quarter under this particular subdivision there are 10

16 particular cases or inmates identified, and the confidential

17 information provided is as to six, more than half.  So that,

18 I think, would help to give the Court a little context for

19 how we believe a random sample should be interpreted from

20 month to month to the extent that there are any documents to

21 produce.

22           THE COURT:  Well, let me interrupt you for just a

23 moment, Mr. Hrvatin.

24      Ms. Bremer, what are you looking for?

25           MS. BREMER:  Well, so Mr. Hrvatin actually jumped

70

1   to the second issue.  So I haven't even addressed that yet,

2   but let me -- let me back up a bit and give a bit more

3   context around that.  So the settlement agreement addresses

4   this.  Paragraph 39 says that representative samples, as

5   discussed in this paragraph, which actually is a reference

6   back to 37 oddly, shall be of sufficient size to allow a

7   determination regarding CDCR's pattern and practice but

8   shall be reasonable in amount such that compliance with the

9   request is not overly burdensome.

10      The parties met and conferred immediately after --

11   within 10 days of the execution of the settlement agreement

12   and agreed that it made sense in keeping with that paragraph

13   to apply a minimum threshold.  In other words, you know, he

14   didn't say what it would be because we didn't yet know what

15   -- what kind of numbers we'd be looking at, but we did

16   agree, all right, let's wait and see when that first

17   production comes, and then let's -- or before it actually

18   comes, but once you're preparing to produce it, engage with

19   us, and let's figure out what that minimum threshold should

20   be.

21      So that's where our proposal comes from.  We've asked

22   them to make a proposal, and they haven't.  So that's ours

23   is, okay, well, we think the threshold should be 20, but

24   that's kind of a separate issue.  I mean, the issue I was

25   addressing was let's first figure out what we got because we

1  don't understand what we got under 37(h).  We got some

2  documents, and that's great.  But we need to understand,

3  okay, you're telling me that's a representative sample.  Of

4  what?  You know, you reported 10 people.  Did you give us

5  all the documents for half of them?  Did you give us half of

6  the documents for all of them?  Did you give us 20 percent

7  of the -- you know, we just have no idea.  It's a black box.

8          MR. HRVATIN:  My understanding, your Honor, is

9  that CDCR has met its commitments here under paragraph 37(h)

10 of the settlement agreement which requires that a sampling

11 of documents relied upon for the validation determination

12 RVR decision for these inmates be produced, and so that --

13          THE COURT:  But to just do a data dump without any

14 -- without any context is next to useless.  It would make

15 more sense if either Ms. Lee or somebody from CDCR would at

16 least explain to Plaintiffs' counsel "This is what we gave

17 you.  This is how we -- where we pulled it from.  These are

18 -- this is a representative sample of the following."  And

19 that way it's in context, and you can do that either by

20 simply a letter transmission saying on such and such a date

21 we provided you with X versus Z documents, and they

22 represent the following information on the following

23 inmates.

24          MS. BREMER:  That's what we're asking for, your

25 Honor.

1          THE COURT:  Yeah.  I don't think that's

2 unreasonable.

3          MS. BREMER:  On the first issue, which is a

4 looking back issue.

5          MR. HRVATIN:  CDCR will do that, your Honor.

6          THE COURT:  All right.  And just so that we keep

7 things moving, why don't we get a deadline date for that.

8 Three weeks?  Three weeks from today, Plaintiffs' counsel,

9 Ms. Bremer.  And then you can circulate it.  And do it by E-

10 mail.  It's faster than snail mail.  This is the 21st

11 century after all.

12          MS. BREMER:  Thank you, your Honor.  And, you

13 know, the related issue, so that's really I -- I look at it

14 as a looking back issue.

15      The going forward issue that Mr. Hrvatin addressed is

16 for the future quarterly productions -- and we agree, as we

17 said we would back in October, and I have a letter

18 memorializing that to the extent the Court's interested --

19 can we now agree to a threshold, and if they think 20 is too

20 high, then by all means, let's talk about that.  But we just

21 haven't been able to get them to engage with us on that, and

22 we'd like -- we think a minimum threshold should be applied,

23 and if 20 is too high, then let's talk about it.

24      And really I guess I should be a little bit more

25 specific.  It's a three-tier -- it's a three-tiered

73

proposal.  And so the proposal would be -- it's on page six

of my letter -- up to 20 cases they produce all the

documents.  Twenty-one to 50 cases they produce half of the

underlying documents.  Fifty-one and over they produce a

third.  That's our proposal.

MR. HRVATIN:  Your Honor, if I may, how about with

respect to this particular sampling issue that our side will

revisit what we believe to be potentially a more amenable

sample, and we can articulate that proposal to Plaintiffs'

counsel when we address the issue on the breakdown of what

was produced previously, and hopefully we can resolve --

hopefully we can resolve that.

