UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nandor J. Vadas, Magistrate Judge

ASHKER, et al., )
)
Plaintiffs, )
)
vs. ) No. C 09-05796-CW
)
BROWN, et al., )
)
Defendants. )
_______________________________)

San Francisco, California
Friday, June 10, 2016

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 9:12 - 10:37/11:03 - 11:32 = 114 MINUTES

APPEARANCES:

For Plaintiffs:

Barco Law Building
3900 Forbes Avenue
Pittsburgh, Pennsylvania 15260
BY: JULES LOBEL, ESQ.

Bremer Law Group
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101
BY: CARMEN E. BREMER, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

APPEARANCES: (Cont'd.)

For Defendants:

Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102
BY: ADRIANO HRVATIN, ESQ.

Department of Corrections and Rehabilitation
Office of Legal Affairs
1515 South Street, 314 South
Sacramento, California 95814
BY: JAY C. RUSSELL, ESQ.
PATRICIA J. LEE, ESQ.
PATRICK R. MCKINNEY, II, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Friday, June 10, 2016 9:12 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

(Portions of proceedings not available.)

MR. LOBEL: Jules Lobel for plaintiffs.

MR. HRVATIN: Good morning. Adriano Hrvatin for defendants.

MR. RUSSELL: Jay Russell for defendants.

THE COURT: All right. Good morning, everyone.

Before we take these motions -- or hear these motions, we printed out this motions report for this case, and I note that there are a lot of open matters and I wanted to go through them and find out what the status is.

Under 441, there's a motion to intervene filed 10/5/2015. Is there -- it appears that this is ripe. Is this before myself or Judge Wilken?

MS. BREMER: Was that filed by CCPOA, your Honor?

THE COURT: I'm just looking at the motions report. I don't have the motions in front of me. So this --

MR. HRVATIN: Your Honor, if I may.

THE COURT: Yes.

MR. HRVATIN: This is Adriano Hrvatin. I know that the docket may reflect a variety of open matters to the extent that inmates have submitted letters in the form of

motions or requesting certain kinds of information that have been docketed as a motion and that haven't necessarily been directed to specifically your Honor or Judge Wilken.

It certainly happened in that regard during the course of the comment period on the settlement but it's happened since then as well, and that might be perhaps one of the sources of confusion.

THE COURT: Mr. Hrvatin, there's no confusion. I'm simply asking what we're doing with open motions on the docket. So as I indicated, the first one is a motion to intervene. It looks like it was filed on 10/5/2015 and it shows that it's ripe 10/27/2015.

Now, I don't know if this is before me or before Judge Wilken. So what I would suggest is that the parties take a look at each one of these, then I go through it, and then give me a joint letter indicating -- it could be an email. It doesn't really make any difference. It can be informal -- just letting me know which of these motions you believe is before me and which of the motions is before Judge Wilken.

The second one, I note, is motion for relief from defendants' retaliation against Ashker class action member Stuart Manago (phonetic) and that was filed January 6th. It's docket number 483. It shows that it is ripe January 28, 2016.

Do the parties have any knowledge of that one?

MS. BREMER: Your Honor, I think that's another one that falls under the category that Mr. Hrvatin mentioned, which is that it was an inmate filing that I believe none of the parties have taken any action on because it wasn't something procedurally I guess that we saw as needing a response. But we'll certainly address that in the letter.

THE COURT: All right. The docket I think needs to be cleaned up a little.

Then we have docket number 513, motion to compel compliance with stipulation, and that's the hearing that is set for today -- one of them.

Then 523, administrative motion to file under seal motion to enjoin and exhibits and declaration in support of.

Now, I asked yesterday whether these motions were before me today and the indication was not. What are we doing with this motion and when is it to be heard? Is it to be heard before me or before Judge Wilken?

MS. BREMER: So, your Honor, any confusion on that is entirely my fault. Ms. Van Meter (phonetic) did send the email asking us to identify the motions before your Honor today, and I identified the two underlying motions, the actual -- the motions that seek relief with respect to the settlement agreement.

What I didn't identify, and I suppose I should have, is that there are also pending administrative motions to seal the papers relating to those motions. And so one of the ones your Honor just identified is a motion to seal our papers concerning the Franco motion. So --

THE COURT: And that's --

MS. BREMER: -- your Honor's correct. That is --

THE COURT: And that's on for today you believe?

MS. BREMER: That's right. The underlying motion is, and so your Honor's correct. Certainly the request would also be addressed to you.

THE COURT: All right. Then motion to enjoin CDCR from continuing to retain five prisoners in the SHU, docket 524. That looks to me like it is on for the 24th.

MS. BREMER: Your Honor, that's the motion that's on for today.

THE COURT: All right. That's on for today.

MS. BREMER: Yes.

THE COURT: I have looked at it.

Then there's a, looks to me, stipulation for proposed order regarding briefing schedule and hearing on plaintiffs' motion to enjoin CDCR from continuing to retain five prisoners in the SHU. And that was filed by Todd Ashker and that's the stipulation.

Is there any objection to the stipulation? I haven't

looked at it. But why don't you tell me what it is briefly.

MS. BREMER: So, your Honor, that was to have it all consolidated to be heard before your Honor on June 2nd so that's now moot since your Honor pushed it to today.

THE COURT: All right. Well, I'll grant the motion just to get it off the docket.

Okay. Then 538, administrative motion to file under seal plaintiffs' reply in support of motion to enjoin CDCR from continuing to retain five prisoners in the SHU.

MS. BREMER: And that one, again, your Honor, is one that I should have identified as on for today because it is to seal the papers for a motion that's on for today.

THE COURT: All right. 16.

All right. 552, administrative motion to file under seal filed by Todd Ashker, et cetera.

MS. BREMER: Your Honor, I don't have the docket in front of me, so I don't see the date on that one, but I believe that is our motion to seal papers associated with a more recent motion to compel that is not on for today. So that one will be resolved later.

THE COURT: All right. Not for 6/10/16.

Then motion to compel compliance with settlement agreement, 553. That looks like it's a hearing set for July 12th.

MS. BREMER: That's correct, your Honor.

THE COURT: All right. So it's 552. The motion to file under seal, 553?

MS. BREMER: That's correct.

THE COURT: All right. So that is -- okay. Then that looks like all of the open motions. Let me see.

I will take a look at 441 and 483 also, but if you could take a quick look at it and let me know to whom you believe that is addressed, it will be helpful.

523, administrative motion to file under seal, motion to enjoin and Exhibits A, B and C to declaration in support thereof.

Any objection on the part of defendants?

MR. HRVATIN: Your Honor, I believe -- and Ms. Bremer can correct me if I'm wrong on this because I don't have the numbers in front of me by way of the -- related to the specific motions. But are those motions related to the initial motion to compel with respect to the recruitment offense?

MS. BREMER: No, these go to the Franco motion, Mr. Hrvatin.

MR. HRVATIN: Okay. Thank you.

And we don't have any objection, your Honor, with respect to that sealing request.

THE COURT: All right. That motion will be granted. The motion to file under seal is granted.

Then let me see, what else do we have.

That looks like everything then. I think we -- what's left is -- oh, then there's also an administrative motion to file under seal plaintiffs' reply in support of motion to enjoin CDCR from continuing to retain five prisoners in the SHU. That's also on today.

Any objection?

MR. HRVATIN: No, your Honor.

THE COURT: That motion to file under seal will be granted. Let me just double-check here.

We're having a little HVAC problems in the courthouse. It's either freezing cold or boiling hot. And this morning, I feel like I'm in Ixtapa. So one of my court clerks is going to try to reduce the --

All right. Let me just double-check here. So what we have left then are 513 and 524 for today. Then the administrative motion to file under seal in 552 relates to 553.

While I have the parties here, let's talk about 552 very briefly, the administrative motion to file under seal, the motion to compel compliance with the settlement agreement.

Any objection to that?

MR. HRVATIN: To the under seal request, your Honor?

THE COURT: Yes.

MR. HRVATIN: No.

THE COURT: All right. Then 552 will also be granted, and that cleans up the docket as far as I can see.

Lynn, do you agree? Do you want to take a quick look at this just to make sure?

All right. Why don't we then take 513. Let me get my -- that's 513. I have it here.

Okay. Ms. Bremer, Mr. Lobel, it's your motion.

MS. BREMER: Thank you, your Honor. I'll address this one, if I may.

513 is our motion to enforce CDCR's compliance with CDCR's stipulation that was reached at the December 28th meeting.

And if your Honor will permit, I'll give just a little bit of background on how we got here. I think it will be instructive.

So back when the parties first met to discuss negotiations for the settlement agreement, then secretary Beard said that CDCR was intending to narrow the universe of SHU eligible offenses. And so they were the first to provide a draft of the SHU assessment chart, which is Attachment B to the settlement agreement.

