# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GOVERNOR OF THE STATE OF CALIFORNIA, et. al., <br><br> Defendants. | Case No.: 4:09-cv-05796-CW <br><br> **DECLARATION OF MARGO SCHLANGER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** <br><br> CLASS ACTION <br><br> Judge: Honorable Claudia Wilken |

*Qualifications*

1. I am the Henry M. Butzel Professor of Law at the University of Michigan.  My full CV is attached.

2. I have long experience with large and complex prisoners' rights cases and with the Prison Litigation Reform Act.  I worked on many large-scale prisoners' rights cases when I was a trial attorney at the U.S. Department of Justice, from 1995 to 1998.  During that time, I was also the Civil Rights Division's lead trial attorney on matters relating to the Prison Litigation Reform Act (PLRA), which became law in 1996. In the years since, I have consulted, both formally and informally, on many prisoners' rights cases, assisting parties and judges in the design and implementation of complex remedies and oversight systems. Most recently, I have consulted on remedial design in class actions addressing solitary confinement at the federal Bureau of Prisons facility ADX Florence and conditions of confinement at the Louisiana State Penitentiary.

3. I serve as the court-appointed settlement monitor in Adams & Knights v. Commonwealth of Kentucky, 3:14-cv-00001-GFVT (E.D. Ky.), monitoring and assisting with implementation of a statewide settlement relating to deaf and hard-of-hearing prisoners. In that role, I am responsible for visiting Kentucky's prisons, monitoring their compliance with the comprehensive settlement, and making recommendations for how they can improve compliance systems.

4. I have done extensive research and writing about prison litigation in general and the PLRA in particular, including:

- *Anti-Incarcerative Remedies for Illegal Conditions of Confinement,* 6 U. MIAMI RACE & SOCIAL JUSTICE L. REV. 1 (2016).
- *How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities,* ACS Issue Brief (May 19, 2016).
- *The Just-Barely-Sustainable California Prisoners' Rights Ecosystem,* 64 ANNALS OF THE AM. ACAD. POL. & SOC. SCI. 62 (2016).
- *Trends in Prisoner Litigation as the PLRA Enters Adulthood,* 5 U.C. IRVINE L. REV 153 (2015).
- *Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts,* 69 U. MIAMI L. REV. 519 (2015).
- *Plata v. Brown and Realignment: Jails, Prisons, Courts, and Politics,* 48 HARV. CIV. RIGHTS-CIV. LIB. L. REV. 165 (2013).
- *Jail Strip-Search Cases: Patterns and Participants,* 71 LAW & CONTEMP. PROB. 65 (2008).
- *Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons),* 2 JOURNAL OF TORT LAW (Aug. 2008).
- *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders,* 81 N.Y.U. L. REV. 550 (2006).  Reprinted in 23 CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Steven Saltzman, ed., 2007).
- *Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates,* 1 J. EMPIRICAL LEG. STUD. 79 (2004) (with Anne Piehl).
- *Inmate Litigation,* 116 HARV. L. REV. 1555 (2003).
- *Beyond the Hero Judge:  Institutional Reform Litigation as Litigation,* 76 MICH. L. REV. 1994 (1999).

5. In 2010 and 2011, I served as the U.S. Department of Homeland Security's presidentially-appointed Officer for Civil Rights and Civil Liberties. Among my duties

was overseeing DHS's system of civil rights inspections, investigations, and

recommendations for the Department's hundreds of immigration detention facilities.

*The Settlement Agreement in Ashker v. Brown*

6. I have read the Settlement Agreement in *Ashker v. Brown*. The Agreement sets up a

complex, innovative remedial and oversight scheme. Much of it will require substantial

monitoring by the plaintiffs' counsel, and it will be difficult to enforce, even with their

very high level of expertise and skill.  I focus in what follows on four particular

approaches taken by the Settlement: the restriction on entry or return to a Special

Housing Unit (SHU); the creation of a Restrictive Custody General Population (RCGP)

unit; new constraints on administrative segregation admissions; and a Step Down

Program. These remedial programs have precedents that suggest they are workable

solutions to the problems alleged in the plaintiffs' complaints. However, they are

extremely innovative, both in terms of their design and their scale. Each will require

CDCR to work through a large variety of design and implementation issues, and each of

those issues will require intensive monitoring and consultation from plaintiffs' counsel, to

ensure that the defendants' plans and practices are consistent with the Settlement

Agreement.

*Limits on admission to the SHU*

7. The core of the Agreement is that the California Department of Corrections and

Rehabilitation (CDCR) has agreed to transfer prisoners out of the SHU into general

population unless they have committed a "SHU-eligible offense" with "a proven nexus to

an STG [Security Threat Group]."  The result is that many gang-affiliated prisoners will

be entering the CDCR's general population, because their gang affiliation has not led them to commit serious misconduct.

