JULES LOBEL (*pro hac vice*)
Email: jll4@pitt.edu
RACHEL MEEROPOL (*pro hac vice*)
Email: rachelm@ccrjustice.org
SAMUEL MILLER, State Bar No. 138942
Email: samrmiller@yahoo.com
A. AZURE WHEELER (*pro hac vice*)
Email: awheeler@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (216) 614-6432
Fax: (212) 614-6499

CARMEN E. BREMER (*pro hac vice*)
Email: carmen.bremer@bremerlawgroup.com
BREMER LAW GROUP PLLC
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Tel: (206) 357-8442
Fax: (206) 858-9730

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, et al., | Case No.: 4:09-cv-05796-CW |
| Plaintiffs, | **CLASS ACTION** |
| v. | **MOTION FOR EXTENSION OF SETTLEMENT AGREEMENT BASED ON SYSTEMIC DUE PROCESS VIOLATIONS** |
| GOVERNOR OF THE STATE OF CALIFORNIA, et. al., | |
| Defendants. | Date: February 6, 2018<br>Time: 2:30 p.m.<br>Location: TBD<br>Judge: Hon. Claudia Wilken |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on February 6, 2018 at 2:30pm in a courtroom to be determined, 1301 Clay Street, Oakland, Plaintiffs will move the Court pursuant to Paragraph 41 of the Settlement Agreement for an order extending that Agreement and the Court's Jurisdiction over this matter for one year, based on Plaintiffs' demonstration by a preponderance of the evidence of continuing, systemic violations of the Due Process Clause of the United States Constitution, related to the *Ashker v. Governor* Second Amended Complaint and Settlement Agreement. This motion is based on this notice, the accompanying Memorandum of Points and Authorities, and all documents and arguments submitted in support thereof.

Plaintiffs have previously sought leave to expand the page limits for this motion. *See* ECF Nos. 886, 889, 895. That motion remains pending.

DATED:  November 20, 2017        Respectfully submitted,


By:   */s/ Carmen E. Bremer*

CARMEN E. BREMER (*pro hac vice*)
Email: carmen.bremer@bremerlawgroup.com
BREMER LAW GROUP PLLC
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Tel: (206) 357-8442
Fax: (206) 858-9730

1

**TABLE OF CONTENTS**

2
**Page**

3

I.      HISTORY OF THE CASE ............................................................. 1

4

II.     SUMMARY OF THE ARGUMENT ............................................ 3

5

III.    CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY
        SYSTEMICALLY MISUSING CONFIDENTIAL INFORMATION TO RETURN

6       ASHKER CLASS MEMBERS TO SOLITARY CONFINEMENT. ................................ 5

7       A.      CDCR'S SYSTEMIC FAILURE TO ACCURATELY DISCLOSE
                CONFIDENTIAL INFORMATION VIOLATES DUE PROCESS. .................... 7

8

9               1.      ██████████ RVR 1 .......................................................... 9

10              2.      ██████████ RVR 2 ........................................................ 11

11              3.      █████████, █████████, █████████ & █████████ .......... 11

12              4.      █████████████ ........................................................ 14

13              5.      ██████ ...................................................................... 15

14              6.      █████████████ ........................................................ 15

15              7.      ████████████████████████ .......... 16

16              8.      █████████ ................................................................ 17

17              9.      █████████ ................................................................ 17

        B.      CDCR'S PATTERN OF PERFUNCTORY AND PRO FORMA RELIABILITY
18              DETERMINATIONS VIOLATE DUE PROCESS ............................................ 18

19              1.      █████████ ................................................................ 19

20              2.      ████████ .................................................................. 20

21              3.      ████████ .................................................................. 22

22              4.      ███████████ ............................................................ 24

23              5.      █████████ ................................................................ 25

24              6.      ████████ .................................................................. 27

25              7.      █████████ ................................................................ 29

26      C.      RELIEF FOR CDCR'S SYSTEMIC DUE PROCESS VIOLATIONS
                INVOLVING CONFIDENTIAL INFORMATION. ........................................ 29

27

28      IV.     CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY PLACING
                AND RETAINING CLASS MEMBERS IN THE RCGP WITHOUT ADEQUATE

PROCEDURAL PROTECTIONS. ................................................................. 30

A.   RCGP DESIGNATION IS ATYPICAL AND SIGNIFICANT. ......................... 31

    1.   The RCGP Imposes Exceptional Physical Restrictions. ......................... 32

        a.   RCGP Prisoners Have Limited Ability to Enjoy Contact Visits... 32

        b.   RCGP Prisoners Have Limited Social Interaction and Job
             Opportunities. ................................................................. 34

        c.   RCGP Placement Limits Parole Eligibility. ................................. 35

    2.   RCGP Placement Is Prolonged. .............................................. 36

    3.   Placement in the RCGP Is Stigmatizing. ................................. 38

    4.   RCGP Designation Is Highly Unusual. ..................................... 39

B.   RCGP CLASSIFICATION AND VERIFICATION PROCEDURES ARE
     CONSTITUTIONALLY DEFICIENT. .................................................. 40

    1.   Prisoners' Private Interest in Avoiding RCGP Placement
         Is Significant. ................................................................. 40

    2.   There Is a Significant Risk of Erroneous Deprivation Under Current
         Procedures. ................................................................... 41

        a.   RCGP Prisoners Are Denied Adequate Notice and Review. ........ 41

        b.   Safety Threat Reviews Lack Sufficient Checks and Balances...... 44

    3.   Additional Procedures Would Safeguard Against Erroneous
         Deprivations. ................................................................. 46

    4.   Government Interests Would Be Better Served by Implementing
         Meaningful Procedures. ...................................................... 47

C.   RELIEF FOR CDCR'S SYSTEMIC DUE PROCESS VIOLATIONS
     INVOLVING PLACEMENT AND RETENTION OF PRISONERS
     IN THE RCGP. ............................................................................. 47

V.   CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY USING
     UNRELIABLE GANG VALIDATIONS TO DENY CLASS MEMBERS A FAIR
     OPPORTUNITY TO SEEK PAROLE. .................................................. 48

A.   THE PROCESS USED TO VALIDATE PRISONERS AS GANG
     AFFILIATES, WHICH IS NOW BEING USED TO DENY CLASS
     MEMBERS A FAIR OPPORTUNITY FOR PAROLE, WAS
     UNCONSTITUTIONAL. ................................................................... 50

    1.   Gang Validation Procedures Lacked Sufficient Checks and Balances. .... 50

    2.   Gang Validation Procedures Gave Prisoners Misleading Notice
         About How to Avoid Revalidation. ......................................... 53

3.     Gang Validation Review Every Six Years Was Insufficiently Frequent as a Matter of Law. ................................................. 56

B.     PLAINTIFFS HAVE A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST IN PAROLE CONSIDERATION AND IN AVOIDING GANG VALIDATION. ................................................................................... 58

C.     CDCR'S CONTINUED USE AND RETENTION OF GANG VALIDATIONS HAS A SYSTEMIC AND ONGOING EFFECT IN THE DENIAL OF PAROLE. ...................................................................... 59

1.     The Blanket Denial of Proposition 57 Parole Consideration Based on Gang Validation is Unconstitutional. ...................................... 59

2.     CDCR's Use of Past Gang Validations to Prevent Class Members with Life Sentences from the Opportunity for Parole Violates the Constitution. ............................................................................. 61

D.     RELIEF FOR CDCR'S SYSTEMIC DUE PROCESS VIOLATIONS INVOLVING THE FAIR OPPORTUNITY FOR PAROLE .............................. 64

VI.     CONCLUSION ............................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aref v. Lynch,*
833 F.3d 242 (D.C. Cir. 2016) ............................................................... 33, 37, 38, 39

*Arnold v. Evans,*
No. C 08-1889 CW (PR), 2010 U.S. Dist. LEXIS 13990 (N.D. Cal. Jan. 25, 2010) ............... 8

*Broussard v. Johnson,*
253 F.3d 874 (5th Cir. 2001) ............................................................................ 5

*Brown v. Or. Dep't of Corr.,*
751 F.3d 983 (9th Cir. 2014) ............................................................... 31, 37, 56, 57

*Cardenas v. Tulare Cty. Sheriff's Dep't,*
No. 1:11-cv-01394-JLT (PC), 2013 U.S. Dist. LEXIS 69315 (E.D. Cal. May 15, 2013) ...... 38

*Cato v. Rushen,*
824 F.2d 703 (9th Cir. 1987) ............................................................................ 26

*Clark v. California,*
No. C 96-1486-FMS, 1996 U.S. Dist. LEXIS 21630 (N.D. Cal. Oct. 1, 1996) ..................... 37

*Conner v. Sakai,*
15 F.3d 1463 (9th Cir. 1993), *vacated in part and amended by* 61 F.3d 751 (9th Cir. 1995) 56

*Freeman v. Rideout,*
808 F.2d 949 (2d Cir. 1986) ............................................................................ 8

*Greenholtz v. Inmates of Neb. Penal and Correctional Complex,*
442 U.S. 1, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979) ............................................ 41, 54, 56, 58

*Haggard v. Curry,*
631 F. 3d 931 (9th Cir. 2010) ............................................................................ 58

*Hanline v. Borg,*
No. 93-15979, 1994 U.S. App. LEXIS 10331 (9th Cir. Apr. 29, 1994) .............................. 8, 9

*Harden-Bey v. Rutter,*
524 F.3d 789 (6th Cir. 2008) ............................................................................ 38

*Hayward v. Marshall,*
603 F. 3d 546 (9th Cir. 2010) (en banc) .............................................................. 58

*Hensley v. Wilson,*
850 F.2d 269 (6th Cir. 1988) ............................................................................ 5

*Hewitt v. Helms*,
    459 U.S. 460 (1983). MTD Order at 18 ........................................................................ 2, 56

*Jones v. Gomez*,
    No. C-91-3875 MHP, 1993 U.S. Dist. LEXIS 12217 (N.D. Cal. Aug. 23, 1993) .................. 6

*Keenan v. Hall*,
    83 F.3d 1083 (9th Cir. 1996) ............................................................................... *passim*

*Koch v. Lewis*,
    216 F. Supp. 2d 994, 2001 U.S. Dist. LEXIS 24466 (D. Ariz. Aug. 30, 2001) ..................... 37

*In re Lawrence*,
    44 Cal. 4th 1181 (2008) .......................................................................................... 58

*Madrid v. Gomez*,
    889 F. Supp. 1146, 1277 (N.D. Cal. 1995) ................................................................... 6

*Madrid v. Woodford*,
    No. C90-3094-T.E.H., 2004 U.S. Dist. LEXIS 11561 (N.D. Cal. June 24, 2004) 19, 20, 21, 22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................... 2, 41, 46, 47

*McQueen v. Tabah*,
    839 F.2d 1525 (11th Cir. 1988) ................................................................................ 56

*Neal v. Shimoda*,
    131 F.3d 818, 830 (9th Cir. 1997) ............................................................................. 38

*Overton v. Bazzetta*,
    539 U.S. 126 (2003) ............................................................................................... 33

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ............................................................................................... 19

*Resnick v. Warden Hayes*,
    213 F.3d 443 (9th Cir. 2000) ................................................................................... 31

*In re Rosenkrantz*,
    29 Cal. 4th 616 (2002) ........................................................................................... 58

*Sandin v. Conner*,
    515 U.S. 472 (1995) ........................................................................................ *passim*

*People ex rel. Santiago v. Warden, Rikers Is. Corr. Facility*,
    793 N.Y.S.2d 722 (Sup. Ct. 2005) ............................................................................ 29

*Scales v. United States*,
    367 U.S. 203 (1961) ............................................................................................... 55

*Serrano v. Francis*,
    345 F.3d 1071 (9th Cir. 2003) .................................................................. 33, 35, 59

*Sherwood v. Tancrator*,
    No. ED CV 06-96-CJC (PLA), 2008 U.S. Dist. LEXIS 113356 (C.D. Cal. June 19, 2008) .. 38

*Silva v. Sanford*,
    No. 91 Civ. 1776 (AJP) (KMW), 1998 U.S. Dist. LEXIS 5905 (S.D.N.Y. Apr. 23, 1998) ... 38

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004) ................................................................................. 5

*Swarthout v. Cooke*,
    562 U.S. 216 (2011) ....................................................................................... 58

*Taylor v. Rodriguez*,
    238 F.3d 188 (2d Cir. 2001) ............................................................................ 54

*Toevs v. Reid*,
    685 F.3d 903 (10th Cir. 2012), *amended on reh'g by* 685 F.3d (10th Cir. 2012) ....... 41, 54, 56

*Toussaint v. McCarthy*,
    801 F.2d 1080 (9th Cir. 1986) ................................................................... 53, 56

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ................................................................................. *passim*

*Williams v. Foote*,
    No. CV 08-2838-CJC (JTL), 2009 US Dist. LEXIS 81958 (C.D. Cal. Apr. 30, 2009) ........... 8

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ............................................................................. 2, 3, 5, 7

*Zimmerlee v. Keeney*,
    831 F.2d 183 (9th Cir. 1987) ................................................................. 5, 6, 7, 18

**Statutes**

CAL. CODE REGS., tit. 15 § 2449.4(b) ................................................................ 58

CAL. CODE REGS., tit. 15 § 3044(b) ................................................................. 35

CAL. CODE REGS., tit. 15 § 3044(d)-(j) (2017) ................................................... 34

CAL. CODE REGS., tit. 15 §§ 3312-26 (2017) ........................................................ 3

CAL. CODE REGS., tit. 15 § 3321 .................................................................... 20

CAL. CODE REGS., tit. 15 § 3321(b) (2017) .............................................. 7, 18, 19, 22

CAL. CODE REGS., tit. 15 § 3321(c) (2017) ........................................................ 21

CAL. CODE REGS., tit. 15 § 3341.5(c) ................................................................. 56, 57

CAL. CODE REGS., tit. 15 § 3370(e) .......................................................................... 61

CAL. CODE REGS., tit. 15 § 3378.2 (2017) ................................................................ 49

CAL. CODE REGS., tit. 15 § 3378.9(e) ....................................................................... 35

CAL.CODE REGS., tit. 15 § 3378.10(b) (2017) .......................................................... 57

CAL. CODE REGS., tit. 15 § 3378(c) (2013) ............................................................... 51

CAL. CODE REGS., tit. 15 § 3378(d) .......................................................................... 51

CAL. CODE REGS., tit. 15 § 3378(e) .......................................................................... 54

CAL. CODE REGS., tit. 15 § 3378(f). .......................................................................... 57

CAL. CODE. REGS., tit. 15 § 3492 (2017).............................................................. 59, 60

CAL. CONST. art. I, § 32(a)(1)................................................................................... 59

Fourteenth Amendment of the United States Constitution .................................... *passim*

**Other Authorities**

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/
     active (last visited Nov. 16, 2017)............................................................... 55

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,
     http://www.cdcr.ca.gov/Facilities_Locator/PBSP.html (last visited Nov. 7, 2017) ......... 30, 31

CDCR COMPSTAT DAI STATISTICAL REPORT – 13 MONTH (HIGH SECURITY),
     (rev. Oct. 13, 2017), *available at* http://www.cdcr.ca.gov/COMPSTAT/ ............................. 34

CDCR POPULATION PROJECTION REPORT 4 (May 2017), *available at*
     http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services
     _Branch/Projections/S17Pub.pdf .............................................................. 39

**MEMORANDUM OF POINTS AND AUTHORITIES**

Through two years of monitoring California Department of Corrections and Rehabilitation's ("CDCR") compliance with the *Ashker v. Governor* Settlement Agreement, Plaintiffs have developed evidence of current and ongoing systemic violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution related to Plaintiffs' Second Amended Complaint ("SAC") and CDCR's resulting reforms. *See Ashker v. Governor,* ECF No. 424-2 ("Settlement Agreement" or "Settlement"), ¶ 41. The violations exist in three distinct areas: first, the misuse of unreliable confidential information to return class members to solitary confinement; second, inadequate procedural protections related to placement and retention of class members in the Restricted Custody General Population Unit (RCGP); and third, the retention of CDCR's old, constitutionally infirm, gang validations, which are being relied on to deny class members a fair opportunity for parole. Each of these three, distinct, violations requires extension of the Court's jurisdiction over this matter.

I.    **HISTORY OF THE CASE**

The *Ashker* Complaint set forth two basic claims. *See generally,* SAC, ECF No. 136. First, Plaintiffs asserted that "the cumulative effect of extremely prolonged confinement, along with denial of the opportunity of parole . . . and other crushing conditions of confinement at the Pelican Bay SHU," caused Plaintiffs significant physical and psychological harm. Order Denying Motion to Dismiss ("MTD Order"), at 2, ECF. No. 191. Plaintiffs claimed that spending "22 and one-half to 24 hours a day" alone in a cramped cell without telephone calls, contact visits and vocational, recreational or educational programming deprived them of basic human needs, including "normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity." *Id*. at 2, 8. Given the length of the deprivation—at least eleven years—the Court found Plaintiffs' Eighth Amendment claim plausible. *Id.* at 9.

