UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| TODD ASHKER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BROWN, et al.,<br><br>    Defendants. | Case No. 09-cv-05796-CW (RMI)<br><br>**ORDER ON PLAINTIFFS'**<br>**ENFORCEMENT MOTION**<br>**REGARDING RCGP**<br>**VERIFICATION REVIEWS**<br><br>Re: Dkt. No. 847 |

In this motion filed October 13, 2017, Plaintiffs contend that Defendants are in substantial noncompliance with the requirements of Paragraph 27 of the Settlement Agreement with regard to the way in which reviews are conducted of prisoners who have been placed in Restrictive Custody General Population ("RCGP"). (Doc. 847.) Based on that contention, Plaintiffs ask the court to impose a specific, detailed list of requirements on Defendants regarding the review of the status of these prisoners, as well as an additional requirement regarding the yard used by these prisoners. Defendants oppose the motion. (Doc. 945.) The matter was heard before the court on March 16, 2018. (Doc. 980.) After reviewing the arguments made by the parties in their papers and in oral argument, the court will deny Plaintiffs' motion.

## DISCUSSION

Paragraph 27 of the Settlement Agreement provides as follows (emphasis added):

27. For those STG inmates considered for release to the General Population either following Step Down Program completion or pursuant to the review described in Paragraph 25, and against whom there is a substantial threat to their personal safety should they be released to the General Population as determined by a preponderance of the evidence, the Departmental Review Board retains the discretion, in accordance with

existing authority, to house that inmate in alternate appropriate non SHU, non-Administrative segregation housing commensurate with his case factors, such as a Sensitive Needs Yard or RCGP, until such time that the inmate can safely be housed in a general population environment. The Departmental Review Board shall articulate the substantial justification for the need for alternative placement. If the Institution Classification Committee refers a case to the Departmental Review Board pursuant to this Paragraph, the Departmental Review Board shall prioritize these case reviews and expeditiously conduct the hearing and render its placement decision. **Thereafter, during their regular 180-day reviews, the Institution Classification Committee shall verify whether there continues to be a demonstrated threat to the inmate's personal safety; and if such threat no longer exists the case shall be referred to the Departmental Review Board for review of housing placement as soon as practicable.** For Departmental Review Board hearings held pursuant to this Paragraph, a staff assistant shall be provided to help inmates prepare and present their case due to the fact that the complexity of these types of cases makes assistance necessary. If Plaintiffs' counsel contends that CDCR has abused its discretion in making housing decisions under this Paragraph, that concern may be raised with Magistrate Judge Nandor J. Vadas in accordance with the dispute resolution and enforcement procedures set forth in Paragraphs 52 and 53 below to determine whether CDCR has articulated substantial justification by a preponderance of the evidence for alternative placement.

Settlement Agreement (Doc. 424-2) ¶ 27.

Plaintiffs contend that under Paragraph 27, "the ICC's task at the prisoner's 180-day review is to verify whether it is more likely than not that the DRB's initial determination that he faces a substantial threat to his safety in GP continues, or if such a threat ever actually existed." [1] Pl.'s Mtn. (Doc. 847) 3:2-5. Plaintiffs further contend that the ICC has a pattern of summarily retaining prisoners in the RCGP without conducting an individualized analysis of the unique factors present in each case and thus does not perform the verification required under Paragraph 27.

Plaintiffs present three major arguments. First, Plaintiffs argue that the ICC routinely fails to demonstrate by a preponderance of the evidence that information demonstrates a continued safety threat. In support of that argument Plaintiffs claim that the ICC improperly treats a lack of new information as dispositive evidence of the continuation of a safety threat. They claim that the ICC fails to adequately explain how new information demonstrates a continued safety threat. Plaintiffs further claim that the ICC improperly relies on not guilty findings to verify a safety

---

[1] The "ICC" is the Institution Classification Committee and the "DRB" is the Departmental Review Board.

2

threat, and that the ICC verification reviews are superficial and brief.

Plaintiffs' second major argument is that the ICC fails to consider evidence demonstrating that prisoners would not face an "inordinate safety threat" in general population. Plaintiffs claim that the ICC does not take into consideration that a prisoner has remained free from harm among prisoners who allegedly pose a threat. They further claim that the ICC does not take prisoners' explanations into account, and misstates evidence of safety threats.

