UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| TODD ASHKER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN C. NEWSOM, et al.,<br><br>Defendants. | Case No. 09-cv-05796-CW   (RMI)<br><br>**ORDER**<br><br>Re: Dkt. No. 905 |

Pending before the court is Plaintiffs' Motion for Extension of the Settlement Agreement Based On Systemic Due Process Violations (dkt. 905), Defendants' Response in Opposition (dkt. 985-3), Plaintiffs' Reply (dkt. 1002), Plaintiff's Supplemental Brief (Dkt. 1027), and Defendants' Response to the Supplemental Brief (dkt. 1084-3).[1] For the reasons stated below, the court will grant Plaintiffs' Motion and extend the Settlement Agreement for a period of 12 months.

## INTRODUCTION

This case has a lengthy procedural history that is now approaching ten years. For present purposes, it is unnecessary to begin any earlier than a description of the substance of the two claims presented in Plaintiffs' Second Amended Complaint. *See Am. Compl.* (dkt. 136) at 40-45. First, due to the cumulative effects of prolonged solitary confinement, attended with windowless cells that are sealed off from contact with other prisoners, a prohibition on social phone calls or contact visits with family members, as well as the deprivation of good time credits or general or

---

[1] Un-redacted copies of Plaintiffs' Motion (dkt. 898-4), Defendants' Response (dkt. 985-7), Plaintiff's Reply (dkt. 1000-4), Plaintiffs' Supplemental Brief (dkt. 1025-4), and Defendants' Response to the Supplemental Brief (dkt. 1084-4) have all been filed under seal.

educational programming which causes the denial of an opportunity for parole, Plaintiffs advanced an Eighth Amendment claim to the effect that class members had been denied the basic needs of normal human contact, environmental and sensory stimulation, acceptable levels of mental and physical health, physical exercise, sleep, nutrition, and meaningful daily or periodic activity. *Id*. at 40-43. Second, Plaintiffs claimed that class members have been denied due process due to the absence of any meaningful and timely periodic reviews of their identification by prison authorities as "active" gang members on which their continued long-term and indefinite detention at the Pelican Bay Special Housing Unit ("SHU") was premised, as well as meaningful notice of what they must do to earn release; instead, Plaintiffs contend that class members' prolonged confinement under such conditions is a coercive means of inducing prisoners to serve as informants, and that their identification as active gang members occurs without reliable evidence. *Id*. at 44-46. As to the class members, the court has previously certified the Eighth Amendment Class as including all inmates who are now or will be in the future, assigned to the Pelican Bay SHU for a period of more than ten continuous years; and the Due Process Class as all inmates who are assigned to an intermediate term at the Pelican Bay SHU on the basis of gang validation, under the policies and procedures in place as of September 10, 2012. *See Order* (dkt. 317) at 21.

Thereafter, the Parties resolved this case and executed a comprehensive Settlement Agreement (dkt. 424-2) in which a process was created for the release of prisoners that had been held in the SHU based on gang validation to general population units, that is, unless they had been found guilty of a SHU-eligible rule violation with a gang nexus within the prior two years. *Id*. at 9-11. The Settlement Agreement also describes certain modifications to the Step Down Program, which is intended as a gang diversion program, as well as providing for the means and circumstances under which prisoners would be transferred to a Restrictive Custody General Population ("RCGP") facility with increased opportunities for human interaction and participation in educational programs. *Id*. 6-9, 11-12. Regarding the use of confidential information in the prison disciplinary process, the Settlement Agreement provides that the disclosure and reliability standards set forth in Section 3321 of Title 15 of the California Code of Regulations shall apply. *Id*. at 14. As for dispute resolution and enforcement concerning any current or ongoing Eighth or

Fourteenth Amendment violations, the Settlement Agreement provides a procedure through which such allegations of non-compliance and motions for enforcement of the Settlement Agreement would be developed and presented. *Id*. at 19-21. Further, the Settlement Agreement allowed for a two-year monitoring period during which Defendants agreed to provide Plaintiffs' counsel the information and documentation necessary to determine Defendants' compliance. *Id*. at 14-17. Lastly, the Settlement Agreement provides that, unless Plaintiffs file a motion for an extension within 30-days of the expiration of the two-year monitoring period, the Agreement and the court's jurisdiction over the matter shall automatically terminate. *Id*. at 17-18. The standard of review for evaluation of such a motion for extension of the Settlement Agreement would be satisfied if Plaintiffs demonstrate by a preponderance of the evidence that current and ongoing systemic violations of the Eighth Amendment or Fourteenth Amendment of the United States Constitution exist as alleged in Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to its Step Down Program or the SHU policies contemplated by the Settlement Agreement. *Id*.

If the court's jurisdiction and this Agreement are to be extended by Plaintiffs' motion, the Settlement Agreement provides that they shall both automatically terminate at the end of the extension period, which is not to exceed 12 months, and the case shall then be dismissed unless Plaintiffs once again make the same evidentiary showing described above. *Id*. at 18. The Agreement also provides that any successive extensions shall not exceed twelve months in duration, and that any extension shall automatically terminate if Plaintiffs fail to meet the requisite evidentiary burden. *Id*. Also, in the event of an extension of the Settlement Agreement and the court's jurisdiction over the matter beyond the initial 24-month period, Defendants' obligations of production of any agreed upon data and documentation to Plaintiffs' counsel will be extended for the same period, and the role and duties of the magistrate judge in the dispute resolution process shall continue coextensively with that of the Agreement, but in no event shall those roles and duties extend beyond the termination of the court's jurisdiction. *Id*.

//

//

***Plaintiffs' Arguments and Evidence for Extension of the Settlement Agreement***

Plaintiffs argue that that the Settlement Agreement should be extended because the California Department of Corrections and Rehabilitation ("CDCR") continues to violate prisoners' due process rights in three distinct ways. *See generally Pls.' Mot.* (dkt. 905). First, Plaintiffs contend that CDCR systemically misuses confidential information in two ways in order to return class members to solitary confinement; namely, by failing to ensure the accuracy of the confidential information disclosures during the disciplinary process, and by engaging in a pattern of perfunctory and *pro forma* reliability determinations as to that information. *Id.* at 14-38. Second, Plaintiffs argue that CDCR violates due process by placing and retaining class members in RCGP without adequate procedural protections. *Id.* at 39-56. Lastly, Plaintiffs also submit that CDCR violates due process by using unreliable gang validations to deny class members a fair opportunity to seek parole. *Id.* at 57-73. Subsequently, Plaintiffs filed supplemental briefing identifying what was described as further evidence of CDCR's pattern of fabricating and inadequately disclosing confidential information in the prisoner disciplinary process, as well as CDCR's pattern of failing to ensure the reliability of such information. *Pls.' Supp. Br.* (dkt. 1027) at 4-15.

