XAVIER BECERRA
Attorney General of California
JAY C. RUSSELL
ADRIANO HRVATIN
Supervising Deputy Attorneys General
KELLY A. SAMSON
Deputy Attorney General
State Bar No. 266927
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7317
  Fax:  (916) 324-5205
  E-mail:  Kelly.Samson@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| **TODD ASHKER, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GOVERNOR OF THE STATE OF CALIFORNIA, et al.,**<br><br>Defendants. | 4:09-cv-05796 CW (RMI)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO STAY ORDER EXTENDING JURISDICTION OVER THE SETTLEMENT AGREEMENT PENDING APPEAL**<br><br>Date:          April 2, 2019<br>Time:         10:00 a.m.<br>Location:    Eureka-McKinleyville Courthouse<br>Judge:       The Hon. Robert Illman<br>Action Filed:  December 9, 2009 |

### NOTICE OF MOTION AND MOTION

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 2, 2019 at 10:00 a.m., before the Honorable

Robert Illman, in the Eureka-McKinleyville Courthouse, located at 3140 Boeing Avenue,

McKinleyville, California, or on another date or at another location convenient to the Court and

the parties, Defendants will move under Federal Rule of Civil Procedure 62 and Northern District

/ / /

1

Defs.' Not. Motion & Motion Stay (4:09-cv-05796 CW (RMI))

1    Civil Local Rule 7 for a stay of the Court's January 25, 2019 order extending the Court's

2    jurisdiction over the parties' Settlement Agreement.  (ECF No. 1122.)

3         Defendants' motion is based on this notice of motion, Defendants' supporting

4    memorandum of points and authorities, declaration and exhibits, the pleadings, records and files

5    in this action, and such other matters as the Court may consider.

6                    **MEMORANDUM OF POINTS AND AUTHORITIES**

7                                 **INTRODUCTION**

8         This class action has always concerned Defendants' prior practice of assigning inmates

9    identified as active prison-gang affiliates to segregated housing for indeterminate terms, which

10   was intended to maintain institutional order and promote inmate and staff safety.  The parties

11   signed a Settlement Agreement, which the Court approved as fair, reasonable, and adequate, to

12   resolve Plaintiffs' claims and reform those policies.  There is no dispute that Defendants fulfilled

13   their threshold contractual promise:  inmates are no longer assigned to indeterminate Security

14   Housing Unit (SHU) terms based on prison-gang affiliation.  Under the Agreement, the Court's

15   further jurisdiction should have ended, but Plaintiffs sought to extend jurisdiction based on three

16   alleged due-process violations that have no connection to Plaintiffs' claims challenging

17   indeterminate SHU housing.

18        Plaintiffs sought an extension of jurisdiction based on class members' parole eligibility, the

19   way Defendants use confidential information in inmate disciplinary proceedings, and the

20   operation of the Restricted Custody General Population housing unit at Pelican Bay State Prison.

21   On January 25, 2019, this Court granted Plaintiffs' extension motion on all but one ground and

22   extended its jurisdiction over the Agreement for another year.  Defendants timely appealed the

23   Court's order on various grounds—Defendants contend the Court erred by making findings that

24   impact policies and practices that were never litigated or negotiated when the parties settled this

25   case.  (ECF No. 1128.)  For example, the Court's order directs to what extent the Board of Parole

26   Hearings, a non-party to this case, may consider an inmate's record of gang-related activity and

27   validation when evaluating the inmate's suitability for parole and release to the community.  The

28   Court should stay its January 25, 2019 order pending Defendants' appeal.

2

Defs.' Not. Motion & Motion Stay (4:09-cv-05796 CW (RMI))

1    Defendants' appeal divested the Court of jurisdiction over matters relating to the January

2    25, 2019 order because the order affirmatively altered the status quo by granting Plaintiffs

3    prospective relief.  Absent the extension motion order, the case would have ended.  Any further

4    order enforcing the January 25, 2019 order requires Defendants to undertake new obligations

5    beyond the status quo.  But, even if Defendants' appeal did not divest the Court of jurisdiction, a

6    stay is appropriate because Defendants are likely to succeed on the merits, and Defendants will

7    suffer irreparable harm if required to make the additional changes to policy contemplated by the

8    Court's January 25, 2019 order, under further extensive monitoring by Plaintiffs' counsel.  On the

9    other hand, a stay preserves Plaintiffs' rights pending an appeal concerning what the parties

10   bargained for when they settled this case.  A stay is appropriate on these grounds.

