UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| TODD ASHKER, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>MATHEW CATE, et al.,<br><br>   Defendants. | Case No. 09-cv-05796-CW (RMI)<br><br>**ORDER ON PLAINTIFFS' ENFORCEMENT MOTION**<br><br>Re: Dkt. No. 1215 |

  Now pending before the court is an enforcement motion filed by Plaintiffs regarding the purportedly unauthorized confinement of class-members in the Special Housing Unit ("SHU") for participation in a rout with a nexus to a Security Threat Group ("STG") (dkt. 1215). Defendants have responded (dkt. 1217), Plaintiffs have replied (dkt. 1219), and the matter came to be heard at oral argument before the undersigned on December 3, 2019 (dkt. 1225). For the reasons discussed below, Plaintiffs' Motion is due to be denied.

  Initially, Plaintiffs note that the Settlement Agreement ("SA") in this case not only ended indeterminate SHU terms for mere gang affiliation, but that it also "effectuated a fundamental shift from an association-based system to a behavior-based system for assessing SHU terms in California prisons." Pls.' Mot. (dkt. 1215) at 3. Plaintiffs add that under the SA, the Parties "agreed on a detailed and exclusive set of SHU-eligible offenses going forward," and that only "[t]hose offenses that are enumerated in the SHU-Term Assessment Chart [found in] in Attachment B to the SA" can result in the assessment of a SHU term. *Id*.; *see also* SA (dkt. 424-2); and, Attachment-B (dkt. 424-3). In short, Plaintiffs contend that prison officials have issued a series of Rules Violation Reports ("RVR") to prisoners accused of participating in a rout with a

1 STG nexus and that officials assessed SHU terms to these prisoners in derogation of the SA because, as Plaintiffs contend, "rout" is not included in the list of offenses for which SHU terms may be imposed under the SA. *See* Pls.' Mot. (dkt. 1215) at 3. Defendants disagree and contend that while the SA did not explicitly identify rout activity as a SHU eligible offense, the SA did identify disturbances, riots, and strikes as SHU-eligible offenses, and that the Merriam-Webster dictionary defines "rout" as a "disturbance," which is encompassed in the listed offenses of "disturbance, riot, or strike," as well as in the provision dealing with the "inciting [of] conditions likely to threaten institutional security." *See* Defs.' Mot. (dkt. 1217) at 2, 3.

## BACKGROUND

The first among the terms and conditions of the SA was the establishment of new criteria for placement in the SHU, in Administrative Segregation, or in the Step-Down Program. *See* SA (dkt. 424-2) at 5-6. The SA provided that gang validation status alone would no longer be a basis for confining prisoners to the SHU and further provided that CDCR would amend the SHU Assessment Chart ("SHU-Chart"), located in Title 15 of the California Code of Regulations, as set forth in the amended SHU-Chart which constituted Attachment-B to the SA. *Id*. The amended SHU-Chart listed the gamut of offenses ranging from homicide to harassment. *See* SHU-Chart (dkt. 424-3) at 4-6. Under Section (7), the chart provides generally for disturbances, riots, and strikes. *Id*. at 5. Section (7)(a) deals with "[l]eading a disturbance, riot, or strike," and provides for a "typical term" ranging from 6 to 18 months of confinement in the SHU. *Id*. at 4, 5. Section (7)(b) deals with "[a]ctive participation in a disturbance, riot, or strike (2 or more offenses within a 12-month period or 1 with [a] direct STG nexus)," and provides for a SHU term between 3 and 9 months. *Id*. at 5. Section (7)(c) deals with behavior that amounts to "[i]nciting conditions likely to threaten institution[al] security," and likewise provides for a SHU term between 3 and 9 months. *Id*. Finally, Sections (13) and (14) of the SHU-Chart provide that unless otherwise specified, attempts shall receive half the term specified for the underlying offense, whereas conspiracies and solicitations shall be subject to the full term for the underlying offense. *Id*. at 6.

