ROB BONTA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General
SARAH M. BRATTIN
Deputy Attorney General
State Bar No. 302043
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7321
  Fax:  (916) 324-5205
  E-mail:  Sarah.Brattin@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **TODD ASHKER, et al.,** | 4:09-cv-05796-CW (RMI) |
| Plaintiffs, | **DEFENDANTS' NOTICE OF APPEAL** |
| v. | |
| **GOVERNOR OF THE STATE OF CALIFORNIA, et al.,** | Judge:        The Honorable Claudia Wilken<br>Action Filed:  December 9, 2009 |
| Defendants. | |

**TO PLAINTIFFS AND THEIR COUNSEL RECORD:**

PLEASE TAKE NOTICE THAT Defendants Newsom, Cate, Lewis, and Chaus appeal to the Ninth Circuit Court of Appeals the order entered April 9, 2021 (ECF No. 1440), a copy of which is attached as exhibit 1.

//

//

//

1

Defs.' Notice of Appeal (4:09-cv-05796-CW (RMI))

1        As required by Ninth Circuit Local Rule 3-2, Defendants' Representation Statement is

2   attached as exhibit 2.

3   Dated:  May 7, 2021                        Respectfully submitted,

4                                              ROB BONTA
                                               Attorney General of California
5                                              ADRIANO HRVATIN
                                               Supervising Deputy Attorney General
6

7

8                                              /s/ Sarah M. Brattin
                                               SARAH M. BRATTIN
9                                              Deputy Attorney General
                                               Attorneys for Defendants
10  SF2012204868/42673038.docx

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# Exhibit 1

1

2

3                    IN THE UNITED STATES DISTRICT COURT

4                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6    TODD ASHKER, et al.,                   Case No. 09-cv-05796 CW

7              Plaintiffs,
                                            ORDER EXTENDING THE
8         v.                                SETTLEMENT AGREEMENT

9    GAVIN NEWSOM, et al.,                  (Re: Dkt. Nos. 1345, 1363)

10             Defendants.

11

12        This class action for violations of 42 U.S.C. § 1983 arises

13   out of the placement and indefinite retention of inmates by the

14   California Department of Corrections and Rehabilitation (CDCR) in

15   solitary confinement in Security Housing Units (SHU) on the basis

16   of so-called gang validation.  Plaintiffs, inmates in California

17   prisons, some of whom have been in solitary confinement for more

18   than ten years, bring this class action against Defendants, the

19   Governor of the State of California, the Secretary of CDCR, the

20   Chief of CDCR's Office of Correctional Safety, and the Warden of

21   Pelican Bay State Prison, for violations of their Eighth and

22   Fourteenth Amendment rights.

23        The parties entered into a settlement agreement (SA) in

24   August 2015, whose terms, and the Court's jurisdiction to enforce

25   the same, were set to expire in twenty-four months, unless

26   Plaintiffs showed, pursuant to paragraph 41 of the settlement

27   agreement, the existence of ongoing and systemic violations under

28   the Eighth Amendment or Fourteenth Amendment as alleged in the

United States District Court
Northern District of California

1   operative complaints or arising out of the SHU-related reforms

2   required by the settlement agreement.  At the end of the

3   settlement agreement's twenty-four-month term, Plaintiffs moved

4   for an extension, and the undersigned referred the motion to the

5   magistrate judge for a report and recommendation subject to de

6   novo review.  The magistrate judge found that Plaintiffs made the

7   requisite showing of ongoing and systemic violations, and he

8   recommends extending the settlement agreement, and along with it

9   the Court's jurisdiction over it, for twelve months.  See

10  Extension Order, Docket No. 1122.

11       Now pending are objections filed by both sides to the

12  magistrate judge's findings and recommendations.  The Court

13  reviews the magistrate judge's findings de novo and affirms his

14  findings in part and reverses them in part, as set forth below,

15  and it concludes that Plaintiffs have met their burden to show

16  that a twelve-month extension of the settlement agreement is

17  warranted under paragraph 41.

18                          BACKGROUND

19  I.   Claims and Procedural History

20       Plaintiffs Todd Ashker and Danny Troxell had lived in

21  solitary confinement in Pelican Bay's SHU for over two decades.

22  Compl. ¶¶ 16-18.  On December 9, 2009, they filed this lawsuit

23  challenging the conditions of their confinement.  Their pro se

24  complaint charged various CDCR officials with violating their

25  First, Fifth, Eighth, and Fourteenth Amendment rights.  Id. ¶ 8.

26       On September 10, 2012, after securing counsel, Ashker and

27  Troxell filed a second amended complaint (2AC) converting this

28  suit into a putative class action and joining eight other long-

                                2

United States District Court
Northern District of California

1  term SHU inmates as plaintiffs. 2AC ¶ 1, Docket No. 136.  In

2  their 2AC, Plaintiffs assert that lengthy exposure to the

3  conditions inside the Pelican Bay SHU violates the Eighth

4  Amendment's ban on cruel and unusual punishment.  Id. ¶¶ 177-92.

5  Specifically, they allege that "the cumulative effect of

6  extremely prolonged confinement, along with denial of the

7  opportunity of parole, the deprivation of earned credits, the

8  deprivation of good medical care, and other crushing conditions

9  of confinement at the Pelican Bay SHU" have caused them

10  significant harm, both physically and psychologically.  Id. ¶¶

11  180-81.  They claim that SHU inmates are forced to "languish,

12  typically alone, in a cramped, concrete, windowless cell, for 22

13  and one-half to 24 hours a day" without access to "telephone

14  calls, contact visits, and vocational, recreational or

15  educational programming."  Id. ¶ 3.

16      Plaintiffs also assert that CDCR's procedures for assigning

17  inmates to the SHU violate the Fourteenth Amendment's guarantee

18  of due process.  Id. ¶¶ 193-202.  According to Plaintiffs, CDCR

19  assigns inmates to the SHU based solely on their membership in or

20  association with prison gangs, without regard for the inmate's

21  "actual behavior."  Id. ¶¶ 91-92.  CDCR relies instead on the

22  word of confidential informants and various indicia such as

23  "gang-related art, tattoos, or written material" to determine

24  whether inmates are affiliated with a gang – a process known as

25  "gang validation."  Id. ¶ 92.  Inmates who have been validated as

26  gang members or associates are assigned to the SHU for an

27  indefinite term.  Id. ¶¶ 92-94.  Once inside the SHU, inmates

28  receive periodic reviews every six months to determine whether

3

they should be released into the prison's general population. Id. ¶¶ 96-97.  Plaintiffs allege that these reviews are essentially "meaningless," because they require inmates to "debrief" – that is, to renounce their membership in the gang and divulge the gang's secrets to prison officials - in order to secure release.  Id. ¶¶ 96-97, 7.  Plaintiffs contend that debriefing is not a viable option for most inmates, who either know no such secrets or believe that debriefing "places [them] and their families in significant danger of retaliation" from other prisoners or their associates outside.  Id. ¶ 7.  CDCR also conducts reviews of SHU inmates' gang affiliation status every six years to determine whether they are still "active" gang members or associates.  Id. ¶¶ 102-04.  As with the six-month reviews, however, Plaintiffs aver that this process typically only leads to the inmates' release from the SHU if inmates are willing to debrief.  Id.  Plaintiffs allege, in short, that they have effectively been denied "information about an actual path out of the SHU, besides debriefing."  Id. ¶ 117.  They allege that they "are entitled to meaningful notice of how they may alter their behavior to rejoin general population, as well as meaningful and timely periodic reviews to determine whether they still warrant detention in the SHU."  Id. ¶ 200.

Plaintiffs' 2AC seeks declaratory and injunctive relief.  In particular, Plaintiffs request "alleviation of the conditions of confinement" in the SHU, meaningful review of the continued need for solitary confinement of all inmates who have been in the SHU for over six months, and release from the SHU of every inmate who

4

United States District Court
Northern District of California

1 has spent over ten years there.  Id. at ¶¶ 45-46; 202.  They have

2 not asserted any claims for monetary damages.

3     Defendants moved to dismiss the complaint in December 2012.

4 The Court denied the motion in April 2013.  Docket No. 191.

5     On May 2, 2013, Plaintiffs moved for class certification

6 under Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2).

7 The motion remained pending for nearly a year at the parties'

8 request while they engaged in settlement negotiations.  On May

9 14, 2014, however, the parties notified the Court that they were

10 not able to reach a settlement.  On June 2, 2014, the Court

11 granted in part and denied in part Plaintiffs' motion for class

12 certification.  The Court certified two classes under Rules

13 23(b)(1) and 23(b)(2): (1) a Due Process Class comprised of all

14 inmates who are assigned to an indeterminate term at the Pelican

15 Bay SHU on the basis of gang validation, under the policies and

16 procedures in place as of September 10, 2012; and (2) an Eighth

17 Amendment Class comprised of all inmates who are now, or will be

18 in the future, assigned to the Pelican Bay SHU for a period of

19 more than ten continuous years.  Order at 21, Docket No. 317.

20     On October 17, 2014, CDCR permanently implemented the

21 Security Threat Group (STG) policy, first piloted in October 2012.

22 See 15 Cal. Code Regs. § 3000, et seq.; Settlement Agreement ¶ 6,

23 Docket No. 424-2.  This policy alters aspects of CDCR's gang

24 validation process and its practice of imposing indeterminate

25 terms in Pelican Bay's SHU.  The STG policy, in part, allows

26 Pelican Bay's SHU inmates to "step down" from the most restrictive

27 placement in the SHU to less restrictive housing conditions,

28 provided that the inmates fulfill certain obligations.

United States District Court
Northern District of California

1   On March 9, 2015, the Court granted Plaintiffs' motion to
2   file a supplemental complaint, which alleges an additional Eighth
3   Amendment claim on behalf of a putative class of gang-validated
4   inmates who were housed at Pelican Bay's SHU for more than ten
5   years and who have been or will be transferred, under the Step
6   Down Program, to a SHU at another CDCR facility.  Order, Docket
7   No. 387; Supp. Compl., Docket No. 388.  In this pleading,
8   Plaintiffs allege that their prolonged placement in any
9   combination of SHUs constitutes cruel and unusual punishment.
10  The Court ruled that the new allegations in the Supplemental
11  Complaint would not be litigated until after the conclusion of
12  the trial based on the 2AC allegations.  Order at 11, Docket No.
13  387; Order, Docket No. 393.

14      On September 2, 2015, the parties jointly moved for
15  preliminary approval of a settlement agreement that would resolve
16  all claims in the 2AC and the Supplemental Complaint.  The Court
17  granted preliminary approval to the settlement agreement on
18  October 14, 2015, and it granted final approval on January 26,
19  2016.  Docket Nos. 445, 488.  In accordance with the settlement
20  agreement, the Court retained jurisdiction to enforce it.  Docket
21  No. 488 at 2.

