UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| TODD ASHKER, et al., | Case No.  09-cv-05796-CW   (RMI) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION RE: MOTION TO EXTEND SETTLEMENT AGREEMENT** |
| MATHEW CATE, et al., | |
| Defendants. | Re: Dkt. No. 1411 |

Now pending before the court is Plaintiffs' Motion for Extension of the Settlement Agreement Based On Systemic Due Process Violations (dkt. 1411), Defendants' Response in Opposition (dkt. 1418), and Plaintiffs' Reply (dkt. 1448). For the reasons stated below, the undersigned recommends the denial of Plaintiffs' Motion and the termination of the court's jurisdiction over the Parties' settlement agreement.[1]

### INTRODUCTION

The factual and procedural background of this case has been recited numerous times and does not require repetition here. *See e.g.,* Order of January 25, 2019 (dktl. 1122) at 1-3. Nevertheless, the undersigned will provide a brief summary for context. The operative complaint in this case premised its claims on certain shortcomings in the state of affairs attending the operations of California's prison system as experienced by the members of a particular class of prisoners. Namely, the class members complained of the cumulative effects of prolonged solitary confinement in settings with windowless cells where they were isolated from other prisoners,

---

[1] Pursuant to Civil Local R. 7-1(b), the undersigned finds that this matter is suitable for disposition without oral argument.

United States District Court
Northern District of California

where they were unable to make social phone calls or have contact visits with family members, and where they were denied the accrual of good time credits or general or educational programming (which they contended resulted in the denial of opportunities for parole). *See id*. at 1-2. As such, Plaintiffs advanced an Eighth Amendment claim to the effect that class members had been denied the basic needs of normal human contact, environmental and sensory stimulation, acceptable levels of care for mental and physical health, physical exercise, sleep, nutrition, and meaningful daily or periodic activity. *See* SAC (dkt. 136) at 40-43. Additionally, Plaintiffs also claimed that they were denied due process due to the absence of any meaningful and timely periodic reviews of their identification by authorities as "active" gang members on which their continued long-term and indefinite detention at Pelican Bay State Prison's Special Housing Unit ("SHU") was premised, as well as meaningful notice of what they must do to earn release; further, Plaintiffs contended that their prolonged confinement under such conditions was little more than a coercive means of inducing them to serve as informants, and that their identification as active gang members routinely occurred without reliable evidence. *Id*. at 44-46. As to the class membership, the Eighth Amendment Class includes all inmates who are now, or will be in the future, assigned to the Pelican Bay SHU for a period of more than ten continuous years; and the Due Process Class includes all inmates who are assigned to an intermediate term at the Pelican Bay SHU on the basis of gang validation, under the policies and procedures in place as of September 10, 2012. *See* Order of June 2, 2014 (dkt. 317) at 21.

Thereafter, the Parties resolved this case and executed a comprehensive Settlement Agreement (the "Agreement") (dkt. 424-2), which set forth a number of reforms that were calculated to remedy the issues underlying the claims described above, and which provided certain mechanisms for monitoring and enforcing the prison system's compliance with the Agreement. As for extension of the fixed monitoring and enforcement periods set forth in the Agreement, the standard for evaluation of such an extension motion would be satisfied if Plaintiffs were to present, by a preponderance of the evidence, proof which demonstrates that current and ongoing systemic violations of the Eighth Amendment or Fourteenth Amendment of the United States Constitution still exist as alleged in Plaintiffs' Second Amended Complaint or Supplemental

1    Complaint or as a result of CDCR's reforms to its Step Down Program or as a result of the SHU

2    policies contemplated by the Settlement Agreement. *Id*. at 17-18. Additionally, the Agreement

3    notes that "[b]rief or isolated constitutional violations shall not constitute an ongoing, systemic

4    policy and practice that violate the Constitution, and shall not constitute grounds for continuing

5    this Agreement or the Court's jurisdiction over this matter." *Id*. at 18. At the end of the previous

6    term, the undersigned opined that the Agreement was due to be extended because Plaintiffs had

7    presented a parade of compelling case studies that were indicative of systemic and ongoing

8    violations of the Agreement, while Defendants' responses and arguments in opposition were

9    unconvincing. *See generally* Order of January 25, 2019 (dkt. 1122). At the present juncture,

10   however, Plaintiffs' evidence and arguments, in light of Defendants' responses, paint a wholly

11   different picture – one that leads the undersigned to arrive at the opposite conclusion. As such, the

12   undersigned recommends the denial of the extension motion.

