1

2

3       IN THE UNITED STATES DISTRICT COURT

4       FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6    TODD ASHKER, et al.,                    Case No. 09-cv-05796 CW

7              Plaintiffs,                   **ORDER EXTENDING THE
                                             SETTLEMENT AGREEMENT FOR
8         v.                                 A SECOND TWELVE-MONTH
                                             PERIOD**
9    GAVIN NEWSOM, et al.,
                                             (Re: Docket Nos. 1411, 1497, 1507)
10             Defendants.

11

12          This class action for violations of 42 U.S.C. § 1983 arises out of the placement and

13   indefinite retention of inmates by the California Department of Corrections and Rehabilitation

14   (CDCR) in solitary confinement in Security Housing Units (SHU) on the basis of so-called gang

15   validation.  Plaintiffs, prisoners in California prisons, some of whom were in solitary confinement

16   for more than ten years, bring this class action against Defendants, the Governor of the State of

17   California, the Secretary of CDCR, the Chief of CDCR's Office of Correctional Safety, and the

18   Warden of Pelican Bay State Prison, for violations of their Eighth and Fourteenth Amendment

19   rights.

20          The parties entered into a settlement agreement (SA) in August 2015, whose terms, and the

21   Court's jurisdiction to enforce the same, were set to expire in twenty-four months, unless Plaintiffs

22   showed, pursuant to paragraph 41 of the settlement agreement, the existence of ongoing and

23   systemic violations under the Eighth Amendment or Fourteenth Amendment as alleged in the

24   operative complaints or arising out of the SHU-related reforms required by the settlement

25   agreement.  At the end of the settlement agreement's twenty-four-month term, Plaintiffs

26   successfully moved for a twelve-month extension of the settlement agreement and the Court's

27   jurisdiction over this action.

28

United States District Court
Northern District of California

Now pending is Plaintiffs' second motion to extend the settlement agreement by another twelve months.  Docket No. 1411.  The Court referred this motion to the magistrate judge for a report and recommendation subject to de novo review.  The magistrate judge found that Plaintiffs failed to make the requisite showing of ongoing and systemic violations, and he recommended denying the motion to extend the settlement agreement.  *See* Report and Recommendations, Docket No. 1497.  Plaintiffs objected to each of the magistrate judge's findings and recommendations.  Docket No. 1507.  The Court reviews the magistrate judge's findings de novo and accepts his findings in part and rejects them in part, as set forth below, and concludes that Plaintiffs have met their burden to show that a second twelve-month extension of the settlement agreement is warranted under paragraph 41.

I.      **BACKGROUND**

A.      **Claims and Procedural History**

Plaintiffs Todd Ashker and Danny Troxell had lived in solitary confinement in Pelican Bay's SHU for over two decades.  Compl. ¶¶ 16-18.  On December 9, 2009, they filed this lawsuit challenging the conditions of their confinement.  Their pro se complaint charged various CDCR officials with violating their First, Fifth, Eighth, and Fourteenth Amendment rights.  *Id.* ¶ 8.

On September 10, 2012, after securing counsel, Ashker and Troxell filed a second amended complaint (2AC) converting this suit into a putative class action and joining eight other long-term SHU inmates as plaintiffs.  2AC ¶ 1, Docket No. 136.  In their 2AC, Plaintiffs assert that lengthy exposure to the conditions inside the Pelican Bay SHU violates the Eighth Amendment's ban on cruel and unusual punishment.  *Id.* ¶¶ 177-92.  Specifically, they allege that "the cumulative effect of extremely prolonged confinement, along with denial of the opportunity of parole, the deprivation of earned credits, the deprivation of good medical care, and other crushing conditions of confinement at the Pelican Bay SHU" have caused them significant harm, both physically and psychologically.  *Id.* ¶¶ 180-81.  They claim that SHU inmates are forced to "languish, typically alone, in a cramped, concrete, windowless cell, for 22 and one-half to 24 hours a day" without access to "telephone calls, contact visits, and vocational, recreational or educational programming."  *Id.* ¶ 3.

Plaintiffs also assert that CDCR's procedures for assigning inmates to the SHU violate the Fourteenth Amendment's guarantee of due process. *Id.* ¶¶ 193-202. According to Plaintiffs, CDCR assigns inmates to the SHU based solely on their membership in or association with prison gangs, without regard for the inmate's "actual behavior." *Id.* ¶¶ 91-92. CDCR relies instead on the word of confidential informants and various indicia such as "gang-related art, tattoos, or written material" to determine whether inmates are affiliated with a gang and to classify them as such – a process known as "gang validation." *Id.* ¶ 92. Inmates who have been validated as gang members or associates are assigned to the SHU for an indefinite term. *Id.* ¶¶ 92-94. Once inside the SHU, inmates receive periodic reviews every six months to determine whether they should be released into the prison's general population. *Id.* ¶¶ 96-97. Plaintiffs allege that these reviews are essentially "meaningless," because they require inmates to "debrief"–that is, to renounce their membership in the gang and divulge the gang's secrets to prison officials–in order to secure release. *Id.* ¶¶ 96-97, 7. Plaintiffs contend that debriefing is not a viable option for most inmates, who either know no such secrets or believe that debriefing "places [them] and their families in significant danger of retaliation" from other prisoners or their associates outside. *Id.* ¶ 7. CDCR also conducts reviews of SHU inmates' gang affiliation status every six years to determine whether they are still "active" gang members or associates. *Id.* ¶¶ 102-04. As with the six-month reviews, however, Plaintiffs aver that this process typically only leads to the inmates' release from the SHU if inmates are willing to debrief. *Id.* Plaintiffs allege, in short, that they have effectively been denied "information about an actual path out of the SHU, besides debriefing." *Id.* ¶ 117. They allege that they "are entitled to meaningful notice of how they may alter their behavior to rejoin general population, as well as meaningful and timely periodic reviews to determine whether they still warrant detention in the SHU." *Id.* ¶ 200.

Plaintiffs' 2AC seeks declaratory and injunctive relief. In particular, Plaintiffs request "alleviation of the conditions of confinement" in the SHU, meaningful review of the continued need for solitary confinement of all inmates who have been in the SHU for over six months, and release from the SHU of every inmate who has spent over ten years there. *Id.* ¶¶ 45-46; 202. They have not asserted any claims for monetary damages.

On May 2, 2013, Plaintiffs moved for class certification under Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2).  The motion remained pending for nearly a year at the parties' request while they engaged in settlement negotiations.  On May 14, 2014, however, the parties notified the Court that they were not able to reach a settlement.  On June 2, 2014, the Court granted in part and denied in part Plaintiffs' motion for class certification.  The Court certified two classes under Rules 23(b)(1) and 23(b)(2): (1) a Due Process Class comprised of all inmates who are assigned to an indeterminate term at the Pelican Bay SHU on the basis of gang validation, under the policies and procedures in place as of September 10, 2012; and (2) an Eighth Amendment Class comprised of all inmates who are now, or will be in the future, assigned to the Pelican Bay SHU for a period of more than ten continuous years.  Order at 21, Docket No. 317.

On October 17, 2014, CDCR permanently implemented the Security Threat Group (STG) policy, first piloted in October 2012.  *See* 15 Cal. Code Regs. § 3000, *et seq*.; Settlement Agreement ¶ 6, Docket No. 424-2.  This policy alters aspects of CDCR's gang validation process and its practice of imposing indeterminate terms in Pelican Bay's SHU.  The STG policy, in part, allows Pelican Bay's SHU inmates to "step down" from the most restrictive placement in the SHU to less restrictive housing conditions, provided that the inmates fulfill certain obligations.

On September 2, 2015, the parties jointly moved for preliminary approval of a settlement agreement that would resolve all claims.  The Court granted preliminary approval of the settlement agreement on October 14, 2015, and it granted final approval on January 26, 2016.  Docket Nos. 445, 488.  In accordance with the settlement agreement, the Court retained jurisdiction to enforce it.  Docket No. 488 at 2.

**B.     Relevant Terms of the Settlement Agreement**

The key terms of the settlement agreement, as relevant to the present motion, include the following: (1) requiring CDCR to no longer place inmates in any SHU or administrative segregation solely on the basis of gang validation; (2) requiring that no inmates be placed in the SHU for a disciplinary term unless they are found guilty in a disciplinary hearing of a new SHU-eligible offense; (3) requiring the creation of the Restrictive Custody General Population Unit (RCGP), in which inmates released from the SHU pursuant to the terms of the settlement

4

United States District Court
Northern District of California

1    agreement shall be placed if there is a substantial threat to their personal safety; (4) requiring the

2    Institution Classification Committee (ICC) to review the placement of inmates in the RCGP

3    during its 180-day reviews by verifying whether there continues to be a demonstrated threat to the

4    inmates' personal safety and, if not, referring the inmates to the Departmental Review Board

5    (DRB) for housing placement; (5) requiring CDCR to adhere to the standards for the use of and

6    reliance on confidential information set forth in Title 15 of the California Code of Regulations,

7    section 3321, and to train staff to ensure that confidential information used against inmates "is

8    accurate"; and (6) requiring CDCR to produce to Plaintiffs, for monitoring purposes, documents

9    relating to determinations as to whether class members have been found "guilty of a SHU-eligible

10   offense," including "redacted confidential information."  *See* SA ¶¶ 13-37, Docket No. 424-2.

11        Paragraph 41 of the settlement agreement permits Plaintiffs to seek an extension of the

12   agreement and the Court's jurisdiction over this matter of not more than twelve months; to obtain

13   the extension, Plaintiffs must demonstrate "by a preponderance of the evidence" that current and

14   ongoing systemic violations of the Eighth or Fourteenth Amendments occur as alleged in the

15   Second Amended Complaint, or the Supplemental Complaint, or as a result of CDCR's reforms to

16   its Step Down Program or the SHU policies contemplated in the agreement.  *Id.* ¶ 41.  Paragraph

17   42 of the settlement agreement provides, "Brief or isolated constitutional violations shall not

18   constitute an ongoing, systemic policy and practice that violate the Constitution, and shall not

19   constitute grounds for continuing this Agreement or the Court's jurisdiction over this matter."  *Id.*

20   ¶ 42.  In the event that an extension beyond the initial twenty-four months is granted, CDCR's

21   obligations with respect to the production of documents would be extended for the same period.

22   *Id.* ¶ 44.  In the absence of this showing, the settlement agreement and the Court's jurisdiction

23   "shall automatically terminate[.]"  *Id.* ¶ 41.  The agreement permits Plaintiffs to seek to extend

24   indefinitely the settlement agreement and the Court's jurisdiction so long as they make the

25   requisite showing just described, with each extension lasting no more than twelve months.  *Id.*

26   ¶ 43.

27       **C.**     **First and Second Motions to Extend the Settlement Agreement**

28        On November 20, 2017, Plaintiffs moved for an extension of the settlement agreement

5

United States District Court
Northern District of California

1    under paragraph 41 on the basis of current and ongoing systemic violations of the Due Process

2    Clause of the Fourteenth Amendment.  Docket No. 898-4.  Plaintiffs advanced three independent

3    categories of due process violations, with each being sufficient to warrant an extension: (1)

4    Defendants' ongoing and systemic misuse of, and lack of accurate disclosures regarding,

5    confidential information; (2) Defendants' ongoing and systemic failure to provide adequate

6    procedural protections prior to the placement and retention of class members in the RCGP based

7    on demonstrated threats to inmates' personal safety; and (3) Defendants' ongoing and systemic

8    retention of old gang validations that could be relied upon for parole purposes.  *Id.* at 1.

9    Defendants opposed the motion.

10        The undersigned referred the motion to the magistrate judge and, on January 25, 2019, that

11   judge concluded that Plaintiffs' motion to extend the settlement agreement should be granted,

12   finding that Plaintiffs had satisfied their burden under paragraph 41 based on two of the three

13   categories of due process violations they advanced in their motion.  Docket No. 1122.

14        On February 6, 2019, Defendants appealed the magistrate judge's January 25, 2019, order

15   directly to the Ninth Circuit.  Docket No. 1126.  Plaintiffs filed a notice of a cross-appeal of the

16   magistrate judge's January 25, 2019, order on February 25, 2019.  Docket No. 1131.  The

17   procedural history of these appeals is described in more detail in the Court's order of April 9,

18   2021.  *See* Docket No. 1440.

19        The parties agree that, while these appeals were pending, the twelve-month extension of

20   the settlement agreement went into effect; the extension began on July 15, 2019, and it ended on

21   July 15, 2020.  *See* Docket No. 1471.

22        On August 3, 2020, the Ninth Circuit held that the magistrate judge's order on Plaintiffs'

23   extension motion was not a final order under 28 U.S.C. § 636(c)(1).  *Ashker v. Newsom*, 968 F.3d

24   975 (9th Cir. 2020).  The court of appeals remanded the action to the undersigned "to consider

25   construing the magistrate judge's extension order as a report and recommendation and afford the

26   parties reasonable time to file objections."  *Id.* at 985.

27        In accordance with the Ninth Circuit's opinion, the Court construed the magistrate judge's

28   order on Plaintiffs' extension motion as a report and recommendation under 28 U.S.C.

§ 636(b)(1)(B) and permitted both sides to file objections to it.

Meanwhile, on December 15, 2020, Plaintiffs filed a second extension motion seeking to extend the settlement agreement for another twelve months based on the same three categories of alleged due process violations upon which their first extension motion was premised, as well as two new categories of alleged due process violations, namely (1) Defendants' systemic failure to ensure that confidential information in confidential memoranda is accurate and complete, and (2) Defendants' systemic failure to timely disclose to inmates a meaningful non-confidential summary of confidential information that could be relied upon by parole commissioners for the purpose of parole determinations.  Docket No. 1411.  This Court referred that motion to the magistrate judge for a report and recommendation.

On April 9, 2021, this Court adopted the magistrate judge's recommendation to grant Plaintiffs' first motion to extend the settlement agreement by twelve months under paragraph 41. Docket No. 1440.  This Court held that the extension was warranted based on all three categories of due process violations advanced by Plaintiffs, not just the two that the magistrate judge had found.  The effect of the Court's April 9, 2021, order was to confirm that the twelve-month extension of the settlement agreement, which the parties agree ran between July 15, 2019, and July 15, 2020, was justified by the evidence that Plaintiffs presented in their first extension motion. The April 9, 2021, order also permits Plaintiffs to move for a second extension of the settlement agreement under paragraph 43; as noted above, Plaintiffs filed a second extension motion on December 15, 2020.

Defendants filed a notice of appeal with respect to the April 9, 2021, order on May 7, 2021.  Docket No. 1455.  That appeal is pending.

On July 12, 2021, the magistrate judge issued a report and recommendations with respect to Plaintiffs' second extension motion.  Docket No. 1497.  The magistrate judge found that Plaintiffs had not satisfied their burden under paragraph 41 based on any of the categories of alleged due process violations they advanced in their second extension motion, and he recommends denying the motion.

1    The Court permitted both sides to file objections to the report and recommendations.

2    Plaintiffs objected to all of the magistrate judge's findings and recommendations.

3    **II.    LEGAL STANDARD**

4    Where a district judge refers a matter to a magistrate judge for a report and

5    recommendation under 28 U.S.C. § 636(b)(1)(B), the district court

6    shall make a de novo determination of those portions of the report
     or specified proposed findings or recommendations to which
7    objection is made.  A judge of the court may accept, reject, or
     modify, in whole or in part, the findings or recommendations made
8    by the magistrate judge.  The judge may also receive further
     evidence or recommit the matter to the magistrate judge with
9    instructions.

10

11   28 U.S.C. § 636(b)(1).

12   "The Fourteenth Amendment's Due Process Clause protects persons against deprivations

13   of life, liberty, or property; and those who seek to invoke its procedural protection must establish

14   that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  A court

15   "need reach the question of what process is due only if the [plaintiff] establish[es] a

16   constitutionally protected . . . interest." *Id.*  If the plaintiff makes a showing that a cognizable

17   interest is at stake, the court then considers "the question of what due process is due" to satisfy the

18   Constitution. *Id.*

19   **III.    DISCUSSION**

20   As noted, Plaintiffs objected to the magistrate judge's findings and recommendations as to

21   each category of alleged violations of due process that formed the basis of their second extension

22   motion.  Because the standard of review is de novo, the Court considers the arguments and

23   evidence presented to the magistrate judge with respect to each of the categories of alleged due

24   process violations that formed the basis of Plaintiffs' second extension motion as if no decision

25   had been rendered by the magistrate judge.  *See Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir.

26   2009) ("De novo review means that the reviewing court do[es] not defer to the lower court's ruling

27

28

United States District Court
Northern District of California

but freely consider[s] the matter anew, as if no decision had been rendered below.") (citation and internal quotation marks omitted).[1]

As noted, the settlement agreement can be extended by twelve months only if Plaintiffs show, by a preponderance of the evidence, that (1) current and ongoing systemic violations occur under the Eighth or Fourteenth Amendments; and (2) such violations occur as alleged in the complaints or as a result of the settlement agreement's reforms to Defendants' SHU policies.  SA ¶ 41.

Below, the Court evaluates each of the categories of alleged due process violations that form the basis of Plaintiffs' second extension motion by considering, first, whether each category of alleged due process violations would fall within the scope of the operative complaints or would "result" from the SHU reforms required by the settlement agreement.  If the answer is yes, the Court will then consider whether Plaintiffs have shown, by a preponderance of the evidence, that the alleged due process violations occur on a current and ongoing systemic basis.  Only if the answer is yes to both of these inquiries can the alleged due process violations in question serve as a basis for extending the settlement agreement under paragraph 41.

## A.    CDCR's Policies and Practices Pertaining to RCGP Retention

Plaintiffs argue that Defendants are violating class members' due process rights in an ongoing and systemic way by retaining them in the RGCP pursuant to paragraph 27 of the settlement agreement without providing them with meaningful periodic reviews and accurate notice of the basis for RCGP retention under paragraph 27.  Plaintiffs contend that class members have a liberty interest in avoiding retention in the RCGP under paragraph 27 because the conditions in the RCGP are considerably more restrictive and onerous than those in the general prison population, and the duration of class members' confinement therein is indeterminate.

---

[1] Defendants rely on *Mathews v. Weber*, 423 U.S. 261, 271 (1976) (*Weber*) for the proposition that "the Magistrate Judge's findings and recommendations here are entitled to deference and should, at a minimum, inform the Court's analysis."  Docket No. 1510-4 at 4. *Weber* is inapposite.  That case addresses the standard of review for referrals to a magistrate judge under 28 U.S.C. § 636(b)(3).  Here, by contrast, the referral to the magistrate judge was under § 636(b)(1)(B).  *See Ashker*, 968 F.3d at 985.  As such, this Court's review of the magistrate judge's report and recommendations must be made pursuant to § 636(b)(1)(C).

United States District Court
Northern District of California

1   Plaintiffs argue that Defendants have failed to provide class members with sufficient procedural

2   protection of their liberty interest in avoiding retention in the RCGP because Defendants have not

3   implemented any procedures to ensure that periodic reviews of RCGP placements are meaningful,

4   or that inmates are provided with adequate notice of the factual basis for RCGP retention under

5   paragraph 27.

6        Defendants do not dispute that the RCGP placements about which Plaintiffs complain are

7   those of class members under paragraph 27 of the settlement agreement or that the alleged due

8   process violations at issue fall within the scope of the settlement agreement.  Defendants argue

9   that Plaintiffs cannot show any due process violations arising out of class members' retention in

10  the RCGP under paragraph 27 because prisoners with safety concerns do not have a liberty interest

11  in avoiding retention in the RCGP and, even if they did have such a liberty interest, the inmates

12  retained in the RCGP receive sufficient due process.

