United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TODD ASHKER, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 09-cv-05796 CW

**ORDER TO BE FILED UNDER SEAL ON MOTION TO ENFORCE ANTI-RETALIATION PROVISION OF SETTLEMENT AGREEMENT**

(Re: Dkt. No. 1698-2)

Now before the Court is Plaintiffs' motion for de novo review of the magistrate judge's denial of Plaintiffs' motion to enforce the anti-retaliation provision of Paragraph 54 of the Settlement Agreement (SA). The retaliation alleged involves the housing placement of class member and named Plaintiff Todd Ashker.[1] Docket No. 1698-2. Plaintiffs also move to exclude the expert opinions of OCS #1 , Defendants' non-retained expert on prison gangs. Defendants oppose Plaintiffs' motions. Docket No. 1705-2. The Court previously granted a third Plaintiffs' motion for de novo review, requiring Defendants' production of documents relevant to Ashker's housing placements. *See* Docket No. 1716. For the reasons set forth below, the Court construes the magistrate judge's rulings as proposed findings and recommendations and reviews them de novo. The Court accepts the magistrate judge's findings in part and rejects them in part,

[1] This motion contained a request for an adverse inference based on Defendants' destruction of certain evidence, which the magistrate judge denied. Plaintiffs also seek de novo review of that ruling.

United States District Court
Northern District of California

and concludes that Plaintiffs have established by a preponderance of the evidence that Defendants substantially violated Paragraph 54's anti-retaliation provision in Ashker's housing placements.

## FINDINGS OF FACT

### I. Relevant provisions of the settlement agreement

A detailed description of the allegations and claims in this class action is set forth in the Court's order of February 2, 2022. *See* Docket No. 1579. The parties entered into the SA in August 2015. *See* SA, Docket No. 424-2. Paragraph 54 of the SA contains an anti-retaliation provision that prohibits Defendants from "retaliat[ing] against any class representative, class member, or other prisoner due to their participation in any aspect of this litigation or the Agreement." SA ¶ 54. Allegations of retaliation may be made to the magistrate judge in accordance with the procedures set forth in Paragraph 53. *Id.* Paragraph 53 provides, in relevant part, that Plaintiffs may seek an order enforcing the SA by filing a motion before the magistrate judge. *Id.* ¶ 53. If Plaintiffs demonstrate substantial noncompliance by a preponderance of the evidence, then the magistrate judge may issue an order to achieve substantial compliance, which shall be subject to review under 28 U.S.C. § 636(b)(1)(B). *Id.* The SA also contains a provision in Paragraph 27 permitting the Departmental Review Board (DRB) to place prisoners in the Restricted Custody General Population (RCGP) if "there is a substantial threat to their personal safety should they be released to the General Population as determined by a preponderance of the evidence[.]" *Id.* ¶ 27. Prisoners placed in RCGP pursuant to Paragraph 27 may be retained there "until such time that the inmate can safely be housed in a general population environment." *Id.* The Institutional Classification Committee (ICC) "shall verify" every 180 days "whether there continues to be a demonstrated threat to the inmate's personal safety; and if such threat no longer exists the case shall be referred to the [DRB] for review of housing placement as soon as practicable." *Id.*

### II. Analysis of the evidence presented in connection with Ashker's retaliation allegations

For the reasons discussed in the Conclusions of Law below, the Court construes all of the magistrate judge's rulings as proposed findings and recommendations under 28 U.S.C. § 636(b)(1)(B) and, as such, the Court reviews them de novo under 28 U.S.C. § 636(b)(1)(C) and

considers the arguments and evidence presented to the magistrate judge as if no decision had been rendered by the magistrate judge.

**A. Ashker** [redacted]

Named Plaintiff and class member Todd Ashker and another class member, Danny Troxell, filed the original lawsuit that became this class action. *See* Docket No. 1. Later in the litigation, Ashker was selected by other prisoners to be one of the main representatives for class members in this action in light of his decades-long experience in challenging CDCR policies and practices. *See* Ashker Decl. ¶¶ 2-4, Docket No. 1599-4. Ashker participated in the negotiation of the SA and has participated and taken a "leadership role" in semi-annual compliance meetings that involve "CDCR officials." *Id.* ¶ 3. Ashker believes his litigation efforts against CDCR have made him well known, influential, and respected among the CDCR prisoner population as a whole. *Id.* ¶¶ 4-5. He also believes that his role in this litigation is well known to CDCR and its employees. *Id.* ¶¶ 3, 6. Plaintiffs presented evidence, which Defendants have not disputed, showing that Ashker's placement in RCGP on the basis of threats to his safety would diminish his influence over other prisoners and would likely result in his removal as a representative for class members in this action, because RCGP placement would stigmatize Ashker. *See, e.g.*, Ashker Decl. ¶¶ 8, 27; Prisoner Decl. ¶¶ 5-7, Docket No. 1600-4 (Ex. CA); Prisoner Decl. ¶¶ 3-5, Docket No. 1600-5 (Ex. CD).

Ashker has been in CDCR custody since January 1985 and spent more than twenty-nine years in solitary confinement in the Special Housing Unit (SHU) at Pelican Bay State Prison (PBSP). Ashker Decl. ¶ 2. Following his release from the SHU as a result of the settlement of this lawsuit, Defendants housed him in the general population (GP) at Kern Valley State Prison (KVSP). Ashker arrived there on February 12, 2016. While he was in GP at KVSP, Ashker allegedly experienced retaliation by KVSP staff. Plaintiffs brought those allegations before the magistrate judge on March 16, 2017, by way of a letter brief. *See* Docket No. 1599-2 (Ex. CF). The retaliation that Plaintiffs alleged included that staff had spread harmful and false rumors about Ashker to the prisoner population to create tensions between him and other prisoners. *Id.* at 3-4.

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 4 of 65

Nonetheless, Ashker resided in GP for approximately fifteen months without experiencing any threats to his safety, until . ¶ He became "single-mindedly focused on how to get a phone call with her to make sure she was safe." *Id.* Ashker was then placed in Administrative Segregation (ASU).

That same day, KVSP #1 notified high-level CDCR officials HQ #1 responded to the email a few minutes later, thanking KVSP #1 for the update. *Id.* Others were copied on HQ #1 response, including HQ #2 , HQ #3 HQ #4 (who reported directly to HQ #1 HQ #5 and HQ #6 On that same day, or shortly thereafter, HQ #1 received a briefing from HQ #4 relating to and he asked HQ #4 to keep him informed. HQ #1

The next day, , Ashker was allowed to call his attorney, who assured him that he would try to contact his fiancée. Ashker Decl. ¶ 16.

OCS #2 .

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 5 of 65

United States District Court
Northern District of California

[redacted] OCS #2 [redacted] OCS #3 [redacted] OCS #2 [redacted]

OCS #3 [redacted]

[redacted] OCS #3 [redacted]

[redacted] OCS #3 [redacted]

[redacted] OCS #3 [redacted]

[redacted] OCS #3 [redacted]

[redacted] OCS #3 [redacted]

[redacted] RCGP placements and retentions are not being made in accordance with Paragraph 27 of the SA. This is relevant because, as will be discussed below, Defendants contend that RCGP placements and retentions are not adverse actions in that the RCGP is being administered as Plaintiffs negotiated. OCS #3 [redacted]

[redacted] OCS #3 [redacted]

United States District Court
Northern District of California

1   ███████████████████████████████████ perpetual retention in RCGP

2   without verification of whether safety threats continue to exist is inconsistent with Paragraph 27.



12   ██████████████████████ ██ Ashker did so because he came to believe that

13   his "concerns had been resolved" and that his loved ones were well, after he was allowed to speak

14   with his lawyer ██████████████████████████

15          On the same date Ashker asked to be released from ASU, May 10, 2017, KVSP #1 emailed

16   HQ #3 █ who was responsible for monitoring the SA. *See* Docket No. 1594-9 at ECF header page

17   23 (Exhibit I); HQ #1 Dep. Tr. at 13. KVSP #1 informed HQ #3 of Ashker's request. Docket No.

18   1594-9 at ECF header page 23 (Exhibit I). HQ #3 responded, "I assume you are retaining to

19   complete safety investigation" and asked KVSP #1 to call her cell phone. *Id.*

20          Also on the same date, May 10, 2017, HQ #3 sent an email to HQ #1 forwarding the email

21   from KVSP #1. HQ #1 Dep. Tr. at 10-15. Later that day, HQ #1 replied to the email from HQ #3

22   copying HQ #5 █ HQ #4 █ and others, and stating, "HQ #4, I would be interested in what . . . our

23   plan is at this point." *Id.* at 14-17.

24          On May 11, 2017, the KVSP ICC had an initial hearing and elected to retain Ashker in

25   ASU pending an investigation into possible concerns for his safety. Docket No. 1594-9 at ECF

26   header page 28 (Ex. J).

27          In a declaration executed on February 25, 2022, Ashker testified that he does not believe

28   that he is in danger from the Aryan Brotherhood (AB) ████████████████████████████



United States District Court
Northern District of California

[redacted] would put [him] in the best position to get a call with [his] lawyer" to check on the status of his family. Ashker Decl. ¶ 17.

The Court credits Ashker's testimony [redacted] motivated by a desire to be permitted to call his attorney to ask about his family. [redacted] HQ #4 [redacted] HQ #4 [redacted]

**B. KVSP's ICC determined that Ashker should be released to GP, [redacted] based on the recommendation of KVSP's IGI Lieutenant, adopted by the KVSP Warden and other KVSP administrators**

Institutional Gang Investigator (IGI), [redacted] KVSP #2 was assigned to investigate Ashker's safety [redacted].

On May 15, 2017, a few days before he finalized a confidential memorandum summarizing his investigation into Ashker's safety, KVSP #2 sent an email to KVSP #1 stating that he received a "surprise call from [HQ #7 ] [of the High Security Mission] digging on info for Ashker." Docket No. 1594-9 at ECF header pages 41-42 (Ex. K). HQ #7 was "asking for any new information such as kites or documentation indicating he was in trouble." *Id.* KVSP #2 further stated in his email that HQ #7 had tried "buttering [him] up prior to asking about Ashker" and that

United States District Court
Northern District of California

KVSP #2 "could feel he [HQ #7 [redacted] wanted way more, but could probably tell that's all he was getting." *Id.*

HQ #7 call to KVSP #2 on May 15, 2017, suggests that staff at CDCR headquarters tried to influence the investigation of Ashker's safety to result in a finding that Ashker would not be safe in GP. HQ #7 questions to KVSP #2 about Ashker's safety were unusual. KVSP #1 testified that he was not aware of another instance in which HQ #7 had ever reached out to IGI staff at KVSP looking for information about a prisoner's safety. KVSP #1 Dep. Tr. at 92. KVSP #1 also could not recall another instance in which someone at the High Security Mission did work in preparation for a safety review and ICC of a prisoner. *Id.* at 192. Defendants have offered no explanation for HQ #7 call to KVSP #2 nor have they pointed to any evidence indicating that it was typical for headquarters to ask for information indicating that a prisoner would not be safe in GP.

KVSP #2 investigation into Ashker's safety is described in his confidential memorandum [redacted]. Docket No. 1594-7 at ECF header page 7 (Ex. D). KVSP #2 testified that he considered his investigation to be adequate. KVSP #2 Dep. Tr. at 123-24, Docket No. 1594-5. He recommended that Ashker be considered by ICC for release to GP at KVSP. Docket No. 1594-7 at ECF header page 7 (Ex. D). The memorandum was also signed by KVSP #1 *Id.*

KVSP #2 investigation involved a review of documents in Ashker's file and an interview with him. KVSP #2 stated in his report that he reviewed Ashker's entire confidential file. [redacted] KVSP #2 [redacted] KVSP #2 [redacted]

---

[redacted]



United States District Court
Northern District of California

KVSP #2 KVSP #2 KVSP #2 KVSP #2 believed that Ashker could safely be released to GP at KVSP. He explained that there were few AB members at KVSP at the time and he deemed it unlikely that they would challenge Ashker's authority within the gang *See* KVSP #2 Dep. Tr. at 115.

KVSP #2 Ashker denied having any concerns for his safety, requested to be released to GP, and signed a Form 128-B waiver reaffirming his desire to be released to GP. *Id.*

KVSP #2 KVSP #2

The Court finds that KVSP #2 conclusion that Ashker could safely program in GP reflected KVSP #2 independent assessment of Ashker's safety . Despite HQ #7 attempt to influence KVSP #2 investigation, the record does not reveal any irregularities in KVSP #2 investigation and findings as to Ashker's safety.

KVSP #1 later attended a pre-ICC meeting with KVSP administrators during which they adopted KVSP #2 recommendation. KVSP #1 Dep. Tr. at 86-88, 97-98, 130. KVSP #1 testified that he would not have adopted a recommendation that a prisoner should be released to GP if he believed that there was additional information that still needed to be investigated. *Id.* at 98-99.

On June 1, 2017, the ICC held a hearing on Ashker's safety and possible release to GP. Docket No. 1595-1 (Ex. M). The ICC was chaired by Chief Deputy Warden KVSP #3 KVSP #1 Dep. Tr. at 88. KVSP #1 testified that he did not chair the ICC himself because HQ #1 was scheduled for a tour of KVSP that day. *Id.* The ICC reviewed KVSP #2 [redacted], confidential memorandum and other confidential documents in Ashker's file and concluded that he should be released to GP in KVSP Facility B. Docket No. 1595-1 (Ex. M). The ICC advised Ashker that if any enemy concern arises while in GP he should inform staff immediately. *Id.*

The Court finds that the record does not indicate any irregularities in the adoption by the ICC, and by KVSP administrators prior to the ICC, of KVSP #2 recommendation to release Ashker to GP.

On that same day, June 1, 2017, Ashker was placed on a bus for KVSP Facility B. Ashker Decl. ¶ 35. When the bus arrived at KVSP Facility B, Ashker was told not to exit the bus and he was returned to ASU. *Id.*

**C. HQ #1 unilaterally countermanded the ICC's decision to release Ashker to GP and Defendants failed to disclose this fact to Plaintiffs and the magistrate judge for years**

Ashker was not immediately informed why he was told not to exit the bus at the GP facility and returned to ASU on June 1, 2017. On June 2, 2017, he received an Administrative Segregation Unit Placement Notice, which stated that he was being retained in ASU "pending further inquiry into possible enemy/safety concerns" at KVSP and would remain in ASU until completion of an investigation into such concerns. Docket No. 1595-4 (Ex. T). This notice did not disclose why the ICC's determination to release Ashker to GP at KVSP had been reversed, nor did it identify why an investigation into "possible enemy/safety concerns" was necessary. *See id.* A few days later, on June 6, 2017, Ashker received a confidential disclosure form, which states:

United States District Court
Northern District of California



United States District Court
Northern District of California

[redacted]

Docket No. 1595-1 at ECF header page 19 (Ex. O). The confidential disclosure form further states [redacted] an investigation has been initiated, and Ashker will be remanded to ASU pending the completion of the investigation.[3] *Id.*

Plaintiffs later obtained records that contradict the statements in this confidential disclosure form. The records show the phone call was accessed twice, on May 26, 2017, and again on June 6, 2017, and that the portion of the call where [redacted] is mentioned was not reviewed until June 6, 2017, several days after Ashker's remand to ASU on June 1, 2017. Docket No. 1595-1 at ECF header pages 13-18 (Ex. P). Accordingly, the [redacted], call could not have been the intelligence that CDCR relied upon to return Ashker to the ASU on June 1, 2017.