THE COURT:  And if the parties can't resolve this

issue amongst themselves, then set up a phone conference

before the next meeting in order to try to resolve this

issue.  Maybe I think sometimes if we do this on discrete

issues, we might move a little bit faster.

MS. BREMER:  Sure.  Thank you, your Honor.

THE COURT:  All right.

MS. BREMER:  Which takes us to 3(b) on the agenda,

list of prisoners in steps one through four of the old step-

down program.

So we've asked CDCR to provide us this information.

You know, these are folks who presumably are going to have

an ICC review this year, but in the meantime, you know,

1  there may be some requirements with respect to programming

2  privileges, what have you.  We don't really have a way to

3  identify who these folks are.  So we did ask CDCR for the

4  list, and the response was, "Well, you know, you have these

5  names.  They're not, you know, individually called out, but

6  they're in the great grand list that you have of all the

7  prisoners that are covered."

8         THE COURT:  How many people are we talking about?

9         MS. BREMER:  I'm sorry.  Let me back up.  Under

10 the settlement agreement there's now a new step down program

11 that's been revised.  There are still prisoners who are in

12 the old step down program, and we just want to know who they

13 are, and the response was, "Well, you have the names of who

14 they are.  They're in the list of all the class members

15 essentially."  But for us to recreate -- figure out who all

16 those people are, we essentially have to correspond with

17 each of them individually, and presumably CDCR has this

18 list.  I think they would know who was in their old step

19 down program.  So we're just asking them to give it to us

20 and make this a lot easier.

21        THE COURT:  Ms. Lee, how many people are we

22 talking about, and do you have that information segregated?

23        MS. LEE:  As I sit here right now, no.  No, your

24 Honor.  It will take time and divert DAI from everything

25 else they have going on to cull that list.  I can tell you

1  that for the step five that remain at -- that they're in the
2  list.  Some of -- I'm sorry.  Some of the fellows are in
3  step five, but they're still on a list for ICC reviews.  The
4  guys who are in the GP, they have the choice of voluntarily
5  continuing on with step five of their step down program or
6  to leave the program and choose general programming.  So
7  there isn't really an issue here because if you're in GP,
8  it's your choice.  If you're in SHU --
9         THE COURT:  She's not talking about step five.
10 We're only talking about step one through four.
11        MS. BREMER:  Yeah, this is a separate, Tricia.
12 You're talking about something that's on our outstanding
13 items list but it's not on the agenda for today.  We're
14 talking about -- and it's page six of my letter brief --
15 prisoners in steps one through four.
16        MS. LEE:  I don't -- I don't know as I sit here
17 right now, no.  I'm sorry.  I looked up step five which is
18 apparently on a different letter.
19        MS. BREMER:  It's not teed up for the Court.  It's
20 -- we have a protocol that we go through to try to meet and
21 confer, and it's on that.
22        THE COURT:  All right.  Why don't you try to meet
23 and confer with steps one through four too.
24        MS. BREMER:  Well, we have tried to, and they've
25 said no they won't give it to us.

76

1           MS. LEE:  Five is not teed up.  One through

2   four --

3           MS. BREMER:  No, that's right.  Five is not teed

4   up for today's hearing.  Five is on a list of things that

5   we've asked them for and we haven't yet gotten a response,

6   but one through four is teed up for today.  We have met and

7   conferred, and they said no.

8           MS. LEE:  I don't know how many people we're

9   talking about, your Honor.  I don't know.

10          THE COURT:  Are we talking about 10 people who are

11  still in the old program step one through four, 15 people?

12  These numbers are small.

13          MS. LEE:  I don't know.  We provided all of the

14  names in the priority list.  We have not provided a separate

15  list of inmates in the old step down program.  Like I said,

16  it would take time away from everything else DAI has got

17  going on in this --

18          THE COURT:  And whether they're in the old step

19  down program or the new step down program, does it affect

20  the speed at which they are pushed through the sausage

21  grinder?

22          MS. LEE:  I don't think it affects the speed.

23  They're not on the priority list by the old step down

24  program or the new step down program.  They're on the

25  priority list as is set forth --

*Echo Reporting, Inc.*

77

1           THE COURT:  By time in SHU.

2           MS. LEE:  Correct, as is set forth in the

3 agreement.  So that doesn't -- that doesn't change anything.

4           THE COURT:  Okay.

5           MS. BREMER:  Yeah, it's about the programming that

6 they may be required to do under the old step down program

7 now, and we don't even know if this is going on, and that is

8 why we asked.  It could be the old step down program is --

9           THE COURT:  But how does it affect -- how does it

10 affect moving these inmates through this process pursuant to

11 the actual settlement agreement?  Does it affect them one

12 way or another?