And we saw when they sent it to us that it had a new SHU eligible offense, which is recruitment. We said, okay,

we'll agree to that but only if it's behavior based, consistent with every other provision in the settlement agreement.

So, in other words, in order for a SHU term to be assessed, the recruitment has to be to actually commit a SHU eligible offense, not merely to affiliate with a gang.

Secretary Beard agreed. He sent over the language that's currently in the settlement agreement under SHU eligible offense 9B.

And until after the parties signed the agreement, we didn't recognize that there was any dispute because in our view the language can and properly should be interpreted to require that there actually be recruitment to commit a SHU eligible offense.

Only after the agreement was signed did CDCR --

THE COURT: I'm sorry. Counsel, I don't mean to interrupt, but the SHU eligible offenses are contained in the settlement agreement, right?

MS. BREMER: That's correct, your Honor. I would direct you to --

THE COURT: You said 9D but maybe I misheard you.

MS. BREMER: I'm sorry?

THE COURT: You said 9D but that's --

MS. BREMER: 9B, as in boy, your Honor.

THE COURT: But --

MS. BREMER: So if you go to -- I don't know if you have the docket version of it but it's --

THE COURT: Yeah, I have 424-2.

MS. BREMER: Yeah, it's actually in 424-3. We had to file it in two documents because it's very long.

THE COURT: Let me see if I have -- yeah, all right. So it's the attachment.

MS. BREMER: That's right, your Honor. And it's at page five of 424-3.

THE COURT: All right. 9 --

MS. BREMER: Towards the bottom of the page, your Honor will see the 9 STG disruptive behavior. And we're talking about B, "Recruiting inmates to become an STG affiliate or to take part in STG activities. That is a behavior listed in the SHU assessment chart."

So that language that your Honor.

THE COURT: Hold on, hold on, hold on.

MS. BREMER: Sure.

THE COURT: "Recruiting inmates to become an STG affiliate or to take part in STG activities. That is a behavior listed in the SHU assessment chart."

And do we have the SHU assessment chart with us?

MS. BREMER: We do. This is the SHU assessment chart, your Honor. So, in other words, to commit any of these other behaviors that are identified in this chart.

THE COURT: Give me a second here. "Recruiting inmates to become an STG affiliate or to take part in STG activities. That is a behavior listed in the SHU assessment chart."

All right. Go ahead.

MS. BREMER: So, your Honor, our interpretation -- this language that your Honor has in front of you is precisely what came back from Secretary Beard in response to our assertion that we will only agree to having a recruitment offense if it requires actual behavior, right? If it requires that there actually be recruitment to commit a SHU eligible offense.

So this is the language that comes back. We interpret this language as being perfectly consistent with our understanding in that the language "That is a behavior listed in the shoe assessment chart" modifies both portions of 9B. In other words, no dice unless there is behavior listed in the shoe assessment chart that is committed.

Well, it wasn't until after the agreement was signed that we realized there was actually a dispute and that CDCR's position is that, no, you can be assessed a SHU term merely for recruiting someone to affiliate with a gang, irrespective of whether they actually commit a SHU offense or if they're even recruiting them to commit a SHU Offense.

So after a lot of meet and confer, we raised this issue

to the Court at the December 28th monitoring meeting which was the first meeting that was held under paragraph 49.

We walked through the negotiation history with your Honor. And your Honor agreed that it wouldn't make sense for 9B to assess a SHU term merely for recruitment that's status based and not behavior based.

And so your Honor urged CDCR at that meeting to clarify the language and to do so by adding some sort of coercive component.

CDCR agreed at that meeting that they would do that.

We ended up with agreed minutes to that meeting six weeks later, and the reason it was six weeks later is because after the January meeting, your Honor implemented the protocol of doing agreed minutes. So we did that.

You know, CDCR had some revisions to our minutes. We were able to work it all out, and we ultimately submitted agreed minutes to the Court six weeks after that meeting that memorialized CDCR's agreement that they would do precisely that.

The due date was at the end of March. And when the due date rolled around, they said no, we're not going to do it. We can't. You know, we've looked at the evidence and we've spoken with experts, and we feel that we can't do this.

So the motion, your Honor, is simple. It simply asks the Court to enforce the agreement that was made. And I

know there was some discussion at the June 2nd hearing, your Honor, when we met in chambers as to whether the Court has authority to do this.

We respectfully submit that your Honor's authority to do this is clearly delineated in paragraph 53 of the settlement. Paragraph 53 deals with situations where plaintiffs contend that CDCR has not substantially complied with a term of the agreement that does not amount to current ongoing systemic violations of the Constitution.

Here, there's a paragraph, 49, in the agreement that explicitly provides for these monthly meetings. Certainly, paragraph 49 contemplates that over the course of implementation of the agreement, the parties may, with the Court's assistance, reach certain agreements to aid in implementation. And that's exactly what happened here.

Now, the only ground that defendants have provided for refusing to comply with their stipulation and their agreement with the Court is that it came in this informal procedure through paragraph 49.

So, your Honor, our position is that by refusing to comply with an agreement they made solely because it came out of one of these meetings under paragraph 49 is itself a violation of paragraph 49 and therefore actionable under 53.

In the alternative, your Honor, we would submit that to the extent the Court doesn't feel that paragraph 53 provides

the necessary authority, then certainly your Honor has inherent authority to enforce the integrity of its own proceedings. When agreements are reached in open court before your Honor, certainly the parties aren't free to then just ignore those agreements down the road, which is exactly what happened here.

So the Court's job is simple. CDCR's job here is actually quite simple too. And we had discussions with their counsel after we filed the motion where both parties agreed -- and I think to this day agree that this dispute would be resolved, your Honor -- and I'll point you again to the actual language in 9B -- simply by removing the comma after the word "affiliate" and the word "or."

So, in other words, it would read: "Recruiting inmates to become an STG affiliate to take part in STG activities. That is a behavior listed in the SHU assessment chart."

And so by eliminating that comma and that "or," the meaning that both parties intended for that provision would be clarified and clear.

So, your Honor, CDCR's job is simple as well. We're simply asking them to remove that comma and that "or," and we see no reason at all why they can't do that.

Indeed, recruitment wasn't even a SHU offense.

THE COURT: Well, wait a minute, wait a minute, wait a minute.

My function here is to enforce -- and I know the CDCR's and AG's office may have somewhat of a different take on this, Ms. Bremer. But my position as magistrate judge assigned to assist the parties in implementing this agreement is, I believe also under 53, to resolve disputes as to interpretation, not change the language of an agreement that was signed off by both parties.

That's a function that is not the Court's. And I'm a little concerned when I look at B and it says, "Recruiting inmates to become an STG affiliate," comma, "or to take part in ... activities," et cetera, et cetera.

It looks to me like the clear reading of that paragraph is that there are two prongs by which you can find STG disruptive behavior under B.

MS. BREMER: But, your Honor, as we submitted to the Court back in December, you have to look at this -- and the law recognizes this. Often ambiguities are not clear on the face of the language of an agreement --

THE COURT: What's ambiguous about --

MS. BREMER: -- until it's understood in context.

THE COURT: What's ambiguous about 9B?

MS. BREMER: Well, when your Honor -- if you were look back at the negotiation discussions and the writings between Secretary Beard and Professor Lobel, it makes perfectly clear that the parties understood that this

language was going to implement a behavior based rather than a status based recruitment offense.

And, your Honor, I would direct you to our December 21st letter brief which I believe was Exhibit A to the motion. It contains Secretary Beard's email discussion with Professor Lobel about the ...

THE COURT: All right.

MS. BREMER: And specifically Professor Lobel sent the -- and this is on page 11 of the letter brief. Professor Lobel sent an email to Secretary Beard. Page 11, your Honor, of our December 21st letter brief.

THE COURT: Let me ask counsel.

Page 21 of the settlement agreement, Roman numeral nine, "Construction of agreement," 59:

"This agreement reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. Any modification to the terms of this agreement must be in writing and signed by a CDCR representative and attorneys for plaintiffs and defendants to be effective or enforceable."

Most settlement --

MS. BREMER: That's correct, your Honor.

THE COURT: Most settlement agreements that are signed by the parties have this clause which then simply says that you may have had other discussions prior to the signing of this document, but what is contained in the four corners of this document is the agreement of the parties.

MS. BREMER: That's right, your Honor. And our point is that this is the agreement of the parties and that it is, while perhaps not apparent on its face from reading simply 9B by itself, if you read it in the context of the rest of the agreement, and certainly if you look to the negotiation history, it's clear that the language of the agreement actually is not entirely unambiguous on its face and that the parties must have intended this language to mean, again, that the phrase -- let me get the language in front of me. That the phrase "That is a behavior listed in the SHU assessment chart" must modify both "recruiting inmates to become an STG affiliate" and "taking part in STG activities."