8.  It is highly likely that some CDCR personnel disagree with this approach to managing the prisoner population.  There is therefore a very real likelihood that some CDCR staff may seek to undermine the Agreement's terms, by misusing the disciplinary system to retain or return prisoners they believe to be gang-affiliated to the SHU, even when those prisoners have not engaged in STG-related misconduct.

9.  In the four decades during with prison and jail consent decrees and injunctions have been common, many such court orders have addressed procedural issues relating to discipline. This Agreement is different—it addresses not just procedure, but substance. CDCR would violate the Agreement if it sends prisoners to the SHU based on non-STG misconduct, or based on misconduct not serious enough to justify SHU confinement. In order to know if this kind of evasion of the Agreement is taking place, plaintiffs' counsel will need to remain deeply informed about CDCR disciplinary processes; they will have to monitor and evaluate the substantive merits of particular disciplinary cases. This work will require exceptional care, skill, and expertise.

*Restrictive Custody General Population*

10. The Settlement Agreement also requires that CDCR establish a new unit, for Restrictive Custody General Population (RCGP). This will be the designated housing for class members who cannot be transferred to general population; it will be more restrictive than general population, but still not solitary confinement. The Agreement does not provide much detail on the expected custodial practices in the RCGP, although it does state:

"Programming for those inmates transferred to or retained in the RCGP will be designed to provide increased opportunities for positive social interaction with other prisoners and staff, including but not limited to: Alternative Education Program and/or small group education opportunities; yard/out of cell time commensurate with Level IV GP in small group yards, in groups as determined by the Institution Classification Committee; access to religious services; support services job assignments for eligible inmates as they become available; and leisure time activity groups."

11. The Agreement contemplates a role for plaintiffs' counsel in the development of RCGP policies and procedures, stating that "CDCR will provide Plaintiffs' counsel with the opportunity to tour the proposed RCGP facility and to meet and confer with Defendants regarding the functioning and conditions of the RCGP, prior to its implementation." This role, while unlikely to be as time consuming as the disciplinary monitoring discussed in paragraphs 7-9, above, will similarly require great expertise.

*Step Down Program*

12. The Settlement Agreement requires major modifications to CDCR's Step Down Program, so that admission to and advancement through the program are based on behavior, not gang affiliation. A frequent problem with solitary confinement step-down programs, several of which have been developed across the country in the past few years, is that they set prisoners up to fail, with rules that some compare to the child's game chutes and ladders; small failures push prisoners down a chute to the beginning of the program. This approach can discourage prisoners facing difficult adjustments after years in solitary

confinement, and is counterproductive with respect to inducing and facilitating their good behavior.

13. The Agreement includes numerous provisions to avoid the chutes-and-ladders problem. There is, however, much detail left to be developed, which will draw on the plaintiffs' counsel's expertise and skill.  In addition, as with respect to the disciplinary monitoring described in paragraphs 7-9, monitoring this part of the Agreement will require close attention to the substance, not just the procedure, of the relevant interactions—which means it will require a very high degree of diligence and expertise.

*Monitoring and Enforcement Provisions*

14. The Settlement Agreement does not provide for a monitor, special master, or other neutral expert to assist in implementation, monitoring, or oversight. This is unusual in a settlement of this depth and breadth, and greatly increases the complexity of plaintiffs' counsels' work and the expertise needed to accomplish that work.

15. The Settlement Agreement includes three pages of provisions describing documents and data to be shared with plaintiffs' counsel.  I have previously researched and written about these kinds of disclosure provisions in prisoners' rights litigation.  See *Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts*, 69 U. MIAMI L. REV. 519 (2015). As I explain there, the Prison Litigation Reform Act has shortened the typical term of prison and jail decrees, opening them up for more frequent reexamination under a standard that is harder for plaintiffs to meet. Accordingly, it has become more important for prisoner-plaintiffs' counsel to stay more informed about conditions in institutions governed by PLRA-covered settlement agreements. The information-disclosure provisions in this Agreement are extremely extensive—which should greatly assist plaintiffs' counsel in fulfilling their assigned role both of monitoring compliance and of ensuring that the

Agreement is extended if there remains a need for it. Counsel will need to do substantial analysis of the disclosures, and many will prove useful not by themselves but as indication of necessary followup. Only highly expert and experienced counsel would have the background to appropriately read and understand the disclosures.

*Summary and Conclusion*

16. The criteria for fee multipliers in civil rights litigation include novelty, difficulty, and superior attorney performance leading to exceptional results. In this case, the design of the Settlement Agreement builds on the superior performance that preceded it; the result of over 1000 class members' release to general population, and a state-wide reduction of the SHU population by over 2000—has certainly already been an exceptional result. Another factor in this case. Moreover, lawyers are often reluctant to represent clients like the plaintiffs, who are thought to be gang leaders.

17. For these reasons, in my opinion, a multiplier on the monitoring fees is warranted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Ann Arbor, Michigan on December 2, 2016.

Margo Schlanger

Margo Schlanger