Second, "Plaintiffs allege[d] that CDCR's procedures for assigning inmates to the SHU [Security Housing Unit] and periodically reviewing those assignments" violate Due Process. *Id.* at 11. The Second Amended Complaint asserted that SHU confinement deprived prisoners of a

liberty interest due to its harsh conditions, lengthy duration and effect on the opportunity for parole. SAC ¶ 196. This Court found the existence of a liberty interest undisputed and used the three-part balancing test established in *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976), to determine that Plaintiffs adequately pled a due process violation. MTD Order at 12-18. The Court did not decide whether Plaintiffs are entitled to the hearing procedures described in *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974), as Plaintiffs argued, or the more "minimal process" set forth in *Hewitt v. Helms*, 459 U.S. 460 (1983). MTD Order at 18.[1]

The Settlement Agreement sought to remedy these violations. For prisoners held in SHU based on gang or Security Threat Group ("STG") validation, the Agreement created a process for release to general population (GP) unless they had been found guilty of a SHU-eligible rule violation with an STG-nexus within the prior two years. SA, ¶ 25. Other provisions focused on changing CDCR's policies and practices going forward. With respect to Plaintiffs' Eighth Amendment claim, the Settlement Agreement was designed to ensure that in the future, people in California prisons would not have to suffer prolonged periods of solitary confinement, and thus it abolished indeterminate SHU sentences for gang affiliation, allowing for SHU placement only when a prisoner is found guilty of a SHU-eligible rule violation, and only for a determinate term as set forth in new regulations. SA, ¶¶ 13, 14, Attach. B. The Agreement allows for the possibility that a few men will be kept in "Administrative SHU," but only if CDCR meets strict criteria. *Id.* ¶ 29. The men would have receive more out-of-cell recreation and programming than prisoners serving determinate SHU sentences, and meaningful annual and semi-annual reviews to identify efforts to move them into less restrictive housing. *Id.*

Similarly, prisoners with serious safety concerns, and those who refuse to program or receive numerous disciplinary reports in the Step Down Program ("SDP"), would not be housed indefinitely in the SHU, but instead would be sent to a newly created Restricted Custody General

---

[1] Several years after the Second Amended Complaint was filed, the Court granted Plaintiffs' motion for leave to file a supplemental complaint to include a new class of prisoners who had already spent ten years at the Pelican Bay SHU and who were subsequently transferred to another SHU. Order Granting Motion for Leave to File a Supplemental Complaint, ECF No. 387.

Population unit (RCGP), designed to provide out-of-cell time and programming commensurate with GP, and "increased opportunities for positive social interaction with other prisoners and staff . . .". SA, ¶ 28. The intent of these provisions was to ensure that going forward, only in extreme circumstances could a prisoner spend more than ten years in the SHU and then only with significantly more-out-of-cell recreation and programming than had previously been provided, and with a recognized way out.

Other provisions of the Settlement Agreement were directed to remedying the due process violations alleged in the Complaint and uncovered in the course of discovery and expert reports. CDCR agreed that in the future, it would only place inmates in the SHU or SDP if they were found guilty of a SHU-eligible rule violation through a prison disciplinary proceeding. CDCR, in line with due process, requires that disciplinary proceedings utilize significant procedural protections. *See* CAL. CODE REGS. tit. 15 §§ 3312-26 (2017); *Wolff*, 418 U.S. at 563-72. In this way, the Settlement Agreement remedied one of Plaintiffs' main demands – that prisoners not be placed in SHU for any substantial period of time without *Wolff* procedures. *See* Plaintiffs' Opp. to Defs' Mot. to Dismiss Second Amended Compl. at 12-14, ECF. No. 178.

Along with requiring *Wolff* procedures, the Settlement Agreement also specified that CDCR must comply with its regulations governing the use and disclosure of confidential information. SA, ¶ 34. "To ensure that the confidential information used against inmates is accurate," CDCR agreed to "develop and implement appropriate training for impacted staff members who make administrative determinations based on confidential information as part of their assigned duties . . .". *Id.* This agreement was essential given the Complaint's focus on how CDCR's prior use of confidential information presented a serious risk of erroneous deprivation of liberty, and the evidence Plaintiffs amassed in expert and fact discovery regarding the same.

## II.     SUMMARY OF THE ARGUMENT

CDCR has removed nearly all of the original class members from the SHU; this is an important result of the lawsuit and the Settlement Agreement. However, serious and systemic constitutional defects continue which, if not rectified, may well result in many of the original class members and other California prisoners being placed once again in the SHU for prolonged

periods without due process of law, being placed and retained in RCGP without cause or a way to transition to a true GP unit, and being denied parole based on gang validations imposed in violation of due process. Thus, Plaintiffs move for a twelve-month extension of the Settlement Agreement and the Court's jurisdiction. SA, ¶ 41. To prevail, Plaintiffs must demonstrate by a "preponderance of the evidence that current and ongoing systemic violations of . . . the Due Process Clause of the Fourteenth Amendment . . . exist as alleged in Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of . . . the SHU policies contemplated by this Agreement." *Id*. We make this showing below.

First, CDCR has completely failed in its implementation of Paragraph 34 of the Settlement Agreement, regarding the use of confidential information. The result is a current and ongoing violation of the due process requirement that confidential information used to find prisoners guilty of rule violations, and to send them to solitary for years on end, be adequately disclosed and determined reliable by the relevant fact-finder.

Second, the Settlement Agreement created enhanced procedural protections to be used when CDCR suspects that a prisoner faces a threat to their safety in GP and requires placement in the RCGP. CDCR has failed to implement these protections in a fair and meaningful way. As described below, the unusual and onerous conditions of the RCGP are atypical and significant compared to the ordinary incidents of prison life, and thus give rise to a liberty interest. Yet, as implemented, CDCR's RCGP placement and retention procedures fail to ensure reliable decision-making.

Third, the Settlement Agreement's prohibition on placing prisoners in the SHU based on gang validation should have ended the previous de facto bar on parole for gang affiliates. But CDCR has continued to maintain and rely on its old gang validations, without acknowledging their flawed nature. CDCR uses validation decisions to bar *Ashker* class members from eligibility for Proposition 57 relief, and the validations also infect non-Prop 57 parole hearings. Because the old validation procedures violated due process, they cannot be relied on to deprive prisoners of their liberty interest in an opportunity for parole, and must be expunged.

### III.   CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY SYSTEMICALLY MISUSING CONFIDENTIAL INFORMATION TO RETURN *ASHKER* CLASS MEMBERS TO SOLITARY CONFINEMENT.

Paragraph 34 of the Settlement Agreement requires CDCR to adhere to its regulations about consideration and reliance on confidential information, and to train relevant staff accordingly. CDCR's failure to do so has resulted in widespread and systemic violations of due process, evidenced by CDCR's reliance on fabricated or inadequately disclosed confidential information, and failure to independently assess the reliability of confidential evidence.

While the full spectrum of constitutional protections is not available to prisoners, "there is no iron curtain drawn between the Constitution and the prisons of the country," and prisoners do not forfeit all constitutional protections by reason of their conviction and confinement. *Wolff*, 418 U.S. at 555-56. In particular, while due process permits prison officials to use confidential information in disciplinary proceedings, the Ninth Circuit, consistent with other Courts of Appeal, has emphasized "the importance of reliability" in connection with such use. *Zimmerlee v. Keeney,* 831 F.2d 183, 186 (9th Cir. 1987).

The reliability of confidential information cannot be assumed based on the assertion of an investigating official. Rather, the hearing official or board must make an independent assessment of the credibility of statements by confidential informants. *Sira v. Morton*, 380 F.3d 57, 77-78 (2d Cir. 2004) (requiring hearing officer to make "independent assessment" of informant credibility to ensure fairness); *Hensley v. Wilson,* 850 F.2d 269, 276-77 (6th Cir. 1988) (To simply accept the investigating officer's conclusion is "recordkeeping" and "not fact finding." To pass constitutional muster, the Committee must have an evidentiary basis "to determine for *itself* that the informant's story is probably credible") (emphasis added); *Broussard v. Johnson*, 253 F.3d 874, 876-77 (5th Cir. 2001) ("Courts generally require that the disciplinary board independently assess the reliability of the informant's tip based on some underlying factual information before it can consider the evidence").

Consistent with these guidelines, the Ninth Circuit requires that reliability be established by: "(1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the

record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an *in camera* review of the documentation from which credibility was assessed." *See Zimmerlee*, 831 F.2d at 186-87. Strict adherence to these requirements is essential, given the high risk that prisoners with incentives to lie will provide false information. *Jones v. Gomez*, No. C-91-3875 MHP, 1993 U.S. Dist. LEXIS 12217, at *11 (N.D. Cal. Aug. 23, 1993) ("[G]iven the differences that arise between prisoners due to jealousies, gang loyalties, and petty grievances, and the unfortunate discrete instances where guards seek to retaliate against prisoners, to rely on statements by unidentified informants without anything more to establish reliability is worse than relying on no evidence: 'It is an open invitation for clandestine settlement of personal grievances'") (citing *Baker v. Lyles*, 904 F.2d 925, 934-35 (4th Cir. 1990)).

The requirement that the Hearing Officer independently judge reliability requires more than a *pro forma* review of the confidential information. As Judge Henderson noted in *Madrid v. Gomez*, prison officials "must do more than simply invoke 'in a rote fashion' one of the five criteria" listed for reliability in CDCR's regulations; they "must also show that the 'realities of the particular informant report' were taken into consideration." 889 F. Supp. 1146, 1277 (N.D. Cal. 1995).

To monitor CDCR's compliance with Paragraph 34 of the Settlement Agreement and the corresponding dictates of due process, Plaintiffs' counsel reviewed the documents CDCR produced on a quarterly basis related to prisoners found guilty of a SHU-eligible rule violation with an STG nexus. SA, ¶ 37(h). Of about forty sets of files, more than half involved men returned to SHU for various "conspiracy" or attempted murder charges.[2] Declaration of Rachel

---

[2] The relatively low number of files may result from the fact that many such cases are referred to the District Attorney's office, which may take months to decide whether to prosecute, and can delay adjudication of the rule violation. It is also the result of CDCR's misinterpretation of the requirement to produce documents related to "all inmates found guilty of a SHU-eligible offense with an STG-nexus" to only require production of documents related to STG-validated prisoners found guilty of a SHU-eligible offense with a STG-nexus. This issue has been fully briefed, and the parties are awaiting guidance from the Court. *See* ECF Nos. 793, 807, 822. It is likely that dozens of non-validated prisoners have been sent to solitary for equally questionable conspiracies; should the Court order the production of their documents, Plaintiffs may seek leave to supplement this motion.

1  Meeropol in Support of Plaintiffs' Motion to Extend the Settlement Agreement ("Meeropol

2  Decl."), ¶ 3. Of twenty-four conspiracy or attempted murder guilty findings, twenty (over 80%)

3  violate due process, because CDCR officials (a) fabricated or improperly disclosed confidential

4  information, or (b) failed to independently ensure the confidential material was reliable. [3]

5  Despite CDCR's agreement to train its administrative staff to ensure that the confidential

6  information they rely on is accurate, the evidence shows that CDCR administrative officials

7  repeatedly have dealt with this information in a slipshod, careless way, demonstrating no effort to

8  ensure that confidential information is accurate, reliable, and properly disclosed. This is the

9  continuation of a problem that infected CDCR's old gang validation procedures (*see generally*

10 section V *infra*; *see also* n.30) and motivated Plaintiffs to insist that validation alone no longer

11 lead to SHU placement. High-level CDCR officials have even perpetuated the fabrication of

12 confidential information, illustrating that the problem involving confidential information is not

13 simply one of lower level officials, but continues to exist on a systemic basis across the entire

14 department.

15    **A.    CDCR's Systemic Failure to Accurately Disclose Confidential Information
        Violates Due Process.**
16

17     When confidential information is used against a prisoner, California regulations require

18 the prisoner be provided with, "[a]s much of the information as can be disclosed without

19 identifying its source including an evaluation of the source's reliability; [and] a brief statement of

20 the reason for the conclusion reached…". CAL. CODE REGS., tit. 15 § 3321(b)(3)(B) (2017).

21 Fabricated or otherwise substantially flawed disclosures violate due process, as a prisoner without

22 knowledge of the evidence used against him, and the claimed basis for reliability, cannot hope to

23 "marshal the facts and prepare a defense" (*Wolff*, 418 U.S. at 564) or challenge the evidence for

24 failing to meet *Zimmerlee* standards.

25

26

27 [3] Plaintiffs' counsel have also received relevant documents directly from the prisoners, and we discuss some of these cases as well, as they present further evidence of the systemic nature of CDCR's misuse of confidential information. *See infra* Section A, regarding ███████████

28 ███████████████████████.

Plaintiffs recognize that offering false evidence of misconduct in a prison disciplinary hearing does not, in itself, violate due process. *See, e.g., Freeman v. Rideout*, 808 F.2d 949, 951-52 (2d Cir. 1986). But the introduction of fabricated *confidential* material presents a different problem. In the normal course of events, when non-confidential, false, evidence is introduced, the prisoner can challenge that evidence within a disciplinary proceeding. So long as the hearing accords with due process protections, the Constitution is satisfied. *See id.* at 953. But when confidential information is fabricated, or not properly disclosed, a prisoner has no opportunity to defend herself, or to challenge reliability. *Cf. Williams v. Foote*, No. CV 08-2838-CJC (JTL), 2009 US Dist. LEXIS 81958, at *35-36 (C.D. Cal. Apr. 30, 2009) (While the filing of a false disciplinary report is not a constitutional violation per se, it may state a claim if the prisoner is deprived of procedural due process in connection with proceedings flowing from such false report). Because a prisoner cannot rebut false confidential information, its use violates due process. *Cf. Freeman*, 808 F.2d at 952 *(citing Morrison v. Lefevre*, 592 F. Supp. 1052, 1073 (S.D.N.Y. 1984)); *see also Hanline v. Borg,* No. 93-15979, 1994 U.S. App. LEXIS 10331, at *11-14 (9th Cir. Apr. 29, 1994) (allegations of fabricated evidence and sham disciplinary hearing state due process claim); *Arnold v. Evans*, No. C 08-1889 CW (PR), 2010 U.S. Dist. LEXIS 13990 (N.D. Cal. Jan. 25, 2010) (refusing to dismiss an amended *pro se* complaint challenging use of false and unreliable confidential information).

At odds with the demands of due process and CDCR's own regulations, Plaintiffs' document review has uncovered repeated failures by CDCR to accurately and fully disclose confidential information. CDCR has repeatedly "disclosed" fabricated evidence that does not actually exist, has misstated confidential information to make it appear corroborated when it is not, has failed to disclose exculpatory evidence, and has provided disclosures so vague and general as to prevent any defense. These examples are not "isolated violations," (*see* SA, ¶ 42) but reflect a systemic problem, found in multiple rule violation reports ("RVRs") throughout the monitoring period, across many prisons, and involving personnel at disparate levels of authority. Moreover, this trend is particularly cruel, in that it has resulted in the return to solitary of dozens of class members only recently released from decades in SHU.

**1.** ██████████ **RVR 1**

████████████ was found guilty of ████████████████████ with an STG nexus at California State Prison -- Los Angeles County. *See* Meeropol Decl., Ex. A (████████ RVR), at 1. As shown below, this finding was based on fabricated confidential information; when two confidential informants provided inconsistent reasons for the alleged conspiracy, CDCR officials doctored the disclosure to make it appear that the evidence was actually consistent, and thus corroborated, when it was not.

████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

CDCR regulations require that confidential information is documented in a confidential memorandum, and summarized for the prisoner in a confidential disclosure form. A disclosure form provided to ████ on February 2, 2017, summarized the information reported by CI1 as recounted above. *See* Meeropol Decl., Ex. B (████████ 2/2/17 Conf. Discl.). Plaintiffs received this disclosure from ████ directly. *See* Meeropol Decl., ¶ 6. However, when CDCR produced ████████ RVR packet, ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

1    In other words, CDCR's documentation first indicated ███████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████. This chain of events suggests purposeful fabrication of informant testimony, to render it

5  consistent.

6    Moreover, *none* of these confidential disclosures accurately reflect ████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████ That "confidential information" appears to have been made

16 up out of whole cloth.

17    Unsurprisingly, the RVR and disclosures also misstate the evidence provided by ████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████. These errors are not

27 harmless; without knowledge of the general substance of the confidential evidence used against

28 him, ████████ could not challenge it, nor could he challenge the reliability of the sources, not

1  knowing that they actually provided inconsistent information.

2         **2.      ████████      RVR 2**

3         On the same day he was provided the ████ RVR, ████ was also charged, and later

4  found guilty, of ████████████████████. Meeropol Decl., Ex. D (████ RVR 2),

5  at 2. ██████████████████████████████████████████████████

6  ██████████████████. Again, the RVR and disclosure provided to ████ misstate

7  the confidential information; and again, the misstatements appear to be purposeful, to make

8  contradictory evidence appear consistent, and thus reliable.