Plaintiffs' third major argument is that the CDCR provides misleading information on how a prisoner may achieve transfer to general population. Plaintiffs claim that misleading information is provided by the DRB. They further claim that the ICC provides misleading information at verification reviews.

Based on the above arguments, Plaintiffs ask the court to find that Defendants are in substantial noncompliance with Paragraph 27 of the Settlement, and order that:

> 1. In consultation with Plaintiffs, Defendants shall develop a set of criteria for the ICC to follow at each 180-day threat verification review that is sufficient to ensure the adequacy of each review under the Settlement. The criteria will specify the weight that each factor should be afforded. The criteria shall include, but not be limited to, the following:
> a. A prisoner's denial that he faces a safety threat shall be given substantial weight in favor of finding no continued threat to his safety;
> b. A prisoner's remaining free from harm during the review period shall be given moderate weight in favor of there being no continued threat to his safety; if he has been among individuals associated with the STG that poses a safety threat, this factor shall be given substantial weight;
> c. The lack of new evidence indicating that the prisoner faces a safety threat shall be given moderate weight in favor of there being no such threat;
> d. If the documents underlying the prisoner's original safety threat determination reflect information that is ten years or more old, this factor shall be given substantial weight in favor of there being no continued threat;
> e. A prisoner's uneventful interaction with general population prisoners through the chain link fence during yard time (see infra point 6) shall be given substantial weight in favor of there being no continued safety threat.
> 2. The aforementioned review criteria shall be made available to prisoners who are housed in the RCGP on the basis of a safety threat.
> 3. Defendants and Plaintiffs collectively choose an independent corrections expert who shall be consulted on each review in which the prisoner requests to be transferred out of the RCGP, and that the consultation occur after the ICC verification review, and before the ICC has rendered a final decision.

> 4. Defendants develop a special appeal process by which an RCGP prisoner who disagrees with an ICC decision to retain him in the RCGP can petition the DRB for a review.
> 5. Defendants implement a waiver process whereby RCGP prisoners who refute safety concerns are afforded an opportunity to be released to general population upon signing a liability waiver.
> 6. Defendants shall allow RCGP prisoners access to a yard separated by a chain link fence from a yard used by the general prison population, so that RCGP prisoners may demonstrate their positive interaction with those prisoners. This simultaneous yard time shall be provided to RCGP prisoners no less than bi-weekly.

Pl.'s Mtn (Doc. 847)14:20-15:25.

Initially, the court notes that Plaintiffs misstate the terms of the Settlement Agreement when claiming that "the ICC's task at the prisoner's 180-day review is to verify whether it is more likely than not that the DRB's initial determination that he faces a substantial threat to his safety in GP continues, or if such a threat ever actually existed." Pl.'s Mtn. (Doc. 847) 3:2-5. As quoted above, the requirement for the ICC is to "verify whether there continues to be a demonstrated threat to the inmate's personal safety; and if such threat no longer exists the case shall be referred to the Departmental Review Board for review of housing placement as soon as practicable." Settlement Agreement (Doc. 424-2) ¶ 27. There is no language in Paragraph 27 requiring the ICC to determine "if such a threat ever actually existed." Further, there is no reference to the preponderance of the evidence "more likely than not" standard in the language defining the task of the ICC in conducting the 180-day reviews of prisoners' status.

In response to Plaintiffs' claims regarding the manner in which the 180-day reviews are conducted, Defendants provide the Declaration of D. Bradbury, Chief Deputy Warden of Pelican Bay State Prison. (Doc. 945-1.) Chief Deputy Warden Bradbury acknowledges, that "[t]he settlement requires the ICC to verify whether there continues to be a demonstrated threat to the inmate's personal safety. Only in cases where 'such threat no longer exists' is the ICC authorized to refer the case to the DRB for transfer from the RCGP to the general population." Bradbury Decl. (Doc. 945-1) 2:20-23. Again, Chief Deputy Warden Bradbury states that, "the ICC must evaluate whether the demonstrated threat found by the DRB continues to exist. The ICC's focus is not on reconsidering the basis for the DRB's initial housing decision, but on whether any facts discovered following the DRB's determination show that 'such threat no longer exists.'" (*Id.* at

3:5-8.) Plaintiffs argue that this focus is contrary to the requirement that the ICC verify whether there continues to be a demonstrated threat. Specifically, they argue that verification that safety concerns "no longer exist" means that the original determination will continue to govern unless new evidence arises to show a threat no longer exists. They argue that verifying whether a safety threat "continues," on the other hand, requires that the ICC look critically at the evidence considered by the DRB and, based on any updated information, determine whether a threat still exists.