*Plaintiffs' Evidence of the Systemic Misuse of Confidential Information:*

In support of the contention that CDCR systemically misuses confidential information to return class members to solitary confinement, Plaintiffs offer evidence of CDCR's failure to provide accurate disclosures, as well as evidence of CDCR's pattern of flawed reliability determinations. *Pls.' Mot.* (dkt. 898-4 *SEALED*) at 18-38.[2] Beginning with the inaccurate disclosure problem, Plaintiffs' Motion for Extension of the Settlement Agreement describes incidents of inaccurate, inadequate, or otherwise improper disclosures in nine separate disciplinary matters occurring in four different prisons, involving fifteen prisoners, nine separate alleged

---

[2] Because the court previously found that this evidence contains confidential information, the release of which would harm institutional safety and security, as well as potentially compromising ongoing investigations, the un-redacted copies of the pleadings describing this evidence have been filed under seal. *See e.g.*, *Order* (dkt. 920) (granting permission for portions of Plaintiffs' Motion and its exhibits to be filed under seal). Accordingly, the court will describe this evidence in generic terms and only with the degree of specificity required for the present purpose.

conspiracies, and various levels of CDCR officials. *Id.* at 18-27.

In the case of one prisoner ("Person-1") who was found guilty of conspiring to murder a fellow inmate, including a finding of the involvement of a gang nexus, Plaintiffs allege this finding to have been based on fabricated confidential information. *Id.* at 18. According to Person-1's rule violation report ("RVR"), two confidential informants ("CI-1" and "CI-2") claimed that Person-1 had ordered the murder of another prisoner ("Victim-1"), who was in fact killed by other inmates. *Id.* The RVR provides that CI-1 maintained that the reason for the murder was Person-1's belief that Victim-1 was an informant, and that CI-2 believed the killing to have been motivated by Person-1's belief that Victim-1 had engaged in trafficking of prison contraband without sharing the profits with Person-1. *Id.* A disclosure form, summarizing this information was provided to Person-1, which Plaintiffs received directly from Person-1. *Id.* On the other hand, the RVR packet for Person-1 that was produced to Plaintiffs during the monitoring period contained only a second disclosure, dated almost three weeks later, in which CI-1 and CI-2 reportedly provided a more consistent account as to why the murder was ordered, with CI-1's account being changed to suggest that Victim-1 was believed to be an informant *and* had engaged in the trafficking of contraband without sharing profits with Person-1. *Id.* at 18-19. However, the confidential memorandum, making no mention of profits from the contraband sales as to CI-1's account, instead provides that CI-1 maintained that Person-1 had made up the fact that Victim-1 was an informant, and that the true cause of Person-1's animus towards the victim was a perception that Victim-1 had not shown an appropriate level of respect for Person-1. *Id.* at 19. The confidential memorandum also makes clear that both disclosures omitted two reasons propounded by CI-2 for the murder, namely the fact that Victim-1 reportedly inadvertently disclosed some information about a profit-sharing agreement he had with Person-1 to a third party, and also the fact that there was a dispute between Person-1 and Victim-1 as to how to handle the displeasure of certain other prisoners regarding the victim's introduction of contraband to a particular part of the facility. *Id.*

In a second disciplinary matter, also involving Person-1, the same two confidential informants, CI-1 and CI-2, provided information on the basis of which Person-1 was later found guilty of the attempted murder of another prisoner ("Victim-2"). *Id.* at 20. Here, Plaintiffs again

point to a discrepancy between the RVR and the disclosure form provided to Person-1, and the information in the confidential memorandum. *Id*. Person-1 was told that CI-1 stated that Victim-2 lost some contraband belonging to another prisoner ("Prisoner-1"), and that Prisoner-1 told Person-1 about the loss, at which point Person-1 ordered Prisoner-1 to attack Victim-2; also, Person-1 was told that CI-2 corroborated this account to some extent by maintaining that the contraband belonged jointly to Prisoner-1 and another inmate ("Prisoner-2") and that they jointly informed Person-1 of its loss, whereupon Person-1 ordered Prisoner-1 to attack Victim-2. *Id*. at 20. However, according to the confidential memorandum (which, of course, was not provided to Person-1), CI-2 stated that Prisoner-2 was alone when he informed Person-1 about the loss, and that Person-1 told Prisoner-2 to handle the situation himself. *Id*. Again, the discrepancy is such that Person-1's disclosure appears to harmonize two accounts from two confidential sources, while concealing from Person-1 the fact that those accounts in fact differed. *Id*.

In a third disciplinary matter, involving four prisoners found guilty of conspiring to murder another prisoner with a gang nexus, a different sort of discrepancy appears between the confidential memorandum of a CI's statement and the disclosures given to the alleged conspirators. *Id*. at 20-21. The four prisoners received a disclosure indicating that a CI had stated that while the target of this conspiracy had already been determined guilty by the hierarchy of a particular prison gang, and that his fate was still being contemplated, but that it was almost certain that his killing would be sanctioned. *Id*. at 21. Instead, the confidential memorandum documenting the interview of the CI makes no mention of any certainty that the killing would be sanctioned; thus, it appears that this portion of the CI's account was concocted by the author of the disclosure form. *Id*. at 21-22. According to the CDCR's first confidential memorandum for this matter, the CI not only did not maintain that the prison gang hierarchy was certain to sanction the killing, but instead, had maintained the hierarchy had not yet reached a decision, and that until they would arrive at a decision, the would-be victim was to be left alone, and indeed respected as a confederate. *Id*. at 22. Thus, in this disciplinary matter, the potentially exculpatory part of the CI's account was never disclosed, and instead it appears to have been replaced by an inculpating statement that the CI never uttered. *Id*.

A fourth disciplinary matter involved a validated prison gang associate ("Prisoner-2") who was found guilty of conspiring to commit a battery with a gang nexus based on the content of an intercepted note that had been passed between other prisoners. *Id*. at 23. Prisoner-2 received an RVR and disclosure form indicating that the author of the note had identified Prisoner-2 as a person occupying a position of authority within a prison gang, and identifying two prisoners who were to be assaulted. *Id*. However, the confidential memorandum reflects that the author of the note had not identified Prisoner-2 by name, instead, the note attributed the gang-status and the plan to assault two prisoners to a nickname that bore no resemblance to Prisoner-2's name, nor did the note or the confidential memorandum include any information linking Prisoner-2 to the nickname used in the note. *Id*. Thus, Prisoner-2 was not only left unaware that he had not been identified by name, but in fact the contrary had been indicated to him through the materially inaccurate disclosure form; and thus, Prisoner-2 was unable to challenge the issue of identity in the disciplinary proceeding because the issue had been concealed from him. *Id*. at 23-24.