11                                        **ARGUMENT**

12   **I.    THE COURT IS DIVESTED OF JURISDICTION WHILE DEFENDANTS APPEAL THE**
            **GROUNDS UPON WHICH THE COURT EXTENDED JURISDICTION.**
13

14   The Ninth Circuit has repeatedly held that, "[o]nce a notice of appeal is filed, the district

15   court is divested of jurisdiction over the matters being appealed."  *See, e.g.*, *Nat. Res. Def.*

16   *Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1167 (9th Cir. 2001) (citing *Griggs v. Provident*

17   *Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *McClatchy Newspapers v. Cent. Valley*

18   *Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir. 1982)).  The divestiture doctrine is a

19   judge-made doctrine "designed to avoid the confusion and waste of time that might flow from

20   putting the same issues before two courts at the same time."  *Kern Oil & Ref. Co. v. Tenneco Oil*

21   *Co.*, 840 F.2d 730, 734 (9th Cir. 1988).  The district court retains limited jurisdiction to issue

22   orders that preserve the status quo during the pendency of an appeal.  *Nat. Res. Def. Council, Inc.*,

23   242 F.3d at 1166.

24   "Where the court supervises a continuing course of conduct and where as new facts develop

25   additional supervisory action by the court is required, an appeal from the supervisory order does

26   not divest the district court of jurisdiction to continue its supervision, even though in the course of

27   that supervision the court acts upon or modifies the order from which the appeal is taken."

28   *Hoffman ex rel. NLRB v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1276

3

1   (9th Cir. 1976).  This limited exception to the divestiture rule allows the district court to take new

2   action in response to new facts.  *Id.*  But the rule does not restore jurisdiction to "adjudicate

3   substantial rights directly involved in the appeal."  *McClatchy Newspapers*, 686 F.2d at 735.  And

4   a district court may not take further action that "materially alters the status of the case on appeal."

5   *Nat. Res. Def. Council*, 242 F.3d at 1166.

6          Here, Defendants timely appealed the January 25, 2019 order extending the parties'

7   Settlement Agreement.[1]  (ECF No. 1128.)  The Ninth Circuit has jurisdiction under 28 U.S.C.

8   § 1291 because the January 25, 2019 order conclusively decided that the Court's jurisdiction over

9   the Agreement should continue with further monitoring and oversight, rather than terminate

10  following the 24-month compliance and contractual enforcement period the parties agreed to

11  when they resolved this case.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1064-65 (9th

12  Cir. 2010) (post-judgment orders are given a practical construction of finality); *see also Parsons*

13  *v. Ryan*, 912 F.3d 486, 502 (9th Cir. 2018) (citing *Plata v. Brown*, 754 F.3d 1070, 1075 (9th Cir.

14  2014)) ("Under the collateral order doctrine . . . an order that does not strictly end the litigation

15  may nonetheless be considered sufficiently final when it is 'too important to be denied review and

16  too independent of the merits of the case to require deferral of review.'").  The Court is divested

17  of jurisdiction because Defendants' appeal concerns, in part, the Court's construction of the

18  Settlement Agreement—in Defendants' view, the Court found grounds to extend jurisdiction that

19  far expand the case's scope and impact policy and operations beyond the plain terms of the

20  Agreement.  Any further order enforcing the January 25, 2019 order, particularly orders that may

21  permit Plaintiffs' counsel to conduct further monitoring, materially alters the status quo and

22  substantially compromises rights that Defendants intend to vindicate on appeal.  The Court is

23  therefore divested of jurisdiction.