With this framework in mind, the court will turn to the incident in question, which transpired on a recreation yard within Pleasant Valley State Prison on February 22, 2019, as

reflected in a RVR submitted as an exhibit to Plaintiffs' enforcement motion. *See* RVR (dkt. 1213-5 *SEALED*) at 2-4. On that occasion, while approximately 112 members of one particular prison gang (or STG) were all on the recreation yard, one prisoner among their number rushed towards a doorway and attempted to forcibly enter a dining hall which was occupied by members of a different prison gang. *Id*. at 2, 3. Standing in his way was a correctional officer who was pushed in the back by the rushing prisoner, causing the correctional officer to fall and strike his head against the frame of the doorway. *Id*. at 2. Fearing for the safety of his colleague, another correctional officer punched the rushing prisoner in the face and placed him in restraints. *Id*. Two other prisoners who had accompanied the rushing prisoner initially "turn[ed] towards the incident with their fists clinched to assist [the] inmate [] in the attack; however, they assumed prone positions on the ground as custody staff near the incident gave numerous verbal orders for them to stay down." *Id*.

During the incident, prison staff observed all of the remaining STG members "come together and form a large group in front of the basketball court . . . the large group turned and responded in unison, making its way towards the dining hall, and ultimately assembling in front of the urinals next to the PAR course, assuming a squatting position, [and] refusing to get down." *Id*. at 2-3. As more prison staff came to assist, the STG members "were observed and heard yelling obscenities at staff and remained in the squatting position refusing to comply with alarm procedures." *Id*. at 3. Repeated announcements to "get down" using the public address system also had no effect until "[r]esponding staff formed a skirmish line on the asphalt track in front of the dining hall, and separated the initial responding staff from the group of STG [members]." *Id*. When "Code 3 responders and Investigative Services Unit [personnel] arrived and joined the skirmish line," the gathering of over one-hundred squatting STG members was eventually disbanded, and the participants were individually placed in restraints, photographed, and then escorted back to their individual housing units. *Id*. Lastly, Plaintiffs have noted the submission of only one RVR, which is representative of four other RVRs for similarly situated prisoners. *See* Pls.' Mot. (dkt. 1215) at 3 n.1.

//

## DISCUSSION

At the heart of the Parties' dispute is the definition of the word "rout." The essence of Plaintiffs' argument is that because participation in a rout with an STG nexus is not a SHU-eligible offense under the Parties' Settlement Agreement, Defendants have breached the agreement by assessing SHU terms to persons who participated in the above-described event at Pleasant Valley State Prison in February of 2019. *See generally id*. at 3-5. Plaintiffs submit that, while the SHU-Chart specifically includes disturbances, riots, and strikes (as well as including the inciting of conditions likely to threaten institutional security), Defendants' contention that a rout is the same as a disturbance carries no weight because rout is an independent criminal offense under California law and "if it were SHU-eligible it would be [specifically] included on the exclusive list of SHU-eligible offenses"; and, because of the SHU-Chart's failure to include the word "rout," Plaintiffs contend that "a rout is categorically ineligible for SHU [confinement] under the SA." *Id*. at 5.

However, at oral argument, Plaintiffs' counsel tempered this position somewhat. Since Plaintiffs have argued that a rout and a disturbance are not the same thing, when asked by the court what might then constitute a SHU-eligible "disturbance" as the term is used in the SHU-Chart, Plaintiffs' counsel responded that she would need to consult the definitions in 15 California Code Regulations § 3000 in order to see what might constitute a disturbance. However, upon review, the court notes that § 3000 does not venture to define "disturbance" at all. In fact, the only appearance of the word "disturbance" in § 3000 is under the provision which defines the phrase, "same and similar behavior," wherein, among other things, it is mentioned that "[d]isturbances, riots, or strikes as listed in subsection 3341.9(c)(7) [i.e., the SHU-Chart] are same/similar only to themselves." *See id*. At oral argument, Plaintiffs' counsel opined that a disturbance would have to involve something more than an attempted riot, and would involve some additional level of activity or of intent on the part of the individuals who are charged. When the court inquired about the provision in the SHU-Chart, at §7(c), wherein a SHU term may be assessed for inciting conditions likely to threaten institutional security, Plaintiffs' counsel conceded that if a rout is to be defined as an attempted riot, then perhaps in certain cases it would be conceivable that rout