22  II.  Relevant Terms of the Settlement Agreement

23      The key terms of the settlement agreement, as relevant to
24  the present motion, include the following: (1) requiring CDCR to
25  no longer place inmates in any SHU or administrative segregation
26  solely on the basis of gang validation; (2) requiring that no
27  inmates be placed in the SHU for a disciplinary term unless they
28  are found guilty in a disciplinary hearing of a new SHU-eligible

6

offense; (3) requiring the creation of the Restrictive Custody General Population Unit (RCGP), in which inmates released from the SHU pursuant to the terms of the settlement agreement shall be placed if there is a substantial threat to their personal safety; (4) requiring the Institution Classification Committee (ICC) to review the placement of inmates in the RCGP during its 180-day reviews by verifying whether there continues to be a demonstrated threat to the inmates' personal safety and, if not, referring the inmates to the Departmental Review Board (DRB) for housing placement; (5) requiring CDCR to adhere to the standards for the use of and reliance on confidential information set forth in Title 15 of the California Code of Regulations, section 3321, and to train staff to ensure that confidential information used against inmates "is accurate"; and (6) requiring CDCR to produce to Plaintiffs, for monitoring purposes, documents relating to determinations as to whether class member have been found "guilty of a SHU-eligible offense," including "redacted confidential information." See SA ¶¶ 13-37, Docket No. 424-2.

Paragraph 41 of the settlement agreement permits Plaintiffs to seek an extension of the agreement and the Court's jurisdiction over this matter of not more than twelve months; to obtain the extension, Plaintiffs must demonstrate "by a preponderance of the evidence" that current and ongoing systemic violations of the Eighth or Fourteenth Amendments occur as alleged in the Second Amended Complaint, or the Supplemental Complaint, or as a result of CDCR's reforms to its Step Down Program or the SHU policies contemplated in the agreement. Id. ¶ 41. In the event that an extension beyond the initial twenty-

7

United States District Court
Northern District of California

1  four months is granted, CDCR's obligations with respect to the

2  production of documents would be extended for the same period.

3  Id. ¶ 44.  In the absence of this showing, the settlement

4  agreement and the Court's jurisdiction "shall automatically

5  terminate[.]"  Id. ¶ 41.  The agreement permits Plaintiffs to

6  seek to extend indefinitely the settlement agreement and the

7  Court's jurisdiction so long as they make the requisite showing

8  just described, with each extension lasting no more than twelve

9  months.  Id. ¶ 43.

10 III. Motion to Extend the Settlement Agreement

11      On November 20, 2017, Plaintiffs moved for an extension of

12 the settlement agreement under paragraph 41 on the basis of

13 current and ongoing systemic violations of the Due Process Clause

14 of the Fourteenth Amendment.  Docket No. 898-4.  Plaintiffs

15 advanced three independent categories of due process violations,

16 with each being sufficient to warrant an extension: (1)

17 Defendants' ongoing and systemic misuse of, and lack of accurate

18 disclosures regarding, confidential information; (2) Defendants'

19 ongoing and systemic failure to provide adequate procedural

20 protections prior to the placement and retention of class members

21 in the RCGP based on demonstrated threats to inmates' personal

22 safety; and (3) Defendants' ongoing and systemic retention and

23 use of old gang validations for parole purposes.  Id. at 1.

24 Defendants opposed the motion.

25      The undersigned referred the motion to the magistrate judge

26 and, on January 25, 2019, that judge granted Plaintiffs' motion

27 to extend the settlement agreement, finding that Plaintiffs had

28 satisfied their burden under paragraph 41 based on two of the

three types of due process violations they advanced in their

motion.  Docket No. 1122.  Specifically, the magistrate judge

found that Plaintiffs showed by a preponderance of the evidence

that ongoing and systemic due process violations existed as a

result of: (1) Defendants' misuse of, and lack of sufficient

disclosures regarding, confidential information; and (2)

Defendants' retention and use of old gang validations for parole

purposes.  Extension Order at 26, Docket No. 1122.  The

magistrate judge further found that these systemic violations

were alleged in the 2AC or were the result of the reforms to SHU

policies and practices required by the settlement agreement and,

as such, they constituted proper bases for extending the

settlement agreement.  Id.  The magistrate judge found that

Plaintiffs had shown that class members have a liberty interest

in avoiding RCGP placement, but that Plaintiffs had not shown by

a preponderance of the evidence that Defendants had engaged in

ongoing and systemic due process violations in connection with

the placement and retention of class members in the RCGP based on

concerns for their personal safety.

The parties agreed to take the position that the magistrate

judge's order on Plaintiffs' extension motion would be a "final

order subject to appellate review[.]"  Joint Notice at 2, Docket

No. 1129.  Defendants filed a notice of appeal to the Ninth

Circuit on February 6, 2019, and Plaintiffs filed a notice of a

cross-appeal on February 25, 2019.  Docket Nos. 1126, 1130, 1131.

On August 3, 2020, the Ninth Circuit held that the

magistrate judge's order on Plaintiffs' extension motion was not

a final order under 28 U.S.C. § 636(c)(1).  Opinion, Docket No.

9

1309.  The court of appeals remanded the action to the
undersigned "to consider construing the magistrate judge's
extension order as a report and recommendation and afford the
parties reasonable time to file objections."  Id. at 17.

Consistent with the Ninth Circuit's opinion, the Court
construes the magistrate judge's order on Plaintiffs' extension
motion as a report and recommendation under 28 U.S.C.
§ 636(b)(1)(B).  The Court permitted both sides to file objections
to the report and recommendation.  The parties have objected to
all of the magistrate judge's findings.

LEGAL STANDARD

Where a district judge refers a matter to a magistrate judge
for a report and recommendation under 28 U.S.C. § 636(b)(1)(B),
the district court

> shall make a de novo determination of those
> portions of the report or specified proposed
> findings or recommendations to which
> objection is made.  A judge of the court may
> accept, reject, or modify, in whole or in
> part, the findings or recommendations made
> by the magistrate judge.  The judge may also
> receive further evidence or recommit the
> matter to the magistrate judge with
> instructions.

28 U.S.C. § 636(b)(1).

"The Fourteenth Amendment's Due Process Clause protects
persons against deprivations of life, liberty, or property; and
those who seek to invoke its procedural protection must establish
that one of these interests is at stake."  Wilkinson v. Austin,
545 U.S. 209, 221 (2005).  A court "need reach the question of
what process is due only if the [plaintiff] establish[es] a
constitutionally protected . . . interest."  Id.  If the

United States District Court
Northern District of California

1    plaintiff makes a showing that a cognizable interest is at stake,

2    the court then considers "the question of what due process is

3    due" to satisfy the Constitution.  Id.

4                              DISCUSSION

5        Each of the magistrate judge's findings and recommendations

6    with respect to all three of the categories of alleged violations

7    of due process that formed the basis of Plaintiffs' extension

8    motion are subject to an objection.  Specifically, Defendants

9    object to the magistrate judge's finding that Plaintiffs showed

10   ongoing and systemic violations of due process under the

11   Fourteenth Amendment (1) based on Defendants' alleged misuse and

12   insufficient disclosures of confidential information presented in

13   proceedings held to determine whether class members should be

14   sent to the SHU for disciplinary terms; and (2) based on their

15   retention of old gang validations that pre-dated the settlement

16   agreement, which were used or could have been used in determining

17   whether class members should be released on parole.  Plaintiffs

18   object to the magistrate judge's finding that they failed to show

19   ongoing and systemic due process violations based on Defendants'

20   alleged failure to provide adequate procedural protections to

21   class members prior to their placement or retention in the RCGP

22   in light of concerns for their personal safety.

23       Because the standard of review is de novo, the Court

24   considers the arguments and evidence presented to the magistrate

25   judge with respect to each of the three categories of alleged due

26   process violations that formed the basis of Plaintiffs' extension

27   motion as if no decision had been rendered by the magistrate

28   judge.  See Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009)

United States District Court
Northern District of California

("De novo review means that the reviewing court do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.") (citation and internal quotation marks omitted).

As noted, the settlement agreement can be extended by twelve months only if Plaintiffs show, by a preponderance of the evidence, that (1) "current and ongoing systemic violations of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment exist"; and (2) such violations "exist as alleged in Plaintiffs' Second Amended Complaint or Supplemental Complaint or as a result of CDCR's reforms to . . . the SHU policies contemplated by this Agreement."  SA ¶ 41.

Below, the Court evaluates each of the three categories of alleged due process violations that form the basis of Plaintiffs' extension motion by considering, first, whether each category of alleged due process violations would fall within the scope of the operative complaints or would "result" from the SHU reforms required by the settlement agreement.  If the answer is yes, the Court will then consider whether Plaintiffs have shown, by a preponderance of the evidence, that the alleged due process violations "exist" on a "current and ongoing systemic" basis. Only if the answer is yes to both of these inquiries can the due process violations in question serve a basis for extending the settlement agreement under paragraph 41.[1]

---

[1] Defendants cite several orders previously entered in this action in connection with motions brought by Plaintiffs to enforce various aspects of the settlement agreement, none of which involved alleged due process violations.  Defendants argue that these orders are relevant to the determination of Plaintiffs' extension motion and that Plaintiffs now seek to "re-

United States District Court
Northern District of California

1    The practices, procedures, and events discussed in this order

2 are those that were discussed in the parties' briefs in

3 connection with Plaintiffs' extension motion and that existed as

4 of the time the extension motion was briefed in 2017 and 2018.

5 The Court uses the qualifier "current" in this order to describe

6 them.

7 I.    RCGP Placement and Retention

8    Plaintiffs argue that Defendants are violating class

9 members' due process rights in an ongoing and systemic way by

10 placing or retaining them in the RGCP without adequate procedural

11 protections.  Plaintiffs argue that class members have a liberty

12 interest in avoiding placement or retention in the RCGP because

13 the conditions in the RCGP are considerably more restrictive and

14 onerous than those in the general prison population, and the

15 duration of class members' confinement therein is indeterminate.

16 Plaintiffs further contend that Defendants have failed to provide

17 class members with adequate procedural protections prior to

18 placing or retaining them in the RCGP, because Defendants have

19 not implemented the RCGP procedures set forth in the settlement

20 agreement in a "fair and meaningful way."  Docket No. 898-4 at 4,

21 30.  Specifically, Plaintiffs argue that Defendants fail to

22 provide inmates with meaningful and accurate notice about why

23 they are placed or retained in the RCGP, a meaningful hearing,

24

25 litigate" them.  The Court disagrees.  None of the orders (or the
   enforcement motions that gave rise to them) that Defendants cite
26 address or resolve the question at issue here, which is whether
   Plaintiffs have shown that an extension of the settlement
27 agreement is warranted under paragraph 41 based on ongoing and
   systemic due process violations.  Accordingly, the orders that
28 Defendants cite are irrelevant to the analysis here.