13                                **DISCUSSION**

14        Even a cursory review of the parade of horribles (describing several dozen case studies

15   where individual prisoners were allegedly railroaded in the prison disciplinary process) contained

16   in Plaintiffs' lengthy briefing on its second extension motion would lead even the casual observer

17   to assume that the previous 1-year term of monitoring and enforcement was attended with – at

18   least – several dozen enforcement motions. However, a review of the docket of this case would

19   totally disabuse that observer from such an assumption. In October of 2019, Plaintiffs filed one

20   enforcement motion seeking to enforce the Agreement by requesting that the court order the

21   vacatur of certain prisoners' discipline for participation in rout activity with a prison gang nexus.

22   *See* Pls.' Mot. (dkt. 1215). After a hearing at which oral arguments were presented (*see* dkt. 1225),

23   the undersigned entered an order that denied Plaintiffs' enforcement motion by citing to little more

24   than the chart of SHU-eligible offenses (the "SHU-Chart") incorporated into the Agreement, a few

25   California code provisions defining various offenses against the public peace (such as routs and

26   riots), as well as a few dictionary entries defining the word, "rout." *See generally* Order of

27   December 18, 2019 (dkt. 1226). Plaintiffs took no issue with the denial of their enforcement

28   motion as they elected against seeking any review of that order. That was it – one single

                                             3

United States District Court
Northern District of California

1    enforcement motion is all that has been filed by Plaintiffs during the latest monitoring period, a

2    period contended by the currently-pending Extension Motion (dkt. 1411) to have been utterly

3    plagued by systemic and ongoing constitutional violations. For the reasons that follow, the

4    undersigned recommends the denial of the Extension Motion.

5    At the outset, the court will note that, by its nature, due process negates any notion of a

6    fixed set of inflexible procedures that would be universally applicable to every conceivable

7    situation. *See Wolff v. McDonnell*, 418 U.S. 539, 560 (1974) (citing *Cafeteria & Rest. Workers

8    Union v. McElroy*, 367 U.S. 886, 895 (1961)). In this regard, considering and determining the

9    contours of procedures that due process may require under a given set of circumstances begins

10   with the identification of the actual nature of the government function involved, as well as the

11   determination of the private interest that has been affected by that government function. *Wolff*, 418

12   U.S. at 560 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Accordingly, when "[v]iewed

13   in this light[,] it is immediately apparent that one cannot automatically apply procedural rules

14   designed for free citizens in an open society, or for parolees or probationers under only limited

15   restraints, to the very different situation presented by a disciplinary proceeding in a state prison."

16   *Wolff*, 418 U.S. at 560. As the *Wolff* Court explained, "[t]he operation of a correctional institution

17   is at best an extraordinarily difficult undertaking," and as such, during prison disciplinary

18   hearings, even the opportunity to call witnesses and present documentary evidence in defense of

19   the disciplinary accusations can be denied when permitting it would be "unduly hazardous to

20   institutional safety or correctional goals." *Id*. at 566. While in the context of criminal court

21   proceedings, the right to present evidence is quite synonymous with what we consider to constitute

22   a fair hearing, "the unrestricted right to call witnesses from the prison population carries obvious

23   potential for disruption and for interference with the swift punishment that in individual cases may

24   be essential to carrying out the correctional program of the institution." *Id*. Thus, the *Wolff* Court

25   cautioned against excessive judicial oversight that might operate to unduly put aside the judgment

26   of prison administrators as to the propriety of presenting witnesses and documentary evidence in

27   the prison disciplinary context. *Id*. Instead, the Court explained that "we must balance the inmate's