13            **1.**       **Whether the alleged due process violations are within the scope of the**

14                        **complaints or settlement-agreement reforms**

15       The Court found in its order of April 9, 2021, that alleged due process violations stemming

16  from Defendants' policies and practices used to retain class members in the RCGP under

17  paragraph 27 can be a basis for extending the settlement agreement under paragraph 41 because

18  they arise out of the reforms required by the settlement agreement, namely those governing the

19  placement and retention of class members in the RCGP under paragraph 27 on the basis of threats

20  to their safety.  Docket No. 1440 at 14-16.

21       Defendants do not argue for a different conclusion in their opposition to Plaintiffs' second

22  extension motion.  *See generally* Docket No. 1419-4.

23       In the absence of any dispute, the Court reaffirms its finding that alleged due process

24  violations arising out of policies and practices resulting in class members' retention in the RCGP

25  under paragraph 27 can be a basis for extending the settlement agreement under paragraph 41.

26            **2.**       **Whether the alleged due process violations occur on an ongoing and**

                      **systemic basis**

27                  **a.**       **Liberty interest**

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   In its order of April 9, 2021, the Court held that class members have a liberty interest in

2   avoiding retention in the RCGP under paragraph 27 "in light of the diminished opportunities for

3   contact visits while in the RCGP relative to the general prison population, in combination with the

4   indeterminate duration of placement in the RCGP, and the possibility of placement on walk-alone

5   status while in the RCGP." Docket No. 1440 at 24. Defendants have not shown that a different

6   conclusion is warranted at this juncture.

7   The question of whether prisoners have a liberty interest in avoiding placement or retention

8   in the RCGP under paragraph 27 is governed by *Sandin v. Conner*, 515 U.S. 472 (1995). There,

9   the Supreme Court held that prisoners could establish a liberty interest in avoiding certain prison

10  conditions if they show that such conditions "impose[] atypical and significant hardship on the

11  inmate in relation to the ordinary incidents of prison life." *Id.* at 484. *Sandin*, therefore, requires a

12  comparison between the conditions of the confinement at issue (here, the conditions in the RCGP)

13  relative to other alternative conditions of confinement that represent "the ordinary incidents of

14  prison life." *Id.*

15  Neither the Supreme Court nor the Ninth Circuit has defined the prison conditions that are

16  the appropriate basis for comparison. *See Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 988 (9th

17  Cir. 2014) ("We have noted that [t]he *Sandin* Court seems to suggest that a major difference

18  between the conditions for the general prison population and the segregated population triggers a

19  right to a hearing, but have not clearly held that conditions in the general population, as opposed to

20  those in other forms of administrative segregation or protective custody, form the appropriate

21  baseline comparator.") (internal citation and quotation marks omitted).

22  The Court concluded in its April 9, 2021, order that the conditions in the general prison

23  population are the appropriate basis for comparison relative to the conditions in the RCGP,

24  because:

25         it is undisputed that class members who were placed in the RCGP
       because of concerns for their safety otherwise would have been

26         placed in the general population following their release from the
       SHU. This finding is consistent with *Sandin*, which provides that

27         the relevant comparison is that "between inmates inside and
       outside" the segregation placement at issue. *See* 515 U.S. at 486–

28         87; *see also Reyes v. Horel*, No. C 08-4561 RMW, 2012 WL

1

2

3

4

> 762043, at *4 (N.D. Cal. Mar. 7, 2012) (holding that the proper comparison under *Sandin* is "between the conditions where the plaintiff is to be housed and where the general prison population is housed"). Accordingly, for the purpose of resolving Plaintiffs' extension motion, the Court considers whether the conditions in the RCGP impose "atypical and significant hardship" on prisoners relative to "the ordinary incidents of prison life" as experienced by prisoners in the general prison population.

5   Docket No. 1440 at 17.  Defendants have not cited any authority that compels a different

6   conclusion.  Accordingly, the Court reaffirms its April 9, 2021, holding that the general prison

7   population is the relevant basis for comparison.

8       Factors relevant to whether conditions impose atypical and significant hardship on

9   prisoners include: (1) the duration of the conditions; (2) the degree of restraint imposed; and (3)

10  whether the state's action will affect the duration of the inmate's sentence.  *Sandin*, 515 U.S. at

11  486-87.  In the Ninth Circuit, determining what "condition or combination of conditions or factors

12  would meet the [*Sandin*] test requires case by case, fact by fact consideration."  *Keenan v. Hall*, 83

13  F.3d 1083, 1089 (9th Cir. 1996).

14      In its order of April 9, 2021, the Court relied on *Aref v. Lynch*, 833 F.3d 242, 256 (D.C.

15  Cir. 2016), which Defendants have neither addressed nor distinguished, to find that class members

16  have a liberty interest in avoiding retention in the RCGP.  The Court continues to find *Aref* to be

17  persuasive and apt.

18      In *Aref*, the District of Columbia Circuit held that prisoners had a liberty interest in

19  avoiding placement in Communication Management Units (CMU), which housed prisoners who

20  required heightened monitoring of their communications as a result of having a history of, or

21  propensity for, communications with extremist groups or conducting illicit activities outside of the

22  prison.  *Id.* at 246.  The court of appeals found that the defining aspect of the CMU was that

23  prisoners held therein had "more limited and less private communications compared to general

24  population inmates"; specifically, all visits with family had to be non-contact, through a glass

25  wall; all visits were live monitored and recorded; all written correspondence was inspected and

26  more limited in permissible quantity; and phone calls were limited to immediate family members.

27  *Id.* at 246-47.

28

United States District Court
Northern District of California

The court of appeals acknowledged that prisoners housed in CMU experienced "significantly less deprivation" than prisoners held in administrative segregation[2], because, unlike prisoners in administrative segregation, CMU prisoners were allowed spaces with other CMU inmates for sixteen hours a day; they had access to educational and professional opportunities; they could keep as many possessions as inmates in the general population; they had no added restrictions on exercise; and they were allowed more phone calls and visits than prisoners in administrative segregation. *Id.* at 257. Indeed, other than the restrictions affecting visits and calls with family and visitors, the CMU "essentially function[ed] as self-contained general population housing unit[s]." *Id.* at 247 (citation and internal quotation marks omitted). Nevertheless, the court of appeals found that the indefinite length of CMU placement, which could be permanent, in combination with the unusual restrictions on visits and contacts with family and other visitors, weighed in favor of finding that prisoners had a liberty interest in avoiding placement in the CMU. The court of appeals reasoned that, even though the deprivations in the CMU were "not extreme," they would necessarily "increase in severity over time," as it would become increasingly difficult for prisoners to maintain relationships with family members and others as the length of their confinement in the CMU increased. *Id.*

Plaintiffs have again shown that conditions in the RCGP, when considered in combination, are even more restrictive than those that the District of Columbia Circuit held gave rise to a liberty interest in *Aref*, as a result of Defendants' prohibition on weekend contact visits, the indeterminate nature of RCGP placement, and the possibility of being placed on walk-alone status. *See* Docket No. 1525 at 41-43; *see also* Docket No. 1505-4 at 48-50.

First, it is undisputed that RCGP inmates may not receive contact visits on weekends, whereas inmates in the general population at Pelican Bay can. As the Court noted in its April 9, 2021, order, the prohibition on weekend contact visits for RCGP inmates makes it less feasible for family and friends who live in other parts of California to make the trip to Pelican Bay. Docket

---

[2] In the District of Columbia Circuit, courts compare the challenged conditions to the conditions in administrative segregation, and not the conditions in the general prison population. *See Aref*, 833 F.3d at 254.

United States District Court
Northern District of California

United States District Court
Northern District of California

No. 1440 at 21.  The evidence that Plaintiffs have presented in support of their second extension motion supports that finding.  *See, e.g.*, Prisoner Decl. ¶ 10, Docket No. 1346-7 (Bremer Decl., Ex. l) ("Because of the remote location [of Pelican Bay], I have received no visits since my transfer here [in July 2018]. . . . Because contact visits are only available on Thursdays and Fridays, my family members would have to take time off of work [sic] if they did visit."); Prisoner Decl. ¶ 8, Docket No. 1346-7 (Bremer Decl. Ex. k); Prisoner Decl. ¶ 4, Docket No. 1346-7 (Bremer Decl., Ex. j).  The evidence that Defendants filed also supports this finding.  Visitation logs tracking RCGP visits from 2018 to early 2020 show that the approximately eighty inmates in the RCGP, collectively, received 220 visits during that time period.  *See* Kirby Decl. ¶ 25, Docket No. 1419-8.  These visitation logs show, however, that 147 of the 220 total visits were received by only *five* RCGP prisoners, each of whom received multiple visits during that period.  *Id.*  This means that the remaining RCGP prisoners, approximately seventy-five prisoners, received, collectively, seventy-three visits during a two-year period, which is roughly one visit per RCGP prisoner every two years.  These facts support a finding that the location of the RCGP in combination with the prohibition on weekend visits makes it more difficult for friends and family members of RCGP prisoners to visit them.

Notably, despite having access to visitation logs, Defendants have not filed any evidence showing that general-population prisoners at Pelican Bay, on average or collectively, receive a similar number of visits relative to RCGP prisoners.[3]  The Court infers from Defendants' failure to file this evidence that it is *not* the case that general-population prisoners at Pelican Bay receive visits at a similar rate relative to RCGP prisoners.

---

[3] L. Kirby, who has been a RCGP Lieutenant at Pelican Bay since November 2019, states in his declaration that he "do[es] not believe that general-population inmates" receive more visits than RCGP prisoners.  Kirby Decl. ¶ 24, Docket No. 1419-8.  The Court gives minimal weight to this statement because there is no evidence in the record from which the Court could infer that the statement is reliable or is based on Kirby's personal knowledge.  Kirby does not claim to have reviewed visitation logs tracking visits to general population prisoners at Pelican Bay.  Kirby also does not include facts in his declaration explaining how his employment as RCGP Lieutenant at Pelican Bay would enable him to know, with any degree of accuracy, how many visits general-population prisoners receive relative to RCGP prisoners.  Accordingly, the Court finds that Kirby's representation about the visits that general-population prisoners receive at Pelican Bay relative to RCGP prisoners is speculative.

1    Second, Plaintiffs have shown that class members' placement in the RCGP is

2    indeterminate because it is not known in advance when the threats to class members' safety will be

3    deemed to no longer exist.

4    Third, RCGP prisoners can be placed on walk-alone status for some, if not all, of their time

5    in the RCGP.  While RCGP prisoners who are not on walk-alone status can program and socialize

6    with other RCGP prisoners in small groups, placement on walk-alone status diminishes or even

7    eliminates a prisoner's ability to socialize and program in groups with other RCGP prisoners for

8    the duration of the walk-alone placement.  A prisoner can be placed on walk-alone status during

9    an observation period when he arrives at the RCGP, because of incompatibilities or altercations

10   with other RCGP prisoners, or because of a determination by prison staff that he cannot program

11   safely with other RCGP prisoners.  Kirby Decl. ¶ 8.

12   These three conditions, when considered in combination, impose on class members an

13   atypical and significant hardship relative to the general prison population that is materially similar

14   to that which gave rise to a liberty interest in *Aref*.  These three conditions are sufficient to support

15   a finding that class members have a liberty interest in avoiding RCGP retention.

16   Defendants' arguments to the contrary are unpersuasive.  Defendants contend that the

17   Constitution does not entitle inmates to the prison of their choice or to a certain "level of social

18   interaction" while in prison.  Docket No. 1419-4 at 52-54.  This argument misapprehends the

19   nature of the liberty-interest inquiry.  The question is not whether the Constitution entitles

20   prisoners to a specific amount of social interaction or a specific prison.  Instead, the question is

21   whether the *difference* in the conditions in the RCGP relative to the conditions in the general

22   population entitles prisoners to *procedural protections* before they are placed or retained in the

23   RCGP.

24   Defendants next contend that their prohibition on weekend visits should play no role in the

25   liberty interest analysis because the parties had an opportunity to negotiate a visiting schedule for

26   RCGP prisoners with the assistance of the magistrate judge.  Docket. No. 1419-4 at 52.  That

27   visitation schedules were negotiated does not alter the Court's findings, because it is undisputed

28

1    that, during these negotiations, Plaintiffs requested weekend visits for class members in the RCGP

2    but Defendants refused to agree.

3         Defendants also argue that the possibility of placement on walk-alone status while in the

4    RCGP is not a factor that weighs in favor of finding a liberty interest in avoiding RCGP retention.

5    Specifically, Defendants contend that the number of RCGP prisoners assigned to walk-alone status

6    has decreased since Plaintiffs' last extension motion and that some RCGP prisoners on walk-alone

7    status have been assigned to a modified walk-alone program that is less restrictive and that

8    provides prisoners with more opportunities for social interaction and programming.  Docket No.

9    1419-4 at 54.  The Court, again, is not persuaded.  It is undisputed that a significant percentage of

10   prisoners in the RCGP as of the end of the second monitoring period were on some kind of walk-

11   alone status, and that placement on walk-alone status reduces a prisoner's opportunities for

12   programming and socializing relative to RCGP prisoners who are not on walk-alone status.[4]

13   Despite the changes that Defendants have made to the walk-alone program to make it less

14   restrictive, it remains the case that prisoners placed on any kind of walk-alone status cannot

15   socialize or program with other RCGP prisoners as RCGP prisoners who are not on walk-alone

16   status can.[5]  Thus, it remains the case that the programming and socializing opportunities available

17   to RCGP prisoners are diminished for inmates on walk-alone status relative to the general prison

18   population.[6]

19

20        [4] Defendants represent that ten out of the eighty prisoners currently in the RCGP are on
     walk-alone status and that thirty-eight of the eighty RCGP prisoners are on "modified" walk-alone
21   status.  Kirby Decl. ¶¶ 9, 8, Docket No. 1419-8.  The "modified" walk-alone status program was
     established in April 2020.  *Id.* ¶ 9.
22

23        [5] *See, e.g.*, Kirby Decl. ¶ 9 (prisoners on modified walk-alone status are restrained in
     "individual therapeutic modules that are secured" while participating in programming).

24        [6] Defendants argue that the Ninth Circuit has held that placement in the RCGP does not
25   violate the terms of the settlement agreement.  *See* Docket No. 1419-4 at 48 (citing *Ashker v.
     Newsom*, 968 F.3d 939, 944-46 (2020)).  This is irrelevant to the Court's analysis here.  The Ninth
26   Circuit's rulings as to Defendants' "walk-alone" program arose out of a motion to enforce the
     settlement agreement.  Because no alleged due process violations arising out of RCGP placements
27   or retentions were before the Ninth Circuit, the court of appeals did not consider whether prisoners
     have a liberty interest in avoiding placement or retention in the RCGP, or whether prisoners must
28   be provided with procedural due process protections before being placed or retained in the RCGP.

1    Defendants next argue that restrictions imposed on RCGP prisoners are not "overly

2   restrictive" because RCGP prisoners have access to job and socializing opportunities and because

3   the restrictions in the RCGP are necessary to keep them safe.  *See* Docket No. 1419-4 at 53-56.

4   These arguments are unavailing.  First, the availability of job and certain socializing opportunities

5   does not impact the fact that other aspects of placement in the RCGP, namely the indeterminate

6   nature of the confinement in the RCGP, the reduced opportunities for contact visits, and the

7   possibility of placement on walk-alone status, in combination, are more than sufficient under *Aref*

8   to find a liberty interest.  The inmates placed in the CMU in *Aref* had access to programming

9   opportunities; the District of Columbia Circuit nevertheless held that inmates had a liberty interest

10   in avoiding placement in the CMU for the reasons discussed above.  Second, that the RCGP

11   restrictions are necessary to keep RCGP prisoners safe plays no role in the liberty interest analysis.

12   *See Wilkinson*, 545 U.S. at 224 (holding that the "necessity" of "harsh conditions" is irrelevant to

13   the consideration of whether such conditions "give rise to a liberty interest in their avoidance").

14    Finally, Defendants argue that RCGP retention is not indeterminate, because "RCGP

15   inmates, like other CDCR inmates, move in and out of the RCGP.  An inmate's eligibility for

16   transfer from the RCGP is determined under agreed-upon criteria."  Docket No. 1419-4 at 56.

17   This argument is unpersuasive.  The indeterminate nature of RCGP placement or retention stems

18   from the fact that no prisoner or prison official can know in advance when a prisoner may satisfy

19   the criteria for transfer out of the RCGP under paragraph 27, which depend on the existence of

20   threats to the inmate's safety.

21    In light of the foregoing, the Court finds that Plaintiffs have shown that class members

22   have a liberty interest in avoiding retention in the RCGP under paragraph 27, as in *Aref*, based on

23   the diminished opportunities for contact visits while in the RCGP, in combination with the

24   indeterminate duration of retention in the RCGP, and the possibility of placement on walk-alone

25   status while in the RCGP.

26          **b.**     **Constitutional sufficiency of procedures**

27    Having determined that class members have a liberty interest in avoiding retention in the

28   RCGP, the Court now turns to the question of what process is due to inmates whom Defendants

United States District Court
Northern District of California

seek to retain in the RCGP under paragraph 27.  Paragraph 27 of the settlement agreement

provides that, "during their regular 180-day reviews, the Institution Classification Committee shall

verify whether there continues to be a demonstrated threat to the inmate's personal safety; and if

such threat no longer exists the case shall be referred to the Departmental Review Board for

review of housing placement as soon as practicable."  SA ¶ 27.  Defendants represent, and

Plaintiffs do not dispute, that, in addition to the ICC's 180-day reviews of RCGP placements

required by paragraph 27, RCGP placements or retentions are subject to review by the DRB every

two years.  *See* Docket No. 1419-4 at 59-60.  Other than these periodic reviews, Defendants have

identified no other procedures currently in place that provide procedural safeguards to prisoners

being retained in the RCGP under paragraph 27.

The issue of whether Defendants' current procedures for retaining inmates in the RCGP

under paragraph 27 satisfy the requirements of the Due Process Clause turns on the Court's

evaluation of the following three factors pursuant to a framework established in *Mathews v.*

*Eldridge*, 424 U.S. 319 (1976) (*Mathews*):

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest
> through the procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-25 (quoting *Mathews*, 424 U.S. at 335).  Instead of relying on rigid

rules, courts employ the *Mathews* framework to evaluate the constitutional sufficiency of

particular procedures because the requirements of due process are "flexible and cal[l] for such

procedural protections as the particular situation demands," *id.* at 224–25 (citations and internal

quotation marks omitted) (alteration in the original).

*Wilkinson* is instructive as to how to employ the *Mathews* framework to analyze the

constitutionality of procedures used to retain prisoners in more restrictive conditions for

administrative reasons.  There, the Supreme Court evaluated the procedures that Ohio followed for

placing and retaining inmates for administrative reasons in the Ohio State Penitentiary (OSP), a

supermax facility, to determine whether they were adequate to provide prisoners with due process.

United States District Court
Northern District of California

1    The procedures required Ohio to (1) provide "notice of the factual basis leading to consideration

2    for OSP placement"; (2) provide three levels of review for a decision recommending an initial

3    OSP placement, with the power to overturn the recommendation at each level; (3) provide "a fair

4    opportunity for rebuttal," as well as a "second opportunity" for rebuttal by allowing the inmate to

5    submit objections prior to the final level of review; (4) provide a placement review within thirty

6    days of the initial placement in the OSP, and an annual review thereafter performed according to

7    the three-tier review process used for the initial placement; and (5) provide "a short statement of

8    reasons" if the recommendation is OSP placement in order to "guard[] against arbitrary

9    decisionmaking while also providing the inmate a basis for objection before the next

10   decisionmaker or in a subsequent classification review" and to serve as "a guide for future

11   behavior."  545 U.S. at 216-18.