In reality, the June 1, 2017, decision to return Ashker to ASU despite the ICC's decision to release him to GP was made by HQ #1 [redacted] HQ #1 Dep. Tr. at 36-41. HQ #1 took an immediate interest in [redacted] and subsequent events because HQ #1 considered Ashker's situation "significant" in light of his "stature" by virtue of his leadership role in this litigation and the related hunger strikes that he had organized. *Id.* at 8-18, 22-27. HQ #1 asked to be kept informed about Ashker's status [redacted], *id.* at 8-10, and he expressed to other high-

[3] [redacted]. *See* Docket No. 1595-4 at ECF header page 21 (Ex. V). That prisoner also filed a declaration in support of Ashker's current motion that is consistent with what he stated [redacted]. *See* Prisoner Decl. ¶¶ 1-3, Docket No. 1600-4 (Ex. BX). The prisoner also declares that, since June 2017, he has not heard from any prisoner that Ashker's safety has been threatened, even though the prisoner has a position of influence among prisoners and would know if Ashker was not safe. *Id.* ¶¶ 2-3.

level CDCR officials that he was interested in a "plan" after [redacted], *id.* at 14-17. This suggests that HQ #1 countermand of the ICC's decision would not have occurred but for Ashker's high-profile status as a result of his activities in this litigation.

HQ #1 reversal of the ICC's decision was atypical. KVSP #1 testified that he could not recall another instance in which anyone from headquarters had overruled his ICC decision as to where a prisoner could safely house. KVSP #1 Dep. Tr. at 140. HQ #8 a Classification Services Unit (CSU) correctional counselor III who collected and analyzed evidence for two of Ashker's housing reviews, testified that she could not recall another instance other than Ashker's case in which an ICC's decision to release a prisoner to GP had been overturned by somebody other than a DRB. HQ #8 Dep. Tr. at 111.

CDCR did not reveal HQ #1 role in Ashker's remand to ASU on June 1, 2017, to either Plaintiffs or the magistrate judge on June 8, 2017, when the magistrate judge held a telephonic conference on an emergency basis with respect to Ashker's return to ASU on June 1, 2017. *See* Docket No. 761 (public portion of hearing transcript); Docket No. 764 (sealed portion of hearing transcript). During that conference, Plaintiffs objected to Ashker's return to ASU on June 1, 2017, on the basis that he had not been provided any information as to why Defendants believed that an additional investigation into his safety was necessary. Docket No. 761 at 4. HQ #9 an attorney at CDCR's Office of Legal Affairs, responded that HQ #5 [redacted] who was also on the line, would "shed some light on the situation." *Id.* at 4-5. HQ #5 represented to the magistrate judge that a further investigation into Ashker's safety was necessary in light of the [redacted] *See* Docket No. 764 at 8. As explained above, this was not the reason for the June 1, 2017, abrupt reversal of the ICC's determination to release Ashker to GP, [redacted] Nor did Defendants disclose to the magistrate judge on June 8, 2017, that it was HQ #1 who had unilaterally countermanded the ICC's decision. Based on HQ #5 representations, the magistrate judge ordered Defendants to investigate Ashker's safety [redacted] and to update him in two weeks as to the status of the investigation. *Id.* at 13.

United States District Court
Northern District of California

On June 21, 2017, pursuant to the magistrate judge's order, the parties submitted a letter brief in which Defendants again failed to inform the magistrate judge of HQ #1 order to remand Ashker to ASU on June 1, 2017. *See* Docket No. 1595-1 (Ex. N). Defendants represented to the magistrate judge that "*before* Ashker's return to the general population" on June 1, 2017, pursuant to the ICC's determination, "CDCR discovered additional intelligence implicating Ashker's safety," and that "HQ #5 described this intelligence during the June 8 conference." *Id.* (emphasis added). As noted, the intelligence described by HQ #5 on June 8 was the [redacted] [redacted], but contrary to Defendants' representations in the letter brief, [redacted] [redacted] [redacted]

Defendants did not reveal HQ #1 involvement in Ashker's remand to ASU until after Plaintiffs sought and obtained leave in August 2019, more than two years later, to conduct discovery relating to Ashker's allegations of retaliation. At that point the magistrate judge ordered that Defendants disclose who made the June 1, 2017, order to return Ashker to ASU, and present that person for deposition. *See* Docket No. 1203. The person that Defendants identified pursuant to this order was HQ #1 and HQ #1 was deposed on December 4, 2019.

During the November 3, 2022, hearing before the undersigned, Defendants did not dispute that they had represented to the magistrate judge, incorrectly, that Ashker was sent back to ASU because of the [redacted]. *See* Hr'g Tr. at 17-19. The only explanation for Defendants' having failed to reveal this to the magistrate judge in June 2017 was that there had been mistakes in communications and "crossed lines." *Id.* The Court finds that Defendants' lack of candor in failing to disclose to the magistrate judge in June 2017, and for more than two years thereafter, that Ashker's remand to ASU on June 1, 2017, was personally and summarily ordered by HQ #1 is evidence of an improper retaliatory motive for rescinding Ashker's GP placement.

During the December 4, 2019, deposition ordered by the magistrate judge, HQ #1 testified that his only motivation for remanding Ashker to ASU on June 1, 2017, was to keep him safe. HQ #1 said that he believed that Ashker would not be safe in GP due to comments that were made to him by two officers he encountered by chance while he was on his June 1, 2017, tour of KVSP led

United States District Court
Northern District of California

United States District Court
Northern District of California

by KVSP #1 HQ #1 Dep. Tr. at 36, 46-49. HQ #1 was not able to recall the names of these officers, but he recalled that one of them was identified by KVSP #1 as an IGI lieutenant who had just come out of Ashker's ICC hearing. *Id.* HQ #1 testified that this lieutenant was the "gang expert of that institution," *id.* at 48, whose "responsibility is to gather all gang information," *id.* at 41. HQ #1 testified that he particularly relied on this lieutenant's statements. *Id.* at 40. HQ #1 stated that KVSP #1 asked the lieutenant about the results of Ashker's hearing, and the lieutenant responded that the ICC had "released him." *Id.* at 37 (internal quotation marks omitted). HQ #1 testified that he then asked the lieutenant what he thought was going to happen, and the lieutenant responded, "I think he's going to get whacked." *Id.* (internal quotation marks omitted). HQ #1 proceeded with the tour. *Id.* at 38-39. He did not ask the lieutenant why the ICC had recommended that Ashker be released to GP despite the lieutenant's belief as the "gang expert of that institution" that Ashker would be killed there. *See id.* at 45-48.

HQ #1 testified that, later on the tour, he ran into an Investigation Services Unit (ISU) officer and asked the officer what he thought would happen given that Ashker "just got released from ad-seg back to the yard," and the ISU officer responded, "He's going to get assaulted." *Id.* at 38 (internal quotation marks omitted). HQ #1 stated that, after thinking "about it for a little bit," *id.*, he instructed KVSP #1 to return Ashker to the ASU on the basis that "I don't want him in the yard yet," *id.* (internal quotation marks omitted).

When asked whether he had received any new information that the ICC committee did not have when it decided to release Ashker to GP, HQ #1 responded, "I don't know what the ICC had. I don't know what they discussed. All I had was the discussion with the ISU lieutenant and he said he was going to get whacked. And I was concerned for Mr. Ashker's safety at that point." *Id.* at 61. KVSP #1 who, as noted, adopted KVSP #2 recommendation to release Ashker to GP prior to Ashker's ICC hearing after a meeting with other KVSP administrators, testified that HQ #1 would not have more knowledge than he about Ashker's safety KVSP #1 Dep. Tr. at 155. HQ #1 testified that, despite his purported concerns for Ashker's safety, he did not order that a further investigation as to Ashker's safety be conducted. *See* HQ #1 Dep. Tr. at 62 (when asked whether he "order[ed] any safety investigation to be undertaken," HQ #1 testified, "I didn't, but I see one

United States District Court
Northern District of California

was . . . I didn't. But I'm glad somebody did"). HQ #1 testified that he never provided any written documentation to Ashker as to his decision to send him back to the ASU and that he left that matter to staff. *Id.* at 42.

It later was revealed that HQ #1 did not speak with KVSP's IGI lieutenant on the day he countermanded the ICC's decision to release Ashker to GP. The sole IGI lieutenant at KVSP in that timeframe was KVSP #2 and he testified on July 21, 2020, that he was not at KVSP on June 1, 2017; he did not work that day. KVSP #2 Dep. Tr. at 124-27. KVSP #2 testified that he did not speak with HQ #1 on June 1, 2017. *Id.* at 124.

On December 7, 2021, Defendants identified two other officers in an email to Plaintiffs; they claimed these were the people with whom HQ #1 spoke at KVSP during his tour on June 1, 2017, namely KVSP #4 and KVSP #5 *See* Docket No. 1595-1 (Ex. Q). KVSP #4 who was the acting IGI lieutenant at KVSP on that day, was deposed on January 12, 2022, and he did not recall attending Ashker's ICC on June 1, 2017, KVSP #4 Dep. Tr. at 38, Docket No. 1595-2, or speaking with HQ #1 about Ashker on that date, *id.* at 17. Further, although HQ #1 testified that it was KVSP #1 who had introduced him to "the IGI lieutenant" with whom he spoke on June 1, 2017, HQ #1 Dep. Tr. at 51, KVSP #1 testified that he was not a part of any conversation between HQ #1 and KVSP #4 KVSP #1 Dep. Tr. at 128-29.

KVSP #5 likewise could not have been the IGI lieutenant with whom HQ #1 spoke in KVSP #1 presence after coming out of Ashker's ICC hearing. KVSP #5 testified on January 12, 2022, that he did not attend Ashker's ICC hearing on June 1, 2017. KVSP #5 Dep. Tr. at 23, Docket No. 1595-3. Neither could KVSP #5 have been the ISU officer with whom HQ #1 purportedly spoke about Ashker, because KVSP #5 did not recall speaking with HQ #1 on that date. *Id.* at 35-39.[4]

[4] KVSP #1 did testify that he was present during a conversation between HQ #1 and KVSP #5 on June 1, 2017, during which HQ #1 asked KVSP #5 for his opinion on Ashker's case and KVSP #5 responded that he believed that Ashker would be assaulted if released to GP. KVSP #1 Dep. Tr. at 129-30, 140. This does not salvage HQ #1 testimony because KVSP #1 acknowledged later in his deposition that it was only after an investigation was undertaken by KVSP #2 to determine which staff members had spoken to HQ #1 on June 1, 2017, that he himself "confirmed" that KVSP #5 had

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 16 of 65

HQ #1 admitted in a declaration he executed on April 16, 2022, years after his December 4, 2019, deposition, and a few months after KVSP #4 and KVSP #5 testified that they did not recall speaking with HQ #1 on June 1, 2017, that he "may have been mistaken" as to whether he spoke with an IGI lieutenant and an ISU officer or "staff members of different ranks in IGI and ISU." HQ #1 Decl. ¶ 13, Docket No. 1627-3. In that declaration, HQ #1 also provided new explanations for his reversal of the ICC's decision to release Ashker to GP. He testified that his decision was based, not just on the statements that were purportedly made to him by two officers during his tour, but on his recollection of the murder of another prisoner after being released to GP by a DRB HQ #1 had chaired. *See id.* ¶¶ 8-14. HQ #1 also testified in the same declaration that he reversed the ICC because he "wanted to make sure that a more thorough safety investigation was completed in case the staff members were correct." *Id.* ¶ 15.

The Court finds that the inaccuracies, inconsistencies, atypicality, and shifts in HQ #1 explanations for what motivated his summary countermand of the ICC's decision, as well as Defendants' lack of candor about it, renders HQ #1 explanations lacking in credibility. Instead, they are evidence of pretext which supports a finding of retaliation. HQ #1 claimed reliance on the officers with whom he testified he spoke on June 1, 2017, in revoking Ashker's GP placement, is inconsistent with other evidence in the record. But even if HQ #1 had spoken with KVSP #5 and KVSP #4 his claimed reliance on their comments about Ashker's safety would not have warranted personally countermanding the ICC's determination to release Ashker to GP. Neither attended the ICC hearing or contributed significantly to the investigation into Ashker's safety. KVSP #1 who signed off on the pre-ICC investigation and adopted its recommendation to release Ashker to GP, testified that he did not believe that KVSP #5 or KVSP #4 was more qualified than himself to determine Ashker's safe housing. KVSP #1 Dep. Tr. at 134-35.

HQ #1 new explanations in his April 16, 2022, declaration about why he reversed the ICC's decision to release Ashker to GP also are not credible. The Court does not credit HQ #1

---

spoken to HQ #1 in his presence. *Id.* at 146-48. KVSP #1 does not know how KVSP #2 was able to discover this. *Id.* at 148.

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 17 of 65

declaration testimony that the murder of another prisoner played a role in his order to return Ashker to ASU on June 1, 2017, because he never mentioned this prisoner during his deposition even though he testified at length about his other reasons for reversing the ICC's decision. Nor does the Court credit HQ #1 declaration testimony that he reversed the ICC because he wanted to make sure that a further investigation into Ashker's safety was completed, because this is inconsistent with his deposition testimony that he did not order an investigation but was glad somebody else did.

A finding of pretext is further supported by the fact that HQ #1 reversal of the ICC's decision was atypical, and that there is no credible evidence indicating that HQ #1 had a better basis for determining whether Ashker would be safe in GP than KVSP's ICC.

The Court further finds that Defendants' failure to reveal to Plaintiffs and the magistrate judge HQ #1 involvement in Ashker's remand to ASU on June 1, 2017, is suspect and indicative of an intent to hide an improper retaliatory motive on HQ #1 part. Defendants' failure to provide any meaningful explanation for their lack of candor further supports that inference.

**D. A second investigation was conducted by KVSP staff as to Ashker's safety and evidence suggests that staff from CDCR headquarters steered that investigation and its findings as well as the ICC's RCGP recommendation**

After Ashker was remanded to ASU on June 1, 2017, at HQ #1 personal order, KVSP #2 was again tasked with investigating his safety, this time in preparation for a second ICC hearing on June 30, 2017, to determine his housing placement. Docket No. 1595-4 (Ex. W).