13           MS. LEE:  My understanding is it does not.

14           THE COURT:  So what's -- what are you looking for?

15           MS. BREMER:  Again, it's about they're being

16 subjected -- the people -- if they're -- to the extent there

17 even are, and I don't know if there are, folks still in

18 steps one through four of the old step down program --

19           THE COURT:  Right.

20           MS. BREMER:  -- then those people are being

21 administered through whatever the correct terminology would

22 be, this old programming, right.

23           THE COURT:  Okay.

24           MS. BREMER:  They're being required to do the

25 journaling and the workbooks, and we'd like to reach out to

78

1  these people and understand what circumstances they're in.

2          THE COURT:  Okay.

3          MS. BREMER:  We don't even know who they are or if

4  this program even exists anymore.

5          THE COURT:  But you got, what, 120 people left to

6  -- how many people --

7          MS. LEE:  I believe it's 136 as to the ICCs to

8  review.

9          THE COURT:  Oh, and we've got -- it seems to me to

10 be a lot of work, and I'm not quite sure what it is that --

11 it will slow down the process to do this.

12         MS. BREMER:  Yeah, and to be fair, your Honor, I'm

13 not asking that a new list be generated.  We perhaps

14 incorrectly thought that CDCR would know who it placed in

15 its old step down.

16         THE COURT:  Apparently they don't.

17         MS. BREMER:  If they don't know that -- and, I

18 mean, I'm shocked by that, but we're not asking them to

19 generate new information.

20         THE COURT:  And it doesn't --

21         MS. LEE:  If I could --

22         THE COURT:  Hold on just -- it appears to me that

23 it doesn't impact the speed at which these inmates are being

24 processed pursuant to the Ashker agreement, and I think --

25         MS. LEE:  Correct.

1          THE COURT:  -- we need to keep focusing -- I know

2   you have other issues, but we need to keep focusing on the

3   primary issue here, which is to move these inmates out of

4   the Security Housing Unit.  So -- yes, ma'am?

5          UNIDENTIFIED SPEAKER:  Yes.  I have a couple of

6   things.  As I have always understood it, at each prison --

7   at each SHU prison where there's a step down program, it's

8   the step down program coordinator.  There's a person whose

9   job it is to coordinate the program.  It seems like you

10  could find that person and ask them who's currently in the

11  program.  I think the reason it would be interesting and

12  helpful for us is because under our agreement we are looking

13  at new program -- a new step down program.  There's experts

14  who've been appointed.  We've had meetings.  We're going to

15  be having more meetings and creating a new step down

16  program.  It would be helpful for us to be able to talk to

17  people who've been through the old one to see what worked,

18  what didn't, what are your suggestions and so on so that

19  when we continue with that other part of the settlement

20  agreement of looking at the new programming, we'll have

21  something intelligent to say, and so that's -- I have heard

22  also from a letter from a prisoner that despite the fact

23  that maybe someone would have been in step three or step

24  four at Tehachapi, that program has shut down.  I don't know

25  if that's true or not.  You know, it seems useful to know,

1 and also we do know that the experts traveled to Corcoran,

2 the CDCR traveled to Corcoran in the last period to see how

3 that step down program was going.

4        So, again, we would like to know who the prisoners are

5 who are in that program and we can check with them as well.

6 So it's related to the new programming, and it shouldn't be

7 that difficult to get the names.

8             THE COURT:  Well, I'm not quite sure if under the

9 Ashker agreement that the Department is required to keep

10 that particular level of specificity.  It sounds to me that

11 we're having a new step down program anyway, and it would

12 strike me that let's focus on the new step down program.

13 I'm not going to force them, especially given the fact that

14 DAI is -- I'd rather DAI would get the rest of these reviews

15 done.  I'd rather have them focus their -- all of their

16 energy on that because that in the end is the most important

17 part of the Ashker settlement agreement is to get these men

18 out of solitary and onto the main line.

19        So I'm not going to require the Department to give you

20 list of the old step down program.

21        And then the last thing looks to me like Plaintiffs'

22 pending motions, but we have those set for June 10th at 9:00

23 a.m.

24             MR. LOBEL:  We have a number of issues now then

25 that we said were under seal.

81

1          THE COURT:  All right.  The Court will seal the

2     courtroom at this time.  Anybody's who's not a party to the

3     matter will be asked to step outside.

4          (Sealed proceedings omitted.)

5          (Proceedings adjourned at 4:10 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

82

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16            Echo Reporting, Inc., Transcriber

17              Monday, June 13, 2016

18

19

20

21

22

23

24

25