And so we're not asking the Court to modify the agreement. I mean at this point we are only asking the Court to enforce CDCR's agreement that it made in court. And so really, respectfully, your Honor, we believe that the issue is that simple. The Court need only look to whether the agreement was reached, which it was, and enforce that agreement.

And I'm simply pointing out that to enforce that agreement, both parties acknowledge simply would require removing the comma and the "or" to make perfectly clear what both parties intended this language to mean.

THE COURT: Anything further, Ms. Bremer?

MS. BREMER: Nothing further on this motion, your Honor.

THE COURT: All right. Mr. Hrvatin, Mr. Russell?

MR. HRVATIN: Your Honor, thank you. Our position is that the motion should be denied. The plaintiffs have brought this motion to invoke the Court's jurisdiction on a breach of contract, on a breach of the agreement. That's what has to be as a threshold matter established for this Court's jurisdiction under paragraph 53 to be invoked such that the Court could order substantial compliance with a term of the settlement agreement.

The plaintiffs have not pointed to any language on the four corners of this settlement agreement that defendants have breached. There has been no, under the terms of the settlement agreement, modification recognized by the parties as the way to modify terms to the settlement that defendants have breached.

THE COURT: Well, let me ask you this --

MR. HRVATIN: So from our perspective --

THE COURT: Mr. Hrvatin, let me ask you this. I

think one of Ms. Bremer's arguments is that 9B as written conflicts with the body of the settlement agreement, if I'm not mistaken. And if so, then how should the Court interpret 9B, specifically the first line, "Recruiting inmates to become an STG affiliate" with the settlement agreement as a whole, the four corners of the settlement agreement?

This Court will not specifically because there's, as I indicated in paragraph 21, the language that states that any other agreements, written or oral, do not affect this agreement and that the language contained in the four corners of the settlement agreement is the settlement agreement itself. There's nothing else for the Court to look at.

Is there a conflict between the settlement agreement as written and 9B, "Recruiting inmates to become an STG affiliate," comma, "or to take part," et cetera, et cetera.

MR. HRVATIN: Your Honor, another fundamental weakness in plaintiffs' motion is that there is no evidence at all that the Department has interpreted that particular offense in a way to be inconsistent with any other term of the settlement agreement.

The plaintiffs' burden has an evidentiary component when it's alleging a breach of the agreement. We don't believe there's a breach in the first instance, and they

have pointed to no evidence to suggest that CDCR since this agreement has been signed has interpreted that offense in a way inconsistent with the remainder of the settlement agreement and applied it in a way in violation of any individual inmate's rights or applied it in a systemic manner that would violate the Constitution and this agreement.

MS. BREMER: Could I be heard on that, your Honor?

THE COURT: Yes, please.

MS. BREMER: So first of all, again, I think it's critical to remember what this motion is seeking, which there is ample evidence of a breach of the agreement to clarify the language of 9B. That agreement came out of the December 28th meeting. Clearly, that breach has been established. They said they won't do it.

But even if we want to step back and essentially delve back into the merits of the agreement in the first place --

THE COURT: No, no, no. Nobody's asking to do that. It's very simple. You have an addendum to this agreement that reads "STG disruptive behavior. Recruiting inmates to become an STG affiliate," comma, or in the alternative, "or to take part in STG activities. That is a behavior listed in the SHU assessment chart."

The fact of the matter is unless this directly contradicts a written portion of the settlement agreement,

it is incorporated into the settlement agreement and it appears to me that both parties must live with the terms of the settlement agreement as written unless each side agrees to stipulate to a change and signs off on that change.

MS. BREMER: But, your Honor, again, paragraph 49 explicitly requires these meetings to discuss issues and concerns regarding implementation of the agreement. This dispute --

THE COURT: Fine. You have the meetings. And parties can disagree. They don't have to agree.

MS. BREMER: That's right, your Honor, but they did agree. And they agreed specifically for the purpose of clarifying what is an ambiguity in the written terms of the agreement. And they agreed on the record, they agreed subsequently in writing that that is precisely what they will do.

And so I believe it's squarely before your Honor and it squarely falls under paragraph 53 for they have breached the obligation under paragraph 49 by rejecting an agreement that they made and doing it solely on the grounds that it came out of one of these monitoring meetings.

That's the only reason the defendants have given your Honor or the core plaintiffs for why they feel that they can ignore this agreement.

MR. HRVATIN: I --

THE COURT: Hold on. Just give me a second.

I did go through most of this.

MR. LOBEL: Your Honor, can I speak for a minute?

THE COURT: Just let me -- I am looking at the minutes of December 28, 2015 status conference. And I'm looking here under -- it seems to me to be subsection D:

> "Interpretation of SHU eligible offenses under 9B. The parties agreed that CDCR will formulate by no later than March 28, 2016 a policy concerning the recruitment SHU eligible offense under 9B that incorporates a coercive element."

And --

MR. LOBEL: And --

THE COURT: If I could. Thank you, Counsel.

So, Ms. Bremer, what you're asking the Court to do is to enforce this informal request that has not been signed by both parties but agreed to. But the clear terms of paragraph 59 states:

> "This agreement reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. Any modification to the terms of this agreement must be in

writing and signed by a CDCR representative and attorneys for plaintiffs and defendants to be effective or enforceable."

So why don't you proceed.

MS. BREMER: So two points, your Honor.

Again, first of all, our position is not that this is a modification. It's a clarification. And I think that's an important distinction.

But secondly, paragraph 49 is a written provision that was incorporated in the settlement agreement. And, frankly, your Honor, paragraph 49 is utterly meaningless if agreements reached and memorialized in writing that come out of those meetings are utterly without any teeth.

If the Court has no authority to enforce them and the parties are utterly free to walk away from those agreements and disregard them, then 49 is utterly meaningless.

And, your Honor, that is ample reason to enforce this agreement that your Honor just read under paragraph 53.

THE COURT: All right. Mr. Lobel --

MR. HRVATIN: Your Honor, if I may.

THE COURT: Just hold on for a moment. Mr. Lobel wanted to add something.

MR. LOBEL: I'll pass.

THE COURT: Mr. Hrvatin.

MR. HRVATIN: Your Honor, with respect to paragraph 49, plaintiffs' counsel is reading a lot of language into paragraph 49 that appears nowhere in that paragraph with respect to what appears to be an expectation that the informal status meetings that the parties agree to would result in enforceable side agreements that --

THE COURT: Then, Mr. Hrvatin, why did you agree to it?

MR. HRVATIN: We agreed, your Honor, to what's in paragraph 49.

THE COURT: No. Why did you agree --

MR. HRVATIN: The parties agreed --

THE COURT: No. Why did you agree --

> "Interpretation of SHU eligible offenses 9B. The parties agreed that CDCR will formulate by no later than March 28, 2016 a policy concerning the recruitment SHU eligible offense under 9B that incorporates a coercive element."

Why did you agree to that?

MR. HRVATIN: I believe that our side, your Honor, agreed to look at whether that language -- in the course of meeting and conferring with plaintiffs' counsel, attending the status conference with your Honor, in an attempt to

resolve or address the various complaints that plaintiffs have brought, my recollection is that our side agreed to look at that language to see whether there could be any -- a modification that the parties could otherwise agree to.

THE COURT: But that's not what it says.

MR. HRVATIN: And the Department when it --

THE COURT: That's not what it says. Everybody's -- what's troubling here is everybody is talking about everything except the plain meaning of the language incorporated either in the settlement agreement or in the minutes of December 28, 2015 status conference.

MR. HRVATIN: Your Honor, if I may --

THE COURT: Does -- does this memorandum between the parties -- which states:

> "Interpretation of SHU eligible offenses 9B. The parties agreed that CDCR will formulate by no later than March 28, 2016 a policy concerning the recruitment SHU eligible offense under 9B that incorporates a coercive element."

Certainly under paragraph 53 of the settlement agreement it's appropriate for me to hear this motion, or Judge Wilken if Judge Wilken wishes to hear it rather than myself.

But the plain meaning of the plea -- or the settlement agreement is that disputes such as this would be brought before me for determination.

My question is, under basic rules of contract law, which nobody seems to have argued about, does this statement "Interpretation of SHU eligible offenses" constitute a modification of the settlement agreement as is stated in paragraph 59?

> "This agreement shall be governed and construed according to California laws. The parties waive any common law or statutory rule of construction that ambiguity should be construed against the drafter of this agreement and agree that the language in all parts of this agreement shall in all cases be construed as a whole according to its fair meaning. The agreement is valid and binding and faithfully kept, observed, and performed, enforceable by and against the parties, their successors and assigns. The obligations governed by this agreement are severable. The waiver by one party of any provision or breach of this

agreement shall not be deemed a waiver of any other provisions or breach of this agreement."