9  ██████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████████

12 ██████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████

15 ████████████████████████████████████████

16 ██████████████████████████████████████████. This is

17 no careless mistake: again CDCR appears to have purposefully misstated confidential

18 information from one informant to make it consistent with information from another informant.

19 *See id.*, Ex. D (████ RVR 2), at 13 (finding second confidential memorandum reliable because

20 other confidential source independently provided *the same* information).

21        **3.      ████████, ████████, ████████ & ████████**

22        ████████ RVRs are not isolated errors. The Court is already familiar with the case of four

23 class members—████████████████████████████—found

24 guilty of conspiracy to commit murder with an STG nexus at Pelican Bay State Prison. *See* Order

25 Denying De Novo Motion, ECF No. 771.[4] ████ and his alleged co-conspirators received

26 _____

27 [4] Plaintiffs do not seek to re-litigate the Court's prior ruling, finding no violation of Paragraph
   34 with respect to the ████ proceedings. Rather, CDCR's treatment of the ████ alleged co-
   conspirators is offered for its value "towards a showing of a violation of due process." *Id.* at 10.

28 We recognize that the Court has rejected individual instances of fabrication and improper
   disclosure in the context of enforcing the Settlement Agreement; but Plaintiffs' current

1    confidential disclosure forms which included a fabricated statement from a confidential source;

2    the source actually provided exculpatory evidence, but it was not disclosed.

3         The men received a confidential disclosure ████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████  Just like with

13   ██████  CDCR officials fabricated a statement from a confidential informant to make it fit their

14   theory of the case.

15        Perhaps even more troubling than the initial fabrication is CDCR's response when the

16   matter was called to their attention during the course of Plaintiffs' enforcement motions. In a

17   sworn declaration, ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ██████  Decl., ¶¶ 15, 16, February 10, 2017 (filed under seal). This is demonstrably false.

21        A second confidential memorandum ████████████████████████████████

22   ████████████████████████

23   ██████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████████████████

25   ██████████████████████████████████████████████████████████████

26   ██████████████████████████████████████████████████████████████

27

28   argument—of patterned Paragraph 34 deficiencies resulting in a systemic due process
     violation—has not previously been considered.



In other words, in attempting to explain a discrepancy in its use of confidential information, CDCR offered to the Court testimony that is demonstrably untrue. It is one thing to make a mistake, but that CDCR fails to acknowledge the grievous error that occurred here, and instead attempted to cover it up, suggests a more serious problem within CDCR's disciplinary system with respect to misuse of confidential information.

While the fabricated informant statement is the most shocking problem with CDCR's use of confidential information in the ▪▪▪ proceedings, it is not the only one. As the Court will recall, ▪▪▪ and the others received a disclosure indicating that ▪▪▪

1

2

3 ██████████████████████████████████. Instead of providing the men with a fair recitation

4 of what the note actually said, CDCR disclosed its own interpretation of the note as if it were the

5 words used. These inconsistencies are not harmless.

6

7

8

9

10

11 ████████████████████████████████████ Disclosure of the words themselves or a fair

12 paraphrase of the words would allow the alleged co-conspirators to make this point. CDCR's

13 disclosure—

14

15 ███████—does not. Meeropol Decl., Ex. E (████ RVR), at 22. This distinction is

16 significant, as CDCR's version

17

18 **4.**

19 Other similar examples abound. █████████ is a validated Mexican Mafia associate

20 found guilty at Wasco State Prison of ██████████████████ with a STG nexus, also based

21 on ████████████. Meeropol Decl., Ex. G (████ RVR), at 6. ████ received an

22 RVR and confidential disclosure indicating that,

23

24

25

26

27 ██████ Based on the disclosure, ████ is left to wrongly assume that

28

1   ████████████████████. He has no way to challenge ████████████ because he

2   does not even know that occurred.

3         **5.**   ████████

4         Similarly, ████████ was found guilty of a conspiracy ████████████ with an STG

5   nexus at California State Prison – Los Angeles County. Meeropol Decl., Ex. I (███ RVR), at

6   39. ████   RVR indicates that a ██████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████

16        **6.**   ████████████████

17        The Court will also recall the proceeding against ████████████ and ████████, who

18  were found guilty of conspiracy to ████████████ with an STG nexus at Pelican Bay State

19  Prison. *See* Plaintiffs' Motion for De Novo Determination of Dispositive Matter, ECF. No. 795.[5]

20  CDCR initially provided a confidential disclosure to ████████████ reporting that ██

21  ████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  _____

28  [5] This motion is pending before the Court, but the evidence provided herein remains relevant
    regardless of its outcome. *See supra,* n.4.

1  ████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████

3  ████████████████████

4  CDCR learned of its mistake when it received ████████████████████

5  █████████████. *Id*. ████████████████ were provided with new confidential disclosures which

6  completely mischaracterized ████████████████████████████████

7  ██████████████. *See* Meeropol Decl., Ex. L (████ 9/21/16 Confid. Discl.). ████████

8  █████████████████████████

9        **7.**    ████████████████████████████████████████

10     Even when confidential information is not fabricated or misstated, it is frequently not

11  disclosed in full, or is disclosed in too vague a way as to allow for its reliability to be tested.

12  According to CDCR paperwork, on May 24, 2017, approximately ████████████████████

13  ████████████████████████████████████████████

14  Meeropol Decl., Ex. M (████ RVR). ████████████████████████████████

15  ██████████████████████████████████████████

16  ██████████████████████████████████████████

17  ██████████████████████████████████████████

18  ███████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████

21  ██████████████████████████████████████████

22  ████████████████████████████████████████

23  ██████████████████████████████████████

24  ███████████████████████████████████████████████

25  █ This information could significantly aid prisoners in arguing ████████████████

26  ████████████████████████████████████. But because it was not

27  disclosed, the men cannot mount this defense.

28

8. ███████████

There are reasons to believe this disturbing pattern is not limited to STG-validated prisoners, but infects all of CDCR's rule violations based on confidential information. For example, ██████████ was charged with ████████████████ at High Desert State Prison in early 2017. The victim was found unconscious in an inmate bathroom in the education facility. Meeropol Decl., Ex. R (████████ RVR), at 4. ████████ received a confidential information disclosure form simply stating:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

*Id.* at 1. ████████ was not provided any additional detail. Such vague and general information is not even close to adequate to allow the accused to prepare a defense.

9. ███████████

Similarly, ████████ was placed in Administrative Segregation at Pelican Bay in August 2017, for ██████████████ and received a confidential disclosure virtually identical to that provided to a different class member placed in administrative segregation on different allegations of a ██████████████████. Compare the two:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████.

The disclosures provide no timeframe, no detail, and no information as to how the informant learned about the alleged conspiracy. While ████ has since been released from solitary without charges, ████ remains in isolation. Meeropol Decl., ¶ 25. That he received a virtually identical confidential disclosure as that given to ████ by a different correctional officer, related

1    to a completely different alleged conspiracy, suggests that these disclosure forms are treated in

2    rote, canned fashion by CDCR staff.

3        The above examples are not "brief or isolated" incidents (*see* SA¶ 42), but rather involve

4    fifteen prisoners, nine different conspiracies, four different prisons, and CDCR officials at every

5    level. Some of the erroneous disclosures of confidential information seem purposeful, others

6    merely negligent, but none are harmless. Each of these class members was sent back to solitary

7    confinement after being told that certain damning, corroborated, confidential information existed

8    against them, when this was not the case. The men, who have access only to the confidential

9    disclosures and not the underlying confidential evidence, have no way to point out discrepancies

10   or to attack the evidence as unreliable, and thus have no way to defend themselves from the

11   claimed rule violations. They do not know of it to this day. It is only due to the existence of the

12   monitoring period that counsel was able to learn of the issue. Meanwhile, almost all the men

13   described above remain in solitary.

14       **B.     CDCR's Pattern of Perfunctory and Pro Forma Reliability Determinations
              Violate Due Process.**

15

16       Compounding its failure to accurately and fully disclose confidential information, CDCR

17   systemically relies on such evidence without ensuring its reliability. The Ninth Circuit has

18   emphasized "the importance of reliability" in connection with prison officials' use of confidential

19   information. *See Zimmerlee*, 831 F. 2d at 186. CDCR regulations are designed to meet this

20   standard, and mandate that only reliable confidential information is to be used in decision-

21   making. Thus, title 15, section 3321(b)(1) of the California Code of Regulations states that no

22   decision will be based upon information from a confidential source, unless the information is

23   corroborated by another source, or "other circumstantial evidence surrounding the event *and* the

24   *documented reliability* of the source satisfies the decision maker(s) that the information is true"

25   (emphasis added). "Any document containing information from a confidential source *shall*

26   *include an evaluation of the source's reliability,"* a brief statement of the reason for the

27   conclusion reached, and a statement of the reason why the information or source is not

28   disclosed." tit. 15, § 3321(b)(2). And to ensure that the prisoner understands CDCR's reasoning

1    as to why the information is reliable, section 3321(b)(3)(B) requires that the documentation given

2    to the prisoner shall include, "[a]s much of the information as can be disclosed without

3    identifying its source including an *evaluation of the source's reliability; [and]* a brief statement

4    of the reason for the conclusion reached . . . " (emphasis added). These regulations have been

5    held to meet due process requirements "so long as [they are] not applied in a rote fashion**,** without

6    regard to the realities of the particular informant." *See Madrid*, 889 F. Supp. at 1277.

7         Here, the documents show repeated failures to ensure confidential information is reliable,

8    including unwarranted assumptions by CDCR officials at every level that confidential

9    informants' statements are reliable, hearing officers' blind reliance on the investigating officers'

10   reliability determination, and findings of corroboration not supported by the factual context. This

11   problem is not confined to one or two isolated incidents; rather, the extent of CDCR's failings,

12   and the fact that they exist at all levels of the department, evidences a systematic violation. *See*

13   *e.g. Madrid v. Woodford,* No. C90-3094-T.E.H., 2004 U.S. Dist. LEXIS 11561, at *189 (N.D.

14   Cal. June 24, 2004) (failure of a specific prominent investigation is "illustrative of a pattern of

15   conduct in which CDC officials at the highest level demonstrate an unwillingness and inability to

16   investigate and discipline serious abuses of force by correctional officers"); *cf. Pembaur v. City of*

17   *Cincinnati*, 475 U.S. 469, 481-82 (1986) (actions by high-level government officials can establish

18   municipal policy for *Monell* purposes). This systemic violation has serious consequences. Many

19   of the men described below have been returned to solitary on the word of one confidential

20   informant, while the CDCR hearing officers required to assess the reliability of that information

21   have completely failed to do so.

22        **1.**    ██████████████

23        First, the evidence shows that Senior Hearing Officers required by due process to make

24   their own reliability assessment frequently fail to do so. ██████████████ provides one example.

25   ██████████ a "non-validated STG-II member" was issued an RVR for ████████████████

26   ████████ for the furtherance of the Mexican Mafia at Centinela Prison. *See* Meeropol Decl., Ex. U

27   (█████████ RVR), at 3.[6] ████████████████████████████████████

28   ───────────────────
     [6] ████████ provides an example of an RVR that should have been produced under the plain



, is precisely the kind of "rote" determination condemned by *Madrid,* 889 F. Supp. at 1277.

**2.**

This reliance on confidential material *already* determined unreliable by other staff is not limited to the disciplinary process. The Departmental Review Board (DRB) decision that

language of the Settlement Agreement, but has been withheld by CDCR. *See supra,* n.2. Given the issues noted above, review of the confidential material underlying ▮▮▮▮ rule violation is essential.

1  ███████████████████████████ is also illustrative of the rote fashion in which even the

2  highest officials treat reliability determinations.

3      The DRB, chaired by Kathleen Allison—the Director of Adult Institutions— decided to

4  send ██████████████████████████████████████████

5  ████████████████████████ ██ ██

6  ███████████████████████████

7  ██████████████████████

8  █████████████████████████████

9  ████████████████████████████

10 ███████████████████████████████

11 ██████████████████████████████

12 ████████████████████████

13 ███

14    ████████████████████████████

15 ██████████████████████████████

16 ████████████████████

17 ███████████████████████████████

18 ██████████████████

_____

[7] Magistrate Judge Vadas recently ruled against Plaintiffs in an enforcement proceeding related to this issue, finding that the █████████████████████████████████████████ █████████████████████████. *See* ██████████████████████████████████████ ██. Plaintiffs disagree with Judge Vadas' reading of the relevant documents, and plan to appeal the issue to this Court.

[8] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████

5  ████████████████████████████████████

6       Allison and the DRB—consisting of five high ranking officials—simply ignored ██████

7  ████████████████████████████████████████ and their own regulations regarding the

8  reliability of confidential information. *See* Cal. Code Regs. tit. 15 § 3321(b)(1) (2017). They did

9  not explain ██████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████, as required by section 3321(b)(2). This too is a reliability

12 decision made in a "rote fashion," *Madrid*, 889 F. Supp. at 1277.

13        **3.**   ████████████

14       ████████████ experience demonstrates a similar failure by staff across CDCR to assess

15 the accuracy of confidential information. ██████ was found guilty of ████████████

16 ████████████████████ with an STG Nexus, at Kern Valley State Prison, based on information

17 ████████████████████████████████████████████████████

18 ████████████ ██████████████████████████████████

19 ████████████████████████████████████

20      The Senior Hearing Officer (SHO) who found ██████ guilty erroneously ████████

21 ████████████████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ██████████████████████████████████████████████

25 ⁹ ─────────────────
   ████████████████████████████████████████████

26 ████████████████████████████████

27 ¹⁰ ████████████████████████████████████████████████████

28 ████████████████████

1

2

3

4

5

6

7

8

9

10   The inaccuracies also appear in the confidential disclosure form

11

12

13

14

15

16

17   Even worse, according to the confidential disclosure,

18

19

20

21

22

23   Apparently *none* of the correctional officials who prepared the disclosures, the hearing

24   officers who made guilty findings, or the chief disciplinary officers who reviewed those findings,

25   read the actual underlying confidential memorandum to determine what the confidential

26   informant said, and whether his statements could be deemed reliable. That so many different

27   officials, at three different levels, repeated and relied on inaccurate confidential information

28



1  compels the conclusion that no one at CDCR is undertaking the independent review demanded by

2  due process.

3      Finally, ██████ and his alleged co-conspirators' disciplinary proceedings demonstrate a

4  second, wholly distinct reliability problem as well: the confidential memorandum ████████

5  ████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████. When

10 Plaintiffs' counsel requested any earlier notes or documentation of the confidential evidence,

11 CDCR confirmed "████████████████████████████████████

12 █████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████████

16 ███████████████████████████████████  This is a patently unreliable

17 method for recording confidential information.

18      **4.**  ████████████████████████

19      The disciplinary proceedings against ████████████████ evidence different, but

20 equally troubling, reliability issues. According to CDCR, on ████████████████████

21 █████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████

23

24  [11] ████████████, one of ████████ alleged co-conspirators (*see* Meeropol Decl., Ex. Z (Chance
    RVR), at 1), was also issued a RVR, and placed in administrative segregation. Meeropol Decl.

25  at ¶ 32. Plaintiffs' counsel sought to obtain his documents, as they might illustrate due process
    violations with respect to the Confidential Information used against him, just as ████████ did,

26  but CDCR refused to produce such documentation and has still not done so, because ████████
    elected to postpone adjudication of his RVR until the District Attorney decided whether to

27  prosecute. *Id.* Thus ████████ has spent a year in solitary without the opportunity for Plaintiffs'
    counsel to review the evidence against him. *Id.*

28

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████

3 █████████████████████████████████████████████

4 █████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ███████████████████████████████████████████████

13 ██████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████  One confidential source, cited

16 in three different places, cannot corroborate himself![12]

17     This means that CDCR relied on ██████████████████

18 ███████████████████████████, with absolutely no corroboration or other

19 indication of reliability, thus relegating ████████ to *years in SHU*.

20     **5.**  ████████

21     ████████ provides another example of reliance on unreliable confidential information.