The court rejects Plaintiffs' argument, and notes that Chief Deputy Warden Bradbury's statement did not misstate the standard set forth in Paragraph 27, but was made to emphasize what the focus of the review is <u>not</u>. The statement was made in response to arguments made by Plaintiffs that Defendants interpreted as requiring the ICC to reanalyze the DRB's initial decision. Further, the court finds nothing in the language of Paragraph 27 requiring the ICC to do this. The use of the phrase "continues to be a demonstrated threat" presupposes the prior existence of such a threat. Nothing in the language of Paragraph 27 calls for the ICC to reconsider the DRB's original conclusion. Rather, it requires the ICC to proceed from the presumption that a demonstrated threat existed and determine whether it continues.

As set forth above, the scope of the ICC's review is defined by Paragraph 27. This portion of the Settlement Agreement requires the ICC to "verify whether there continues to be a demonstrated threat to the inmate's personal safety; and if such threat no longer exists the case shall be referred to the Departmental Review Board for review of housing placement as soon as practicable." In response to Plaintiffs' claims regarding the ICC's review, treatment and consideration of evidence, Defendants explain their methods as follows:

> To make this determination [whether there continues to be a demonstrated threat to the inmate's personal safety], the ICC notes the basis for the inmate's assignment to the RCGP, reviews the inmate's nonconfidential and confidential custody records, analyzes the presence or lack of new information as to the ongoing nature of the inmate's safety concerns, and considers how the inmate has been programming in the RCGP, including whether the inmate has engaged in any disciplinary behavior or engaged in gang behavior. (Bradbury Decl. ¶ 6.) Consistent with regulations, RCGP inmates receive notice at least seventy-two hours before an upcoming ICC housing review, with appropriate disclosures of all non-confidential and confidential information that may inform the ICC's decision.

5

> (*Id.*) Pelican Bay's gang investigators complete an updated safety investigation report, which often includes interviewing the inmate who is the subject of the investigation, and correspond with staff at CDCR's Debrief Processing Unit—where inmates in the process of disassociating from prison-gang life are housed—to determine what information, if any, pertains to the ongoing nature of an inmate's safety concerns. (*Id.*) Given the gang unit's expertise in prison-gang politics and activity, its investigation contributes to the ICC's analysis of the ongoing nature of an inmate's safety concerns, all of which is documented in the memorandum prepared following the inmate's meeting with the ICC. (*Id.*) Contrary to Plaintiffs' contention, this process allows the ICC to give appropriate consideration to all relevant information that may demonstrate a continued threat to an inmate's safety, which varies from inmate to inmate. (*Id.*)

Def.'s Opp. (Doc. 945) 6:19-7:9.

In response to Plaintiffs' contention that the ICC's reviews are "superficial and brief," Defendants explain that the length of an ICC hearing depends on the amount of information presented to the ICC from one review to the next. Arguing that the length of the ICC hearing does not establish the intensity of Pelican Bay's safety review or a breach of the Settlement Agreement, Defendants provide the following statement from Deputy Warden Bradbury:

> In certain cases, the ICC is readily familiar with an RCGP inmate's case factors and its review may be limited to how new evidence (if any) informs the continued nature of the threat to the inmate's safety. That the ICC does not find new information concerning the threats to an inmate's safety does not mean that the ICC did not review the inmate's unique circumstances. In other cases, the ICC conducts a more-involved file review or asks staff to conduct a further investigation to harmonize information relevant to an inmate's safety that has been discovered since the inmate's last 180-day review. The work done in advance of a 180-day review, particularly related to an inmate's updated safety investigation, varies from inmate to inmate. Similarly, the time spent with an inmate in committee varies from inmate to inmate based on the information presented and the amount of participation by the inmate. In my experience participating in housing reviews, I am not aware of a maximum or minimum time that an inmate must sit in committee, and it varies from inmate to inmate.