In a fifth disciplinary matter, another prisoner ("Prisoner-3") was found guilty of conspiring to commit murder with a gang nexus. *Id*. at 24. The RVR and disclosure given to Prisoner-3 maintained that a confidential source with first-hand knowledge had stated that Prisoner-3 ordered the murder of two other prisoners for a number of reasons and with the sanction of other prison gang associates. *Id*. However, as it turned out, the confidential source was merely a recording of a phone call between Prisoner-3 and some other person, wherein Prisoner-3 appears to be aware of the reasons for several assaults, but providing no indication that Prisoner-3 either ordered the assaults or that the intended result was homicide rather than battery. *Id*. The RVR indicates corroboration by a second confidential source, however, the copy of the confidential memorandum received by Plaintiffs' counsel contained redactions that rendered it impossible for this corroboration to be confirmed or refuted. *Id*.

In a sixth disciplinary matter, two other prisoners were found guilty of conspiracy to commit a murder with a gang nexus and were provided with a disclosure regarding an intercepted note that provided that a group of people, all of whose names had been redacted, had agreed to "remove" someone themselves. *Id*. The recitation of the purported contents of this note included a

parenthetical annotation containing the name of a particular prisoner as the intended target of the conspiracy, however, this information constituted CDCR's interpretation and it later proved to be false. *Id*. In material that was subsequently disclosed to Plaintiffs' counsel, CDCR acknowledged that the note in fact related to an entirely different intended target, and that this information had never been disclosed to the prisoners who were found guilty of this conspiracy. *Id*. at 24-25. The mistaken interpretation of this note, which resulted in the incorrect disclosure of details about a conspiracy pertaining to one intended victim, came to light upon CDCR's receipt of a confidential letter from another prisoner in which a different intended victim was identified. *Id*. at 25. Rather than bringing this discrepancy to the attention of the prisoners involved in the disciplinary matter, CDCR provided them with new disclosures that claimed, again incorrectly, that the letter merely confirmed CDCR's initial interpretation of the note as to the original intended target. *Id*.

In a seventh disciplinary matter, Plaintiffs contend that in the course of a prison fight involving a large number of participants, certain prisoners were accused of attempted murder of correctional officers, but that their confidential disclosures omitted the exculpatory portions of the informants' accounts – such as an informant's statement that the accused prisoners did not have any weapons and had not appeared to target any officers. *Id*. In an eighth disciplinary matter, one not involving a prison gang nexus, a prisoner was accused of an attempted murder and the disclosure received in advance of the disciplinary hearing stated only that corroborated information identified this prisoner as the assailant. *Id*. at 26. In the ninth matter, a prisoner was found guilty of conspiracy to commit murder and the only disclosure given in advance of the disciplinary hearing was that a confidential source had identified the prisoner as a gang-member and responsible for planning and coordinating the conspiracy to assault a member of the staff. *Id*. at 26.

*Plaintiffs' Evidence of Systemic Flaws in CDCR's Reliability Determinations:*

Plaintiffs offer evidence from seven disciplinary matters in an effort to demonstrate that "[c]ompounding its failure to accurately and fully disclose confidential information, CDCR systemically relies on such evidence without ensuring its reliability," and, as a result, many of the prisoners described below are claimed to have been improperly returned to solitary confinement.

*Id.* at 27-28.

In the first disciplinary matter, a prisoner was found guilty of conspiracy to commit a murder with a gang nexus following a violation report that was based on a confidential memorandum in which it was reported that an informant claimed to have been instructed by the prisoner to kill someone as a result of a drug debt. *Id.* at 28-29. At the disciplinary hearing, the prisoner attempted to defend the case by pointing out that the same confidential memorandum formed the basis of an identical violation report for another prisoner, and that the hearing officer in that case had determined this informant to be unreliable. *Id.* at 29. Nevertheless, and without any explanation of substance, the hearing officer noted that this was a different hearing and that the confidential information was reliable; as a result, the prisoner was found guilty. *Id.*

In a second matter, a review board found that a prisoner should be placed in RCGP based on the prisoner's own statements about threats against him, statements that were given while in an agitated state to an investigator who deemed the statements to be unreliable. *Id.* at 30-31. During the course of this review, the prisoner submitted declarations challenging the existence of such threats; however, the CDCR reviewing authority ultimately decided to place the prisoner in RCGP by relying on his initial statements, notwithstanding the fact that they had previously been deemed unreliable. *Id.* at 31.

In a third case involving three rounds of hearing officer reviews, a prisoner was repeatedly found guilty of conspiracy to commit a murder with a gang nexus based on information provided by one informant who had named the prisoner, and another who had not named him. *Id.* at 31. The first hearing officer found the prisoner guilty, noting that both informants had named him. *Id.* at 32. The matter then became the subject of two subsequent hearings, where, again, it was noted that both informants had named this prisoner as a participant in the conspiracy. *Id.* The disclosure form that had been provided to the prisoner likewise indicated that both informants had named him, however, the undisclosed confidential memorandum indicated that the prisoner had only been specifically named by one informant. *Id.* The disclosure, on the other hand, went so far as to relate that one of the reasons that one informant had been deemed reliable was that another informant had independently provided the same information. *Id.*

United States District Court
Northern District of California

The fourth exemplar disciplinary matter involved two prisoners who were respectively found guilty of attempted murder and conspiracy to commit murder, both with a gang nexus, stemming from a physical fight with a third prisoner in which no weapons were used and from which the victim was reported to have been able to walk away. *Id*. at 33-34. The evidence relied upon to implicate one prisoner in the conspiracy, and for the finding of a gang nexus as to the other prisoner, was the account of an informant. *Id*. at 34. However, whereas the disclosure provided indicated that this informant's account was found to be reliable because another confidential source had independently provided the same information, that was not the case. *Id*.

In a fifth case, a prisoner was found guilty of conspiring to commit the murder of another inmate, who was in fact attacked by two other inmates, based on reports from several informants that were in the nature of non-firsthand information, as well as a writing found in the prisoner's cell. *Id*. at 34-35. One informant was said to have reported that he heard that the victim may have been suspected of a transgression of prison gang rules, and that the others were asking each other if this prisoner was in fact a person of influence within a particular gang. *Id*. at 35. The hearing officer in this case, however, also based the finding of guilt as to the conspiracy on a piece of writing in the prisoner's cell about how pressure creates diamonds, and how in a recent opportunity to shine, all had run from the pressure except for two, from which the hearing officer inferred a reference to the stabbing attempt of the inmate by two assailants. *Id*. at 35-36.