24  **II.   EVEN IF THE COURT IS NOT DIVESTED OF JURISDICTION, A STAY IS APPROPRIATE.**

25         A court's "power to stay proceedings is incidental to the power inherent in every court to

26  control the disposition of the causes on its docket with economy of time and effort for itself, for

27  _____

28         [1] Plaintiffs have also cross-appealed—further demonstrating that the Court is divested of jurisdiction.  (ECF No. 1131.)

4

1   counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A stay is "an

2   exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances

3   of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal alterations, citations,

4   and quotations omitted).  In ruling on stay motions, courts consider four factors: (1) the likelihood

5   that the movant will succeed on the merits; (2) whether irreparable injury will result absent a stay;

6   (3) whether the issuance of a stay will substantially injure other parties interested in the

7   proceeding; and (4) the effect on the public interest of the issuance or non-issuance of the stay.

8   *Id.* at 434.  The factors are weighed on a continuum.  At one end, "the moving party is required to

9   show both a probability of success on the merits and the possibility of irreparable injury." *Golden*

10  *Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (citations

11  omitted).  At the other end, the moving party "must demonstrate that serious legal questions are

12  raised and that the balance of hardships tips sharply in its favor." *Id.*  "[I]f there is a 'probability'

13  or 'strong likelihood' of success on the merits, a relatively low standard of hardship is sufficient.

14  [But] if 'the balance of hardships tips sharply in . . . favor' of the party seeking the stay, a

15  relatively low standard of likelihood of success on the merits is sufficient." *Id.* at 1119 (internal

16  citations omitted).  All factors favor a stay in this case.

17      **A.    Defendants Are Sufficiently Likely to Succeed on the Merits.**

18      Courts routinely use different formulations to describe "the exact degree of likely success

19  that stay petitioners must show," such as "a minimum quantum of likely success necessary to

20  justify a stay," a "reasonable probability" or "fair likelihood" of success, or a "a substantial case

21  on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011) (citations omitted).

22  These formulations are "largely interchangeable," and each indicates that, "at a minimum," the

23  party seeking a stay must show that there is "a substantial case for relief on the merits." *Lair v.*

24  *Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012); *Leiva–Perez*, 640 F.3d at 967-68.  Alternatively,

25  the moving party may show that the appeal raises "serious legal questions" even if there is only a

26  minimal chance of prevailing on those questions. *Id.* at 968; *O'Connor v. Uber Techs., Inc.*, No.

27  13-CV-03826-EMC, 2015 WL 9303979, at *1 (N.D. Cal. Dec. 22, 2015).  Often "serious legal

28  questions" are those "that raise[] genuine matters of first impression, or which may otherwise

5

1    address a pressing legal issue which urges that the Ninth Circuit hear the case." *Morse v.*

2    *Servicemaster Glob. Holdings, Inc.*, No. C 08-03894, 2013 WL 123610, at *3 (N.D. Cal. Jan. 8,

3    2013) (citing *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1412 (9th Cir. 1990)).  Defendants

4    meet their burden under any articulation of this standard.

5                    **1.    Defendants' appeal raises a substantial case for relief on the merits.**

6            Under the Settlement Agreement's paragraph 41, the parties agreed that this action would

7    automatically terminate absent a showing by Plaintiffs that the Agreement and the Court's

8    jurisdiction should be continued.  (ECF No. 424-2, pp. 17-18.)  Plaintiffs were required to show

9    by a preponderance of the evidence that current and ongoing systemic violations of the Eighth

10   Amendment or the Due Process Clause of the Fourteenth Amendment exist as alleged in

11   Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of CDCR's

12   reforms to its Step Down Program or the SHU policies contemplated by the Agreement.  (*Id.*)

13   The Settlement Agreement controls any interpretation of the parties' dispute, and the law is clear

14   that a court should not look beyond the four corners of the Agreement.  *Republic Pictures Corp.*

15   *v. Rogers*, 213 F.2d 662, 665 (9th Cir. 1954).