4

activity may be likely to threaten institutional security, but that mere *participation* in a rout could not rise to the level *inciting* conditions that would be likely to threaten institutional security. Lastly, Plaintiffs' counsel suggested at the hearing that the dictionary definition of rout being the same as disturbance is "obscure" and should not dictate the outcome here. However, as discussed below, that "obscure" definition of "rout" (i.e., disturbance) is what renders it a legal term, and causes it to be found in nearly every legal dictionary, and nearly every criminal code, in the English-speaking world.

Defendants contend that while the SA and the SHU-Chart did not explicitly include rout as a listed offense, that rout activity is nevertheless encompassed within §7 of the SHU-Chart. *See* Defs.' Mot. (dkt. 1217) at 3. Defendants add that under California law, which governs the interpretation of the Parties' Settlement Agreement, the words used in a contract are to be understood in their ordinary and popular sense, unless used in a technical sense, or unless a special meaning is given to the term by usage, in which case the latter must be followed. *Id.* (citing Cal. Civ. Code. § 1644). Defendants then make reference to a Merriam-Webster dictionary entry defining "rout" as a "disturbance," as well as citing to the California Penal Code wherein "rout" is defined as occurring when two or more persons, assembled and acting together, make any attempt or advance toward the commission of an act which would be a riot if fully committed. Defs.' Mot. (dkt. 1217) at 3 (citing Cal. Pen. Code § 406). Defendants add that the prisoner for whom the RVR was submitted by Plaintiffs pleaded guilty to violating the code of conduct found in 15 Cal. Code. Reg. § 3005(d)(3), which prohibits participation in riots, routs, or unlawful assemblies. Def.'s Mot. (dkt. 1217) at 4.

In reply, Plaintiffs make much of the fact that "Defendants' incomplete and misleading citation to Merriam-Webster (which actually provides "disturbance" as the *fourth* definition for the noun "rout," after "a disorderly retreat" a "precipitate flight" and "a crowd of people") cannot supplant the definition section of CDCR's own regulations." Pls.' Rep. Br. (dkt. 1219) at 3 (emphasis in original). Notably, Plaintiffs contend that if CDCR views routs as attempted riots, "CDCR plainly violated the SA when it assessed [full] SHU terms for a completed riot, which carries twice the [length of] term as an attempt under Section 13 of the SHU Term Assessment

5

Chart." *Id*. at 5. Thus, it appears that Plaintiff's complaint as to the *length* of the SHU terms for rout activity, as opposed to their outright legality and permissibility under the SA, was presented for the first time in the Plaintiffs' Reply Brief. *See generally* Pls.' Mot. (dkt. 1215); and, Pls.' Rep. Br. (dkt. 1219) at 5.

"Rout" is not only a commonly used term with several meanings in both the verb and noun forms, all of which have an interesting etymological history; but, most importantly, "rout" is an important legal term with a prominent place in legal history and also in every legal dictionary ever produced in the English language. "Besides the current sense of disorderly retreat of a defeated army, rout (via Old French from Latin *rupta*, a detachment; *rumpere*, *ruptum*, to break) had a range of meanings." *See* Shipley, Joseph T., "A Dictionary of Early English," Littlefield, Adams & Co. (1963) at 565. Among this range of meanings is included that of a flock, a pack, or a number of persons or things. *See e.g.*, Chaucer, William, "The Canterbury Tales: The Knight's Tale" (1386) at Part 4, Lines 1635-36 ("And to the paleys rood ther many a route of lordes upon steedes and palfreys."). Indeed, the currently common usage of the word – that of a precipitate and disorderly retreat – did not develop until the end of the 16th century. *See* Shipley at 565; *see e.g.,* Shakespeare, William, "Cymbeline" (1611) at Act 5, Scene 3 ("Then began . . . a retire, anon a rout, confusion thick; forthwith they fly"). As to a more relevant meaning, as early as the 13th century, the word had developed an unfavorable connotation in signifying a disorderly or disreputable crowd, that is, a gathering of three or more persons with criminal intent. *See* Shipley at 545; *see also* Shakespeare, William, "Comedy of Errors," (1594) at Act 3, Scene 1 ("And that supposed by the common rout against your yet ungalled estimation . . . ."). Incidentally, from this sense of the word – a disreputable crowd – the term came to be used, by humor, in the 18th and 19th centuries as a common word for fashionable gatherings or large evening parties. *See* Shipley at 565.