13

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and multiple levels of review for decisions to retain them in the
2  RCGP.

3      Defendants do not dispute that the RCGP placements about
4  which Plaintiffs complain are those of class members under
5  paragraph 27 of the settlement agreement.  Defendants argue that
6  Plaintiffs cannot show any due process violations arising out of
7  class members' placement or retention in the RCGP because inmates
8  with safety concerns do not have a liberty interest in avoiding
9  transfer to the RCGP and, even if they did have such a liberty
10 interest, the inmates placed in the RCGP received sufficient due
11 process in accordance with the procedures set forth in the
12 settlement agreement.

13      A.    Whether the alleged due process violations are within
             the scope of the complaints or settlement-agreement
14           reforms

15 Plaintiffs argue that the alleged violations of due process
16 arising from class members' placement or retention in the RCGP
17 can be a basis for extending the settlement agreement under
18 paragraph 41 because they exist "as a result of" the SHU reforms
19 required by the settlement agreement.

20      The settlement agreement required Defendants to modify their
21 SHU policies so that inmates who had been placed there prior to
22 the settlement agreement could be released from the SHU as soon
23 as possible pursuant to the terms of the agreement.  Paragraph 27
24 of the settlement agreement also required Defendants to establish
25 the RCGP to, in relevant part, house class members who, upon
26 their release from the SHU, are determined to face a substantial
27 threat to their personal safety if they were released to the
28 general prison population.  SA ¶ 27.  Once inmates are placed in

                                    14

United States District Court
Northern District of California

1   the RCGP for concerns for their safety, their RCGP placement must

2   be reviewed every 180 days by the ICC, and during each such

3   review, the ICC "shall verify whether there continues to be a

4   demonstrated threat to the inmate's personal safety."  Id.  If

5   such a threat is found, the prisoners will be retained in the

6   RCGP without further automatic review.  Id.  If the ICC finds

7   that such a threat no longer exists, the prisoners must be

8   referred to the DRB for a housing determination.  Id.

9        The Court finds that the due process violations that

10  Plaintiffs allege in connection with the RCGP arise out of the

11  reforms required by the settlement agreement, namely those

12  governing the placement and retention of class members in the

13  RCGP under paragraph 27, after their release from the SHU, on the

14  basis of threats to their safety.  Accordingly, the due process

15  violations that Plaintiffs allege can be a basis for extending

16  the settlement agreement under paragraph 41.

17       As noted, Defendants do not dispute that the placement and

18  retention of the prisoners discussed in Plaintiffs' extension

19  motion is governed by paragraph 27 of the settlement agreement.

20  Defendants argue that the alleged due process violations at issue

21  cannot serve as a reason for extending the settlement agreement

22  under paragraph 41 because Plaintiffs are precluded from arguing

23  that the very terms and procedures for RCGP placement and

24  retention to which they agreed violate due process.

25       Defendants misapprehend the nature of the due process

26  violations about which Plaintiffs now complain, which arise from

27  the way in which Defendants are implementing the reforms to which

28  the parties agreed.  The purpose of paragraph 41 is to allow

15

United States District Court
Northern District of California

1 Plaintiffs to seek an extension of the settlement agreement based

2 on due process violations that may arise out of the reforms

3 required by the settlement agreement, including the

4 implementation of the reforms.  The due process violations at

5 issue, therefore, fall squarely within the scope of paragraph 41.

6      B.   Whether the alleged due process violations exist on an
          ongoing and systemic basis
7

8           1.   Liberty interest

9      The Court first considers whether Plaintiffs have shown that

10 prisoners have a liberty interest in avoiding placement or

11 retention in the RCGP.  The parties agree that this analysis is

12 governed by Sandin v. Conner, 515 U.S. 472 (1995).

13     In Sandin, the Supreme Court held that prisoners could

14 establish a liberty interest in avoiding certain prison conditions

15 if they show that such conditions "impose[] atypical and

16 significant hardship on the inmate in relation to the ordinary

17 incidents of prison life." Id. at 484.  Sandin, therefore,

18 requires a comparison between the conditions of the confinement at

19 issue (here, the conditions in the RCGP) relative to other

20 alternative conditions of confinement that represent "the ordinary

21 incidents of prison life."  Id.

22     Neither the Supreme Court nor the Ninth Circuit has defined

23 the prison conditions that are the appropriate basis for

24 comparison.  See Brown v. Oregon Dep't of Corr., 751 F.3d 983,

25 988 (9th Cir. 2014) ("We have noted that [t]he Sandin Court seems

26 to suggest that a major difference between the conditions for the

27 general prison population and the segregated population triggers

28 a right to a hearing, but have not clearly held that conditions

16

United States District Court
Northern District of California

in the general population, as opposed to those in other forms of administrative segregation or protective custody, form the appropriate baseline comparator.") (internal citation and quotation marks omitted).

The parties disagree as to what the alternative conditions of confinement that represent the "ordinary incidents of prison life" would be here.  Defendants argue that they are the conditions in "other high-security units," while Plaintiffs argue that they are the conditions in the general prison population.

The Court finds that the conditions in the general prison population are the appropriate basis for comparison relative to the conditions in the RCGP, because it is undisputed that class members who were placed in the RCGP because of concerns for their safety otherwise would have been placed in the general population following their release from the SHU.  This finding is consistent with Sandin, which provides that the relevant comparison is that "between inmates inside and outside" the segregation placement at issue.  See 515 U.S. at 486-87; see also Reyes v. Horel, No. C 08-4561 RMW, 2012 WL 762043, at *4 (N.D. Cal. Mar. 7, 2012) (holding that the proper comparison under Sandin is "between the conditions where the plaintiff is to be housed and where the general prison population is housed").  Accordingly, for the purpose of resolving Plaintiffs' extension motion, the Court considers whether the conditions in the RCGP impose "atypical and significant hardship" on prisoners relative to "the ordinary incidents of prison life" as experienced by prisoners in the general prison population.

1       Factors relevant to whether conditions impose atypical and

2   significant hardship on prisoners include: (1) the duration of

3   the conditions; (2) the degree of restraint imposed; and (3)

4   whether the state's action will affect the duration of the

5   inmate's sentence.  Sandin, 515 U.S. at 486-87.

6       Plaintiffs argue that class members have a liberty interest

7   in avoiding placement or retention in the RCGP under Sandin

8   because, relative to the conditions that prisoners experience in

9   the general population, the RCGP imposes atypical and significant

10  hardship on prisoners housed there because of (1) physical

11  restrictions, including minimal contact visits with family and

12  friends as a result of Defendants' prohibition on contact visits

13  during weekends for RCGP inmates, and the RCGP's remote location

14  in Pelican Bay in California, which makes it more difficult for

15  family and friends to travel there on weekdays; (2) limited

16  social interaction, as RCGP inmates' interactions are limited to

17  their programming group, each of which is comprised of only nine

18  to twelve prisoners; (3) limited job opportunities and limited

19  access to educational or rehabilitative programming, which in

20  turn impacts RCGP inmates' eligibility for telephone access,

21  family visits, and parole; (4) the duration of the placement,

22  which is indeterminate, as inmates can be deemed to have safety

23  concerns in perpetuity; (5) the stigma associated with being

24  placed in the RCGP, as other inmates target RCGP prisoners based

25  on the assumption that they committed a sex crime, a crime

26  against an elderly person, or broke an STG code or rule; and (6)

27

28

the potential for placement on walk-alone status while in the

RCGP.[2]  See Docket No. 898-4 at 31-38; Docket No. 1000-4 at 18-19.

Plaintiffs argue that the conditions in the RCGP are

substantially similar or worse than the conditions that the

District of Columbia Circuit recognized as giving rise to a

liberty interest in Aref v. Lynch, 833 F.3d 242, 256 (D.C. Cir.

2016).

In Aref, the court of appeals held that prisoners had a

liberty interest in avoiding placement in Communication

Management Units (CMU), which housed prisoners who required

heightened monitoring of their communications as a result of

having a history of, or propensity for, communications with

extremist groups or conducting illicit activities outside of the

prison.  Id. at 246.  The court of appeals found that the

defining aspect of the CMU was that prisoners held therein had

"more limited and less private communications compared to general

population inmates"; specifically, all visits with family had to

be non-contact, through a glass wall; all visits were live-

monitored and recorded; all written correspondence was inspected

and more limited in permissible quantity; and phone calls were

limited to immediate family members.  Id. at 246-47.

---

[2] Defendants argue that due process violations cannot be
established by virtue of the RCGP's location, or the level of
social interaction or employment that RCPG inmates can have while
in the RCGP.  This argument is misplaced.  Plaintiffs are not
attempting to establish due process violations by showing that
the location of the RCGP is remote, or that RCGP inmates do not
receive enough social interaction or employment opportunities.
Plaintiffs address these circumstances only in the context of
whether prisoners have a liberty interest in avoiding the RCGP.

1     The court of appeals further found that prisoners housed in
2  CMU experienced "significantly less deprivation" than prisoners
3  held in administrative segregation[3], because, unlike prisoners in
4  administrative segregation, CMU prisoners were allowed spaces
5  with other CMU inmates for sixteen hours a day; they had access
6  to educational and professional opportunities; they could keep as
7  many possessions as inmates in the general population; they had
8  no added restrictions on exercise; and they were allowed more
9  phone calls and visits than prisoners in administrative
10 segregation.  Id. at 257.  Indeed, other than the restrictions
11 affecting visits and calls with family and visitors, the CMU
12 "essentially function[ed] as self-contained general population
13 housing unit[s]."  Id. at 247 (citation and internal quotation
14 marks omitted).  Nevertheless, the court of appeals found that
15 the indefinite length of CMU placement, which could be permanent,
16 in combination with the unusual restrictions on visits and other
17 contacts with family and other visitors, weighed in favor of
18 finding that prisoners had a liberty interest in avoiding
19 placement in the CMU.  The court of appeals reasoned that, even
20 though the deprivations in the CMU were "not extreme," they would
21 necessarily "increase in severity over time," as it would become
22 increasingly difficult for prisoners to maintain relationships
23 with family members and others as the length of their confinement
24 in the CMU increased.  Id.

25
26 _____
27     [3] In the District of Columbia Circuit, courts compare the
   challenged conditions to the conditions in administrative
28 segregation, and not the conditions in the general prison
   population.  See Aref, 833 F.3d at 254.