28   interest in avoiding loss of good time against the needs of the prison, and some amount of

4

United States District Court
Northern District of California

flexibility and accommodation is required . . . [such that officials can be afforded] the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence . . . [because] [a]ny less flexible rule appears untenable as a constitutional matter . . ." *Id*. Due to the fact that prison officials are tasked with managing the complex and dynamic responsibility of assuring the safety of all inmates and staff, the notion of allowing an unqualified right of access to witnesses and documents in the disciplinary process would amount to an "unduly crippling constitutional impediment[]" that would render the discharge of that responsibility unreasonably difficult, if not impossible. *Id*. at 566-67. Therefore, as explained in *Wolff*, in the prison disciplinary context, "[t]here is this much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents." *Id*. at 567.

As to the question of confrontation and cross-examination in this context, the *Wolff* Court explained that those facets of ordinary criminal trials present even greater hazards to institutional interests and that "[i]f confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls." *Id*. Importing confrontation and cross-examination into the prison disciplinary context would cause such hearings to be longer and would tend to render them unmanageable, thus, the Court explained that the Constitution should not be read to impose these requirements because "adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination." *Id*. at 567-68. In setting forth this curtailed approach to due process in the prison disciplinary context, the *Wolff* Court viewed prison disciplinary hearings as more of a rehabilitation vehicle than an adversarial hearing in the mold of traditional court proceedings; as such, the Court explained that affording counsel in this context "would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals." *Id*. at 570. The Court therefore held that "we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." *Id*. In short, because "prison disruption remains a serious concern to

administrators," the *Wolff* Court's approach to the application of diminished and curtailed constitutional due process standards in the prison disciplinary context was calculated "to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle." *Id.* at 568.

Aside from what isn't necessary, the lynchpin to ensuring fairness in the prison disciplinary context has been explained as such: "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits" the ascertainment of which "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence," rather, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455-56 (1985); *see also Grimes v. Beard*, 834 F. App'x 352, 353 (9th Cir. 2021) ("the district court properly dismissed Grimes's due process claim because Grimes failed to allege facts sufficient to show that the disciplinary decision was not supported by some evidence."); *Parnell v. Martinez*, 821 F. App'x 866, 867 (9th Cir. 2020) ("to satisfy due process, prison officials must provide an inmate advance written notice of the violation, a written statement as to the evidence relied upon and the reasons for the disciplinary action taken, and a limited right to call witnesses and present documentary evidence"); *Rios v. Brandon*, 769 F. App'x 447, 447 (9th Cir. 2019) ("The 'some evidence' standard, which is quite low, requires us to ask only 'whether there is any evidence in the record that could support the conclusion.'"); *Santos v. Holland*, 761 F. App'x 707, 712 (9th Cir. 2019) ("Due process does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board."); *Williams v. Thomas*, 492 F. App'x 732, 734 (9th Cir. 2012) (same); *see also Cousins v. Lockyer,* 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to follow internal prison policy does not amount to a constitutional violation). Therefore, as described below, the undersigned finds that these concepts undermine all of Plaintiffs' arguments in favor of extending the Agreement based on what appears to be Plaintiffs' attempt at taking the disciplinary process out of the mold of a "rehabilitation vehicle" while attempting to force it into the mold of a traditional adversarial hearing. Further, Plaintiffs' extension arguments seem to avoid this "some

United States District Court
Northern District of California

1    evidence" standard and rather focus on what flaws can be found in each disciplinary packet, and

2    therefore Plaintiffs' arguments appear to be based on a non-existent 'error-free' standard for

3    contending that some errors (or even many errors) constitute ongoing and systemic due process

4    violations that require the extension of the Agreement.