12         The Supreme Court held that, because the OSP placements at issue were administrative

13   placements made for the purpose of protecting the safety of inmates and prison staff, the

14   "informal, nonadversary procedures" that the Supreme Court held were sufficient to afford

15   inmates with constitutional due process in *Hewitt v. Helms*, 459 U.S. 460, 473-76 (1983),

16   *abrogated in part on other grounds in Sandin*, 515 U.S. at 472, "provide the appropriate model"

17   for the procedural safeguards that due process requires in the context of administrative prison

18   placements.  *Id.* at 229.  The informal, nonadversary procedures held to be constitutionally

19   sufficient in *Hewitt* are providing prisoners with the reason for placement, an opportunity to be

20   heard, and periodic review of placement.

21         The Supreme Court held, based on a balancing of the *Mathews* factors, that Ohio's

22   procedures were sufficient "to safeguard an inmate's liberty interest in not being assigned to

23   OSP."  *Id.*  Specifically, the Supreme Court found that (1) the inmates' interest in avoiding

24   erroneous placement in the OSP (first *Mathews* factor) was "more limited than in cases where the

25   right at stake is the right to be free from confinement at all," because the inmates subject to the

26   OSP were already in lawful confinement and their liberty was, therefore, "curtailed by definition,"

27   *id.* at 225; (2) the State's interest in ensuring prison security was a "dominant consideration" (third

28   *Mathews* factor) because the OSP placements were made for the purpose of ensuring the safety of

1    inmates and the institution; and (3) Ohio's procedures provided inmates with safeguards that

2    resulted in a low risk of erroneous placement in the OSP (second *Mathews* factor) and were

3    "comparable" to those upheld as constitutionally sufficient in *Hewitt*, in relevant part because the

4    procedures required Ohio to provide inmates with "notice of the factual basis" for OSP placement

5    and a fair opportunity for rebuttal, required a three-tiered review for any decision recommending

6    OSP placement, and required an automatic thirty-day review following the initial OSP placement

7    and an annual review thereafter.  *Id.*

8           Here, as in *Wilkinson*, the first *Mathews* factor, namely the private interest affected by

9    Defendants' RCGP retentions under paragraph 27, is "more limited than in cases where the right at

10   stake is the right to be free from confinement at all," because class members are already in lawful

11   confinement and their liberty is, therefore, "curtailed by definition."  *Id.* at 225.

12          As in *Wilkinson*, the third *Mathews* factor, namely the State's interest, is a "dominant

13   consideration" here, because the RCGP placements under paragraph 27 are administrative, as

14   opposed to disciplinary, and because the RCGP placements at issue are made by Defendants for

15   the purpose of keeping inmates safe.  *See id.*

16          The *Mathews* analysis here, as in *Wilkinson*, turns on the second factor, which "addresses

17   the risk of an erroneous placement under the procedures in place, and the probable value, if any, of

18   additional procedural or alternative procedural safeguards."  *Id.* at 225-26.  As in *Wilkinson*, the

19   "appropriate model" for determining whether Defendants' procedures for retaining inmates in the

20   RCGP under paragraph 27 are adequate is *Hewitt*, which, as noted, requires "informal,

21   nonadversary procedures," namely notice of the reason for placement, an opportunity to be heard,

22   and periodic review.[7]  *Id.*

23

24

25          [7] Defendants do not dispute that due process in the context of RCGP retention under
     paragraph 27 requires, under *Hewitt*, notice of the reason for placement, an opportunity to be
26   heard, and periodic review.  *See* Docket No. 1419-4 at 60 ("If the Court finds that the RCGP is so
     restrictive that inmates have a liberty interest in avoiding it, due process would require only that
27   CDCR provide inmates with a notice of the reason for their placement, an opportunity to be heard,
     and a periodic review.").

28

United States District Court
Northern District of California

1    Plaintiffs argue that Defendants' current procedures result in an unacceptable risk of

2 erroneous retention in the RCGP because Defendants lack any procedures that require them to

3 provide class members with *meaningful* periodic reviews of their RCGP retention, or with

4 accurate notice of the basis for continued RCGP retention.  Plaintiffs argue that the absence of

5 these procedural protections violates due process because, on the whole, Defendants' procedures

6 for retaining inmates in the RCGP are less robust than those that the Supreme Court upheld as

7 constitutionally sufficient in *Wilkinson*.  Specifically, unlike the procedures in *Wilkinson*, which

8 required prison officials to provide "notice of the factual basis" for OSP placement and a fair

9 opportunity for rebuttal, to employ a three-tiered review system for any decision recommending

10 OSP retention with the power to overturn the retention recommendation at any level, and to

11 conduct annual reviews of OSP placements subject to the same three-tiered review system just

12 described, Defendants' procedures here (1) do not require a multi-tiered review of a decision to

13 retain an inmate in the RCCP; and (2) do not require that a review by the DRB of any ICC

14 decision to retain inmates in the RCGP take place annually as in *Wilkinson*.  Docket No. 1409-1 at

15 60.

16    Defendants do not dispute that they do not provide class members with multi-tiered or

17 annual reviews of RCGP-retention decisions by the ICC or that their procedures for retaining class

18 members in the RCGP under paragraph 27 contain fewer checks and balances than those at issue

19 in *Wilkinson*.  Defendants nevertheless contend that their practices for retaining inmates in the

20 RCGP are comparable to those held sufficient in *Hewitt* because they do provide class members

21 with meaningful periodic reviews and adequate notice of the reasons for RCGP retention, under

22 paragraph 27.

23    For the reasons discussed below, the Court finds that Plaintiffs have shown, by a

24 preponderance of the evidence, that Defendants systemically fail to provide class members with

25 *meaningful* periodic reviews of their RCGP retention or with accurate notice of the reasons for

26 RCGP retention under paragraph 27.  These failures, which result in depriving class members of

27 the minimal procedural safeguards set forth in *Hewitt*, are systemic, because Defendants have not

28 pointed to any policies or procedures they have implemented to ensure that class members receive

United States District Court
Northern District of California

meaningful periodic reviews or accurate notice. These failures are likely to result in a significant risk of erroneous RCGP retentions, which could be meaningfully reduced by implementing additional procedural safeguards, such as instituting multi-level reviews for ICC determinations to retain inmates in the RCGP, making the DRB reviews more frequent, or instituting policies and procedures to provide guidance to the ICC as to how to verify during its 180-day reviews whether threats to the inmate's safety continue to exist. Defendants have not identified any administrative or financial burdens that could result from requiring them to implement additional procedural safeguards in the context of ICC reviews of RCGP placements. Accordingly, the second *Mathews* factor weighs in favor of finding that Defendants' current practices and policies are constitutionally insufficient. The Court concludes, therefore, that Plaintiffs have shown ongoing and systemic due process violations as a result of Defendants' policies and practices relating to the retention of class members in the RCGP under paragraph 27.

### i.   Failure to provide class members with meaningful periodic reviews of RCGP placement

As noted, one of the informal, nonadversary protections that must be provided to inmates in the context of administrative prison placements pursuant to *Hewitt* is periodic review of an administrative placement in more restrictive housing conditions. *See Hewitt*, 459 U.S. at 477 n.9. The purpose of requiring periodic reviews is to prevent administrative segregation from becoming a "pretext for indefinite confinement of an inmate." *Id.*

To satisfy due process, a periodic review must be "meaningful and non-pretextual," meaning that it must be "open to the possibility of a different outcome[.]" *See Isby v. Brown*, 856 F.3d 508, 527-28 (7th Cir. 2017) ("[U]nder *Hewitt*, the periodic review must still be meaningful and non-pretextual") (citing cases); *id.* at 530 ("[P]rison officials have been on notice since *Hewitt* that periodic reviews of administrative segregation are constitutionally required, and it is self-evident that they cannot be a sham."); *see also Incumaa v. Stirling*, 791 F.3d 517, 533 (4th Cir. 2015) ("This record, bereft of any evidence that Appellant has ever received *meaningful* review, stands in contrast to *Wilkinson* and falls short of satisfying *Hewitt*.") (emphasis added). To determine whether a periodic review was meaningful and non-pretextual, a court may "examine[]

22

United States District Court
Northern District of California

1    the reasons given" for an inmate's continued confinement in the administrative prison placement

2    at issue.  *See Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986).

3            Plaintiffs have cited authorities, which Defendants have not distinguished or otherwise

4    addressed in their briefs, that hold that periodic reviews that result in continued administrative

5    placement in more restrictive prison housing are not meaningful where it appears that the inmate's

6    continued placement therein is based, not on findings that *current* circumstances warrant the

7    continued placement, but on the rote repetition of boilerplate phrases and reliance upon historical

8    evidence that led to the inmate's initial placement in the more restrictive prison housing.  *See, e.g.*,

9    *Isby*, 856 F.3d at 526-28; *Incumaa*, 791 F.3d at 534-35.

10           In *Isby*, the Seventh Circuit held that a reasonable jury could conclude that the periodic

11   reviews that had been provided to the plaintiff, who had been retained for years in administrative

12   segregation for administrative reasons (i.e., for posing a safety or security risk), were not

13   meaningful.  *Id.*  The Seventh Circuit held that, for a periodic review to be meaningful, it must

14   "take into account any updated circumstances in evaluating the need for continued placement."  *Id.*

15   at 528.  The Seventh Circuit found a genuine issue of material fact as to whether the plaintiffs'

16   periodic reviews had been meaningful (1) because of "the rote repetition of the same two

17   boilerplate sentences following each review"; (2) because the plaintiff had been repeatedly

18   retained in administrative segregation despite "long stretches of time without any disciplinary

19   issues"; and (3) because prison officials had not made clear whether their repeated decisions to

20   keep the plaintiff in administrative segregation were based on "past" events and behaviors that led

21   to his initial placement in administrative segregation as opposed to being based on behaviors and

22   events that were "currently affecting" the plaintiff and that justified continuing his administrative

23   segregation.  *Id.* at 527-28.  The court of appeals reasoned that a reasonable jury could conclude

24   based on these factors that the periodic reviews had not been meaningful, because they suggested

25   that prison officials had not considered current circumstances when deciding to keep the plaintiff

26   in administrative segregation and instead had relied heavily, if not exclusively, on historical

27   evidence that justified the plaintiff's initial placement in administrative segregation in retaining

28   him there.  *See id.* at 528.

1        In *Incumaa*, 791 F.3d at 521, the Fourth Circuit similarly held that a genuine issue of

2  material fact existed as to whether the periodic reviews that had been afforded to an inmate who

3  had been retained for many years in administrative segregation for administrative reasons (i.e., to

4  protect other inmates and staff and maintain prison order) had been meaningful.  *Id.*  In so

5  concluding, the Fourth Circuit relied, in relevant part, on evidence showing that the inmate had

6  been retained in administrative segregation on multiple occasions despite having a "nearly perfect

7  disciplinary record" while in administrative segregation, as well as the fact that the inmate had

8  been provided "the same justification" at nearly every periodic review for retaining him there,

9  which was the justification for his initial placement in administrative segregation, namely that he

10  was a validated gang member who must be placed in security detention.  *Id.* at 534.  The Fourth

11  Circuit noted that the prison's practice of "merely rubber-stamp[ing] Appellant's incarceration in

12  the [administrative segregation unit] (figuratively and sometimes literally), listing in 'rote

13  repetition' the same justification every 30 days," impinged upon due process because it

14  "encourages 'arbitrary decisionmaking' and risks the possibility that the ICC may single out

15  Appellant 'for an insufficient reason.'"  *Id.*

16        The Court finds the reasoning in these cases to be persuasive.[8]  Because historical evidence

17  will always be a part of an inmate's record, prison officials' rote reliance on historical evidence

18  that justified the inmate's initial placement in administrative segregation to retain the inmate

19  therein could easily lead to the inmate's permanent retention in administrative segregation if not

20  coupled with findings that *current* conditions exist that warrant the inmate's continued retention.

21  *See Isby*, 856 F.3d at 528 (citing *Proctor v. LeClaire*, 846 F.3d 597, 611 (2d Cir. 2017) for the

22  proposition that "[i]t is inherent in *Hewitt's* use of the term 'periodic' that ongoing Ad Seg

23

---

24        [8] Other cases that Plaintiffs did not cite are in accord with *Isby* and *Incumaa*.  For example,

25  in *Sourbeer*, 791 F.2d at 1101, the Third Circuit affirmed the district court's ruling that an
inmate's due process rights were violated on the basis that the periodic reviews for his continued

26  retention in administrative segregation had been "perfunctory."  *Id.*  In reaching this conclusion,
the Third Circuit relied on the fact that the inmate had been retained in administrative segregation

27  for months based on the rote repetition of the same reason for his initial placement there (i.e., that
he was awaiting sentencing for a murder conviction) even though prison regulations required that
the initial placement be reassessed during periodic reviews based on other factors, such as the

28  inmate's behavior or programmatic needs.  *Id.* at 1101-02.

United States District Court
Northern District of California

1    reviews may not be frozen in time, forever rehashing information addressed at the inmate's initial

2    Ad Seg determination . . . . prison officials must look to the inmate's present and future behavior

3    and consider new events to some degree to ensure that prison officials do not use past events alone

4    to justify indefinite confinement.").  The possibility of indefinite confinement in administrative

5    segregation is what the Supreme Court sought to prevent by requiring in *Hewitt* that a placement

6    in administrative segregation be subject to periodic review.

7        Here, Plaintiffs point to evidence showing that the periodic reviews that have been

8    provided to class members are similar to those criticized in *Isby* and *Incumaa*.  Specifically,

9    Plaintiffs point to records showing that Defendants retain class members in the RCGP "based on

10   rote and meaningless reviews whereby officials simply assume that restrictive housing must

11   continue" in light of the historical safety concerns that led to the inmates' initial placement in the

12   RCGP, even where (1) there is no new evidence that supports a conclusion that the threat

13   continues to exist; or (2) there is new evidence that undermines a finding that the threat continues

14   to exist.  Docket No. 1409-1 at 53.  In other words, these records show that inmates' continued

15   retention in the RCGP appears to be based, not on findings that *current* circumstances warrant the

16   inmate's continued RCGP retention, but on the rote repetition of boilerplate phrases and reliance

17   on historical evidence of safety threats that led to the inmates' initial placement in the RCGP.  *See*

18   Docket No. 1409-1 at 53-56.

19       For example, an inmate who was initially placed in the RCGP in December 2016 had an

20   ICC 180-day review hearing on September 9, 2019, during which the ICC decided to keep the

21   inmate in the RCGP despite having noted that "no new information was placed in [the inmate's]

22   file subsequent to his last review," that "there has been no new demonstrated threat to [the

23   inmate's] personal safety," and that "no new information has come forward regarding his safety

24   concerns."  Docket No. 1346-10 at ECF pages 2-3 (Bremer Decl., Exhibit ee).  The ICC concluded

25   that retaining the inmate in the RCGP was appropriate despite the inmate's own denials of the

26   existence of safety threats because "it cannot state that such threat no longer exists."  *Id.* at 3.

27   Because there was no new evidence regarding the existence of safety concerns against the inmate,

28

the ICC relied on historical evidence regarding past threats to the inmate's safety as support for its conclusion that the inmate should be retained in the RCGP.[9]  *Id.*

At the next ICC review in December 2019, the ICC again decided to retain the inmate in the ICC even though, this time, the ICC had new evidence before it (other than the inmate's own statements) suggesting that threats to the inmate's safety had abated.  Specifically, the ICC noted that a confidential source said in September 2019 that the inmate "was in good standing with the [gang] and could positively program on any GP facility."  Docket No. 1346-10 at ECF page 2 (Bremer Decl., Ex. ff).  Notwithstanding this new evidence, the ICC still retained the inmate in the RCGP because it found it "cannot state that such threat no longer exists."  *Id.* at 7.

The records of other inmates show that they were similarly and repeatedly retained in the RCGP during periodic reviews based on historical threats to their safety and the rote assumption that such threats continue to exist.  In deciding to retain the inmates in the RCGP, the ICC repeated the phrase that it "cannot state that such threat no longer exists" even where there was evidence, by way of the inmate's own statements or the statements of confidential sources, that the historical safety threats had been resolved and were no longer an issue.[10]  *See, e.g.*, Docket No.

_____

[9] Prior ICC reviews conducted in December 2018 and February 2019 had similar results. *See* Docket No. 1346-7 at ECF pages 27-28 (Bremer Decl., Ex. d) (noting that during December 2018 and February 2019 reviews, the "ICC noted that no new information had been received to either refute nor support safety concerns; therefore, elected to retain [inmate] in the RCGP pending referral back to the DRB for a 2 year review.").

[10] The records submitted by Plaintiffs show that the ICC often relies on the recommendations of gang investigators (STGI) that inmates should be retained in the RCGP based on historical evidence of safety threats, even where there is no new evidence that suggests that historical safety threats continue to exist.  Notably, the records show that gang investigators frequently do not credit the statements of the inmates about the absence of threats to their safety in making their RCGP retention recommendations on the basis that the inmates refuse to be interviewed, or to provide details, about how the historical threats to their safety were resolved. *See, e.g.*, Docket No. 1346-10 at ECF page 29.  The same records state, however, that an inmate's refusal to be interviewed or to provide information to investigators is consistent with the inmate abiding by gang codes of conduct, suggesting that the inmate's refusal to provide information to investigators about gang dynamics may be an attempt to remain in good standing with his gang. *See, e.g.*, *id.* ("The STGI noted that [the inmate's] refusal to be interviewed was abiding by the 8th Bond of the 14 Bonds established and followed by the NS.").  Thus, it appears that inmates are placed in a Catch-22 when investigators decline to find that the inmates are in good standing with gang leadership such that they can be released from the RCGP unless the inmates provide them information in violation of gang codes of conduct.  Because the threats to RCGP inmates' safety tend to originate from actual or perceived violations of gang codes of conduct, any new violations of gang codes of conduct could create new disputes between the inmate and gang leadership, and

26

1   1346-10 at ECF page 24 (Bremer Decl., Ex. hh); Docket No. 1346-10 at ECF page 30 (Bremer

2   Decl., Ex. ii).

3        The ICC's practice of retaining class members in the RCGP based on historical threats to

4   their safety and the rote assumption that such threats continue to exist despite the absence of new

5   evidence of safety concerns appears to be systemic.  Counsel for Plaintiffs reviewed the records of

6   dozens of inmates and identified eighty-seven instances where the ICC decided to retain a prisoner

7   in the RCGP despite the absence of new evidence of safety concerns; the reason stated for

8   retaining inmates in the RCGP was that the ICC "cannot state that such threat no longer exists."[11]

9   Bremer Decl. ¶ 58, Docket No. 1346-6.

10        The Court finds, based on the evidence just described, that the periodic reviews provided

11   to class members are not meaningful, as in *Isby* and *Incumaa*.  The rote repetition of and reliance

12   on the same historical safety threats that led to the inmates' initial placements in the RCGP

---

14   potentially, new threats to their safety.  Expecting inmates to provide information to investigators
15   about how they resolved disputes with a gang as a condition of recommending RCGP release,
     therefore, creates a circumstance that could lead to inmates' permanent retention in the RCGP.
16   This practice appears to be inconsistent with what Defendants represent is their reasoning for their
     policy regarding debriefing.  *See* Harden Decl. ¶ 10, Docket No. 1419-7 ("The debriefing process
17   is completely voluntary and must be initiated by the inmate.  One reason for this is that requesting
     to debrief can is [sic] considered treasonous by most, if not all STGs.  Requesting to debrief,
18   therefore, puts an inmate's life in danger, and is effectively a death sentence—for the debriefing
     inmate and possibly for their relatives in the community—if other inmates learn that the inmate
19   requested to debrief, regardless of whether the inmate completes the debrief process.").  The
     foregoing weighs in favor of finding that Defendants' practices for retaining class members in the
20   RCGP are constitutionally deficient and violative of class members' rights under the Due Process
     Clause.