Evidence in the record suggests that CDCR headquarters directed KVSP staff with respect to the second ICC investigation into Ashker's safety and had input as to the content and substance of important documents generated in connection therewith. An email dated June 13, 2017, shows that KVSP #1 was instructed that "*all documents* associated with the safety review for Ashker should be sent to HQ #10 " at CDCR headquarters. *See* Docket No. 1598-2 (Ex. BI) (emphasis added). HQ #10 is a former ██████ of the Department of Adult Institutions. HQ #8 Dep. Tr. at 56. Another email dated June 14, 2017, shows that HQ #10 reviewed and commented on confidential memoranda drafted by KVSP #2 that pertained to his re-investigation as to Ashker's

United States District Court Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 18 of 65

United States District Court
Northern District of California

safety. Docket No. 1598-2 (Ex. BK). Emails that were sent a couple of weeks later suggest that CDCR headquarters staff made requests as to what information should be investigated in connection with Ashker's safety; HQ #10 and others at headquarters evaluated and approved documents pertaining to Ashker's safety before the documents were finalized and were placed in Ashker's file. *See* Docket No. 1595-4 at ECF header page 42-43 (Ex. Y) (email chain in which KVSP #2 forwards to KVSP #1 an email by CDCR headquarters staff asking KVSP #2 to gather specific additional information in connection with Ashker's safety; KVSP #2 states to KVSP #1 "If we get into this, everything will have to be re evaluated by HQ #10 " of headquarters, HQ #7 of headquarters, "and the attorneys again prior to placing in erms [ERMS] correct? I would think they would've caught this prior or requested corrections prior to being approved if they were concerned").

On June 16, 2017, KVSP #2 finalized a confidential memorandum describing his second investigation as to Ashker's safety, which KVSP #1 approved. Docket No. 1595-4 (Ex. W). KVSP #2 second investigation was comprised of two components. First, [redacted] the searches resulted in no findings regarding Ashker's safety. *Id.* at ECF header page 29. Second, KVSP #2 [redacted] KVSP #4 [redacted] KVSP #2 concluded that Ashker would be targeted for murder by the AB [redacted] and he recommended that the ICC refer him to DRB for a housing determination. *Id.* at ECF header page 33.

KVSP #2 June 16, 2017, confidential memorandum contains inaccuracies that Defendants have not explained. First, [redacted]



Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 19 of 65

The anomalies in KVSP #2 June 16, 2017, memorandum can be attributed to CDCR headquarters. Because "all documents" associated with Ashker's safety review were to be sent to staff at CDCR headquarters for review and approval, those officials were in a position to correct any misstatements or omissions in the documents, including in KVSP #2 memorandum. Their failure to do so suggests an intent to conceal HQ #1 involvement in Ashker's remand to ASU, which bespeaks an improper motive on HQ #1 part, and to obscure facts that could undermine the conclusion that Ashker would be unsafe in GP.

Documents created in preparation for the June 30, 2017, ICC hearing as to Ashker's safety and housing suggest that CDCR headquarters steered the ICC toward recommending that Ashker be referred to DRB for placement in RCGP. On June 13, 2017, more than two weeks before the ICC hearing, ██████ of CDCR headquarters emailed recommendations to KVSP #1 at KVSP as to the information that should be reviewed and included in the CDC 128G form for referring Ashker to DRB. *See* Docket No. 1595-4 (Ex. U). KVSP #1 described these recommendations as "[k]ind of a step by step of what HQ wants us to include in the DRB referral 128G and Referral Memo." *Id.*

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 20 of 65

United States District Court
Northern District of California

In an email dated June 27, 2017, three days before the ICC hearing, HQ #3 at CDCR headquarters instructed KVSP #1 and his staff to "touch bases" with HQ #8 the CSU correctional counselor III who was tasked with gathering evidence and drafting documents in connection with Ashker's DRB, regarding "DRB prep for Ashker." Docket No. 1599 at ECF header page 2 (Ex. BM). Another email shows that, on June 29, 2017, a day before the ICC hearing, HQ #8 had already prepared a draft 128G referral memorandum stating that the "Committee determined that [Ashker] requires a DRB review of possible safety concerns, and referred this case to the DRB for placement consideration," and that "CSU recommends transfer to the RCGP." Docket No. 1594-3 at ECF header pages 31-32 (Ex. AB at 6008-09). Although KVSP #1 testified that the KVSP ICC did not determine prior to its hearing whether it would refer Ashker to the DRB, KVSP #1 Dep. Tr. at 222, the Court does not credit that testimony in light of these documents, which provide evidence that it did.

On June 30, 2017, the KVSP ICC recommended that Ashker be seen by the DRB for placement in RCGP. Docket No. 1594-9 at ECF header page 29 (Ex. J).

CDCR headquarters' involvement in Ashker's safety investigation and its work preceding his June 30, 2017, ICC was unusual and not consistent with typical practices. KVSP #1 testified that he had never worked with HQ #10 of headquarters in connection with a safety review prior to Ashker's case, KVSP #1 Dep. Tr. at 192, and that he could not recall any other instance in which he had received instructions from headquarters about what to include in a DRB referral for a prisoner who had not yet had a DRB hearing, *id.* at 218-19. HQ #8 the CSU correctional counselor III, testified that she was not aware of HQ #10 "working with CSU in connection with preparing a case for the DRB other than Todd Ashker's," HQ #8 Dep. Tr. at 58, and that she could not recall another instance in which she had been asked to work on a case before an ICC hearing, *id.* at 21.

Defendants argue in their briefs that headquarters' involvement before Ashker's ICC was due to the need to expedite his investigation and housing determinations in light of his pending retaliation motion in this action. Defendants also argue that it was not unusual for headquarters staff to answer questions by KVSP staff about prisoners' housing placements and upcoming ICCs and possible DRBs. The Court is not persuaded. Defendants do not explain why the need to

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 21 of 65

United States District Court
Northern District of California

expedite Ashker's housing reviews and the generation of related documents would require that CDCR headquarters staff direct, review, evaluate, and approve the contents of documents relating to investigative findings as to Ashker's safety. Defendants also do not explain emails showing that KVSP staff was *directed* to coordinate with CDCR headquarters; these emails contradict Defendants' assertions, which imply that KVSP's contacts with headquarters originated from KVSP staff's questions about ICCs and DRBs.

**E. Ashker's August 4, 2017, DRB resulted in a recommendation that he be placed in RCGP on the basis that he would be unsafe in GP, but the DRB chrono omits information tending to show that he would be safe; that CSU had recommended that he be released to GP; and that HQ #4 decision to recommend RCGP was based in part on possible retaliation by CDCR staff against Ashker at KVSP**

HQ #8 the CSU correctional officer III, was tasked with gathering and evaluating relevant evidence and drafting a chrono for Ashker's August 4, 2017, DRB. HQ #8 Dep. Tr. at 19-22. The purpose of a DRB chrono is to "document any information that is being considered or reviewed for the hearing," *id.* at 77, and to assist the DRB chair in preparing for the hearing, *id.* at 32. The correctional officer's evaluation of the evidence involves reviewing the documents to look for reliability and corroboration. *Id.* at 98. HQ #8 explained that the correctional officer assigned to draft the chrono is responsible for making CSU's recommendation as to where the prisoner should be housed, which is included in the CSU recommendation section of the draft chrono that is provided to the DRB chair for preparation for the hearing. *Id.* at 30-32. A CSU supervisor and the CSU chief review the draft chrono and the CSU recommendation. *Id.* Then, the draft chrono is submitted to the DRB chair prior to the DRB hearing to assist the DRB chair in preparing for the hearing. *See id.* at 32-33. The CSU's recommendation can change during a DRB hearing but, if it changes then, that would be memorialized in the "DRB action" portion of the chrono; the "CSU [recommendation] portion" of the chrono "would not change." *Id.* at 37-39. The final version of the chrono is issued to the prisoner after the DRB hearing.

HQ #8 first draft of the DRB chrono for Ashker, which she circulated by email on June 29, 2017, stated that CSU recommended that Ashker should be housed in RCGP. *See* Docket No. 1596 at ECF header pager 32 (Ex. AB). However, on July 10, 2017, Ashker submitted a rebuttal

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 22 of 65

and objections to the ICC's referral to the DRB, recommending placement in RCGP. Docket No. 1596 at ECF header page 38 (Ex. AC). He objected that there was insufficient evidence of substantial threats to his safety if he were released to GP. *Id.* at ECF header pages 41-68. He argued that [redacted] (i.e., [redacted]) and [redacted] would not lead to his assault by other prisoners as a violation of AB rules. *Id.* at ECF header pages 46-49. He also identified by name validated AB members who he claimed [redacted], were released to GP and have not been murdered or assaulted.. *Id.*

On July 12, 2017, HQ #8 emailed to a colleague an updated draft of Ashker's DRB chrono, which took into account Ashker's rebuttal. Docket No. 1596 at ECF header page 87 (Ex. AC). In the section containing the CSU's recommendation, the updated draft DRB chrono recommended "release to the KVSP GP." *Id.* at ECF header page 83.

On August 3, 2017, the day before the DRB hearing, HQ #8 participated in a pre-DRB meeting with HQ #4 CSU Chief HQ #11, Office of Legal Affairs attorney HQ #9 and others. *See* Docket No. 1596 at ECF header page 117 (Ex. AE). Before the meeting, HQ #8 emailed to HQ #9 an updated draft of the DRB chrono (hereinafter referred to as the August 3, 2017, draft chrono), which Plaintiffs represent was the version of the draft chrono that was presented to the DRB chair before the DRB hearing. *See* Docket No. 1596 (Ex. AD). The fact that HQ #8 had emailed a draft chrono to an attorney from CDCR's Office of Legal Affairs was unusual. During her deposition, HQ #8 could not recall another instance where she had provided drafts of DRB chronos to people in the Office of Legal Affairs. HQ #8 Dep. Tr. at 144.

The August 3, 2017, draft chrono, like HQ #8 July 12, 2017, draft chrono, took into account Ashker's July 10, 2017, rebuttal and stated that the CSU recommended that Ashker be released to GP; the August 3, 2017, draft chrono contained additional information indicating that concerns for Ashker's safety in GP were unsupported. *See* Docket No. 1596 (Ex. AD). It identified and evaluated prior instances, based on HQ #8 research, in which [redacted] but such actions had not created safety concerns. *See id.* at ECF header pages 109-10. It stated, based on

United States District Court
Northern District of California

those prior instances, some of which Ashker had discussed in his July 10, 2017, rebuttal, that Ashker's argument in his rebuttal that he would not be unsafe as a result of had "some merit." *See id.* HQ #8 testified that she had no reason to believe that this information was not accurate. HQ #8 Dep. Tr. at 132-33. The August 3, 2017, draft chrono also relied on the lack of evidence that Ashker . *Id.* at ECF header pages 108, 110.

Plaintiffs argue, and Defendants dispute, that the August 3, 2017, draft chrono was the version of the chrono that was presented to HQ #4 the DRB chair and decision-maker, before the August 4, 2017, DRB hearing to assist her in preparing for the hearing. HQ #4 testified that she understood that HQ #8 August 3, 2017, draft chrono, recommending GP and containing the supportive information discussed above, reflected the CSU's final recommendation to her before the DRB hearing and for what should be included in the chrono. *See* HQ #4 Dep. Tr. at 73 (HQ #8 draft chrono recommending GP, was CSU's recommendation for the final document with the exception of the [DRB's] final decision"); *id.* at 78-79 (CSU's recommendation to release Ashker to KVSP GP was "one piece" of information that she took into consideration in making her DRB recommendation). In light of HQ #4 testimony, the Court finds that the August 3, 2017, draft chrono was the version of the chrono that was presented to HQ #4 before the August 4, 2017, DRB hearing.

Pursuant to typical procedures, the information about prior instances of AB-rules violations that did not lead to safety concerns and about the lack of evidence that Ashker should have been included in the final DRB chrono issued to Ashker after the DRB hearing. Both HQ #8 and HQ #4 testified that, HQ #4 Dep. Tr. at 22-23, 73; HQ #8 Dep. Tr. at 79-80. The information in question in the August 3, 2017, draft chrono . *See, e.g.*, Docket No. 1596 at ECF header page 109 (August 3, 2017, draft DRB chrono stating,

United States District Court
Northern District of California

[redacted], that "CSU noted ASHKER's rebuttal forwarded by KVSP to CSU on 7/11/2017, and noted there is some merit in ASHKER's defense specifically relevant to portions in which he described inmates released to a GP subsequent to violations in the AB STG-1 rules similar to what is being said about ASHKER"); *see also id.* (August 3, 2017, draft DRB chrono stating, [redacted], that in review of another AB STG-I member's file, "it was noted the inmate population was aware of the AB member [redacted], and [redacted]; however, it was determined the inmate did not to [sic] have safety concerns, and programmed on a GP without issues"); *id.* at ECF header page 110 (August 3, 2017, draft DRB chrono stating, [redacted] "There is no documentation in the file that ASHKER [redacted] Further, according to HQ #8 the CSU's recommendation to the DRB chair before the hearing, which in this case was a recommendation for GP placement, should have remained in the CSU recommendation portion of the final chrono issued to Ashker, even if the DRB chose not to follow that recommendation. HQ #8 Dep. Tr. at 37-39.

During the August 3, 2017, pre-DRB meeting that HQ #8 [redacted] HQ #4 [redacted] HQ #9, and others attended, the participants reviewed HQ #8 draft DRB chrono "from beginning to end." *Id.* at 177. HQ #8 testified that she did not remember the specifics of what was discussed. *Id.* at 173-80. The Court finds that the August 3, 2017, draft chrono was the version of the chrono that was discussed during the August 3, 2017, pre-DRB meeting. This finding is supported by HQ #4 testimony that the August 3, 2017, draft chrono reflected the CSU's recommendation to her before the DRB hearing, and by the fact that the August 3, 2017, draft chrono is the version of the chrono that HQ #8 emailed to HQ #9 prior to the pre-DRB meeting.

HQ #8 testified that she may have taken notes during the August 3, 2017, pre-DRB meeting but she no longer has them in her possession and the notes could have been destroyed because she was only told "not long ago" that she should retain her notes. HQ #8 Dep. Tr. at 171-73. In light of Defendants' failure to preserve HQ #8 notes of the pre-DRB meeting, Plaintiffs requested an adverse inference that the notes would have established retaliatory motive. As explained in the

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 25 of 65

Conclusions of Law, the Court draws a weak inference that HQ #8 notes would have supported the retaliatory motive required to establish a violation of Paragraph 54. The notes of this pre-DRB meeting could have revealed why information contained in the August 3, 2017, draft chrono about prior instances of AB-rules violations that did not lead to safety concerns and about the [redacted] [redacted], as well as the CSU's recommendation for GP placement, were omitted from the final version of the chrono that was issued to Ashker after the August 4, 2017, DRB hearing, as discussed in more detail below.