Looking at paragraphs 59 through 64, construction of the agreement, which is what the parties signed, does this oral modification of 9B constitute a binding agreement on the part of CDCR to change the language as Ms. Bremer has indicated?

I don't know what else there is to argue about. You have agreement --

MR. HRVATIN: Your Honor, our position is no.

THE COURT: You have what appears to be a modification here from the December 28, 2015 hearing. Is it binding?

MR. HRVATIN: Not under the terms of the settlement agreement, your Honor.

THE COURT: Well --

MR. HRVATIN: And particularly paragraph 59.

THE COURT: Well, then, why don't you argue that. What's the Government's position?

MR. HRVATIN: Your Honor, that -- the -- our view, your Honor, is that the plaintiffs have not established a breach of the settlement agreement. There is a way under the settlement agreement to modify the terms of the settlement agreement.

Ms. Bremer just indicated that the plaintiffs are not seeking to modify the agreement. They're seeking to clarify it.

THE COURT: Well, that -- please.

MR. HRVATIN: Your Honor, I don't understand. The settlement agreement provides a mechanism for modifying the terms of the settlement agreement. The December 28 minutes which took an extraordinary amount of times to negotiate, given the manner in which they were drafted. Multiple drafts of those minutes, your Honor, were exchanged, because the parties could not agree on the terminology used from one issue to the next. This one --

THE COURT: So what you're saying is that the language that I've just read was a hard-fought agreement between the parties.

MR. HRVATIN: Your Honor, I do not think at all.

THE COURT: An arms length hard-fought agreement between the parties.

MR. HRVATIN: No, your Honor.

THE COURT: Okay.

MR. HRVATIN: They were not -- the minutes that have been generated out of these meetings have been pieces of advocacy, essentially, from the plaintiffs' side. That's why that process has fallen apart. That process does not work, to the extent that we're trying to work with

plaintiffs on issues of implementation from month to month to see this settlement agreement through.

There is a way to modify the agreement. The plaintiffs have not done so here under paragraph 59. And so this Court, from our view, your Honor, doesn't have the threshold jurisdiction under 53 to grant plaintiffs' motion because there has been no breach of the agreement.

There is nothing that the Court can substantially -- can issue an order that defendants substantially comply with, because they haven't breached --

THE COURT: The parties -- but Mr. --

MR. HRVATIN: -- the settlement.

THE COURT: All right. But Mr. Hrvatin, you've just indicated to the Court that the minutes that I've read were apparently a negotiated document that you indicated went back and forth between the parties. CDCR, your client, was satisfied with the language and had input to modify the language to reflect, as you indicated, somewhat of a hard-fought argument over this 9B issue.

I don't think I have anywhere in front of me any document that indicates that this isn't a joint submission of the minutes of the December 28, 2015 status conference and that specifically -- it says here, "Interpretation of SHU eligible offenses under 9B."

I keep reading it over again because it seems to be the

operable paragraph.

"The parties agreed that CDCR will formulate by no later than March 28, 2016 a policy concerning the recruitment SHU eligible offense under 9B that incorporates a coercive element."

So if you go back and you look at that 9B again, what counsel is suggesting is that "Recruiting inmates to become an STG affiliate" in and of itself lacks a coercive -- I'm looking back and forth, excuse me -- lacks a coercive element.

It strikes me that rather than remove the comma, we can leave the Oxford comma in and change "or" to "and" and that resolves the problem.

MS. BREMER: I agree with that, your Honor.

MR. HRVATIN: Your Honor, our position is that the Court has no authority to rewrite the settlement agreement.

THE COURT: I'm not rewriting it. It appears that you guys did.

MR. HRVATIN: We did not, your Honor.

THE COURT: Then what is the purpose of --

MR. HRVATIN: That's why the plaintiffs have brought this motion.

THE COURT: What is the effect of paragraph B under the minutes of December 8 (sic), 2015, which

apparently you indicated was a hard-fought agreement and that the parties, both sides had input to, and that this was the final outcome?

MR. HRVATIN: Your Honor, that negotiation took place among litigation counsel. To the extent that any modification of this agreement can be made, that requires a CDCR representative's signature and probably the settlement should have included the Governor's office's signature because this agreement is not going to be modified --

THE COURT: So you'd like me to modify the settlement agreement?

MR. HRVATIN: -- without making it up that high, your Honor.

THE COURT: So, Mr. Hrvatin, you'd like me to modify the settlement agreement?

MR. HRVATIN: No, your Honor. We believe -- our position is that your Honor cannot.

THE COURT: You just said that it should have included the Governor's signature, which is not in the settlement agreement.

MR. RUSSELL: But we are not asking for that modification. Were we to seek that modification, it would be signed by all parties.

THE COURT: Well, I'm troubled by this, I have to admit.

Clearly, we agreed to negotiate -- we. Clearly, the parties agreed to negotiate this issue on December 28, 2015. And the clear language of B indicates that there was an oral agreement to do so.

However -- and I absolutely disagree with defense counsel. Under 49 and paragraph 53, I have not only the right but the obligation to hear these matters and to rule on them.

However, looking at the agreement itself, which is what I have to do and looking under paragraph 59, it states and I'll -- again, for the record:

> "This agreement reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. Any modification to the terms of this agreement."

And I find that the D paragraph under the minutes of the December 28, 2015 is an attempt to modify the agreement. It is not an attempt to make -- understand the terms of the agreement because plaintiffs' counsel is either asking to remove the "or" or to substitute "and" for "or" and that is a modification.

Clearly, our intent was to informally work the agreement -- because any agreement, when it's put into practice in such a complicated case with so many pieces

moving, will sometimes not simply reflect all of the possible permutations that enforcing an agreement like this would have. And I had hoped that the parties would work -- well, collegial is not quite the correct word. But in a more collaborative method.

Apparently that's not going to happen. This is going to be slogfest. But having said that, Ms. Bremer, the plain reading of section 9, "Construction of the agreement," paragraph 59, 60, 61, 62, 63 and 64 is very clear that your request, though I will agree with you, was one that you had negotiated. It was an oral negotiation and not a written modification.

Your arguments that prior to the entry of this document there were written and oral communications between the parties is clearly addressed in paragraph 59, which states that any modification to this term must be in writing and that "this agreement supersedes any prior written or oral agreements between them."

So based on the plain language of the settlement agreement and the request of plaintiffs' counsel, I'm going to deny this motion.

The problem is that this is going to make the implementation of the rest of the settlement agreement even more difficult because if the parties cannot collaborate on basic issues like this, we are simply -- we're going to have

one hell of a fight over the next six months to get this thing done.

And the primary purpose of this settlement agreement is to get these men out of the SHU and back into general population. It is not for the Court to manage CDCR. This is not a consent decree. There isn't a special master involved here.

It is simply to get the 1600 -- I know it's a moving target -- men who have been in the security housing unit, many of them for 30 years, out of that housing unit and back into general population. And I have said that from day one.

But given what I have seen here, Ms. Bremer, I understand your point. I think you're right that there was an informal oral agreement to modify 9B. But under the clear terms of the settlement agreement, that is not binding.

And so what I consider to be somewhat of a technicality, given the nature of how we've been proceeding, I must deny your motion.

MS. BREMER: So, your Honor, if I may. There may be a way around --

THE COURT: Well, let me just finish. What it means is that then you're going to have to struggle with CDCR to get any modifications to the agreement in writing. There's nothing I can do about that.

But go ahead, Ms. Bremer.

MS. BREMER: Well, I was going to suggest, your Honor, particularly in view of the indication which I certainly agree with, that we're dealing with a technicality here. To the extent the Court's in agreement with our position but is uncomfortable making changes to the language, I submit that an order from the Court indicating how 9B -- that 9B is to be interpreted consistent with our understanding of it would get us to the same place and would protect the integrity of the proceedings before your Honor, which as you've noticed, are essentially completely gutted.

THE COURT: I am not -- this Court -- no court, especially a district court should make advisory opinions. I'll rule on the motions that are before me.

MR. LOBEL: Your Honor --

THE COURT: But that kind of -- informally we can discuss the interpretation, which is different than asking for an order for the Court to do so, which is basically an advisory opinion. And the Court will reluctantly deny that request.

Mr. Lobel, you were going to add something.

MR. LOBEL: Your Honor, can I just -- yes. I think the implication of CDCR's position here is draconian in terms of the process going forward.

If you recall, we had a dispute about another provision

in the agreement, the RCGP phone calls provision. If you look at the settlement agreement, it says that the RCGP prisoners shall be given the same phone calls as the general population. We had a dispute about the interpretation of that.