22 ████ was also found guilty of ████████████████ with an STG nexus. Meeropol Decl.,

23

24 [12] Also problematic is CDCR's finding that ████████████████████

25 ███████████████████████████████████████████████

26 ███████████████████████████████████████████████

27 ███████████████████████████████████████████████

28 █████████████████████████████████████████████

1   Ex. II ( ███ RVR), at 1, 24. According to ████ RVR, ████████████████████

2   ████████████████████████████████████████████████████████████

3   █ ██████████████████████████████████████████████████████████████

4   ████████████████████████████████████ ▬ ████████████████████

5   █████████████████████████████████ ▬ ████████████████████████

6   █████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████. But uncorroborated hearsay statements

9   of a confidential informant are not competent evidence. *Cato v. Rushen,* 824 F.2d 703, 705 (9th

10  Cir. 1987).

11          The Senior Hearing officer ██████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████

17

18  [13] ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  [14]  ████ disciplinary hearing results were finalized and provided to him on January 5, 2017

22  (Meeropol Decl., Ex. II at 9), triggering CDCR's obligation to produce it to Plaintiffs, along
    with redacted versions of all the confidential material relied upon, under Paragraph 37(h) of the

23  Settlement Agreement. However, the documents were not included in CDCR's April 2017
    quarterly production. Meeropol Decl. ¶ 42. The RVR was subsequently ordered reheard, but

24  that determination was made in May (*see id.*, Ex. II at 10) and thus cannot explain CDCR's
    production failure. CDCR eventually produced ████ documents, after his RVR was reheard

25  and re-finalized, as part of the October 2017 production. Meeropol Decl., ¶ 42. Because of the
    size of CDCR's October production, a prior agreement between the parties meant that CDCR

26  only had to produce the underlying confidential material for every other disciplinary packet,
    thus ████ confidential materials were not produced. *Id.* ¶¶ 43, 44. As a result we were unable

27  to investigate whether ████ confidential material evidences further due process violations.

    [15] The allegation is that ████████████████████████████████████████████

28

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ███████████████████████████████████████████████████████████

4 █████████████████████████████████████████████████████████████████

5 ████████████████████████████ This investigative leap is remarkable, and certainly cannot

6 corroborate the informants' gossip.

7       **6.** █████████████

8 ████████████ was also found guilty of ████████████████████████████

9 ████████████████████ deemed reliable in a perfunctory, rote fashion. According to CDCR,

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████████

16 █████████████████████████████████████████

17       CDCR did not produce to Plaintiffs the confidential memorandum upon which ██████

18 guilty finding was based, thus a full analysis of the case is impossible. Meeropol Decl., ¶ 45.

19 Nonetheless, the documentation provided is internally contradictory, and other evidence gathered

20 by ██████ casts the reliability of the confidential informant into serious doubt, yet CDCR officials

21 have either ignored this information or deliberately squelched it.

22 ███████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ██████████████████████

25 ████████████████████████████████████████████████████████

26 █████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████████████████████████████████

5    ████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7     **7.**    ██████████████

While Plaintiffs' primary concern is with the due process implications of CDCR's failure to assess the reliability of confidential information, it is also worth noting CDCR's reliance on non-confidential material that is equally unreliable.

██████████████ was found guilty of ██████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████. *See People ex rel. Santiago v. Warden*, *Rikers Is. Corr. Facility*, 793 N.Y.S.2d 722 (Sup. Ct. 2005) (holding prisoner could not be sent to solitary based on allegation in an indictment, as an indictment is not evidence).

### C.   Relief for CDCR's Systemic Due Process Violations Involving Confidential Information.

The above evidence shows systemic due process violations through California's misuse of confidential information to find class members guilty of rules violations, and return them to solitary confinement. Extension of the Settlement Agreement is necessary to monitor this issue, including the continued production of documentation related to all SHU-eligible RVRs with an STG nexus. Given the extensive problems uncovered with respect to conspiracy RVRs, the Court should order production of all SHU-eligible conspiracy RVRs with an STG-nexus, along with *all* supporting confidential information, on a monthly basis as soon as they are issued, rather than on

1    a quarterly basis after a guilty finding. This is essential to avoid class members' prolonged

2    placement in administrative segregation or SHU based on fabricated or unreliable evidence.

3          Moreover, given the extent of the problem and the mounting evidence that CDCR is

4    engaged in the purposeful misrepresentation and fabrication of confidential information, other

5    forms of relief may also be necessary, including independent oversight of the department's use of

6    confidential information, and the creation of a mechanism for prisoners who are currently serving

7    prolonged solitary terms based on confidential information to appeal those disciplinary

8    proceedings to an independent fact-finder. The magistrate judge or a special master may be better

9    suited than Plaintiffs' counsel to review all confidential files upon which conspiracy charges are

10   based for accuracy and reliability, and could report to the Court on a quarterly basis as to whether

11   CDCR has come into compliance with due process requirements.

12
13   **IV.    CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY PLACING
         AND RETAINING CLASS MEMBERS IN THE RCGP WITHOUT ADEQUATE
         PROCEDURAL PROTECTIONS.**

14         The Restricted Custody General Population (RCGP) unit was established by the

15   Settlement Agreement primarily to house prisoners who would face a substantial threat to their

16   personal safety in GP. SA, ¶¶ 27, 28. The RCGP is meant to be a transitional housing unit for

17   such prisoners, designed to provide them with "increased opportunities for positive social

18   interaction with other prisoners and staff" while they work towards release to GP. *Id.* ¶ 28.[16]

19   However, in practice, CDCR is using the RCGP as an interminable placement for the vast

20   majority of prisoners who enter the facility, and one that is considerably more restrictive than GP,

21   and certainly more restrictive than necessary.[17] One CDCR official aptly described the unit as

22   "▮▮▮▮▮▮" stating "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮" Declaration of Carmen E. Bremer in Support of Plaintiffs' Motion to Extend the

24   Settlement Agreement ("Bremer Decl."), Ex. u (▮▮▮▮ Interview Transcript), at 2.

25

26   [16] Details & History, *Pelican Bay State Prison (PBSP)*, CALIFORNIA DEPARTMENT OF
     CORRECTIONS AND REHABILITATION, http://www.cdcr.ca.gov/Facilities_Locator/PBSP.html

27   (last visited Nov. 7, 2017) (describing the RCGP as a "transitional unit").

28   [17] Plaintiffs understand from Defendants' counsel that ▮▮▮▮ RCGP prisoners have been
     transferred to GP through CDCR's review procedures. Bremer Decl., ¶¶ 3, 4.

1     The RCGP unit imposes an exceptional hardship on prisoners, due largely to poor

2 management, as well as its location. Defendants placed the RCGP at Pelican Bay State Prison

3 (PBSP)—a maximum security facility designed to house California's "most serious criminal

4 offenders."[18] PBSP is located on the north coast of California, just thirteen miles from the Oregon

5 border.[19] Due to the RCGP's remote location at PBSP, the vast majority of RCGP prisoners are

6 effectively cut off from enjoying visits with their loved ones.

7     A prison due process challenge involves a two-step inquiry. First, the court must

8 determine whether the housing conditions at issue implicate a liberty interest protected by the

9 Due Process Clause. *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Second, if such an interest

10 exists, the Court must then determine whether the procedures utilized satisfy due process

11 requirements. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). These two steps are discussed in

12 sections A and B, below.

13         **A.    RCGP Designation Is Atypical and Significant.**

14     The Due Process Clause protects prisoners from any restraint that "imposes atypical and

15 significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at

16 484. Precedent suggests that conditions in GP constitute the "ordinary incidents of prison life,"

17 against which challenged restraints must be compared. *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th

18 Cir. 1996) ("The *Sandin* Court seems to suggest that a major difference between the conditions of

19 the general prison population and the segregated population triggers a right to a hearing.");

20 *Resnick v. Warden Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (finding no liberty interest in part

21 because plaintiff did not compare conditions at issue with those in GP). But this is not "entirely

22 clear." *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014). What is clear in the Ninth

23 Circuit, however, is that determining what "condition or combination of conditions or factors

24 would meet the [*Sandin*] test requires case by case, fact by fact consideration." *Keenan*, 83 F.3d

25 at 1089. Under this fact-intensive analysis, the RCGP imposes an atypical and significant

26 
---
[18] Details & History, *Pelican Bay State Prison (PBSP)*, CALIFORNIA DEPARTMENT OF
27 CORRECTIONS AND REHABILITATION, http://www.cdcr.ca.gov/Facilities_Locator/PBSP.html
(last visited Nov. 7, 2017).

28 [19] *Id.*

---

1   hardship warranting due process protections because of its physical restrictions, the duration of

2   the placement, the unusualness of the transfer, and the stigma inherent in the unit.

3                    **1.      The RCGP Imposes Exceptional Physical Restrictions.**

4           First, the RCGP is atypical and significant because it imposes exceptional deprivations on

5   the prisoners placed there, including minimal opportunity for visits, limited social interaction and

6   job opportunities, and parole ineligibility. As the name suggests, the *Restricted Custody* General

7   Population unit is considerably more restrictive than GP housing. As noted *supra*, a CDCR

8   official himself has described the unit as "█████████ Bremer Decl., Ex. u (█████ Interview

9   Transcript), at 2. This grim description is corroborated by RCGP prisoners who describe the

10  conditions as ██████████████████████ *Id.*, Ex. i (████████ Decl.), ¶ 7; Ex. e

11  (███████ Decl.), ¶ 4. One prisoner, who has been in CDCR custody for over twenty-six years,

12  including ten years in the SHU, said that it was the RCGP unit that finally "broke [his] spirit." *Id.*,

13  Ex. i (█████████ Decl.), ¶ 7.

14          The RCGP's restrictive nature, described below, is magnified by its location at PBSP. The

15  location is especially onerous for RCGP prisoners whose case factors make them eligible for

16  placement at lower security level facilities, but have no choice but to be housed at the most

17  restrictive facility in the state. *See, e.g.,* Bremer Decl., Ex. m at 102 (████ DRB Chrono)

18  (indicating that he has a Level I placement score of 0), 075 (████ DRB Chrono) (indicating that

19  he has a Level II placement score), 090 (█████████ DRB Chrono) (indicating that he has a Level

20  II placement score).

21                    **a.      RCGP Prisoners Have Limited Ability to Enjoy Contact Visits.**

22          Although RCGP prisoners are allowed bi-weekly contact and non-contact visits, most

23  prisoners receive very few visits, if any, because of the RCGP's remote location at PBSP. Bremer

24  Decl., Ex. g (████████ Decl.), ¶¶ 12-13; Ex. K (██████ Decl.), ¶ 18; Ex. t (█████████ Parole Hearing

25  Transcript), at 17:18-18:15; Ex. x (RCGP Letter to Judge Vadas 7/21/16), at 1; *see also* Bremer

26  Decl., Ex. i (█████████ Decl.), ¶ 15 (explaining that ████████████████████████████████

27  ███████████████████████████████████████████████). *See Serrano v.*

28  *Francis*, 345 F.3d 1071, 1078-79 (9th Cir. 2003) (analyzing existence of liberty interest based not

1    on what amenities and privileges were theoretically available to the prisoner, but on his ability to

2    take advantage of them). Visits from families and friends are one of the most important means of

3    support for prisoners. *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003). In finding a protected

4    liberty interest in a housing unit that is substantially similar to the RCGP, the D.C. Circuit

5    specifically pointed to the significance of the strain on family relationships over time: "Inmates

6    housed in CMUs [Communication Management Units] . . . may spend years denied contact with

7    their loved ones and with diminished ability to communicate with them. The harms of these

8    deprivations are heightened over time, as children grow older and relationships with the outside

9    become more difficult to maintain." *Aref v. Lynch*, 833 F.3d 242, 256 (D.C. Cir. 2016).

10       When the Settlement received preliminary approval, various class members wrote this

11   Court objecting to its provision of fewer contact visits for RCGP prisoners than those in a regular

12   GP unit. *See* Letter from Robert Cole to Court, ECF No. 432; Letter from Johneil Bailey to Court,

13   ECF No. 433; Letter from Andrew R. Lopez to Court, ECF No. 444; Letter from Derrick Sims to

14   Court, ECF No. 447. This Court opined that their objections had merit and suggested that the

15   parties negotiate to fix this problem. Transcript of Proceedings at 8:21-10:5, ECF No. 477.

16   Plaintiffs and Defendants negotiated at length, but CDCR ultimately refused to equalize visits for

17   RCGP safety prisoners and regular GP prisoners. Bremer Decl., Ex. y (CDCR 11/10/16

18   Compliance Letter), at 4-5.

19       The upshot of CDCR's decision to have only one RCGP unit in the most isolated prison in

20   the state, and their refusal to allow *any* contact visits on the weekends when prisoner families

21   would not have to miss work or school, has resulted in most prisoners getting almost no family

22   contact visits. Bremer Decl., Ex. g (████ Decl.), ¶ 13; Ex. k (████ Decl.), ¶ 18; Ex. e (████

23   Decl.), ¶ 5. As ████████ explained, ████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████. *Id.*, Ex. g (████ Decl.), ¶¶ 12-13; *see also id.*,

26   Ex. k (████ Decl.), ¶ 18 ("████████████████████████████████████

27   ████████████████████████████████████

28   ████"); *id.*, Ex. t (████ Parole Hearing Transcript), at 17:18-18:15 (explaining that ██

1 █████████████████████████████████████████████████████

2 ████████████████████████). Because RCGP placement is often indefinite—and

3 likely permanent for those serving life sentences—the corrosive strain on prisoners' contact with

4 loved ones is magnified. Yet, ████████████████████████████████████

5 ███████████████. Bremer Decl., ¶ 2.[20]

6   The strain caused by the lack of weekend contact visits and the RCGP's location is

7 unique. Although other prisoners at PBSP may suffer the same visiting limitations while housed

8 there, non-RCGP prisoners enjoy greater freedom to be transferred to other facilities that are

9 more accessible to loved ones. Administrative segregation, protective custody, and even SHU

10 units are located at various facilities throughout the state, and transfer between units is routine.[21]

11     **b.**  **RCGP Prisoners Have Limited Social Interaction and Job**

12         **Opportunities.**

13   Prisoners in the RCGP do not enjoy nearly the same level of social interaction as

14 prisoners housed in GP; their interactions are limited to their programming group, each of which

15 is comprised of ██████████████████. Bremer Decl., Ex. o (CDCR 9/27/17 Compliance

16 Letter), at 2. ██████████████████████████████. *Id.*, Ex. e (██████ Decl.), ¶

17 2; Ex. x (RCGP Letter to Judge Vadas 7/21/16), at 1.

18   There are also limited job opportunities for RCGP prisoners, which is harmful in itself,

19 but also bars them from achieving a higher privilege group level, which influences telephone

20 access and frequency of visits. Bremer Decl., Ex. e (██████ Decl.), ¶¶ 6-7; Ex. g (██████ Decl.),

21 ¶ 9; Ex. x (RCGP Letter to Judge Vadas 7/21/16), at 1. *See also* CAL. CODE REGS.,

22  tit. 15 § 3044(d)-(j) (2017). Although RCGP prisoners are eligible for jobs, as Defendants

23 admit, ██████████████████████. Bremer Decl., Ex. o (CDCR 9/27/17

24 Compliance Letter), at 2. This is due solely to the constraints of the unit. *Id.*, Ex. e (██████

25 —————————————————————

26 [20] Confining RCGP prisoners to the northern most part of the state at PBSP is not the only option for Defendants, as CDCR has twenty facilities for males throughout the state, ten of which are maximum security facilities. CDCR COMPSTAT DAI STATISTICAL REPORT – 13 MONTH (HIGH SECURITY), (rev. Oct. 13, 2017), *available at* http://www.cdcr.ca.gov/COMPSTAT/.

27

28 [21] *See id.* (noting various facilities located at different institutions).

1    Decl.), ¶ 6. As a result, RCGP prisoners are unable to achieve the highest privilege level, which

2    requires a full-time job. tit. 15 § 3044(b)(1). In contrast, prisoners not in the RCGP may be able

3    to achieve a higher work group privilege status even without a full-time job by participating in

4    other educational or rehabilitative programming. *Id.* But this is not possible in the RCGP. *Id.* §

5    3378.9(e)(1).

6         The harm caused by limited social interaction and lack of job opportunities is uniquely

7    acute with respect to *Ashker* class members in the RCGP, who previously spent years in SHU. As

8    demonstrated in a recent report entitled *Mental Health Consequences Following Release from*

9    *Long-Term Solitary Confinement in California*, prisoners released from long-term SHU

10   confinement demonstrate particular psychological disturbances that last even after their release

11   from segregation. Bremer Decl., Ex. v (Stanford Report: *Mental Health Consequences*), at 4. *See*

12   *also* Plaintiffs' Enforcement Motion Regarding Violation of Settlement Agreement Provision

13   Requiring Release of Class Members to General Population, ECF No. 849, 11-12. Though these

14   effects of long-term segregation are persistent, increased social interaction, and having a job are

15   two factors that help prisoners overcome the detrimental effects of long-term isolation. Bremer

16   Decl., Ex. v (Stanford Report: *Mental Health Consequences*), at 15, 22, 25. In particular, the

17   report reveals that former long-term SHU prisoners who are denied opportunities for employment

18   "can be expected to demonstrate greater levels of psychiatric distress, poorer general health, and

19   poorer outcomes with regard to functioning and performance." *Id.* at 23. Thus, the lack of social

20   interaction and job opportunities leads to a particularly significant and atypical hardship for class

21   members in the RCGP.

22                    **c.    RCGP Placement Limits Parole Eligibility.**

23        The California Board of Parole Hearings appears to consider RCGP placement as a reason

24   to disqualify prisoners for parole; this imposes a significant and atypical hardship on its own.