Bradbury Decl. (Doc. 945-1) ¶ 7.

In response to Plaintiffs' contention that the ICC gives inappropriate consideration to an inmate's disciplinary record while in the RCGP, particularly if an inmate was charged but ultimately found not guilty of a disciplinary rules violation, Defendants cite the following portion of Deputy Warden Bradbury's Declaration:

> [A]n inmate's disciplinary record and actions while housed in the RCGP inform the overall consideration of whether an inmate continues to have safety concerns. For example, if an inmate was involved in a fight with another RCGP inmate, the ICC must consider the altercation's circumstances (e.g., with whom and why the inmate fought) to determine how it affects an inmate's safety were he to be housed in the general population, if not in the RCGP. Further, even if an inmate is found not guilty of a disciplinary rules violation, evidence uncovered during the investigation, including communications with certain gang affiliates or actions not arising to a disciplinary infraction, may be relevant to whether an inmate's safety concerns continue.

Bradbury Decl. (Doc. 945-1) ¶ 8.

In response to Plaintiffs' claim that the ICC does not adequately consider whether an inmate is programming while housed in the RCGP or to an inmate's opinion as to whether he can safely program with the general population, Defendants cite the following portion of Deputy Warden Bradbury's Declaration:

> The ICC considers an inmate's positive (or negative) programming in the RCGP and the inmate's input with respect to his safety concerns, but these factors (together with all others) are evaluated on a case-by-case basis to address whether the evidence shows that an inmate's documented safety concerns no longer exist.

Bradbury Decl. (Doc. 945-1) ¶ 9.

Finally, Defendants cite the following in response to Plaintiffs' claims that certain inmates are confused about how they make transition from the RCGP to alternative housing:

> The settlement in this case is well known to all inmates. And class members in particular are well aware of the settlement's terms—the settlement document itself is readily available to all inmates in Pelican Bay's law library. I am aware that many RCGP inmates have personal copies of the settlement in their cells. Moreover, the ICC discusses with each inmate that risks to his safety are central to determining where he can be safely housed. The settlement agreement sets forth the criteria for an inmate's assignment to the RCGP, and the criteria applied by Pelican Bay's ICC every 180 days for possible transfer.

(Bradbury Decl. (Doc. 945-1) ¶ 10.

//

//

//

//

7

**CONCLUSION**

Under the express terms of Paragraph 27 of the Agreement, the ICC, in doing 180-day reviews, must verify whether there continues to be a demonstrated threat to the inmate's personal safety. After reviewing the parties' arguments and supporting evidence, the court concludes that Plaintiffs have not carried their burden of showing substantial noncompliance of this portion of the Settlement Agreement. (*See* ¶ 53 of Settlement Agreement.) While particular prisoners may disagree with the ICC's analysis and would prefer that the 180-day reviews be conducted pursuant to a set of criteria of their choosing, this does not amount to a showing of noncompliance with Paragraph 27 the Settlement Agreement.

Further, in entering into the Settlement Agreement, Defendants did not delegate to Plaintiffs the authority to determine exactly how the 180-day RCGP verification reviews would be conducted. Indeed, to have done so would certainly have left open for questioning Defendants' adherence to their Constitutional duty to the prisoners in their care. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners.). Prison officials have a particular duty to protect prisoners from violence at the hands of other prisoners. *See id*. at 833; *Cortez v. Skol*, 776 F. 3d 1046, 1050 (9th Cir. 2015); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005); *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982).

For the court to now flatly impose Plaintiffs' extensive list of proposed procedural requirements upon Defendants would exceed the court's authority under the Settlement Agreement. It would also violate clearly established law. *See Bell v. Wolfish,* 441 U.S. 520, 547 (1979) (Prison administrators are entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators,

8

who bear a significant responsibility for defining the legitimate goals of a correctional system and for determining the most appropriate means to accomplish them." ); *Griffin v. Gomez,* 741 F.3d 10, 21 (9th Cir. 2014) ("In particular, federal courts should exercise restraint when reviewing management decisions taken by prison administrators to secure the safety of prisoners and state prison personnel.").

Accordingly, Plaintiffs' Motion is hereby DENIED.

**IT IS SO ORDERED.**

Dated: March 29, 2018

ROBERT M. ILLMAN
United States Magistrate Judge