In a sixth case, a prisoner was found guilty of an unfulfilled conspiracy to commit murder with a gang nexus based on the report of an informant that was deemed reliable. *Id*. at 36. The disclosure given to the prisoner stated that the informant had been found reliable because another confidential source had independently provided the same information, however, no such information appeared anywhere in the disciplinary documents that were produced. *Id*. at 37. When the prisoner attempted to question the correctional officer that had authored the confidential memorandum as to what the other corroborating informant had said, the hearing officer deemed the inquiry to be irrelevant and refused to allow the questions. *Id*. Later, this was the subject of a rehearing before a different hearing officer, however, again, the prisoner was found guilty and the hearing officer refused to allow any questions relating to the reliability of the informants because

of the stated reason that the hearing officer could not independently review the reliability determinations of CDCR personnel. *Id*. at 37-38. Lastly, in the seventh exemplar of disciplinary matters with flawed reliability determinations, a prisoner was found guilty of conspiring to distribute a controlled substance with a gang nexus based only on being named as an un-indicted conspirator in an indictment. *Id*. at 38. Although the prisoner defended the matter on the ground that the contents of an indictment are not evidence, the hearing officer did not address the argument. *Id*.

*Plaintiffs' Evidence of Due Process Violations in RCGP Placement and Retention:*

When the RCGP unit came into being as a result of the Settlement Agreement in this case, Defendants established the unit in Northern California, at Pelican Bay State Prison. *Id*. at 40. Plaintiffs begin by suggesting that the prison's remote location provides an independent hardship as it renders family visitation impractical. *Id*. Plaintiffs then present evidence that while RCGP prisoners are permitted to have bi-weekly contact and non-contact visits, that most prisoners receive few if any visits due to the remote location and the policy of not permitting weekend contact visits. *Id*. at 41-43. Plaintiffs also present evidence that, as compared to general population housing units, RCGP prisoners have more curtailed social interactions, fewer job opportunities, and that RCGP placement limits parole eligibility. *Id*. at 43-45. Additionally, Plaintiffs submit evidence that RCGP placement is prolonged, stigmatizing, and also highly unusual. *Id*. at 45-49.

In support of the contention that CDCR's classification and verification procedures for the RCGP result in deprivations of adequate notice and meaningful review, Plaintiffs tender evidence to establish that the current classification system's deficiencies give rise to serious risks of erroneous and unnecessary deprivations of recognized liberty interests due to unwarranted RCGP classification or retention. *Id*. at 50. First, Plaintiffs submit that pursuant to Paragraph 27 of the Settlement Agreement, prisoners may only be placed in the RCGP if the Departmental Review Board ("DRB") finds by a preponderance of the evidence that there exists a substantial threat to the safety of that prisoner if placed in general population. *Id*. However, Plaintiffs present evidence of nine cases where prisoners were transferred to the RCGP "at least in part" on a finding that their release to general population would pose a threat to the security of the institution. *Id*. at 51.

11

Plaintiffs then submit that institutional security, as opposed to safety concerns relating to the individual prisoner, constitutes "a flagrant violation of the purpose of the RCGP, and constitutes clear evidence that several have been transferred to the RCGP on incorrect grounds, and thus have been erroneously deprived of their liberty." *Id*. Plaintiffs also provide evidence that in six cases, the CDCR's Institution Classification Committee ("ICC") used a restrictive presumption to retain prisoners in the RCGP by finding in some cases that while there is no evidence of a continuing threat to a prisoner's safety if released to general population, that nevertheless it could not be categorically stated that no such threat still exists. *Id*. at 51-52.

Plaintiffs also present evidence in support of the contention that not only does CDCR fail to give prisoners adequate notice about how to go about securing their return to general population, but that it actively misleads the prisoners in this regard. *Id*. at 52. A number of prisoners' accounts are presented wherein the prisoners submit that they were told that participation in RCGP programs and remaining incident free for a 6-month period would result in them being returned to general population, but that they were nevertheless retained in RCGP based on the presumption that a safety threat continues. *Id*. at 52. Additionally, Plaintiffs submit evidence from a number of prisoners' cases to support the contention that class members are denied meaningful review in the RCGP classification and retention context due to CDCR's apparent disregard of the prisoners' own statements about whether or not there exist risks to their safety. *Id*. at 53.

Regarding the contention that CDCR's safety threat reviews lack sufficient procedural protections to avoid arbitrary decision-making, Plaintiffs submit that, pursuant to Paragraph 27 of the Settlement Agreement, once the DRB approves RCGP placement, the decision becomes final and can only be reversed by the DRB. *Id*. at 53-54. Thus, if during a 180-day review, the ICC finds that a particular prisoner no longer faces any risk to his safety, the case must still be referred back to the DRB for a decision as to whether to approve or deny the transfer to general population. *Id*. Accordingly, Plaintiffs complain that a two-tier review system must be navigated for a prisoner's recommended release from RCGP to be effectuated, but not so for the prisoner's retention in RCGP. *Id*. Plaintiffs also submit evidence from a number of prisoners to support the

contention that the 180-day reviews before the ICC are not meaningful hearings because prisoners are often retained in RCGP custody simply for the stated reason that because the review has uncovered no new information, the ICC can not categorically conclude that such threat no longer exists. *Id*. at 54-55.

Plaintiffs then submit two proposed solutions. The first would be to overhaul CDCR's procedures for RCGP classification and retention such that they would provide "meaningful and accurate notice, a meaningful hearing, and multiple levels of review." *Id*. at 55-56. The second would be to alleviate the conditions that render RCGP so different from general population by addressing the following concerns: the fact that there is only one RCGP unit and it is located in a remote area making visitation difficult; the desire for reduced numbers of prisoners in the unit to allow for better participation in educational programs; the desire for increased opportunities for social interaction among prisoners; and, the desire for contact visits on weekends. *Id*. at 55-57.

*Plaintiffs' Evidence of Systemic Due Process Violations Affecting Denials of Parole:*

Plaintiffs contend that the Second Amended Complaint alleged that an unwritten CDCR policy effectively prevented any prisoner housed in SHU from being granted parole, and since the Settlement Agreement provided that gang validation alone shall no longer form the basis of an indeterminate SHU sentence, that class members are still being systemically denied a meaningful opportunity for parole consideration due to the same gang validations on which their SHU sentences were based. *Id*. at 58-59. The problem, as Plaintiffs see it, is two-fold: first, CDCR relies on decisions made under an old gang validation system to find class members ineligible for parole under a California Constitutional Amendment enacted in 2016; and, second, CDCR's failure to expunge these old validations from its system, or to otherwise inform the Parole Board as to their lack of reliability, has effectively resulted in a continuation of *de facto* parole disqualification for class members. *Id*.