16           Here, the Court's ruling extended jurisdiction on grounds that did not stem from the

17   constitutional claims alleged in Plaintiffs' complaint or the policy changes contemplated by the

18   Agreement.  The Court dismissed Defendants' arguments that Plaintiffs' extension motion fell far

19   outside of the parties' contemplated Agreement and erred by looking beyond the Agreement to

20   redefine Defendants' contractual obligations.  For example, this case, and the parties' Agreement,

21   focused on indeterminate SHU placement in connection with gang validation.  It did not involve

22   CDCR's disciplinary proceedings and the process provided to inmates, including when using

23   confidential information, for adjudicating prison rules violations, which may subject inmates to

24   determinate fixed terms based on their behavior.  The underlying action also did not concern how

25   gang validations impacted parole eligibility—indeed, when the parties submitted the Agreement

26   for the Court's approval, they jointly addressed multiple inmate comments requesting that the

27   Agreement provide further relief expunging inmates' prison-gang validations to purportedly

28   improve parole suitability.  The parties expressly told the Court that it could reject these inmates'

6

1   comments because they had not negotiated for the expungement of gang validations.  (*See* Joint

2   Mot. for Final Approval, January 12, 2016, ECF No. 485 at 17:1-20 ("The parties' Agreement is a

3   forward-looking document with several forms of anticipated prospective reform, and as such does

4   not contemplate the 'exoneration' of past validations;" *see also* 18:25-26 ("However, Plaintiffs

5   did not seek to change parole policies, and those polices were not a subject of the parties'

6   negotiations.").)  This Court's January 25, 2019 order undermines the bargained-for and agreed-

7   upon terms negotiated by the parties and extends jurisdiction to now expose Defendants to

8   monitoring and litigation on claims regarding validation and parole considerations that were

9   not—until now—part of this case.

10      The Court separately erred by accepting Plaintiffs' characterization of facts without any

11  independent analysis, and without considering Defendants' interpretation of that evidence.  For

12  example, the Court only considered excerpts of parole hearing transcripts, rather than considering

13  the full transcripts and Defendants' evidence showing that class members received adequate due

14  process.  The Court also stated that Defendants only relied on argument, rather than evidence, to

15  rebut Plaintiffs' claim regarding the confidential information used in disciplinary proceedings; but

16  the Court ignored that Defendants analyzed the same records Plaintiffs relied on to allege a

17  constitutional violation.  The Court did not evaluate this evidence—it simply accepted Plaintiffs'

18  interpretation of the records and failed to address Defendants' analysis, in contravention of well-

19  settled legal precedent providing prison officials with deference in maintaining prison order

20  through disciplinary proceedings.  *See Winson v. Marshall*, 108 F.3d 1387 (9th Cir. 1997) ("We

21  afford deference to defendants' expressed security concerns."); *see also Harper v. Wallingford*,

22  877 F.2d 728, 733 (9th Cir. 1989) ("The security concerns expressed by prison officials are

23  entitled to respect and deference by the courts.").

24      These errors are significant and show that Defendants' appeal raises a substantial case for

25  relief on the merits.

26          **2.  Defendants' appeal raises serious legal questions.**

27      The moving party may show that the appeal raises "serious legal questions" even if there is

28  only a minimal chance of prevailing on those questions.  *O'Connor v. Uber Techs., Inc.*, No. 13-

7

1  CV-03826-EMC, 2015 WL 9303979, at *1 (N.D. Cal. Dec. 22, 2015).  Defendants' appeal

2  presents serious legal questions.

3        For example, the Court here found that an inmate's assignment to and retention in the

4  Restricted Custody General Population (RCGP) unit implicates a liberty interest because

5  Plaintiffs showed that the unit is "different" than housing in the general population.  (ECF No.

6  1122 at 25.)  Such a finding raises serious legal questions, given that even an inmate's assignment

7  to SHU does not implicate a liberty interest.  *See Hewitt v. Helms*, 459 U.S. 460, 466-68 (1983)

8  (the Fourteenth Amendment's Due Process Clause does not confer on inmates a liberty interest in

9  being confined in the general prison population, as opposed to a form of segregated housing); *see*

10  *also Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) (SHU placement and retention was

11  within range of confinement normally expected by inmates in relation to ordinary incidents of

12  prison life; thus, the inmate had no protected liberty interest); *May v. Baldwin*, 109 F.3d 557, 565

13  (9th Cir. 1997) (inmate had no liberty interest in freedom from state action taken within sentence

14  imposed and segregation falls within the terms of confinement ordinarily contemplated by a

15  sentence).