In the law, the term has been used to signify a specific category of public disturbance from at least 1553 when it was legislated upon. *See e.g.*, 1 Mar. Sess. 2, c. 12. Based on this legislative enactment during the reign of Queen Mary, an early legal lexicographer of the English language defined "rout" as such: "[r]out is when people assemble themselves together, and after proceed, or

6

ride, or go forth, or move by the instigation of one or more, who is their leader. This is called a rout because they move and proceed in routs and numbers." Rastell, John, "Les Termes de la Ley," W. Rawlins et al (1685) at 603. Rastell's entry for rout goes on to add that "[a]lso, where many assemble upon their own quarrels and brawls; as if the inhabitants of a town mill gather together to break hedges, walls, ditches, pales, or such like, to have common there, or to beat another that hath done them a common displeasure, or such like; that is a rout, and against the law, although they have not done or put in execution their mischievous intent." *Id*. (citing 1 Mar. Sess. 2, c. 12). Likewise, in 1644, Lord Coke distinguished riots, routs, and unlawful assemblies. Coke defined riots as happening in the common law "when three or more doe any unlawful act, as to beat any man, or to hunt in his park, chase, or warren, or to enter or take possession of another man's land, or to cut or destroy corn, grasse, or other profit, &c." *See* 3 Inst. 175-76. He defined routs as happening "when three or more do any unlawfull act for their own, or the common quarrel . . . as when commoners break down hedges or pales, or cast down ditches, or inhabitants for a way claimed by them, or the like." *Id*. Coke defined unlawful assembly as "when three or more assemble themselves together to commit a riot or rout, and doe it not." *Id*. More than a century later, in his Commentaries on the Laws of England, Blackstone defined unlawful assemblies as "where three or more do assemble themselves together to do an unlawful act . . . and part without doing it, or making any motion towards it." 4 Bl. Comm. 176. On the other hand, Blackstone defined rout as "where three or more meet to do an unlawful act upon a common quarrel . . . and make some advances towards it." *Id*. Lastly, Blackstone defined riot as "where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel . . . or even do a lawful act, such as removing a nuisance, in a violent and tumultuous manner." *Id*. Thus, Defendants' reliance on the current edition of Merriam-Webster's dictionary, giving a secondary definition for the noun, "rout," as a "disturbance,"[1] is well placed; and Plaintiffs' suggestion that the definition is "obscure" is without merit. Because riots, routs, unlawful assemblies, affrays (public fighting), tumultuous petitioning, and other forms and manners of breaching the peace

---

[1] *See* https://www.merriam-webster.com/dictionary/rout

7

have always been considered broadly as offenses against the public peace, it makes perfect sense for a modern non-legal dictionary to merely include the word "disturbance" when describing the effect of a rout as it pertains to the public peace, namely, a disturbance. *See e.g.,* 4 Bl. Comm. 142-153; *see also* Title 15 Cal. Pen. Code ("Of Crimes Against the Public Peace").