United States District Court
Northern District of California

1    The conditions in the RCGP, when considered in combination,

2  are even more restrictive than those that the District of

3  Columbia Circuit held gave rise to a liberty interest in <u>Aref</u>.

4    First, Plaintiffs showed, and Defendants did not dispute,

5  that RCGP inmates' contact visits are limited to weekdays,

6  whereas the same is not true for inmates in the general

7  population at Pelican Bay.  This undisputed limitation on contact

8  visits, which is atypical relative to inmates in the general

9  population, has resulted in very limited contact visits for RCGP

10  inmates in light of the fact that Pelican Bay is located in a

11  remote part of California.  The Court is persuaded, as a matter

12  of common sense, that the ban on weekend contact visits for RCGP

13  inmates makes it less feasible for family and friends who live in

14  other parts of California to make the trip to Pelican Bay.

15  Second, Plaintiffs showed, and Defendants did not meaningfully

16  dispute[4], that class members' placement in the RCGP is

17  indeterminate, because it is not clear when the threats to class

18  members' safety will be deemed to no longer exist.  These two

19  conditions, when considered in combination, impose on prisoners

20  an atypical and significant hardship relative to the general

21  prison population that is materially similar to that which gave

22  rise to a liberty interest in <u>Aref</u>.  These two conditions,

23

24

25    [4] Defendants argue that placement in RCGP is not
26  indeterminate because paragraph 27 of the settlement agreement
    provides that inmates can be released if the ICC determines that
27  the threat to the inmates' safety no longer exists.  Defendants
    miss the point.  Placement in the RCGP is indeterminate because
28  neither the prisoners nor the prison know in advance when the
    threat to the prisoners' safety will no longer exist.

21

United States District Court
Northern District of California

therefore, are sufficient to support a finding that prisoners have a liberty interest in avoiding RCGP placement under <u>Aref</u>.

Third, RCGP inmates can be placed on walk-alone status for some, if not all, of their time in the RCGP.  This constitutes a third factor that, when combined with the two others, supports a finding that prisoners are subject to conditions that are more restrictive and onerous than those that gave rise to a liberty interest in <u>Aref</u>.  Defendants did not dispute that prisoners are placed on walk-alone status during "an orientation and observation period" upon their placement in the RCGP and can remain on walk-alone status for as long as they are in the RCGP if the ICC determines that they cannot program safely with other inmates.  <u>See</u> Docket No. 985-7 at 22.  It is also undisputed that the proportion of RCGP inmates on walk-alone status has increased over time, with the majority of RCGP inmates now on walk-alone status.  Berg Decl. ¶¶ 5-9; <u>see also</u> Docket No. 1000-4 at 18-19. Prisoners on walk-alone status cannot socialize or program with other RCGP prisoners in compatible groups, like RCGP inmates who are not on walk-alone status can.  <u>Id.</u>  In other words, the programming and socializing that Defendants contend makes being in the RCGP substantially similar to being in the general population are diminished or essentially non-existent for inmates on walk-alone status.  Plaintiffs showed, and Defendants did not dispute, that diminished opportunities for programming, in turn, can negatively impact inmates' eligibility for parole, <u>see</u> Docket No. 1004-4 at 26-27, which in turn can lengthen the duration of inmates' sentences.

United States District Court
Northern District of California

1    Defendants attempt to distinguish <u>Aref</u> on the basis that the

2  prisoners were placed in the CMU because of suspected terrorism,

3  whereas here the prisoners' placement in the RCGP is based on

4  concerns for their safety.  <u>See</u> Docket No. 985-7 at 25 n.10.

5  Defendants do not explain why this purported distinction would

6  affect the liberty-interest analysis.  The placements here, as

7  well as those in <u>Aref</u>, were made for administrative reasons, as

8  opposed to disciplinary reasons.  They are, therefore, similar in

9  the way that matters.

10    Defendants also argue that RCGP is "less restrictive than

11  administrative segregation" as a result of the conditions and

12  programming opportunities available to RCGP inmates[5], and that any

13

14        [5] Under paragraph 27 of the settlement agreement, inmates
15  placed in the RCGP have the right to the following programming
    and privileges:

16
            Programming for those inmates transferred to
17          or retained in the RCGP will be designed to
            provide increased opportunities for positive
18          social interaction with other prisoners and
            staff, including but not limited to:
19          Alternative Education Program and/or small
            group education opportunities; yard/out of
20          cell time commensurate with Level IV GP in
            small group yards, in groups as determined
21          by the Institution Classification Committee;
            access to religious services; support
22          services job assignments for eligible
            inmates as they become available; and
23          leisure time activity groups.  Contact
            visiting shall be limited to immediate
24          family and visitors who have been pre-
            approved in accordance with existing Title
25          15 visiting regulations, and shall occur on
            the schedule set forth in Attachment A.
26          Other privileges provided in the RCGP are
            also set forth in Attachment A.  CDCR policy
27          is that inmate movement, programming, and
            contact visits within the RCGP shall not
28          require the application of mechanical
            restraints; any application of restraints

                              23

restrictions imposed on RCGP inmates are necessary to keep them safe.  <u>See</u> Docket No. 985-7 at 22-23.  The Court is not persuaded.  First, the availability of programming opportunities does not impact the fact that the minimal opportunities for contact visits for RCGP inmates, the indeterminate nature of the confinement in the RCGP, and the possibility of placement on walk-alone status, in combination, are more than sufficient under <u>Aref</u> to find a liberty interest.  The inmates placed in the CMU in <u>Aref</u> likewise had access to programming opportunities; the District of Columbia Circuit nevertheless held that inmates had a liberty interest in avoiding placement in the CMU for the reasons discussed above.  Second, whether any of the aforementioned restrictions are necessary to keep RCGP inmates safe is irrelevant to the liberty interest analysis.  <u>See</u> <u>Wilkinson</u>, 545 U.S. at 224 (holding that the "necessity" of "harsh conditions" is irrelevant to the consideration of whether such conditions "give rise to a liberty interest in their avoidance").

Accordingly, the Court finds that Plaintiffs have shown that prisoners have a liberty interest in avoiding placement or retention in the RCGP, as in <u>Aref,</u> in light of the diminished opportunities for contact visits while in the RCGP relative to the general prison population, in combination with the indeterminate duration of placement in the RCGP, and the possibility of placement on walk-alone status while in the RCGP.

shall be in accordance with existing Title 15, section 3268.2.

24

United States District Court
Northern District of California

2.   Constitutional sufficiency of procedures

Having determined that class members have a liberty interest in avoiding placement or retention in the RCGP, the Court now turns to the question of what process is due to inmates whom Defendants seek to place or retain in the RCGP under paragraph 27.

Because the requirements of due process are "flexible and cal[l] for such procedural protections as the particular situation demands," the Supreme Court has "declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." Wilkinson, 545 U.S. at 224-25 (citations and internal quotation marks omitted).  This framework, established in Mathews v. Eldridge, 424 U.S. 319 (1976), requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Wilkinson, 545 U.S. at 224-25 (quoting Mathews, 424 U.S. at 335).

Placement in the RCGP based on concerns for class members' safety under paragraph 27 is administrative, not disciplinary. Where that is the case, the State's interest, which is the third of the Mathews factors, becomes "a dominant consideration" in determining whether the procedures in place are Constitutionally sufficient.  Accordingly, in light of the significant weight that must be accorded to the State's interest in this context, the procedures to be followed before placing inmates in administrative

25

segregation need not be "formal, adversary-type procedures" such
as those required in the context of disciplinary segregation;
instead, they can be "informal, nonadversary procedures" such as
those set forth in Hewitt v. Helms, 459 U.S. 460, 473-76 (1983),
abrogated in part on other grounds in Sandin, 515 U.S. at 472.
These informal, nonadversary procedures include notice of the
reason for placement, an opportunity to be heard, and periodic
review.  Id.

Plaintiffs argue that Defendants are violating class
members' due process rights in connection with their placement or
retention in the RCGP under paragraph 27 because Defendants do
not follow, or have not meaningfully implemented, the procedures
set forth in paragraph 27 of the settlement agreement and are
thereby depriving inmates of notice of the reason for RCGP
placement or retention and meaningful periodic review.  As noted
above, paragraph 27 provides the DRB with the discretion to house
inmates in the RCGP instead of in the general population if it
determines that there are threats to their personal safety.  SA ¶
27.  The settlement agreement further requires the ICC to
consider the placement during its 180-day reviews by verifying
whether there continues to be a demonstrated threat to the
inmates' personal safety; if not, the inmates must be referred to
the DRB for a housing determination.  Id.

Plaintiffs argue that Defendants fail to provide inmates
with meaningful notice of the reason for RCGP placement or
retention because, even though RCGP placement based on paragraph
27 should be made only if there are threats to the security of
the inmate, the DRB and the ICC "often consider factors in the

United States District Court
Northern District of California

RCGP reviews that are irrelevant to the existence of a safety threat [to the prisoner], or simply use the wrong standard." Docket No. 898-4 at 42.  For example, Plaintiffs' evidence showed that Defendants have relied on findings that releasing prisoners to the general population would pose a threat to the safety of the institution even though paragraph 27 does not contemplate the safety of the institution as a reason for keeping prisoners in the RCGP.  Id.; Bremer Decl., Ex. N, M.  Rather, under paragraph 27, it is the safety of the prisoners that is the relevant consideration.  Plaintiffs' evidence also showed that Defendants failed to provide inmates with accurate notice of how to gain release from the RCGP under paragraph 27.  Plaintiffs' evidence showed that CDCR told prisoners that participating in programming and remaining incident-free for six months would result in transfer out of the RCGP, Docket No. 898-4 at 43; Bremer Decl., Ex. A, B, F, J, K, which is inconsistent with paragraph 27, which permits Defendants to retain inmates in the RCGP only if the ICC verifies that "there continues to be a demonstrated threat to the inmate's personal safety," SA ¶ 27.

Plaintiffs next argue that Defendants failed to provide inmates with meaningful periodic review of their RCGP placement because the ICC has failed to verify during the 180-day reviews that a demonstrated threat to inmates' safety continues to exist. Plaintiffs' evidence showed that, instead of evaluating whether a safety concern continues to exist, the ICC operates under what appears to be a presumption that historical threats to prisoners' safety continue to exist in the absence of affirmative evidence

that the threats have abated.  Docket No. 898-4 at 42; Bremer
Decl., Ex. N.  This is also contrary to paragraph 27.

 Plaintiffs contend that Defendants' failure to provide
prisoners with adequate notice and meaningful periodic review
creates a high risk of erroneous placement or retention in the
RCGP, particularly because no further automatic review is
required under paragraph 27 if the ICC or DRB decides to retain
prisoners in the RCGP.  Docket No. 898-4 at 43-45.