5         In this fashion, Plaintiffs present more than fifty examples where class members were

6    disciplined and the disciplinary process was attended with what Plaintiffs contend was either

7    inaccurately disclosed, or downright false, confidential information. *See* Pls.' Mot. (dkt. 1411) at

8    10-44. However, as stated above, this category of allegation does not rise to the level of making

9    out a due process claim in the prison disciplinary context and Plaintiffs fail to demonstrate that

10   most, or all (or even many), of its chosen examples of disciplinary matters resulted in discipline

11   that ran afoul of the above-described standards. Accordingly, all that Plaintiffs have shown is that

12   some or most (or even all) of the several dozen examples of prisoner discipline were not

13   completely error-free – however, what has not been shown is that these asserted errors amount to

14   ongoing and systemic disciplining of prisoners in violation of the 'some evidence' standard

15   described above. Defendants, on the other hand, identify the correct standards and convincingly

16   argue that Plaintiffs' arguments fail to show any widespread or systemic violation of those

17   standards. *See* Defs.' Opp. (dkt. 1418) at 27-53. Given that the Parties have spent considerable

18   energy and a great many pages in describing the disciplinary matters of these several dozen

19   prisoners, the undersigned does not find it necessary to repeat that information here – instead, it is

20   sufficient to note that for the reasons stated above, in addition to the reasoning expounded by

21   Defendants, the undersigned finds that Plaintiffs have failed to meet their burden in order to carry

22   the day on their first argument (i.e., that CDCR's supposed fabrication and allegedly inadequate

23   disclosure of confidential information constitutes an ongoing and systemic due process violation)

24   and on their second argument (i.e., that CDCR's supposed failure to ensure that the confidential

25   information it uses is reliable also constitutes an ongoing and systemic due process violation).

26   Instead, the undersigned finds that – as explained by Defendants (*see id.*) – the overwhelming

27   majority of the disciplinary matters cited by Plaintiffs were effected in compliance with the

28   standards described above and therefore Plaintiffs' first two arguments (*see* Pls.' Mot. (dkt. 1411)

United States District Court
Northern District of California

at 10-44) for extending the Agreement are unpersuasive.

Plaintiffs' third argument asserts the existence of systemic and ongoing due process violations in the parole context – again – by virtue of CDCR's use of confidential information and by virtue of the use of purportedly unreliable gang validations. *See id.* at 45-53. The gist of Plaintiffs' third argument is not that class members were prohibited from speaking at their parole hearings, or that they were not permitted to contest or address the evidence against them, or that they were not afforded access to their records in advance, or that they were never notified of the reasons that parole was ultimately denied. Instead, Plaintiffs concede that these basic standards of process were adhered to but argue that this was not enough. In essence, Plaintiffs contend that some parole seekers, who had not been "active" in a prison gang for some time were entitled to have CDCR inform the parole board that while the parole applicant was at some point validated as a gang member, perhaps that validation has become stale due to the prisoner's inactivity in that gang. *See id.* at 45. Additionally, while conceding that "flawed confidential materials" are in fact "revealed to the prisoners [] just before appearing in front of the parole board," that this constitutes a due process violation because revealing this information with more advance notice (that is, at an earlier time) would afford the prisoner "a much stronger opportunity for release." *Id.* In short, Plaintiffs contend that "[b]y keeping all this stale and untested confidential information a secret for years and only giving cursory notice to the prisoners just before the hearings, CDCR provides class members no realistic way to challenge the information thereby violating due process." *Id.*

As stated above, "[i]t is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12-13 (1979) (internal quotations and citations omitted). That said, the function of any legal process – at least as to fact-finding – is to minimize the risk of erroneous decisions; and, in the prison context "flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation [is] depend[ent] upon the need to serve the purpose of minimizing the risk of error." *Id.* Thus, the parole determination, like a prisoner-transfer decision, may be made "for a variety of reasons and often [involves] no more than informed predictions as to what would best serve [correctional purposes] or the safety and

United States District Court
Northern District of California

welfare of the inmate . . . [and such a] decision turns on a discretionary assessment of a multiplicity of imponderables, entailing primarily what a man [or woman] is and what he [or she] may become rather than simply what he [or she] has [or has not] done." *Id*. at 10 (internal quotations and citations omitted). In this light, the Supreme Court has explained that there is "nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular evidence in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release." *Id*. at 15 (internal quotation marks omitted). Instead, the purpose of communicating a decision denying parole, and the reasons therefor, is merely to serve "as a guide to the inmate for his future behavior . . . [and] [t]o require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination." *Id*. at 15-16. This is precisely what Plaintiffs' arguments seek to accomplish, at least by implication.