21       [11] Defendants initially objected to the Court's consideration of these eighty-seven instances
     on the grounds that (1) Plaintiffs did not file the records relating to these instances and instead
22   described their contents in the declaration of Carmen Bremer, counsel for Plaintiffs, and (2) Ms.
     Bremer did not lay a proper foundation for her description of these instances.  *See* Docket No.
23   1419-4 at 62.  During the hearing held on October 28, 2021, Defendants did not dispute that they
     had produced and reviewed the documents that form the basis of Ms. Bremer's assertions about
24   the eighty-seven instances at issue and were, therefore, capable of verifying the accuracy of her
     statements.  They also represented that they did not dispute the accuracy of the factual assertions
25   made by Ms. Bremer as to the eighty-seven instances at issue, and they represented that their
     objection, rather than being evidentiary, was one about "the order in which the evidence was
26   presented in the briefing schedule."  Hr'g Tr. at 18-19.  In light of Defendants' statements at the
     October 28 hearing, and because Ms. Bremer offers sufficient facts in her declaration to show that
27   she has personal knowledge of the contents of the documents that form the basis of her statements,
     the Court finds that Defendants' evidentiary objections to Ms. Bremer's statements regarding the
28   eighty-seven incidents at issue are not well-taken and overrules them.

United States District Court
Northern District of California

1    without a supported determination that *current* circumstances warrant the inmates' continued

2    retention in the RCGP suggests that the periodic reviews were not open to a different outcome.

3         As noted above, Defendants do not address *Isby* or *Incumaa* in their briefs, nor do they

4    respond to Plaintiffs' arguments that the ICC's periodic reviews are not meaningful based on its

5    rote presumption that historical threats that led to the inmates' RCGP placement continue to exist

6    in perpetuity, even where there is no evidence that supports a finding that historical threats

7    continue to exist or where there is evidence suggesting that they do not continue to exist.

8         Defendants also do not dispute that they have not implemented any procedure to ensure

9    that the periodic reviews of RCGP placements are meaningful and are open to a different outcome.

10   The only "procedure" to which Defendants point is the language in the settlement agreement,

11   which, as noted, states that the ICC shall "verify" whether a threat to an inmate's personal safety

12   continues to exist.  *See* Docket No. 1419-4 at 49 (Defendants arguing that "the settlement provides

13   clear direction for assignment and retention in the RCGP").  The records discussed above suggest

14   that, instead of "verifying" or determining whether historical safety threats continue to exist based

15   on *current* evidence and circumstances, the ICC simply presumes that they do continue to exist.

16   Accordingly, that the settlement agreement requires the ICC to "verify" that safety threats

17   continue to exist during its 180-day reviews does not mean that it actually does so in a manner

18   consistent with the plain meaning of that term.

19        The examples to which Plaintiffs have pointed, in combination with Defendants' failure to

20   point to any procedures that provide guidance to the ICC as to how to "verify" whether safety

21   threats continue to exist, support a finding that the periodic reviews of class members' RCGP

22   placements are not meaningful and that the manner in which Defendants conduct them results in a

23   significant risk of erroneous RCGP retention.

24        Defendants' arguments to the contrary do not alter this finding.  Defendants contend,

25   conclusorily, that Plaintiffs have not shown "any due process violation sufficient to extend the

26   settlement" because class members "received adequate notice and an opportunity to be heard with

27   respect to their housing reviews" and because the ICC's goal is to keep inmates safe.  Docket No.

28   1419-4 at 62.  The Court is not persuaded, because Defendants do not square these conclusory

United States District Court
Northern District of California

1    arguments with the examples of periodic reviews and RCGP retentions to which Plaintiffs have

2    pointed, which, as discussed above, suggest that class members are being retained in the RCGP

3    based on the presumption that historical threats to their safety continue in perpetuity, even where

4    no current evidence exists to support that presumption or where there is current evidence

5    suggesting that the historical safety threats have abated.  Under *Isby* and *Incumaa*, these examples

6    suggest that the periodic reviews provided to class members are not meaningful and do not

7    comport with due process requirements.

8           Defendants next argue that Plaintiffs "contest the sufficiency of the evidence" relied upon

9    for keeping inmates in the RCGP and, therefore, Plaintiffs' due process challenges are substantive,

10   not procedural.  Docket No. 1510-4 at 30; Docket No. 1419-4 at 59.  The Court disagrees.  A

11   failure to provide meaningful periodic reviews to an inmate held in administrative prison housing

12   constitutes a procedural due process violation.  *See Sourbeer*, 791 F.2d at 1101 (affirming district

13   court's finding that prisoner's procedural due process rights were violated because the periodic

14   reviews he received "were perfunctory, thus denying [him] the most fundamental right of due

15   process: a meaningful opportunity to be heard" and noting that this was a "defect in the 'process,'

16   as opposed to the 'substance,' of [prison officials'] decisionmaking").  As noted above, to

17   determine whether any procedural due process violations arise out of periodic reviews of

18   administrative segregation placements, a court may "examine[] the reasons given" for an inmate's

19   continued confinement in administrative segregation.  *See id.*  Accordingly, the Court's

20   consideration of the records discussed above does not convert Plaintiffs' procedural due process

21   challenges into substantive ones.

22          Defendants also argue that Plaintiffs' due process violation allegations fail as a matter of

23   law because the parties negotiated, and the Court approved, the terms of the settlement agreement,

24   including paragraph 27, which specifies the criteria for placing or retaining inmates in the RCGP.

25   Docket No. 1419-4 at 49 n.23.  The Court is not persuaded.  The settlement agreement requires

26   that the ICC "verify" during its 180-day reviews whether a demonstrated threat to the inmate's

27   personal safety continues to exist.  The examples of periodic reviews discussed above show that

28   Defendants have failed to meaningfully implement paragraph 27, because they suggest that the

United States District Court
Northern District of California

1   ICC systemically fails to "verify" that the safety threats used to justify prisoners' initial placement

2   in the RCGP continue to exist.  Further, that the parties negotiated, and that the Court approved,

3   the criteria for placing and retaining inmates in the RCGP as stated in paragraph 27 is irrelevant to

4   the question of whether Defendants are providing sufficient procedural due process to inmates in

5   the form of *meaningful* periodic reviews before retaining them in the RCGP.  Defendants have

6   cited no authority showing that they can be absolved from their responsibility to provide periodic

7   reviews to class members that are meaningful and comply with due process requirements merely

8   because a settlement agreement sets forth the general criteria for RCGP placement and retention.

9       Defendants next argue that the RCGP retentions at issue cannot be a basis for extending

10  the settlement agreement, because Plaintiffs failed to file any motions to enforce the settlement

11  agreement in the context of RCGP placements or retentions.  Docket No. 1419-4 at 63.  That

12  Plaintiffs failed to file any enforcement motions challenging RCGP retentions is irrelevant to the

13  resolution of the present motion.  While the settlement agreement permits Plaintiffs to file

14  enforcement motions under paragraphs 52 and 53 to dispute RCGP "housing decisions" under

15  paragraph 27, the settlement agreement does not require that Plaintiffs file any such enforcement

16  motions.  *See* SA ¶ 27.  The settlement agreement also does not require that Plaintiffs file

17  enforcement motions as a condition for seeking to extend the settlement agreement under

18  paragraph 41.

19      Finally, Defendants argue that ICC's reviews are meaningful because seventy inmates have

20  been released from the RCGP since it opened in 2016.  *See* Kirby Decl. ¶ 37.  Defendants,

21  however, have not shown that *any* of these seventy inmates were released from the RCGP on the

22  basis that the ICC determined, during periodic reviews, that safety threats against the inmates no

23  longer existed.  Defendants' evidence suggests, instead, that the inmates were released from the

24  RCGP for reasons *other* than findings as to the existence of threats to their safety.  *See* Kirby Decl.

25  ¶ 37 (stating that "almost 70 inmates have been released from the RCGP since it opened in

26  January 2016 . . . because they served their prison terms, have been released from custody on

27  parole, or have been transferred to other housing units"); *see also id.* ¶ 28 (stating that RCGP

28  inmates can be transferred out of RCGP to a non-designated programming facility for reasons

30

other than the existence of threats to their safety, such as "hav[ing] demonstrated a positive programming attitude, a desire to break free of prison gangs and politics, and a desire to complete their prison terms in a violence-free manner"). Accordingly, the Court cannot infer based on the release of the seventy inmates in question that Defendants' policies and practices result in meaningful periodic reviews.

In sum, the Court finds that the ICC's periodic reviews of class members' RCGP placements systemically are not meaningful and that the manner in which Defendants conduct them results in a significant risk of erroneous RCGP retention.

### ii. Lack of adequate notice for RCGP retention

The Supreme Court has held that "notice of the factual basis" for restrictive placement and "a fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 225-26. As discussed above, notice of the reason for placement is one of the informal, nonadversary procedures that must be provided to an inmate in the context of administrative placement in more restrictive prison housing pursuant to *Hewitt*, 459 U.S. at 473-76.

Plaintiffs argue that Defendants fail to provide RCGP inmates with accurate notice of the basis for RCGP retention under paragraph 27 as required by *Hewitt*. Plaintiffs point to inmate declarations stating that inmates who were placed in the RCGP under paragraph 27 because of concerns for their safety were told by Defendants that they could gain release from the RCGP for reasons unrelated to their safety, such as (1) programming positively for six months, Prisoner Decl. ¶ 12, Docket No. 1346-7 (Bremer Decl. Ex. k); Prisoner Decl. ¶ 7, Docket No. 1346-7 (Bremer Decl. Ex. m); Prisoner Decl. ¶ 5, Docket No. 1346-8 (Bremer Decl. Ex. u); (2) requesting a transfer to a Sensitive Needs Yard or non-designated program facility, Prisoner Decl. ¶ 12, Docket No. 1346-7 (Bremer Decl. Ex. k); Prisoner Decl. ¶ 6, Docket No. 1346-8 (Bremer Decl. Ex. u); or (3) debriefing, Prisoner Decl. ¶ 12, Docket No. 1346-7 (Bremer Decl. Ex. k); Prisoner Decl. ¶ 5, Docket No. 1346-8 (Bremer Decl. Ex. u); Inmate Decl. ¶ 5, Docket No. 1346-7 (Bremer Decl., Ex. j). Plaintiffs contend that these practices by Defendants result in misleading prisoners

31

1    in the RCGP into believing that they can be released from the RCGP for reasons other than threats

2    to their safety, which, in turn, deprives class members of a fair opportunity for rebuttal with

3    respect to their retention in the RCGP under paragraph 27.

4           Defendants do not point to any evidence that contradicts the statements of these prisoner-

5    declarants.  Further, Defendants admit in their briefs that, consistent with the prisoner-declarants'

6    statements, they consider factors other than threats to the inmate's safety when determining

7    whether to retain an inmate in the RCGP, such as whether the inmate is getting along with other

8    inmates or is "incident-free."  *See* Docket No. 1419-4 at 61 ("Remaining incident-free and

9    demonstrating livability or compatibility with other inmates give the inmate the best chance of

10   such release, but it does not guarantee it.").  Defendants do not explain how these practices could

11   be consistent with paragraph 27, which, as noted above, permits Defendants to retain inmates in

12   the RCGP on the basis of an existing demonstrated threat to the inmate's safety.  Defendants also

13   do not point to any authority that would permit them to retain inmates in the RCGP under

14   paragraph 27 based on factors other than threats to the inmates' safety.

15          Because it is undisputed that (1) the RCGP placements and retentions at issue in the

16   present motion are pursuant to paragraph 27, and (2) that RCGP placements or retentions under

17   paragraph 27 can be made only if demonstrated threats to the safety of the inmate exist, the Court

18   finds that Defendants' practice of telling inmates that they can be released from the RCGP based

19   on factors other than threats to their safety deprives inmates of notice of the *actual* basis for their

20   RCGP retention under paragraph 27.  Defendants' failure to provide inmates with notice of the

21   actual basis for RCGP retention under paragraph 27, in turn, deprives inmates of the minimal

22   procedural due process protection of notice of the basis for restrictive placement pursuant to

23   *Hewitt*.  Because Defendants have not pointed to any policies or procedures requiring prison

24   officials to provide notice to inmates of the basis for RCGP retention that is consistent with the

25   criteria set forth in paragraph 27, the Court finds that these due process violations are systemic.

26          Defendants' arguments to the contrary are unavailing.  Defendants argue conclusorily and

27   without pointing to any evidence that their practices do not violate *Hewitt's* due process

28   requirements because "the inmates receive notice in advance of the review, which includes a

1    disclosure of the evidence that may inform the Institutional Classification Committee's analysis of

2    the inmate's safety concerns."  Docket No. 1419-4 at 59.  Because Defendants do not point to any

3    evidence showing that they provide inmates with accurate notice in advance of periodic reviews of

4    the basis for RCGP retention that is consistent with paragraph 27's criteria, the Court cannot

5    conclude that Defendants provide inmates with the notice required by *Hewitt*.

6          Defendants next argue no due process violations occur because "CDCR is abiding" by the

7    settlement agreement in retaining inmates in the RCGP.  Docket No. 1419-4 at 59.  As discussed

8    above, however, Defendants have not shown that their practices of telling inmates that they can be

9    released from the RCGP based on factors other than threats to their safety is consistent with

10   paragraph 27.

11         The Court finds, based on the foregoing, that Plaintiffs have shown that Defendants fail to

12   provide class members with minimum procedural safeguards required by *Hewitt* before retaining

13   them in the RCGP, namely meaningful periodic reviews and accurate notice of the basis for RCGP

14   retention.  Because Defendants have failed to point to any procedures currently in place to ensure

15   that RCGP inmates receive meaningful periodic reviews and accurate notice, and because it is

16   undisputed, as discussed above, that the other procedural safeguards that Defendants provide to

17   RCGP inmates are less robust than those in *Wilkinson*, the Court finds that Defendants' current

18   practices are systemic and are likely to result in a significant risk of erroneous retention in the

19   RCGP.  Defendants have not shown that the implementation of additional procedural safeguards

20   would be burdensome.  Accordingly, the Court finds, based on a balancing of the *Mathews* factors,

21   that Defendants' current RCGP retention practices result in ongoing and systemic violations of

22   due process that warrant extending the settlement agreement under paragraph 41.

23         **B.      CDCR's Policies and Practices Pertaining to Confidential Information**

24         Plaintiffs argue that ongoing and systemic violations of class members' due process rights

25   occur as a result of the way Defendants disclose, memorialize, and make determinations as to the

26   reliability of confidential information in connection with disciplinary proceedings that could lead

27   to the placement of class members in the SHU for having committed SHU-eligible offenses.

28   Plaintiffs argue that the disciplinary proceedings in question, and Defendants' use of confidential

United States District Court
Northern District of California

information therein, are governed by and arise from the reforms required by the settlement agreement, and that any such due process violations can serve as a basis for extending the settlement agreement under paragraph 41.  The alleged due process violations are of three types: (1) those arising out of inaccuracies or omissions in disclosure forms intended to summarize in non-confidential terms confidential information that could be used against class members in disciplinary proceedings; (2) those arising out of Defendants' failure to accurately memorialize confidential information in confidential memoranda that are considered in disciplinary proceedings; and (3) those arising out of Defendants' reliance in disciplinary proceedings upon confidential information that Defendants failed to evaluate properly for reliability.

Defendants argue that the alleged due process violations just described cannot be a basis for extending the settlement agreement under paragraph 41 because they are neither alleged in the 2AC nor the result of the SHU reforms required by the settlement agreement.  Defendants further argue that, even if the alleged due process violations at issue could serve as a basis to extend the settlement agreement under paragraph 41, Plaintiffs have not met their burden to show that the alleged violations amount to ongoing and systemic due process deprivations.

### 1.    Whether the alleged due process violations are within the scope of the complaints or settlement-agreement reforms

In its order of April 9, 2021, the Court found that the due process violations that Plaintiffs allege with respect to Defendants' use of confidential information in disciplinary proceedings are a proper ground for extending the settlement agreement under paragraph 41 because they arise out of the reforms required by the settlement agreement.  Specifically, the Court found that:

> By its plain terms, the settlement agreement requires Defendants to take certain steps to ensure that confidential information used against inmates "is accurate" and in compliance with California regulations regulating the use and disclosure of confidential information, which are referenced in paragraph 34 of the settlement agreement.  *See* SA ¶¶ 24, 34, 37(h).  This would include the use or disclosure of confidential information in connection with the disciplinary proceedings described in the settlement agreement, pursuant to which a class member can be found guilty of committing a SHU-eligible offense and placed in the SHU for a disciplinary term for that offense pursuant to the SHU reforms required in the settlement agreement.  *Id.* ¶¶ 13-17.  Accordingly, any alleged violations of class members' due process

34

rights that arise from Defendants' failure to comply with these requirements arise out of the SHU reforms contemplated by the settlement agreement, and therefore constitute a proper ground for extending the settlement agreement under paragraph 41.

Docket No. 1440 at 33-34.

In their response to the present motion, Defendants repeat the same argument that the Court rejected in its April 9, 2021, order, namely that the settlement agreement's requirements relating to confidential information are "separate and distinct" from the settlement agreement's SHU and Step Down Program reforms.  Docket No. 1419-4 at 4-5.  The Court rejects this argument for the same reasons as previously.  Defendants' proposed interpretation of the settlement agreement would render meaningless the provision in the settlement agreement requiring Defendants to take steps to ensure that confidential information "is accurate."  To have meaning, this provision must be read in conjunction with the settlement agreement's other terms, which include the terms that require reforms to Defendants' SHU policies.[12]  It is undisputed that Defendants use confidential information in the context of disciplinary proceedings that could lead to SHU placements under the SHU reforms required by the settlement agreement.  A reasonable interpretation of the settlement agreement is that, pursuant to paragraph 34, Defendants must take steps to ensure that confidential information they use in that context "is accurate."  The alleged violations, therefore, arise out of the SHU reforms in the settlement agreement.

Defendants' own representations during the hearing on October 28, 2021, support this finding.  During the hearing, Defendants implicitly confirmed that the use and disclosure of confidential information in the context of disciplinary proceedings that can result in SHU placement under the SHU reforms in the settlement agreement are governed by paragraph 34 of the settlement agreement.  Specifically, the Court asked Defendants whether CDCR has policies

---

[12] Paragraph 34 also must be read in conjunction with provisions that require Defendants to produce, for monitoring purposes, documents to Plaintiffs' counsel about STG-eligible convictions, including any confidential information relied upon in "find[ing] the inmate guilty of the SHU-eligible offense." SA ¶ 37(h).  Defendants do not explain why the settlement agreement would require them to produce to Plaintiffs for monitoring purposes documents containing confidential information relied upon during disciplinary proceedings that could result in SHU placements under the settlement agreement's SHU reforms if the settlement agreement had not addressed their obligations as to the use of confidential information in such disciplinary proceedings.