The DRB hearing took place on August 4, 2017. Before the DRB, HQ #4 was aware of Ashker because "his name is obviously well known in our business" in that "he is one of the named plaintiffs in the litigation. The SHU litigation." HQ #4 Dep. Tr. at 7. HQ #4 was involved in correspondence regarding [redacted], because Ashker is a "high-profile inmate," *id.* at 9-10; this included the email about coming up with a "plan," *see* HQ #1 Dep. Tr. at 17. HQ #1 who was HQ #4 supervisor and the [redacted] CDCR official at the time, told her about his decision to countermand the ICC's determination to release Ashker to GP soon after he made it on June 1, 2017. *Id.* at 43.

The final version of the DRB chrono, which HQ #4 reviewed and approved prior to its issuance to Ashker, states that the DRB approved him for placement in RCGP. Docket No. 1594-9 at ECF header page 25 (Ex. J); *see also* HQ #8 Dep. Tr. at 259-60 (testifying that HQ #4 reviewed and approved contents of final DRB chrono before signing it and had the authority to request modifications to it). HQ #4 testified that she decided to place Ashker in RCGP based on the "totality" of the information available to her, HQ #4 Dep. Tr. at 71, and concerns for Ashker's safety, *see id.* at 42-43, 16, 79, 101.

The record contains evidence that undermines the credibility of this testimony. First, HQ #4 admitted during her deposition that her determination as to Ashker's placement was based, at least in part, on her belief that Ashker might not be safe in GP at KVSP because CDCR staff members could be spreading false rumors that Ashker [redacted]; these false rumors could have been *in retaliation* for Ashker having made "a lot of allegations against staff at KVSP." *See id.* at 96-97. HQ #4 explained that it is "a common practice when inmates make significant

United States District Court
Northern District of California

allegations of staff misconduct, that they're oftentimes moved for their own safety." *Id.* This is an admission that changes in placements—at least some of which were presumably adverse as was Ashker's—were made as a result of retaliatory actions by staff. This testimony suggests that concerns for Ashker's safety in GP at KVSP were at least in part the result of retaliatory conduct by CDCR staff against Ashker. The response to that retaliation was further retaliation.

Second, the final DRB chrono which HQ #4 approved states that Ashker had been remanded to ASU due to new "information received" indicating that he could be unsafe in GP and warranting a further investigation. Docket No. 1594-9 at ECF header page 29 (Ex. J). HQ #4 was aware at the time that she approved this chrono that Ashker was remanded to ASU because HQ #1 ordered it. HQ #4 Dep. Tr. at 32. HQ #4 initially testified that the "information received" was the [redacted] discussed above, *id.* at 28-31, but [redacted] was reviewed *after* Ashker had already been remanded to ASU on HQ #1 order and therefore could not have been the reason for Ashker's remand to ASU. When Plaintiffs pointed this out, HQ #4 admitted it. *Id.* When asked what the "information received" was [redacted] HQ #4 responded with a non sequitur that the ICC had been staffed by an associate warden. She testified that, in her opinion, an associate warden was "too low of a level to have reviewed a case as serious as Mr. Ashker's." *Id.* at 39-40.

This explanation is not supported by the record. As noted above, KVSP #1 testified that the June 1, 2017, ICC had been chaired by a deputy warden who was his direct underling, not an assistant warden. Additionally, the ICC's decision to place Ashker in GP had been based on the recommendation of KVSP #2 the KVSP IGI lieutenant who investigated Ashker's safety, and that recommendation had been adopted, prior to the ICC hearing, by KVSP #1 and other KVSP administrators after they met to discuss KVSP #2 investigation and recommendation. Thus, the ICC's decision to release Ashker to GP on June 1, 2017, reflected the consensus of various KVSP staff, including KVSP's Warden and KVSP's IGI investigator, KVSP #2 it was not the individual determination of an inexperienced assistant warden. Notably, KVSP #1 testified that he did not believe that HQ #1 was more qualified than himself to make determinations as to Ashker's safety. KVSP #1 Dep. Tr. at 155. KVSP #1 also testified that he would not have adopted KVSP #2

recommendation to release Ashker to GP if he believed that there was additional information that needed to be investigated. *Id.* at 98-99. The ICC's recommendation to release Ashker to GP was well supported and reasonable, at least when compared with HQ #1 uninformed and off-the-cuff determination.

Third, HQ #4 testified that she considered "the totality" of the evidence available to her in making her DRB determination, including evidence tending to show that Ashker would not be unsafe in GP and CSU's recommendation prior to the hearing to place Ashker in GP at KVSP. HQ #4 Dep. Tr. at 55, 70-71, 78-79, 112-13, 55. However, the DRB chrono that was issued to Ashker after the DRB hearing, which HQ #4 reviewed and approved prior to its issuance, omits evidence that Ashker would *not* be unsafe in GP (namely the information regarding prior instances in which AB members who [redacted] in the past were not found to have safety concerns), and omits the fact that CSU's recommendation prior to the DRB hearing was to release Ashker to GP. Docket No. 1594-9 at ECF header page 30-36 (Ex. J). HQ #8 testified that information that was reviewed by the DRB is supposed to be documented in the final chrono issued after the DRB hearing, HQ #8 Dep. Tr. at 168, and the CSU's recommendation prior to the DRB hearing also is supposed to be documented in the CSU recommendation portion of the final chrono, *id.* at 33-39. Accordingly, HQ #4 approval of the final chrono which omitted this information is evidence that she did not consider it.

The removal of information from the final DRB chrono regarding [redacted] were not found to have safety concerns in GP is particularly suspect. This information undermines the primary basis that Defendants have advanced for concluding that Ashker would be unsafe in GP. The deletion of this information from the final DRB chrono raises the inference that Defendants understood that this information would undermine the rationale for concluding that Ashker could not safely house in GP, and that Defendants intentionally removed it for that reason.

Defendants argue that this information was removed because it was confidential and the final chrono would be issued to Ashker and could be shared with other prisoners. However, as discussed above, the information in question was [redacted]

United States District Court
Northern District of California



Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 28 of 65

and, therefore, it was not intended that the information would be removed from the final chrono .

Also deleted from the final DRB chrono was that there was no evidence that Ashker . This omission also raises questions about whether the DRB decision was motivated by a belief that Ashker was unsafe. HQ #8 testified that other prisoners might ask to see the final DRB chrono after it was issued to Ashker. HQ #8 Dep. Tr. at 95. Statements in the chrono that Ashker , therefore, could protect Ashker, not endanger him. *See* HQ #4 Dep. Tr. at 72; HQ #8 Dep. Tr. at 94-95. Yet HQ #4 approved a final DRB chrono that did not contain these statements, suggesting again that Ashker's safety was not Defendants' major concern.

Defendants also claim that the statements that . The Court is not persuaded. It is undisputed that Ashker , *See* OCS #1 Rep. at 4, Docket No. 1627-3 at ECF header page 11 HQ #4 , HQ #4 Dep. Tr. at 42-43, *id.* at 60. Thus, HQ #4 Including that information

United States District Court
Northern District of California

in the chrono would have "assist[ed] Ashker" in avoiding threats to his safety. HQ #8 Dep Tr. at 136, 94-95.

HQ #4 approval of a final DRB chrono that omitted the CSU's recommendation that Ashker be released to GP suggests that Defendants deviated from normal practices to try to hide facts that would undermine the conclusion that Ashker would be unsafe in GP. Defendants' response is that HQ #8 draft chrono of August 3, 2017, actually did not constitute the CSU's final recommendation to HQ #4 before the DRB hearing, which was instead to place Ashker in RCGP. But that is inconsistent with HQ #4 testimony that she understood CSU's recommendation prior to the DRB hearing was to release Ashker to GP. HQ #4 Dep. Tr. 73, 78-79. The portions of HQ #8 deposition testimony that Defendants cite to support their argument that HQ #8 August 3, 2017, draft chrono was modified *before* it was presented to HQ #4 prior to the hearing do not actually establish that. HQ #8 could not remember when changes to the chrono she drafted were made or what the changes were. *See* HQ #8 Dep. Tr. at 167-68, 200-01.

Finally, HQ #4 testified to a number of other factors that led her to conclude that Ashker would be unsafe in GP. These either are not typically relied on by DRB chairs in determining whether a prisoner is unsafe, or otherwise are not credible in light of other facts in the record.

HQ #4 testified that she relied in part on her observation that Ashker "talked incessantly" during the DRB hearing about this litigation and what his attorneys had advised him. *Id.* at 102-03, 107-08. She worried that Ashker cared more about what the attorneys thought than his own safety, which, in her mind, undermined the credibility of his statements that he was not concerned about his safety in GP. *Id.* However, HQ #4 encouraged Ashker to discuss his future litigation plans, KVSP #1 Dep. Tr. at 232-33, and it was not typical for a DRB chair to do so, *id.* at 238. KVSP #1 testified that he was not aware of other instances in which the DRB chair had inquired about a prisoner's litigation plans during a DRB. *Id.* at 238. When asked how Ashker's plans for future litigation were relevant to the DRB hearing, KVSP #1 testified that "litigation mitigation is the job of all administrators and all staff that create – within the department." *Id.* This suggests that Ashker's litigation activities, and a desire to mitigate such activities, played a role in HQ #4 DRB decision even though the final DRB chrono states that HQ #4 reviewed the evidence "with

United States District Court
Northern District of California

strict concern" for Ashker's "wellbeing and his safety, and with no concern for any pending litigations." Docket No. 1594-9 at ECF header page 36 (Ex. J). It also suggests that her safety-related explanations for discussing Ashker's litigation during the DRB hearing, HQ #4 Dep. Tr. at 102, 107-08, were pretextual.

Next, HQ #4 testified that it concerned her that, during the hearing, Ashker did not appear to know which yards were not good according to AB rules, and did not want to be placed in yards that had validated AB members. HQ #4 Dep. Tr. at 83, 101, 104. It concerned her that Ashker was willing to program at [redacted] even though that yard was considered by the AB as no good and Ashker has enemies there. *Id.* at 104-06. However, HQ #8 contemporaneous notes of the DRB hearing, Docket No. 1596 at ECF header page 121 (Ex. AG), do not include these comments. The notes report that Ashker "asked about transferring to [redacted]" [redacted], and stated that "he is going where the DRB tells him he can go;" the notes report that it was "[t]he Chairperson" who "asked if he would want to go [redacted]." Docket No. 1596 at ECF header page 124. HQ #8 notes contradict HQ #4 testimony. Further, the final DRB chrono does not list [redacted] as one of the prisons discussed during the hearing, which also undermines the credibility of HQ #4 testimony on this point. *See* Docket No. 1594-9 at ECF header pages 36-37 (Ex. J).

Also in explanation of the reasons for her DRB decision, HQ #4 testified that it "gave [her] great pause" that Ashker said multiple times during his discussions with CDCR staff in early May 2017 [redacted] that he believed that other gang members thought he was no good. HQ #4 Dep. Tr. at 83. However, HQ #4 also testified that she believed that Ashker was [redacted] [redacted] concerned about his fiancée at the time. HQ #4 Dep. Tr. at 108-11. HQ #4 decision to weigh these statements more heavily than Ashker's later statements that he did not believe he would be unsafe, such as those he made in his rebuttal prior to the DRB hearing or during the DRB hearing, *see* Docket No. 1594-9 at ECF header page 36 (Ex. J), is suspect.

The Court finds that the record strongly suggests that HQ #4 actions in connection with the DRB she chaired were intended to support and further HQ #1 claimed rationale that Ashker

would be unsafe in GP as a result of [redacted], which was a pretext for Defendants' retaliation against Ashker for his protected activities. HQ #4 motivation to further HQ #1 pretextual rationale can be inferred from the fact that her deposition testimony lacks credibility and is inconsistent with other facts in the record. Also supporting pretext is her approval of a final DRB chrono that included misleading information about [redacted] to explain why a second investigation into Ashker's safety was initiated, concealing HQ #1 involvement in Ashker's remand to ASU. In addition, this chrono omitted, in a deviation from typical procedures, (1) information indicating that Ashker would not be unsafe in GP because similarly situated prisoners had not been harmed, (2) information corroborating that Ashker [redacted] that would have helped him avoid threats to his safety, and (3) the fact that the CSU had recommended prior to the hearing that Ashker be released to GP. Pretext can also be inferred from the fact that HQ #4 reported to HQ #1 who was the [redacted] official at CDCR. She was involved in communications with him and others at headquarters regarding [redacted] and subsequent events, as well as regarding the apparent need to devise a "plan." The evidence suggests that Defendants deviated from typical practices to create a record that would support the conclusion that Ashker would be unsafe in GP, and conceal contrary facts. By relying on this record to support the pretextual rationale that Ashker would be unsafe in any GP, HQ #4 perpetuated the retaliatory course of conduct that HQ #1 began on June 1, 2017.

**F. Some confidential memoranda and reports indicating that Ashker is a target of the AB [redacted] contain material discrepancies between what confidential sources said and what was stated in the memoranda, suggesting that confidential memoranda and reports are, in general, unreliable indicators of whether Ashker is being targeted by the AB [redacted].**

After Ashker's DRB on August 4, 2017, Defendants generated multiple confidential memoranda and confidential debrief reports indicating that Ashker is being targeted by the AB [redacted].[5] Defendants' prison gang expert OCS #1 relied on such documents

[5] Confidential memoranda and confidential debrief reports are supposed to memorialize information that was provided to CDCR staff by a confidential informant. When the informant is providing the information as part of his debrief, the document generated is referred to as a

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 32 of 65

to opine that Ashker would be targeted for murder or assault if he were housed in GP, and Defendants, in turn, have relied on [REDACTED] opinions to argue in their opposition to the present motion that Ashker cannot safely house in any GP [REDACTED] However, the reliability of these confidential documents as to whether Ashker is, in fact, being targeted by the AB [REDACTED] is questionable.

The Court found in its order of February 2, 2022, in which it granted Plaintiffs' second motion to extend the settlement agreement, that material discrepancies existed between what a confidential informant stated about Ashker and what was written in a confidential memorandum dated June 5, 2019, which Defendants relied upon to recommend that Ashker be housed in RCGP. Defendants documented in the June 5, 2019, memorandum that [REDACTED] but the Court found that the transcript of the interview with the confidential source did not contain these statements. Docket No. 1579 at 54-55. Despite these inaccuracies, OCS #1 relies upon that memorandum to conclude that Ashker is being targeted by the AB [REDACTED] and would be assaulted or murdered in GP.

In support of their present motion to enforce Paragraph 54, Plaintiffs point to additional confidential memoranda and debrief reports that state that Ashker is being targeted by the AB [REDACTED] that contain material discrepancies similar to those that the Court addressed in its February 2, 2022, order. Plaintiffs were able to uncover these discrepancies [REDACTED] that Defendants happened to preserve before they implemented a litigation hold on recordings of interviews with confidential sources in October 2019. Plaintiffs represent, and Defendants do not dispute, that prior to October 2019, Defendants did not require CDCR staff to retain recordings of their interviews of confidential informants even though those discussions formed the basis of confidential memoranda and confidential debrief reports. Accordingly, some of those recordings were destroyed, although some were preserved.

---

confidential debrief report.