CDCR said that means once a month if they don't have a job. I said, but well, in this context, you can't read it that way. And you came up with what I thought and we all thought was a good solution, namely twice a week. And we all agreed on that.

THE COURT: Yes.

MR. LOBEL: Yeah, good. I'm --

THE COURT: I'm not disagreeing with you, Mr. Lobel.

MR. LOBEL: Yeah. Now, here's the problem. If that agreement, if CDCR were to turn around tomorrow and say oh, we don't want to give them phone calls twice a week even though we agreed to that with Judge Vadas in one of these meetings, and we're going to just go back to once a month, the only alternative you're giving us is to file motion after motion. And that is a bad way to resolve these disputes. And that's the problem.

THE COURT: And I don't -- Mr. --

MR. LOBEL: That's the problem with their position. It's not --

THE COURT: Mr. Lobel --

MR. LOBEL: Yeah.

THE COURT: -- I don't disagree with you. Not to put too sharp a point on it, my grandfather was a corporate lawyer in Germany before the Second World War and he had a sign over his desk that said "Guter Rat ist teuer," "Good advice is expensive."

And if that's the way CDCR wants to do this, somebody is going to have to pay the nickel for it. I find it to be --

MR. LOBEL: And -- and --

THE COURT: I am a practical guy. I like practical answers to practical issues. Litigation for litigation's sake annoys me, and I'll be blunt. But having said that, if CDCR insists on doing it this way, it appears to me that this time they have, under the terms of the settlement agreement, the better of the arguments. And I'm sorry to say that. I think it's a waste of time.

I think the parties, especially under 9D -- excuse me, especially under D of the December 28th hearing, which discusses specifically the modification that you requested under 9B of the attachment to the settlement agreement is logical and was agreed to by the parties.

But I don't think it's enforceable, given the language under 59 of the -- the language of the settlement agreement,

9, "Construction of agreement," 59 through 63.

And so that's my ruling as far as this motion is concerned. The motion will be denied.

Why don't we move on to the next motion, which is I believe the motion to enjoin CDCR from continuing to retain five prisoners in the SHU.

Mr. Lobel, I think that's your motion.

MR. LOBEL: Yes, your Honor.

I won't go into a long background. Just to say there was six prisoners at Pelican Bay SHU who were alleged to have committed a conspiracy in January through April of 2015 to murder another inmate. Right before they were supposed to get out under the settlement agreement, CDCR filed conspiracy to murder charges against them.

We again raised this --

THE COURT: Mr. Lobel, I don't mean to interrupt you but I want to --

MR. LOBEL: Yes.

THE COURT: -- make sure that we're all on the same page.

This is the incident in which CDCR presented to me the unredacted versions of the C file, I believe. And I reviewed that, indicated what could go out and what could not go out, balancing security and safety of the institution with the plaintiffs' right to know.

And then you received the redacted version of those documents; is that correct?

MR. LOBEL: Correct.

THE COURT: All right.

MR. LOBEL: And now we're filing a motion under paragraph 53 of the settlement agreement to enforce paragraph 15 and paragraph 34 of the settlement agreement -- article 25, I'm sorry, not 15. Article 25.

THE COURT: All right. Paragraph --

MR. LOBEL: And Article -- paragraph 25 and 34.

THE COURT: And 34.

MR. LOBEL: Now, paragraph 25 -- tell me when you're ready.

THE COURT: No, I'm ready. Go ahead. I just wanted to get them in front of me.

MR. LOBEL: Okay. Paragraph 25 says if an inmate has not been found guilty of a SHU eligible rule violation with a proven STG nexus within the last 24 months, he shall be released to general population.

Now, our interpretation of that is that if there is a dispute about whether or not the rule violation that the person was given either doesn't comport with due process, was pretextual, was bogus, there was no evidence on it, was retaliatory, for whatever reason, there is a dispute about whether that SHU eligible violation is valid.

And, by the way, the language says with a proven STG nexus. That suggests that there has to be something proven, that it can't just be pretextual, can't be no evidence involved in it.

If there's a dispute about that, that goes to you. And you could rule as to whether or not there's been a violation of paragraph 15 or not. And in these six cases -- there's now only four -- we believe that there was not a valid guilty finding of a SHU eligible offense with a proven STG nexus for two reasons.

One is there's no evidence, in our view, of a conspiracy or an agreement to murder here. And I'm happy to discuss that further. What happened here is that there was an inmate who the alleged gang members thought had done something wrong and there were a number of notes with a couple of guys saying: Here's what we should do.

Those notes could be interpreted those guys thought they should do something very bad to this guy, but the gravamen of this whole situation is that the hierarchy, the general council of the Nuestra Familia, decided, agreed on a particular course of action, which was to murder the guy.

And just to give you an example, there is absolutely no evidence that the alleged general of this general council, Antonio Guillen, had anything to say on this matter whatsoever. He didn't write any notes. He didn't --

there's no evidence that he received any notes. In fact, the evidence suggests that these gang people who were writing the notes said "Guillen hasn't gotten the notes. We've got to send him another copy of it."

And there is certainly no evidence that he agreed to conspire to murder -- to an agreement to murder the guy.

And I ask either you or Mr. Hrvatin or Mr. Russell to show me where in this whole record there is any evidence that Antonio Guillen agreed to murder anybody. And if you don't, then the whole conspiracy charges both against Guillen and all the other guys has to fall.

That's my first argument.

There is no evidence in the record that the general council made any final decision. In fact, in note after note, they say, "We are awaiting a final decision of the general council. Has there been a final decision? We can't reach a final decision because we've got to give the guy due process and hear his side of the story," which is ironic apparently in this gang formation that they had to give the guy due process.

But that's what the notes say. And the notes is the evidence that we have to go on.

THE COURT: Well, but Mr. Lobel, having been both a prosecutor and now a judge, and well aware of the complexity of large organized gangs such as this, they are

run like any big business. And I think it would be foolish to ever think that somehow they were trying to be cute or anything like that.

This is business and they make a determination based on what they believe are the facts.

MR. LOBEL: Right. But is there any evidence that the general council of this alleged gang made any decision as to what to do about inmate Guzman?

That's the question. Is there any evidence that Mr. Guillen who didn't write any notes, who didn't receive any notes, made any decision? That's the question I have here.

If you can show me or if Mr. Hrvatin can show me the evidence, then I'll go to another matter. But I can't continue to argue this one. But I don't see any evidence of it.

THE COURT: Well, you know, if it wasn't for the tapes, Nixon would have been president for the second term.

MR. LOBEL: Right. But here we have notes. We don't have tapes. We don't have notes. And the notes alleged by -- CDCR says the notes say these guys came to an agreement to murder this guy.

And it's not a question of whether they're involved in a gang or whether they're bad or good. It's the question of evidence. And that's the only thing we can base our arguments here on, is evidence. And I --

THE COURT: Here's -- you know what, let me first focus on this. And obviously Mr. Hrvatin can respond.

As a preliminary mater, I think under paragraph 49 and paragraph 53, the plaintiffs are absolutely right, that if you can't agree on this sort of issue, that this is the exact issue that should be brought to me for determination. It focuses on the length of time that some of the remaining defendants -- or plaintiffs, I should say in this case, have in the SHU and when and how they're going to be removed from the SHU.

So I agree with you that given the plain meaning of what I read in 49 and 53, that this is appropriate.

Two, this is also sort of a dry run regarding what I have talked about from the very beginning, that we will have by October -- the vast majority of people out of the SHU -- I should say men -- out of the SHU and boots on the ground in general population.

We're already well over 50 percent. And Ms. Bremer's concerns aside, I think we continue to move to get these guys out, which is the primary focus of the settlement agreement.

What I talked about from the very beginning was that we're going to have a group of men -- maybe 300, maybe 200, maybe 150, I don't know -- at the end they're going to be problematic, including gentlemen such as the five that you

have an issue with their current SHU housing. And that in some sense, what I had intended to do was to get everybody out that we could get out.

Then as I think I said at the last status meeting, to prepare a list, alphabetical, of all the names of the remaining plaintiffs who are in security housing, how long they've been there, and why they continue to be in the SHU, with the hope that we can informally -- but this seems to be becoming a harder and harder task to do -- figure out how and when they will be removed from the SHU into less restrictive housing.

Having said that, my problem is, and what I want you to address, Mr. Lobel, is the fact that because of the process we engaged in, which was to deliver to the Court the unredacted information upon which you are basing your motion -- that is, you're basing your motion on the redacted part of that information -- this Court knows more about the activities of the five men in question than you do, which puts you at a disadvantage and somehow in some sense it's somewhat awkward for the Court too. Because as a practical matter, based on what I saw in the files unredacted, the response of CDCR to the unredacted files is appropriate.