25   Whether challenged conditions affect the duration of one's sentence is a significant factor in the

26   *Sandin* liberty interest analysis. *Sandin*, 515 U.S. 472, 487 (1995); *Serrano*, 345 F.3d at 1078;

27   *Keenan*, 83 F.3d at 1089. Indeed, that the placement at issue in *Wilkinson v. Austin* lead to parole

28

---

disqualification is one of the main reasons the Supreme Court found it to be atypical and significant. 545 U.S. at 224.

Similar to the designation in *Wilkinson*, RCGP placement has a dispositive effect on one's ability to parole. All four RCGP prisoners who have gone before the parole board have been denied. Bremer Decl., ¶ 5. For example, ████████████ was denied elder parole on ████████, after his transfer to the RCGP following nearly thirty years in the SHU. *Id.*, Ex. t (████ Parole Hearing Transcript), at 182:24-183:4; Ex. m at 092 (████████ DRB Chrono). The Board expressed its concern that RCGP placement demonstrates that ████████ would be unable to ████████████████████████. *Id.*, Ex. t (████████ Parole Hearing Transcript), at 69:23-70:6 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"). The Board also noted that ██████████████████████████████████████████████████████████. *Id.* at 193:12-22 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").

*See also id.* at 198:23-199:18 (instructing Mr. ████████ that if he ████████████████████████████████████████████████████████████████████).

This is not only a significant hardship imposed by the placement, but it is atypical, as ████████████████████████████████████████████████████. Bremer Decl., Ex. t (████████ Parole Hearing Transcript), at 70:9-14. Special Needs Yard (SNY), an alternative placement for prisoners who require protective custody, does not foreclose the parole board from finding that one would be successful if released on parole. *Id.* at 70:9-14, 71:4-8 (████████████████████████████).

### 2.     RCGP Placement Is Prolonged.

RCGP placement is also atypical and significant because it is prolonged. The duration of a given restriction factors significantly into the liberty interest analysis. *Keenan*, 83 F.3d at 1089

1  ("[t]he length of confinement cannot be ignored in deciding whether the confinement meets

2  constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a

3  few days and intolerably cruel for weeks or months.") (quoting *Hutto v. Finney*, 437 U.S. 678,

4  686-87 (1978) (internal quotations omitted)). In *Brown v. Or. Dep't of Corr.*, the Ninth Circuit

5  reaffirmed the role of duration in the liberty interest inquiry, noting that it was the "crucial factor

6  distinguishing" the IMU (the housing unit at issue) from the ordinary incidents of prison life. 751

7  F.3d at 988. The court compared the conditions at issue in the IMU to those in the DSU—a

8  "generally . . . similar" housing unit. *Id.* The only distinguishing factor between the units was

9  duration: the prisoner had been housed in the IMU for twenty-seven months, whereas the

10  maximum period of confinement in the DSU was six months. *Id. See also Clark v. California*,

11  No. C 96-1486-FMS, 1996 U.S. Dist. LEXIS 21630, at *28 (N.D. Cal. Oct. 1, 1996) (noting that

12  the "length of confinement" is a factor in determining whether a liberty interest has been created);

13  *Koch v. Lewis*, 216 F. Supp. 2d 994, 1002, 2001 U.S. Dist. LEXIS 24466 (D. Ariz. Aug. 30,

14  2001) ("Measured *by both degree and duration*, Koch has suffered a form of detention that is far

15  worse than the conditions" typically experienced) (emphasis added).

16       RCGP placement is indefinite, and due to various failings in the RCGP verification

17  review process, very few prisoners have actually been transferred from the RCGP to GP.[22]

18  Bremer Decl., ¶ 4; *see* Plaintiffs' Enforcement Motion Regarding Inadequate RCGP Verification

19  Reviews, Dkt. 847. In *Aref v. Lynch*, the similarly indefinite and prolonged classification was a

20  "significant" factor in finding a liberty interest in CMU designation. 833 F.3d at 254. Although

21  the conditions in the CMUs involved "significantly less deprivation than administrative

22  segregation," their duration was "indefinite and could be permanent," and so the deprivations

23  suffered "necessarily increase in severity over time." *Id.* at 257. Much like the RCGP, the CMUs

24  were "self-contained general population housing unit[s]." *Id.* at 247. CMU prisoners were

25  _____

26  [22] ████████████████████████████████████████████████████████████████████. As the Supreme

Court has held, "[t]estifying against, or otherwise informing on, gang activities can invite one's

27  own death sentence." *Wilkinson*, 545 U.S. at 227. *See also Koch*, 216 F. Supp. 2d at 1001

(rejecting defendant's argument that the prisoner was not serving an indeterminate term because

28  he had the option of debriefing).

1  allowed two fifteen-minute calls per week and two four-hour non-contact visits per month. *Id.* at

2  257. They were allowed in common spaces with other prisoners for most of the day, had access to

3  educational and professional opportunities, had property privileges akin to those in GP, and had

4  no added restriction on exercise. *Id.* Nevertheless, the court found that the duration of CMU

5  designation, together with its highly selective application, "pushe[d] CMU designation over the

6  *Sandin* threshold." *Id. See also Wilkinson*, 545 U.S. at 224 (noting that the indefinite duration of

7  the designation to a Supermax facility contributed to the liberty interest finding); *Harden-Bey v.*

8  *Rutter*, 524 F.3d 789, 793 (6th Cir. 2008) ("most (if not all) of our sister circuits have considered

9  the nature of the more-restrictive confinement *and* its duration in determining whether it imposes

10  an 'atypical and significant hardship.'); *Silva v. Sanford*, No. 91 Civ. 1776 (AJP) (KMW), 1998

11  U.S. Dist. LEXIS 5905, at *46 (S.D.N.Y. Apr. 23, 1998) ("Duration is one of the most important

12  factors in [the atypical and significant] analysis.").

### 3.    Placement in the RCGP Is Stigmatizing.

14         RCGP placement is also atypical and significant because it is stigmatizing. As the Ninth

15  Circuit has recognized, a stigmatizing classification gives rise to a liberty interest. *Neal v.*

16  *Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997) ("the stigmatizing consequences of the attachment of

17  the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory

18  treatment program . . . create the kind of deprivations of liberty that require procedural

19  protections."); *see also Cardenas v. Tulare Cty. Sheriff's Dep't*, No. 1:11-cv-01394-JLT (PC),

20  2013 U.S. Dist. LEXIS 69315, at *10 (E.D. Cal. May 15, 2013) (noting plaintiff's resistance to

21  entering protective custody "due to the social stigma" associated with it); *Sherwood v. Tancrator*,

22  No. ED CV 06-96-CJC (PLA), 2008 U.S. Dist. LEXIS 113356, at *12 (C.D. Cal. June 19, 2008)

23  (noting stigma of protective custody that attaches within gangs).

24         Prisoners in the RCGP face a serious stigma, contributing to their liberty interest in

25  avoiding transfer to the unit. Bremer Decl., Ex. i (████████ Decl.), ¶ 10; Ex. h (██████ Decl.),

26  ¶¶ 7-8; Ex. l (██████ Decl.), ¶ 21 (discussing stigma associated with RCGP placement). ███

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████ Thus, RCGP

5 placement is not only stigmatizing in the sense that it causes disgrace, but it also endangers

6 prisoners' safety.

### 4.    RCGP Designation Is Highly Unusual.

8      Finally, RCGP placement gives rise to a liberty interest because it is so unusual. *See*

9 *Sandin*, 515 U.S. at 484 (holding that conditions imposing "*atypical* and significant hardship"

10 require procedural protections) (emphasis added). In *Aref*, the D.C. Circuit specifically found the

11 unusualness of CMU designation to be a significant factor in its finding a liberty interest. 833

12 F.3d at 257. This makes sense, as the singling out of only a few prisoners from a vast population

13 for different treatment suggests arbitrary, discriminatory, or retaliatory decision-making, or at

14 least the appearance of the same. Where such selectivity occurs, procedural protections are

15 particularly important.

16      For CDCR prisoners, the RCGP is a highly unusual placement, and the vast majority will

17 never even face the possibility of RCGP designation. According to CDCR's most recent

18 Settlement compliance report, there are ██ prisoners in the unit, out of a total prisoner population

19 of about 129,000. Bremer Decl., Ex. o (CDCR 9/27/17 Compliance Letter), at 2.[23] Being one of

20 so few prisoners is by definition an atypical experience. This atypicality, together with the

21 hardship imposed by the RCGP for a prolonged period, implicates a liberty interest.

22      The RCGP unit is exactly the type of placement that warrants Due Process Clause

23 protections, given the physical restrictions imposed, the duration of the placement, the

24 unusualness of the transfer, and the stigma inherent in the unit. Any one or two of these factors

25 alone gives rise to a liberty interest under *Sandin*. Taken together, there is no question that the

26

27 ——————————————————
[23] CDCR POPULATION PROJECTION REPORT 4, (May 2017), *available at*

28 http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Projections/
S17Pub.pdf.

1  RCGP imposes an atypical and significant hardship in relation to the ordinary incidents of prison

2  life.

3         **B.      RCGP Classification and Verification Procedures Are Constitutionally**
              **Deficient.**
4

5         Having established that prisoners have a liberty interest in avoiding RCGP placement, the

6  Court next must consider what process is due, balancing three factors: first, the private interest

7  affected by the official action; second, the risk of erroneous deprivation of such interest through

8  the procedures used, and the probable value, if any, of additional or substitute procedural

9  safeguards; and third, the government's interest, including the function involved and fiscal and

10 administrative burdens that the additional or substitute procedural requirement would entail.

11 *Wilkinson*, 545 U.S. at 224-25 (citing *Mathews*, 424 U.S. at 335).

12            **1.      Prisoners' Private Interest in Avoiding RCGP Placement Is**
                  **Significant.**
13

14        Prisoners already have their liberty curtailed by definition; thus, the first Mathews

15 factor—the private interest at stake—must be evaluated "within the context of the prison system

16 and its attendant curtailment of liberties." *Wilkinson*, 545 U.S. at 225. That said, given the

17 restrictions imposed by the RCGP, the private interest in avoiding the unit is substantial, and as

18 this court has previously found, the prolonged duration of the conditions weigh in favor of there

19 being a significant private interest at stake. MTD Order at 12.

20        CDCR itself has implicitly recognized the significance of the deprivations imposed by the

21 RCGP. *See, e.g.*, Bremer Decl., Ex. p (CDCR Design and Construction Policy Guidelines for

22 Prisons), at 45; Ex. q (PBSP Operational Procedure 204: General Population Program), at 3 (both

23 documents in which CDCR recognizes the importance of providing programming opportunities

24 and full-time work assignments); Ex. s (Lewis Deposition ("depo.")), at 119:19-21 ("In my

25 opinion, social interaction with family plays a very important role with inmates incarcerated in

26 State Prison."); Ex. r (Giurbino depo.), at 149:2-16 (acknowledging that greater contact with

27 family reduces recidivism).

28

1

**2.      There Is a Significant Risk of Erroneous Deprivation Under Current Procedures.**

2      The second *Mathews* factor addresses "the risk of an erroneous placement under the

3    procedures in place." *Wilkinson*, 545 U.S. at 224-25. Under the current RCGP review system,

4    there is more than a serious *risk* of erroneous deprivation; there is evidence that CDCR has

5    wrongly retained several prisoners in the unit. These deficiencies give rise to a high risk of

6    arbitrary decision-making in the safety threat review process, leading to the erroneous deprivation

7    of liberty for many.

8

**a.      RCGP Prisoners Are Denied Adequate Notice and Review.**

9      Notice of the factual basis leading to a decision, and a full and fair opportunity for rebuttal

10   are "among the most important procedural mechanisms for purposes of avoiding erroneous

11   deprivations." *Wilkinson*, 545 U.S. at 225-26 (citing *Greenholtz v. Inmates of Neb. Penal and*

12   *Correctional Complex*, 442 U.S. 1, 15, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979)). *See also infra*

13   Section V.A.2. Notice must be meaningful, in that it "provid[es] the inmate [with] a basis for

14   objection before the next decisionmaker or in a subsequent classification review." *Wilkinson*, 545

15   U.S. at 226. Notice "also serves as a guide for future behavior." *Id.*; *see also Greenholtz*, 442

16   U.S. at 15 (prisoners denied parole given notice of the reason "as a guide to the inmate for his

17   future behavior"). If "one supposedly has the keys to one's release, but one has no idea what they

18   are," notice is deficient. *Toevs v. Reid*, 685 F.3d 903, 914 (10th Cir. 2012), *amended on reh'g by*

19   685 F.3d (10th Cir. 2012).

20      CDCR utterly fails to conduct its reviews in a manner consistent with the standards

21   provided to RCGP prisoners on how they may demonstrate eligibility for a GP transfer. The

22   Settlement provides that prisoners may only be placed in the RCGP if the DRB demonstrates "by

23   a preponderance of the evidence" that there exists "a substantial threat to their personal safety

24   should they be released to the General Population." SA, ¶ 27. Thereafter, during their 180-day

25   reviews, the ICC "shall verify whether there continues to be a demonstrated threat to the inmate's

26   personal safety." *Id.* If such a threat is found, the prisoner will be retained in the RCGP without

27   further review. *Id.* And if the ICC finds that such a threat no longer exists, the prisoner is referred

28   to the DRB to conduct another threat assessment review. *Id.*

1    But in practice, the DRB and the ICC often consider factors in the RCGP reviews that are

2    irrelevant to the existence of a safety threat, or simply use the wrong standard, creating a high

3    risk of erroneous deprivation. For instance, the DRB has transferred several prisoners to the

4    RCGP based at least in part on a finding that ███████████████████████████████████████

5    ██████████.” Bremer Decl., Ex. m at 014 (███████ DRB Chrono), 023 (████ DRB

6    Chrono), 032 (████ DRB Chrono), 044 (█████ Arthur DRB Chrono), 057 (████ DRB

7    Chrono), 064 (███████ DRB Chrono), 069 (██████ DRB Chrono), 095 (█████ DRB

8    Chrono), 110 (████ DRB Chrono), 115 (█████ DRB Chrono). In ████████ review, the

9    DRB even stated that "████████████████████████████████████████████████████████

10   █████████████," but nevertheless transferred him to the RCGP based on its finding that he

11   "████████████████████████████"[24] *Id.*, Ex. m at 110 (████ DRB Chrono)

12   (emphasis added). The purpose of the RCGP is to house prisoners who face substantial *personal*

13   safety concerns; there is *no* provision in the Settlement for RCGP placement based on a purported

14   ████████████████████████████. SA, ¶ 27. The DRB's practice of sending prisoners to the

15   RCGP on the basis of ██████████████████" is a flagrant violation of the purpose of the

16   RCGP, and constitutes clear evidence that several have been transferred to the RCGP on incorrect

17   grounds, and thus have been erroneously deprived of their liberty.

18       Similarly, the ICC has demonstrated a pattern of retaining prisoners in the RCGP even

19   where the evidence fails to demonstrate a continued safety threat. In fact, contrary to the plain

20   language of the Settlement, the ICC has retained prisoners despite finding that "████████████

21   ██████████████████████████." Bremer Decl., Ex. n at 023 (████ 6/20/16 ICC Chrono),

22   029 (████ 6/22/16 ICC Chrono), 037 (████ 7/14/16 ICC Chrono). But this is the *exact*

23   finding upon which a prisoner should be recommended for transfer to GP. SA, ¶ 27. Instead,

24   ████ based this finding, the ICC incongruously concludes that it "████████████████████████

25   ████████████████" Bremer Decl., Ex. n at 023 (████ 6/20/16 ICC Chrono), 029 (████

26   ─────────────────────

[24] Moreover, the conclusion that ████████████████████████████████████████ is plainly

27   unsubstantiated, as the DRB noted just a few sentences prior that ████████████████████████
     ██████████████████████████████████████████████████████████████████████." Bremer

28   Decl., Ex. m at 110 (Ruiz DRB Chrono).

6/22/16 ICC Chrono), 037 (████ 7/14/16 ICC Chrono). This framework directly contradicts the plain meaning of the Settlement, leaving prisoners in an untenable position, without any meaningful guide for how to gain release from the RCGP.

In addition to conducting reviews in a manner that is inconsistent with the standards provided by the Settlement Agreement, CDCR actively gives prisoners *misleading* notice about how to gain release from the RCGP. Several prisoners attest that at their initial DRB safety reviews, they were told that ██████████████████████████████████████████ ████████████████████████. Bremer Decl., Ex. a (████ Decl.), ¶¶ 6-7; Ex. b (████ Decl.), ¶ 3; Ex. f (████ Decl.), ¶ 3; Ex. j (████ Decl.), ¶ 6; Ex. k (████ Decl.), ¶ 11. *See also id.*, Ex. w (RCGP Prisoners' Letters to Judge Vadas), at 002, 005, 008 (noting that ████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. *See id.*, Ex. n at 009-10 (████ 4/20/17 ICC Chrono), 031 (████ 5/18/17 ICC Chrono) (both noting that ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████). *See also id.*, Ex. n at 004-5 (████ 4/20/17 ICC Chrono), 037-38 (████ 7/14/16 ICC Chrono) (neither noting that ████████████████████████ ████████████████████████████████████████████). The ICC perpetuates this misleading guidance, stating in some cases that ████████████████████████████████ ████████████████████████████████████████████████." *Id.*, Ex. n at 021 (████ 11/21/16 ICC Chrono), 036 (████ 11/21/16 ICC Chrono), 044 (████ 11/21/16 ICC Chrono). But even where prisoners have done so, they continue to be retained at their subsequent ICC reviews. *Id.*, Ex. n at 019-20 (████ 5/18/17 ICC Chrono), 033-34 (████ 5/18/17 ICC Chrono) (both showing individual was retained, ████████████ ████████████████████████████████████████████ ████. RCGP prisoners' ability to object to their retention in the unit is severely undermined by CDCR's failure to provide them with meaningful notice of how to gain removal from the unit.