As to the problems plaguing the old process for gang validation, Plaintiffs submit that a gang investigator would gather information, sometimes without even meeting with the prisoner involved, and that once a file that included at least three "source items" (pieces of information) was assembled, it was forwarded to the Office of Correctional Safety ("OCS") which had final

authority on the question of gang validation. *Id*. at 60. During the validation process, class members were not heard by the OSC, and so Plaintiffs contend that under those procedures, there was no meaningful opportunity to be heard – that is, if the gang investigator gathers information sometimes without even meeting with the prisoner involved, and if that prisoner is also not heard by the OSC, then there is no real opportunity for rebuttal. *Id*. at 60-61. Further, Plaintiffs present evidence that gang investigators' findings were rarely, if ever, rejected by the OSC. *Id*. at 61-62.

Plaintiffs also submit evidence that CDCR's notice to class members about how to avoid revalidation was misleading. *Id*. at 62-63. Prisoners were told that a validated gang affiliate would not be revalidated if he were found "inactive," that is, by having avoided involvement in gang "activity" for a period of at least six years. *Id*. at 63. However, CDCR's interpretation of the word "activity" also included something described as, "non-action piece[s] of evidence." *Id*. Thus, Plaintiffs provide evidentiary examples of a number of prisoners' old gang validations, based on pure association or even abstract concepts, rather than conduct, that continue to operate as a *de facto* disqualifier for meaningful parole consideration. *Id*. at 63-64. A number of prisoners have a validation based on the appearance of their name on a list of alleged gang members. *Id*. at 63. Others were validated for having received correspondence (regardless of the content) or artwork, a birthday card, or other possessions from a validated gang member. *Id*. at 64. One prisoner was validated for having a photograph of his former cellmate, who was a validated gang member. *Id*. Some prisoners were validated based on the nature of the artwork they possessed (such as art containing Aztec or Mayan images), or because of having been seen speaking to a gang member or being mentioned in a gang member's correspondence (regardless of the substance or context), or because of having certain tattoos, books by certain authors, or, in one case, for having a pamphlet in Swahili. *Id*.

Plaintiffs then submit that because parole represents a state-created liberty interest, and because due process requires a fair set of procedures for its vindication, a prisoner subject to parole should be given a meaningful opportunity to be heard. *Id*. at 67. Plaintiffs note that in 2016, the California Constitution was amended ("Proposition 57") to provide that those convicted of nonviolent felonies would be eligible for parole consideration after completing the full term for

their primary offense, and that it was incumbent on CDCR to promulgate regulations thereunder. *Id*. at 68. Plaintiffs add that CDCR then promulgated a screening process that disqualified any prisoner who had been placed in a security housing unit within the previous five years due to involvement with a prison gang. *Id*. at 68-69. Thus, Plaintiffs submit that CDCR is using its old and constitutionally-defective gang validations to categorically bar class members from Proposition 57 relief. *Id*. at 69. Plaintiffs provide two evidentiary examples of class members who were considered disqualified for parole consideration under Proposition 57 due to serving indeterminate SHU sentences based on gang validation. *Id*.

Plaintiffs add that the prior validations also affect parole decisions regarding class members convicted of violent crimes. *Id*. at 70. Plaintiffs provide evidence from a number of class members' parole transcripts in support of the contention that gang validation is a significant, if not often dispositive, factor in parole consideration. *Id*. at 70-71. Further, Plaintiffs also provide evidence that when prisoners dispute their validation at their parole hearings, commissioners consider the challenge itself to constitute evidence of dishonesty and a manifestation of a lack of credibility or remorse. *Id*. at 71-72. Plaintiffs conclude by noting that they "do not challenge Parole Board procedures or decisions; it is CDCR's continued retention of the old validations and their unqualified transmittal to BPH [Board of Parole Hearings] that is the problem." *Id*. at 72.

*Plaintiffs' Supplemental Evidence of Systemic Fabrication of Confidential Information:*

Following a subsequent order directing additional document production (*see* dkt. 970), Plaintiffs filed a *Supplemental Brief* to present new evidence in support of extending the Settlement Agreement. *Pls.' Supp. Br.* (dkt. 1027) at 4. Plaintiffs submit that close to half of the 110 complete disciplinary files provided for review in the supplemental production manifest problems with fabricated or inadequately disclosed confidential information, or with flawed reliability determinations. *Id*.

In the case of three prisoners found guilty of attempted murder with a gang nexus based on identification in a photographic line-up by a confidential source; Plaintiffs submit that, in reality, one of the three prisoners had never been identified at all, and another was only identified weeks later after the source had failed to identify him the first time. *Id*. (dkt. 1025-4 *SEALED*) at 6. As

to the prisoner that was never identified at all, his violation report and disclosure indicates a positive identification by the informant; however, the underlying confidential memorandum indicates that the informant was shown a photographic array the day after the incident, and another array two weeks later, neither of which resulted in the identification of this prisoner. *Id*. As to the other prisoner, he was similarly told that an informant had identified him in a photographic array when in fact the informant had failed to identify him in the first array (identifying two others instead), and had only identified him, as well as several others, two weeks later when shown another array. *Id*. at 7. As to the third prisoner, who had in fact been identified in the initial array, he was told that the confidential source had also informed authorities that the attempted murder was for the benefit of a prison gang; however, the underlying confidential memorandum contains no information to indicate that the informant had provided any information about a possible gang nexus. *Id*. at 7.

In the case of a prisoner found guilty of conspiring to murder another inmate based on confidential information, the prisoner was told that an informant indicated that the prisoner had conspired with another to murder someone for the benefit of a prison gang. *Id*. However, the underlying confidential memorandum states that the only evidence against this prisoner is that he provided information he discovered about the victim to others. *Id*. at 7-8. In another case, a prisoner was alleged to have occupied a leadership role in a gang after his failure to obey a general command to get down on the ground appeared to be mirrored by other prisoners in the exercise yard. *Id*. at 8. The prisoner was told that the evidence against him included two confidential sources that had stated that if this prisoner had made a move against the guard who had ordered him to get down, other nearby gang members would have rushed to his aid; however, according to the underlying confidential memorandum, there were not two sources, there was only one, and that person stated that he did not witness the event in question. *Id*. at 8-9. In yet another case, a prisoner was found guilty of battery with a gang nexus based on confidential information and his disclosure informed him that an informant had identified him and the victim as belonging to rival gangs; the confidential memorandum, on the other hand, contains no information to indicate that the accused prisoner was a gang affiliate. *Id*. at 9.