16        Further, the Court improperly applied a "meaningful" standard applicable to social security

17  disability benefits when examining the validity of parole decisions (ECF No. 1122 at 22:6-7),

18  rather than applying the legal standard applicable to California parole decisions.  *See Roberts v.*

19  *Hartley,* 640 F.3d 1042 (9th Cir. 2011).

20        In light of these issues, Defendants' appeal raises serious legal questions.  This factor

21  further supports a stay.

22       **B.**    **Defendants Will Be Irreparably Harmed Absent a Stay.**

23        Absent a stay, CDCR will be forced to reform policies and practices for purported due-

24  process violations that are being challenged on appeal, and which Defendants maintain were

25  never part of this case.  The Settlement Agreement already incorporated significant reforms,

26  including the creation of the RCGP housing unit and the transfer of nearly all class members from

27  indeterminate SHU terms to the general population.  Defendants will be forced to further modify

28  / / /

1    policy and prison operations to correct alleged wrongs in a settled action where there was no

2    admission of liability and as to issues that were never raised or litigated in this case.

3         In addition, the vague and broad-sweeping extension opens the door to similarly vague and

4    broad-sweeping monitoring demands.  Monitoring was to terminate automatically after 24-

5    months.  But the Court's extension order continues monitoring, apparently beyond the grounds

6    upon which the Court found due-process violations, and will require staff to, among other things,

7    engage in extensive document collection and production, the scope of which Plaintiffs now seek

8    to expand, while the threshold question of whether the Court's jurisdiction was properly extended

9    is challenged on appeal.  Plaintiffs have already stated that they intend to demand document

10   production not just to monitor the two due-process issues upon which the Court extended

11   jurisdiction, but more broadly on issues in contemplation of an alleged "second extension

12   motion."  (Samson Decl., Ex. A, February 13, 2019 Jules Lobel Letter to Magistrate Judge

13   Illman.)  For instance, Plaintiffs' counsel demanded documents related to all inmates in the

14   RCGP, with an indication as to which of those inmates are on "walk-alone status," even though

15   the Court did not extend jurisdiction based on Plaintiffs' RCGP allegations.  (Samson Decl., Ex.

16   B, Email Exchange with Carmen Bremer).  But Defendants appealed Judge Wilken's order

17   regarding RCGP inmates on walk-alone status, and Judge Wilken stayed further enforcement of

18   that order pending appeal.  (Order, December 7, 2018, ECF No. 1113). Plaintiffs' demands for

19   these documents seeks to circumvent that stay and further alter the status quo.

20        Plaintiffs' requests also contemplate an extensive production of documents retroactive to

21   when the Agreement's monitoring obligations terminated in October 2017:

22        With respect to 37 (h), we would like to modify the provision to require production of
          RVRs and hearing officer decisions for all inmates found guilty of a SHU eligible
23        offense involving confidential information, along with all relevant confidential
          information and disclosures, including not only confidential memoranda but also
24        recordings and/or transcripts of informant interviews.  Material relating to validation
          decisions need not be produced.  The documents shall be produced on a monthly
25        basis, with the first production to occur on April 15, 2019, and to include documents
          related to guilty findings made between January 25, 2019 and April 1, 2019.  *We will*
26        *also need this same material relevant to inmates found guilty of SHU-eligible offenses*
          *between the date of CDCR's last 37(h) production (Sep. 2017), and Jan. 2019.*
27

28

9

(Samson Decl., Ex.C, February 6, 2019 Rachel Meeropol Email to CDCR Office of Legal

Affairs) (emphasis added)).  Thus, Plaintiffs believe they are entitled to an extension of 29-

months of documents and monitoring.  Meanwhile, the January 25, 2019 order only contemplates

a 12-month extension.