Modernly, the California Legislature has defined each of these three offenses – defining rout as such: "[w]henever two or more persons, assembled and acting together, make any attempt or advance toward the commission of an act which would be a riot if actually committed, such assembly is a rout." Cal. Pen. Code. § 406. In turn, California defines the term riot as "[a]ny use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot." Cal. Pen. Code § 404(a). Further, it is specifically noted that "[a]s used in this section, disturbing the public peace may occur in any place of confinement . . . any state prison, county jail, industrial farm, or road camp, or any city jail . . . ." Cal. Pen. Code § 404(b). Lastly, the California Legislature has defined unlawful assembly as "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner." Cal. Pen. Code § 407. For present purposes, under California law, "riot" is broadly defined as two or more people, acting together and without authority of law, in either (1) disturbing the public peace, or (2) using or threatening force or violence. Cal. Pen. Code § 404(a). Thus, if two or more persons, assembled and acting together, make any attempt, or advance toward the commission of an act which would be either a disturbance of the peace or constitute the use or threatened use of force or violence if completed – in California, that assembly is a rout. *See* Cal. Pen. Code § 406.

The SHU-Chart provides that given an STG-nexus, participating in a "disturbance," "riot," or "strike" is a SHU-eligible offense. While Plaintiffs argue that routs were not specifically listed along with disturbances, riots, and strikes, therefore rendering routs categorically ineligible for SHU term assessments; the flaw in Plaintiffs' argument became unavoidable when Plaintiffs' counsel had no answer when the court asked for an explanation of the meaning of the word "disturbance" – a negotiated and bargained-for term that was included in the Parties' Settlement

8

Agreement as a SHU-eligible offense in the SHU-Chart. Meanwhile, Defendants point to the Merriam-Webster dictionary entry for rout, and therein the word "disturbance" appears. Obviously, not every form of conceivable disturbance was contemplated by the SA's inclusion of the word "disturbance" in the SHU-Chart. A great many things could constitute a disturbance; for example, 5 people laughing loudly (laughter with an STG-nexus) in a library or a chapel would constitute a serious disturbance, but no one would suggest this is the sort of disturbance that the Parties contemplated as being SHU-eligible. The clear meaning for the separate inclusion of the word "disturbance," along with "riot" and "strike," in the SHU-Chart was to make SHU-eligible offenses out of other collectively-committed and STG-related offenses against the public peace (such as routs). Once again, the court notes that the present task is not the gleaning of some murky or arcane legislative intent; instead, the court is tasked with determining whether or not the SA has been breached by the imposition of a SHU term for rout activity under an agreement that permits SHU terms for "disturbances, riots, and strikes." The court finds that the SA has not been breached in this regard. While Plaintiffs' counsel noted at oral argument that a "disturbance" would have to involve something more than a rout, some additional level of activity or of intent on the part of the individuals who are charged, counsel did not explain any further or refer to any authority for such a proposition. Accordingly, the court finds that rout activity – in particular the rout activity described herein (which may have even constituted a riot under California law) – is exactly the sort of "disturbance" against the public peace that was contemplated by the Parties' inclusion of the word "disturbance" in the SHU-Chart.

Lastly, in their reply brief, Plaintiffs contend for the first time that if CDCR views routs as attempted riots, "CDCR plainly violated the SA when it assessed [full] SHU terms for a completed riot, which carries twice the [length of] term as an attempt under Section 13 of the SHU Term Assessment Chart." *See* Pls.' Rep. Br. (dkt. 1219) at 5. As mentioned, this argument was not presented in Plaintiffs' Motion (*see generally* dkt. 1215); accordingly, the court will not consider it. *See Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief."); *see also In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1035 (N.D. Cal. 2014) ("arguments raised for

the first time in reply briefs are waived"); *Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990) (parties "cannot raise a new issue for the first time in their reply briefs"); *Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief."). If Plaintiffs wish to present that argument in a new enforcement motion, they are free to do so, however, prior to any such filing the Parties are ordered to meet and confer in light of the guidance provided herein.

## CONCLUSION

Accordingly, Plaintiffs' enforcement motion (dkt. 1215) is **DENIED**.

**IT IS SO ORDERED.**

Dated: December 18, 2019

ROBERT M. ILLMAN
United States Magistrate Judge