 Defendants do not dispute that the placement or retention of
the prisoners discussed in Plaintiffs' extension motion is
governed by paragraph 27 and that such placement or retention
should have been on the basis of existing threats to their safety
only.  Further, Defendants do not meaningfully address, much less
dispute, any of the specific incidents described by Plaintiffs in
their extension motion, thereby implicitly conceding that they
failed to provide meaningful notice to prisoners of the reasons
for RCGP placement and retention and meaningful periodic review of
RCGP retention.  See Docket No. 985-7 at 29-30.

 In light of the absence of a dispute with respect to the
incidents that Plaintiffs have described, the Court finds that
Plaintiffs have shown that Defendants have failed to provide
prisoners meaningful notice of the reason for RCGP placement and
retention and meaningful periodic review.

 Wilkinson, 545 U.S. at 221, illustrates why these failings by
Defendants support a finding that the current procedures for
placing and retaining inmates in the RCGP pursuant to paragraph
27, as implemented, are Constitutionally insufficient.

In that case, the Supreme Court considered whether Ohio's procedures for placing and retaining inmates for administrative reasons in the Ohio State Penitentiary (OSP), a supermax facility, were adequate in providing prisoners with due process under Mathews.  The procedures required Ohio to (1) provide "written notice summarizing the conduct" triggering review for placement in the OSP; (2) provide the prisoner an opportunity to attend and offer a fair rebuttal at the hearing during which a Classification Committee evaluates whether the prisoner should be placed in the OSP; (3) provide "multiple levels of review for any decision recommending OSP placement, with the power to overturn the recommendation at each level"; and (4) provide a placement review within thirty days of the initial placement in the OSP, and an annual review thereafter.  545 U.S. at 223-26.

The Supreme Court held that these procedures were sufficient under the three-factor Mathews balancing test because (1) the inmates had a "more than minimal" interest in avoiding erroneous placement in the OSP (first Mathews factor); (2) the State's interest in ensuring prison security was a "dominant consideration" (third Mathews factor); and (3) the procedures in place created a low risk of erroneous placement in the OSP, in relevant part because the inmates received "notice of the factual basis" for OSP placement and a fair opportunity for rebuttal, because of the multiple levels of review for any decision recommending OSP placement, and because of the automatic thirty-day review following the initial OSP placement.  Id.

Here, in contrast to Wilkinson, and based on the undisputed incidents described above, the procedures currently in place, as

29

1    implemented, do not result in the provision of meaningful notice

2    of the reasons for RCGP placement or retention, or in the

3    provision of meaningful review of RCGP placement or retention.

4    Accordingly, the Court finds that the current procedures for

5    placing and retaining prisoners in the RCGP under paragraph 27, as

6    implemented, create a high risk[6] of erroneous RCGP placement or

7    retention and are therefore Constitutionally inadequate under

8    Mathews and Wilkinson.

9        Defendants argue, conclusorily, that no due process

10   violations exist because "CDCR is abiding" by the settlement

11   agreement and Plaintiffs agreed to the terms of the settlement

12   agreement.  However, it is undisputed that Defendants have failed

13   to provide meaningful notice to inmates of the basis for RCGP

14   placement or retention that is consistent with the terms of

15   paragraph 27, and to provide meaningful review of RCGP retention

16   as required by paragraph 27.  Further, Plaintiffs' alleged due

17   process violations arise out of Defendants' failure to

18   meaningfully implement paragraph 27, and such failures can give

19   rise to due process violations that would permit an extension of

20   the settlement agreement under paragraph 41.

21

22

23

---

24       [6] Plaintiffs showed, and Defendants did not dispute, that no
     further automatic review is required under paragraph 27 if the
25   ICC or DRB decides to retain prisoners in the RCGP.  The lack of
     automatic review as to determinations to keep prisoners in the
26   RCGP further increases the risk of erroneous RCGP retention.  Cf.
     Wilkinson, 545 U.S. at 223-26 (holding that procedures minimized
27   the risk of erroneous placement in the OSP in part because they
     required multiple levels of review for any decision recommending
28   OSP placement, in addition to the yearly review of OSP
     placement).

United States District Court
Northern District of California

1    Defendants next contend that Plaintiffs cannot show due

2    process violations by merely "disagree[ing] with CDCR's findings

3    regarding inmates' safety concerns," Docket No. 985-7 at 29.

4    This argument misapprehends the basis of the alleged due process

5    violations here.  Plaintiffs are not challenging the ultimate

6    <u>determinations</u> of the DRB or ICC with respect to whether security

7    concerns exist to place or keep class members in the RCGP under

8    paragraph 27; instead, Plaintiffs challenge the lack of

9    <u>procedural protections</u> afforded to class members in connection

10   with RCGP placement or retention, and the resultant risk of

11   erroneous RCGP placement or retention.

12       The Court finds, based on the foregoing, that Plaintiffs have

13   shown that the current procedures, as implemented, are

14   Constitutionally deficient under <u>Mathews</u> and that such

15   deficiencies give rise to ongoing and systemic due process

16   violations.  Accordingly, the settlement agreement can be extended

17   under paragraph 41 as a result of ongoing and systemic due process

18   violations arising out of class members' placement or retention in

19   the RCGP under paragraph 27.

20       As noted, the magistrate judge found that Plaintiffs had not

21   met their burden to show ongoing and systemic due process

22   violations arising out of RCGP placement or retention, but the

23   Court respectfully disagrees with that finding in light of the

24   undisputed evidence discussed above.

25   II.  Misuse of Confidential Information

26       Plaintiffs argue that ongoing and systemic due process

27   violations of class members' rights occur as a result of the way

28   in which Defendants disclose and rely upon confidential

information in connection with disciplinary proceedings that could lead to the placement of class members in the SHU for having committed a SHU-eligible offense.  Plaintiffs note that these disciplinary proceedings, and Defendants' use of confidential information therein, are governed by and arise from the reforms required by the settlement agreement.  Plaintiffs contend that the alleged due process violations at issue are of two types: (1) those arising out of Defendants' inaccurate or insufficient disclosure of confidential information used against class members in the proceedings, which deprived class members of the ability to mount a defense during their disciplinary hearings; and (2) those arising out of Defendants' reliance upon confidential information that Defendants failed to evaluate for reliability.  Plaintiffs explain that they discovered these alleged due process violations by reviewing the documents and information that Defendants are required to disclose to Plaintiffs for monitoring purposes under paragraph 37(h) of the settlement agreement.

Defendants argue that the alleged due process violations just described cannot be a basis for extending the settlement agreement under paragraph 41 because they are neither alleged in the 2AC nor the result of the SHU reforms required by the settlement agreement.  Defendants further argue that, even if the alleged due process violations at issue could serve as a basis to extend the settlement agreement under paragraph 41, Plaintiffs have not met their burden to show that the alleged violations amount to ongoing and systemic due process deprivations, because Plaintiffs' evidence shows, "at best, human error" in Defendants'

32

United States District Court
Northern District of California

disclosure and reliance upon confidential information, and because "[f]ailing to include every fact in a confidential disclosure form, and periodic errors in recording reliability determinations, does not constitute an ongoing, systemic due-process violation."  Docket No. 1345 at 4-5.

A.  Whether the alleged due process violations are within the scope of the complaints or settlement-agreement reforms

As noted, prior to the settlement agreement, placement in the SHU had been on the basis of gang validation status.  The settlement agreement modified the process for placing class members in the SHU by requiring that any such placement be based on a conviction for an SHU-eligible offense after a disciplinary hearing.  SA ¶¶ 13-17.  Paragraph 34 of the settlement agreement requires CDCR to comply with California regulations that govern the use and disclosure of confidential information and to train staff to ensure that confidential information used against inmates "is accurate."  Under paragraph 37(h), for monitoring purposes, Defendants are required to produce to Plaintiffs' counsel documents relating to determinations as to whether a class member has been found "guilty of a SHU-eligible offense," including "redacted confidential information."  SA ¶ 37(h).

Plaintiffs argue that the due process violations they allege with respect to Defendants' use of confidential information are a proper ground for extending the settlement agreement under paragraph 41 because they arise out of the reforms required by the portions of the settlement agreement just described.

The Court agrees.  By its plain terms, the settlement agreement requires Defendants to take certain steps to ensure

33

that confidential information used against inmates "is accurate" and in compliance with California regulations regulating the use and disclosure of confidential information. See SA ¶¶ 24, 34, 37(h). This would include the use of confidential information against inmates in connection with the disciplinary proceedings described in the settlement agreement, pursuant to which a class member can be found guilty of committing a SHU-eligible offense and placed in the SHU for a disciplinary term for that offense. Id. ¶¶ 13-17. Accordingly, any alleged violations of class members' due process rights that arise from Defendants' failure to comply with these requirements arise out of the SHU reforms contemplated by the settlement agreement, and therefore constitute a proper ground for extending the settlement agreement under paragraph 41.

Defendants argue that the alleged due process violations in question are not the result of the SHU policy changes that CDCR agreed to implement pursuant to the settlement agreement, because "there is no evidence that the reforms to the Step Down Program or SHU policies changed how CDCR handles confidential information." Docket No. 1345 at 4. This argument is unpersuasive. It ignores the provisions of the settlement agreement that require Defendants to train their staff to ensure that their use of confidential information "is accurate" and in compliance with the California regulations governing the use of confidential information. SA ¶ 34. It also ignores the provisions that require Defendants to produce, for monitoring purposes, documents to Plaintiffs' counsel about STG-eligible convictions, including any confidential information relied upon

34

United States District Court
Northern District of California

in "find[ing] the inmate guilty of the SHU-eligible offense." SA
¶ 37(h). Defendants' interpretation of the settlement agreement
gives no effect to these provisions, and is not viable for that
reason. Defendants do not explain why the settlement agreement
requires them to produce to Plaintiffs for monitoring purposes
documents containing confidential information relied upon during
disciplinary hearings if the settlement agreement had not
addressed their obligations as to the use of confidential
information in disciplinary hearings.

In light of the foregoing, the Court concludes that the
alleged due process violations in question result from the SHU-
related reforms required by the settlement agreement and can,
therefore, serve as a basis for extending the settlement
agreement under paragraph 41.

B.    Whether the alleged due process violations exist on an
      ongoing and systemic basis

1.    Liberty interest

The Court next considers whether class members have a
liberty interest in avoiding placement in the SHU.