In this context, the *Greenholtz* Court held that when a parole procedure "affords an opportunity to be heard, and when parole is denied [the parole board] informs the inmate in what respects he [or she] falls short of qualifying for parole; this affords the process that is due under these circumstances [and] [t]he Constitution does not require more." *Id*. Therefore, in the parole context, due process requires only that prisoner be provided with an opportunity to be heard and a statement of the reasons why parole was denied. *See also Swarthout v. Cooke*, 562 U.S. 216, 219-20 (2011) ("Cooke and Clay received at least this amount of process: They were allowed to speak at their parole hearings and to contest the evidence against them, [they] were afforded access to their records in advance, and [they] were notified as to the reasons why parole was denied."). *See also Andrews v. Martinez*, 829 F. App'x 814, 814 (9th Cir. 2020) ("While there is a California-created liberty interest in parole release [], the procedures required for due process are minimal . . . [and a] prisoner receives adequate process when he [or she] has an opportunity to be heard and is provided a statement of the reasons why parole was denied.") (internal quotations omitted) (citing *Swarthout*, 562 U.S. at 219-20); *see also Harley v. Shartle*, 754 F. App'x 667, 668 (9th Cir. 2019) (prisoner's contention that a parole board "improperly failed to consider other mitigating factors in

United States District Court
Northern District of California

1    denying parole including the lack of a disciplinary record, his educational achievements, and his

2    consistent efforts at rehabilitation, is meritless.").

3         For these reasons, Plaintiffs' arguments in support of what can only be described as a non-

4    existent standard of due process in the parole context is unpersuasive. The undersigned finds that

5    Plaintiffs' arguments, if accepted, would in fact "tend to convert the process into an adversary

6    proceeding and to equate the Board's parole-release determination with a guilt determination."

7    *Greenholtz*, 442 U.S. at 15-16. On the other hand, the undersigned is persuaded by Defendants'

8    arguments (*see* Defs. Opp. (dkt. 1418) at 15-27) in this respect and, while it is unnecessary to

9    repeat them here – it is sufficient to say that Defendants' parole procedures do not, by any means,

10   manifest anything approaching systemic and ongoing due process violations under the standards

11   described above. Accordingly, Plaintiffs' third argument as to why the Agreement should be

12   extended is similarly unpersuasive.

13        Plaintiffs' fourth and final argument in support of extending the Agreement concerns a

14   series of prison conditions under a designation called, "Restricted Custody General Population"

15   ("RCGP"), and submits that: (1) RCGP is more restrictive than general population and therefore

16   implicates a liberty interest for prisoners who wish to avoid placement in this more restrictive unit;

17   and (2) that the RCGP placement and retention procedures are constitutionally deficient for

18   several reasons. *See* Pls.' Mot. (dkt. 1411) at 53-68. As to the first point – that RCGP placement is

19   more restrictive than general population – while the undersigned finds Defendants' arguments to

20   be both compelling and persuasive, the undersigned will assume without deciding that RCGP is in

21   fact more restrictive than general population and therefore that RCGP placement (attended with

22   fewer liberties than an ordinary general population unit) does give rise to a liberty interest.