1   that are relevant to the alleged due process violations pertaining to the use or disclosure of

2   confidential information.  Hr'g Tr. at 31, Docket No. 1536.  Defendants responded that these

3   issues were "addressed in the parties' settlement agreement in paragraph 34.  And that was that the

4   -- use of confidential information would be continued to be governed by Title 15, Section 3321."

5   *Id.*

6          In light of the foregoing, the Court reaffirms its prior finding that the alleged due process

7   violations in question result from the SHU-related reforms required by the settlement agreement

8   and can, therefore, serve as a basis for extending the settlement agreement under paragraph 41.

9                    **2.      Whether the alleged due process violations exist on an ongoing**
                            **and systemic basis**
10

11                   **a.      Liberty interest**

12         The Court next considers whether class members have a liberty interest in avoiding

13   placement in the SHU.

14         This Court previously held when denying Defendants' motion to dismiss that Plaintiffs had

15   alleged a liberty interest in avoiding placement in the SHU in light of Defendants' failure to argue

16   otherwise.  *See* Docket No. 191 at 12.  Defendants do not argue that Plaintiffs lack such an

17   interest.  Accordingly, in the absence of any dispute as to this issue, the Court concludes that

18   Plaintiffs have a liberty interest in avoiding disciplinary placement in the SHU.  *See Zimmerlee v.*

19   *Keeney*, 831 F.2d 183, 186 (9th Cir. 1987) ("The parties do not discuss and we assume that

20   Zimmerlee has a protected liberty interest in not being subject to disciplinary segregation.").

21                   **b.      Constitutional sufficiency of procedures**

22         The procedures required to satisfy due process when placing prisoners in segregation vary,

23   primarily depending on whether the segregation is for disciplinary purposes or administrative

24   purposes.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1272 (N.D. Cal. 1995) (noting that "the

25   amount of process due depends, in significant part, on whether the prisoner's transfer to the SHU

26   is characterized as disciplinary or administrative").

27         The placement at issue here is placement in the SHU based on a conviction for SHU-

28   eligible offenses and is, therefore, disciplinary in nature.

1       The parties agree that the Court's analysis as to whether class members have been provided

2   with sufficient procedural safeguards in the context of disciplinary charges that could lead to their

3   placement in the SHU is governed by *Wolff v. McDonnell*, 418 U.S. 539 (1974).  *See* Docket No.

4   1419-4 at 18.

> *Wolff* established five procedural requirements.  First, written
> notice of the charges must be given to the disciplinary-action
> defendant in order to inform him of the charges and to enable him
> to marshal the facts and prepare a defense.  Second, at least a brief
> period of time after the notice, no less than 24 hours, should be
> allowed to the inmate to prepare for the appearance before the
> Adjustment Committee.  Third, there must be a written statement
> by the factfinders as to the evidence relied on and reasons for the
> disciplinary action.  Fourth, the inmate facing disciplinary
> proceedings should be allowed to call witnesses and present
> documentary evidence in his defense when permitting him to do so
> will not be unduly hazardous to institutional safety or correctional
> goals.  Fifth, [w]here an illiterate inmate is involved . . . or where
> the complexity of the issue makes it unlikely that the inmate will
> be able to collect and present the evidence necessary for an
> adequate comprehension of the case, he should be free to seek the
> aid of a fellow inmate, or . . . to have adequate substitute aid . . .
> from the staff or from a[n] . . . inmate designated by the staff.  The
> Court specifically held that the Due Process Clause does not
> require that prisons allow inmates to cross-examine their accusers,
> nor does it give rise to a right to counsel in the proceedings[.]

16   *Walker v. Sumner*, 14 F.3d 1415, 1419 (9th Cir. 1994), *overruled on other grounds by Sandin,* 515

17   U.S. at 472 (internal citations and quotation marks omitted).

18       In addition to the five procedural safeguards required by *Wolff*, due process also requires

19   that the prison hearing officers' findings be supported by "some evidence" in the record.

20   *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 453-54 (1985)

21   (*Hill*); *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) ("[O]ur discussion in *Hill* in no way

22   abrogated the due process requirements enunciated in *Wolff*, but simply held that in addition to

23   those requirements, revocation of good-time credits does not comport with 'the minimum

24   requirements of procedural due process,' unless the findings are 'supported by some evidence in

25   the record.'") (quoting *Hill*, 472 U.S. at 454).

26       As noted, the due process violations that Plaintiffs allege arise out of Defendants' policies

27   and practices with respect to the disclosure, memorialization, and use of confidential information

28   that could be used against inmates in the context of disciplinary proceedings.

United States District Court
Northern District of California

1    Confidential information includes information that, if known to the prisoner, would

2 endanger the safety of any person or jeopardize the security of the institution. *See* 15 Cal. Code

3 Regs. § 3321(a).  CDCR records confidential information in confidential memoranda, which are

4 placed in the confidential section of the prisoners' central file.  Harden Decl. ¶¶ 26, 28, Docket

5 No. 1419-7; *see also* 15 Cal. Code Regs. § 3321(d)(1).  Prisoners do not have access to

6 confidential documents in the confidential section of their central file but, as discussed below,

7 CDCR is required in some circumstances to provide prisoners with non-confidential disclosure

8 forms that summarize confidential information in non-confidential terms (Forms 1030).

9    Before a confidential memorandum is placed in a prisoner's file, it must be reviewed by

10 supervisors for the purpose of confirming that the confidential designation on the document and its

11 placement in the confidential section of an inmate's central file is appropriate.  *See* Docket No.

12 1358-10 at ECF page 3 (Defendants representing in interrogatory responses that "[a] confidential

13 memorandum must be approved under state regulations before it can be placed in an inmate's

14 confidential central file"); *see also* 15 Cal. Code. Regs. § 3321(d)(2) (providing that proposed

15 confidential documents must be reviewed, signed, and dated by a person of a certain rank "to

16 indicate approval of the confidential designation and placement in the confidential section of the

17 central file").  Once placed in a prisoner's central file, a confidential memorandum stays there

18 indefinitely.  Harden Decl. ¶ 29.

19    Confidential memoranda are used to "document" an investigation or interview of a

20 confidential source.  Docket No. 1358-10 at ECF page 3.  According to Defendants' interrogatory

21 responses, the "author of the confidential memorandum has discretion to determine what

22 information to include or not include in drafting the confidential memorandum." *Id.* at ECF pages

23 12-13.  "[T]he general practice in drafting confidential memoranda is to include the information

24 from the confidential source that is relevant to the subject of that particular investigation." *Id.* at

25 ECF page 11.  However, "CDCR does not have a formal written 'policy or practice' requiring a

26 confidential memorandum to include all information provided by the confidential source." *Id.* at

27 15.  Defendants have not identified any policy or procedure requiring that confidential memoranda

28 be reviewed for accuracy and completeness by a person other than the author before being placed

38

United States District Court
Northern District of California

in prisoners' files.  As noted above, pursuant to 15 Cal. Code. Regs. § 3321(d)(2), Defendants review confidential memoranda prior to placing them in the confidential portion of inmates' central file for the purpose of confirming that the confidential designation on the document and its placement in the confidential section of an inmate's central file is appropriate.  Defendants have not shown that their review of confidential memoranda pursuant to 15 Cal. Code. Regs. § 3321(d)(2) involves reviewing the contents of the memoranda for accuracy and completeness.

If confidential information is used in any manner that is adverse to an inmate's placement, program, or sentence, a Confidential Information Disclosure Form, known as a Form 1030, is generated in the Strategic Offender Management System for each piece of confidential information.  Harden Decl. ¶ 31.  "A confidential memorandum may contain multiple sources, and a Confidential Information Disclosure Form is provided for each source of information or the specific information that is being used."  *Id.*  "The Confidential Information Disclosure Form is provided to the inmate and provides as much information as possible without identifying the source, documents the reliability of the source, and provides a statement of the reasons why the identity of the source is not disclosed."  *Id.*

### i.    Insufficient or inaccurate disclosures

Plaintiffs argue that, in at least twenty-three instances[13], Defendants failed to provide class members with disclosure forms (Forms 1030) that accurately and fully described, in non-confidential terms, confidential information that was relevant to disciplinary charges against them for SHU-eligible offenses, which could have or did result in their placement in the SHU. Plaintiffs argue that the inaccurate and incomplete disclosure forms at issue violated class members' due process right under *Wolff* to have adequate notice of the charges against them and to marshal the facts and prepare a defense.

---

[13] Plaintiffs note that they "planned to present" evidence of additional, but "less serious inaccuracies" for other inmates but they did not do so in the interest of saving space and in light of "CDCR's implicit concession that 23 examples is adequate to evidence a systemic violation." Docket No. 1409-1 at 13 n.5.

United States District Court
Northern District of California

1       As discussed above, one of the procedural safeguards required by *Wolff* is notice of the

2  charges.  The Supreme Court held in *Wolff* that "[p]art of the function of notice is to give the

3  charged party a chance to marshal the facts in his defense and to clarify what the charges are, in

4  fact."  418 U.S. at 564 (citation omitted).  For a prisoner to have a meaningful opportunity to

5  prepare a defense as required by *Wolff*, he must be allowed to know what the evidence against him

6  is and must be allowed to examine it.  *See Melnik v. Dzurenda*, 14 F.4th 981, 986 (9th Cir. 2021)

7  ("[I]f a prisoner is to be able to respond to evidence presented against him, as a general

8  proposition he should be allowed to know what it is and to examine it, unless there is reason to the

9  contrary."); *see also Patterson v. Coughlin*, 761 F.2d 886, 890 (2d Cir. 1985) (holding that, under

10  *Wolff*, "an inmate who is facing prison disciplinary charges that could result in punitive

11  segregation is entitled, at a minimum, to advance written notice of the charges against him and of

12  the evidence available to the factfinder.  He must be permitted to marshal the facts and prepare his

13  defense").  A prisoner's "right to access and prepare evidence for a disciplinary hearing,"

14  however, "may be limited by prison officials if they have a 'legitimate penological reason,'" such

15  as preventing undue hazard to institutional safety.  *Melnik*, 14 F.4th at 986 (citations omitted).

16  "The penological reason must be legitimate, though, not merely pretense or pretext.  The denial of

17  access may not be arbitrary as '[t]he touchstone of due process is protection of the individual

18  against arbitrary action of government.'"  *Id.* at 987 (quoting *Wolff*, 418 U.S. at 558).

19       Plaintiffs show many examples in which the disclosure forms (Forms 1030) served on

20  class members failed to reveal non-sensitive information that class members could have used to

21  marshal the facts and prepare a defense to disciplinary charges that could or did result in SHU

22  placement.

23       In many instances, the disclosure forms did not reveal that the confidential informant did

24  not identify the accused inmate or other inmates involved in the alleged misconduct by name; in

25  these instances, according to the confidential memoranda memorializing the confidential

26  informant's statements, the confidential informant used nicknames, generic references, or

27  photographs to identify prisoners, but this fact was not revealed to the prisoner who received the

28  disclosure forms.  Defendants' failure to disclose to class members that the confidential informant

used nicknames, generic terms, or photographs to identify persons involved in the alleged misconduct deprived class members of facts that they could have used to challenge the accuracy or reliability of the confidential informant's statements, or Defendants' investigations, which connected them to the alleged misconduct.  *See* Harden Decl. ¶¶ 6-7 ("If, during an investigation or interview, a confidential source identifies another inmate by a moniker, further investigation [by Defendants] is conducted to confirm that inmate's identity.").  Notably, Defendants have not identified any legitimate penological reason for not having disclosed to class members the information in question.

For example, Inmate #2 received a disclosure form stating that a confidential source had identified him as having distributed narcotics.  Docket No. 1348-2 at ECF page 147.  The disclosure form does not reveal, however, that the confidential source used a nickname to identify the person who allegedly distributed narcotics, and that the confidential source did not specifically identify Inmate #2 by name.  *See id.* at 150.  Similarly, Inmate #3 received a disclosure form stating that Source #1 had identified him as ordering the assault of another inmate.  Docket No. 1348-2 at ECF page 186.  The disclosure form does not reveal that Source #1 identified both the alleged perpetrator of the assault, as well as the victim of the assault, by nickname only.  *Id.*  The disclosure forms that other inmates received similarly did not indicate that the confidential source used nicknames to identify persons involved in the alleged misconduct.  *See, e.g.*, Inmate #13 (confidential disclosure at Docket No. 1350 at ECF page 218); Inmate #14; Inmate #15, Inmate #7 (confidential disclosure at Docket No. 1349 at ECF page 55).

Inmate #1 received a disclosure form implying that a confidential source had identified him as the visiting porter who allegedly retrieved narcotics from a location within the prison and introduced them into the prison.  Docket No. 1348-2 at ECF page 78.  The disclosure form does not disclose that the confidential source used the generic term "the porter" to identify the person who allegedly introduced the narcotics into the prison and did not specifically identify Inmate #1. *See id.* at 83.

Inmate # 7 received a disclosure form stating that a confidential source had identified him as planning attacks on other inmates, but the form did not reveal that the confidential source had

41

United States District Court
Northern District of California

1    used housing rosters with photographs to identify the person involved in the misconduct.  *See*

2    Docket No. 1349 at ECF pages 25-33; Docket No. 1349 at ECF page 35-36.  The disclosure forms

3    that other prisoners received likewise did not reveal that the confidential source relied on

4    photographs to identify persons involved with the alleged misconduct.  *See, e.g.*, Inmates #8, #9.

5         Plaintiffs' evidence also shows that disclosure forms do not accurately represent the

6    contents of the confidential memoranda that they are supposed to summarize, thereby depriving

7    class members of the opportunity to marshal the facts and prepare a defense to the charges against

8    them.

9         The following is a representative example.  Inmate #4 was charged with attempted murder

10   with an STG nexus.  In connection with that charge, he received a disclosure form regarding

11   confidential information that, according to Defendants, supports the STG nexus portion of the

12   charge.  The disclosure form states that an intercepted note that was supposed to be a

13   communication between a confidential source and certain gang members stated that any inmates

14   who chose to program in a non-designated yard "would be considered 'not active' or 'trash' by the

15   [gang leadership] *and ultimately would be targeted for assault [by the gang]*."  Docket No. 1348-2

16   at ECF page 243 (emphasis added).  The disclosure form implies that the intercepted note included

17   the specific phrase italicized above ("and ultimately would be targeted for assault [by the gang]"),

18   but the transcription of the note does not state that.  *See* Docket No. 1348-2 at ECF pages 253-54.

19   Defendants implicitly acknowledge that the transcription of the note did not include the sentence

20   in question by arguing that "the sentence in question is a reasonable deduction from the text of the

21   long kite [intercepted note]."  Docket No. 1419-9 at ECF page 50.  Defendants, however, offer no

22   penological reason for not revealing in the disclosure form served on Inmate #4 that the sentence

23   in question was the investigator's deduction as opposed to the contents of the intercepted note.

24   Defendants' failure to disclose this information to Inmate #4 deprived him of the opportunity to

25   challenge the investigator's interpretation of the note in question, and to otherwise marshal the

26   facts and prepare a defense to the STG nexus aspect of the charges against him.

27        The Court finds, based on the examples described above, which are representative of the

28   evidence that Plaintiffs have presented, that Plaintiffs have shown due process violations under

42

United States District Court
Northern District of California

1    *Wolff* arising out of Defendants' failure to provide class members with disclosure forms that

2    contained accurate, complete, and non-misleading non-confidential summaries of confidential

3    information that could be used against them.  The Court finds that Plaintiffs' evidence is indicative

4    of a systemic problem because Defendants have not identified any procedures or policies currently

5    in place to ensure that class members are provided with disclosure forms that provide them with

6    sufficient notice of the charges and evidence against them such that inmates may have the

7    opportunity to marshal the facts and prepare a defense as required by *Wolff*.  To provide adequate

8    notice under *Wolff*, the disclosure forms must accurately and fully describe, in non-confidential

9    terms, the non-sensitive information that confidential informants provided to Defendants that

10   could be used against class members in disciplinary proceedings.[14]  *See Melnik*, 14 F.4th at 986

11   ("[I]f a prisoner is to be able to respond to evidence presented against him, as a general

12   proposition he should be allowed to know what it is and to examine it, unless there is reason to the

13   contrary.").

14          Defendants' arguments do not alter this finding.  Defendants argue that their failure to

15   reveal in disclosure forms that confidential sources used nicknames or generic terms to identify

16   persons involved in alleged misconduct is not constitutionally problematic because Defendants

17   conduct investigations to determine whether a particular nickname or generic term refers to a

18   particular inmate.  This argument fails, because it ignores that a prisoner's right under *Wolff* to

19   marshal the facts and prepare a defense includes the right to have an opportunity to challenge the

20   results of Defendants' investigation connecting him to the alleged misconduct.  A prisoner is

21   deprived of such an opportunity if the disclosure form does not indicate that his identification as

22   the person involved in misconduct was the result of Defendants' investigation as opposed to the

23   statements of the confidential informant alone.

24          Defendants also contend that the inaccuracies or omissions in disclosure forms to which

25   Plaintiffs point are harmless because there was some evidence in the record to support the

26   disciplinary officers' determinations with respect to the disciplinary charges in question.  This

27   _____

28   [14] The information that must be disclosed to class members does not include sensitive
     information, such as that which could reveal the identity of the source.

1    argument is unavailing.  Plaintiffs' due process violation allegations are not predicated on the

2    theory that the determinations of the disciplinary officers who adjudicated the disciplinary charges

3    were unsupported; they are predicated instead on the theory that class members were deprived of

4    their right under *Wolff* to receive adequate notice of the charges and to marshal the facts and

5    prepare a defense.  Accordingly, the question of whether the determinations of the hearing officers

6    were supported by some evidence is irrelevant.  *See Edwards*, 520 U.S. at 648 (noting that "when

7    the basis for attacking the judgment is not insufficiency of the evidence . . . it is irrelevant"

8    whether there is sufficient evidence in the record to support the prison hearing determination).

9           In light of the foregoing, the Court finds that Plaintiffs have shown that the settlement

10   agreement can be extended under paragraph 41 based on ongoing and systemic due process

11   violations arising out of Defendants' inaccurate, insufficient, or misleading disclosure forms.

12                    **ii.        Inaccuracies in confidential memoranda**

13          Plaintiffs argue that confidential memoranda "often misstate[] the information provided by

14   the confidential informant," or otherwise omit information that the informant provided that a

15   prisoner could use to marshal the facts and prepare a defense.  Docket No. 1409-1 at 18.  Plaintiffs

16   contend that this is, "in some respects, even worse than CDCR's systemic fabrications in

17   confidential disclosures, as nobody, including the Hearing Officer, will ordinarily have access to

18   the underlying confidential informant statements."  Docket No. 1446-4 at 16.  Plaintiffs contend

19   that they requested that CDCR produce recordings of interviews with confidential sources, and

20   that CDCR produced only six.  Plaintiffs contend that each of the six recordings that CDCR

21   produced shows that "CDCR officials fabricated confidential information" that was included in

22   confidential memoranda.  *Id.* at 19.  Plaintiffs contend that the alleged fabrications are the result of

23   the fact that (1) CDCR policies and procedures do not require that confidential memoranda include

24   or summarize all relevant material or all potentially exonerating material; (2) Defendants give

25   CDCR staff discretion as to what to include in confidential memoranda; and (3) there is no

26   supervisory system in place to ensure that all relevant information is included and accurately

27   reported in confidential memoranda.  Docket No. 1409-1 at 18-19.  Plaintiffs further contend that

28   CDCR's destruction of confidential source interview recordings, after it was on notice in February

1  2019 that the recordings were relevant evidence, raises an inference that the destroyed recordings

2  would have confirmed the systemic nature of fabrications in confidential memoranda.  *Id.* at 24.