United States District Court
Northern District of California

United States District Court
Northern District of California

Below are some examples of the material discrepancies in confidential memoranda and confidential debrief reports generated prior to the October 2019 litigation hold that Plaintiffs were able to uncover. Defendants have not disputed or attempted to explain any of these material discrepancies.

Despite the inaccuracies, OCS #1 relies on this confidential report to opine in opposition to the instant motion that Ashker is being targeted by the AB .

OCS #1

[redacted] This omission is material because a DRB that met on August 13, 2019, relied on the [redacted] memorandum in finding that Ashker had safety concerns in GP. *See* Docket No. 1599-2 at ECF header page 102 (Ex. CG).[6]

Plaintiffs represent, and Defendants do not dispute, that, since the October 2019 litigation hold, there have been *no* confidential memoranda or debrief reports of a confidential informant stating that Ashker is being targeted by the AB [redacted]. *See* Docket No. 1598-0 at ECF header pages 22-25 (listing all confidential information relied upon for Ashker's housing placements up to the May 27, 2021 DRB hearing). This supports an inference that the material discrepancies in reports generated prior to the October 2019 litigation hold were not accidents, and instead were intentional misrepresentations that Ashker was a target of the AB [redacted]. It further raises an inference that pre-October 2019 reports that Ashker was targeted by the AB, which Plaintiffs were *not* able to check for accuracy because the source recordings were destroyed, likely contain similar material discrepancies.[7] Yet, Defendants' gang expert OCS #1 relied on reports generated prior to the October 2019 litigation hold as a basis for his opinions, and Defendants have likewise relied on such reports to support their conclusion that Ashker would be unsafe in any GP, as well as their recommendations that Ashker must be placed in RCGP. The foregoing supports the Court's finding that Defendants' prisoner-safety rationale for concluding that Ashker cannot safely live in any GP, to the extent it is

---

[6] [redacted] Docket No. 1507-2 at ECF header page 66 (Ex. AS).

[7] The Court draws these inferences based on its analysis of the evidence, but also because of Defendants' failure to preserve the recordings despite having had notice that they were relevant to this litigation as of July 14, 2017, when Plaintiffs filed their motion to enjoin retaliation against Ashker. This is discussed in more detail in the Conclusions of Law.

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 35 of 65

predicated on purported confidential-informant statements as memorialized in unreliable confidential memoranda and reports that pre-date the litigation hold, is pretextual.

**G. A safety investigation in April 2021 concluded that Ashker had resolved any issues he previously had with the AB but a May 2021 DRB declined to release Ashker to any GP based on documents not disclosed in its chrono and the DRB chair's own investigation, deviating from typical DRB practices**

On April 21, 2021, KVSP #7 wrote a confidential report assessing Ashker's safety, in which he concluded that [redacted] Docket No. 1598 at ECF header page 7 (Ex. AV). KVSP #7 recommended that Ashker be referred to the ICC for a housing review for possible release to GP. *Id.* at ECF header page 13. This recommendation was based on [redacted] as well as three confidential memoranda that were placed in Ashker's file since the last "safety concern investigation was completed" on January 7, 2021. One of these was dated March 9, 2021, and authored by OCS #1 Defendants' prison gang expert. It contained information provided by a confidential informant in [redacted] that Ashker was in good standing with the AB. *Id.* at ECF header pages 10-12. OCS #1 found this information to be reliable. *Id.* at ECF header page 11. The other two memoranda referred to in KVSP #7 report were dated February 8, 2021, and April 5, 2021, but KVSP #7 did not find the information in these memoranda to be reliable.

On April 29, 2021, the ICC, chaired by KVSP #1 decided to refer Ashker to the DRB for review. Docket No. 1598 at ECF header page 2-4 (Ex. AU). The ICC chrono points out that, since the last ICC hearing on January 21, 2021, KVSP #7 report and the three memoranda it discussed had been added to Ashker's file. *Id.* at header pages 2-3. The ICC chrono states: "There was no information received during this investigation stating ASHKER has continued Safety and/or Enemy Concerns with Member/Associates of the Aryan Brotherhood." *Id.* at header page 3.

United States District Court
Northern District of California

Nonetheless, on May 27, 2021, HQ #5 who at that point was [redacted] the Division of Adult Institutions, chaired a DRB which recommended that Ashker be placed in RCGP "based on unresolved safety concerns." Docket No. 1598 at ECF header pages 16, 29-31 (Ex. AW). The DRB chrono noted that the CSU recommended certain Level IV and Level III GP facilities where Ashker could be placed in the event that the DRB determined that he could be safely released to a GP. *Id.* at ECF header page 29. The Level III GP facilities would require a behavioral override. *Id.* HQ #5 did not consider any of those GP options, or the possibility of a behavioral override, instead concluding that "the RCGP remains appropriate." *Id.* at ECF header pages 30-31.

As noted above, HQ #5 is one of the people who was included in communications among HQ #1 and other staff at CDCR headquarters regarding [redacted] At the time of those communications, she reported to HQ #1 who was the [redacted] at CDCR. The communications to which she was privy included the email in which HQ #1 stated that CDCR headquarters needed to develop a "plan" in response to [redacted]. *See* HQ #1 Dep. Tr. at 10-18. HQ #5 was familiar with Ashker's allegations of retaliation in connection with his placement in ASU [redacted] She was the CDCR representative who told the magistrate judge inaccurately in June 2017 that a second investigation into Ashker's safety was necessary because of the [redacted]. She failed to reveal that HQ #1 had summarily ordered Ashker's remand to ASU. *See* Docket No. 764 at 8.

The chrono for the May 27, 2021, DRB that HQ #5 approved itemized all sixteen pieces of evidence that HQ #5 said she considered in making her determination. Docket. No. 1598 at ECF header page 16, 29-31 (Ex. AW). Of the sixteen items, the chrono identified only four as supporting a finding that Ashker continues to be unsafe in a GP (Items 3, 8, 10, and 12). The chrono stated these items originated from purported confidential informant statements that pre-date the October 2019 litigation hold.

The chrono also stated that no more recent information indicated that Ashker's issues with the AB had been resolved. Two items that suggested that Ashker's issues with the AB had been resolved were considered by HQ #5 but rejected as unreliable (Items 14 and 16).

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 37 of 65

Item 14 is the confidential memorandum dated March 9, 2021, that KVSP #7 addressed in his safety investigation report, as described above. Docket. No. 1598 at ECF header page 26. HQ #5 found the confidential informant statements in this memorandum to be unreliable because his statements about Ashker were based on information from 2013. She did not explain how she determined this. *Id.* at ECF header page 30. But according to HQ #8 the March 9, 2021, memorandum does not state that the information the confidential informant provided was from 2013. *See* HQ #8 Dep. Tr. at 242-44 (testifying that she reviewed the March 9 memorandum and does not remember seeing that the information in it was from 2013 and if she had, she would have documented it in the DRB chrono). HQ #8 testified that she did not know how HQ #5 had determined that the information provided by the informant was from 2013. *Id.* at 244.

HQ #5 seems to have conducted her own investigation as to the accuracy and reliability of the confidential informant's statements, in an apparent departure from typical procedures. The "typical process" is for lower-level staff to investigate the reliability or accuracy of the evidence that will be considered during a DRB. HQ #4 Dep. Tr. at 50-51 (when serving as DRB chair, she did not investigate evidence relevant to a DRB hearing; the "typical process" is for a staff member to do the investigation and to include the results in the preparation documents that are provided to the DRB chair); *see also* HQ #8 Dep. Tr. at 98 (she, as correctional counselor, reviews documents relevant to a DRB hearing to look for reliability and corroboration and includes that information in the draft chrono that is presented to the DRB chair). HQ #8 reviewed the documents relevant to this DRB and drafted the DRB chrono. She concluded that the confidential informant's statements were current (not from 2013). HQ #8 Dep. Tr. at 242-44.

During the hearing on November 3, 2022, the Court asked Defendants how HQ #5 came to the conclusion that the confidential informant's information about Ashker was from 2013. They responded that HQ #5 relied on Plaintiffs' "Exhibit AY," which is a transcript of the recorded interview with the confidential informant that Defendants produced to Plaintiffs with redactions. Defendants did not explain how HQ #5 came to review that transcript in that there is no indication in the DRB chrono that it was a document upon which she relied.

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 38 of 65

United States District Court
Northern District of California

The partially redacted transcript of the interview of the confidential informant, Docket No. 1598-2 at ECF header page 2 (Ex. AY), provides *Id.* at 52-59. OCS #1 who authored the March 9, 2021, memorandum and interviewed the informant, understood that Ashker's good standing was the informant's "understanding at the time of the interview" in 2021 and "[t]hat's what [he] documented" in the March 9, 2021, memorandum. OCS #1 Dep. Tr. at 315, 333.

The second item in the DRB chrono that supported a finding that Ashker was not in danger from the AB, but that HQ #5 did not credit, is Item 16. It is KVSP #7 security concerns investigation report of April 21, 2021, which, as noted above, concludes that Docket No. 1598 at ECF header page 7 (Ex. AV). HQ #5 did not credit the report because it relied on the information, described in the March 9, 2021, confidential memorandum, that HQ #5 took to refer to 2013.

The Court finds that the reason that HQ #5 gave for not crediting the confidential informant's statements that Ashker is in good standing with the AB, as well as KVSP #7 security investigation report, is not credible and is pretextual, because it is not consistent with other evidence and because HQ #5 appears to have departed from typical practices in justifying not crediting these documents. Further, HQ #5 was included in communications with HQ #1 and others at headquarters about and the need to come up with a "plan" when ; as well, HQ #5 appears to have assisted in concealing HQ #1 involvement in Ashker's remand to ASU on June 1, 2017. All this persuades the Court to find that HQ #5 actions in connection with Ashker's DRB were intended to support and perpetuate HQ #1 claimed rationale that Ashker would be unsafe in GP , which was pretext for Defendants' retaliation against Ashker for his protected activities, which began when HQ #1 remanded Ashker to ASU on June 1, 2017.

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 39 of 65

**H. Influential prisoners declare that they do not believe that [REDACTED], that they believe that Ashker would be safe in GP, and [REDACTED] were not targeted for doing so**

Some prisoners filed declarations in support of Ashker's retaliation motion that were executed since Ashker's DRB in May 2021. These prisoners, including influential prisoners who are identified as white, declare that they do not believe rumors that [REDACTED], have not heard that Ashker is being targeted by the AB, and believe that Ashker would be safe in GP. *See, e.g.*, Prisoner Decl. ¶¶ 5-10, Docket No. 1600-4 (Ex. CB) (executed in February 2022); Prisoner Decl. ¶¶ 1-5, Docket No. 1600-4 at ECF header page 11 (Ex. BZ) (executed in November 2021); *see also generally* Prisoner Decl., Docket No. 1600-4 at ECF header page 16 (Ex. CA) (declaration executed in February 2022); Prisoner Decl., Docket No. 1600-5 at ECF header page 2 (Ex. CD) (executed in March 2022); Prisoner Decl., Docket No. 1600-5. at ECF header page 6 (Ex. CE) (executed in October 2020).

Influential prisoners, [REDACTED], filed declarations that confirm HQ #8 findings and Ashker's assertions that there have been prior instances in which AB members committed violations of AB rules [REDACTED] and those members were not targeted for those violations and were able to program safely in GP. These prisoners declare that [REDACTED] *See* Prisoner Decl. ¶¶ 8-10, Docket No. 1600-4 (Ex. CB); *see also* Prisoner Decl. ¶ 5, Docket No. 1600-4 (Ex. BY). Defendants do not dispute these prisoners' assertions.

These prisoner declarations lend further support to the Court's finding that Defendants' prisoner-safety rationale for concluding that Ashker cannot safely live in any GP because of [REDACTED] is pretextual.

**I. The Court considers but gives minimal weight to the opinions of Defendants' prison gang expert**

OCS #1 gave his opinion, as a non-retained expert witness for Defendants, on Ashker's safety. Docket No. 1507-2 at ECF header page 25 (Ex. AQ); OCS #1 Decl. ¶ 1-3, Docket No. 1627-3 at ECF header page 6. His

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 40 of 65

United States District Court
Northern District of California

experience includes [redacted] investigations of prison gang activity. OCS #1 Decl. ¶ 2. As set forth in his report, dated December 6, 2019, Docket No. 1627-3 at ECF header page 8, OCS #1

> opinion is that inmate Todd Ashker, if returned to general population, would have grave safety concerns, including likely being targeted for murder due to [redacted] does not alter my opinion. I am unaware of any circumstances where, if known to the inmate population, an Aryan Brotherhood affiliate can [redacted] return to general population and not be targeted for murder.

OCS #1 Decl. ¶ 4.

In his report, OCS #1 states that he is familiar with AB rules and with "how the AB operates," based on his extensive experience and training, interviews of active and debriefing affiliates of the AB, as well as his review of "Confidential Debriefs" conducted by other investigators. Docket No. 1627-3 at ECF header page 8. OCS #1 describes various AB rule violations in his report [redacted]

[redacted] opinions about Ashker's purported safety concerns with the AB are based on his review of documents that specifically refer to Ashker. Some of the documents OCS #1 relied on were provided to him by the CDCR's Office of Legal Affairs and included chronos relating to Ashker and transcripts of [redacted]. *Id.* at 12. OCS #1 also relied on documents located in Ashker's file, which included confidential memoranda and confidential debriefing reports that mentioned Ashker and that were generated prior to the October 2019 litigation hold. *Id.*

OCS #1 [redacted] OCS #1 [redacted]

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 41 of 65

[redacted] *Id.* at 20. He also considered the declarations filed before a February 12, 2018, DRB hearing of Ashker's case, by four AB affiliates stating that Ashker would not be unsafe in GP, but these declarations did not alter OCS #1 opinion. *Id.* at 21.

Plaintiffs moved to exclude OCS #1 s opinion as unreliable. As noted, the magistrate judge denied Plaintiffs' motion. The Court will consider Plaintiffs' motion to exclude OCS #1 opinions de novo. The Court finds that OCS #1 opinions are admissible because they are sufficiently reliable, as they are based on OCS #1 extensive training and experience in investigating the AB and on his review of documents relevant to Ashker's safety concerns, and because they would assist the Court in deciding the issues now before it.

However, the Court gives OCS #1 opinions as to Ashker's safety minimal weight for the following reasons.

First, OCS #1 opinion that Ashker would be unsafe in GP appears to have been pre-determined. Plaintiffs have shown, and Defendants have not disputed, that *before* he was asked to serve as an expert in this action, OCS #1 [redacted] OCS #1 [redacted] This strongly suggests that his conclusion that Ashker would be unsafe because he is targeted by the AB [redacted] pre-dated his analysis of the relevant documents and information that he claims to have reviewed to prepare his report and generate his opinions.

Second, OCS #1 opines that he is "unaware of any circumstances where an AB affiliate [redacted] It is undisputed that there are multiple prior instances in which AB members [redacted] were found by CDCR not to be unsafe, and were able to live safely in GP.