MR. LOBEL: Your Honor, I --

THE COURT: And that's makes this difficult because that puts you in an awkward position. I understand

that. But having read the unredacted files which was a procedure that both parties agreed to, and having that information in front of me, I find as a practical matter that CDCR did not violate the terms of this agreement. And I can't say any more because that portion is under seal.

But why don't you proceed.

MR. LOBEL: Your Honor, I must say I'm very puzzled by what you say. At the last discussion of this -- well, first of all, we were supposed to get in the redacted version every relevant piece of evidence that CDCR was going to rely on.

We're the attorneys. I understood that the redacted provisions would take out names, would take out extraneous material that CDCR didn't want us to see. But I thought we were getting every piece of material that was relevant to these conspiracy charges.

And I asked that question explicitly at the last conference that we had on this, and Mr. Hrvatin and I believe your Honor -- and I could be mistaken here, but I know that somebody gave me the answer that this is the whole record that CDCR intends to rely on.

Now, if it's not the record, it's a star chamber. You cannot say we're going to convict these guys on the --

THE COURT: I'm not -- okay. All right. There are a couple of things.

This is not a criminal matter. This is not a habeas matter. This is simply an implementation of a settlement agreement.

MR. LOBEL: Right. But I was supposed to get the redacted file --

THE COURT: That's what you got.

MR. LOBEL: -- of all material that's relevant to these --

THE COURT: Yes.

MR. LOBEL: -- to these conspiracy charges. Now, if that's --

THE COURT: And redacted -- in part, if it was, one, irrelevant and, two, if it compromised the safety and security either of defendants -- or of the defendants slash plaintiffs, or of staff at CDCR.

MR. LOBEL: But, your Honor, we're attorneys here. You're not giving this to the inmates. If you cannot give us the materials that is relevant because there is some reason that we can't get it -- and I don't believe -- I've looked at this whole file and all of the notes -- every little bit of the notes that are relevant was given to us.

There is nothing that is not in this thing -- in the notes that is not relevant -- I mean that was redacted. In fact, they didn't redact enough.

THE COURT: Why?

MR. LOBEL: Because they gave us a name that they should never have given us and I had to redact it.

THE COURT: Let me see. Where is -- okay.

MR. LOBEL: All of the relevant notes were given to us, all of the relevant translation. There is nothing else that they're relying on.

THE COURT: Hold on. Hold on.

MR. LOBEL: And I apologize for being agitated.

THE COURT: No, no. Go ahead. It's Friday. You have a right to be.

MR. HRVATIN: We're used to it, Jules.

MR. LOBEL: Yeah, I'm agitated because I thought I was getting the full file.

THE COURT: Let me pull the -- I've got the files here. Let me take another look at them.

MR. LOBEL: And if there was redactions of relevant evidence, that in my view was improper.

THE COURT: I misspoke in terms of relevant evidence. What was redacted was information that was not part of the actual conspiracy to murder.

MR. LOBEL: That's what I understood to be the case. But then I go back to square one, my initial proposition.

In all of the relevant evidence, show me any shred of evidence that explains how Antonio Guillen agreed to murder

another inmate. And if you can show me that, then I'll agree that at least we have an argument here.

But I don't think you have that. I don't think this whole file has any bit of relevant evidence that Antonio Guillen agreed, wrote any note, got any note, submitted his response, voted on the general council to murder anybody.

THE COURT: All right. Anything further?

MR. LOBEL: Yes. I have two other -- I'll try to make it short, your Honor.

The second is that CDCR has rules and regulations which are incorporated into this. They have to be found guilty of a SHU eligible offense that comports with their rules. It is now three months after they said they were going to reissue these rule violations.

Under their own rules, they have 15 days to reissue them. At the most, they can extend that time to 30 days. They're out of time. They cannot in comporting with their own rules and regulations, issue these new SHU eligible offenses.

These guys cannot be charged, and they should be freed immediately.

And, third, we had a series of due process objections which I'll hold until after Mr. Hrvatin speaks. But we would like your Honor -- we request your Honor to rule on whether these original rule violations charges violated due

process because we believe that CDCR and this case shows that CDCR does not really understand their obligations under paragraph 3321 as to what they have to provide people under the rule which was expressly incorporated into the settlement agreement.

And therefore to prevent other inmates from facing the same type of situation, we ask that you give a ruling on what's required under due process and 3321. But I'll rest here.

THE COURT: All right. Let me hear from Mr. Hrvatin.

MR. LOBEL: Thank you, your Honor.

THE COURT: Thank you, Mr. Lobel.

MR. HRVATIN: Thank you, your Honor.

On reply, we learned for the first time that the plaintiffs are bringing this motion based on an alleged violation of paragraph 25. Defendants dispute that the plaintiffs have established a violation of paragraph 25 with respect to these inmates.

There appears to be a dispute that from the plaintiffs' view defendants have violated paragraph 34 of the settlement agreement which deals with the disclosures required confidential information.

We disagree with that characterization. But as we noted in our response to plaintiffs' papers, to the extent

that there have been any allegations that California Code of Regulations section 3321 was not complied with, from our view, your Honor, that issue is moot because the rules violation reports that Mr. Lobel continues to attack from a retrospective angle, those rules violations reports have been reissued to the inmates.

And so pursuant to CDCR protocol, the inmates will receive all of the information that they're entitled to, including the appropriate disclosures of confidential information. My understanding is that those rules violations reports were reissued within the past 10 days or so. And that the process has and will continue to commence to adjudicate those rules violations.

And so plaintiffs' motion here to the extent that it attempts to attack earlier rules violations, in our view is moot. And to the extent that the plaintiffs are alleging -- continue to challenge the underlying evidence used with respect to these rules violations, that matter is now before a senior hearing officer and we'll adjudicate those rules violations reports.

And to the extent that plaintiffs continue to be dissatisfied with the results, they have a variety of different forums, your Honor, available to them. It sounds like Mr. Lobel has a well drafted habeas petition as well as a separate 1983 action, should he think that those are the

avenues that might bring him relief in seeking to reexamine the record on rules violations.

So from our view, similar to the earlier motion, your Honor, we don't believe that the plaintiffs have made the threshold -- it's not that the Court can't hear it. I wanted to make clear, if the plaintiffs are alleging a breach of the settlement agreement, we absolutely agree that this Court should hear that issue.

We don't believe the plaintiffs have met their burden. And certainly, paragraph 25 which we learned on reply is the hook that the plaintiffs are trying to establish here to give this Court jurisdiction -- there's nowhere in paragraph 25 that gives the plaintiffs an avenue to re-litigate and de novo review the evidence of rules violations that have since been reissued.

And so from a threshold matter, we don't believe the plaintiffs have made the required -- they've made that threshold showing to establish a breach.

And second, the relief that they seek, your Honor, further exceeds, to the extent there has been a breach, your Honor's role would be to bring substantial compliance.

The relief that the plaintiffs seek by way of expungement of prior RVRs, to enjoin CDCR from investigating criminal behavior far exceeds what this Court can do under the enforcement provisions.

So for that reason, we'd also ask that the Court deny the motion.

THE COURT: All right. I don't know if we're all on the same page in terms of the redacted documents.

But, first of all, the issue that perhaps there's nothing in the record that Mr. Guillen was somehow involved in any portion of the decision to order a hit on Guzman.

Do you have the redacted documents, B patent page 35 of 82?

MR. LOBEL: I have redacted documents. They are labeled RVR in camera. But if you tell me what document you're looking at, I could probably find it.

THE COURT: I'm looking at -- it's page 35 of 82.

MR. LOBEL: That's the September 30, 2015 memorandum. B patent. I can find that. Yes, I've got it. Okay.

THE COURT: It says "Status from the O but left it." Are we on the same page?

MR. LOBEL: Page 32 starts with --

THE COURT: No, 35.

MR. LOBEL: Oh, 35. Okay.

MS. BREMER: Your Honor, could I just interject with a housekeeping matter and suggest that -- I mean from the video it doesn't look like anybody is in any of the courtrooms. But perhaps this portion of the proceeding

should be sealed.

THE COURT: I'm only talking about the unsealed -- I mean the --

MR. LOBEL: No, no -- the court recorder --

MS. BREMER: Well, I believe even the unredacted version would be considered attorney eyes only. But I guess that's for CDCR --

THE COURT: Well, I don't see anybody in the courtrooms. But to the extent -- any objection, Mr. Hrvatin, Mr. Russell?

MR. HRVATIN: No, your Honor.

For the record, I would let the Court and Mr. Lobel and Ms. Bremer know that we have been joined by a couple of colleagues from CDCR, legal counsel Patrick McKinney and Patricia Lee.