1    RCGP prisoners' right to a meaningful review is also undermined by CDCR's disregard

2    of their statements denying that they face a safety threat, and offering evidence that they can be

3    safely housed in GP. Bremer Decl., Ex. g (████ Decl.), ¶ 15; Ex. b (████ Decl.), ¶¶ 5, 7. In

4    the course of the DRB and ICC reviews, prisoners are routinely asked ████████████████

5    ████████████████    *See, e.g., id.*, Ex. m at 007 (████ DRB Chrono), 023 (████ DRB

6    Chrono), 064 (████████ DRB Chrono) (all noting that ████████████████████

7    ████████████████████████); Ex. n at 014 (████ 4/20/17 ICC

8    Chrono), 034 (████ 5/18/17 ICC Chrono), 042 (████ 4/21/17 ICC Chrono) (all noting █

9    ████████████████████████████████

10   ████████). But there is no indication that the DRB or the ICC actually considers a prisoner's

11   denial that he faces a safety threat.

12   The cursory manner in which the ICC reviews are conducted further indicates that the

13   ICC is simply summarily retaining individuals without giving due consideration to prisoners'

14   explanations that they may be safe in GP. Prisoners ████████ and ████████—who have

15   each had at least two ICC reviews—attest that ████████████. Bremer Decl., Ex. a

16   (████ Decl.), ¶ 12 (████████████████████████████; Ex. j

17   (████ Decl.), ¶ 11 (████████████████████████).

18   CDCR's deviation from the standards provided in the Settlement, as well as its actively

19   giving RCGP prisoners misleading notice, undermines the very purpose of the notice

20   requirement, deprives prisoners of a "fair opportunity" to seek transfer out of the RCGP, and fails

21   to safeguard against erroneous deprivations of liberty. *Wilkinson*, 545 U.S. at 225-26.

### b.    Safety Threat Reviews Lack Sufficient Checks and Balances.

23   In *Wilkinson*, the Supreme Court noted with approval that Ohio's three-tiered review

24   process "provides multiple levels of review for any decision recommending OSP placement, with

25   the power to overturn the recommendation at each level." *Wilkinson,* 545 U.S. at 227. Following

26   transfer to the OSP, the prisoner's placement is reviewed at least annually according to the same

27   robust three-tiered classification review initially applied. *Id.* at 217.

28

1    In contrast to the Ohio procedures in *Wilkinson*, multiple levels of review are required to

2    *release* a prisoner from the RCGP, but no further review is required if the ICC decides to *retain* a

3    prisoner. After the DRB approves RCGP placement, the decision is final. SA, ¶ 27. The DRB is

4    the only body that may reverse that decision, or approve any transfer from PBSP. *See, e.g.,*

5    Bremer Decl., Ex. m at 007 (███ DRB Chrono), 111 (███ DRB Chrono).[25] Even if the ICC

6    finds at a 180-day review that a prisoner no longer faces a threat to his personal safety, the case

7    must be referred to the DRB to recommend or deny transfer to GP. SA, ¶ 27. If at any point

8    following the prisoner's initial ICC review, the ICC or the DRB elects to retain the prisoner in the

9    RCGP, there is no further check on that decision, and the process terminates until the prisoner's

10   following 180-day review. *Id.* Thus, a recommendation to remove a prisoner from the RCGP

11   requires a heightened two-tiered review, but a recommendation to retain him does not. The Ohio

12   procedures in *Wilkinson* require the inverse: for both the initial placement review and annual

13   follow-up reviews, if a reviewing body elects to remove the prisoner from OSP placement, that

14   decision is final. *Wilkinson*, 545 U.S. at 227. But if the recommendation is to retain him in the

15   OSP, that decision must go through another level of review. *Id.* at 217, 227. This multi-layered

16   review system "guards against arbitrary decisionmaking." *Id.* at 227.

17   Moreover, also unlike the procedures in *Wilkinson*, the ICC reviews are not being

18   conducted in a meaningful manner. At the 180-day review, the ICC will often retain prisoners

19   based on only ███████████████████████████████████. *See,*

20   *e.g.,* Bremer Decl., Ex. n at 002 (███ 1/19/17 ICC Chrono), 007 (███ 4/11/17 ICC

21   Chrono), 009-10 (███ 4/20/17 ICC Chrono), 014 (███ 1/18/17 ICC Chrono), 025-26 (███

22   6/23/17 ICC Chrono), 027-28 (███ 5/12/17 ICC Chrono), 029 (███ 6/22/16 ICC Chrono),

23   040 (███ 2/21/17 ICC Chrono), 042 (███ 4/21/17 ICC Chrono). In such instances, the

24   ICC includes the same boilerplate language: that the ███████████████████

25   ████████████████████████████████████████████

26   ███████████████" and retains the prisoner in the RCGP. *Id.* The ICC has explicitly

27

28   [25] However, the DRB control is lifted if the prisoner enters the debriefing program. Bremer
     Decl., Ex. m at 007 (███ DRB Chrono), 111 (███ DRB Chrono).



stated in some cases that ███████████████████████████████████

███████████████. *Id.*, Ex. n at 010 (██████ 4/20/17 ICC Chrono) ("███████

████████████████████████████████████████████████████████████

████████████████████████████████████.") (emphasis

added); 034 (██████ 5/18/17 ICC Chrono) ("██████████████████████

████████████████████████████████████████████████████████████

██████████") (emphasis added). The ICC's failure to conduct a holistic review of an

individual's case factors, and the lack of a fair opportunity to object to the decision, creates a

substantial risk of erroneous deprivation that would be considerably curtailed by implementing a

check on the ICC's decisions.

Even more problematically, in some circumstances the ICC's purported review appears to

operate as little more than a rubber stamp of the Institutional Gang Investigator's (IGI)

recommendation. RCGP prisoners' accounts of conversations with the IGI in advance of their

ICC reviews indicate that the IGI controls the outcomes of the reviews. *See* Bremer Decl., Ex. f

(██████ Decl.), ¶¶ 5-6 (describing █████████████████████████████

████████████████████████); Ex. b (██████ Decl.), ¶¶ 5-7 (indicating that

████████████████████████████████).

### 3.   Additional Procedures Would Safeguard Against Erroneous Deprivations.

*Mathews* next instructs the court to consider "the probable value, if any, of additional or

substitute procedural safeguards." *Wilkinson*, 545 U.S. at 224-25. Here, providing meaningful

and accurate notice, a meaningful hearing, and multiple levels of review would significantly

reduce CDCR's pattern of erroneous RCGP placement. CDCR's own procedures indicate that

even adding one additional level of review to RCGP placement decisions substantially reduces

erroneous placements. The ICC was responsible for an initial recommendation regarding *Ashker*

class members' need for RCGP placement. SA, ¶ 27. Paragraph 27 required the DRB to review

the ICC's recommendation before transfer to the RCGP. *Id.* Of ███ prisoners recommended for

RCGP placement by the ICC, the DRB approved only ███—████████—for RCGP

placement.[26] Bremer Decl., ¶ 3. Despite this clear evidence that ███████████████████

███████████████████████████████████████, it has the authority to make

unchecked decisions to retain prisoners in the RCGP. Given this pattern, it is no surprise that ███

███████████████████████████████████████, though the placement is

supposed to be temporary. *Id.* ¶ 4. The dramatic decrease in RCGP placements when a two-tiered

system is utilized supports a finding that additional procedures are necessary to correct and

prevent further erroneous deprivations of liberty.

**4.      Government Interests Would Be Better Served by Implementing Meaningful Procedures.**

The final *Mathews* factor is "the Government's interest, including the function involved

and the fiscal and administrative burdens that the additional or substitute procedural requirement

would entail." *Wilkinson*, 545 U.S. at 224-25. Here, the government's interests would be served

by implementing meaningful procedures. Implementing more robust procedures would very

likely lead to a reduction in the RCGP population, thereby offsetting any initial modest increase

in required resources. A smaller number of prisoners in the unit would enable CDCR to offer

more meaningful educational and vocational programming per prisoner—both of which are

currently in short supply because the unit is overburdened. *See supra* section IV.A.1.b; Bremer

Decl., Ex. c (████ Decl.), ¶ 8; Ex. d (████ Decl.), ¶ 11; Ex. g (████ Decl.), ¶¶ 7-9

(describing ███████████████████████████████████████████████████

███████████████████████████). Additionally, if the population of the unit were reduced,

CDCR would be better able to manage the sensitive protection needs of the prisoners who

actually require RCGP placement.

**C.      Relief for CDCR's Systemic Due Process Violations Involving Placement and Retention of Prisoners in the RCGP.**

The above evidence demonstrates that Defendants' RCGP review procedures are

constitutionally deficient, and as a result, prisoners are being erroneously deprived of their liberty

---

[26] Defendants' document productions indicate that ███ prisoners were referred to the DRB following their initial Paragraph 25 reviews, but Defendants only provided DRB review outcomes for ███ of them. Bremer Decl., ¶ 3.

1    without due process of law. Extending monitoring of Defendants' administration of the RCGP

2    and the safety threat reviews is necessary to correct these due process violations, as are the

3    following changes in CDCR's practices and procedures: (a) adoption of a multi-tiered RCGP

4    classification and verification review system in which any decision or recommendation to place

5    or retain a prisoner in the RCGP is not deemed final until it is confirmed by at least one other

6    reviewing body; and (b) implementation of a set of criteria that the DRB and the ICC will adhere

7    to at each initial safety review and subsequent 180-day review, which specifies the factors to be

8    considered, and the weight afforded to each.[27] To correct the errors that have already occurred,

9    Defendants should be made to re-review the case factors of each prisoner who has been classified

10   for placement in the unit according to the proper criteria, within six months of the Court's order.

11   Continuation of Defendants' document production obligations under Paragraph 37, subsections

12   (j), (i), (l), and (d), with respect to RCGP prisoners, is also necessary, so that Plaintiffs may

13   properly monitor Defendants' future RCGP placement decisions.

14        Alternatively, Defendants could fix the due process issue by relieving the burdens

15   imposed by the RCGP that give rise to a liberty interest, including by: (a) re-locating the RCGP,

16   or establishing an additional RCGP unit, that is centrally located within the state of California in

17   order to relieve the burdens imposed by virtue of the remoteness of PBSP, including the lack of

18   opportunities for visiting; (b) providing greater opportunities for increased social interaction with

19   other prisoners by allowing prisoners in programming groups to interact with prisoners in other

20   groups or other housing units in controlled settings, or through a chain link fence; (c) providing

21   RCGP prisoners with the opportunity to enroll in courses that demonstrate to the Board of Parole

22   Hearings eligibility for parole, including the Long Term Offender Program; and (d) offering

23   RCGP prisoners the opportunity to have contact visits on weekends.

24  **V.    CDCR CONTINUES TO VIOLATE THE DUE PROCESS CLAUSE BY USING
25         UNRELIABLE GANG VALIDATIONS TO DENY CLASS MEMBERS A FAIR
            OPPORTUNITY TO SEEK PAROLE.**

26

27   [27] *See* Plaintiffs' Enforcement Motion Regarding Inadequate RCGP Verification Reviews, ECF
     No. 847 (in which Plaintiffs proposed that Defendants be ordered to adopt specific criteria with
28   respect to 180-day ICC reviews).

A key feature of the Settlement Agreement is that CDCR has changed from a status-based system to a proven disciplinary-based system for making SHU placement decisions. CDCR has ceased using gang validations to place and retain prisoners in the SHU, and must now make such placements only on the basis of a defined set of serious misbehaviors. SA, ¶ 13 ("CDCR shall not place inmates into a SHU, Administrative Segregation, or Step Down Program solely on the basis of their validation status."); *id.* ¶ 18. Recently promulgated regulations also require greater complexity in the validation process, purportedly to reduce the risk of error. *See* Cal. Code Regs., tit. 15 § 3378.2 (2017); *see also id.* § 3000; Defendants' Motion to Dismiss at 7, ECF No. 160. This is essential, because, as shown below, the old validation procedures failed to comport with due process requirements.[28]

Despite these improvements, CDCR has retained the gang validations completed under the old system. CDCR treats these validations as if they were reliable, resulting in deprivations of class members' liberty interest in the fair opportunity for parole. This functions in two discrete ways. First, CDCR relies on decisions made under the old validation system to find *Ashker* class members categorically ineligible for relief under Proposition 57, a Constitutional Amendment passed by California voters in 2016 to provide non-violent offenders with an opportunity to parole. Second, CDCR's failure to expunge the validations from prisoners' records, or to otherwise inform the parole board that the validations do not reliably indicate that a prisoner has been active on behalf of a gang, has led the parole board to rely on these constitutionally infirm validations to deny class members fair parole consideration. These two uses of old validations to disqualify class members from parole eligibility deprive them of a substantial liberty interest – that of the opportunity to earn release from incarceration.

This is a new incarnation of what Plaintiffs alleged in the Second Amended Complaint. SA, ¶ 41. There, Plaintiffs complained that "an unwritten policy prevents any prisoner housed in the SHU from being granted parole." SAC ¶ 87; *see also id.* ¶¶ 88-90 (providing examples of

---

[28] Plaintiffs take no position on whether the new regulations regarding STG validation procedures, promulgated on October 27, 2017, are adequate to avoid erroneous classifications. *See* tit. 15 § 3378.2.

1   individual prisoners denied the opportunity to parole because of SHU confinement). The SAC

2   also asserted as a basis for a liberty interest in release from SHU confinement the "effect on the

3   possibility of parole being granted and the overall length of imprisonment that results from such

4   confinement." *Id.* ¶ 196(c); *see also id.* ¶ 171(f). The release of most class members from the

5   SHU through the implementation of the Settlement Agreement should have remedied this

6   problem; without SHU placement prompting the parole board to deny parole for gang-validated

7   prisoners, class members would have a fair opportunity to seek release from incarceration.

8   Instead, since the Settlement, gang-validations (or six-year inactive review denials) have been

9   substituted for SHU confinement as a substantial obstacle for Class Members seeking parole.

10  Thus, the violations alleged in the SAC are ongoing – namely, the use of constitutionally flawed

11  gang validations to deny class members the opportunity to parole. The only difference is that the

12  gang validations are now directly responsible for denying prisoners a fair opportunity for parole,

13  whereas in the past, the validations underlay SHU placement, which itself resulted in *de facto*

14  parole disqualification. Such a result constitutes a systemic ongoing deprivation of Plaintiffs'

15  liberty interest in the opportunity for parole.

    **A.**    **The Process Used to Validate Prisoners as Gang Affiliates, Which Is Now Being Used to Deny Class Members a Fair Opportunity for Parole, Was Unconstitutional.**

           **1.**    **Gang Validation Procedures Lacked Sufficient Checks and Balances.**

19        The gang validation procedures previously used by CDCR (and now relied on to deny

20  class members a fair opportunity to seek parole) were devoid of necessary checks and balances

21  designed to minimize the risk of error. The validation process was so infirm that it violated

22  Supreme Court requirements of significant checks to guard against the risk of erroneous

23  decisions. *See Wilkinson*, 545 U.S. at 216-17, 226-27; *see also* MTD Order at 12-18.

24        As CDCR has conceded, the former gang validation process was terribly flawed. CDCR's

25  Office of Correctional Safety (OCS) had exclusive authority to validate prisoners as gang

26  affiliates, and OCS officials have admitted that this process lacked "independent review" and did

27  not provide sufficient "check and balance . . . to review information generated by the OCS."

28  Miller Decl., Ex. 1 (Giurbino July 18, 2014 depo.), at 73:3-15, 207:10-16. Indeed, CDCR's

process for validating and revalidating SHU prisoners included none of the checks and balances that salvaged Ohio's procedures in *Wilkinson*.