16

Plaintiffs then provide several evidentiary examples where corroborating sources appear in disclosures to prisoners but not in the underlying confidential materials. In one disciplinary matter, a prisoner was accused of participation in a large fight based, in part, on a report by a single informant, however, the disclosure provided to that prisoner stated incorrectly that another confidential source independently provided the same information. *Id*. at 9-10. In another case, a prisoner was found guilty of assault with a gang nexus; his disclosure stated that confidential information had been received that the prisoner, acting on behalf of a gang, had threatened to beat another inmate for not showing the gang his case-related papers, and that this information was also independently provided by another source – again, according to the confidential memorandum, there was no other source. *Id*. at 10.

Plaintiffs then present evidence from another series of cases where documents are indicative of CDCR officials portraying their own investigatory conclusions as the statements of informants. *Id*. at 11-12. For example, one prisoner was convicted of battery with a gang nexus and was informed through his disclosure that an informant had identified him as perpetrating the beating on behalf of a gang, however, the confidential memorandum provides that the informant did not even name the prisoner, instead, the gang investigator's own conclusion appears to have been the source of the identification. *Id*. at 11. Plaintiffs also present evidence in cases where exculpatory evidence was not disclosed. *Id*. at 12-13. In one instance, a prisoner was not informed that the confidential materials contained an informant's report that contradicted the reports of two other informants regarding the prisoner's participation in a fight. *Id*. In another case, a prisoner was convicted of participating in a fight for a gang-related reason, and where the prisoner asserted a different reason, one unrelated to gangs, corroborating information to that effect appeared in the confidential memorandum but was omitted from the disclosure. *Id*. at 13.

As to Plaintiffs' contention that CDCR's disclosures of confidential information are often so vague as to make it impossible for the prisoners to mount a defense, Plaintiffs present a number of cases where the disclosures contain no detail. In one case, a prisoner was found guilty of beating another inmate with a gang nexus, despite statements to the contrary from both the victim and the offender. *Id*. at 14. The prisoner was found guilty on the basis of a single confidential

informant, and the disclosure received stated only that confidential information had been received that identified the prisoner as having been involved with a battery in a particular part of the prison. *Id*. Lastly, Plaintiffs also present additional cases to bolster their original evidentiary presentation regarding CDCR's flawed reliability determinations. *Id*. at 15-17. For example, in one case, a prisoner was found guilty of issuing a threat based on evidence from multiple confidential sources that were summarily deemed reliable, the prisoner's disclosures revealed that one informant had corroborated the account of another when in fact they were the same person. *Id*. at 16.

### Defendants' Arguments and Evidence Against Extending the Settlement Agreement

Defendants respond primarily by argument rather than evidence. As to Plaintiffs' first contention, Defendants respond by couching it as an attempt to undermine the CDCR disciplinary process by challenging the use of confidential information; that the court lacks jurisdiction to review CDCR disciplinary findings because the challenge is outside the scope of the pleadings or the Settlement Agreement; and, that Plaintiffs have incorrectly interpreted the confidential information at the root of their challenge, contending that CDCR uses neither unreliable nor fabricated evidence in prisoner disciplinary proceedings. *Defs.' Opp.* (dkt. 985-3) at 15-26. Defendants' response to the second contention is that Plaintiffs' challenge to the operations of the RCGP should be rejected procedurally as falling outside the scope of the Settlement Agreement, as well as on their merits because RCGP placement does not implicate due process or any liberty interest; because its location and the facets of its operation do not violate due process or the Settlement Agreement; and because Plaintiffs have not shown that prisoners have been assigned to the RCGP facility any longer than necessary. *Id*. at 26-35. Defendants' response to the third contention maintains that parole decisions are not an appropriate ground upon which to extend the Settlement Agreement because Plaintiffs' Complaint did not allege that gang validations were resulting in parole denials; and because the subsequent changes to state law regarding parole were not contemplated by the Settlement Agreement and thus were not amongst the issues that were litigated and settled in this case. *Id*. at 11-15. Subsequently, Defendants filed a response to Plaintiffs' supplemental briefing in which they invoked the doctrine of waiver as to Plaintiffs' suggestion that the use of fabricated or unreliable information in disciplinary proceedings

constitutes a due process violation. Defendants argue that Plaintiffs are not allowed to second-guess the factual findings of prison officials; and that, in any event, the CDCR disciplines prisoner misconduct only based on sufficient and reliable evidence. *Defs.' Supp. Resp.* (dkt. 1084-3) at 2-10.

Defendants respond to Plaintiffs' claim that constitutionally infirm gang validations operate as a *de facto* bar to meaningful parole consideration by contending that Plaintiffs have focused only on certain portions of various prisoners' parole transcripts. *Id*. at 12. Accordingly, Defendants have submitted a large number of parole hearing transcripts. However, Defendants' pleading does not discuss the contents of those transcripts or make an attempt to argue that the gang validations were not a significant factor in those parole denials. Instead, Defendants simply state that the gang validations were not dispositive because "the full transcripts show that each inmate was allowed an opportunity to be heard and that the Board gave each inmate a statement as to why he was denied parole." *Id*. at 12, 15.

## DISCUSSION

The Parties agree that the standard for extending the Settlement Agreement is outlined in the termination and extension provisions of Paragraph 41. *See Pls.' Mot.* (dkt. 905) at 13; *Defs.' Opp.* (dkt. 985-3) at 9. The Settlement Agreement provides, in pertinent part, that following the end of the 24-month primary term of the Agreement, Plaintiffs can seek an extension of the Agreement, and the court's jurisdiction over the matter, for up to 12 months, by demonstrating by a preponderance of the evidence that there exist current and ongoing systemic due process or Eighth Amendment violations as alleged in Plaintiffs' Second Amended Complaint or as a result of CDCR's reforms to its Step Down Program or the SHU policies contemplated by the Agreement. *Sett. Agmt.* (dkt. 424-2) at 17-18. Thus, in the present instance, the court must decide whether Plaintiffs have shown, by a preponderance of the evidence, that (1) there exist current and ongoing systemic due process violations; and (2) that they are as alleged in the operative complaint, or that they have resulted from CDCR's reforms under the Agreement. Because Defendants have primarily proceeded by argument rather than evidence, the court does not need to weigh one set of evidence against another in order to determine which constitutes a

preponderance. Instead, the only task at hand is to evaluate Plaintiffs' evidence in light of Defendants' arguments.