Plaintiffs' requests also seek to change express terms of the Agreement to expand their

document demands:

> With respect to 37 (k), CDCR's obligations shall continue, with the modification that
> Plaintiffs are entitled to all relevant confidential information, not a random sampling.

(*See* Ex. C).  But the Agreement only provides for the production of "non-confidential"

documents and a "random representative" sample of confidential information underlying inmates'

disciplinary findings, not a broad sweeping production of all documents that could endanger

safety and security from 2017 to present.  (ECF No. 424-2 at 16:20-23.)  In addition, paragraph

37(k) of the Agreement refers to inmates on Administrative SHU status, but the Court did not

grant extension of jurisdiction, and Plaintiffs did not bring any motion, with regard to such

inmates.  Plaintiffs demands show that they believe monitoring has been opened in all respects,

even concerning issues which they did not raise in their extension motion.

Plaintiffs' also demand production documents concerning matters not even within the

Agreement, which include the following new categories of information:

> (1)   For all prisoners charged with (but not yet found guilty of) a SHU-eligible RVR
> involving confidential information; the RVR and all confidential information and
> disclosures, including not only confidential memoranda but also recordings and / or
> transcripts of informant interviews.  The documents shall be produced on a monthly
> basis, with the first production to occur on April 15, 2019, and to include documents
> related to RVRs issued before April 1, 2019.
>
> (2)   For all prisoners currently in administrative segregation pending investigation for
> a SHU-eligible offence based on confidential information, who have been there for
> more than 30 days: all relevant confidential information and disclosures, including
> not only confidential memoranda but also recordings and / or transcripts of informant
> interviews.  The documents shall be produced on a monthly basis, with the first
> production to occur on March 1, 2019.
>
> (3)   A list of all prisoners with gang validations made under the CDCR procedures
> challenged in plaintiffs' Second Amended Complaint, who have had a parole hearing
> since October, 2015 or have a parole hearing date within the next 5 years. For all such
> individuals, production of all Parole Consideration Decisions and parole hearing
> transcripts going forward on a quarterly basis. We are open to discussing a schedule

1   for the back-production – perhaps spread out over several months – to minimize
    CDCR's burden.

2

3   (4)   A list of all nonviolent prisoners who have been, or otherwise would be,
    disqualified from Proposition 57 review under subdivision (c)(3) of section 3492

4   "Public Safety Screening and Referral," along with all BPH non-violent decision
    forms and CDCR screen-out documentation, to be produced on a quarterly basis

5   moving forward.  As with the above, we are open to discussion of a schedule for the
    back-production – perhaps spread out over several months – to minimize CDCR's
    burden.

6

7   (*See* Ex. C.)  Plaintiffs are thus using the Court's order to expand monitoring into areas where no

8   constitutional violation was found or even alleged.  Plaintiffs' new demands are so expansive they

9   now require responses by an agency, the Board of Parole Hearings, that was not a party to the

10  litigation or Settlement Agreement.  Even if the Court properly extended jurisdiction (which it did

11  not), there is nothing in the Agreement that would permit Plaintiffs to impose discovery demands

12  on non-parties to the litigation or that the Court would have jurisdiction to enforce the

13  Agreement's terms against non-parties.

14       There would be no way to undo the harm that would be suffered by resuming the

15  monitoring and compliance aspects of the January 25, 2019 order, which Defendants are

16  challenging on appeal.  Plaintiffs' demands are expansive, burdensome, and in many respects,

17  unrelated to the allegations upon which the Court ordered its jurisdiction extended.