This Court previously held when denying Defendants' motion
to dismiss that Plaintiffs had alleged a liberty interest in
avoiding placement in the SHU in light of Defendants' failure to
argue otherwise. See Docket No. 191 at 12. Defendants do not
contend at this juncture that Plaintiffs lack such an interest.
Accordingly, in light of Defendants' implicit concession that
prisoners do have such an interest, the Court concludes that
Plaintiffs have a liberty interest in avoiding disciplinary
placement in the SHU. See Zimmerlee v. Keeney, 831 F.2d 183, 186

United States District Court
Northern District of California

(9th Cir. 1987) ("The parties do not discuss and we assume that Zimmerlee has a protected liberty interest in not being subject to disciplinary segregation.").

>    2.    Constitutional sufficiency of procedures

The procedures required to satisfy due process when placing prisoners in segregation vary primarily depending on whether the segregation is for disciplinary purposes or administrative purposes. See Madrid v. Gomez, 889 F. Supp. 1146, 1272 (N.D. Cal. 1995) (noting that "the amount of process due depends, in significant part, on whether the prisoner's transfer to the SHU is characterized as disciplinary or administrative").

The placement at issue here is placement in the SHU based on a conviction for STG-eligible offenses and is, therefore, disciplinary in nature.

"Prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). "The Supreme Court in Wolff spelled out the minimum procedural protections that the Due Process Clause requires when substantial liberty interests are being deprived in the prison setting; [the Ninth Circuit] subsequently held that the Wolff requirements must be met in the disciplinary segregation context." Walker v. Sumner, 14 F.3d 1415, 1419 (9th Cir. 1994), overruled on other grounds by Sandin, 515 U.S. at 472 (citations omitted). Even if state regulations provide prisoners with more extensive procedural protections, Wolff requirements nevertheless control the inquiry of whether the prisoners' due process rights were violated. Id. ("[W]e need not consider

United States District Court
Northern District of California

whether the prison complied with its own regulations.  Walker's right to due process was violated only if he was not provided with process sufficient to meet the <u>Wolff</u> standard.").

> <u>Wolff</u> established five procedural requirements.  First, written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense.  Second, at least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee.  Third, there must be a written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action.  Fourth, the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.  Fifth, [w]here an illiterate inmate is involved . . . or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or . . . to have adequate substitute aid . . . from the staff or from a[n] . . . inmate designated by the staff.  The Court specifically held that the Due Process Clause does not require that prisons allow inmates to cross-examine their accusers, nor does it give rise to a right to counsel in the proceedings[.]

<u>Id.</u> (internal citations and quotation marks omitted).

     In addition to purely procedural protections, due process also requires prison officials to have an evidentiary basis for their decisions to confine inmates to disciplinary segregation. <u>See</u> <u>Superintendent, Massachusetts Correctional Institution v. Hill</u>, 472 U.S. 445, 455 (1985) (<u>Hill</u>).

a.   Insufficient disclosures

Plaintiffs argue that Defendants failed to provide class members with accurate and complete disclosures of confidential information that was relevant to charges made against them for STG-eligible offenses, which could have or did result in their placement in the SHU.  Plaintiffs argue that the inaccurate and incomplete disclosures at issue violated class members' due process right to have adequate notice of the charges against them and to marshal the facts and prepare a defense.

Plaintiffs represent, and Defendants do not dispute, that CDCR regulations require that information obtained from confidential informants be documented in a confidential memorandum, which is not disclosed to the inmates; the inmates are provided a summarized version of the confidential memorandum (i.e., a disclosure form), which lacks any confidential information that cannot be disclosed to the inmates, such as the name of the confidential informant.

Plaintiffs' evidence showed many instances in which disclosure forms attributed to confidential informants statements that the confidential informants did not actually make.  The statements attributed to the confidential informants, which Plaintiffs argue were simply "fabricated" by Defendants, incriminated class members of committing STG-eligible offenses. Plaintiffs' evidence also showed many instances in which disclosure forms failed to disclose confidential information that was exculpatory or that class members could have used during their disciplinary hearings to defend themselves against the charges against them.

United States District Court
Northern District of California

1    For example, the disclosure forms provided to prisoner 1

2    stated that two confidential informants both said that prisoner 1

3    wanted prisoner 2 killed, in part because prisoner 2 had not

4    provided prisoner 1 with his cut of the proceeds from contraband.

5    Docket No. 898-4 at 9-10; Meeropol Decl., Ex. A, B, C.  However,

6    the confidential memorandum that the disclosure forms were

7    supposed to summarize does not state that one of the informants

8    said that prisoner 1 wanted prisoner 2 killed because he had not

9    provided him with a cut of the proceeds from contraband.  Id.

10   The confidential informant gave a different reason entirely for

11   why he thought prisoner 1 wanted prisoner 2 killed.  Id.

12    Defendants do not dispute that the statements attributed to

13   one of the confidential informants in the disclosure forms

14   provided to prisoner 1 were not actually made by the confidential

15   informant; nor do Defendants dispute that the disclosure forms

16   provided to prisoner 1 contained inaccurate information about

17   what this confidential informant actually said against prisoner

18   1.  See Docket No. 985-7 at 14-15.  Defendants argue that what

19   matters is that prisoner 1's "order was carried out" and prisoner

20   2 "was stabbed."  Id. at 14.  Defendants further argue that

21   prisoner 1 was provided with sufficient information in the

22   disclosure forms to satisfy due process requirements because such

23   forms revealed that two confidential informants had accused

24   prisoner 1 of ordering prisoner 2's assault, and Defendants were

25   not required to disclose more than that because the reasons why

26   prisoner 1 purportedly ordered prisoner 2 to be assaulted were

27   "irrelevant."  Id.  For the reasons discussed in more detail

28   below, the inaccurate disclosures that Defendants provided to

United States District Court
Northern District of California

prisoner 1 violated his due process rights because they deprived him of the ability to challenge or otherwise raise questions as to the reliability of confidential information that could have been or was used against him.

As another example, the disclosure forms provided to four prisoners (prisoners 3, 4, 5, and 6), who were accused of conspiring to murder another inmate, attributed incriminating statements to a confidential informant that the informant did not actually make.  See Docket No. 898-4 at 11-13; Meeropol Decl., Ex. E, F.  Further, the forms omitted information that the confidential informant actually did provide to Defendants that was exculpatory.  Id.  Specifically, the disclosure forms failed to disclose to the four prisoners that the confidential informant stated that the inmate who was the alleged victim of the murder conspiracy had <u>not</u> been ordered murdered by the four co-conspirators.  Id.

Defendants do not dispute that the disclosure forms provided to these four prisoners contained statements attributed to a confidential informant that the informant did not make, and they also do not dispute that these forms failed to disclose the exculpatory evidence just discussed.  For the reasons discussed in more detail below, these incomplete and inaccurate disclosures violated the prisoners' due process rights because they deprived the prisoners of the ability to challenge or otherwise raise questions as to the reliability of confidential information that could have been or was used against them.

As another example, the disclosure form that was provided to prisoner 7, who allegedly conspired to commit battery with an

40

STG-nexus, stated that intercepted prisoner notes identified prisoner 7 by name as ordering the assault of two other inmates. Docket No. 898-4 at 14-15; Meeropol Decl., Ex. G, H.  But the confidential note did not, in fact, identify prisoner 7 by name; it instead identified a prisoner by what appears to be a nickname.  Id.  The confidential memorandum that the disclosure form was supposed to summarize does not contain any information connecting prisoner 7 to the nickname that was mentioned in the note.  Id.  The disclosure form provided to prisoner 7 did not reveal that the note at issue had incriminated a prisoner identified only by using a nickname.  Id.

Defendants do not address this incident in their briefs, thereby implicitly conceding that the information disclosed in the disclosure form provided to prison 7 was inaccurate.

For the reasons discussed in more detail below, the incomplete disclosures that Defendants provided to prisoner 7 violated his due process rights because they deprived him of the ability to challenge or otherwise raise questions as to the reliability of confidential information that could have been or was used against him.

As noted above, due process requires, among other things, that "an inmate receive advance written notice of the claimed violation" for which he could face discipline. Zimmerlee, 831 F.2d at 188 (citing Wolff, 418 U.S. at 563).  "Wolff provides little guidance as to the specificity of notice necessary to satisfy due process.  However, the [Supreme] Court has stated that in identifying the safeguards due process requires in this context, courts should remember 'the legitimate institutional

needs of assuring the safety of inmates and prisoners' and avoid 'burdensome administrative requirements that might be susceptible to manipulation.'" Id. (quoting Hill, 472 U.S. at 454-55). "Whether notice satisfies due process is a question of law[.]" Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 918 (9th Cir. 1995).

The Court finds, based on the examples described above, which are representative of the evidence that Plaintiffs have presented, that Plaintiffs have shown due process violations arising out of Defendants' failure to provide class members with adequate notice of the charges and evidence against them and by failing to disclose non-sensitive information or evidence that class members could have used to mount a defense at their disciplinary hearings. The inaccurate or incomplete disclosures that Defendants provided to class members deprived class members of the ability to challenge or otherwise raise questions as to the reliability of confidential information that could have been or was used against them during their disciplinary hearings. See Brown v. Plaut, 131 F.3d 163, 172 (D.C. Cir. 1997) ("If [an inmate] was not provided an accurate picture of what was at stake in the hearing, then he was not given his due process.").

Defendants do not meaningfully dispute that disclosures provided to class members contained inaccurate information or failed to disclose relevant and non-sensitive exculpatory information derived from confidential sources. Further, Defendants have advanced no legitimate penological reason for having failed to provide class members with disclosures (without revealing the identity of confidential informants or other detailed information that could have revealed the identity of

42

confidential informants)[7] that accurately reflected confidential information that was relevant to the charges against them. Indeed, Defendants attribute the deficiencies in the disclosures that Plaintiffs have identified to "human error," thereby conceding that the deficient disclosures were not the result of a need to withhold information from class members for legitimate institutional reasons.  See Docket No. 1345 at 4-5.

Defendants argue that any "errors" made with respect to the disclosure of confidential information are harmless because there was sufficient evidence in the record to support the disciplinary officers' ultimate determinations, including guilty pleas and findings of guilt.  This argument misses the point.  Plaintiffs' due process allegations here are not predicated on the theory that the ultimate determination of the disciplinary officers was unsupported; they are predicated instead on the theory that the procedures employed were Constitutionally insufficient. Accordingly, whether the ultimate determinations of the hearing officers were supported by sufficient evidence is irrelevant. See Edwards v. Balisok, 520 U.S. 641, 648 (1997) (noting that "when the basis for attacking the judgment is not insufficiency of the evidence . . . it is irrelevant" whether there is sufficient evidence in the record to support the prison hearing determination).