23   However, for the reasons that follow, Plaintiffs' identification of flaws in the RCGP placement

24   and retention procedures do not amount to systemic and ongoing due process violations that would

25   justify extending the Agreement. While persons housed in this unit for reasons including the

26   assurance of their own safety are afforded periodic reviews, Plaintiffs describe those reviews as

27   meaningless, rote, and pretextual. *See id*. at 59-64. In support of that contention, Plaintiffs present

28   a small handful of similar examples – three or four case studies, which they claim are indicative of

more – that fall into the following rubric: CDCR will place a validated gang member into RCGP based on information indicating that some other gang members elsewhere in the prison system intend to harm that prisoner for some reason or another; meanwhile, the prisoner placed in RCGP is quite adamant that he is in fact in good standing with his gang and that he should be released or he should be given a full opportunity to challenge the information indicating a that a gang threat actually exists. *See id*. at 59-64. Plaintiffs contend that RCGP prisoners (at least those that fit the mold described above) are "denied adequate notice" because CDCR will not necessarily always give them all the information that would inform that prisoner of every detail as to why CDCR believes that their gang (or another gang) means to harm them. *See id*. at 64-66. Plaintiffs also contend that the "lack of sufficient checks and balances" in the safety review process attending a prisoner's retention in the RCGP is also constitutionally problematic, and that it would generally be better if additional procedures calculated to safeguarding against "erroneous deprivations" were implemented. *Id*. at 67-69.

The undersigned is unpersuaded by any of Plaintiffs' arguments in this regard. First, enforcing or extending the Agreement in this case does not entitle this court to take it upon itself to micro-manage CDCR's operations to the degree that Plaintiffs urge. Second, the standard for extension of the Agreement is proof by a preponderance of the evidence of systemic and ongoing due process or Eighth Amendment violations tethered to the operative complaint or the reforms stemming from the Agreement, and Plaintiffs' attacks on the RCGP placement and retention procedures do not even establish isolated and occasional due process violations, let alone the sort of ongoing and systemic constitutional deprivations described in Paragraph 41 of the Agreement. Instead, the undersigned is persuaded by Defendants' arguments as to why the substance of Plaintiffs' arguments do not establish the requisite level of systemic and ongoing constitutional violations. *See* Defs.' Mot. (dkt. 1418) at 57-73. As stated by Defendants, the notice provisions and the procedures for RCGP assignment and transfer are sufficient to satisfy due process standards applicable to prison discipline and prisoner transfers (as described above) and contrary to Plaintiffs' suggestions, those procedures do not need to rise to the level of being completely error-free – all that is needed is notice and a meaningful opportunity to be heard. *See id*. at 69-73.

United States District Court
Northern District of California

1    As to Plaintiffs' attack on the particulars attending RCGP's conditions, restrictions, and its

2    retention and placement procedures (many of which Plaintiffs expressly negotiated and bargained

3    for as part of the Agreement (*see id*. at 59 n. 23)), to put it in Defendants' words, the undersigned

4    finds that Plaintiffs "continue to press this Court to not only impose a level of due process

5    different than the one they negotiated, but which has no foundation in the law." *Id*. at 73.

6    Accordingly, the undersigned finds Plaintiffs' fourth argument in support of extending the

7    Agreement to be similarly unpersuasive.

8         Aside from these four principal arguments in support of extending the Agreement,

9    Plaintiffs have also injected two tangential matters into this extension motion. First, Plaintiffs

10   contend that CDCR's failure to retain certain source interview recordings (after supposedly being

11   put on notice that those recordings were potentially relevant evidence) amounts to willful

12   evidentiary spoliation that requires an adverse inference presumption. *See* Pls.' Mot. (dkt. 1411) at

13   31-33. However, while Plaintiffs cite a number of generic spoliation cases in the trial context, it

14   does not appear that any of Plaintiffs' cited authorities would be even arguably applicable in the

15   present context – that is, a settled case wherein one party is seeking to extend a settlement

16   agreement (under largely the same standard as would apply to enforcing the agreement) for which

17   it seeks evidence that was not retained and contends that the now-missing evidence may or may

18   not have been helpful to its effort to extend (or enforce) the settlement agreement. *See id*. In any

19   event, the undersigned finds that Plaintiffs' spoliation contention does not require any substantial

20   discussion and the argument is due to be rejected for the reasons outlined by Defendants. *See*

21   Defs.' Opp. (dkt. 1418) at 53-57. In short, an adverse inference presumption, or any sanction, is

22   unnecessary because, as stated by Defendants: (1) Plaintiffs have conceded that more evidence of