3         Defendants do not dispute that their policies and procedures do not require authors of

4  confidential memoranda to include all relevant information provided by a confidential source in

5  the memoranda, and do not require supervisors to review confidential memoranda to ensure that

6  the memoranda accurately and fully reflect the statements of the confidential informants.  Nor do

7  they dispute that, before October 2019, they did not have a policy mandating the retention of

8  confidential interview recordings, except in homicide cases and Prison Rape Elimination Act

9  investigations.  Docket No. 1419-4 at 44.  Defendants do not address in their briefs the specific

10  examples of inaccuracies or omissions in confidential memoranda to which Plaintiffs point.  To

11  the extent that Defendants addressed any of these examples, they did so in an attachment to the

12  declaration of L. Lyons, attorney for Defendants, s*ee* Docket No. 1419-9, which does not conform

13  to the local rules of this district.  *See* Civil Local Rule 7-5(b) (prohibiting argument in declarations

14  filed in opposition to a motion).

15         Before analyzing Plaintiffs' evidence, the Court first examines whether discrepancies

16  between what a confidential informant said during an interview with an investigator and what was

17  written in confidential memoranda that purport to document the statements of the informant could

18  give rise to cognizable violations of the Due Process Clause.  The confidential memoranda in

19  question are those that could be used against a class member in disciplinary proceedings that could

20  result in SHU placement.  Neither party has identified a Ninth Circuit case that addressees the

21  issue.  The Court finds authorities from the Second Circuit to be instructive.

22         In *Morrison v. Lefevre*, 592 F. Supp. 1052, 1073 (S.D.N.Y. 1984), the district court held

23  that a prisoner is "denied due process" where his placement in segregation "was based on findings

24  or suspicions created by false reports made by prison officials" and the prisoner was not provided

25  with a hearing or other procedural protections that allowed him an opportunity to challenge the

26  false reports.  The court in *Morrison* supported this conclusion with the following reasoning:

27         However minimal may be the process due to prisoners before
           segregation, that process is insufficient when it has been
28         contaminated by the introduction through state action of false

1
2
3
4
5
6
7

inculpatory evidence.  The introduction of false evidence in itself violates the due process clause.  In *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), the Court explained the violation in these terms: the use of "[s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."  *See Brady v. Maryland*, 373 U.S. 83, 86-88 (1963); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Leyva v. Superintendent, Green Haven Correctional Facility*, 428 F. Supp. 1, 2 n. 1 (E.D.N.Y.1977).  The fact that prisoners are not entitled to the full panoply of procedural protections afforded at trial when they are subject to internal prison discipline does not deprive them of the fundamental right not to have state officials make purposefully false statements about them.

8    *Id.*

9         After *Morrison*, the Second Circuit clarified that a due process violation arising out of the

10   use of false evidence to discipline a prisoner can be deemed "cure[d]" if the prisoner received a

11   hearing pursuant to *Wolff* during which the prisoner had the opportunity to rebut the false

12   evidence.  *See Grillo v. Coughlin*, 31 F.3d 53, 56 (2d Cir. 1994) ("It is true that we held in

13   *Freeman* [*v. Rideout*, 808 F.2d 949, 954 (2d Cir. 1986)] that a fair hearing, conforming to the due

14   process standards of *Wolff*, would 'cure' a constitutional violation otherwise resulting from a false

15   accusation."); *Freeman*, 808 F.2d at 952-54 (holding that *Morrison* "does not support" a claim for

16   violations of due process where the prisoner "was granted a hearing, and had the opportunity to

17   rebut the unfounded or false charges").  A due process violation arising out of the use of false

18   evidence is not "cured," however, where the prisoner was not provided with the opportunity to

19   discover and rebut the false evidence.  *See Grillo*, 31 F.3d at 56 ("[T]he proposition of *Freeman*—

20   that any unconstitutionality inhering in a false accusation is vitiated when it is tested in a fair

21   hearing—cannot support summary judgment [in favor of prison officials] where there is evidence

22   that the accused was not shown the allegedly spurious evidence used against him, and therefore,

23   arguably, did not receive a fair hearing.").

24         The Court finds the reasoning in these cases to be persuasive and adopts it here to conclude

25   that the use of confidential information in disciplinary proceedings that could lead to a prisoner's

26   SHU placement gives rise to due process violations where the confidential information, as

27   memorialized in confidential memoranda, does not accurately reflect what a confidential

28   informant said during his interview.  Any material discrepancy between what a confidential source

United States District Court
Northern District of California

46

said and what was memorialized in confidential memoranda is equivalent to false evidence or false accusations.  Because the record shows that prisoners do not have access, at any point in the disciplinary proceedings, to the actual statements of the confidential informant or to the confidential memoranda that are supposed to document them, prisoners do not have any opportunity to discover any discrepancies between the two, much less to rebut them.  Accordingly, none of the procedural safeguards required by *Wolff* can "cure" the due process violations that arise from the discrepancies in question.  In these circumstances, the use of confidential memoranda containing such inaccuracies in disciplinary proceedings would amount to arbitrary governmental action that violates the Due Process Clause.  *See Wolff*, 418 U.S. at 558 (holding that "[t]he touchstone of due process is protection of the individual against arbitrary action of government").

Here, Plaintiffs have shown multiple instances of material discrepancies between what a confidential informant said to investigators and what investigators wrote in confidential memoranda with respect to the statements of the informant.[15]

To illustrate, Inmate #3 was found guilty of conspiracy to commit battery with a deadly weapon with an STG nexus based on an assault committed by two other inmates against a third inmate ("assault victim").  In making this finding, the disciplinary hearing officer relied on a confidential memorandum dated February 14, 2020, which states that the confidential source and an inmate identified in the memorandum as Inmate #3 (suggesting that the confidential source identified Inmate #3 by name), jointly ordered the assault of the victim on the grounds that the victim was mentally ill.  *See* Docket No. 1554-3 at ECF page 4.  The transcript of the interview with the confidential source, however, does not support these statements in the February 14, 2020, confidential memorandum.  First, the confidential source never identified Inmate #3 by name.  The

---

[15] Defendants initially filed and produced to Plaintiffs versions of certain documents relevant to the resolution of the present motion that contained heavy redactions.  The Court ordered Defendants to file under seal unredacted versions of these documents for the Court's *in camera* review.  *See* Docket No. 1548.  Unless noted otherwise, the Court's findings with respect to the memoranda and transcripts discussed in this section are based on what Defendants represent are unredacted versions of the relevant memoranda and transcripts, which they filed in response to the Court's order, Docket No. 1548.

confidential source also never identified Inmate #3 by what Defendants claim is his full nickname, which is comprised of a generic moniker followed by a specific geographic location. *See* Docket No. 1554-3 at ECF page 4. The transcript shows that the confidential source referred at times to someone with Inmate's #3 generic moniker but never mentioned the specific geographic location that Defendants contend is the second part of Inmate #3's nickname. *See* Docket No. 1554-4 at ECF page 35. Accordingly, the confidential source could have been referring to an inmate, not Inmate #3, who shares the first part of Inmate #3's nickname (i.e., the generic moniker). *See* Harden Decl. ¶ 6 ("While there are 'common' monikers that are used by different inmates, inmates identify other inmates by their moniker plus their hometown, such as Sleepy from 18th Street."). Second, in the pages of the transcript where the confidential source mentions the assault victim, the source appears to suggest that the reason for the assault was that another inmate, whom he does not identify, "wants to fuck him up for drugs for him." Docket No. 1554-4 at ECF page 35. The transcript of the interview does not state that the confidential source mentioned the assault victim's mental illness as the reason for the assault. *See id.* Accordingly, the confidential memorandum's statement that the assault in question was motivated by the assault victim's mental illness has no support in the transcript of the interview.

Despite these discrepancies between the statements of the confidential informant and the confidential memorandum that was supposed to document them, the disciplinary hearing officer relied on the confidential memorandum at issue in finding Inmate #3 guilty of conspiring to order the assault. *See* Docket No. 1348-2 at ECF pages 167-69. Notably, the hearing officer found, based on the confidential memorandum at issue, that the reason for the assault was that "[Inmate #3] believed that [the assault victim] could not remain housed on [specific prison facility] due to his mental health status" and that, "[b]ecause [the assault victim] was viewed as having mental health issues, [Inmate #3] viewed this as a sign of inappropriate representation as an active [gang] member[.]" *Id.* Again, according to the transcript of the interview with the confidential informant, the informant did not state that the assault was motivated by the assault victim's mental illness or the assault victim's inability to be an adequate gang representative in light of his mental illness.

The record shows that there is no procedural mechanism in place that would have permitted the hearing officer to discover the discrepancies between the informant's statements and the confidential memorandum that was supposed to document them.  The hearing officer did not have access to a recording of the interview with the confidential informant, or the transcript of such interview, and, therefore, he was not in a position to discover any discrepancies between what is stated in the confidential memorandum and the actual statements of the confidential informant.  Inmate #3 likewise did not have any way to become aware of the discrepancies between what the confidential informant said and what was stated in the confidential memorandum and, therefore, did not have an opportunity to challenge them, rebut them during his *Wolff* hearing, or seek to correct them. [16]  Accordingly, Inmate #3's due process rights were violated as a result of the discrepancies in question under the Second Circuit cases discussed above.  They were also violated under *Wolff* because the discrepancies at issue deprived Inmate #3 of the ability to marshal the facts and prepare a defense.

The Court finds that the types of material discrepancies found with respect to Inmate #3 are likely to exist in confidential memoranda systemwide for three reasons.  First, Defendants have not identified any procedures or policies in place that can reasonably ensure that the contents of confidential memoranda accurately reflect the statements of confidential informants and that confidential memoranda include all information provided by informants that a prisoner could use to marshal the facts and prepare a defense.  Defendants argued at the hearing on October 28, 2021, that there is a "check" on the "accuracy of confidential memoranda," namely that the "confidential memoranda were initialed on each page by the source from which the information was derived,"

---

[16] Defendants state in their responses to interrogatories that "inmates have various avenues to address concerns with respect to confidential information," including inaccuracies in the contents of the memoranda, by virtue of "regular classification committee hearings, CDCR's administrative grievance process and, in the context of a rules violation, the ability to submit evidence and make a statement, as well as utilization of an investigative employee."  Docket No. 1358-10 at ECF page 5.  Defendants do not explain, however, how these "avenues" would permit an inmate to challenge or request corrections of inaccuracies or omissions in confidential memoranda if the inmate has no way to discover that the contents of confidential memoranda do not reflect accurately the statements of the confidential source.  Prisoners cannot challenge inaccuracies in confidential information that they do not know exist.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Hr'g Tr. at 55, Docket No. 1536.  After reviewing the evidence presented by both sides, the Court

2    is not persuaded that Defendants have a sufficient check in place.  Defendants' evidence shows

3    that Defendants "generally" permit informants to initial memoranda only in the context of

4    debriefing; there is no evidence that memoranda generated outside of the context of debriefing are

5    initialed by the informant.  *See* Docket No. 1358-10 at ECF pages 12-14.  The confidential

6    memorandum discussed above with respect to Inmate #3, for example, was not initialed by the

7    informant.  *See generally* Docket No. 1554-10.  Accordingly, the Court cannot infer that

8    Defendants' policy of "generally" allowing debriefing informants to initial memoranda is

9    sufficient to ensure that the contents of confidential memoranda generated systemwide are

10   accurate and fully reflect the information provided by informants that prisoners could use to

11   marshal the facts and prepare a defense.  In their briefs, Defendants did not attempt to show that

12   the policies and practices currently in place are sufficient to ensure that confidential memoranda

13   accurately and fully reflect the statements of informants, nor did they identify any penological or

14   other reason for not implementing policies and procedures that could reasonably ensure that

15   confidential memoranda generated systemwide are accurate and complete.

16          Second, Plaintiffs uncovered multiple other material discrepancies in confidential

17   memoranda based on only six recordings or transcripts that Defendants produced.  The high

18   incidence of discrepancies found relative to the number of recordings and transcripts that

19   Defendants produced supports a finding that confidential memoranda generated systemwide are

20   likely to contain material discrepancies that could be used against class members in disciplinary

21   proceedings.

22          For example, a confidential memorandum stated that a confidential informant had

23   identified an inmate who goes by a certain nickname (hereinafter "Inmate A") as having attacked a

24   specific group of inmates in a specific dorm during an altercation between gangs.  *See* Docket No.

25   1554-2 at ECF page 3.  The transcript of the interview with the confidential informant, however,

26   does not show that the confidential source ever mentioned Inmate A.  The transcript shows that the

27   confidential source's statements were about a group of inmates who collectively use a plural form

28   of the nickname that Defendants claim is used to refer to Inmate A.  *See* Docket No. 1556-8 at

ECF pages 35-37.  Inmate A was not identified by the confidential source at all, by nickname or legal name, according to the transcript.  In the Lyons declaration, Defendants point to a specific portion of the transcript where they claim the confidential source identified Inmate A as attacking a specific group of inmates during the altercation, *see* Docket No. 1419-9 at ECF pages 57-58; however, the portions of the transcript to which Defendants point do not show that the confidential source identified any specific inmate by name or nickname; the confidential source, instead, discusses an inmate by referring to him as "him" or "he."  *See* Docket No. 1556-8 at ECF pages 35-37.  Further, according to the transcript, the inmate that was identified by the confidential source as "him" or "he" simply "ran into" a specific dorm; the transcript does not show that the confidential source said that this inmate attacked a specific group of inmates in that dorm, as stated in the confidential memorandum.  The confidential memorandum containing these inaccuracies was placed in Inmate A's file, *see* Docket No. 1554-2 at ECF page 5, where it will remain permanently, implicating him in serious misconduct with an STG nexus, which could lead to SHU placement.

As another example, the February 14, 2020, confidential memorandum discussed above with respect to Inmate #3 contains additional significant inaccuracies that could be used against Inmate #3 in future disciplinary proceedings.  The memorandum indicates that the confidential informant stated that he enforced gang rules, and that such rules required certain gang members to give to the confidential informant and to Inmate #3 a one-third portion of narcotics introduced into the prison as a kick-back, and that failure to comply with that rule could result in murder at his "and [Inmate #3's] direction."[17]  Docket No. 1348-2 at ECF page 195.  The transcript of the

---

[17] As discussed in more detail below, Defendants produced two different versions of the February 14, 2020, confidential memorandum in question, and only one of the two versions contains the phrase "and [Inmate #3's] direction."  Defendants represent that the version of the memorandum that contains this phrase is the version that was placed in the confidential section of Inmate #3's central file.  *See* Docket No. 1558-1.  The Court's determination of whether any discrepancies exist between the transcript of the interview with the confidential informant and the contents of the February 14, 2020, memorandum in the context of the phrase "and [Inmate #3's] direction" is based on the version of the memorandum that was placed in Inmate #3's central file, as that version of the memorandum is the one that could be used against Inmate #3 in future disciplinary proceedings.  *See* Docket No. 1348-2 at ECF pages 191-200.

United States District Court
Northern District of California

interview with the confidential informant, however, does not contain this statement.  *See* Docket. No. 1554-4 at ECF pages 52-53.  When the confidential source was asked by the interviewer what would happen if an inmate did not pay the required one-third portion of the narcotics he brought into the prison, the confidential informant responded that the inmate in question would get searched down, meaning that he "won't be able to bring any dope in or nothing."  *Id.* at 53.  Then, the investigator asked whether the inmate could get "killed over that," and the confidential informant responded that "[i]t's a possibility," *id.*  When asked whether that would be the confidential informant's call, he responded that "it could be" but that "someone else could do it on their own."  *Id.*  The confidential source did not mention Inmate #3, by name or nickname, in the context of ordering murders or otherwise enforcing the narcotics rule.  The February 14, 2020, confidential memorandum's statement that Inmate #3 could order murders for failure to comply with the narcotics rule in question is not what the confidential source said and is, therefore, inaccurate.  The inclusion of this inaccuracy in the February 14, 2020, confidential memorandum is significant, because it could be used to establish the STG-nexus aspect of any offense with which Inmate #3 is charged in the future, as the inaccuracy could support a finding that Inmate #3 is in a position of authority within a gang.

The record suggests that the inaccuracy in question was added to the February 14, 2020, memorandum *after* Inmate #3 received disclosures for the memorandum, which raises additional due process concerns under *Wolff* that are separate from those arising out of the inaccuracy itself. The Court issued an order asking Defendants to explain a substantive discrepancy that it noticed between the redacted and unredacted versions of the February 14, 2020, memorandum, both of which were created by Defendants.  Docket No. 1557.  Specifically, the redacted version of the memorandum contains the inaccurate, unsupported phrase discussed above, that Inmate #3 could order murders for failure to comply with the one-third narcotics kickback rule.  *See* Docket No. 1348-2 at ECF page 195.  The unredacted version of the memorandum, which Defendants filed for *in camera* review at the Court's request, does not contain the unsupported reference to Inmate #3's supposed authority to order murder for violation of narcotics rules.  *See* Docket No. 1554-3 at 6. In their response to this order, Defendants represent that the version of the memorandum that was

United States District Court
Northern District of California

United States District Court
Northern District of California

1    placed in Inmate #3's central file is the redacted version that contains the inaccurate phrase in

2    question, which they claim is the "finalized" version of the memorandum, and that the unredacted

3    version of the memorandum lacking the phrase in question was an earlier draft of the

4    memorandum.  *See generally* Docket Nos. 1558-1, 1566-3.

5         Neither Defendants nor their declarant explain the source or the specific timing of this

6    embellishment, but Defendants' response leaves open the possibility that the unsupported murder-

7    authority accusation was added *after* the date on which disclosure forms were served on Inmate

8    #3, describing the memorandum in question.  *See* Docket No. 1558-1 at 2-3 (author of the

9    memorandum representing that his practice was "to begin drafting a confidential memorandum in

10   Microsoft Word and continue working from that draft until the memorandum is finalized" and

11   representing that he "finalized" the memorandum six days after its ostensible date of February 14,

12   2020); *see also* Docket No. 1348-2 at ECF pages 185-190 (disclosure forms served on Inmate #3

13   for memorandum at issue on February 14, 2020, six days before the memorandum was

14   "finalized").  The disclosure forms served on Inmate #3 do not reveal that the February 14, 2020,

15   memorandum states that Inmate #3 could order murders for failure to comply with the one-third

16   narcotics rule, suggesting that that information had not been added to the confidential

17   memorandum at the time the disclosure forms were served on Inmate #3.  *See* Docket No. 1348-2

18   at ECF page 185-190.  If the inaccurate phrase at issue was added to the memorandum after the

19   date the disclosures for that memorandum were served on Inmate #3, then that would raise a due

20   process concern under *Wolff*.  A prisoner is deprived of the opportunity to marshal the facts and

21   prepare a defense under *Wolff* where the evidence that could be used against him is altered after he

22   has been provided with notice of the same.  *See Grillo*, 31 F.3d at 56 (finding a genuine issue of

23   material fact as to whether a prisoner's due process rights under *Wolff* were violated where

24   inculpatory evidence used against him at a disciplinary hearing had been altered after the prisoner

25   had received copies of the evidence and noting that, "[u]nquestionably, the right of an accused to

26   know the evidence against him and to marshal a defense is compromised when the evidence he is

27   shown differs from the evidence shown to the factfinder").