United States District Court
Northern District of California

United States District Court
Northern District of California

As discussed above, Ashker and other prisoners identified several examples of this in the declarations they filed in support of Plaintiffs' motion, and at least some of those examples were investigated and discussed by HQ #8 in her draft chrono for the August 4, 2017, DRB. She found them valid and supporting that Ashker could reside safely in GP. OCS #1 failure to address that relevant evidence in his analysis undermines his credibility. He testified at his deposition that "what [he] was asked to do was to find documentation that would identify possible safety concerns." OCS #1 Dep. Tr. at 68.

Third, OCS #1 opinions rely on confidential memoranda and debrief reports that are not consistent with what the confidential source said. Some of those confidential memoranda and debrief reports are discussed in more detail above. They include the confidential memorandum of June 5, 2019, that this Court found in its order of February 2, 2022, contained material discrepancies but was nevertheless used to recommend that Ashker be housed in RCGP. *See* OCS #1 Rep. at 12, Docket No. 1627-3 at ECF header page 19. As discussed above, the Court has found that confidential memoranda and reports regarding Ashker that pre-date the start of the litigation hold on October 2019 are likely to contain material inaccuracies similar to those that Plaintiffs were able to uncover in reports based on source information that had not been destroyed. These unsourced reports are not a reliable indicator of whether Ashker is, in fact, being targeted by the AB. OCS #1 reliance on these documents diminishes the persuasiveness of his opinions, particularly because he admitted that he did not try to determine whether any safety concerns stated in the documents he reviewed were accurate but simply assumed that they were. *See, e.g.*, OCS #1 Dep. Tr. at 69.

## CONCLUSIONS OF LAW

### I. Standard of review for the magistrate judge's rulings

The Court first turns to the parties' dispute as to the standard of review that applies to the magistrate judge's rulings. Defendants contend that Plaintiffs' motion under Paragraph 53 to enforce Paragraph 54 with respect to Ashker's housing placements is subject to clear error review on the basis that Plaintiffs failed to identify the portions of the magistrate judge's order to which

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 43 of 65

they object as required by Civil Local Rule 72-3(a)[8] and because their motion for de novo review is "bereft of legal analysis[.]" Docket No. 1705-2 at 4.

The SA provides that an order by the magistrate judge resolving a motion to enforce the SA under Paragraph 53 is subject to review under 28 U.S.C. § 636(b)(1)(B). Section 636(b)(1)(B) governs findings and recommendations by a magistrate judge, and those, in turn, are subject to de novo review under 28 U.S.C. § 636(b)(1)(C). Defendants do not dispute this. Docket No. 1705-2 at 2 ("The Settlement Agreement contemplates 'review under 28 U.S.C. § 636(b)(1)(B)' of motions alleging substantial non-compliance with the Settlement Agreement's terms, including motions alleging retaliation against class members").

The Court is not persuaded by Defendants' contention that, notwithstanding the SA's terms, this Court must review the magistrate judge's rulings with respect to Plaintiffs' motion to enforce Paragraph 54 for clear error on the basis that Plaintiffs failed to object to them with the requisite degree of specificity. Plaintiffs sufficiently identified the portions of the magistrate judge's rulings to which they object by arguing in their motion for de novo review that the magistrate judge's rulings fail to take into account the evidence and arguments they made. Docket No. 1698-2 at 1-3. Accordingly, the Court construes the magistrate judge's rulings with respect to Plaintiffs' motion to enforce Paragraph 54 as proposed findings and recommendations under 28 U.S.C. § 636(b)(1)(B) and reviews them de novo review under 28 U.S.C. § 636(b)(1)(C). Where the standard of review is de novo, the Court considers the arguments and evidence presented to the magistrate judge as if no decision had been rendered by the magistrate judge. *Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir. 2009) ("De novo review means that the reviewing court do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.") (citation and internal quotation marks omitted).

[8] Civil Local Rule 72-3(a) provides, "Any objection filed pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)(B) must be made as a 'Motion for De Novo Determination of Dispositive Matter Referred to Magistrate Judge.' The motion must be made pursuant to Civil L.R. 7-2 and must specifically identify the portions of the Magistrate Judge's findings, recommendation, or report to which objection is made and the reasons and authority supporting the motion."

United States District Court
Northern District of California

Defendants next argue that the magistrate judge's rulings as to Plaintiffs' motion to exclude ██████ expert opinions and Plaintiffs' request for an adverse inference based on Defendants' destruction of certain evidence are subject to review for clear error, not de novo review, because they are non-dispositive matters. Docket No. 1705-2 at 2.

The Court is not persuaded. Defendants have not pointed to any portion of the SA that supports their argument that rulings by the magistrate judge with respect to non-dispositive matters are subject to review for clear error. As this Court discussed in a prior order, Docket No. 1740,

> The SA does not distinguish between dispositive and non-dispositive matters, and it does not mention 28 U.S.C. § 636(b)(1)(A), the statute that governs referrals to a magistrate judge under a clear error standard of review. The SA mentions only 28 U.S.C. § 636(b)(1)(B) when addressing the standard of review that applies to the magistrate judge's rulings pursuant to the SA which, as noted above, governs referrals for reports and recommendations subject to de novo review.

*See id.* at 8. Further, Plaintiffs' request for an adverse inference and motion to exclude ██████ opinions are intertwined with the merits of their motion to enforce Paragraph 54, under Paragraph 53, which, as discussed above, is subject to de novo review. Accordingly, the Court construes the magistrate judge's rulings as to the matters in question as proposed findings and recommendations under 28 U.S.C. § 636(b)(1)(B) subject to de novo review under 28 U.S.C. § 636(b)(1)(C).

Defendants also argue, in passing and in a footnote, that, to the extent this Court interprets the magistrate judge's rulings as proposed findings and recommendations, Plaintiffs "are entitled to no reply brief." Docket No. 1705-2 at 5 n.4. This argument fails. As discussed above, the magistrate judge's rulings are proposed findings and recommendations under 28 U.S.C. § 636(b)(1)(B). Civil Local Rule 72-3 provides that objections to such reports and recommendations must be made pursuant to Civil Local Rule 7-2, which allows a reply. *See* Civil L.R. 7-3.

**II. Plaintiffs' motion to exclude the opinions of Defendants' prison gang expert**

As noted, Plaintiffs move to exclude OCS #1 opinions and report. Docket No. 1589-2. They contend that OCS #1 opinions are unreliable, as (1) OCS #1 cherry-picked evidence

United States District Court
Northern District of California

and intentionally ignored information that did not support his desired conclusion that Ashker would be unsafe in GP; (2) his opinions are based on confidential memoranda that contain material discrepancies from their sources; and (3) he failed to consider the opinions of other CDCR subject matter experts who investigated Ashker's safety and came to the conclusion that Ashker could be safely housed in GP. *Id.* at 3.

Defendants oppose the motion. Docket No. 1626-1. Defendants argue that the Court "should admit expert testimony important for understanding the specialized issues in this case, including the rules of the Aryan Brotherhood prison gang and the implications of violating those rules: the actual reason Ashker was kept in restricted housing." *Id.* at 1. Defendants further contend that OCS #1 opinions are admissible because they are "based on his knowledge and experience in the correctional system and his years of gang investigation work," as well as his "review of documents and information from other investigators and about Ashker specifically." *Id.* at 5.

Under Federal Rule of Evidence 702, an expert is qualified as a witness if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Before admitting expert testimony, a district court must "assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citation omitted). "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Id.* (citation and internal quotation marks omitted).

[REDACTED] testimony is based on his specialized knowledge and training in investigating prison gangs, including the AB, as well as his review of documents relevant to Ashker's safety. Where, as here, the expert testimony in question is based primarily on the expert's specialized knowledge (as opposed to the expert's scientific or technical knowledge), the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable" and the admissibility

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 46 of 65

United States District Court
Northern District of California

of that type of expert testimony instead "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (citation omitted). Further, "in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." *Id.* at 1168 (citation and internal quotation marks omitted).

The Court finds, in its discretion, that OCS #1 specialized knowledge and experience in investigating prison gangs and the AB, as well as his review of documents relevant to the question of whether Ashker would be safe in GP, are sufficient to serve as a reliable foundation for his opinions. *See Primiano*, 598 F.3d at 564 ("[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case.") (citation and internal quotation marks omitted). The Court also finds that OCS #1 opinions are relevant to, and will assist the Court in resolving, the issues now before it. Because OCS #1 opinions have a reliable foundation and are relevant, they are not subject to exclusion under Rule 702. *Primiano*, 598 F.3d at 564; *Hankey*, 203 F.3d at 1169.

For the reasons discussed in the Findings of Fact, however, the Court is not persuaded by OCS #1 opinions regarding Ashker's safety.

## III. Plaintiffs' motion to enforce Paragraph 54 in connection with retaliation in Ashker's housing placements

As noted, Plaintiffs contend that three separate housing placements by Defendants constitute retaliation against Ashker in violation of Paragraph 54: (1) HQ #1 June 1, 2017, countermand of the ICC decision to release Ashker to GP, which led to Ashker's retention in ASU; (2) HQ #4 August 4, 2017, DRB determination that Ashker would be unsafe in GP and should be housed in RCGP; and (3) HQ #5 May 27, 2021, DRB determination to the same effect.

"[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (citation and internal quotation marks omitted). "The most fundamental of the constitutional protections that prisoners

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 47 of 65

retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts, for '[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices.'" *Id.* (citation omitted). Accordingly, while courts should "accord adequate deference to the judgment of the prison authorities," courts should not "condone" retaliation against a prisoner for exercising his First Amendment rights or threatening to do so. *Id.*

The parties agree that the standard for establishing retaliation in violation of Paragraph 54 is the one set forth in *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). That standard requires showing, by a preponderance of the evidence: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights," or that he suffered some other harm, and that "(5) the action did not reasonably advance a legitimate correctional goal." *Id.*

The Ninth Circuit has held that the *Rhodes* standard "strike[s] th[e] balance" between, on the one hand, ensuring that prison officials do not retaliate against a prisoner for exercising his First Amendment rights and, on the other hand, deferring to "reasonable decisions of prison officials." *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) ("We have long recognized that a corrections officer may not retaliate against a prisoner for exercising his First Amendment right to report staff misconduct. . . . At the same time, we must defer to reasonable decisions of prison officials. . . . When a prisoner claims retaliation, we strike this balance by requiring him to show that (1) 'a state actor took some adverse action . . . (2) because of (3) [the] prisoner's protected conduct, . . . that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'") (quoting *Rhodes*, 408 F.3d at 559). Accordingly, the *Rhodes* standard takes into account and incorporates the deference that must be afforded to prison officials.

Defendants do not dispute that the challenged housing determinations were actions by state actors, or that Ashker's activities and role in this litigation are protected conduct. Accordingly, the

United States District Court
Northern District of California

Court evaluates below whether Plaintiffs have met their burden to establish the other elements for a retaliation claim under *Rhodes*.

For the reasons below, the Court finds and concludes that Plaintiffs have shown by a preponderance of the evidence that Defendants substantially failed to comply with Paragraph 54 in connection with the three housing placements at issue. The Court finds that the evidence to which Plaintiffs point is sufficient to establish that the proffered basis for these housing placements, namely that the AB is targeting Ashker for assault or murder [redacted] f and that Ashker cannot safely house in any GP as a result, is pretext for retaliation against him for his participation and activities in this litigation, which are protected under the First Amendment.

**1. Adverse action**

The first element of the *Rhodes* standard requires a showing that a state actor took an adverse action. An adverse action is a negative repercussion and "need not be an independent constitutional violation." *Watison v. Carter*, 668 F.3d 1108, 1114-16 (9th Cir. 2012); *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997). It may be an action that otherwise could be legitimate when taken for a nonretaliatory reason. *See Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995). "[T]he mere threat of harm can be an adverse action in the retaliation context." *Shepard*, 840 F.3d at 689 (citation and internal quotation marks omitted).

**a. HQ #1 countermand of the ICC decision to release Ashker to GP**

Plaintiffs contend that HQ #1 June 1, 2017, summary countermand of Ashker's approval by the ICC for GP housing is an adverse action because it resulted in his retention in ASU. Plaintiffs have presented evidence that ASU placement is a negative repercussion because prisoners enjoy fewer privileges there than in GP. Ashker declares that he cannot participate in rehabilitation programs or receive contact visits in ASU. Ashker Decl. ¶¶ 10-11. Defendants do not dispute this.

The Court finds and concludes that HQ #1 countermand on June 1, 2017, of the ICC's decision to release Ashker to GP, which resulted in his retention in ASU, was an adverse action. *See Shepard*, 840 F.3d at 688 ("In *Watison v. Carter*, we found that being placed in administrative

United States District Court
Northern District of California

United States District Court
Northern District of California

segregation constitutes an adverse action.") (citation omitted). The first element of the *Rhodes* test is, therefore, met with respect to HQ #1 countermand of the ICC decision.

**b. HQ #4 and HQ #5 DRB recommendations that Ashker be housed in RCGP**

Plaintiffs contend that HQ #4 and HQ #5 recommendations on August 4, 2017, and May 27, 2021, respectively, to place Ashker in RCGP, and not in any GP in the state, were adverse actions because this Court previously held that class members have a liberty interest in avoiding RCGP placement. In addition, Plaintiffs point to an AB rule that requires [redacted] arguing that this rule means that Ashker would not be safe in RCGP. Docket No. 1640-2 at 7.

Defendants respond in a footnote in their opposition that they dispute that "assignment to RCGP housing—which was created and is administered as Plaintiffs themselves negotiated—is an adverse action." Docket No. 1627-1 at 13 n.5. Defendants say nothing in their briefs about the AB rule requiring [redacted] or about whether this would create safety concerns for Ashker if he were housed in RCGP. During the hearing held on November 3, 2022, the Court asked Defendants about that alleged AB rule, and Defendants responded that they are aware of the rule and, without relying on any facts in the record, stated conclusorily that they would keep Ashker safe in RCGP.

This Court held in its orders granting Plaintiffs' motions to extend the settlement agreement that class members have a liberty interest in avoiding placement and retention in the RCGP in light of the fewer privileges that prisoners there enjoy relative to those in GP. *See* Docket No. 1440 at 24; Docket No. 1579 at 17. That the RCGP was instituted as part of the settlement of this lawsuit, as an improvement over the former PBSP SHU, does not alter this conclusion. The Court held in its order granting Plaintiffs' second motion to extend the settlement agreement that Defendants systemically deprive class members of meaningful periodic review of their RCGP placements and that class members are held in RCGP based on historical evidence of safety concerns without verifying whether those security threats continue to exist, in violation of Paragraph 27. Docket No. 1579 at 22-31. The record now before the Court contains additional

evidence that the RCGP is not being administered as the parties negotiated. As discussed above, the statements that OCS #3 [redacted] suggest that RCGP placements and retentions are made based on factors that are not contemplated in Paragraph 27, [redacted]. This implies that Defendants may retain prisoners in RCGP without verifying on a periodic basis that threats to their safety continue to exist, as Paragraph 27 requires. Accordingly, HQ #4 and HQ #5 recommendations to place Ashker in RCGP are adverse actions that satisfy the first element of the *Rhodes* test.