Your Honor is familiar with them, and we have no objection to otherwise -- if the Court feels appropriate, to sealing this portion of the discussion.

(Portion of transcript sealed.)

THE COURT: All right. So then at this juncture, the matter will become unsealed.

Taking a look under 8.20, conspiracy elements. I just note, one becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy

even though the person does not have full knowledge of all the details of the conspiracy.

Under the comments it's still noted "A person may be a member of a conspiracy even though the person does not know all of the purpose of or participates in the conspiracy." And it states well settled law on the matter.

But go ahead, Mr. --

MR. LOBEL: And I agree with that law but they have to have a basic agreement on a conspiracy to murder. They don't have to know all the details, but there's no showing here that the general council, including Guillen, made any decision as to what to do with this guy.

So in any event, I'll end that. You've heard enough from me.

THE COURT: Submitted?

MR. LOBEL: And I thank you for going through the record.

THE COURT: Submitted?

MR. LOBEL: But -- yeah.

On the due process point though, in the RVRs that were given these people, they didn't get the note that they were alleged to have authored, they didn't get the FBI translations of those notes that they were alleged to have authored, and they didn't get a record of what the evidence against them was going to be, namely the -- the people who

didn't authorize these notes didn't get some basic summary of what the evidence was, including, your Honor, the confidential information -- you don't have to give his name.

But the fact that he said no final decision has been made ought to be given to these people so they can mount a defense.

THE COURT: Well, that last point has always troubled me in these SHU hearings.

Let me hear from Mr. Hrvatin if in fact -- well, first of all -- well, first let me hear from Mr. Hrvatin as to counsel's position that the remaining plaintiff defendants aren't given any information on which the Department bases its determination. And if so, shouldn't they be receiving some of that information under the broad interpretation of the settlement agreement?

MR. HRVATIN: Your Honor, my understanding is that in connection with these reissued rules violations to these four inmates, that CDCR has complied with the regulations that require them to produce, including confidential information to the extent they can, new -- they're called forms 1030 with respect to the confidential information and whatever other information that the Department is relying upon to rule upon these rules violations reports.

So if -- I mean plaintiffs' counsel may want -- may want --

THE COURT: What were they given?

MR. HRVATIN: I'm sorry, your Honor?

THE COURT: What were they given or what are they --

MR. HRVATIN: I don't know specifically.

THE COURT: Ms. Lee is there. Does she know?

(Pause.)

MS. LEE: Your Honor, I know that the new 1030s with additional information was provided with the reissued RVRs.

THE COURT: What additional information?

MS. LEE: I have not seen the final 1030s that have been reissued, but I know that they were lengthy, much lengthier than a usual 1030 for an RVR.

MR. LOBEL: And, your Honor, we asked that the RVRs and the 1030s be given to us prior to this hearing and they've declined to make them available.

THE COURT: Well, to the extent that Mr. Lobel and Ms. Bremer represent the defendants slash plaintiffs in this matter, I think it's appropriate that you at least let them see what it is that you're relying on to make the determination, since you're going to give this to the plaintiffs slash defendants at their hearing, it strikes me appropriate that you do at least allow counsel to look at what it is that's going to be used to -- that the Department

is going to use to try to reevaluate the situation.

Do you have any problem --

MR. HRVATIN: Your Honor, we would be happy to provide those rules violations reports. We received the request two days ago. I have not seen the rules violations reports. CDCR counsel has not seen the rules violations reports. So we haven't been able to turn them over to counsel because we don't have them. Now, separately --

THE COURT: So when are you going to have them?

MR. HRVATIN: When I get back to the office, I will ask again for a copy of the RVRs and find out when I can receive them.

THE COURT: All right. Why don't we work with Ms. Lee, Mr. Hrvatin, and deliver to defense counsel no later than Friday, June -- what's next Friday, is that the 17th?

MR. HRVATIN: It is, your Honor.

MR. LOBEL: The 17th, yes.

THE COURT: The 17th, no later than 5:00 p.m., the documentation that the Department will use -- that they intend to supply the plaintiff/defendants to determine whether or not they are in violation of the rules report.

So that includes everything that would be given to the inmates for that determination, and that should be supplied to plaintiffs' counsel no later than Friday, June 17th, 5:00 p.m.

Now, in terms of the motion, I find that given what I have heard, especially in light of the fact that a new hearing is being conducted regarding this matter, that the defendants remain in substantial compliance with the terms of the agreement and I'm going to deny counsel's motion to enjoin CDCR from continuing to retain the five prisoners in the SHU until the Department has reviewed the information another time.

All right.

MR. LOBEL: Your Honor, one last thing. What about the question, which you continued today, of whether they could get privileges commensurate with the RCGP given that these guys have been in the SHU more than 10 years?

THE COURT: All right.

MR. LOBEL: Your Honor, one last thing. What about the question, which you continued today, of whether they could get privileges commensurate with the RCGP, given that these guys have been in the SHU more than 10 years?

THE COURT: All right. Eventually, these guys are getting out and being moved to general population.

MR. LOBEL: Well, eventually may be years from now.

THE COURT: Yeah, understood. But they are part of this class, and as such, it makes sense to me that they do receive some of the benefits that the class is entitled

to.

Are there specific privileges, Mr. Lobel, that you believe that your clients should be entitled to?

MR. LOBEL: Three, your Honor. Contact visits, phone calls, and small group recreation, you know, that two of them can recreate together. There's four of them. And they don't have to recreate with the general population, but if they could recreate together, that would be the beginning of some socialization.

THE COURT: That strikes me as not being unreasonable and within the spirit of the settlement agreement.

Mr. Hrvatin, may I hear from you?

MR. HRVATIN: Your Honor, thank you.

To the extent that the request is for these inmates to receive privileges and programming equivalent to what the inmates in the new RCGP unit are getting, the settlement agreement is very clear as to who is eligible for RCGP privileges. These inmates do not qualify.

These inmates, given the charges, would otherwise be in administrative segregation. They are in Corcoran SHU at plaintiff counsel's request. CDCR accommodated that request to be transferred from Pelican Bay to Corcoran SHU. These inmates are not entitled to RCGP privileges, unless the Court -- unless plaintiffs are asking the Court to rewrite

the agreement to create another category of inmates who are entitled to those privileges.

And we'd have an objection to that, your Honor.

THE COURT: You know, for almost 30 years the Soviet Union had the same ambassador to Washington, DC. Every time a request was made to the Soviet Union, his response was "Nyet" to the point that he was known in Washington as "Mr. Nyet," Mr. No.

It strikes me an attempt to accommodate the process here that a small amount of conciliatory behavior on the part of the Department might go a long way to reduce the animosity that this implementation is taking on.

My suggestion to you and Ms. Lee is to take a look at the request and see if it can't be accommodated in the spirit of the settlement agreement.

MR. LOBEL: Your Honor, this is not an attempt at modification. The settlement agreement is clear.

"During the review described in paragraph 25" -- this is paragraph 26 -- "any inmate housed in a SHU program for 10 or more years who has committed a SHU eligible offense with a nexus to an STG during the preceding two years will be transferred into the RCG for completion of step-down program requirements."

These four guys have had way more than 10 years in the SHU. Even if they had committed a SHU eligible offense,

they would be entitled to RCG privileges.

We're not asking, I mean, to go to the RCGP. We're not asking them to go to the RCGP. We're just asking them to get some of those privileges. But under the settlement agreement, that's what they'd be entitled to.

The defendants take this position which is so technical that it's absurd, that this doesn't apply because they haven't been convicted of a SHU eligible offense so that paragraph 26 doesn't apply.

THE COURT: Well, I thought they were convicted of a SHU eligible offense and that the Department is reviewing that.

MR. LOBEL: But their position is, there's no SHU eligible offense because we're reviewing it. For that reason, they can't go to the RCGP. But since they're reviewing it, they can't go to the general population. It's an unbelievable position to me.

THE COURT: All right.

MR. LOBEL: And it goes directly contrary to 26 and 25, and we would like a ruling. Unless they're going to get back to you in three or four days or something like that, we would like a ruling on this aspect of the motion.

The other thing is, they didn't transfer them to Corcoran because they were going to be nice to me. They transferred them to Corcoran because paragraph 32 of the

settlement says you can't house anybody in Pelican Bay SHU for more than five years. And we raised that and they transferred them to Corcoran.

This wasn't out of the generosity of their own heart. It was because paragraph 32 says they have to. And paragraph 26 says they have to give them RCGP privileges. Unless they transfer them --

THE COURT: Mr. Lobel, there isn't a lot of generosity on either side of the aisle in this case.