Gang validation in California began with an Institution Gang Investigator (IGI), who was authorized to investigate gang affiliation based on information from any number of sources, and then develop a validation packet including at least three "source items." CAL. CODE REGS. tit. 15 § 3378(c) (2013); Miller Decl., Ex. 2 (Ducart 30(b)(6) depo.), at 205:25-206:6; Ex. 3 (Frisk depo.), at 31:17-22, 108:18-110:14; Ex. 4 (Barneburg depo.), at 70:7-11, 76:14-18. After the IGI prepared the validation packet, it was forwarded to the Office of Correctional Safety (OCS), which, according to policy, had *exclusive* overall authority for validating a prisoner as a gang affiliate. CAL. CODE REGS. tit. 15 § 3378(c)(6) (2013); Miller Decl., Ex. 3 (Frisk depo.), at 124:10-24; Ex. 5 (Hubbard depo.), at 18:7-16. When making validation decisions, OCS did not review the prisoner's disciplinary history, programming, or complete central file, and in practice, OCS's focus was on gang affiliation alone. CAL. CODE REGS. tit. 15 §§ 3341.5(c)(2)(A)(2), 3378(c)(6), (8); Miller Decl., Ex. 5 (Hubbard depo.), at 18:7-25; Ex. 6 (Kernan depo.), at 76:6-17; Ex. 3 (Frisk depo.), at 132:24-133:16; Ex. 7 (Austin Expert Report), ¶¶ 20, 21. Once OCS approved a gang validation, it sent the decision to the Institutional Classification Committee (ICC), which had no authority to overturn the OCS decision. Tit. 15 §3378(d); Miller Decl., Ex. 7 (Austin Expert Report), ¶ 21. This same lack of independent review governed the revalidation process that occurred every six years (though only a single source item was needed to revalidate a prisoner). Miller Decl., Ex. 2 (Ducart 30(b)(6) depo.), at 230:6-16; Ex. 8 (Parry depo.), at 12:1-7; Ex. 3 (Frisk depo.), at 38:18-22; Ex. 9 (CDCR Operations Manual (2014)), § 52070.18.4.

Class members were not heard by OCS in the validation process, sometimes did not even meet with the IGI investigator, and only a minority of the interviews were held in a confidential setting. Miller Decl., Ex. 5 (Hubbard depo.), at 18:2-6; Ex. 3 (Frisk depo.), at 92:19-93:25, 100:3-7, 101:20-25; Ex. 7 (Austin Expert Report), ¶¶ 20, 21. Indeed, CDCR admits that it added the word "meaningful" to describe the reviews prisoners would receive under the regulations it enacted in 2014 because, under the policies challenged here, there often was no opportunity for "the individual to provide . . . meaningful rebuttal back to th[e] information [that IGI had

1    presented].” *Id.*, Ex. 10 (Giurbino Dec. 18, 2014 depo.), at 179:1-25; Ex. 5 (Hubbard depo.), at

2    27:2-13.

3          Even more problematic, OCS's purported review of the IGI validation packets was, in

4    practice, little more than a rubber stamp. The acting Associate Warden at Pelican Bay testified

5    that he could not recall a single IGI-recommended validation being rejected by OCS. Miller

6    Decl., Ex. 4 (Barneburg depo.), at 176:7-177:22.[29] Lieutenant Frisk, who oversaw the IGI Unit at

7    Pelican Bay, testified that he was not aware of *any* instance in which OCS rejected all the source

8    items submitted by IGI as part of a validation packet, asked IGI to conduct a follow-up interview

9    with a prisoner concerning a validation, or requested additional documentation or investigation.

10   Miller Decl., Ex. 3 (Frisk depo.), at 25:9-25, 125:18-25, 126:7-21, 129:21-130:7. Similarly, Frisk

11   testified that individual source items were rejected by OCS less than 5% of the time. *Id.*, Ex. 3

12   (Frisk depo.), at 127:11-128:15. Thus, IGI acted as both investigator and de-facto gang validation

13   decision-maker, negating OCS's role as a check and balance. *Id.*, Ex. 5 (Hubbard depo.), at

14   27:14-28:6 (OCS "were not neutral reviewers of [validation] information").[30]

15         California's validation system fell significantly short not only of the procedures the

16   Supreme Court mandated in *Wilkinson*, but of validation systems across the country. SHU

17   placement elsewhere in the nation typically begins with an institutional classification committee

18   that has access to complete information about a prisoner, including his offense, programming,

19   and disciplinary history – not simply information about gang affiliation. Miller Decl., Ex. 7

20   (Austin Expert Report) ¶ 22. The decision is made by a group, and is not solely driven by gang

21

_____

22   [29] By contrast, the Federal Bureau of Prisons (BOP) uses a many-tiered process for evaluating
     referrals to restrictive settings such as Special Management Units (SMUs), a process that results

23   in a 14-19% rate of rejection at the final level of review – a significantly higher rate that does
     not include referrals rejected earlier in the process. Miller Decl., Ex. 11 (Austin Rebuttal

24   Report), at 10.

     [30] Also problematic was the fact that validations sometimes were based entirely on confidential
25   information that was not given to the prisoner. Miller Decl., Ex. 12 (Troxell 128-B-2 Forms).
     Nonetheless, CDCR did not have any method to document or track informants who provided
26   false confidential information. *Id.*, Ex. 2 (Ducart 30(b)(6) depo.), at 190:7-11. CDCR officials
     admit that, as a result of the recent *Ashker* DRB review process, they have found some such
27   confidential information "not to be accurate;" they also have found cases in which confidential
     information is neither corroborated within a confidential report, nor elsewhere in a prisoner's
28   file. *Id.*, Ex. 5 (Hubbard depo.), at 156:24-157:11; 159:5-17.

_____

investigator concerns. *Id.* The committee's decision is typically followed by an independent review by a warden *and* by a central office classification division, each of which reviews the recommendation and makes its own recommendation, which then requires approval by the head of the correctional system or her designee. *Id.* Such multi-tiered systems include significant checks and balances, and thus protect against erroneous deprivations of liberty. *Wilkinson*, 545 U.S. at 227.

By contrast, CDCR's system – as its officials now admit – resulted in significant numbers of prisoners being unnecessarily sent to the SHU on the basis of inaccurate or uncorroborated information, facing significant difficulties in challenging their validations, and being retained in SHU far longer than otherwise could be justified. Miller Decl., Ex. 5 (Hubbard depo.), at 27:2-13, 47:15-48:9, 156:24-157:11, 159:5-17; Ex. 6 (Kernan depo.), at 31:2-12, 35:3-11, 42:6-14, 69:23-70:20; Ex. 1 (Giurbino July 18, 2014 depo.), at 74:5-12, 198:9-12; Ex. 8 (Parry depo.), at 24:12-25:18, 72:5-16, 73:1-9. CDCR's validation process plainly created a significant risk of erroneous deprivation. Indeed, through the Settlement Agreement, CDCR agreed to stop relying on validations to determine whether an inmate should be sent to the SHU. SA, ¶ 16. Nonetheless these flawed validations and revalidations continue to play a significant role in parole determinations.[31]

### 2. Gang Validation Procedures Gave Prisoners Misleading Notice About How to Avoid Revalidation.

As explained in section B.2.a, above, a "fair opportunity" for rebuttal is "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 226; *see also Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986). To provide a prisoner with meaningful notice, reviews of a validation decision should "serve[] as a

---

[31] The old, defective validations also still play a role in other CDCR determinations that implicate a liberty interest. For example, gang validated prisoners who return to CDCR are immediately placed in Administrative Segregation for prolonged periods of time while a so-called safety investigation is undertaken by staff. During that period of time they lose their good time credits because of the Work Group they are placed in. *See* ECF No. 875 (Order re Plaintiffs' Enforcement Mot. Regarding Retention of Gang-Validated Readmitted Inmates in Administrative Segregation), at 5.

1   guide for future behavior," *Wilkinson*, 545 U.S. at 226, "giv[ing] the prisoner some idea of the

2   requirements for, and his progress toward, more favorable placement." *Toevs*, 646 F.3d at 758

3   (citing *Wilkinson*); *see also Greenholtz*, 442 U.S. at 15 (noting that prisoners denied parole were

4   given notice of the reason "as a guide to the inmate for his future behavior"). "A prisoner should

5   not . . . have to guess what conduct forms the basis for the charges against him." *Taylor v.*

6   *Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001).

7          Here, notice to class members about how to avoid being revalidated as an active gang

8   member was misleading to the point of being nonsensical. Under CDCR policy and practice, a

9   validated gang affiliate was given notice that he would not be revalidated if he was found

10  "inactive," meaning that he had not been involved in gang "activity" for a minimum of six years.

11  Tit. 15 §§ 3341.5(c)(5), 3378(e). Miller Decl., Ex. 2 (Ducart 30(b)(6) depo.), at 23:9-14; Ex. 8

12  (Parry depo.), at 74:18-23 (a SHU prisoner is "inactive" if "there was no evidence that they were

13  involved in any gang activity for that six-year period."). However, CDCR's internal interpretation

14  of the term "activity" did not cohere with logic or plain-language meaning. CDCR's Validation

15  Instruction Manual, which was not shared with prisoners, included as an activity "*non-action*

16  *piece[s] of evidence*." *Id.*, Ex. 13 (CDCR Validation Instruction Manual (June 2011)), at 12

17  (emphasis added). The definition of "activity" as applied by CDCR thus was of indecipherable

18  and unbounded scope, meaning that prisoners who were not involved in current gang activity

19  under the plain meaning of the term routinely were revalidated as "active" gang members.

20         In line with these linguistic gymnastics, source items that were used to revalidate SHU

21  prisoners as gang affiliates at inactive reviews—and thus now still are used to justify denying

22  them parole—routinely consisted of pure association, rather than specific gang-related conduct or

23  "activity" under any reasonable interpretation of that term. The following so-called gang

24  "activity" is typical of what was used at "inactive" reviews to revalidate prisoners as gang

25  associates:

26     •   A prisoner's name simply appearing on a list of alleged gang members. Miller Decl.,
           Ex. 10 (Giurbino Dec. 18, 2014 depo.), at 163:11-20; Ex. 14 (Franco 128-B-2); Ex. 15
27         (Franklin 1030); Ex. 16 (1030 Form dated Feb. 3, 2012), at CFILE072872; Ex. 17
           (Garcia 128-B);

28

- Having artwork, a birthday card, or possessions from a validated gang affiliate. *Id.*, Ex. 8 (Parry depo.), at 70:18-21;

- Having a photograph of a former cellmate who is a gang-affiliated prisoner. *Id.*, Ex. 2 (Ducart 30(b)(6) depo.), at 36:13-18;

- Having political and historical writings and photographs, including a pamphlet in Swahili. *Id.,* Ex. 18 (Dewberry 128-B);

- Having drawings or artwork (such as Aztec and Mayan images). *Id.*, Ex. 19 (Esquivel 128-B-2); Ex. 20 (Reyes 128-B-2); Ex. 21 (Ruiz 128-B); Ex. 22 (Ruiz Decl.), ¶ 5;

- Speaking to another prisoner, regardless of the substance of the conversation. *Id.*, Ex. 3 (Frisk depo.), at 240:22-241:25; Ex. 23 (Ashker Gang Chrono);

- Writing to, or receiving mail from, a validated gang affiliate, or being mentioned in a validated gang affiliate's mail, regardless of the content of the correspondence. *Id.*, Ex. 2 (Ducart 30(b)(6) depo.), at 155:8-14; Ex. 24 (Johnson 128-B) (describing a letter that was sent to plaintiff Johnson in which a validated gang member inquires about Johnson's health and sends his respects); Ex. 25 (Bruce 1030) (describing letter a prisoner informs another prisoner that Bruce is housed on the same yard as another validated gang associate, and stating that this "evidences your shared allegiance and gang association with a validated . . . associate");

- Appearing in a photograph with a validated gang affiliate. *Id.*, Ex. 26 (Ruff depo.), at 66:18-25;

- Having a tattoo that CDCR determines is gang-related, despite the fact that CDCR does not provide a program that allows prisoners to remove tattoos. *Id.*, Ex. 26 (Ruff depo.), at 72:6-74:6;

- Having a book written by George Jackson. *Id.*, Ex. 26 (Ruff depo.), at 56:23-57:9; Ex. 3 (Frisk depo.), at 240:7-10.

Contrary to the above examples, the plain meaning of the words "active" and "inactive" suggest that to have engaged in gang "activity," a prisoner must have taken some kind of action, or have performed a specific function, on behalf of a gang. Similarly, a prisoner would logically become "inactive," and therefore have some chance at parole, if he has *not* performed specific acts on behalf of a gang, and is merely affiliated with a gang. As the Supreme Court has put it, "the distinction between 'active' and 'nominal' membership is well understood in common parlance." *Scales v. United States*, 367 U.S. 203, 222-23, 225 (1961) ("active" member of the Communist Party must mean "more than the mere voluntary listing of a person's name on Party rolls"); *see Definition of Active*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/active (last visited Nov. 16, 2017) ("active" defined as: "characterized by action rather than by contemplation or speculation.").

Because CDCR's undisclosed definition of "activity" included "non-action," SHU prisoners were left in an untenable position, without any meaningful guide for future behavior and with misleading notice about how to remove their validation. *See*, *e.g.*, *Conner v. Sakai*, 15 F.3d 1463, 1469 (9th Cir. 1993), *vacated in part and amended by* 61 F.3d 751 (9th Cir. 1995) (holding that the due process clause "bars the state from imposing punishment on the basis of an unexpected and unusual interpretation of plain language"). Indeed, prisoners were routinely revalidated based on evidence that does not constitute gang activity as they, and even CDCR officials, understand those words.[32] This undermined the very purpose of notice, deprived prisoners of a "fair opportunity" to remove their validations, and thus failed to safeguard against erroneous deprivations of liberty. *Wilkinson*, 545 U.S. at 226; *Toevs*, 646 F.3d at 758; *see also Greenholtz*, 442 U.S. at 15.

### 3. Gang Validation Review Every Six Years Was Insufficiently Frequent as a Matter of Law.

Due process requires periodic review of the continued validity of the gang validation. *See Hewitt*, 459 U.S. at 477 n.9 (there must be periodic reviews of segregation determinations). There is no settled rule as to how frequently review must occur, but the Ninth Circuit has signaled that annual review for segregation is insufficient. *Toussaint*, 801 F.2d at 1101 ("We do not believe that annual review sufficiently protects plaintiffs' liberty interest"); *Brown*, 751 F.3d at 988 (27 months without meaningful review of prison segregation violates due process); *see also McQueen v. Tabah*, 839 F.2d 1525, 1529 (11th Cir. 1988) (11 months without review states due process claim). Startlingly, class members were only reviewed for a determination of active gang membership *every six years*.[33] These "inactive reviews" were the *only* reviews that could result in

---

[32] Miller Decl., Ex. 27 (Dewberry Decl.), ¶¶ 8-9; Ex. 28 (Esquivel Decl.), ¶ 4; Ex. 29 (Franco Decl.), ¶ 2; Ex. 30 (Franklin Decl.), ¶¶ 5-6; Ex. 31 (Johnson Decl.), ¶¶ 5-6; Ex. 32 (Redd Decl.), ¶¶ 3, 5-8; Ex. 33 (Reyes Decl.), ¶¶ 10-11; Ex. 22 (Ruiz Decl.), ¶ 5; *compare id.*, Ex. 8 (Parry depo.), at 75:25-76:11 (Brian Parry, former Assistant Director at OCS, testifies that he does not "think" that appearing on a list constitutes gang activity) *with* Ex. 14 (Franco 128-B-2); Ex. 15 (Franklin 1030); Ex. 16 (1030 Form dated Feb. 3, 2012), at CFILE072872; Ex. 17 (Garcia 128-B) (appearing on a list used as evidence of gang activity); *see also id.*, Ex. 34 (Vanyur depo.), at 182:5-183:6 ("I think the fact that one source could be used to declare you active [at an inactive review] was not as clear to an inmate of exactly: what do I need to do these six years?").

[33] While class members received 180-day and annual reviews, tit. 15 §§ 3341.5(c)(2)(A)(1),

a change of status from active to inactive, and the decisions were based on whether a prisoner had received one "source item" at any time during the prior six years. Tit. 15 §§ 3341.5(c)(5), 3378(e)-(f). Miller Decl., Ex. 2 (Ducart 30(b)(6) depo.), at 230:6-16; Ex. 8 (Parry depo.) 12:1-7; Ex. 3 (Frisk depo.), at 38:18-22; Ex. 5 (Hubbard depo.), at 19:6-12; Ex. 35 (Aug. 24, 2006 Memorandum: Documentation Concerning Active and Inactive Prison Gang Members and Associates), at 2. If even one new source item was found, the prisoner was revalidated as an active gang affiliate. *Id.*, Ex. 5 (Hubbard depo.), at 19:23-20:2; Ex. 9 (CDCR Operations Manual (2014)).[34]

This six-year review regime was unparalleled: no other prison system in the United States reviewed prisoners for release from the SHU so infrequently. Miller Decl., Ex. 7 (Austin Expert Report), ¶ 49. Indeed, both Plaintiffs' and Defendants' experts agreed that six years is simply too long between reviews. *Id.*, Ex. 34 (Vanyur depo.), at 193:9-12 (reviews should occur at least annually, and "in many systems, it's probably 180 days"), 194:4-7. While courts have not set a bright line rule about how frequently reviews must occur, six year reviews were plainly unconstitutional. *See*, *e.g.*, *Brown*, 751 F.3d at 988.