### Current and Ongoing Systemic Due Process Violations

Generally speaking, the aim of due process is protection of the individual against arbitrary government action. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)). Once society has validly convicted an individual of a crime, and therefore established its right to punish, the demands of due process, and the degree of protection from arbitrary action, are reduced accordingly (*see e.g.*, *Ford v. Wainwright*, 477 U.S. 399, 429 (1986) (O'Connor, J., dissenting)); however, that is not to say that due process would not still be violated when a prison disciplinary hearing results in a finding of guilt even though no evidence was presented. *See, e.g., Burnsworth v. Gunderson*, 179 F.3d 771, 774 (9th Cir. 1999). In the context of prisons, due process still protects against arbitrary action in prison disciplinary proceedings, but provides less protection than would be the case in a criminal prosecution. *Ponte v. Real*, 471 U.S. 491, 495 (1985). Nevertheless, it ensures that inmates have a right to call and present witnesses and documentary evidence before a prison disciplinary board. *Id*. Furthermore, the information that forms the basis of a prison disciplinary action must possess some indicia of reliability to satisfy due process. *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) (uncorroborated hearsay statement of a confidential informant is insufficient to satisfy due process). In evaluating whether "some evidence" exists, the inquiry focuses on whether there is any evidence in the record that could support the conclusion reached by the disciplinary board, without assessing the witnesses' credibility or reweighing the evidence. *Superintendent v. Hill*, 472 U.S. 445, 455-456 (1985); *see also Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003); *Munoz v. Rowland*, 104 F.3d 1096, 1098 (9th Cir. 1997); *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994); and, *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990).

Thus, a statement by a confidential informant would satisfy due process provided that the record contained facts from which it could be reasonably concluded that the information was reliable, and the record contained a prison official's statement that safety prevented the disclosure of the inmate's name. *Zimmerlee v. Keeney*, 831 F.2d 183, 186-87 (9th Cir. 1987). Reliability may

be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information; (2) corroborating testimony; (3) a statement on the record by the chairman of the reviewing committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record; or (4) an *in camera* review of the documentation from which credibility was assessed. *Id.*

As to placement and retention in a unique facility such as the RCGP unit, before invoking the procedural protections of the Due Process Clause of the Fourteenth Amendment, which protects against deprivations of life, liberty, or property, it must first be established that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). While the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement (*see Meachum v. Fano*, 427 U.S. 215, 225 (1976) (no liberty interest arising from Due Process Clause itself in transfer from low to maximum security because confinement in any state institution is within the normal range of custody)), the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding [more] restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Id.* at 223 (internal quotation marks omitted). Once a liberty interest is established, as to the evaluation of a claimed deprivation of due process, the framework established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) requires consideration of three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Wilkinson*, 545 U.S. at 224-25; *see also Vasquez v. Rackauckas*, 734 F.3d 1025, 1044 (9th Cir. 2013).

In the context of parole hearings, due process entitles prisoners to a fair hearing, and a statement of reasons for a parole board's decision. *Miller v. Or. Bd. of Parole & Post-Prison Supervision*, 642 F.3d 711, 716 (9th Cir. 2011) (citing *Swarthout v. Cooke*, 562 U.S. 216, 220

(2011) ("When, however, a State creates a liberty interest [such as parole], the Due Process Clause requires fair procedures for its vindication – and federal courts will review the application of those constitutionally required procedures."). Finally, and of key importance to the disputes at the heart of the currently pending motion, it should be noted that a fundamental requirement of due process is not only "the opportunity to be heard" that was described in *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), but "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Plaintiffs argue that that the Settlement Agreement should be extended because CDCR continues to violate prisoners' due process rights in three distinct ways: through the systemic misuse of confidential information in order to return class members to solitary confinement; by placing and retaining class members in RCGP without adequate procedural protections; and, by using unreliable gang validations to deny class members a fair opportunity to seek parole. *See generally Pls.' Mot.* (dkt. 905). In support of these arguments, Plaintiffs have lodged the above-described evidence of denials of due process in each of these contexts.

Defendants, in essence, respond by contending that Plaintiffs have not demonstrated due process violations, or that the matter is simply beyond the court's purview. As to Plaintiffs' argument that unreliable gang validations are used to effectively deny class members meaningful parole hearings, Defendants submit that the parole transcripts show that the prisoners were all given an opportunity to be heard and a statement of reasons for the denial of parole, and that this is all the process they are due. *Defs.' Opp*. (dkt. 985-3) at 11-12. Defendants also argue that the prisoners' gang validations were not dispositive in those parole hearings. *Id*. 15. However, Defendants do not address the contention that class members are systemically being denied *meaningful* parole hearings at which they may challenge a gang validation, or even *meaningful* notice about how to go about challenging the designation in the future. As mentioned above, Plaintiffs have provided the court with ample evidentiary examples that demonstrate that the CDCR's old process for gang validation was constitutionally infirm (for example, because CDCR's interpretation of the word "activity" also included something described as, "non-action piece[s] of evidence"). As a result, prisoners' validations were sometimes based on as little as the

appearance of their name on a list of alleged gang members, or for having received correspondence (regardless of the content) or artwork, a birthday card, or other possessions from a validated gang member, or for having a photograph of a former cellmate who was a gang member, or for the artwork they possessed (such as art containing Aztec or Mayan images), or for speaking to a gang member or being mentioned in a their correspondence (regardless of the substance or context), or for having books by certain authors or a pamphlet in Swahili. Plaintiffs also provide evidence from a number of class members' parole transcripts in support of the contention that gang validation is a highly significant, if not often a dispositive factor in parole consideration, and that when prisoners dispute their validation at their parole hearings, Commissioners consider the challenge itself to constitute evidence of dishonesty and a manifestation of a lack of remorse or credibility.

Given that the state has created a liberty interest in parole, fair procedures must be in place for its vindication. Thus, it is no answer for Defendants to simply state that class members were given an opportunity to be heard, instead, due process required "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. Accordingly, the court finds that Plaintiffs have carried their burden to show systemic due process violations in the use of unreliable gang validations to effectively bar class members a meaningful opportunity for parole.

Regarding Plaintiffs' contention that CDCR is systemically violating due process and returning class members to solitary confinement through the misuse of confidential information in disciplinary proceedings, Defendants argue: (1) that this court lacks jurisdiction to review CDCR's disciplinary findings; (2) that Plaintiffs are merely second-guessing the CDCR's use of confidential information; (3) that Plaintiffs misinterpret the confidential information because CDCR does not use fabricated evidence; and, (4) that CDCR does not use unreliable evidence. *Defs.' Opp.* (dkt. 985-3) at 15-26. Starting with Defendants' argument that this court lacks jurisdiction to review CDCR's disciplinary findings, the argument is without merit. First, the court is not taking it upon itself to review CDCR's disciplinary findings for the purpose of affirming or reversing those decisions; instead, the court is merely reviewing evidence concerning CDCR's disciplinary *process*, submitted pursuant to a provision in a settlement agreement to which

Defendants are a party. Second, Paragraph 41 of the Settlement Agreement makes it incumbent on Plaintiffs to submit such materials (if at all), and likewise incumbent upon this court to review them in the context of adjudicating motions to extend the Agreement, and thus establishes the court's jurisdiction to effect such a review.