18       For all of these reasons, absent a stay, Defendants will be irreparably harmed.

19

20  **C.    A Stay Will Not Impact Plaintiffs Because the Status Quo Will Be
          Maintained.**

21       A stay will preserve the status quo.  The January 25, 2019 order granted Plaintiffs benefits

22  that far exceed what the parties agreed to, and which will require, if enforced, significant policy

23  changes.  Such changes may include how a non-party, the Board of Parole Hearings, can use

24  prison-gang validations to determine parole suitability.  Until the Ninth Circuit resolves whether

25  inmates are entitled to such relief, a stay is appropriate to maintain the status quo.

26       Inmates have well-established avenues to challenge alleged due-process violations with

27  respect to disciplinary findings, parole proceedings, and housing decisions.  Inmates—including

28  class members—can submit administrative grievances, seek habeas relief, or file individual §1983

                                            11

civil rights actions.  In view of those avenues, class members will not be significantly impacted if the Court issues a stay to preserve the status quo pending appeal.

Absent a stay, Plaintiffs will continue to litigate disputes under a Settlement Agreement that the Ninth Circuit may conclude should already have terminated.  The parties will undoubtedly expend the Court's resources, as well as their own, litigating further discovery motions, fees motions, and enforcement motions during the pendency of Defendants' appeal.  By way of example and precedent, during the pendency of the Agreement, Plaintiffs filed thirty enforcement motions alone.  (*See* ECF Nos. 513, 524, 553, 588, 590, 670, 681, 702, 706, 712, 728, 735, 737, 780, 793, 794, 801, 804, 811, 832, 838, 841, 844, 847, 848, 849, 905, 913, 986, 992.)  If Defendants' appeal is successful, that expenditure of resources will have been all for naught.

Further, "[i]t has been said. . . that: 'The status quo is the last uncontested status which preceded the pending controversy.'"  *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (internal citations omitted).  The last uncontested status before Plaintiffs' extension motion was filed on November 20, 2017, (ECF No. 905) was the expiration of the 24-month period of the Court's jurisdiction and monitoring.  Thus, the status quo is no monitoring and no extension of the Court's jurisdiction.

These considerations, too, weigh in favor of a stay.

**D.    The Public Interest Favors Granting the Stay in this Case.**

The public has an interest in CDCR remaining free to exercise its discretion to properly validate gang members and protect confidential informants.  The public also has an interest in allowing the Board of Parole Hearings Commissioners to consider all relevant information in parole decisions.  No public interest would be served by impairing prison officials' ability to exercise their discretion to manage prisons and award parole; while keeping staff, inmates, and the public safe.  At the same time, the Court has a public interest in preserving judicial resources. This is especially true in a case where CDCR satisfied its threshold contractual obligation to end indeterminate SHU housing, the relief Plaintiffs requested and received when the parties agreed to settle this case.

/ / /

**CONCLUSION**

This Court was divested of jurisdiction when Defendants appealed the January 25, 2019 order. Any further order relating to the January 25, 2019 order will materially alter the status quo, and result in further policy and operational reforms that far exceed what the parties agreed to when they settled the case, and therefore fall outside the Court's limited continuing jurisdiction. Moreover, even if it had not been divested of jurisdiction, given the breadth of the Court's order finding systemic due-process violations, the Court should nevertheless stay proceedings until the Ninth Circuit determines the propriety of the January 25, 2019 order.

Dated: February 26, 2019                    Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JAY C. RUSSELL
ADRIANO HRVATIN
Supervising Deputy Attorneys General

*/s/ Kelly A. Samson*

KELLY A. SAMSON
Deputy Attorney General
*Attorneys for Defendants*

SF2012204868
13479859.docx

13

# CERTIFICATE OF SERVICE

Case Name:   ___*Ashker, et al. v. Newsom, et al.*___      No.   ___4:09-cv-05796 CW (RMI)___

I hereby certify that on <u>February 26, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

> ➢ **DEFENDANTS' NOTICE OF MOTION AND MOTION TO STAY ORDER EXTENDING JURISDICTION OVER THE SETTLEMENT AGREEMENT PENDING APPEAL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>February 26, 2019</u>, at Sacramento, California.

| L. Venable | */s/ L. Venable* |
|:---:|:---:|
| Declarant | Signature |

SF2012204868
13481171.docx