Defendants next argue that Plaintiffs improperly seek to "second-guess prison officials" and "reverse" Defendants'

---

[7] Plaintiffs do not argue that Defendants should have revealed names or dates or other detailed information that could have revealed the identity of a confidential informant.

43

findings with respect to whether class members committed STG-eligible offenses.  See, e.g., Docket No. 985-7 at 15.  But Plaintiffs do not seek to vacate or alter the outcome of the disciplinary hearings at issue; rather, they seek to show that procedural due process violations of class members' rights occurred prior to the disciplinary hearings.

Defendants also contend that, even if the disclosures provided to class members contained inaccurate or fabricated information, that would not give rise to violations of due process because there is no Constitutional right to be free from false disciplinary charges.  See Docket No. 1084-4 at 3.  This argument is misplaced.  The cases upon which Defendants rely to support this proposition in turn rely on Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) and Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986).  See id.  The Eighth Circuit in Sprouse and the Second Circuit in Freeman held that no due process violation arises from the use of false evidence in charging a prisoner if adequate procedural due process protections as required by Wolff were provided to the prisoner and the prisoner, therefore, had an opportunity to defend himself against the false charges.  Id.

Sprouse and Freeman, and the other cases that Defendants cite that rely on Sprouse and Freeman, are inapposite.  Here, the information that Plaintiffs have shown was inaccurate or fabricated was information that Defendants incorrectly attributed to a confidential informant.  Because confidential informants do not testify at disciplinary hearings and their identities are not disclosed in order to protect their safety or the safety of

44

United States District Court
Northern District of California

others, class members had no means to determine first-hand what the confidential informants actually said; class members were forced to rely on the disclosure forms that Defendants provided to them, which purported to summarize the confidential informants' statements but did not, in fact, accurately do so. Accordingly, class members never had the opportunity to defend themselves against the false or inaccurate information at issue, as there was no way for class members to even learn that the summaries of confidential information that had been provided to them were inaccurate.[8]

Accordingly, the Court finds that Plaintiffs have shown due process violations arising out of Defendants' inaccurate or insufficient disclosures of confidential information.  As a result of the number of incidents that are undisputed, as well as Defendants' position that the incidents are harmless, the Court concludes Plaintiffs have shown that these violations are the result of Defendants' policies and procedures and are, therefore, indicative of a systemic issue.

                    b.    Insufficient reliability determinations

Plaintiffs argue that Defendants violated class members' due process rights because hearing officers failed to independently assess whether information provided by confidential informants was reliable.

A "prison disciplinary committee's determination derived from a statement of an unidentified inmate informant satisfies

_____

[8] Plaintiffs' counsel learned of the inaccuracies at issue because Defendants are required to produce documents to Plaintiffs for monitoring purposes under paragraph 37(h) of the settlement agreement.

due process when (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name." Zimmerlee, 831 F.2d at 186.  The Ninth Circuit requires that the reliability of the confidential informant's statement be established by: "(1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an in camera review of the documentation from which credibility was assessed." Id. at 186-87.  "Proof that an informant previously supplied reliable information is sufficient." Id. (citations omitted).

Compliance with these procedural requirements is paramount in light of the significant risk that prisoners could fabricate information to settle grievances with other prisoners.  See Jones v. Gomez, No. C-91-3875 MHP, 1993 WL 341282, at *3 (N.D. Cal. Aug. 23, 1993) ("[G]iven the differences that arise between prisoners due to jealousies, gang loyalties, and petty grievances, and the unfortunate discrete instances where guards seek to retaliate against prisoners, to rely on statements by unidentified informants without anything more to establish reliability is worse than relying on no evidence: 'It is an open

United States District Court
Northern District of California

1    invitation for clandestine settlement of personal grievances.'") 

2    (citation omitted).

3        Plaintiffs' evidence showed many instances in which 

4    Defendants relied upon confidential information without first 

5    establishing its reliability as required by <u>Zimmerlee</u>.

6        For example, Plaintiffs' evidence showed that hearing 

7    officers simply assume, without actually determining for 

8    themselves as they are required, that information provided by a 

9    confidential informant is reliable.  <u>See, e.g.</u>, Supp. Meeropol 

10   Decl., Ex. 14, 31.

11       Plaintiffs also filed evidence showing that hearing officers 

12   refused to allow prisoners to ask questions during disciplinary 

13   hearings about the reliability of confidential informants on the 

14   ground that such questions were not relevant.  <u>See</u> Meeropol 

15   Decl., Ex. NN, QQ; Supp. Meeropol Decl., Ex. 33, 34.

16       Some of Plaintiffs' evidence showed that certain 

17   confidential informants had been deemed reliable on the ground 

18   that another confidential source had corroborated their 

19   statements, but the materials produced by Defendants to 

20   Plaintiffs' counsel under paragraph 37(h) of the settlement 

21   agreement did not show that there was another confidential source 

22   who could have corroborated the sources at issue, <u>see, e.g.</u>, 

23   Meeropol Decl., Ex. EE, or the documents produced show that the 

24   second confidential source did not actually corroborate the first 

25   informant, <u>see, e.g.</u>, <u>id.</u>, Ex. Z, AA, BB, CC.

26       Defendants do not meaningfully dispute any of the incidents 

27   just described.  Defendants argue that no due process violations 

28   occurred as a result of these incidents because Plaintiffs'

47

United States District Court
Northern District of California

1  allegations show nothing but "periodic errors in recording

2  reliability determinations," Docket No. 1345 at 5.  The Court

3  disagrees.  Plaintiffs' evidence shows that Defendants' errors

4  were not mere recording errors, but instead were failures to

5  undertake the reliability determinations required by Zimmerlee.

6      The Court finds, based on the incidents described above,

7  which are representative of the evidence that Plaintiffs have

8  presented, that Plaintiffs have shown ongoing and systemic due

9  process violations arising out of Defendants' failure to conduct

10 the reliability determinations required by Zimmerlee before

11 relying on evidence provided by confidential informants.

12     In light of the foregoing, the Court finds that Plaintiffs

13 have shown that the settlement agreement can be extended under

14 paragraph 41 as a result of ongoing and systemic due process

15 violations arising out of Defendants' misuse or insufficient

16 disclosures of confidential information.

17 III. Retention and Continued Use of Old Gang Validations

18     Plaintiffs argue that CDCR is engaging in ongoing and

19 systemic violations of class members' due process rights by

20 continuing

21         to maintain and rely on its old gang
22         validations, without acknowledging their
           flawed nature. . . . Because the old
23         validation procedures violated due process,
           they cannot be relied on to deprive
24         prisoners of their liberty interest in an
           opportunity for parole[.]

25 Docket No. 898-4 at 4.  The old gang validations at issue are

26 those that pre-date the settlement agreement.  After the

27 settlement agreement was effectuated, Defendants modified their

28 procedures for gang validations going forward, but they did not

48

vacate the gang validations made prior to the settlement agreement.  Plaintiffs argue that Defendants' retention of the old gang validations in their system without adding any qualifications to indicate to the Parole Board that they are unreliable has deprived class members of a fair opportunity for parole, because the Parole Board has and continues to rely on the gang validations for the purpose of determining whether a class member is eligible for Proposition 57 relief[9] or for parole generally.

Defendants contend that the use or reliance upon the gang validations at issue for the purpose of parole eligibility is not a proper ground for extending the settlement agreement under paragraph 41.  Defendants further argue that the continued use or reliance upon the old gang validations would not result in violations of due process in any event, because prisoners receive the due process the Constitution requires in connection with their parole hearings, as they receive an opportunity to be heard and a statement of reasons regarding any parole denials.

A.   Whether the alleged due process violations are within the scope of the complaints or settlement-agreement reforms

Plaintiffs argue that the due process violations they allege with respect to Defendants' retention and continued use of gang validations in the context of parole are a basis for extending

_____

[9] Proposition 57 is an amendment to the California Constitution passed in 2016 to provide non-violent offenders with an opportunity to parole.  See Cal. Const. art. I § 32(a)(1) (providing that any person convicted of a non-violent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term of his or her primary offense).

49

the settlement agreement under paragraph 41 because they are alleged in the 2AC and because they arise out of the reforms required by the settlement agreement.

Defendants respond that the settlement agreement cannot be extended under paragraph 41 based on the claimed due process violations at issue because they are not alleged in the 2AC and because the settlement agreement does not include any terms modifying or prohibiting the use of old gang validations for parole purposes.

In the 2AC, Plaintiffs allege that the old gang validations were made without providing class members adequate due process. See, e.g., 2AC ¶¶ 87-90, 230, 237, 249, 256, 261.  They also allege that the gang validations had the ultimate effect of depriving class members of a fair opportunity for parole because of an unwritten policy that barred prisoners housed in the SHU based on gang validation from being granted parole.  Id.  The due process violations at issue here, which are based on the theory that the old gang validations continue to result in the denial of a fair opportunity for parole for class members, can, therefore, serve as a basis under paragraph 41 for extending the settlement agreement.

B.   Whether the alleged due process violations exist on a current and ongoing systemic basis

1.   Liberty interest

The Court first considers whether Plaintiffs have shown that prisoners have a liberty interest in parole.

Plaintiffs argue, and Defendants do not dispute, that class members have such an interest.

United States District Court
Northern District of California

United States District Court
Northern District of California

In light of the absence of any dispute as to this issue, the Court finds that class members have a liberty interest in parole. See Pearson v. Muntz, 639 F.3d 1185, 1190-91 (9th Cir. 2011) (holding that "California law creates a liberty interest in parole") (citation and internal quotation marks omitted).

2.    Constitutional sufficiency of procedures

In Swarthout v. Cooke, 562 U.S. 216, 220 (2011), the Supreme Court held that inmates are afforded sufficient procedural due process in the context of parole if they are "allowed an opportunity to be heard" and are "provided a statement of the reasons why parole was denied."  Id.

Plaintiffs argue that Defendants' continued retention of old gang validations without any warning to the Parole Board as to their flaws and unreliability deprives class members of a fair opportunity for parole.  Plaintiffs offer the following evidence to show that the old gang validations are Constitutionally flawed and unreliable.

First, Plaintiffs' evidence, which Defendants did not dispute, showed that the procedures for generating the old gang validations lacked any checks and balances to minimize the risk of error.  See Miller Decl., Ex. 1, Guirbino Dep. Tr. at 73, 207. Specifically, the evidence showed that the Office of Correctional Safety (OCS) had the exclusive authority to validate prisoners as gang affiliates, and that any gang validations made by the OCS were not subject to any form of review, as neither the ICC nor any other entity had the authority to overturn a gang validation made by the OCS.  Miller Decl., Ex. 2, Ducart Dep. Tr. at 205-06; Miller Decl., Ex. 3, Frisk Dep. Tr. at 31, 108-110, 124; Miller Decl., Ex. 4, Barneburg Dep. Tr. at 70, 76; Miller Decl., Ex. 7,

Austin Decl. ¶ 21.  Although Defendants reviewed gang validations every six years, this process likewise was not subject to any further review.  Miller Decl., Ex. 2, Ducart Dep. Tr. at 230; Miller Decl., Ex. 8, Parro Dep. Tr. at 12; Miller Decl., Ex. 3, Frisk Dep. Tr. at 38; Miller Decl., Ex. 9, CDCR Operations Manual of 2014 § 52070.18.4.