23   the supposedly systemic violations by CDCR was not even necessary (citing Pls.' Mot. (dkt. 1411)

24   at 31), thereby undermining their request for sanctions; (2) that there has been no showing that

25   Defendants' failure to retain the material in question was done with any culpable state of mind

26   such as being specifically done to deny Plaintiffs the ability to use the information in this

27   litigation; (3) that it is far from certain that Plaintiffs put CDCR on actual notice to preserve the

28   recordings in question when they claim they did; and, (4) that Plaintiffs have not established how a

1   broad category of interview recordings would be relevant, rather than merely hoping their contents

2   might be relevant. *See generally* Defs.' Opp. (dkt. 1418) at 53-57. At bottom, the supposed

3   relevance of these confidential informant interview recordings must become the subject of serious

4   doubt by the fact that when "the investigating employee completes a confidential memorandum of

5   the content of the interview . . . the inmate then personally initials each page verifying its

6   accuracy." *Id.* at 57. Thus, the undersigned is unconvinced by Plaintiffs' spoliation argument, and

7   attendant request for an adverse inference presumption; as such, no sanction is warranted.

8          Lastly, Plaintiffs have included an enforcement-type argument into their request to extend

9   the Agreement by concluding with the statement that the court is obligated to devise and

10  implement a global remedy for the constitutional violations that Plaintiffs have outlined. *See* Pls.'

11  Mot. (dkt. 1411) at 69-71. It should be noted that Plaintiffs have developed this habit of including

12  blanket requests for enforcement-type relief in various unrelated motions or papers. For example,

13  in a recent discovery dispute letter brief pertaining to the scope of a particular prison guard's

14  deposition, Plaintiffs asked for leave to exceed the applicable page limitations which they then

15  used to move the court to force CDCR to permit a particular prisoner in one unit to be afforded

16  liberties and privileges not available in that unit. *See* Order of June 28, 2021 (dkt. 1493) at 3-4.

17  Another example is manifest in Plaintiffs' prior extension motion (from the previous monitoring

18  period) wherein they similarly asked the court for the fashioning of blanket remedies, and as Judge

19  Wilken stated on that occasion, "[t]he only issue now before the Court is whether Plaintiffs have

20  shown that the settlement agreement should be extended by twelve months under paragraph 41.

21  Plaintiffs have not shown that the Court can take any action under paragraph 41 other than to

22  extend the settlement agreement." *See* Order Extending Settlement Agreement (dkt 1440) at 56

23  n.10. Accordingly, the undersigned similarly finds that the issues underlying Plaintiffs' desired

24  remedies and reforms should be properly presented in the form of an enforcement motion and not

25  simply mentioned in passing in an extension motion.

26  //

27  //

28  //

United States District Court
Northern District of California

13

**CONCLUSION**

For the reasons stated herein, the undersigned finds that Plaintiffs have failed to meet their burden, and therefore the undersigned **RECOMMENDS** that Plaintiffs' Second Motion for Extension of Settlement Agreement (dkt. 1411) be **DENIED**.[2] Any party may file objections to this report and recommendation with the district judge within fourteen (14) days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B) & (C); Fed. R. Civ. P. 72(b); Civil Local Rule 72-3. Failure to file objections within the specified time may waive the right to appeal the district court's order.

**IT IS SO ORDERED.**

Dated: July 12, 2021

_____
ROBERT M. ILLMAN
United States Magistrate Judge

---

[2] Plaintiffs have filed a Reply Brief (dkt. 1448) to which they appended more than 130 pages of evidence and exhibits. (*See* dkts. 1446-6 and 1446-7). Naturally, Defendants have objected (dkt. 1455) and have moved to either strike these materials or to permit Defendants leave to file a sur-reply brief such as to have an opportunity to address them. The undersigned herewith **DENIES** Defendants' request to strike the materials; and because the undersigned has considered the materials and finds them to be unpersuasive, Defendants' request to file a sur-reply is **DENIED** as unnecessary. However, in the event that Plaintiffs file objections to this R&R, Defendants are free to raise the issue with Judge Wilken if necessary.