28

                                              53

United States District Court
Northern District of California

1    Yet another example of material discrepancies found in confidential memoranda is the

2  following.  The February 14, 2020, memorandum states that the confidential informant said that he

3  and Inmate #3 ordered the assault of a second inmate identified by a nickname on the basis that

4  this inmate owed the confidential source and Inmate #3 money.  *See* Docket No. 1554-3 at ECF

5  page 5.  The transcript of the interview with the confidential informant, however, does not show

6  that the confidential informant identified Inmate #3, either by name or by nickname, as one of the

7  people who ordered the assault of this second victim.  *See* Docket No. 1554-4 at ECF pages 38-39.

8  Instead, the confidential source stated that "a few of us" ordered the assault, without identifying

9  the inmates who did.  *Id.*  The confidential memorandum's statement that Inmate #3 ordered the

10  assault of this second victim is, therefore, inaccurate.  This inaccuracy remains in the confidential

11  memorandum in Inmate #3's file and can be used at any time in the future to establish Inmate #3's

12  involvement in the alleged assault of this second victim, and neither Inmate #3 nor the hearing

13  officer will have any way to discover the inaccuracy.

14    As another example of material discrepancies, a confidential memorandum states that

15  Inmate #41 is being targeted for murder by members and associates of a gang "for requesting to

16  debrief, while housed [in a specific facility of a specific prison]."  Docket No. 1554-10 at ECF

17  page 7.  The confidential memorandum quotes the confidential source as having stated: "'The fact

18  [Inmate #41] requested to dropout from the [gang] and enter the debriefing process, was the straw

19  that broke the camel's back'" and "'[t]here are absolutely zero chances of ever returning to good

20  graces with the [gang] after requesting to debrief.  The individual would forever be labeled as an

21  informant and viewed as a coward.'"  *Id.*  The transcript of the interview with the confidential

22  source, however, does not contain *any* of these statements that the confidential memorandum in

23  question attributes to the confidential source by using quotation marks.  *See generally* Docket No.

24  1554-11.  Further, the confidential source appears to provide reasons for Inmate #41's bad

25  standing with the gang different than the reason stated in the confidential memorandum (i.e.,

26  asking to debrief).  *See id.* at ECF pages 33-34.  Defendants do not explain these discrepancies.

27  These discrepancies are material to Inmate #41's administrative placement and retention in RCGP,

28  as his current placement therein is based on the theory that the gang intends to murder him for

54

requesting to debrief.  Plaintiffs argue that other reasons for being in bad standing with the gang were previously found by Defendants to be insufficient to warrant RCGP placement.  *See, e.g.*, Docket No. 1354 at ECF page 12.  While these discrepancies do not appear to be relevant to disciplinary charges that could be brought against Inmate #41, they are nevertheless probative of whether material discrepancies exist in confidential memoranda systemwide.

Third, the Court infers that additional material discrepancies similar to those discussed above would have been revealed if Defendants had retained any recordings of confidential source interviews that existed or were created as of February 6, 2019, the date on which Defendants were put on notice that such recordings were relevant.  *See Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (holding that "a trier of fact may draw an adverse inference from the destruction of evidence relevant to a case" based on an "evidentiary rationale," which is "nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document").  On February 6, 2019, Plaintiffs emailed Defendants to propose changes to Defendants' production obligations under the settlement agreement such that Defendants would be required to produce recordings and transcripts of interviews with confidential sources.  Plaintiffs indicated in the email that these were relevant to RCGP placements or SHU-eligible charges or investigations conducted pursuant to the terms of the settlement agreement.  *See* Docket No. 1419-9 at ECF pages 116-17.  Defendants contend that a duty to preserve the recordings at issue was not triggered by this email because Defendants' production obligations had been previously negotiated by the parties and Defendants were not under an obligation at the time of the email to produce recordings or transcripts.  This argument is not persuasive.

In light of the foregoing, the Court finds that Defendants' policies and procedures result in the systemic generation of confidential memoranda that are likely to contain material discrepancies between what the confidential informants said and what is documented in the memoranda with respect to the informants' statements.  These discrepancies, which cannot be discovered by prisoners or hearing officers, systemically deprive class members of due process

United States District Court
Northern District of California

1    when they are used in disciplinary proceedings that could lead to their placement in the SHU.

2    This constitutes another basis for finding that the settlement agreement can be extended under

3    paragraph 41.

4                    **iii.        Insufficient reliability determinations**

5           Plaintiffs argue, based on twenty-six examples, that Defendants violated class members'

6    due process rights by failing to ascertain that confidential information that could be used against

7    class members was reliable.  Based on these examples, Plaintiffs argue that CDCR staff's "claim

8    of corroboration" with respect to confidential information that could be used against class

9    members "is unproven or fabricated"; that it is not possible to tell why "CDCR believes

10   confidential information is reliable, as contradicting boxes are checked on the RVR, confidential

11   disclosure, and corresponding confidential memorandum"; and that hearing officers rely on the

12   disclosure forms provided to inmates instead of relying on confidential memoranda when making

13   reliability determinations.  Docket No. 1409-1 at 27.  Plaintiffs contend that "CDCR's systemic

14   failure to properly scrutinize confidential information for reliability . . . is particularly troubling"

15   because the information that CDCR receives from confidential informants is frequently "false," as

16   confidential informants have incentives to lie to CDCR investigators.  *Id.* at 35-36.

17          Defendants respond that many of the examples of alleged due process violations to which

18   Plaintiffs point are not cognizable under *Zimmerlee v. Keeney*, 831 F.2d 183, 186-87 (9th Cir.

19   1987), which sets forth the standard for due process when confidential information is relied upon

20   to adjudicate disciplinary charges, because no disciplinary charges had been adjudicated by a

21   hearing officer in those instances.  Defendants further contend that, for the examples in which

22   disciplinary charges were adjudicated, the hearing officers complied with *Zimmerlee's*

23   requirements because they made reliability determinations with respect to confidential information

24   they relied upon, and those determinations were supported by some evidence in the record.

25   Defendants further argue that any discrepancies between the reliability determinations made by

26   CDCR staff and noted in disclosure forms or confidential memoranda, on the one hand, and those

27   made by hearing officers and memorialized in disciplinary hearing results, on the other hand, are

28   explained by the fact that hearing officers' reliability determinations are independent of any

56

1    reliability determinations made by other CDCR staff.  Robertson Decl. ¶ 15.  Finally, Defendants

2    contend that hearing officers do not rely on disclosure forms instead of relying on confidential

3    memoranda when making reliability determinations, because hearing officers are required to

4    review the underlying confidential memoranda when adjudicating disciplinary charges.  Robertson

5    Decl. ¶¶ 15-17.

6            It is undisputed that the alleged due process violations at issue are governed by *Zimmerlee*,

7    831 F.2d at 186.  Under *Zimmerlee*, "a disciplinary committee's determination derived from a

8    statement of an unidentified inmate informant satisfies due process when (1) the record contains

9    some factual information from which the committee can reasonably conclude that the information

10   was reliable, and (2) the record contains a prison official's affirmative statement that safety

11   considerations prevent the disclosure of the informant's name."  *Id.*  "Review of both the

12   reliability determination and the safety determination should be deferential."  *Id.* (citation

13   omitted).  Compliance with these procedural requirements is paramount in light of the significant

14   risk that the confidential information provided by informants could be inaccurate.  *See Jones v.*

15   *Gomez*, No. C-91-3875 MHP, 1993 WL 341282, at *3 (N.D. Cal. Aug. 23, 1993) ("[G]iven the

16   differences that arise between prisoners due to jealousies, gang loyalties, and petty grievances, and

17   the unfortunate discrete instances where guards seek to retaliate against prisoners, to rely on

18   statements by unidentified informants without anything more to establish reliability is worse than

19   relying on no evidence: 'It is an open invitation for clandestine settlement of personal

20   grievances.'") (citation omitted).

21           Defendants require hearing officers adjudicating disciplinary charges to make independent

22   reliability determinations before relying on confidential information for the purpose of

23   adjudicating such charges, and hearing officers employ the standards set forth in section 3321 of

24   Title 15 of the California Code of Regulations when making such determinations.  Robertson

25   Decl. ¶¶ 14-15.  Under section 3321, a confidential source's reliability may be established by any

26   of the following: (1) the confidential source has previously provided information which proved to

27   be true; (2) other confidential sources have independently provided the same information; (3) the

28   information provided by the confidential source is self-incriminating; (4) part of the information

1   provided is corroborated through investigation or by information provided by non-confidential

2   sources; (5) the confidential source is the victim; (6) this source successfully completed a

3   polygraph examination.

4   On this record, Plaintiffs have not shown that Defendants' procedures and practices for

5   making reliability determinations as to confidential information relied upon to adjudicate

6   disciplinary charges are constitutionally insufficient.

7   Many of the examples to which Plaintiffs point as evidence of due process violations do

8   not fall within the scope of *Zimmerlee* and, therefore, cannot give rise to due process violations

9   under *Zimmerlee*, because (1) the disciplinary charges have not yet been adjudicated by a hearing

10  officer, *see, e.g.*, Inmates # 44, # 45, # 46; or (2) no disciplinary rule violation has been charged at

11  all, *see, e.g.*, Inmates # 42, # 41.  As noted, *Zimmerlee*'s requirements must be followed where a

12  disciplinary officer or committee makes a *determination* that is "derived from statements of a

13  confidential informant," 831 F.2d at 186.  Because there has been no determination by a

14  disciplinary hearing officer in these instances, there can be no due process violation under

15  *Zimmerlee*.

16  For the remaining examples to which they point, Plaintiffs have not shown either that the

17  hearing officer failed to make the reliability determinations required by *Zimmerlee*, or that the

18  hearing officer's reliability determinations were not supported by "some factual information" as

19  required by *Zimmerlee*.[18]

20  In many instances, Plaintiffs challenge not the hearing officers' reliability determinations,

21  which are the only reliability determinations that can give rise to due process violations under

22  *Zimmerlee*, but the reliability determinations made by CDCR staff as memorialized in disclosure

23  forms (Forms 1030) or in confidential memoranda.  *See, e.g.*, Inmates # 13, # 49, # 50, # 51, # 52,

24  # 53, # 54, # 56, # 57, # 58.  For these inmates, Plaintiffs take issue with discrepancies between

25  the reliability determinations stated in the rules violations reports, the disclosure forms, and the

26  _____

27  [18] For some of the examples where there was a disciplinary hearing, Defendants contend,
    and Plaintiffs do not dispute, that the rules violation charges at issue did not have an STG nexus
28  and, therefore, are not properly before the Court.  *See, e.g.*, Inmates # 38 and # 43.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   confidential memoranda.  *See* Docket No. 1409-1 at 27 (arguing that due process violations exist

2   because "it is not possible to tell why CDCR believes confidential information is reliable, as

3   contradicting boxes are checked on the RVR, confidential disclosure, and corresponding

4   confidential memorandum").[19]  The existence of discrepancies between the reliability

5   determinations made by various CDCR staff does not mean that the hearing officer's

6   determinations are deficient under *Zimmerlee*.  As noted, *Zimmerlee* requires that hearing officers

7   make reliability determinations for any confidential information they rely upon and that such

8   determinations be supported by some factual information.  Plaintiffs' evidence shows that the

9   hearing officers made independent reliability determinations; the hearing officers indicated the

10  grounds for finding their confidential sources reliable by checking boxes that correspond to the

11  various permissible grounds for finding reliability under section 3321.  Plaintiffs have not shown

12  that the grounds identified by the hearing officers for finding their confidential sources reliable are

13  unsupported by some factual information in the record.  Accordingly, these examples do not

14  support a *Zimmerlee* violation.

15          In other examples, Plaintiffs challenge hearing officers' reference to confidential

16  disclosure forms in the evidence section of the disciplinary hearing results, arguing that this

17  indicates that the hearing officer failed to review the confidential memoranda and instead relied on

18  the disclosure forms that summarized the information in the confidential memoranda.  *See, e.g.*,

19  Inmates # 60, # 25, # 5, # 6, # 4.  Plaintiffs, however, have not cited any authority that a due

20  process violation can arise from such references.  Further, as noted, Defendants have proffered

21  evidence that hearing officers are required to review the underlying confidential memoranda when

22  adjudicating disciplinary charges.  Robertson Decl. ¶¶ 15-17.  In light of that requirement, and

23  because Plaintiffs have pointed to no evidence showing that the hearing officers' reliability

24

25  ─────────────────────

26          [19] Plaintiffs also appear to take issue with the responses that CDCR staff (and not
    disciplinary hearing officers) gave to inmates who asked questions about the reliability
27  determinations in these documents.  *See* Docket No. 1409-1 at 33-34 (citing questions asked by
    Inmate # 52, # 51, # 13, # 4).  Plaintiffs have not shown that these questions and answers are
28  relevant to the *Zimmerlee* analysis.

1   determinations in these instances were not supported by some evidence in the record, the Court

2   cannot conclude that these examples give rise to due process violations under *Zimmerlee*.

3          In light of the absence of evidence of systemic due process violations under *Zimmerlee*, the

4   Court finds that Plaintiffs have not met their burden to show, by a preponderance of the evidence,

5   that an extension of the settlement agreement under paragraph 41 is supported by Defendants'

6   policies and practices as to hearing officers' reliance upon confidential information in adjudicating

7   disciplinary charges.  *See* SA ¶ 42 ("Brief or isolated constitutional violations shall not constitute

8   an ongoing, systemic policy and practice that violate the Constitution, and shall not constitute

9   grounds for continuing this Agreement or the Court's jurisdiction over this matter.").

10          In sum, the Court finds that Plaintiffs have shown that the settlement agreement can be

11   extended under paragraph 41 based on ongoing and systemic due process violations arising out of

12   Defendants' inaccurate, insufficient, or misleading disclosure forms, and Defendants' systemic

13   generation of confidential memoranda that are likely to contain material discrepancies between

14   what the confidential informants said and what is documented in the memoranda with respect to

15   the informants' statements.  The Court finds that Plaintiffs have not shown, on this record, that the

16   settlement agreement can be extended under paragraph 41 based on hearing officers' reliability

17   determinations as to confidential information they relied upon in adjudicating disciplinary charges.

18          **C.      CDCR Policies and Practices that Impact the Parole Process**

19          Plaintiffs argue that CDCR is engaging in ongoing and systemic violations of class

20   members' due process rights in the parole process in two ways.  First, Plaintiffs argue that

21   CDCR's continued retention in inmates' central files of gang validations that pre-date the

22   settlement agreement, even though they are constitutionally flawed and unreliable, violates class

23   members' due process rights by denying them a meaningful opportunity to be heard in parole

24   decisions.  Docket No. 1525 at 9.  Plaintiffs argue that, because they are retained in inmates'

25   central files, the gang validations are accessible to the parole commissioners for use in parole

26   determinations.  Plaintiffs contend that Defendants' failure to add any qualifications to the gang

27   validations at issue to indicate to the parole board that they do not reliably indicate that a prisoner

28   has been active on behalf of a gang results in systemic bias in the parole process and ultimately

1    results in denying class members of a meaningful opportunity to be heard.

2        Second, Plaintiffs argue that CDCR's failure to provide class members with timely

3    disclosures of confidential information in their files that could be used against them in parole

4    determinations violates class members' due process rights, because this practice denies class

5    members of a meaningful opportunity to challenge inaccuracies in the confidential information

6    and, therefore, of a meaningful opportunity to be heard at their parole hearings.

7        Defendants respond that the parole board's use of the gang validations or confidential

8    information at issue for the purpose of parole determinations is not a proper ground for extending

9    the settlement agreement under paragraph 41.  Defendants further argue that the challenged

10   practices do not amount to due process violations because class members receive the due process

11   the Constitution requires in connection with their parole hearings, as they receive an opportunity

12   to be heard and a statement of reasons for any parole denials.

### 1.    Whether the alleged due process violations are within the scope of the complaints or settlement-agreement reforms

15       The parties disagree as to whether the settlement agreement can be extended based on

16   alleged due process violations arising out of CDCR's policies and practices relating to its retention

17   of old gang validations in inmates' central files without any qualification as to their flaws and

18   unreliability, and its policies and practices relating to its disclosure of confidential information that

19   could be relied upon for parole determinations.

20       As to the alleged violations of due process arising out of CDCR's retention of old gang

21   validations in inmates' central files, the Court finds, as it did in its order of April 9, 2021, that they

22   can serve as a basis for extending the settlement agreement under paragraph 41 because they arise

23   out of the allegations in the 2AC.  *See* Docket No. 1440 at 49-50.  Specifically, in the 2AC,

24   Plaintiffs allege that the old gang validations were made without providing class members

25   adequate due process.  *See, e.g.*, 2AC ¶¶ 87-90, 230, 237, 249, 256, 261.  They also allege that the

26   gang validations had the effect of depriving class members of a fair opportunity for parole because

27   of an unwritten policy that barred prisoners housed in the SHU based on gang validation from

28   being granted parole.  *Id.*  The due process violations at issue here, which are based on the theory

United States District Court
Northern District of California

1    that the same gang validations alleged in the complaint continue to result in the denial of a fair

2    opportunity for parole, can, therefore, serve as a basis under paragraph 41 for extending the

3    settlement agreement.

4          Defendants argue that Plaintiffs are judicially estopped from alleging due process

5    violations arising out of CDCR's retention of old gang validations in inmates' central files,

6    because these allegations amount to a request to change parole policies, which is inconsistent with

7    Plaintiffs' representation during the settlement-approval process that they "did not seek to change

8    parole policies," Docket No. 1510-4 at 7 (citing Docket No. 486 at 17-18).

9          Plaintiffs respond that judicial estoppel applies only where a party has taken a position

10   "clearly inconsistent" with its earlier position and, here, no such inconsistency exists.  Plaintiffs

11   contend that their statement during the settlement approval process that they did not seek to

12   change parole policies is not inconsistent with alleging due process violations arising out of

13   CDCR's retention of the gang validations at issue, because Plaintiffs are not attempting to

14   challenge or change the parole board's policies or decisions by making these allegations.  Docket

15   No. 1446-4 at 39.

16         Judicial estoppel can be applied where (1) the party's past and current positions are clearly

17   inconsistent; (2) the party successfully persuaded the court to accept the earlier position; and (3)

18   the party would obtain an unfair advantage, or the other party would be unfairly prejudiced, if

19   estoppel is not applied.  *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983,

20   993-95 (9th Cir. 2012).  Here, Plaintiffs' current and past positions as to whether they seek to

21   change the parole board's policies are not inconsistent.  The due process violations that Plaintiffs

22   allege in the context of gang validations pertain to CDCR's procedures for maintaining the old

23   gang validations in the inmates' central files without any accompanying information to inform the

24   parole board that the gang validations are constitutionally deficient and unreliable.  The

25   procedures and practices of the parole board are not the subject of these alleged due process

26   violations.  Thus, the Court concludes that Plaintiffs are not judicially estopped from alleging the

27   due process violations at issue.

28

As to the alleged violations of due process caused by CDCR's policies and practices relating to the timing of the disclosure to inmates of confidential information that could be used in parole determinations, the Court finds that Plaintiffs have not shown that they have a sufficient nexus either to the SHU reforms in the settlement agreement or the allegations in the complaints. Accordingly, the Court concludes that this category of alleged due process violations cannot serve as a basis for extending the settlement agreement under paragraph 41.

### 2. Whether the alleged due process violations exist on an ongoing and systemic basis

#### a. Liberty interest

The parties are in accord that prisoners have a liberty interest in parole, and the Court so concludes. *See Pearson v. Muntz*, 639 F.3d 1185, 1190–91 (9th Cir. 2011) (holding that "California law creates a liberty interest in parole") (citation and internal quotation marks omitted).

#### b. Constitutional sufficiency of procedures

Both parties rely on two Supreme Court cases to argue that Defendants' procedures do or do not provide class members with due process, namely *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979) and *Swarthout v. Cooke*, 562 U.S. 216 (2011).