**2. Causal connection between adverse action and protected conduct**

The *Rhodes* test requires a showing that there is a causal connection between the adverse action against the prisoner and the prisoner's protected conduct. To establish that causal link, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation omitted). That causal connection establishes a defendant's retaliatory motive. *Shepard*, 840 F.3d at 689 (citations omitted). The causal connection can be established by way of direct evidence, circumstantial evidence that the defendant's explanations for the adverse action were pretextual, or both. *Id.* at 690; *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

That the defendant's explanations for the adverse action were pretextual can be supported by showing "proximity in time between protected speech and the alleged retaliation." *Shepard*, 840 F.3d at 690 (citation and internal quotation marks omitted). It can also be established by showing that the defendant gave inconsistent or unsupported reasons or explanations for the adverse action. *See id.*; *see also Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 870 (9th Cir. 2014) (holding that defendant's "shifting, inconsistent reasons . . . are themselves evidence of pretext"). It can also be established by showing that the defendant attempted to hide his involvement in the adverse action or that he circumscribed typical procedures that would have been followed for a typical prisoner. *See Pratt v. Rowland*, 856 F. Supp. 565, 569-570 (N.D. Cal. 1994), *rev'd on other grounds*, 65 F.3d 802 (9th Cir. 1995) ("Plaintiff's transfer is particularly suspect in light of Defendants' attempt to obscure the origin of the transfer order," which came in

United States District Court
Northern District of California

United States District Court
Northern District of California

"circumvention of normal Departmental Review Board procedures" as a "direct order from the Director").

a. HQ #1 **countermand of the ICC decision to release Ashker to GP**

Plaintiffs contend that the reasons that HQ #1 gave for countermanding the ICC decision to release Ashker to GP, namely that he was concerned for Ashker's safety and had reason to believe that he would be murdered in GP, were pretextual and were intended to hide the real motive for his action, which was to retaliate against Ashker for his activities and role in this litigation. Plaintiffs point to the following evidence to support their argument: (1) HQ #1 was aware of Ashker's litigation activities and became involved in Ashker's housing determination only because of Ashker's status as a high-profile prisoner; (2) HQ #1 explanation as to why he believed that Ashker would be assaulted if he were released to GP lacks credibility and is contradicted by other evidence in the record; (3) HQ #1 spontaneous, summary, and unilateral countermand of the ICC's decision was not typical of CDCR's practices; and (4) Defendants' efforts to hide from Plaintiffs and the magistrate judge for years that the real reason for Ashker's remand to ASU on June 1, 2017, was that HQ #1 had summarily ordered it.

HQ #1 motivation is rendered suspect in that his involvement on June 1, 2017, in Ashker's housing was *because of* Ashker's high-profile status due to his litigation activities. HQ #1 was aware of Ashker's leadership role in this litigation and in the hunger strikes he organized, which are related to this litigation. HQ #1 Dep. Tr. at 8-18, 25-27. HQ #1 testified that he considered Ashker's situation "significant" because of his "stature" and that this led him to be kept "in the loop" as to Ashker's housing. *Id.* All this suggests that, but for Ashker's high-profile status, HQ #1 would not have intervened on June 1, 2017, and Ashker would have remained on the bus to the GP facility at KVSP pursuant to the ICC's determination.

For the reasons discussed at length in the Findings of Fact, the Court does not find credible HQ #1 convoluted narrative of how he came to believe that Ashker would be assaulted or killed by the AB if he were released to GP. His description of having talked to two specific staff members is undermined, if not directly contradicted, by other evidence in the record, including that of CDCR personnel. And, even if it were true that HQ #1 had spoken with the two different staff

members that Defendants claim he did, the Court is not persuaded that HQ #1 had any reasonable basis to credit or give weight to statements made by these staff members about Ashker's safety. HQ #1 made no attempt to determine the ICC's reason for releasing Ashker to GP or the adequacy of the safety investigation that had already occurred, and he did not himself order a further investigation into Ashker's safety. Defendants respond that HQ #1 failure to ask for additional information as to why the ICC had decided to release Ashker is not suspicious or indicative of pretext because KVSP #1 testified that HQ #1 had "much more experience overall in regards to STGs and safety concerns" than the ICC had. Docket No. 1627-1 at 15. This argument is not persuasive because KVSP #1 testified that, in the context of Ashker's safety concerns, he had more knowledge than HQ #1 KVSP #1 Dep. Tr. at 155, and that the ICC's determination to release Ashker to GP reflected the consensus of KVSP administrators, including KVSP #1 himself. KVSP #1 along with other KVSP administrators, had adopted the recommendation of the KVSP IGI Lieutenant who investigated Ashker's safety after [redacted] the recommendation was to release Ashker to GP. KVSP #1 Dep. Tr. at 86-88, 97-98, 130, 134-35, 155. All of this suggests that the KVSP ICC's determination to release Ashker to GP on June 1, 2017, which was made pursuant to the usual ICC procedures, was a reasoned and sensible decision. Most recently, Defendants argue that HQ #1 explained in his declaration of April 16, 2022, that what he "actually considered" when reversing the ICC was preventing a murder like that of another prisoner. Docket No. 1627-1 at 15. For the reasons discussed in the Findings of Fact, the Court does not find HQ #1 declaration testimony about this prisoner, which he failed to mention during his December 2019 deposition and which he made a few months after other CDCR staff contradicted his deposition testimony, to be credible. Further, that HQ #1 explanations for his actions on June 1, 2017, have shifted over time further supports a finding that such explanations are pretextual. *See Ollier*, 768 F.3d at 870 (holding that defendant's "shifting, inconsistent reasons . . . are themselves evidence of pretext").

HQ #1 reversal of the ICC's decision came relatively close in time to a letter brief that Plaintiffs filed in this action in March 2017 alleging that Ashker was experiencing retaliation by KVSP staff for having filed grievances against KVSP staff. *See* Docket No. 1599-2 (Ex. CF at 3-4); *see also Shepard*, 840 F.3d at 690 ("proximity in time between protected speech and the

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 53 of 65

alleged retaliation" is evidence of pretext). This, when combined with all of the other evidence described above, is indicative of a causal connection between HQ #1 reversal of the ICC's decision on June 1, 2017, and Ashker's ongoing litigation activities in this case, which raises the inference of an intent to retaliate against Ashker for those activities.

It was very unusual for anyone from CDCR headquarters to countermand an ICC's determination as to a prisoner's housing, which also is indicative of pretext. *See Pratt*, 856 F. Supp. at 569-570. KVSP #1 could not recall another instance in which "anyone from headquarters outside of the DRB" overruled his ICC determination of where a prisoner could safely house. KVSP #1 Dep. Tr. at 140. It would seem even more unusual that a high-ranking official from headquarters would unilaterally, summarily, and spontaneously order a prisoner off the bus to his new placement, ignoring established procedures and committees for making placement decisions. Defendants respond that HQ #1 in remanding Ashker to ASU, was complying with California regulations that require that a prisoner be immediately removed from GP and placed in ASU if there are concerns for his safety. This argument assumes that HQ #1 had a reasonable basis for believing that Ashker would not be safe in GP, but the evidence does not support that assumption. Further, those regulations require that a prisoner placed in ASU be provided with a notice that includes "sufficient information and detail to allow the inmate to present a written or verbal defense to the stated reason(s) and circumstances for segregation[.]" *See* 15 Cal. Code Regs. § 3335(b)(1) & (b)(3). The only information that Defendants later provided to Ashker about his remand to ASU was that the [redacted] indicated that an additional investigation into threats to his safety was necessary, which, as explained in the factual findings above, was not (and could not have been) the real reason for his return to ASU. That HQ #1 reversal of the ICC's determination appears to be a deviation from typical practices further supports the Court's finding that HQ #1 explanations for his actions on June 1, 2017, were pretextual. *See Pratt*, 856 F. Supp. at 569-570 (attempts to conceal the defendant's involvement in allegedly retaliatory action is evidence of pretext).

Here, Defendants concealed from the magistrate judge and Plaintiffs *for years* that HQ #1 order had been the reason for Ashker's remand to ASU. Defendants did not reveal HQ #1

involvement until after the magistrate judge granted in August 2019, over Defendants' objections, Plaintiffs' motion for discovery in the form of the identification and deposition of the person who decided to overrule the ICC's decision on June 1, 2017, to release Ashker to GP at KVSP. *See* Docket No. 1203 at 6-8. Defendants' statements to the magistrate judge in June 2017, and in various documents pertaining to Ashker's housing and safety concerns, about [redacted] having led to Ashker's remand to ASU, were misleading, to say the least. During the hearing on November 3, 2022, Defendants attributed their failure to disclose HQ #1 involvement to "crossed lines," without offering any details or further explanation. The Court is not persuaded that any reasonable explanation exists for Defendants' failure to disclose HQ #1 order, other than an effort to hide an improper motive on HQ #1 part.

In light of the foregoing, the Court concludes that Plaintiffs have shown by a preponderance of the evidence that the reasons Defendants have advanced for HQ #1 countermand of the ICC's decision were false and indicative of pretext. That is sufficient for Plaintiffs to establish the causation element and requisite retaliatory motive under the *Rhodes* standard with respect to this housing determination.

**b. HQ #4 DRB determination that Ashker cannot safely house in any GP and recommendation that he be housed in RCGP**

Plaintiffs contend that the safety rationale that HQ #4 provided for her August 4, 2017, DRB recommendation to place Ashker in RCGP was pretextual and was intended to hide the real motivation for her recommendation, which was to support and perpetuate Defendants' retaliation against Ashker for his activities and role in this litigation. Plaintiffs point to the following evidence to support their argument: (1) HQ #4 admitted during her deposition that retaliation against Ashker by KVSP staff played a role in her RCGP recommendation; (2) headquarters was involved in the preparation work for the August 4, 2017, DRB to an unusual degree and directed what was written about Ashker's safety in documents relevant to his housing; (3) the final DRB chrono, which was reviewed and approved by HQ #4 omitted accurate information that supported a finding that Ashker would *not* be unsafe in GP, as well as the CSU's recommendation prior to the DRB hearing to release Ashker to GP; and (4) the explanations that HQ #4 gave during her

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 55 of 65

deposition for having concluded that Ashker would be unsafe in GP are not credible and are inconsistent with other evidence.

The Court does not credit the explanations that HQ #4 provided during her deposition for concluding that Ashker would be targeted by the AB [REDACTED]. Some of the reasons she provided are not consistent with other facts in the record or are atypical grounds for finding that a prisoner cannot safely house in GP, which is indicative that such reasons are pretextual. *See Ollier*, 768 F.3d at 870 (holding that defendant's "shifting, inconsistent reasons . . . are themselves evidence of pretext"). Further, the record suggests that HQ #4 DRB determination was driven by motives *other* than the safety concerns that she claims to have been exclusively guided by. When HQ #4 made her DRB determination, she was aware of Ashker's role in this litigation and of grievances that Ashker had filed in 2017 against KVSP staff for alleged retaliation against him, and she admitted that her DRB determination was influenced by Ashker's grievances and litigation activities.

As discussed in the Findings of Fact, the evidence strongly suggests that high-ranking CDCR headquarters employees involved themselves in investigations of Ashker's safety to an unusual degree and steered the findings to create a record that Ashker would be unsafe in GP. The final DRB chrono that HQ #4 reviewed and approved furthered these efforts, in a deviation from typical practices. *See Pratt*, 856 F. Supp. at 569-570 (circumvention of typical procedures is evidence of pretext). The final DRB chrono omitted information that the CSU correctional counselor had intended, pursuant to typical practices, to be included; the omitted information indicated that Ashker would not be unsafe in GP, that Ashker had [REDACTED] [REDACTED], and that the CSU had recommended to HQ #4 before the DRB hearing that Ashker be released to GP. The reasons that Defendants have advanced for why this information was omitted from the final chrono are not persuasive, as discussed in the Findings of Fact.

The final DRB chrono that HQ #4 approved also contained misleading statements as to why the second investigation into Ashker's safety was initiated and it did not reveal either that Ashker had been remanded to ASU because of HQ #1 order or the reasoning that HQ #1 had provided for doing so. It is suspect that, when HQ #4 was asked during her deposition why she

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 56 of 65

had approved a DRB chrono that contained these misleading statements, she failed to answer the question directly, and instead attempted to justify HQ #1 reversal of the ICC on June 1, 2017, by testifying that the person who had served as ICC chair that day was an assistant warden and was insufficiently qualified. HQ #4 testimony that an assistant warden served as the ICC chair is contradicted by other evidence. HQ #4 efforts, in a document she approved, to hide HQ #1 involvement in Ashker's June 2017 remand to ASU, and later to try to justify HQ #1 action, is consistent with an effort to further and perpetuate HQ #1 retaliatory actions against Ashker. *See Pratt*, 856 F. Supp. at 569-570 (attempts to conceal the defendant's involvement in allegedly retaliatory action is evidence of pretext and retaliatory motive).

Plaintiffs requested that the Court draw an adverse inference of retaliatory motive on Defendants' part, based on Defendants' failure to preserve notes that HQ #8 took during a pre-DRB hearing that took place on August 3, 2017, as detailed in the Findings of Fact. It is undisputed that Defendants had notice that these notes were relevant to Ashker's retaliation allegations; Plaintiffs had moved on June 14, 2017, to enjoin alleged retaliation. *See* Docket No. 712. Plaintiffs have shown that they were prejudiced by Defendants' failure to preserve these notes, because HQ #8 testified that she could not recall what took place during the meeting. *See* HQ #8 Dep. Tr. at 177-82. The material changes that were made to the DRB chrono prior to its issuance to Ashker likely were made or discussed during this meeting, and HQ #8 notes of the meeting, therefore, could have revealed information that could have assisted Plaintiffs in establishing retaliation in violation of Paragraph 54. Accordingly, the Court grants Plaintiffs' request in part and draws a weak inference that, had HQ #8 notes been preserved, they would have revealed additional evidence that would help establish the causal element of the *Rhodes* standard. This is not a presumptive inference but a common-sense evidentiary rationale. *See Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (holding that a court may draw an adverse inference based on an "evidentiary rationale" which is "nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document").

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 57 of 65

The Court concludes that Plaintiffs have shown by a preponderance of the evidence that the safety rationale that Defendants have advanced for HQ #4 August 4, 2017, recommendation to place Ashker in RCGP is pretextual. That satisfies the causation element of the *Rhodes* standard for proof of retaliation for protected activity, with respect to this housing determination.