But I think Mr. Lobel's point is well taken. This hypertechnical reading of paragraph 25 and 26 to deny some basic accommodation to the four while their cases are being reviewed I think is not in the spirit of the settlement agreement, Mr. Hrvatin.

And I think -- and this is -- so that we are clear, this is not a blanket determination by this Court as to what privileges should or should not be given to the remaining SHU inmates but as to these -- do we have four left, Mr. Lobel?

MR. LOBEL: Yeah.

THE COURT: There are four left?

MR. LOBEL: Four left. And all of the four have been there for more than 10 years.

THE COURT: They should each then get the contact visits, the phone call and the small group that's

appropriate under the settlement agreement.

MR. HRVATIN: All right. Anything further?

MR. HRVATIN: Your Honor, I cannot commit --

THE COURT: Nobody's asking you to commit. I'm ordering.

MR. RUSSELL: We will have a statement of decision on that, your Honor.

THE COURT: Pardon me?

MR. RUSSELL: As to how that's a breach of the agreement.

THE COURT: All right. Are you saying that these four inmates have or have not been found guilty of a SHU eligible rule violation?

MR. HRVATIN: Your Honor, our understanding, we were conferring with CDCR legal counsel. These inmates have been --

THE COURT: I'm looking at -- let us go then go to C, "Review of STG validated inmates currently in SHU," number 25.

All right. There's no question that the four in question are in the SHU.

MR. RUSSELL: By their request, your Honor, we can return them to ad seg.

THE COURT: No. They are currently in the SHU.

MR. HRVATIN: They are housed currently in

Corcoran SHU. They were housed in administrative segregation in connection with their charges for conspiracy to murder another inmate.

THE COURT: They're currently in the SHU.

MR. HRVATIN: Correct, your Honor.

THE COURT: Thank you. So are these four inmates --

MR. HRVATIN: Your Honor --

THE COURT: Are these four inmates currently guilty of a SHU eligible rule violation with a proven STG nexus?

MR. HRVATIN: If we're looking, your Honor, at paragraph 25 of the agreement, when they were reviewed by ICC, pursuant to paragraph 25, they were not guilty. Those charges had not been issued at that time that they came up for ICC review in the priority that the parties agreed to.

It was subsequent to the parties -- those inmates, your Honor, came up for review -- my understanding, based on their case records were at that time they did not have an STG SHU eligible offense. So they would have been cleared for general population.

THE COURT: But if an inmate has --

MR. HRVATIN: Subsequent to that is when these conspiracy charges came down, which is why they were transferred to administrative segregation like any other

inmate charged with a serious rules violation report like conspiracy to commit murder.

THE COURT:

"If an inmate has not been found guilty of a SHU eligible violation with a proven STG nexus within the last 24 months, he shall be released from the SHU and transferred to general population, level IV 180-design facility or other general population institution consistent with these factors."

Is that the situation we find ourselves in? Since Mr. Russell has asked for the Court to determine the basis on which I would ask that CDCR accommodate these four inmates, now I'm asking you under paragraph 25, do these four inmates fit that category?

MR. HRVATIN: Once the RVRs, your Honor, were issued to these inmates, they were no longer eligible for general population. Those RVRs were heard. Those inmates were in administrative segregation pursuant to policy. Those RVRs are now -- have now been reissued and reheard -- to be -- they will be reheard.

So in the interim, rather than these inmates being housed in administrative segregation, they are being housed at Corcoran SHU and they are not eligible for RCGP

privileges.

If plaintiffs' counsel would like, we can remove them from Corcoran SHU and return them to administrative segregation.

MR. LOBEL: Your Honor, do you want to hear from me or do you want to just --

THE COURT: No, go ahead.

MR. LOBEL: Under the agreement, there are only two kinds of inmates who are in the Ashker class. One is people who have not committed a SHU offense and therefore should go to general population or people who have committed a SHU offense who if they have more than 10 years of time in the SHU are eligible for the RCGP.

If these guys are not eligible for the general population, then they are eligible for the RCGP either because they've committed a SHU offense or because they have a SHU offense pending against them.

THE COURT: Where do you see that?

MR. HRVATIN: That is not part of the agreement.

THE COURT: Where do you see that?

MR. HRVATIN: That is not part of the agreement. Your Honor, let's take another example.

THE COURT: Mr. Hrvatin, I've asked Mr. Lobel, where do you see that?

MR. LOBEL: I agree with the sentiment of your

question which is the agreement just says people who have committed a SHU offense. But I don't think it would be proper to allow CDCR to get out from its obligations to put somebody in the RCGP by not convicting them of a SHU offense because of these due process violations but simply continuing --

THE COURT: Well, this is what concerns me also, is that they sit in this limbo where --

MR. LOBEL: Exactly. And the settlement agreement didn't contemplate that.

THE COURT: And I understand that, but I think sadly that once again, Mr. Hrvatin may have a point, Mr. Russell may have a point. And so the question before the Court I assume is if they are now currently being reevaluated, I should say, or being -- if a determination is now being made whether or not they have committed a SHU eligible rules violation with a proven STG nexus, whether or not they are entitled to any step-down type program.

And it strikes me, I'm afraid, that until that has been determined, the Court is not able to answer that question.

MR. LOBEL: Your Honor, this gets back to unfortunately the first motion. But under the settlement agreement, the agreement is supposed to be interpreted according to California law.

And under California law, the way a provision of a

settlement agreement or any contract, including a settlement agreement, should be interpreted is not the way the defendants are doing it. I will read from a recent California case, Epic Communications v. Ridgeway Technology.

"The character of a contract is not to be determined by isolating any single cause or group of causes. On the contrary, a contract is to be construed as a whole so as to give effect to every part, if reasonably practicable, each clause helping to interpret another."

THE COURT: I understand --

MR. LOBEL: What the defendants have done --

THE COURT: I understand that, Mr. Lobel. But the devil is in the details.

MR. LOBEL: And the details here is that paragraph 25 and paragraph 26 must be read as a whole. And the intent of both paragraphs taken together is that either a person be sent to general population or if they have more than 10 years in the SHU they should be sent to the RCGP.

By construing -- by reading these paragraphs independently and isolating this clause in a way that both California law and the Supreme Court law says is impermissible, the defendants have reached an absurd illogical result which is contrary to the intent and to the

language of the agreement.

THE COURT: Let me then also --

MR. LOBEL: But that's what they're doing over and over again.

THE COURT: But let me also then add to that, again looking at "Construction of the agreement" on page 21:

> "The parties waive any common law or statutory rule of construction that ambiguity should be construed against the drafter of this agreement and agree that the language in all parts of this agreement shall in all cases be construed as a whole according to its fair meaning."

MR. LOBEL: Exactly, your Honor.

THE COURT: Applying that to paragraphs 25 and 26, let me hear from counsel. Since it was Mr. Russell who complained, perhaps he can explain to the Court how exactly that particular paragraph should be applied to paragraphs 25 and 26.

MR. HRVATIN: Your Honor, if I may. This is Adriano Hrvatin.

I think if we're looking at paragraphs 25 and 26, then the Department still retains the discretion under paragraph 26 with respect to certain inmates -- these inmates may fall

into this category -- that allows inmates who pose an unreasonable risk to individual institutional safety and security not to be housed either in the GP or the RCGP.

So that language -- and I'm looking at paragraph 26, your Honor, lines 10 through 15, that contemplate certain inmates -- and I would argue that inmates who have been charged with conspiracy to murder another inmate arguably pose an unreasonable risk to individual institutional safety and security such that the Department should have the discretion -- because your Honor mentioned a limbo with respect to these inmates.

There is no limbo. The limbo is administrative segregation until the charges are resolved.

THE COURT: When are the charges going to be resolved?

MR. HRVATIN: Your Honor, as I mentioned earlier, we would expect by the end of the month -- end of this month, your Honor, beginning of July.

THE COURT: All right. Given that, we'll allow the Department to go through. I will expect that this be resolved no later than July 15th. Once that is resolved in terms of the reissuance of the rules violations, that Mr. Lobel can either then discuss with CDC whether or not it is then appropriate to put these four inmates back into the process of being stepped down and eventually returned to

general population.

MR. LOBEL: Your Honor, can I just ask one question.

THE COURT: Yes.

MR. LOBEL: Your order today on these two motions I assume are a final order. There's not going to be any decision to follow?

THE COURT: No. I'm going to ask Mr. Hrvatin to prepare a proposed order, submit it to plaintiffs' counsel for review and then submit it to the Court.

The Court denies both 513 and 524 for the reasons stated on the record.

In terms of the four remaining inmates, their status regarding housing, the parties should informally take that up after the hearing and that I would order that the hearing take place no later than July 15th. This has to be resolved.

All right. Thank you all.

(Proceedings adjourned at 11:32 a.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Thursday, June 23, 2016