Now that CDCR no longer uses validations to place class members in SHU, it has abolished the six year inactive reviews. It is thus even more difficult for class members to challenge these old defective validations. Current regulations allow validated gang members released from segregation to challenge their validation *eleven* years after that release. CAL.CODE REGS. tit. 15 § 3378.10(b)(1) (2017).

---

3378(c)(7), CDCR acknowledges that these reviews did not and could not result in release from the SHU or change in gang status; indeed, the committees that ran these reviews were not authorized to release a prisoner from the SHU. Miller Decl., Ex. 2 (Ducart 30(b)(6) depo.), at 225:9-226:1, 228:2-6, 230:6-16; Ex. 36 (180-day and Annual Review Records), at PEL00000197, PEL00006258, PEL00015492, PEL00009765 ("recognized avenues for release from SHU are through the debriefing process or through being determined to be an inactive prison gang member or associate"); *cf. id.*, Ex. 37 (Redd UCC Review Chrono) (sole question asked at 180-day review is whether Redd was interested in debriefing).

[34] If no new source item was discovered, the IGI submitted a request to headquarters to change the prisoner's status to "inactive." Miller Decl., Ex. 9 (CDCR Operations Manual (2014)), § 52070.18.4; Ex. 5 (Hubbard depo.), at 20:3-7.

1

2

**B.** **Plaintiffs Have a Constitutionally Protected Liberty Interest in Parole Consideration and in Avoiding Gang Validation.**

3

Prisoners incarcerated in California have a state created liberty interest in parole that is

4

protected by the Federal Due Process Clause. *See Haggard v. Curry*, 631 F. 3d 931, 935-36 (9th

5

Cir. 2010); *Hayward v. Marshall*, 603 F. 3d 546, 561-63 (9th Cir. 2010) (en banc). Due process

6

requires that the Board of Parole Hearings ("BPH") give "individualized consideration of all

7

relevant factors" bearing on an inmate's parole suitability. *In re Rosenkrantz*, 29 Cal. 4th 616,

8

558, 655 (2002). BPH must consider only "relevant and reliable" information. CAL. CODE REGS.,

9

tit. 15 § 2449.4(b). Likewise, due process requires that the Board's decision to deny parole have a

10

"basis in fact;" otherwise it is "arbitrary and capricious" and "violate[s] established principles of

11

due process of law." *In re Lawrence*, 44 Cal. 4th 1181, 1204-05 (2008). To deny parole, the

12

Board must provide "more than rote recitation of the relevant factors with no reasoning

13

establishing a rational nexus between those factors and the necessary basis for the ultimate

14

decision—the determination of current dangerousness." *Id*. at 1210 (also holding that "a policy of

15

rejecting parole . . . , without individualized treatment and due consideration, deprives an inmate

16

of due process of law") (citing *Rosenkrantz*, 29 Cal. 4th at 684). Thus, prisoners have a liberty

17

interest in receiving individualized consideration of all relevant factors bearing on parole

suitability.

18

When a state creates such a liberty interest, "the Due Process Clause requires fair

19

procedures for its vindication—and federal courts will review the application of those

20

constitutionally required procedures." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). At a

21

minimum, a prisoner subject to parole must be allowed an opportunity to be heard and provided a

22

statement of the reasons why parole was denied. *Id*., citing *Greenholz*, 462 U.S. at 16. Where

23

prisoners who otherwise are qualified to apply for parole are denied these basic procedural

24

protections by being disqualified from any opportunity for parole consideration, they are deprived

25

of a constitutionally recognized liberty interest.

26

Because it disqualifies them from Proposition 57 relief, described below, prisoners also

27

have a direct liberty interest in avoiding gang validation. *See Wilkinson,* 545 U.S. at 224 (noting

28

1   impact of OSP placement on parole eligibility as reason for finding of a liberty interest); *Sandin*,

2   515 U.S. 472, 487 (1995); *Serrano*, 345 F.3d at 1078; *Keenan*, 83 F.3d at 1089; *see also*, section

3   IV.A.1.a, *supra.*

4         **C.**     **CDCR's Continued Use and Retention of Gang Validations Has a Systemic and Ongoing Effect in the Denial of Parole.**

5

6        As shown above, CDCR's previous gang validation procedures violated due process, and

7   CDCR prisoners have a liberty interest in avoiding such validations, and in a fair opportunity for

8   parole. CDCR is depriving prisoners of those liberty interests in two ways: first, it is using

9   decisions made under the old validation procedures to render *Ashker* class members categorically

10   ineligible for Proposition 57 relief; second, by retaining the validations on files accessible to the

11   parole board, CDCR is denying *Ashker* class members a fair parole hearing unmarred by reliance

12   on constitutionally infirm information.

13         **1.**     **The Blanket Denial of Proposition 57 Parole Consideration Based on Gang Validation is Unconstitutional.**

14

15        With the 2016 passage of Proposition 57, California voters amended the State

16   Constitution to provide a parole opportunity for prisoners with nonviolent convictions, as

17   follows: "Any person convicted of a nonviolent felony offense and sentenced to state prison shall

18   be eligible for parole consideration after completing the full term for his or her primary offense."

19   Cal. Const. art. I, § 32(a)(1).

20        The law required CDCR to adopt regulations in furtherance of its provisions (*id*. § 32(b)),

21   and CDCR consequently promulgated a "Public Safety Screening and Referral" procedure. Cal.

22   Code. Regs., tit. 15 § 3492 (2017). This new procedure is designed to screen certain prisoners

23   out of parole consideration. Only those prisoners who pass this screening are referred to the

24   Board of Parole Hearings for an individualized determination of their suitability for release.

25   Miller Decl., Ex. 38 (CDCR Notice of Change of Regulations), at 4 ("Only inmates who pass this

26   public-safety screening are referred to the board.").

27        Among CDCR's various disqualifiers are those non-violent offenders whose "prison

28   record indicates they have been placed in a security housing unit for any involvement with a

1   Security Threat Group (i.e., prison gang) in the past five years." Miller Decl., Ex. 38 (CDCR

2   Notice of Change of Regulations), at 4. This means that CDCR is treating all *Ashker* class

3   members validated or found active in a six-year review under the old procedures and still in

4   indeterminate SHU in 2012 or later as categorically ineligible for Prop 57 parole consideration.

5   As described in section V.A above, the procedures by which CDCR made these decisions

6   violated due process. By using those flawed validations as the exclusive basis for the absolute

7   disqualification of Proposition 57 parole consideration, CDCR extends and exacerbates the

8   constitutional violation.

9        CDCR rationalizes this categorical disqualification on the faulty premise that

10  "[p]lacement in a security housing unit is reserved for the most serious offenses committed in

11  prison, clearly indicating that the nonviolent offender continues to pose a risk to public safety."

12  Miller Decl., Ex. 38 (CDCR Notice of Change of Regulations), at 4. That should be true going

13  forward, now that the Settlement Agreement limits SHU placement to those found guilty of a

14  SHU-eligible offense, but it certainly was not true of those *Ashker* class members who were

15  assessed SHU terms during the relevant period for having a book by George Jackson, or because

16  their name appeared on a list. *See supra,* p. 55.

17       Since July 1, 2017, when CDCR began implementing its Proposition 57 screening

18  procedures under title 15 section 3492(a), CDCR has disqualified at least six class members as

19  "not eligible for review as a nonviolent offender." Miller Decl., Ex. 39 (Inmate Board Actions).

20  ██████████ provides a recent example, demonstrating that CDCR's policy is a total bar on Prop

21  57 eligibility for many *Ashker* class members. *See id.* at 8 (noting "an indeterminate SHU term

22  assessment due to an Aryan Brotherhood gang connection. ███████ was housed in the SHU

23  during 2015. BPH NV policy excludes from review those cases in which an inmate received a

24  SHU Term Assesment and/or the SHU housing is within 5 years of review. As such, this case is

25  jurisdictionally excluded from NV review."); *see also, id.,* Ex. 40 (Shannon Hogg E-mail)

26  (stating another *Ashker* class member "is not eligible for the non-violent review process because

27  he was still serving an indeterminate SHU term and was housed in SHU housing as recent as

28  11/10/14 . . . . [H]e was housed in SHU housing which makes him ineligible.").

1   This is a systemic violation, based on explicit CDCR policy. Plaintiffs thus ask the Court

2   to hold that the regulation at issue is unconstitutional and order CDCR to refer all nonviolent

3   prisoners who have been, or otherwise would be, disqualified due to being assessed a SHU term

4   for an STG reason within the past five years to be referred to the Board of Parole Hearings for

5   parole consideration under Prop 57.

### 2. CDCR's Use of Past Gang Validations to Prevent Class Members with Life Sentences from the Opportunity for Parole Violates the Constitution.

8   Prior validations also continue to affect *Ashker* class members' eligibility for parole

9   outside the Prop 57 context. Because CDCR retains the old validation decisions in prisoners'

10   files, and because CDCR has not acknowledged that these validations are flawed, the BPH—

11   which has access to those records (tit. 15 § 3370(e))—understandably relies on the validations in

12   making its parole determinations. This deprives numerous class members with life sentences of a

13   liberty interest by denying them a fair opportunity to seek release from incarceration through a

14   parole hearing unmarred by constitutionally flawed information.

15   Plaintiffs' extensive review of the parole transcripts of many class members since their

16   *Ashker* reviews and release from SHU shows that gang validation is a significant factor in parole

17   consideration and risk rating. Miller Decl., ¶¶ 42-56 (Parole Board Hearing transcripts and

18   Comprehensive Risk Assessments for class members ████████████████████████████

19   ████████████████████████████████████████████). As CDCR is

20   aware, parole commissioners remain concerned with gang status notwithstanding a prisoner's

21   release from SHU. During parole review, the simple fact of a prisoner's validation raises a

22   presumption of actual gang activity or affiliation. As one Commissioner put it bluntly: ████

23   ████████████████████████████████████████████████████████

24   ████████████████████████ *Id.*, Ex. 51 (████████ Transcript), at 67:18-

25   24. The presumption is unequivocal, as the truth and accuracy of the validation goes

26   unquestioned by BPH. As a Commissioner made clear: ████████████████████████

27   ████████████████████████████████████████████████████████

28

1  ████████████████████████ *Id.*, Ex. 52 (██████ Transcript), at 193:6-11; *see also id.*, Ex. 50

2  (██████ Transcript), at 98-99, 152.

3       The fact of a validation by CDCR remains damning even where the prisoner has engaged

4  in extensive programming and/or had a long history of discipline-free behavior. For example,

5  BPH issued a three-year denial of parole for a prisoner who had been discipline-free for decades,

6  with a Commissioner explaining: ████████████████████████████████

7  ████████████████████████████████████████

8  ██████████████████████████████████.” Miller

9  Decl., Ex. 42 (██████ Transcript), at 79:24-80:4. The Commissioner further stated: “███

10 ████████████████████████████████████████

11 ████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████

14 ██████████████████████████████████

15 ████████████████ *Id.*, Ex. 42 (██████ Transcript), at 81:20-82:7. Other prisoners in similar

16 circumstances—with positive programming and no recent disciplinary history—have also been

17 unable to mitigate the impact of the past validations. *See, e.g., id.*, Ex. 47 (BPH Comprehensive

18 Risk Assessment of ████████), at 10-13 (a forensic psychologist noted, “████████████

19 ████████████████████████████████████

20 ████████████████████████████████████

21 ████████████████████████████████████

22 ████████████████████████████████████████

23 ██████████

24      When prisoners dispute their validation status or the use of confidential information,

25 commissioners consider the challenge as evidence of dishonesty and lack of credibility, which

26 supports the denial of parole. *See, e.g.,* Miller Decl., Ex. 52 (██████ Transcript), at 187:10-119

27 (Commissioner: “████████████████████████████████

28 ████████████████████████████████████

1 ██████████████████████████████████████████████████████████████████

2 ██ In many cases, the commissioners directly state that debriefing is the only means of having a

3 chance for parole. For example, a Commissioner addressed a prisoner who stated that he had not

4 participated with a gang in over two decades, by stating: ███████████████████████████

5 ██████████████████████████████████████████████████████████

6 █████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████████████ *Id.,*

8 Ex. 43 (██████ Transcript), at 118:7-13; *see also id.,* Ex. 43 at 54-55. Similarly, in a

9 Comprehensive Risk Assessment, the forensic psychologist credited the prisoner for having no

10 115s since 2001 and that programming efforts indicate a positive direction, yet stated: ████████

11 ██████████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████

13 ██████████████████████████████████████████ *Id.*, Ex. 48

14 (██████ BPH Comprehensive Risk Assessment), at 17; *see also id.*, Ex. 53 (██████ Transcript),

15 at 22:24-23:2 (Comprehensive Risk Statement asserts ████████████████████████████

16 ███████████████████"). In fact, Plaintiffs are unaware of any recent applications of validated

17 prisoners for parole that have been granted. *Id.*, ¶ 57.[35]

18       To be clear, Plaintiffs do not challenge Parole Board procedures or decisions; it is

19 CDCR's continued retention of the old validations and their unqualified transmittal to BPH that is

20 the problem.[36] CDCR and outside experts agree that the old validations were reached by faulty

21 procedures, and resulted in overclassifying prisoners as gang members. That CDCR retains and

22 allows these faulty validations to affect Plaintiffs' parole opportunities is a continuing violation

23 of their due process rights. To ensure a legal process that minimizes the "risk of erroneous

24

25 [35] Even if a few gang-validated prisoners were to receive parole, there can be no dispute that gang validation is a substantial barrier.

26 [36] Plaintiffs recognize that active gang membership and gang-related misconduct could be a

27 legitimate criterion for the Parole Board to consider. However, using gang validation or six-year review determinations that occurred prior under the old regulations as a proxy for gang activity and membership is constitutionally invalid because, as discussed in section V.A above, the risk

28 of error in that process was substantial.

decisions" involving an important liberty interest, CDCR must expunge the old validations, or inform the BPH that they cannot be treated as reliable.

### D. Relief for CDCR's Systemic Due Process Violations Involving the Fair Opportunity for Parole

To remedy CDCR's systemic due process violations regarding class members' fair opportunity for parole, Plaintiffs ask that the Court: (1) order that Defendants expunge all past validations and revalidations made in violation of due process and which may be used in the consideration of class members applying for parole, and (2) hold that CDCR's regulation implementing Proposition 57 is unconstitutional and order CDCR to refer all nonviolent prisoners who have been, or otherwise would be, disqualified due to being assessed a SHU term for an STG reason within the past five years to be referred to the Board of Parole Hearings for parole consideration.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court find that Defendants have engaged in a current and ongoing systemic violation of Due Process by failing to ensure the accuracy and reliability of confidential information, improperly administering the RCGP unit, and denying class members the opportunity to seek parole based on unconstitutional gang validations. To remedy these ongoing violations, Plaintiffs seek a one year extension of the Settlement Agreement and the Court's jurisdiction, to run from the date of the Court's order on this matter, as well as the specific relief described above.

DATED: November 20, 2017                    Respectfully submitted,


By:   */s/ Carmen E. Bremer*

CARMEN E. BREMER (*pro hac vice*)
Email: carmen.bremer@bremerlawgroup.com
BREMER LAW GROUP PLLC
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Tel: (206) 357-8442
Fax: (206) 858-9730

JULES LOBEL (*pro hac vice*)
Email: jll4@pitt.edu
RACHEL MEEROPOL (*pro hac vice*)
Email: rachelm@ccrjustice.org
SAMUEL MILLER (Bar No. 138942)
Email: samrmiller@yahoo.com
A. AZURE WHEELER (*pro hac vice*)
Email: awheeler@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6432
Fax: (212) 614-6499

ANNE CAPPELLA (Bar No. 181402)
Email: anne.cappella@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Tel: (650) 802-3000
Fax: (650) 802-3100

CAROL STRICKMAN (SBN 78341)
Email: carol@prisonerswithchilodren.org
LEGAL SERVICES FOR PRISONERS WITH
CHILDREN
1540 Market Street, Suite 490
San Francisco, CA 94102
Tel: (415) 255-7036
Fax: (415) 552-3150

CHARLES F.A. CARBONE (Bar No. 206536)
Email: Charles@charlescarbone.com
LAW OFFICES OF CHARLES CARBONE
P. O. Box 2809
San Francisco, CA 94126
Tel: (415) 981-9773
Fax: (415) 981-9774

MARILYN S. MCMAHON (SBN 270059)
Email: Marilyn@prisons.org
CALIFORNIA PRISON FOCUS
P.O. Box 1129
2000 Allston Way
Berkeley, CA 94701
Tel: (510) 734-3600
Fax: (510) 836-7222

ANNE BUTTERFIELD WEILLS (SBN 139845)
Email: abweills@gmail.com
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 500
Oakland, CA 94612
Tel: (510) 839-1200
Fax: (510) 444-6698

*Attorneys for Plaintiffs*