Turning to Defendants' contention that Plaintiffs are merely second-guessing or misinterpreting CDCR's use of confidential information, Defendants submit that "the evidence shows that inmates are provided sufficient notice to contest disciplinary charges and that they do so." *Id*. at 18. The court disagrees. The court notes that Defendants do not offer any competing interpretation of this body of evidence, nor do they direct the court to any facts or additional information from which it could be concluded that some or all of the above-described apparent failures to conduct *meaningful* disciplinary hearings were mitigated by the existence of some competent piece of evidence on which a finding of guilt may have reasonably been based. Plaintiffs, on the other hand, present evidence pertaining to a number of disciplinary matters occurring in a number of different prisons, involving many prisoners, and various levels of CDCR officials. In doing so, Plaintiffs demonstrate that, time and again, the shield of confidentiality for informants and their confidential accounts is used to effectively deny class members any meaningful opportunity to participate in their disciplinary hearings, and resulting in their return to secured housing units – effectively frustrating the purpose of the Settlement Agreement.

Defendants also contend that Plaintiffs' reliability demands are unwarranted, and that in any event, CDCR does not use unreliable information in disciplinary proceedings. *Id*. at 23-26. The evidence before the court paints a different picture. Plaintiffs present evidence from a number of other disciplinary matters in support of their argument that CDCR systemically relies on confidential information without ensuring its reliability, thus, improperly returning class members to solitary confinement and frustrating the purpose of the Settlement Agreement. In a number of cases, an informant had been determined to be reliable purportedly because his account had been independently corroborated by a second informant, except that there was no second informant, a fact that remained confidential. Additionally, Plaintiffs present evidence that class members' attempts to challenge the reliability of an informant's account at their disciplinary hearings were

foreclosed as "irrelevant." Accordingly, the court finds that Plaintiffs have shown by a preponderance of the evidence that systemic due process violations are manifest in CDCR's misuse of confidential information in disciplinary proceedings, resulting in a return of class members to solitary confinement, and a frustration of the purpose of the Settlement Agreement.

Lastly, regarding Plaintiffs' argument that RCGP classification and retention is effected with such a lack of procedural protections as to manifest systemic due process violations, the court finds this argument unpersuasive. The court does agree with Plaintiffs that RCGP classification or retention implicates a liberty interest because Plaintiffs have provided evidence that RCGP is sufficiently different from general population (i.e., RCGP limits prisoners' parole eligibility, is singular, remotely located, prolonged, and stigmatizing), however, the court finds that Plaintiffs' complaints about RCGP designation and retention do not rise to the level of "systemic" due process violations as contemplated by the Settlement Agreement. Plaintiffs contend that certain prisoners are housed in RCGP for an improper reason – namely, due to threats to institutional safety rather than their personal safety. However, even if that were an "improper" reason, which does not appear to be a matter governed by the Settlement Agreement, it does not rise to the level of a systemic denial of due process. Further, Plaintiffs present evidence that class members have been told that participation in RCGP programs and remaining incident free for a 6-month period would result in their return to general population, but that they were nevertheless retained in RCGP based on a presumption that a safety threat continues. In this regard, the court finds that Plaintiffs' evidence – largely the fact that RCGP prisoners deny that there is any risk to their safety – is insufficient to demonstrate a systemic due process violation. After all, the CDCR is far better situated than any single prisoner to determine whether or not there is a risk to a prisoner's safety in one or another institution or unit. Lastly, while Plaintiffs suggest that the structure and interaction of the DRB and the ICC could benefit from an overhaul such as to avoid the possibility of arbitrary decision-making, Plaintiffs do not provide any detailed case-studies (as was the case with the claims above) to show that RCGP placement and retention decisions are in fact arbitrarily made, let alone evidence that would demonstrate systemic due process violations in this context. Accordingly, the court finds that Plaintiffs have not satisfied their evidentiary burden to

demonstrate that RCGP classification and retention is effected with such a lack of procedural protections as to manifest systemic due process violations.

### *Relationship Between Due Process Violations & Operative Complaint or Settlement Agreement*

Plaintiffs have demonstrated by a preponderance of the evidence that current and ongoing systemic due process violations exist – namely, the systemic misuse of confidential information in what appear to be meaningless disciplinary hearings such as to return class members to solitary confinement, and by using unreliable gang validations to deny class members a fair opportunity to seek parole. Accordingly, the court must decide whether the due process violations that exist are "as alleged in Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to . . . the SHU policies contemplated by this Agreement." *Sett. Agmt.* (dkt. 424-2) at 17-18.

The court finds that both of the currently ongoing sets of due process violations at issue are as alleged in Plaintiffs' Second Amended Complaint or as a result of CDCR's reforms to its SHU policies contemplated by the Agreement. First, as to unreliable gang validations being used to deny class members a meaningful parole hearing, Plaintiffs' operative complaint alleged that these same unreliable gang validations, which had caused them to be placed in indefinite solitary confinement, unfairly deprived them (among other things) of a fair opportunity to seek parole. *See Am. Compl.* (dkt. 136) at 40-45. Second, as to the systemic misuse of confidential information in disciplinary hearings to return class members to solitary confinement, by its nature this claim is intertwined with CDCR's reforms of its SHU policies as a result of the Settlement Agreement. If the Settlement Agreement was executed for the purpose of ending indeterminate SHU sentences at the root of which was unreliable confidential information, and wherein CDCR agrees to abide by its regulations regarding the use of confidential information but often fails to do so, then systemic due process violations resulting in the return of class members to the SHU effectively frustrates the purpose of the agreement. Accordingly, the court finds that misusing confidential information in disciplinary proceedings to return class members to solitary confinement is related to, and is a result of, the CDCR's reforms to its SHU policies under the Settlement Agreement.

//

## CONCLUSION

For the above-stated reasons, Plaintiffs' Motion For Extension of the Settlement Agreement Based on Systemic Due Process Violations (dkt. 905) is GRANTED. The Settlement Agreement, and the court's jurisdiction, is herewith extended for a period of 12 months from the date of this order.

**IT IS SO ORDERED.**

Dated: January 25, 2019

_____
ROBERT M. ILLMAN
United States Magistrate Judge