Second, Plaintiffs' evidence, which Defendants did not dispute, showed that class members were not provided a meaningful opportunity to rebut the gang validation evidence used against them as part of the old gang validation process.  Specifically, class members were not heard by the OCS in the validation process and the OCS's review of the validation packets prepared by the Institutional Gang Investigator (IGI) was not meaningful, as it involved merely accepting the gang-validation recommendations of the IGI.  Miller Decl., Ex. 5, Hubbard Dep. Tr. at 18, 27; Miller Decl., Ex. 3, Frisk Dep. Tr. at 92-93, 25, 125-26, 129, 100-01; Miller Decl., Ex. 7, Austin Decl. ¶¶ 20-21; Miller Decl., Ex. 10, Giurbino Dep. Tr. at 179; Miller Decl., Ex. 4, Barneburg Dep. Tr. at 176-77.

Third, Plaintiffs' evidence, which Defendants did not dispute, showed that Defendants failed to provide accurate notice to class members as to how to avoid a gang validation under the old procedures.  For example, the old gang validation procedures provided that revalidation would not occur if the prisoners were not involved in any gang "activity" for at least six years.  See 15 Cal. Code. Regs §§ 3341.5(c)(5), 3378(e); Miller Decl., Ex. 2, Ducart Dep. Tr. at 23; Miller Decl., Ex. 8, Parry Dep. Tr. at 74. Plaintiffs' evidence showed that Defendants did not provide notice to class members that the type of "activity" that could

lead to revalidation included "non-action," such as possessing artwork from a gang affiliate, or possessing a photograph of a gang affiliate.  Miller Decl., Ex. 13, CDCR Validation Instruction Manual of June 2011 at 12; Miller Decl., Ex. 10, Giurbino Dep. Tr. at 163; Miller Decl., Ex. 14-23.

Fourth, Plaintiffs' evidence showed that Defendants reviewed the old gang validations only every six years, which Plaintiffs argue was too infrequent to satisfy due process requirements. See 15 Cal. Code Regs. §§ 3341.5(c)(5), 3378(e)-(f); Miller Decl., Ex. 2, Ducart Dep. Tr. at 230; Miller Decl., Ex. 8, Parry Dep. Tr. at 12; Miller Decl., Ex. 3, Frisk Dep. Tr. at 38; Miller Decl., Ex. 5 Hubbard Dep. Tr. at 19; Miller Decl., Ex. 35 at 2.

The Court finds that the undisputed incidents described above show that Defendants failed to provide class members with meaningful notice of how to avoid gang validation or revalidation, a meaningful opportunity for rebuttal, meaningful periodic review, and sufficient checks and balances to reduce the risk of erroneous gang validation.  Accordingly, the Court concludes that Plaintiffs have shown that the procedures used to generate the old gang validations, as well as the resulting old gang validations themselves, are Constitutionally deficient and unreliable.

Plaintiffs contend that these deficiencies deprive them of a fair opportunity for parole for two reasons.

First, Plaintiffs' evidence, which Defendants did not dispute, showed that, pursuant to a policy enacted in 2017, Defendants have deemed ineligible for Proposition 57 parole consideration any class members whose "prison record indicates they have been placed in a security housing unit for any

involvement with a Security Threat Group (i.e., prison gang) in the past five years." Miller Decl., Ex. 38 at 4.  As a result of this policy, class members who were gang-validated or found "active" in a six-year review under the old procedures and were still in indeterminate SHU placement in 2012 or thereafter were automatically deemed ineligible for Proposition 57 parole consideration.  Miller Decl., Ex. 39, 40.

Second, Plaintiffs' evidence, which Defendants did not dispute, showed that the Parole Board continues to consider the old gang validations outside of the Proposition 57 context when determining class members' parole eligibility.  See, e.g., Miller Decl. ¶¶ 42-56 & Ex. 50-52.  Plaintiffs' undisputed evidence further showed that the Parole Board appears to be unaware that the old gang validations are Constitutionally flawed and unreliable.  See, e.g., Miller Decl., Ex. 52, Commissioner Dep. Tr. at 193 ("[B]eing validated is no simple feat.  It doesn't happen overnight . . . the correctional officers are going through to make sure they validate it according to the law.").

As noted, Defendants have not disputed the evidence just described.  Defendants argue only that the due process violation allegations fail because Plaintiffs seek to "challenge the merits of individual-inmate parole decisions," and this Court lacks jurisdiction to consider any such challenges.  Docket No. 985-7 at 6-7.

The Court is not persuaded.  Defendants, once again, misapprehend the nature of Plaintiffs' due process arguments. Plaintiffs are not challenging the outcome of any parole determinations; Plaintiffs, instead, challenge the continued use

of Constitutionally-flawed gang validations in parole proceedings on the basis that doing so violates class members' procedural due process rights in the context of parole.

In light of the undisputed evidence discussed above, the Court finds that Defendants' continued retention and use of old gang validations without any acknowledgement of the fact that they are flawed and unreliable gives rise to violations of class members' right to a meaningful hearing in the context of parole. See Swarthout, 562 U.S. at 220 (holding that due process in the context of parole requires, in relevant part, that inmates be allowed a meaningful opportunity to be heard).  Accordingly, the Court finds, based on the undisputed evidence above, that Plaintiffs have shown ongoing and systemic due process violations that constitute a valid basis for extending the settlement agreement under paragraph 41.

//

United States District Court
Northern District of California

CONCLUSION

For the reasons set forth above, the Court affirms in part and reverses in part the findings and recommendations of the magistrate judge, and it grants Plaintiffs' motion to extend the settlement agreement for twelve months pursuant to paragraph 41.[10] The twelve months shall commence when this order becomes final.

IT IS SO ORDERED.

Dated: April 9, 2021

CLAUDIA WILKEN
United States District Judge

---

[10] In their extension motion, Plaintiffs appear to argue that, in addition to extending the settlement agreement under paragraph 41, they are entitled to other remedies to redress the due process violations they discuss in their motion.  The Court disagrees.  The only issue now before the Court is whether Plaintiffs have shown that the settlement agreement should be extended by twelve months under paragraph 41.  Plaintiffs have not shown that the Court can take any action under paragraph 41 other than to extend the settlement agreement.

# Exhibit 2

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**TODD ASHKER, et al.,**

Plaintiffs-Appellees,

v.

**GOVERNOR OF THE STATE OF CALIFORNIA, et al.,**

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

No. 4:09-cv-05796 CW (RMI)
The Honorable Claudia Wilken, District Judge

**REPRESENTATION STATEMENT**

ROB BONTA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
NEAH HUYNH
ADRIANO HRVATIN
Supervising Deputy Attorneys General
SARAH M. BRATTIN
Deputy Attorney General
State Bar No. 302043
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-7321
  Fax: (916) 324-5205
  Email:  Sarah.Brattin@doj.ca.gov
*Attorneys for Defendants-Appellants*
*Newsom, Cate, Lewis, and Chaus*

The undersigned represents Defendants-Appellants Newsom, Cate, Lewis, and Chaus in this appeal.  Below is a service list for the counsel who represent the Plaintiffs-Appellees' class, as well as individual Plaintiffs-Appellees Todd Ashker, Danny Troxell, George Ruiz, Jeffrey Franklin, George Franco, Gabriel Reyes, Richard Johnson, Paul Redd, Luis Esquivel, and Ronnie Dewberry, in this matter:

| |
|---|
| SAMUEL MILLER (Bar No. 138942)<br>Email: samrmiller@yahoo.com<br>JULES LOBEL (pro hac vice)<br>Email: jll4@pitt.edu<br>RACHEL MEEROPOL (pro hac vice)<br>Email: rachelm@ccrjustice.org<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>Tel: (212) 614-6432<br>Fax: (212) 614-6499 |
| CARMEN E. BREMER (pro hac vice)<br>Email: carmen.bremer@bremerlawgroup.com<br>BREMER LAW GROUP PLLC<br>1700 Seventh Avenue, Suite 2100<br>Seattle, WA 98101<br>Tel: (206) 357-8442<br>Fax: (206) 858-9730 |
| ANNE CAPPELLA (Bar No. 181402)<br>Email: anne.cappella@weil.com<br>WEIL, GOTSHAL & MANGES LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065-1134<br>Tel: (650) 802-3000<br>Fax: (650) 802-3100 |

CHARLES F.A. CARBONE (Bar No. 206536)
Email: Charles@charlescarbone.com
LAW OFFICES OF CHARLES CARBONE
P. O. Box 2809
San Francisco, CA 94126
Tel: (415) 981-9773
Fax: (415) 981-9774

MARILYN S. MCMAHON (Bar No. 270059)
Email: Marilyn@prisons.org
CALIFORNIA PRISON FOCUS
P.O. Box 1129
2000 Allston Way
Berkeley, CA 94701
Tel: (510) 734-3600
Fax: (510) 836-7222

ANNE BUTTERFIELD WEILLS (Bar No. 139845)
Email: abweills@gmail.com
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 500
Oakland, CA 94612
Tel: (510) 839-1200
Fax: (510) 444-6698

3

Dated:  May 7, 2021                    Respectfully Submitted,

                                       ROB BONTA
                                       Attorney General of California
                                       MONICA N. ANDERSON
                                       Senior Assistant Attorney General
                                       NEAH HUYNH
                                       ADRIANO HRVATIN
                                       Supervising Deputy Attorneys General


                                       */S/ SARAH M. BRATTIN*
                                       SARAH M. BRATTIN
                                       Deputy Attorney General
                                       *Attorneys for Defendant-Appellants*
                                       *Newsom, Cate, Lewis, and Chaus*

SF2012204868
42676361.docx

4

# CERTIFICATE OF SERVICE

Case Name:   **Ashker, et al. v. Newsom, et al.**        No.   **4:09-cv-05796-CW (RMI)**

I hereby certify that on <u>May 7, 2021,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

    &#10148;  **DEFENDANTS' NOTICE OF APPEAL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>May 7, 2021</u>, at Sacramento, California.

| P. Pimentel | */s/ P. Pimentel* |
|:---:|:---:|
| Declarant | Signature |

SF2012204868
35081149.docx