In *Greenholtz*, 442 U.S. at 3, the issue before the Supreme Court was whether the Due Process Clause applied to Nebraska's procedures for discretionary parole, and, if so, whether such procedures met constitutional requirements. The court of appeals had held that the Due Process Clause applied to Nebraska's procedures, which required, in relevant part, that prisoners receive an informal hearing during which parole eligibility would be determined based on the inmate's records and any statements or letters presented by the inmate, and a short statement describing why parole was denied. The court decided that these procedures were constitutionally deficient. Based on this holding, the court ordered Nebraska to implement additional procedural protections, including that each prisoner receive a formal hearing before the parole board during which the prisoner could appear in person and present documentary evidence on his own behalf, subject to security considerations, and that the parole board provide a full written explanation of the facts

relied upon and reasons for denying parole.  *Id.* at 6.

The Supreme Court held that, because Nebraska inmates had a liberty interest in parole arising out Nebraska law, Nebraska was required to provide them with procedural protections consistent with the Due Process Clause in the parole context.  Citing the balancing framework in *Mathews*, 424 U.S. at 335, the Supreme Court held that the issue of whether any procedural protections provided to prisoners are constitutionally sufficient must be evaluated based on the need "to minimize the risk of erroneous decisions," noting that:

> The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions.  Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.

*Id.* at 12-13 (citing *Mathews* 424 U.S. at 335).  In balancing the *Mathews* factors, the Supreme Court reasoned that, in the context of evaluating Nebraska's procedures for discretionary parole, the need for minimizing the risk of error was less than in more adversarial contexts, such as disciplinary prison proceedings, in light of the nature of prisoners' liberty interest in parole and because "the Parole Board's decision as defined by Nebraska's statute is necessarily subjective in part and predictive in part."  *Id.* at 13-14 (noting that, in light of the discretionary and predictive nature of the parole board's inquiry, "[p]rocedures designed to elicit specific facts," such as those required in *Wolff*, "are not necessarily appropriate[.]").  The Supreme Court then evaluated the "additional procedures mandated by the Court of Appeals" to determine whether they were "required under the standards set out in *Matthews*," *id.* at 14.

As to the court of appeals' mandate that a formal hearing be held for every inmate, the Supreme Court found that it was unnecessary under *Mathews* because a formal hearing "would provide at best a negligible decrease in the risk of error."  *Id.*  The Court reasoned that, during the informal hearings provided to prisoners for the purpose of determining whether the prisoner was an appropriate candidate for parole under Nebraska's existing procedure, "the decision is one that must be made largely on the basis of the inmate's files," *id.* at 14.  Because the prisoners were provided during these informal hearings with "an effective opportunity, first, to insure that the

64

United States District Court
Northern District of California

1    records before the Board are in fact the records relating to his case; and, second, to present any

2    special considerations demonstrating why he is an appropriate candidate for parole," the Supreme

3    Court concluded that Nebraska's existing procedure requiring informal hearings "adequately

4    safeguards against serious risks of error and thus satisfies due process." *Id.*

5        As to the court of appeals' mandate that the parole board "specify the particular 'evidence'

6    in the inmate's file or at his interview on which it rests the discretionary determination that an

7    inmate is not ready for conditional release," *id.* at 15, the Supreme Court likewise held that it was

8    unnecessary under *Mathews*.  The Court reasoned that Nebraska's existing procedure required the

9    parole board to inform the inmate after the informal hearing "in what respects he falls short of

10   qualifying for parole," which was constitutionally sufficient.  Requiring the board to go beyond

11   that by "provid[ing] a summary of the evidence" was not warranted, because doing so "would tend

12   to convert the process into an adversary proceeding and to equate the Board's parole-release

13   determination with a guilt determination." *Id.* at 15-16.

14       The Supreme Court concluded its opinion with the following statement: "The Nebraska

15   procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in

16   what respects he falls short of qualifying for parole; this affords the process that is due *under these*

17   *circumstances*.  The Constitution does not require more." *Id.* at 16 (emphasis added).

18       In *Swarthout*, 562 U.S. at 220, the issue before the Supreme Court was a different one

19   from that addressed in *Greenholtz*.  The issue was whether the Due Process Clause requires the

20   correct application of a state standard of judicial review for evaluating parole denials, namely

21   California's "some evidence" rule. *Id.* at 217.  California courts apply this standard when a

22   California inmate is denied parole and seeks judicial review in a state habeas petition. *Id.*  The

23   Supreme Court held that the Due Process Clause does not require the application of this or any

24   other state standard of judicial review.  The Supreme Court reasoned that, for state prisoners in

25   California, a liberty interest in parole was created by California law, and that when a state

26           creates a liberty interest, the Due Process Clause requires fair
            procedures for its vindication—and federal courts will review the
27          application of those constitutionally required procedures.  In the
            context of parole, we have held that the procedures required are
28          minimal.  In *Greenholtz*, we found that a prisoner subject to a

65

1

> parole statute similar to California's received adequate process
> when he was allowed an opportunity to be heard and was provided
> a statement of the reasons why parole was denied. "The
> Constitution," we held, "does not require more."

*Id.* (citations omitted). The Supreme Court then compared the due process that the plaintiffs in the

case before it (Cooke and Clay) had received with the due process it previously held to be

sufficient in *Greenholtz*, and it concluded that the plaintiffs had received "at least" the amount of

due process held to be sufficient in *Greenholtz* because "[t]hey were allowed to speak at their

parole hearings and to contest the evidence against them, were afforded access to their records in

advance, and were notified as to the reasons why parole was denied." *Id.* The Supreme Court

further held that this "should have been the beginning and the end of the federal habeas courts'

inquiry into whether Cooke and Clay received due process" and that the court of appeals had erred

in evaluating the parole denials "on the merits" based on California's "some evidence" judicial

review standard. *Id.* at 220-21. The Supreme Court concluded that "it is no federal concern here

whether California's 'some evidence' rule of judicial review (a procedure beyond what the

Constitution demands) was correctly applied."[20] *Id.* at 221.

Plaintiffs argue that CDCR's policies and practices deprive them of the minimum due

process for protecting their liberty interest in parole by failing to provide a meaningful opportunity

to be heard at their parole hearings. The policies and practices at issue pertain to CDCR's

retention in inmates' central files of gang validations that pre-date the settlement agreement

without any statement as to their unreliability or constitutional flaws. Plaintiffs contend that these

policies and practices negatively impact class members' ability to be meaningfully heard at parole

hearings and result in systemic bias in the parole process, thereby increasing the risk that inmates

will be denied parole unfairly.

In its order of April 9, 2021, the Court found that the procedures used to generate the gang

validations at issue, as well as the gang validations themselves, are constitutionally deficient and

---

[20] Following *Swarthout*, the Ninth Circuit held that, "there is no substantive due process right created by California's parole scheme. If the state affords the procedural protections required by *Greenholtz* and *Cooke*, that is the end of the matter for purposes of the Due Process Clause." *Roberts v. Hartley*, 640 F.3d 1042, 1046 (9th Cir. 2011).

1    unreliable because Plaintiffs presented evidence, which Defendants did not dispute, showing that

2    Defendants failed to provide class members with meaningful notice of how to avoid gang

3    validation or revalidation, a meaningful opportunity for rebuttal, meaningful periodic review, and

4    sufficient checks and balances to reduce the risk of erroneous gang validation.  Docket No. 1440 at

5    51-53.

6           In their present motion, Plaintiffs argue that the Court should reaffirm its finding with

7    respect to the unconstitutionality and unreliability of the gang validations at issue because none of

8    the facts upon which the Court relied in finding them constitutionally deficient and unreliable have

9    changed.

10          In their opposition to the second extension motion, Defendants do not offer any evidence

11   to undermine the Court's finding in its April 9, 2021, order with respect to the constitutionality of

12   the gang validations at issue and the procedures employed to generate them.

13          Accordingly, the Court reaffirms its finding that the gang validations that pre-date the

14   settlement agreement are constitutionally deficient and unreliable.[21]

15          The Court now turns to the question of whether any ongoing and systemic due process

16   violations result from CDCR's retention of the gang validations at issue in inmates' central files

17   without any qualification as to their flaws and unreliability.

18

19

---

20          [21] Defendants cite two cases for the proposition that the "Ninth Circuit has regularly
     upheld CDCR's validation process against due process challenges," Docket No. 1510-4 at 10
21   (citing *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) and *Castro v. Terhune*, 712 F.3d 1304,
     1313 (9th Cir. 2013)).  These authorities, however, do not alter the Court's conclusion that the
22   gang validations at issue are constitutionally infirm and unreliable.  In *Castro*, 712 F.3d at 1313,
     the plaintiff asserted a void-for-vagueness challenge with respect to a now-obsolete California
23   administrative regulation that defined "associate" for the purpose of gang validation.  The Ninth
     Circuit held that, "[a]ssuming inmates can challenge prison administrative regulations on
24   vagueness grounds, section 3378(c)(4) satisfies the requirements of due process" because it was
     sufficiently definite as to what conduct would fall within the definition of "associate."  *Castro* is
25   irrelevant to the analysis here because the Court's findings with respect to whether Defendants'
     procedures for generating gang validations comply with due process requirements did not depend
26   on the definiteness of the definition of "associate" at issue in *Castro*.  In *Bruce*, 351 F.3d at 1287,
     and unlike here, the issue was whether there had been "some evidence" in the record to support the
27   plaintiff's gang validation; the procedural protections that had or had not been provided to inmates
     generally pursuant to CDCR's policies and practices were not at issue in this case.  *See id.*
28

1    Plaintiffs contend that CDCR's retention of the gang validations in inmates' central files

2    results in the gang validations being made available to the parole board for parole determination

3    purposes "without notification of their infirmity," which infects "the parole process with systemic

4    bias" and deprives class members of a meaningful opportunity to be heard in the context of parole

5    eligibility.  Docket No. 1446-4 at 42.  Plaintiffs argue that the parole board is misled to believe

6    that a gang validation is reliable and indicative of involvement in gang activity, which

7    systemically deprives inmates of a fair opportunity to be heard because this finding is "often

8    dispositive" in parole determinations.  Docket No. 1409-1 at 39.  Plaintiffs further contend that the

9    retention of old gang validations deprives prisoners of an opportunity to be heard because

10   prisoners have no meaningful way to object to the validations, as "BPH predictably treats CDCR

11   validations as reliable, and treats a prisoner's attempt to dispute validation as evidence of

12   dishonesty and lack of remorse."  Docket No. 1409-1 at 39-40.

13       Defendants do not dispute the key premises underlying Plaintiffs' arguments.  They do not

14   dispute that CDCR controls the record management systems that contain inmates' central files and

15   that CDCR, therefore, could remove the gang validations at issue from inmates' central files or

16   add qualifying statements as to their flaws and unreliability.  *See* Shaffer Decl. ¶ 6 (declaring that

17   CDCR maintains the Strategic Offender Management System and Electronic Records

18   Management System through which parole commissioners have direct access to an inmate's

19   central file).  They also do not dispute that the gang validations at issue continue to be accessible

20   to the parole board through the prisoners' central files without any qualification as to their

21   unreliability and flaws.  Defendants do not dispute that there is no procedure currently in place to

22   ensure that the parole board is notified or otherwise has access to information as to the

23   unreliability and constitutional deficiency of the gang validations or the procedures that were used

24   to generate them.  Finally, Defendants do not dispute that gang validations can play a role in

25   parole determinations.  *See* Docket No. 1419-4 at 5 (Defendants arguing that, "[w]hen making

26   parole-suitability determinations, parole commissioners consider all relevant and reliable

27   evidence, *including the fact that an inmate is validated as a gang member*—and the evidence

28   underlying the validation, as well as confidential information in the inmate's file") (emphasis

United States District Court
Northern District of California

1   added).  Defendants argue only that Plaintiffs have not, and cannot, show the existence of due

2   process violations in this context because the only procedural protections required by *Greenholtz*

3   and *Swarthout* are an opportunity to be heard and information as to why parole was denied, and

4   both of these protections are provided to class members.

5       As discussed above, the Supreme Court held in *Greenholz* that the analysis of whether

6   procedural protections afforded to prisoners in the parole context are constitutionally sufficient

7   must be based on the standards set out in *Matthews*, which requires a balancing of private and

8   governmental interests and the risk of error associated with the challenged procedures relative to

9   additional procedural safeguards that could be implemented without significant burden to the

10  government.  442 U.S. at 14.  Here, the analysis as to the first and third *Mathews* factors (the

11  private and governmental interests, respectively) is the same as that in *Greenholz* because the

12  procedural safeguards at issue relate to prisoners' liberty interest in discretionary parole.

13      The *Mathews* analysis turns on the second factor, which evaluates the risk of error

14  associated with the challenged procedures relative to additional procedural safeguards that could

15  be implemented without significant burden to the government.  CDCR's practice of retaining the

16  gang validations at issue in inmates' central files without any qualification as to their flaws and

17  unreliability results in a significant and unacceptable risk of error in parole determinations

18  because, as noted above, Defendants do not dispute that the gang validations at issue can play a

19  role in parole determinations and that there is no procedure in place to alert the parole board of

20  their flaws and unreliability.  Requiring CDCR to add a qualification to the inmates' central files

21  indicating the flaws and unreliability of the gang validations at issue would significantly decrease

22  the risk of error.  Defendants have not shown that requiring them to modify their policies and

23  practices to add this qualification to inmates' central files would result in any significant burden to

24  them.  Accordingly, the second *Mathews* factor tips the balance of the relevant factors in favor of

25  finding that the policies and practices at issue fail to provide class members with the due process

26  they are owed under *Greenholtz*.

27      Defendants argue that no due process violations arise out of the challenged practice,

28  because the only procedural protections required by *Greenholtz* and *Swarthout* are an opportunity

United States District Court
Northern District of California

to be heard and information as to why parole was denied, and both of those protections are provided class members. The Court is not persuaded. Defendants' reading of *Greenholtz* and *Swarthout* ignores the key aspect of the opinions, which is that a court's evaluation of whether the process afforded to an inmate comports with the Due Process Clause must be made in each case pursuant to the standards set forth in *Mathews*. *Mathews* requires considering the risk of error associated with the process at issue, and whether such a risk need be and could be reduced by requiring stronger procedural protections.

There is risk of error here because the "opportunity to be heard" that class members receive is not meaningful. As noted, in *Greenholtz*, the Supreme Court held that the informal hearing that was provided to prisoners under Nebraska's existing regulations was constitutionally sufficient under the *Mathews* framework because, at that hearing, inmates were "provided with an effective opportunity, first, to insure that the records before the Board are in fact the records relating to his case; and, second, to present any special considerations demonstrating why he is an appropriate candidate for parole." 442 U.S. at 15. Here, by contrast, class members lack an "effective opportunity" to argue at their parole hearings that the gang validations available to the parole board should not be treated as being part of their central files for parole purposes in light of their constitutional flaws and inherent unreliability. Because an inmate does not know before or during the parole hearing whether a parole board will find pre-settlement-agreement gang validations to be reliable indicators of gang activity, the inmate may fear to argue to the parole board that the gang validations should not be considered for parole purposes on the basis of their constitutional flaws and unreliability, as doing so could be perceived by the parole board as evidence of dishonesty. Accordingly, the parole board may not be aware of the unreliability of the gang validations at issue, resulting in a significant risk of error in parole determinations.

Defendants contend that the parole board's consideration of a gang validation is "nuanced," Docket No. 1419-4 at 14, suggesting that parole commissioners do not automatically treat a gang validation in an inmate's central file as reliable evidence of gang affiliation. Defendants represent that parole commissioners are "trained to review the inmate's entire file and to make their own reliability determinations for each piece of evidence they rely upon," and that

they are "empowered to conclude that pieces of evidence are not reliable." Docket No. 1419-4 at 14; *see also* Shaffer Decl. ¶ 11. These arguments imply that commissioners are *capable* of independently assessing the reliability of evidence relevant to an inmate's parole suitability, and that they have the discretion to *choose* not to rely on evidence that they find to be unreliable. Defendants, however, have pointed to no policies or procedures that *require* commissioners to make independent determinations as to the reliability of gang validations before relying on them.[22] The absence of an actual policy or procedure that requires independent reliability assessments by parole commissioners as to gang validations makes it likely that CDCR's systemic practice of making gang validations available in inmates' central files without any statement as to their flaws and unreliability will result in depriving class members of a meaningful opportunity to be heard.

Defendants also contend that class members are not deprived of due process even if they are unable "to challenge a single piece, or even pieces of evidence" that the parole board may consider, Docket No. 1419-4 at 11, because "none of the inmates [Plaintiffs] relied on were denied parole based just on their validation status" or any other single piece of evidence and because "[a] comprehensive evaluation was completed for each inmate," Docket No. 1510-4 at 10. This argument goes to the sufficiency of the evidence supporting a denial of parole, which is an issue that is not before the Court. The alleged due process violations at issue do not arise out of the theory that parole denials lack evidentiary support.

---

[22] Defendants argue that, if parole commissioners choose to rely on confidential information in determining suitability for parole, "they must make an independent finding that the information is reliable," Docket No. 1419-4 at 14. Defendants cite 15 Cal. Code Regs. § 2235(a) to support that argument. Section 2235(a) provides, "The reliability of confidential information to be used [by the parole board] shall be established to the satisfaction of the hearing panel. A finding of reliability shall be documented by the hearing panel." Defendants have not shown that gang validations, which are labels that are used to classify prisoners as members or associates of a gang, constitute "confidential information" subject to section 2235(a) such that parole commissioners are required to make reliability determinations under section 2235(a) with respect to them. If the gang validations themselves (which are distinct from the information that was relied upon to generate the validations) were subject to section 2235(a), any reliability determinations by the parole commissioners with respect to the validations should have been "documented" as required by that section. Defendants have not pointed to evidence that any reliability determinations as to the gang validations themselves were made or documented pursuant to section 2235(a).

United States District Court
Northern District of California

1

In light of the foregoing, the Court concludes that CDCR's continued retention of the gang validations at issue in prisoners' central files without any notation of the fact that they are flawed and unreliable gives rise to ongoing violations of class members' constitutional right to a meaningful opportunity to be heard in the context of parole. Because the policies and practices in question, and their effects, are systemic, the Court finds that the violations of class members' due process rights warrant extending the settlement agreement under paragraph 41.

**D.      Remedies**

In addition to an extension of the settlement agreement pursuant to paragraph 41, Plaintiffs request a variety of remedies to "cure the[] continuing and systemic constitutional violations" they established in the present motion. *See* Docket No. 1409-1 at 62-64.

These requests are not well-taken. Plaintiffs have not shown that the Court can take any action under paragraph 41 other than to extend the settlement agreement. Paragraph 52 of the settlement agreement appears to be the proper vehicle for requesting remedies other than extensions of the settlement agreement; that paragraph permits Plaintiffs to file a motion to seek prospective remedies to redress ongoing and systemic constitutional violations before the magistrate judge after meeting and conferring. *See* SA ¶ 52. Accordingly, the Court denies Plaintiffs' request for remedies without prejudice to filing a motion under paragraph 52.

**IV.      CONCLUSION**

For the reasons set forth above, the Court accepts in part and rejects in part the findings and recommendations of the magistrate judge, and grants Plaintiffs' motion to extend the settlement agreement for another twelve months pursuant to paragraph 41. The twelve months shall commence when this order becomes final.

IT IS SO ORDERED.

Dated: 2/2/2022

CLAUDIA WILKEN
United States District Judge