**c. HQ #5 DRB determination that Ashker cannot safely house in any GP and should be housed in RCGP**

Plaintiffs contend that the reason that Defendants provided for HQ #5 May 27, 2021, DRB recommendation to place Ashker in RCGP, which was that she was concerned that he would be assaulted or murdered in GP in the absence of new evidence that he had resolved his issues with the AB, was pretextual and intended to hide the real motivation for her recommendation. Plaintiffs contend that HQ #5 real motivation was to support and further Defendants' retaliation against Ashker for his activities and role in this litigation. Plaintiffs argue that pretext can be inferred from the fact that HQ #5 failed to credit more recent evidence indicating that Ashker was in good standing with the AB. Plaintiffs contend that HQ #5 stated reason for failing to consider the recent evidence is inconsistent with other evidence in the record, including the deposition testimony of OCS #1 and HQ #8 Plaintiffs argue that, instead, HQ #5 relied on historical evidence that pre-dates the October 2019 litigation hold.

As discussed in the Findings of Fact, the evidence suggests that HQ #5 participated in Defendants' efforts to hide HQ #1 involvement in Ashker's June 2017 remand to ASU and to further HQ #1 retaliation against Ashker by helping to perpetuate the pretextual reasoning for keeping Ashker from residing in GP. She was privy to HQ #1 communications regarding [redacted] and HQ #1 email about the need to devise a "plan" about Ashker after [redacted]. She provided inaccurate information to the magistrate judge about why Ashker had been remanded to ASU and why a second investigation into threats to his safety was necessary. HQ #5 participation in Defendants' efforts to hide HQ #1 involvement in Ashker's remand to ASU supports an inference that the safety rationale for the May 27, 2021, DRB recommendation for RCGP placement was pretext for Defendants' ongoing retaliation against

Ashker, which began with HQ #1 summary remand of Ashker to ASU on June 1, 2017. *See Pratt*, 856 F. Supp. at 569-570.

HQ #5 refused to credit recent confidential information that Ashker was not a target of the AB and was in good standing with the group, and she did so on the basis that the information was from 2013 and not indicative of whether Ashker was currently being targeted. But HQ #5 interpretation of the confidential information is inconsistent with that of other skilled CDCR staff, including correctional counselor HQ #8 and Defendants' prison gang expert OCS #1 HQ #8 and OCS #1 both testified that they understood the information to reflect the confidential informant's knowledge of Ashker's safety as of the date of his interview, which took place in 2021. Accordingly, the reason she provided for not crediting the confidential information that Ashker is in good standing with the AB is not credible.

HQ #5 appears to have deviated from typical practices and procedures by conducting her own investigation into the accuracy and reliability of the confidential information although that task is typically performed by lower-level staff; she appears to have relied on a transcript that was not documented in the DRB chrono she approved although all documents considered by the DRB are supposed to be described in the DRB chrono. This further supports an inference that the safety rationale underlying the DRB recommendation for RCGP placement was pretextual. *See Pratt*, 856 F. Supp. at 569-70 (circumvention of normal procedures is evidence of pretext).

Additionally, the historical evidence of safety threats that the DRB recommendation for RCGP placement relied upon originated from confidential memoranda or reports generated prior to October 2019, at which time the litigation hold was instituted to prevent the destruction of source recordings and documents. The Court has found that the reliability of such memoranda and reports as to whether Ashker is, in fact, unsafe as a result of [redacted] is questionable in light of the many material discrepancies that Plaintiffs presented. The reliability of such memoranda and reports is questionable for the additional reason that, since October 2019, when Defendants implemented the litigation hold, there have been no more confidential memoranda or debrief reports indicating that Ashker is targeted by the AB. That raises an inference that the inaccuracies in the confidential source memoranda and reports produced before

United States District Court
Northern District of California

the litigation hold, indicating that Ashker was being targeted by the AB, were intentional misrepresentations aimed at generating a record that would support a pretextual safety-related rationale for placing Ashker in RCGP.

Defendants respond that the May 27, 2021, DRB recommendation that Ashker be placed in RCGP because he could not safely reside in any GP, was appropriate and justified. They contend that [REDACTED] made him a target for assault or murder by the group; that historical confidential evidence indicated that he was being targeted by the AB for [REDACTED]; and that the "lack of more recent evidence of the threat to Ashker is not evidence of the threat's absence." Docket No. 1627-1 at 19. The Court is not persuaded. Defendants' argument assumes that AB rules are enforced without exception but, as discussed above, the record does not support that assumption. Defendants have not disputed evidence of case-by-case enforcement of AB rules, including the rules [REDACTED]. They do not dispute evidence that [REDACTED] did not result in assaults in GP on the AB members who committed such infractions. That undisputed evidence, which was not considered by Defendants' prison gang expert, undermines the theory that Ashker will be targeted by the AB [REDACTED] Defendants' argument also assumes that the historical confidential information indicating that Ashker was being targeted by the AB [REDACTED] is reliable, but the Court has found that it is not.

Plaintiffs requested that the Court infer retaliatory motive based on Defendants' failure to preserve recordings of confidential-source interviews that relate to Ashker's safety that existed or were created as of June 14, 2017, the date when Plaintiffs moved to enjoin retaliation against Ashker. The Court grants that request in part. Plaintiffs have shown, and Defendants have not disputed, that Defendants had notice that such recordings were relevant to this litigation as of June 14, 2017, when Plaintiffs first moved to enjoin retaliation against Ashker in his housing placements. Further, the Court finds that Plaintiffs were prejudiced by the destruction of these recordings because it prevented them from testing the accuracy of the confidential memoranda and reports generated between June 14, 2017, and October 2019, when the litigation hold was

United States District Court
Northern District of California

implemented, that were used to recommend that Ashker be placed in RCGP.[9] The Court will, accordingly, infer that, had these recordings been preserved, they would have revealed additional evidence that would have helped Plaintiffs establish the causation element under the *Rhodes* standard. *See Akiona*, 938 F.2d at 161. The Court does not infer that these recordings, on their own, would have established the causation element under the *Rhodes* standard for any of the housing determinations at issue.

The Court concludes that Plaintiffs have shown by a preponderance of the evidence that the safety rationale that Defendants have advanced for the May 27, 2021, DRB recommendation that Ashker be placed in RCGP is pretextual. That is sufficient for Plaintiffs to establish the causation element of the *Rhodes* standard with respect to this housing determination.

**3. Harm**

The *Rhodes* test requires that the adverse action would have "chilled or silenced a person of ordinary firmness" from exercising their rights. *Watison*, 668 F.3d at 1114. "[T]he harm need only be 'more than minimal.'" *Shepard*, 840 F.3d at 691; *see also Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) ("In *Rhodes*, we explicitly held that an objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'") (citation omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm." *Brodheim*, 584 F.3d at 1269.

Plaintiffs argue that "CDCR's actions resulted in Ashker being barred from return to GP, causing him great harm." Docket No. 1594-2 at 19. They argue that "[t]he rumors and falsified information spread by KVSP staff also have caused Ashker substantial harm." *Id.* Defendants do not respond to these arguments.

[9] In their supplemental brief, Defendants did not address Plaintiffs' request for an adverse inference based on the destruction of recordings. *See* Docket No. 1728.

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 61 of 65

United States District Court
Northern District of California

The Court finds and concludes that, due to the GP privileges of which prisoners in ASU and RCGP are deprived, the adverse actions at issue would have chilled or silenced a prisoner of ordinary firmness. The actions have caused Ashker harm in the form of the loss of those privileges. Accordingly, the harm element of the *Rhodes* standard is met.

**4. Advancement of a legitimate correctional goal**

The *Rhodes* test requires that the adverse action did not "reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68. Plaintiffs have cited authorities, which Defendants have not distinguished, holding that an adverse action does not advance a legitimate correctional goal if the adverse action was retaliatory. *See Shepard*, 840 F.3d at 692 ("As *Bruce* recognized, a prison official who uses a valid procedure as subterfuge to obscure retaliation 'cannot assert that [his action] served a valid penological purpose, even though [the prisoner] may have arguably ended up where he belonged.'") (citing *Bruce*, 351 F.3d at 1289); *Bruce*, 351 F.3d at 1289 ("It is clear, and Bruce concedes, that prisons have a legitimate penological interest in stopping prison gang activity. But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have arguably ended up where he belonged.") (internal citation omitted); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) ("[P]laintiff has alleged that [a prison official's] actions were retaliatory and were arbitrary and capricious. He has thereby sufficiently alleged that the retaliatory acts were not a reasonable exercise of prison authority and that they did not serve any legitimate correctional goal.").

Defendants argue that the housing placements at issue were for the legitimate penological purpose of keeping Ashker safe.

For the reasons discussed above, the Court has found and concluded that the safety rationale that Defendants have advanced for the housing placements at issue is a pretext for retaliation against Ashker for his participation and litigation activities in this case. Accordingly, Defendants cannot establish that the housing placements at issue advanced a valid penological

purpose, even if he arguably ended up where he belonged. *See Shepard*, 840 F.3d at 692; *Bruce*, 351 F.3d at 1289; *Rizzo*, 778 F.2d at 532.

Further, as discussed in detail above, the Court is not persuaded that the record supports the conclusion that Ashker is being targeted by the AB [REDACTED]. But for a series of purported coincidences that HQ #1 claims led him to countermand the ICC's decision on June 1, 2017, Ashker would have been released to GP on that date despite [REDACTED]. The ICC's decision was made pursuant to standard procedures. It reflected the reasoned judgment of KVSP's IGI Lieutenant, warden, and other KVSP administrators and, therefore, appears to have been a sensible and well-supported determination. The totality of the evidence before the Court strongly suggests that, since HQ #1 countermanded the ICC's decision on June 1, 2017, for reasons that this Court has found to be pretextual, Defendants' investigations of Ashker's safety, their generation of relevant documents, and their housing determinations have resulted in the creation of an inaccurate and incomplete record, in order to support Ashker's placement in RCGP. For that reason, the Court is not persuaded that the record that was generated since HQ #1 intervention on June 1, 2017, is an accurate or reliable basis for determining whether Ashker is a target of the AB [REDACTED].

Additionally, the Court also is not persuaded that, even if Ashker were under threat by the AB [REDACTED] CDCR would not be able to keep him safe in *any* GP yard in the state. The record shows that CSU staff identified at different points various GP yards where Ashker could safely live [REDACTED]. For example, in preparation for Ashker's May 27, 2021, DRB, CSU recommended certain Level IV and Level III GP facilities where Ashker could program in the event that the "DRB determine[d] that Ashker can be safely released to a GP upon further evaluation of the evidence[.]" Docket No. 1598 at ECF header page 29 (Ex. AW). HQ #5 did not consider any of those GP options, persisting in her conclusion that "the RCGP remains appropriate." *Id.* at 30-31. Defendants have not explained why these GP yards are not viable alternatives to RCGP placement. Defendants' failure to meaningfully consider these GP options constitutes further evidence that their aim is not to find a

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 63 of 65

safe GP placement for Ashker, but to further the retaliatory conduct that began when HQ #1 remanded him to ASU on June 1, 2017.

### IV. Remedies

Under Paragraph 53, the Court may issue an order "to achieve substantial compliance with the Agreement's terms" if Plaintiffs have established by a preponderance of the evidence that Defendants have not substantially complied with those terms. SA ¶ 53.

Here, the parties are in agreement that the appropriate remedy for retaliation in violation of Paragraph 54 would be to restore Ashker to a position where he would have been but for the retaliation.

Plaintiffs request an order (1) declaring that Defendants have retaliated against Ashker in violation of Paragraph 54; (2) requiring Defendants to place Ashker in a GP; and (3) requiring the parties to meet and confer "to ensure that [Ashker's] interests in safety and appropriate programming are taken into account in these remedial measures." Proposed Order, Docket No. 1601-5. Plaintiffs also request that [REDACTED] Docket No. 1594-2 at 25. Plaintiffs did not explain what [REDACTED] Plaintiffs suggest that, in ordering that Defendants place Ashker in GP, "the Court could consider appointing an expert or special master to evaluate which prisons and programs would be appropriate." *Id.*

Defendants oppose Plaintiffs' requested remedies because they would order Defendants to "selectively edit CDCR records and to micromanage Ashker's housing by ordering a discretionary behavioral override to house him at a lower-level institution than he was assigned to in 2017," which Defendants contend amounts to "overreach." Docket No. 1627-1 at 25. Defendants further argue, "The only relief to which Ashker could be entitled is for the Court to order his return to a Level IV GP facility, despite CDCR's assessment that Ashker will be murdered by the AB." *Id.*

In their reply, Plaintiffs propose a "bifurcated resolution of this Motion, whereby the Court first determines whether to issue a declaration that retaliation has occurred and then determines remedy." Docket No. 1640-2 at 15. They state that they "would be open to meeting and

United States District Court
Northern District of California

Case 4:09-cv-05796-CW Document 1750 *SEALED* Filed 01/05/23 Page 64 of 65

conferring to resolve the placement issue without the need for a specific order, and/or the appointment of an expert or special master." *Id.*

Because Plaintiffs' request for an order declaring that Defendants retaliated against Ashker in violation of Paragraph 54 is justified in light of the above findings and conclusions, the Court GRANTS that request and declares that Defendants retaliated against Ashker in violation of Paragraph 54 of the SA in making the three housing decisions at issue.

The Court also GRANTS Plaintiffs' request to proceed with a bifurcated approach that requires the parties to meet and confer with respect to Plaintiffs' other requested remedies. The Court DEFERS ruling on those other requested remedies until the parties have met and conferred.

**CONCLUSION**

For the reasons discussed above, the Court accepts the magistrate judge's proposed findings in part and rejects them in part. The Court accepts the magistrate judge's recommendation to deny Plaintiffs' motion to exclude OCS #1 expert opinions. The Court otherwise declines to accept the magistrate judge's proposed findings and recommendations, and concludes that Plaintiffs have established by a preponderance of the evidence that Defendants substantially failed to comply with SA Paragraph 54's anti-retaliation provision with respect to Ashker's housing placements. The Court GRANTS Plaintiffs' request for an order declaring that Defendants retaliated against Ashker for his participation and activities in this action, which are protected under the First Amendment. The Court DEFERS its consideration of Plaintiffs' other requested remedies. The parties shall meet and confer no later than thirty days of the date of this order, to try to agree on an appropriate housing placement for Ashker and Plaintiffs' request for [redacted]. The parties shall file a joint or separate statements, informing the Court of the outcome of their meet-and-confer efforts and proposing further steps, no later than forty-five days of the date of this order.

This order shall be filed under seal in the first instance such that only counsel for the parties will be granted access to it. Within twenty-one days of the date this order is filed under seal, the parties shall file a joint motion to redact portions of the order if redactions are necessary for a legitimate penological purpose, such as ensuring the safety of any class member or CDCR

United States District Court
Northern District of California

United States District Court
Northern District of California

staff or institutions. The joint motion shall be accompanied by a proposed order and shall include as an attachment a redacted version of this order that reflects the parties' proposed redactions. If no redactions are necessary, the parties shall, within ten days of the date this order is filed under seal, file a stipulation providing that no redactions are necessary and a proposed order that the order can be filed on the docket without any redactions.

IT IS SO ORDERED.

Dated: 1/5/2023

CLAUDIA WILKEN
United States District Judge